# EXHIBIT 43

SDMS # 88104223

# POOR LEGIBILITY

ONE OR MORE PAGES IN THIS DOCUMENT ARE DIFFICULT TO READ
DUE TO THE QUALITY OF THE ORIGINAL

SFUND RECORDS CTR
1654-05680

AR3741

SFUND RECORDS CTR
88104223

# COMMENTS ON THE SROA II, NINE CRITERIA ANALYSIS, PROPOSED PLAN AND RELATED DOCUMENTS

October 29, 1992

Submitted by:

Atlantic Richfield Company
Phillips Petroleum Company
Shell Oil Company
Texaco Inc.
and
Union Oil Company of California

Volume III

# TABLE OF CONTENTS


| | PAGE NO. |
|---|---|
| LIST OF TABLES/LIST OF FIGURES | iv |
| 1.0 INTRODUCTION | 1-1 |
| 1.1 History | 1-1 |
| 1.2 Scope of Report | 1-3 |
| 1.3 Sources of Information | 1-5 |
| 1.4 Report Organization | 1-5 |
| 2.0 SITE CHARACTERISTICS | 2-1 |
| 2.1 Site Background | 2-1 |
| 2.2 General Site Conditions | 2-2 |
| 2.3 Sump Conditions | 2-4 |
| 3.0 REMEDIATION ALTERNATIVES EVALUATED IN THE SROA | 3-1 |
| 3.1 General | 3-1 |
| 3.2 Options Included in Supplemental Reevaluation of Alternatives (SROA) | 3-1 |
| 3.2.1 Total Excavation and Redisposal | 3-1 |
| 3.2.2 RCRA Equivalent Onsite Containment | 3-2 |
| 3.2.3 RCRA Equivalent Closure | 3-3 |
| 3.2.4 Excavation and Onsite Incineration | 3-3 |
| 4.0 SUMMARY OF BASELINE RISK ASSESSMENT AND REMEDIATION OBJECTIVES | 4-1 |
| 4.1 Introduction | 4-1 |
| 4.2 General | 4-1 |
| 4.3 Baseline Risks | 4-2 |
| 4.4 Health Issues Associated With Excavation | 4-3 |
| 4.4.1 $SO_2$ Effects | 4-3 |
| 4.4.2 Total Hydrocarbon Effects | 4-4 |
| 4.4.3 Tetrahydrothiophene Effects | 4-4 |
| 4.5 Remediation Goals | 4-5 |

# TABLE OF CONTENTS
(Continued)


| | PAGE NO. |
|---|---|
| 5.0 REMEDIATION GOALS | 5-1 |
| 5.1 General | 5-1 |
| 5.2 Specific Remediation Goals | 5-4 |
| 5.3 Design Procedures to Meet Goals | 5-5 |
| 6.0 DEVELOPMENT OF SELECTIVE EXCAVATION ALTERNATIVE | 6-1 |
| 6.1 General | 6-1 |
| 6.2 Types of Sump Conditions | 6-4 |
| 6.3 Description of Individual Remediation Activities | 6-5 |
| 6.3.1 Elevated Arsenic Material Excavation (Type 1 Area) | 6-5 |
| 6.3.2 In Situ Treatment and Solidification Procedures (Type 3 Areas) | 6-6 |
| 6.3.3 Tarry Material Excavation (Type 2 Areas) | 6-8 |
| 6.3.4 Special Closure Cap Design Considerations | 6-10 |
| 6.3.5 Final Closure Activities | 6-11 |
| 7.0 RECOMMENDED ALTERNATIVE DESCRIPTION | 7-1 |
| 7.1 General | 7-1 |
| 7.2 Selective Excavation Alternative Description | 7-1 |
| 7.2.1 General | 7-1 |
| 7.2.2 Site Condition No. 1 - Existing Conditions | 7-3 |
| 7.2.3 Site Condition No. 2 - Infrastructure Requirements | 7-4 |
| 7.2.4 Site Condition No. 3 - Elevated Arsenic Removal | 7-6 |
| 7.2.5 Site Condition No. 4 - Neutralization, Partial Stabilization, and Selective Excavation | 7-7 |
| 7.2.6 Site Condition No. 5 - Commencement of In Situ Treatment and Solidification Activities | 7-7 |
| 7.2.7 Site Condition No. 6 - Commencement of Closure Activities | 7-8 |
| 7.2.8 Site Condition No. 7 - Commencement of Cap Installation | 7-9 |
| 7.2.9 Site Condition No. 8 - Site Condition After Closure | 7-9 |
| 7.2.10 Predesign Activities | 7-10 |
| 7.3 Recommended Alternative Cost Evaluation | 7-11 |

# TABLE OF CONTENTS
## (Continued)

PAGE NO.

8.0 PUBLIC HEALTH ASSESSMENT EXPOSURE AND TOXICITY ASSESSMENTS, RISK CHARACTERIZATION AND ALTERNATIVE RISK EVALUATION — 8-1
- 8.1 Introduction — 8-1
- 8.2 Public Health Assessment — 8-2
  - 8.2.1 Background on Preferred Alternative — 8-2
  - 8.2.2 Implementation Risks — 8-4
    - 8.2.2.1 Total Excavation and Incineration Remedial Alternative — 8-4
    - 8.2.2.2 Selective Excavation, Treatment and RCRA-Equivalent Closure Remedial Alternative — 8-8
    - 8.2.2.3 Comparison of Alternatives — 8-10
  - 8.2.3 Residual Risks — 8-12
    - 8.2.3.1 Total Excavation — 8-13
    - 8.2.3.2 Selective Excavation, Treatment and RCRA-Equivalent Closure Remedial Alternative — 8-14
    - 8.2.3.3 Comparison of Alternatives — 8-16
  - 8.2.4 Transportation Risk — 8-16
    - 8.2.4.1 Total Excavation — 8-17
    - 8.2.4.2 Selective Excavation, Treatment and RCRA-Equivalent Closure Remedial Alternative — 8-18
    - 8.2.4.3 Comparison of Alternatives — 8-18
  - 8.2.5 Risk Comparisons for the Five Proposed Remediation Alternatives — 8-19

9.0 NCP ANALYSES — 9-1
- 9.1 Introduction — 9-1
- 9.2 Formulation of the Selective Excavation Alternative — 9-1
- 9.3 NCP Criteria — 9-2
  - 9.3.1 Overall Protection of Human Health and the Environment — 9-3
  - 9.3.2 Compliance with ARARs — 9-3
  - 9.3.3 Long-Term Effectiveness and Permanence — 9-3
  - 9.3.4 Reduction of Toxicity, Mobility or Volume Through Treatment — 9-3
  - 9.3.5 Short-Term Effectiveness — 9-4
  - 9.3.6 Implementability — 9-4
  - 9.3.7 Cost Effectiveness — 9-4
  - 9.3.8 State Acceptance — 9-4
  - 9.3.9 Community Acceptance — 9-4

# TABLE OF CONTENTS
(Continued)


| | PAGE NO. |
|---|---|
| 9.4 NCP Analysis of the Recommended Approach - Selective Excavation Treatment and RCRA Equivalent Closure Alternative | 9-5 |
| 9.4.1 Overall Protection of Human Health and the Environment | 9-5 |
| 9.4.2 Compliance with ARARs | 9-6 |
| 9.4.3 Long-Term Effectiveness and Permanence | 9-6 |
| 9.4.4 Reduction of Toxicity, Mobility or Volume Through Treatment | 9-7 |
| 9.4.5 Short-Term Effectiveness | 9-9 |
| 9.4.6 Implementability | 9-9 |
| 9.4.7 Cost Effectiveness | 9-10 |
| 9.4.8 State Acceptance | 9-10 |
| 9.4.9 Community Acceptance | 9-10 |
| 9.5 Comparative NCP Analysis of Alternatives | 9-17 |
| 9.5.1 Overall Protection of Human Health and the Environment | 9-18 |
| 9.5.2 Compliance with ARARs | 9-19 |
| 9.5.3 Long-Term Effectiveness and Permanence | 9-19 |
| 9.5.4 Reduction of Toxicity, Mobility or Volume Through Treatment | 9-20 |
| 9.5.5 Short-Term Effectiveness | 9-20 |
| 9.5.6 Implementability | 9-22 |
| 9.5.7 Cost Effectiveness | 9-23 |
| 9.5.8 State Acceptance | 9-24 |
| 9.5.9 Community Acceptance | 9-24 |
| 10.0 ARAR ANALYSIS | 10-1 |
| 11.0 REFERENCES | 11-1 |

# TABLE OF CONTENTS
(Continued)

## LIST OF TABLES


| TABLE NO. | TITLE | PAGE |
|---|---|---|
| 2.1 | Preliminary Assessment of Chemical and General Physical Characteristics of Waste | 2-6f |
| 6.1 | Estimated Admixture Requirements | 6-1a |
| 7.1 | Estimated Sump Area Waste Material Volumes by Type | 7-2a |
| 7.2 | Summary of Infrastructure Items | 7-4b |
| 7.3 | Estimated Costs for Selective Excavation Option | 7-11a |
| 8.1 | Probability of Accidents, Spills, and Fatalities While Transporting McColl Site Waste for Offsite Incineration | 8-17a |
| 8.2 | Probability of Accidents, Spills, and Fatalities While Transporting McColl Site Incinerator Ash for Offsite Disposal | 8-18a |
| 8.3 | Probability of Accidents, Spills, and Fatalities While Transporting McColl Site Waste for Offsite Disposal | 8-18b |
| 8.4 | Probability of Accidents, Spills, and Fatalities While Transporting Chemical Additives to the McColl Site | 8-18c |
| 8.5 | Comparison of Health Risks Among the Five Remedial Alternatives for the McColl Site | 8-18d |
| 10.1 | Federal ARARs | 10-1a |
| 10.2 | State ARARs | 10-1b |

# TABLE OF CONTENTS
(Continued)

## LIST OF FIGURES


| FIGURE NO. | TITLE | PAGE |
|---|---|---|
| 1.1 | Vicinity Map | 1-1a |
| 1.2 | Site Location Map | 1-1b |
| 1.3 | Site Plan (Aerial Photo Overlay and Overlay Showing Seep Locations) | 1-1c |
| 2.1 | Site Topography | 2-1a |
| 2.2 | Perspective View of Existing Conditions | |
| 2.3 | Ground Water Monitoring Well Locations | 2-2a |
| 2.4 | Estimated Average Sump Conditions | 2-4a |
| 2.5 | Characteristics of Elevated Arsenic | 2-6a |
| 2.6 | Characteristics of Drilling Mud | 2-6b |
| 2.7 | Characteristics of Mixed Soil/Drilling and Tarry Material | 2-6c |
| 2.8 | Characteristics of Tarry Material | 2-6d |
| 2.9 | Characteristics of Asphaltic Material | 2-6e |
| 2.10 | Relative Problems with Existing Conditions | 2-7a |
| 4.1 | Waste Volume and Risk Relationship | 4-2a |
| 5.1 | Remediation Considerations - Shallow Elevated Arsenic | 5-2a |
| 5.2 | Remediation Considerations - Drilling Mud | 5-2b |
| 5.3 | Remediation Considerations - Mixed Soil/Drilling Mud and Tarry Material | 5-2c |
| 5.4 | Remediation Considerations - Tarry Material | 5-2d |
| 5.5 | Remediation Considerations - Asphaltic Material | 5-2e |
| 5.6 | Relative Waste Excavation Problems | 5-3a |
| 5.7 | Relative Implementation Problems Associated with Various Materials | 5-4a |
| 6.1 | Selective Excavation Alternative Flow Diagram | 6-3a |
| 6.2 | Shallow Soil Mixer | 6-7a |
| 6.3 | In Situ Blender | |
| 6.4 | In Situ Treatment and Solidification Equipment | 6-7c |
| 6.5 | Excavation Sequence at Type 2 Seep or Potential Seep Area | 6-8a |
| 6.6 | Curing and Solidification Enclosure | 6-9a |
| 6.7 | Illustration of RCRA Equivalent Cap Closure Elements | 6-11a |

# TABLE OF CONTENTS
(Continued)

## LIST OF FIGURES
(Continued)

PAGE


| | | |
|---|---|---|
| 7.1 | Summary Project Schedule Selective Excavation Alternative | 7-3a |
| 7.2 | Preliminary Project Schedule Selective Excavation Alternative | 7-3b |
| 7.3 | Site Condition No. 1 - Existing Conditions | 7-3c |
| 7.4 | Site Condition No. 2 - Site Infrastructure and Perimeter Crib Walls | 7-3d |
| 7.5 | Air Treatment System Flow Diagram | 7-3e |
| 7.6 | Site Condition No. 3 - Type 1 Area Elevated Arsenic Removal | 7-3f |
| 7.7 | Site Condition No. 4 - Neutralization, Partial Stabilization and Selected Excavation | 7-3g |
| 7.8 | Site Condition No. 5 - In Situ Treatment and Solidification | 7-3h |
| 7.9 | Overlapping Pattern of In Situ Treatment Cylinders | 7-3i |
| 7.10 | Site Condition No. 6 - Commence Closure Activities | 7-3j |
| 7.11 | Site Condition No. 7 - Commence Cap Installation | 7-3k |
| 7.12 | Perspective View After Closure | |
| 7.13 | Schematic of Sulfur Dixoide Scrubber and Hydrocarbon-Activated Carbon Adsorption System | 7-9a |

1.0

# 1.0 INTRODUCTION

## 1.1 HISTORY

1. The McColl Superfund site is an inactive waste disposal facility located in Fullerton, California (Figures 1.1 and 1.2). According to McColl site records, the facility accepted acid petroleum waste sludge between 1942 and 1946. This sludge, produced in the refining of aviation fuel for use by the military in World War II, was placed in 12 excavated sumps (Figure 1.3). Reports indicate that other types of waste, including construction debris and miscellaneous trash, have also been disposed of at the McColl site.

2. During the 1950s, at least three of the sumps on the eastern side of the McColl site were covered with drilling mud from various California oil fields. This side of the McColl site is now referred to as the Ramparts area. The western sumps were later covered with natural fill materials during the construction of the Los Coyotes Country Club golf course in the late 1950s. This portion of the McColl site is known as the Los Coyotes area.

3. In September 1980, the California Department of Health Services (DHS) and the U.S. Environmental Protection Agency (EPA) began a joint investigation of the site. The first step in the investigation was an historical information search conducted for EPA by its Field Investigation Team (FIT) contractor, Ecology & Environment, Inc. (E&E). E&E prepared a report of its findings for EPA and, for the first time in a published document, identified the site as the McColl Hazardous Waste Disposal site. Site investigation activities have continued from 1980 to the present.

4. In 1982, the McColl site was placed on the federal Superfund list (i.e., National Priorities List, or NPL). Based on the Remedial Investigation and Feasibility Study (RI/FS) conducted in 1982-1983 by Radian Corporation for the McColl Site Group (MSG) and DHS, it was determined by DHS and EPA that the appropriate remedial action was excavation, removal and transportation of the hazardous wastes from the McColl site to an offsite facility for final disposal. The EPA prepared a Record of Decision (ROD) in April 1984 selecting excavation and redisposal as the preferred remedial action.

5. A contractor (Canonie Engineers, Inc.) was hired by DHS and EPA to implement the selected remedial action. DHS and EPA selected the Petroleum Waste, Inc. (PWI) landfill in Kern County, California to receive the wastes for final disposal. However, before remediation of the site began, the Kern County Board of Supervisors filed a lawsuit asking that DHS be

90-336A/ETCR 2/6/91




FIGURE 1.1

VICINITY MAP

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

30 336A/ETCR 2/6/91

136391




0 2000 4000 FEET

SCALE

FIGURE 1.2

**SITE LOCATION MAP**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REFERENCE U S G S 7.5 MINUTE TOPOGRAPHIC QUADRANGLE MAP OF LA HABRA, ORANGE COUNTY, CALIFORNIA BASE MAP DATED 1964 AND PHOTOREVISED 1981



ESTIMATED LOCATIONS OF EXISTING SEEPS



90-336A/ETCR 2/6/91




FIGURE 1.3

SITE PLAN

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

required to prepare an Environmental Impact Report (EIR) prior to implementing the excavation and redisposal action. On May 31, 1985, a Superior Court judge issued an injunction requiring the State of California to prepare an EIR for the McColl site remediation in accordance with the California Environmental Quality Act (CEQA).

6. Subsequent to the court's decision, EPA chose to reevaluate remedial action alternatives for the site. EPA contracted with $CH_2M$ Hill to conduct additional waste, contaminated soil and ground water investigations at the McColl site. These field activities were performed at the site between November 1986 and June 1987.

7. In June of 1987, the MSG proposed to the agencies a remediation approach which provided for limited excavation and redisposal of 5,000 cubic yards of waste materials, a perimeter cement/bentonite containment wall, berm stabilization and a Resource Conservation and Recovery Act (RCRA) equivalent cover with passive emission control system.

8. In February 1989, EPA issued a "Supplemental Reevaluation of Alternatives" (SROA) in which the results of these investigations were provided along with an evaluation of the remedial alternatives under consideration for the McColl site. The SROA stated a preference for excavation and onsite incineration. At approximately the same time, DHS released a draft EIR (DHS, 1989). On May 30, 1989, the MSG provided extensive comments on the Agencies' findings and selection of remedy.

9. In 1989, EPA performed a trial burn of McColl wastes at the Ogden Environmental facility in La Jolla, California. Reports were published in the fall of 1989, subsequent to which an onsite trial burn was cancelled. Later in 1989, EPA undertook treatability studies, the results of which have yet to be published In June 1990, EPA performed a trial excavation of a portion of a sump at McColl. A pre-publication report was issued in November 1990 (EPA, 1990). In August 1990, EPA conducted a borehole drilling project on one of the McColl sumps. No report on this project has yet been issued. Ongoing ground water monitoring studies are reported periodically.

10. The MSG expressed concern for the preferred alternative in the SROA because of risks associated with excavation and added public exposure from incinerator emissions. Accordingly, in 1990, in response to a Section 122 Notice Letter, the MSG submitted the 1990 Stabilization and Closure Plan prepared by Brown and Caldwell (MSG, 1990) which recommended remediation using a cap and slurry wall closure concept with procedures for

treatment of arsenic, in situ stabilization of the drilling muds, solidification of tarry material with gravel, and biofiltration and redundant systems for controlling organic emissions that might occur at the cap.

11. In November 1990, the MSG retained Environmental Solutions, Inc. to reevaluate technologies which could be applicable for McColl site remediation to determine if an alternative could be developed which potentially could satisfy the public, agencies, and the MSG. The MSG also retained the ENVIRON Corporation (ENVIRON) to perform a Health Risk Assessment of the alternative and compare it to the preferred alternative in the SROA. A primary objective of the Environmental Solutions, Inc. activity was to evaluate the alternative technologies sufficiently to allow a remediation scope of work to be developed which would include flexibility for the development of the most appropriate remedy during predesign investigation and design stages.

12. The Environmental Solutions, Inc. and ENVIRON study results indicated that complete excavation of the sumps cannot be justified because of the high risks to which the onsite workers and nearby residents would be exposed during the excavation period. It was concluded however, that the remedy should address the geotechnical instability problems with the drilling muds and tarry materials, and mobility potential for tarry materials to cause surface seeps. Also, removal of shallow materials with elevated arsenic concentrations could be accomplished without creating significant onsite or offsite risks. The principal purposes of subsequent studies, leading to this report, were therefore to:

    - Develop a remediation approach which addresses EPA's concerns with respect to closure while avoiding the substantial risks associated with total excavation and incineration/thermal destruction.
    - Compare the new remediation approach with those remedial approaches evaluated in the SROA.

## 1.2 SCOPE OF REPORT

1. This report determines: (1) if a selective excavation option exists which can be implemented safely at McColl, (2) solutions to the concerns expressed by EPA and DHS for the 1987 and

1990 plans proposed by MSG, and (3) types of predesign activities required to develop detailed procedures for implementing the most appropriate remedy. The investigation included the following major steps:

- The review of available site characterization data, including discussions with experts on refinery material properties, to develop a characterization of the range of conditions which exist within the sumps. This characterization is necessary to evaluate the technical feasibility for implementing any remediation procedures, and for defining predesign activities required to design details for the solution.
- The review of previously evaluated remediation alternatives, including quantitative and qualitative evaluations of how well each alternative satisfies the National Contingency Plan (NCP) criteria; and especially health risk and technical feasibility considerations.
- The review of past health and environmental risk evaluations, with contributions from ENVIRON, to determine how both short-term and long-term risks are affected by various alternative procedures; with special emphasis on comparisons of short-term risk due to remediation implementation, and long-term residual risks subsequent to site closure.
- The establishment of site remediation goals with special consideration of NCP criteria and risks, and impact on nearby residents due to onsite activities.
- The development of an approach involving selective excavation and treatment which goes beyond basic RCRA equivalent closure, but has the potential to significantly reduce the high implementation risks associated with total sump excavation and/or onsite incineration.
- The evaluation of the range of selective excavation and treatment options with respect to site conditions, technical feasibility, risk and schedule.
- Development by ENVIRON, of comparisons of short- and long-term risks of the selective excavation alternative with alternatives considered in the SROA.
- Identification of Applicable or Relevant and Appropriate Requirements (ARARs) which would have to be satisfied by the selective excavation alternative.
- A comparison of the degree to which the selective excavation alternative and the prior SROA alternatives satisfy the NCP criteria.
- The identification of predesign activities required to fully develop a design for the selective excavation alternative.

Consistent with the approach taken in the SROA, a ground water study and monitoring program should be instituted but is not included in this report.

## 1.3 SOURCES OF INFORMATION

1. Chapter 11.0 summarizes the reference material used for the investigations described in this report. The manner in which the references are identified in the text is by first giving the name of the source and its respective date. Examples would be: (EPA, 1988), (Radian, 1983), and (MSG, 1990).

## 1.4 REPORT ORGANIZATION

1. The remainder of this report is discussed in the following chapters, authored by the organization indicated by footnote:

- Chapter 2.0 - Site Characteristics(1)
- Chapter 3.0 - Remediation Alternatives Evaluated in the SROA(1)
- Chapter 4.0 - Risk Considerations(2)
- Chapter 5.0 - Remediation Goals(1)
- Chapter 6.0 - Development of Selective Excavation Alternative(1)
- Chapter 7.0 - Description of Recommended Alternative(1)
- Chapter 8.0 - Recommended Alternative Risk Evaluation(3)
- Chapter 9.0 - NCP Analyses(2)
- Chapter 10.0 - ARARs Analysis(1)
- Chapter 11.0 - References(2)

(1) Authored by Environmental Solutions, Inc.
(2) Co-Authored by Environmental Solutions, Inc. and ENVIRON
(3) Authored by ENVIRON

2.0

TABLE OF CONTENTS

# APPENDIX H

## McColl Superfund Site, Selective Excavation, Treatment and RCRA-Equivalent Closure Report, February 12, 1991

90-336A

# McCOLL SUPERFUND SITE

# SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE REPORT

February 12, 1991

ENVIRONMENTAL SOLUTIONS, INC.
ENVIRON

# 2.0 SITE CHARACTERISTICS

## 2.1 SITE BACKGROUND

1. The McColl Superfund Site is located on approximately 22 acres adjacent to Rosecrans Avenue in the city of Fullerton, as shown in Figure 2.1 and illustrated in Figure 2.2. The site includes 12 sumps, within a portion of the site encompassing approximately 8 acres, where alkalation process wastes were allegedly disposed during World War II and drilling muds were allegedly disposed in the 1950s. Elevated levels of arsenic, from unknown origin, have been found at one location in one sump. The sumps are divided into two basic groups, the Los Coyotes Sumps and Ramparts Sumps on the western and eastern portions of the site, respectively. Sumps in these two areas are further subdivided into the following groupings:

   - Los Coyotes Sumps
     - East Los Coyotes Sumps L-1 and L-2
     - West Los Coyotes Sumps L-3, L-4, L-5, and L-6
   - Ramparts Sumps
     - Lower Ramparts Sumps R-1, R-2, R-3, and R-4
     - Upper Ramparts Sumps R-5 and R-6

2. The Ramparts Sumps subdivision is logically made because of a steep slope area, which physically and logistically separates the upper and lower groups. The subdivision for the Los Coyotes Sumps is made primarily because the outside edges of this group of sumps slope (drain run-off) in separate directions.

3. The sumps are presently covered with approximately 1 to 5 feet of clean overburden. As a result, the wastes are generally not exposed to the atmosphere except at the locations of tarry material seeps.

4. The tar seeps extend through the overburden material at approximately 50 locations illustrated in Figure 1.3. The seeps have been a source of odors which have bothered nearby residents from time to time. The California DHS has an ongoing program to cover seep areas with plastic liners and soil as soon as they are observed to minimize such emissions. Preventing the seep conditions and isolation of the arsenic material would reduce long-term residual carcinogenic risks associated with the site to an estimated level of less than $1 \times 10^{-11}$.

5. Most of the health risk associated with the sumps in their present condition is related to elevated arsenic concentrations, which exist at shallow depths in a portion of Sump R-1. Assuming that these materials could become exposed over time due to wind or water erosion,

2-1a

336A/ETCR 2/6/91




FIGURE 2.1

SITE TOPOGRAPHY

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.




Exhibit 43

90 336 ... CR REV 2/12/91



LEGEND

FENCE

FIGURE 2 2

**PERSPECTIVE VIEW OF EXISTING CONDITIONS**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

the risk assessment in the SROA indicates that ingestion and inhalation of dust from the arsenic would represent approximately 98 percent of the total health risk presently associated with the site.

6. The close proximity of the residences to the site increases the concern for emissions which occur from the seeps or remedial activities. As illustrated in Figure 1.3, there are residences immediately adjacent to the entire eastern portion of the property and across Rosecrans Avenue at the northeast portion of the site. These residences are located at distances varying between 60 and 300 feet from the sumps. Other surrounding land uses include:
   - The Los Coyotes Country Club golf course to the south.
   - A wooded slope area of the Frank B. Clark Regional Park to the west.
   - Chevron Oil Company production field facilities to the north across Rosecrans Avenue.

7. Ground water monitoring wells have been installed on and near the site, at locations shown in Figure 2.3 (MSG, 1990). Ground water in the regional aquifer was first encountered at a depth of at least 225 feet below ground surface (approximately 200 feet below deepest waste) in all previous test drilling operations directly on the site (MSG, 1990). One offsite well, located 800 feet from the site, encountered ground water at about 190 feet below ground surface.

8. The wells have not indicated any significant contamination which may have occurred from the McColl Site sumps. A single finding of very low concentrations of benzene and thiophenes was reported in one well in one sampling period. The EPA has noted that this sampling may indicate some contamination from the sumps is now occurring. However, the geologic conditions at the site and chemical characteristics of the wastes make the potential for ground water contamination very remote. On that basis, the small levels of organics noted will not be consistently observed over long periods and that those noted may have been due to characteristics of the completed well. In either event, it is reasonable to conclude that the potential for major ground water contamination is very low considering the sumps have existed for 50 years with no special cover or closure provisions (MSG/ENVIRON, 1990).

## 2.2 GENERAL SITE CONDITIONS

1. The overall slope trend at the site is from north to south as illustrated in Figures 2.1 and 2.2. This trend is disrupted toward the west side of the site where a wide shallow swale exists which drains rainfall run-off from approximately the western two-thirds of the property.

90-336A/ETCH Rev 02/15/91




LEGEND

△ SHALLOW WELL LOCATION AND DESIGNATION
○ DEEP WELL LOCATION AND DESIGNATION

FIGURE 2.3

**GROUND WATER MONITORING WELL LOCATIONS**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

2-2a

The Los Coyotes Sumps exist on an elevated knoll area adjacent to this drainage swale, and run-off from the west Los Coyotes Sumps primarily drains toward the swale.

2. The eastern side of the knoll containing the Los Coyotes Sumps slopes fairly steeply toward the east to a narrow drainage channel existing just to the west of the property lines of the adjacent residences. The steepness of this slope decreases from north to south and becomes relatively gentle as the knoll blends into the abutting golf course.

3. Topography in the Ramparts Sumps areas is characterized by relatively flat zones in the two upper and lower groupings. The slope downward from the Upper Ramparts Sumps is relatively steep and appears to represent the outside slope of berms constructed to form those original depressions. The slope downward from the Lower Ramparts toward the adjacent residences is also relatively steep and appears to form the outside slope of the berms used to form those sumps. Drainage from the Ramparts portion of the site generally occurs as sheetflow toward the south, until it encounters a drainageway immediately north of adjacent residences.

4. The northwestern portion of the site has been extensively graded primarily to establish parking lots and staging areas for remediation activities, which were to be initiated in 1984 (see Section 1.1). Presently, the majority of this graded area is vacant except for the storage of drums and stockpiles containing materials from borings and the 1990 trial excavation (EPA, 1990) and an existing decontamination facility near the center of the site.

5. Subsurface and hydrogeologic conditions for the site area have been described in previous site study reports (see Chapter 11). Subsurface strata at the site consists of finely interbedded layers of clay, sandy clay, silts, and clayey sands. This interbedded type of stratigraphy can prevent or retard the downward migration of infiltrating rainwater and may in part account for the natural protection to ground water which has been observed.

6. Ground water exists at a depth of approximately 225 feet below the ground surface. The gradient of this ground water generally is toward the southwest. The nearest known water supply wells are two wells operated by the City of Fullerton located south and slightly east of the site at a distance of approximately one-half mile. Monitoring wells located downgradient from the site in the shallow aquifer do not contain any contaminants in concentrations that exceed applicable standards. Static ground water elevations in these wells are consistent with the potentiometric surface encountered in the McColl site monitoring wells.

## 2.3 SUMP CONDITIONS

1. Preliminary characterization of the sumps can be developed using information from the following three references:
   - "Physical and Chemical Characterization and Distribution of Waste at the McColl Site," prepared in 1983 by Radian.
   - The SROA report, prepared by $CH_2M$ Hill in 1989, which includes appendices describing subsurface investigations used to supplement the earlier Radian work.
   - The technical evaluation report for the 1990 trial excavation (EPA, 1990), which describes in detail the conditions encountered at one portion of Sump L-4.

2. Although additional, more detailed sump characterization work will be required during a predesign portion of a remediation program (see Section 7.2.10), the existing data does show sufficient consistency to characterize conditions in the sump to adequately develop and evaluate conceptual remediation alternatives. The following paragraphs summarize the characterization of sumps used in this report, as illustrated in Figure 2.4.

3. The available boring data and experience from the test excavation show that the bottom portion of the sumps is composed of an asphaltic-type material, which is described as a hard char or coal-like material in various boring logs. This material typically has an inorganic ash content in the 50 to 60 percent range. Discussions with an oil refinery expert (Beychok, 1990) regarding published data from the McColl site time period (SRP, 1942) indicate that most likely the origin of this hard asphaltic-type material is through the natural auto-oxidation process, which occurs in sulfuric acid sludges over time.

4. Materials overlying the asphaltic material are significantly different between the Los Coyotes, Upper Ramparts, and R-3 Sumps; and the Lower Ramparts, R-1, R-2, and R-4 Sumps. The main difference is that, in one case, the overlying material consists primarily of overburden soil placed onto the sumps. The majority of overlying material in the three Lower Ramparts Sumps, on the other hand, consist of drilling mud disposed in the 1950s. These sumps also include a thin overburden soil cover varying in thickness between 0.5 to 2 feet, which was placed above the drilling mud in 1984.

5. The available drilling data, the existence of tar seeps at approximately 50 locations above nine of the sumps, and the trial excavation experience, indicate that tarry-type material exists above the asphaltic material for some portion of the overall sump areas. This material has organic

90-336A/E1 2 REV 02/12/91




**LOS COYOTES, UPPER RAMPARTS, AND LOWER RAMPARTS R-3 SUMPS**




**LOWER RAMPARTS R-1, 2, AND 4 SUMPS**



**CONCEPTUAL ILLUSTRATION OF TAR SEEP CONDITIONS**




FIGURE 2.4

**ESTIMATED AVERAGE SUMP CONDITIONS**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

characteristics similar to those of the asphaltic material, but an ash content of only about 2 percent. The factors causing this tar to occur are not specifically known, but it may have naturally evolved as a film above the asphaltic material when inert constituents partially settled prior to its solidification.

6. Initially, in this investigation it was assumed that the most appropriate preliminary characterization would have been to assume that a 1- to 2-foot layer of tarry material existed fairly uniformly above the hard asphaltic material in each of the sumps. However, considering the manner in which the overburden soils and drilling muds would have been placed in the sumps, and the fact that soil borings and the trial excavation indicate a nonuniform distribution, a reasonable hypothesis would be that the tarry material existing above the hard asphaltic layer would have been "mud waved" across the sump bottom as the overlying, heavier material was deposited into the sump. This activity would result in more concentrated zones of tar, which could be thicker at some locations, such as at the trial excavation in Sump L-4. As depicted in Figure 2.4, the resulting characterization would be the occurrence of many locations where the tarry material would be very thin, and a variety of buried "pockets" where the tarry material may be in thicknesses ranging up to as much as several feet. In addition to its chemical characteristics, the tarry material is an important factor for remedy evaluation because of its inherent low stability characteristics in a geotechnical sense, and its mobility potential as evidenced by the existence of seeps at the top of the overburden soils.

7. The exact mechanism that causes these seeps to occur is not presently known. However, it is reasonable to anticipate that the source is at least partially related to geostatic pressure within buried tarry zones caused by the weight of the overburden material. This could be an important factor for evaluating remediation requirements because, if pressure is the major factor for causing tar seepage, it would be reasonable to assume that conditions are presently at a state near equilibrium. It is possible that the rate of seepage and the number of seeps could change (probably increase) if additional weight were applied to the sumps in the form of a closure cap. Therefore, an important design consideration for cap installation would be to account for deformations or movement which could occur due to tarry material instability in a procedure to assure additional seepage would not impair the usefulness of the cap. As an alternative, zones of thickest tar, especially in areas of existing seeps, should be excavated if removal can be safely accomplished.

8. Figure 2.4 illustrates how available boring data shows that the bottom portion of the overburden appears to be mixed, to varying degrees and thicknesses, with a tarry-like material. At several feet above the asphaltic material, the overburden generally becomes clean (i.e., tar-free). Figure 2.4 illustrates a similar mixed zone at the base of the drilling mud for Sumps R-1, R-2 and R-4. Available data indicates that the top portion of the drilling mud does not appear to be affected by the underlying organic materials.

9. Figure 2.4 also illustrates the existence of a zone of elevated arsenic concentrations within one location in Sump R-1, approximately in the interface between the thin overburden material and the drilling mud. The source of this arsenic is not known. Available data indicates that the areal extent of the elevated arsenic zone is relatively small.

10. Chemical and general physical characteristics of the various sump materials are summarized in Table 2.1. Key characteristics estimated for the following sump materials are summarized in Figures 2.5 through 2.9:

    - Elevated Arsenic
    - Drilling Mud
    - Mixed Soil/Drilling Mud and Tarry Material
    - Tarry Material
    - Asphaltic Material

    These figures illustrate several characteristics which are important for evaluating risks and problems associated with the various materials. The elevated arsenic is primarily located near the top of the drilling mud (in Sump R-1). $SO_2$ emissions, which would represent major excavation difficulties and worker and community risks, are associated primarily with the tarry and asphaltic materials, although moderate emissions are also related to the mixed materials.

11. The depth of each material is an important consideration if an open excavation were to be attempted because of related potential effects on excavation equipment suitability and side wall slope stability. The indicated maximum depths of the drilling muds, mixed materials and tarry wastes could create significant problems for large excavation areas, especially with heavy equipment located adjacent to excavation slopes consisting of materials with low geotechnical strength. Large scale excavation to the 30-foot maximum depth of the asphaltic materials using available types of equipment probably would be impossible. Although excavators or backhoes with extended arms can reach this deep in trenches, their use for a large excavation

90 336A/ETCH 2 5 REV 2/12/91




- Arsenic - 50 to 5,000 ppm
- $SO_2$ Emission Rate - None/Low
- Average Depth - 2.5 ft.
- Volume - 1,800 c.y.
- Migration Potential - None/Low
- Existing Geotechnical Instability Potential - Low

FIGURE 2 5

CHARACTERISTICS OF ELEVATED ARSENIC

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

2-6a

90 336A/E 2 6 REV 2/12/91




- Arsenic - Low
- $SO_2$ Emission Rate - Low
- Maximum Depth - 13 ft.
- Volume - 10,900 c.y.
- Migration Potential - None
- Existing Geotechnical Instability Potential - High

FIGURE 2.6

CHARACTERISTICS OF DRILLING MUD

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

2-6b

90-336A/E1...-2 7 REV. 2/12/91




- Arsenic - Low
- $SO_2$ Emission Rate - Moderate
- Maximum Depth - 16 ft.
- Volume - 19,100 c.y.
- Migration Potential - Low
- Existing Geotechnical Instability Potential - Low

FIGURE 2.7

**CHARACTERISTICS OF MIXED SOIL/DRILLING MUD AND TARRY MATERIAL**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REVISED FEBRUARY 12, 1991

2-6c

90-336A/E REV 2/12/91




- Arsenic - None
- $SO_2$ Emission Rate - High
- Maximum Depth - 17 ft.
- Volume - 5,900 c.y.
- Migration Potential - High
- Existing Geotechnical Instability Potential - High

FIGURE 2.8

CHARACTERISTICS OF TARRY MATERIAL

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REVISED FEBRUARY 12, 1991

2-6d

90-336A/ETCH-2 9 REV 2/12/91




- Arsenic - None
- $SO_2$ Emission Rate - High
- Maximum Depth - 30 ft.
- Volume - 48,000 c.y.
- Migration Potential - None
- Existing Geotechnical Instability Potential - None

FIGURE 2.9

CHARACTERISTICS OF ASPHALTIC MATERIAL

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

2-6e

REVISED FEBRUARY 12, 1991

# TABLE 2.1

## PRELIMINARY ASSESSMENT OF CHEMICAL AND GENERAL PHYSICAL CHARACTERISTICS OF WASTE

| MATERIAL TYPE | LOCATION | pH | ASH CONTENT | SIGNIFICANT METALS | TOC | LEACHATE SULFATE (mg/L) | PHYSICAL CHARACTER-ISTICS | SPECIAL CHARACTER-ISTICS |
|---|---|---|---|---|---|---|---|---|
| Clean Overburden | Los Coyotes Upper Ramparts Lower Ramparts No Overburden | Similar to local soil pH 7.0 to 8.5. | High, about 80%. Typical for soil. | Acceptable heavy metals content. | About 1%. | Low | Soil like. | None |
| Soil or Waste Containing Elevated Arsenic | Sump R-1 Generally near surface | Probably acidic due to proximity to waste surface. | Expected to be high. | Other than arsenic (1 to 5 feet depth), only barium averages about four times background near surface. | High if tarry, low if soil. | Expect low in soil, higher in waste. | Expected to be the same as overburden or mixed soil and tarry waste. | High values generally limited to small areas in upper 1 to 5 feet of Sump R-1. |
| Drilling Muds | Lower Ramparts R-1 to R-4 | Generally pH 7.0 to 8.0. One sample (pH 2.0) has high tar content. | No data available, but assumed to be high except for high tar sample. | Expect high barium detected since barium sulfate is a constituent of drilling muds. | Ranges from 2 to 58% depending on tar content. | Averages about 96,000; maximum 351,000. High values indicate possible contact with sulfuric acid. | Soft wet thixotrophic clay with moisture content of 25 to 60%. | Generally high moisture content. One sample with high TOC; probably not drilling mud, but tar. |
| Mixed Soil and Tarry Waste | At interface in Los Coyotes and Upper Ramparts. Limited amount in Lower Ramparts. | Since tarry material is characterized by low pH, would expect mixture in range pH 1 to 4. Data shows 1 to 3.5 with one sample 7.5. | Expect intermediate ash about 35%. | Would expect to have acceptable heavy metals content because neither soil nor tars have high metals. | TOC level depends on tar content. Average of 5 samples 34%. | Depends on tar content. Ranges 5,000 to 238,000 mg/L over 5 samples. Average 131,000 mg/L. | Black sticky soil. | It is assumed that this mixing occurred as overburden was placed on tarry waste. |
| Tarry Waste | In all sumps. | Acidic pH <1.0 to 2.0 | Unmixed tar about 2% ash. | Very low metals content. | Very high TOC, maximum 61%. | High acidity corresponds to high leachable sulfate. Average for Ramparts and Los Coyotes 203,000 mg/L. | Black with high viscosity. | Unmitigated $SO_2$, benzene, and THT emissions estimated from trial excavation at 4,000 to 40,000 ppm, 12 to 160 ppm, and 5 to 43 ppm, respectively. |



90-336A (2/12/91/mh)

above materials with low strength would be extremely risky; especially with consideration of the health effects (Chapters 4.0 and 8.0) of high $SO_2$ emissions on workers if an accident were to occur.

12. The volumes shown in Figures 2.5 through 2.9 are based on material thicknesses determined from borings at each sump. The side slopes of the original sumps are estimated to be approximately 1:1 based on the interpretation of borings. The shallow elevated arsenic material represents only about 2 percent of the total waste volume. At the other extreme, the deep asphaltic material represents approximately 56 percent of the total waste material volume.

13. The final data on these figures illustrate the major geotechnical problems associated with the various materials. These are:

    - Only the tarry material has a high potential to be mobile. This condition is indicated by the seep conditions at the site.
    - The two materials which have highest potential to cause geotechnical problems are the soft drilling mud and the tar. The mixed materials could have low geotechnical instability, but only near the tarry material interface.

The asphaltic material represents neither a mobility nor a geotechnical stability problem. Figure 2.10 provides a qualitative summary of the relative problems associated with each of the sump materials for existing conditions.

90-336A/E . . -5 7 REV 2/12/91

| PROBLEM / MATERIAL | POTENTIAL HEALTH RISK | POTENTIAL EXPOSURE | MIGRATION POTENTIAL | CAP INSTABILITY |
|---|---|---|---|---|
| Elevated Arsenic | ● | ● | | |
| Drilling Mud | | | | ● |
| Mixed Materials | | | • | • |
| Tar | • | ● | ● | ● |
| Asphaltic | | | | |




BASED ON DATA FROM THE SROA
REVISED FEBRUARY 12, 1991

FIGURE 2.10

**RELATIVE PROBLEMS WITH EXISTING CONDITIONS**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

2-7a

# 3.0 REMEDIATION ALTERNATIVES EVALUATED IN THE SROA

## 3.1 GENERAL

1. This chapter describes the remediation alternatives currently being evaluated by EPA and DHS so that comparisons can be made with the selective excavation alternative recommended in this report.

2. As discussed in Chapter 1.0, in 1989 the EPA undertook a Supplemental Reevaluation of Alternatives (SROA) to reconsider options for site remediation/closure. Per NCP guidelines, the SROA evaluated three categories of remedial alternatives. The categories were: (1) no action, (2) treatment alternatives, and (3) containment options. From the three alternative categories, the following four specific alternatives were selected by the EPA for evaluation in the SROA:

   - Excavation and Redisposal
   - RCRA Equivalent Onsite Containment
   - RCRA Equivalent Closure
   - Excavation and Onsite Incineration

   These remedial options are discussed below. Chapter 8.0 discusses risks associated with the selective excavation option and one of the SROA alternatives. Chapter 9.0 provides both an individual and a comparison analysis of the selective excavation approach and four SROA alternatives per the NCP criteria.

## 3.2 OPTIONS INCLUDED IN SUPPLEMENTAL REEVALUATION OF ALTERNATIVES (SROA)

### 3.2.1 TOTAL EXCAVATION AND REDISPOSAL

1. The excavation and redisposal alternative considered in the SROA was primarily based on the 1983 alternative evaluated by the DHS. The prior DHS alternative was updated to reflect revised transportation plans (Canonie, 1985) to redispose of the wastes at Petroleum Waste, Inc. in Buttonwillow, California. In addition, more recent air quality modeling studies indicated that a more substantial excavation enclosure would be required to prevent exposure of the surrounding neighborhood to air emissions from the excavation process.

2. The excavation and redisposal alternative evaluated would involve the complete removal of the arsenic-containing materials, overburden, drilling muds, mixed wastes, tarry wastes and asphaltic wastes from both the Ramparts and Los Coyotes sumps, with the wastes being transported and redisposed in a permitted Class I landfill. As part of this excavation,

significant portions of the overburden, berm material and underlying soils would also be excavated and disposed in a Class 1 or 2 landfill. The SROA failed to consider RCRA's Land Ban Restrictions.

3. The excavation and redisposal alternative would rely heavily on the use of temporary and permanent odor suppression foams to control air emissions, and deodorants to control odors. This alternative would also include the use of an excavation enclosure or tent to collect residual emissions. The collected emissions were to be treated by scrubbing to remove $SO_2$, and incineration to destroy hydrocarbons. All emission calculations preceded the trial excavation.

4. Redisposal of the excavated waste materials would require transportation of these materials over long distances. However, the location of the redisposal site was not considered in this alternative.

### 3.2.2 RCRA EQUIVALENT ONSITE CONTAINMENT

1. This alternative would involve the onsite construction of a secure hazardous waste landfill. The landfill would meet the current federal and state requirements for landfill construction. The arsenic-containing materials, overburden, drilling muds, mixed wastes, tarry wastes, asphaltic materials and underlying soils would be excavated from the sumps, and placed in the landfill unit. After the excavation was completed and the wastes transferred to the landfill unit, the landfill would be capped and closed in compliance with the federal and state regulations. Air emissions during excavation would be controlled by the use of foams, and by neutralization using lime. To prevent exposure of contaminants to the residents, the emissions were to be controlled by the use of enclosures and air treatment systems. The air treatment system would consist of a flare or a passive granular activated carbon adsorption system.

2. The onsite containment alternative would consist of the following three major systems:
   - A composite liner system including leachate collection.
   - A multilayer cover system.
   - A gas collection and treatment system to collect and control air emissions.

3. The onsite landfill or landfills would be located in one of the following areas:
   - The Ramparts sump area
   - The Los Coyotes sump area
   - The current parking lot area

### 3.2.3 RCRA EQUIVALENT CLOSURE

1. The RCRA equivalent closure alternative evaluated in the SROA would include the installation of a cover system and the lateral containment of the wastes, with an in situ low permeability cutoff wall around the perimeter of the waste areas.

2. The low permeability cover considered would include provisions for a gas collection layer, which would use either carbon adsorption or a flare system to treat offgases after capping. The alternative also would include provisions to improve the geotechnical stability in the drilling mud areas, prior to installing the cap by adding geotextile and crushed rocks to control differential settlement.

3. This alternative would also include provisions for the improvement of slope stability by installation of crib walls and pile supports.

### 3.2.4 EXCAVATION AND ONSITE INCINERATION

1. The excavation and onsite incineration alternative would include: excavation of the arsenic-containing soils, drilling muds, mixed soils, tarry wastes, asphaltic wastes and underlying soils; pretreatment of the wastes to achieve acceptable consistency; incineration of the wastes; and disposal onsite of the incineration residue. Excavation procedures for this alternative were considered to be the same as those for the excavation and redisposal, and the excavation and onsite containment options.

2. Air emissions from the excavation would be controlled by the use of foams, lime and enclosures, as described for the RCRA equivalent onsite containment option.

3. After excavation, the wastes would be pretreated with lime to reduce the acidity, and physically sized using a vibrating grid to produce an acceptable consistency for incineration. The wastes would be incinerated using a rotary kiln system, with an air emissions control system. No special emissions control provisions would be provided for arsenic or chromium volatilizations.

4. After incineration, the residual ash, which potentially could be hazardous due to metal content, would be redisposed onsite. If the ash were found to be hazardous, the ash would be

disposed of using the RCRA equivalent closure plans; however, if the ash were found not to be hazardous, the material would be backfilled onsite without a liner and covered with clean soil. Alternatively, the ash could be sent to a RCRA Class I facility.

5. In addition to the waste residual disposal, approximately 28,500 tons of alkaline scrubber waste would also be generated and would require treatment and/or disposal.

# 4.0 SUMMARY OF BASELINE RISK ASSESSMENT AND REMEDIATION OBJECTIVES

## 4.1 INTRODUCTION

1. In the February 1989 Supplemental Reevaluation of Alternatives (SROA), the EPA issued a Public Health Assessment for the McColl Site. The Companies, assisted by ENVIRON, provided comments on the Public Health Assessment in May 1989. ATSDR also performed a preliminary site assessment in 1989. In April 1990, the Companies submitted a Risk Assessment on the four alternatives under consideration by EPA. In September 1990, EPA issued EPA's Pre-Publication Report, Technology Evaluation Report, SITE Program Demonstration of a Trial Excavation at the McColl Superfund Site (Trial Excavation Report) dated September 1990 which provides significant new data and information with respect to the concentrations of emissions related to total excavation, the effectiveness of foams and other worker and community safety concerns. Contemporaneously with this document, the Companies are submitting their comments on the Trial Excavation Report. All of the above documents have been relied upon by ENVIRON in the preparation of the Public Health Assessment for the Selective Excavation, Treatment and RCRA Equivalent Closure Alternative, and are hereby incorporated by reference. In this Chapter, we provide a review of the baseline (i.e., No-Action Alternative) public health assessment, so as to lay a foundation for our remediation goals. In preparing our review, which is essential to the establishment of remediation goals, we provided information based upon the EPA's trial excavation.

## 4.2 GENERAL

1. In the selection of remedial alternatives for hazardous waste sites, the NCP requires weighing such factors as long-term residual risk reductions posed by a site against the short-term (implementation) risks associated with the remediation activities themselves. To provide background information to such a decision for the McColl site, this chapter describes the health risks posed by the site in its current condition. These are the risks that an acceptable remediation plan must mitigate.

2. Four remedial alternatives were proposed in the SROA: Total Excavation and Redisposal, RCRA-Equivalent Onsite Containment, RCRA-Equivalent Onsite Closure, and Total Excavation and Incineration. A fifth remedial alternative is proposed herein: Selective Excavation, Treatment and RCRA-Equivalent Closure. All five remedial alternatives **purport** to meet NCP's criterion to be protective of human health and the environment. To determine

which alternative is preferred, it is necessary to understand the nature of the baseline risks at the McColl site, the residual risks resulting from each remedial alternative, and the implementation risks resulting from each remedial alternative.

3. This Chapter summarizes the baseline risks associated with the McColl site and the goals that any remediation alternative proposed must meet. Chapter 8 presents the residual and implementation risks as well as transportation risks of each remedial alternative.

## 4.3 BASELINE RISKS

1. As described in the SROA, 98 percent of the total cancer risk estimated for the McColl site under current conditions is attributed to arsenic in the top 1 foot of soil (Figure 4.1). This is only 2 percent of the volume of the McColl waste. The remaining cancer risk is attributed to benzene and methylene chloride vapors coming from the buried wastes. In separate health assessments of the McColl site, the California Department of Health Services (1983) and the Agency for Toxic Substances and Disease Registry (ATSDR, 1989) also expressed concern about potential for direct skin contact with acidic seep material that occasionally appears on the surface of the site.

2. Ingestion of arsenic-bearing soil is the largest single source of risk estimated for the site, accounting for over 70 percent of the total estimated cancer risk (SROA). This estimate is based on the assumption that an individual enters the site every day for a 70 year lifetime and that all of the soil a person is assumed to eat over a lifetime comes from the surface of the McColl site (SROA). Inhalation of arsenic in dust blowing from the site is the second largest source of the estimated risk for the site, accounting for approximately 28 percent of the total cancer risk (SROA).

3. As noted in the SROA, the elevated arsenic responsible for the high risk attributed to soil ingestion and dust inhalation is localized in one sump, R-1, in the Ramparts area. The average arsenic levels reported for surface soil in the Los Coyotes Sumps area of the site is only slightly elevated above local background (2.8 vs. 1.5 mg/kg). The higher average concentration in the Ramparts Sumps is largely determined by two measurements, 5,480 mg/kg and 316 mg/kg ($CH_2M$ Hill 1987), both in R-1. The other surface samples in the Ramparts sumps all had arsenic concentrations under 10 mg/kg ($CH_2M$ Hill 1987).

90 336A/L 1 REV 02/12/91




FIGURE 4.1

**WASTE VOLUME AND RISK RELATIONSHIP**

McCOLL SITE

**ENVIRON**

BASED ON DATA FROM THE SROA

4. The SROA estimated a cancer risk of 1 x $10^{-6}$ from inhalation exposure to methylene chloride and benzene diffusing through a 5 foot soil layer and emitted into the air. Volatile emissions from buried wastes would increase if the site was not managed and the soil cover allowed to erode. The cancer risk increased to 2 x $10^{-3}$ in the absence of a soil cover (SROA).

5. The seeps that occasionally appear on the site have been associated with nuisance odor and the potential for skin burns via direct contact with the acidic seep material (ATSDR 1989, CDHS 1983). Based on an evaluation of air sampling performed after an odor episode attributed to a waste seep, the California Department of Health Sciences concluded that, ". . . air monitoring has indicated that no unhealthful levels are reached in these odor episodes" (CDHS 1989).

## 4.4 HEALTH ISSUES ASSOCIATED WITH EXCAVATION

### 4.4.1 $SO_2$ EFFECTS

1. Emissions of $SO_2$ caused by total excavation of the McColl site pose potentially serious irreversible health effects and conceivably death to remediation workers. Full-scale excavation will generate $SO_2$ levels that are consistently above 100 ppm, a level that is considered Immediately Dangerous to Life or Health ("IDLH") by NIOSH (1990). During the trial excavation, maximum $SO_2$ levels averaged approximately 600 ppm within the enclosure on days that actual excavation occurred. Based on the trial excavation data, ENVIRON estimates $SO_2$ levels within the enclosure will reach 4,000 to 40,000 ppm during full-scale excavation.

2. These levels of $SO_2$ are well above IDLH levels. In the event of failures in the respiratory protective equipment workers will be required to wear, workers may be overcome within minutes, before they are able to escape. If $SO_2$ levels are at the higher end of the predicted range, even the 10,000-fold protection factor afforded by the Level A PPE may not be sufficient to protect workers from being exposed to levels in excess of OSHA's permissible exposure level of 2 ppm. Therefore, it is anticipated that full-scale excavation will result in workers' exposure to $SO_2$ that are clearly unacceptable.

3. Sulfur dioxide emissions routinely escaping from the enclosure during full-scale excavation are expected to exceed California and proposed national ambient air quality $SO_2$ standards. In the event of significant leakage or complete collapse of the enclosure, the $SO_2$ levels could remain virtually undiluted for up to 200 feet downwind under low wind conditions. In such an instance, nearby residents may be exposed to $SO_2$ levels many times above IDLH levels.

Thus, it is anticipated that full-scale excavation will result in nearby residents being exposed to unacceptable levels of $SO_2$.

### 4.4.2 TOTAL HYDROCARBON EFFECTS

1. Total Hydrocarbons (THC) emissions from excavation and waste processing create an additional health concern for workers and the community. Exposures and risks from individual THC constituents cannot be evaluated because speciation data collected during the trial excavation was declared invalid. Radian (1983), however, reported that benzene constituted 6 to 80 percent of THC in air at the site. Even assuming benzene comprises just 6 percent of THC, the level of benzene in the air would exceed the State's Applied Action Level (AAL) of $2.2 \times 10^{-5}$ ppm if THC levels exceeded $3.7 \times 10^{-4}$ ppm. We note that under the Community Contingency Plan, site excavation can proceed as long as THC levels at the perimeter remain below 70 ppm for thirty seconds. Thus it is possible that THC levels could remain well below the limit established in the CCP (i.e., 70 ppm for 30 seconds) and still correspond to levels above the THC level (i.e., $3.7 \times 10^{-4}$ ppm) that corresponds to the State's AAL for benzene. Determining the actual risk posed to the community by benzene emissions during excavation will require the acquisition of data to characterize the constituents of the hydrocarbon mixture that will be released during waste excavation and processing.

### 4.4.3 TETRAHYDROTHIOPHENE EFFECTS

1. Tetrahydrothiophene (THT) and related sulfur compounds will be released during the excavation of McColl site wastes. It is anticipated that the THT levels within the enclosure during full-scale excavation will be so high that even Level A PPE will not be sufficient to protect workers against these foul-smelling compounds. It is anticipated that the THT levels during full-scale excavation will be well above THT's odor threshold in nearby communities causing discomfort, anxiety, and possibly other adverse health effects among the residents. The odor problem will need to be addressed for each proposed remedial alternative for the McColl site, especially in light of the proximity of homes from the site.

## 4.5 REMEDIATION GOALS

1. Any remediation alternative proposed for the McColl site must attain residual risk levels within the NCP cancer risks criterion of $1 \times 10^{-6}$ to $1 \times 10^{-4}$ and a hazard index for non-cancer effects of less than 1.0. Potential odor and other aesthetic problems also should be mitigated. Thus, an appropriate remedial alternative at the McColl Site should:
   - Eliminate or reduce exposure by direct contact and particulate emissions from arsenic-containing materials;
   - Eliminate or reduce exposure to volatile organic compounds;
   - Eliminate the potential for direct contact with seeps and inhaling volatile chemicals liberated from seeps;
   - Eliminate or reduce the appearance of new seeps to reduce any exposure to odor or volatile organic compound emissions associated with new seeps.

2. The appropriate remedial alternative should reduce residual risks to acceptable levels without increasing significantly the risks to workers and nearby residents during its implementation. The appropriate remedial alternative should address such site-specific issues as the nature of the wastes (high levels of $SO_2$ and reduced sulfur compounds), the quantity and disposition of the wastes within the sumps (small quantities of carcinogenic wastes near the surface and large quantities of malodorous compounds near the bottom of the sumps), and the relative proximity of the sumps to residential neighborhoods.

3. Besides exposure to carcinogenic compounds such as arsenic and benzene, workers may also be exposed to $SO_2$ levels that are capable of causing irreversible health damage and death, to levels of malodorous reduced sulfur compounds which may be intolerable, to work conditions which may result in heat stress or heat stroke and numerous opportunities for accidents. These latter conditions will be compounded by the likelihood that cumbersome personal protective equipment such as a self-contained breathing apparatus (SCBA) for respiratory protection and a total body encapsulating suit for skin protection will be needed. Nearby community residents will be exposed to $SO_2$ or reduced sulfur compounds that may cause greater respiratory distress and discomfort in addition to some incremental increase in cancer risks due to the release of carcinogenic agents.

4. Thus, the appropriate remedial alternative for the McColl site needs to balance the reduction in residual risk by the increase in implementation risk. Only by achieving a suitable balance of these two risks can the appropriate remedial alternative be selected.

5.0

# 5.0 REMEDIATION GOALS

## 5. 1 GENERAL

1. In general, the preferred alternative is to be designed to satisfy, as best as possible, the following nine NCP feasibility screening criteria:

   - Threshold criteria which must be met:
     - Protection of human health and the environment.
     - Compliance with ARARs.
   - Primary criteria which must be optimized:
     - Long-term effectiveness and permanence.
     - Reduction of mobility, toxicity or volume through treatment.
     - Short-term effectiveness.
     - Implementability
     - Cost effectiveness.
   - Balancing criteria which should be considered:
     - State acceptance.
     - Community acceptance.

2. Selection of a "best alternative" on the basis of these criteria often is difficult and the decision requires tradeoffs because the different alternatives satisfy the various criteria to different levels. While at times the selection or elimination of remedies is straightforward, more often the relative importance of each criteria is very site-specific.

3. The evaluation of alternatives for the McColl site is more unique than those for other sites because of: (1) the widely differing degrees to which various alternatives satisfy different criteria, and (2) the characteristic that the long-term risks at the site are, unless exacerbated by the remedy, far below that normally considered acceptable for Superfund remediation projects. The areas of conflict relate to: the degree to which treatment should be implemented and the type of treatment which should be employed; and the unusually high risks that workers and the public would be subjected to if large scale excavation of the materials were to be implemented.

4. Risk assessment calculating presented in the SROA and developed independently by ENVIRON (see Chapter 8.0) consistently indicate that excavation and incineration/thermal destruction of the waste at the McColl site will not significantly (if at all) improve the long-term risks associated with the site which are, by all measurements, insignificant. On the other hand, there are significant risks associated with uncovering and removing the waste materials from their present location for treatment and thereby exposing the workers and the public to

those materials and their emissions. One of the major goals of this report is to determine if there are ways to increase the treatment of relevant materials without posing unnecessary high risks to the public and workers.

5. The specific characteristics of the various waste materials also represent basic factors which must be considered to establish appropriate remediation goals. Figures 5.1 through 5.5 have been prepared to summarize special remediation considerations which are appropriate for the various waste materials.

6. Each Figure repeats the estimated volume and depth characteristics described in Chapter 2.0. They also provide a rationale of why each material should be considered for remediation by treatment and/or excavation. These are:

   - Elevated arsenic materials represent the major contributor (98 percent) to health risks associated with the existing site conditions.
   - The tarry material is the potential source of two potential problems:
     - This soft material is not geotechnically stable and would represent a potential differential settlement issue if a closure cap were to be constructed without complete in situ solidification.
     - The material's mobility yields tar seeps which have a low pH and emit $SO_2$ and organics at concentrations which may cause odor episodes to nearby residents.
   - Unless solidified, the drilling mud represents a potentially unstable foundation if a closure cap were to be constructed.
   - The mixed materials do not pose any specific problems, other than they overlie the tarry waste. Chemicals in these materials do not pose a significant health risk, and the nondrilling mud portion of mixed materials do not represent a major geotechnical problem.
   - The asphaltic materials do not permit any existing or future problems which would indicate that special treatment or excavation is required. The asphaltic material:
     - Is geotechnically stable.
     - Is not mobile.
     - Does not present a pH or emission risk in its present configuration and location.

7. This evaluation shows that removal and/or treatment of the elevated arsenic materials should be an important remediation goal. This is especially true because that shallow material can be excavated with conventional equipment without creating any significant health risks to the community or onsite workers.

90-336A/E1UH 5 1 REV 2/11/91




- **Volume - 1,800 c.y.**
- **Depth - Shallow**
- **Rationale for Considering Treatment/Excavation of Material:**
  - **Arsenic is the major contributor (98%) to health risk of unremediated site.**

FIGURE 5.1

REMEDIATION CONSIDERATIONS
SHALLOW ELEVATED ARSENIC

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REVISED FEBRUARY 12, 1991

5-2a




- **Volume - 10,900 c.y.**
- **Maximum Depth - 13 ft.**
- **Rationale for Considering Treatment/Excavation of Material:**
  - **Geotechnically unstable relative to cap.**

FIGURE 5.2

REMEDIATION CONSIDERATIONS
DRILLING MUD

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REVISED FEBRUARY 12, 1991

90-336A/ET... 5 3 REV 2/11/91




- Volume - 19,100 c.y.
- Maximum Depth - 16 ft.
- Rationale for Considering Treatment/Excavation of Materials:
  - None, other than it overlays tarry waste.
    - Contains no chemicals which would pose a significant health risk.
    - Geotechnical stability relative to cap is not a major issue.

FIGURE 5.3

REMEDIATION CONSIDERATIONS
MIXED SOIL/DRILLING MUD
AND TARRY MATERIAL

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REVISED FEBRUARY 12, 1991

5-2c

90 336A/E1 5 4 REV 2/11/91




- Volume - 5,900 c.y.
- Maximum Depth - 17 ft.
- Rationale for Considering Treatment/Excavation of Material:
  - Geotechnically unstable relative to cap.
  - Material mobility yields seeps which have:
    - Low pH.
    - Sulfur dioxide and benzene present.

FIGURE 5.4

REMEDIATION CONSIDERATIONS
TARRY MATERIAL

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

5-2d

REVISED FEBRUARY 12, 1991

90 336A/ETCR 5 5 REV 2/11/91




- **Volume - 48,000 c.y.**
- **Maximum Depth - 30 ft.**
- **Rationale for Considering Treatment/Excavation of Materials:**
  - **None.**
    - **Geotechnically stable relative to cap.**
    - **Material is not mobile.**
    - **Material in-place does not present a pH or emission risk.**

FIGURE 5.5

REMEDIATION CONSIDERATIONS
ASPHALTIC MATERIAL

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REVISED FEBRUARY 12, 1991



5-2e

8. The drilling mud and tarry materials pose potential problems because of their low strength characteristics. Key goals of remediation should be to excavate the current seeps and those other appropriate tarry materials and drilling muds which can be excavated safely, and to eliminate the unstable characteristics of both of these materials, and especially to immobilize the remaining problematic tarry materials which are causing the seeps.

9. Finally, Figures 5.6 and 5.7 are provided to illustrate the relative magnitude of problems anticipated to be associated with excavating each of the materials. The factors considered in this evaluation are:
   - Gaseous emissions which would occur if the material is exposed.
   - Handling difficulties due to either the chemical (e.g., pH) or physical material properties.
   - Depth-related problems associated with access with conventional equipment and slope stability.
   - Schedule, because of the length of time that other problems would have to be dealt with and the time that the community and workers would be exposed to related risks.
   - Volume, which is a measure of the total effort required to excavate any material.

10. Figure 5.6 shows that the excavation problems would be greatest if removal of the asphaltic material were to be attempted. It is judged to represent the greatest amount of difficulty in all categories except handling. Even then, low pH and $SO_2$ emission characteristics would make handling of the asphaltic material significantly more difficult than normal soil type conditions.

11. The tarry material would be the next most difficult material to excavate because of its $SO_2$ emission and physical characteristics. This soft viscous material could not be readily handled with conventional equipment on a large scale basis or by pumping. Also, its flowing characteristics would make it extremely difficult to clean the bottom of an excavation for testing or backfilling.

12. Lesser, but still significant, difficulties would be encountered with excavation of the drilling mud. This soft, wet material will have very low shear strength and therefore would not be expected to be stable for steep excavation forces. The mixed soil material would have variable amounts of difficulty depending on its closeness to the tar.

90-336A/E1CR-5 6 REV 2/12/91

| MATERIAL \ PROBLEM | VOLUME | GASEOUS EMISSIONS CONTROL | HANDLING DIFFICULTIES | DEPTH RELATED PROBLEMS | SCHEDULE |
|---|---|---|---|---|---|
| Elevated Arsenic | ● | | | | |
| Drilling Mud | ● | ● | ● | ● | ● |
| Mixed Material | ● | ● | ● | ● | ● |
| Tar | ● | ● | ● | ● | ● |
| Asphaltic | ● | ● | ● | ● | ● |




FIGURE 5.6

**RELATIVE WASTE EXCAVATION PROBLEMS**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

REVISED FEBRUARY 12, 1991

13. Figure 5.7 qualitatively illustrates the overall relative degree of excavation problems anticipated for the various materials. The relative percentages were determined by ranking the degrees of difficulty for each material considering the last four categories shown in Figure 5.6. The relative rankings were then multiplied by the respective volumes to reflect the importance of problems and materials to be handled. This figure illustrates:

    - That the asphaltic wastes constitute about 75 percent of the problems which would be realized if large scale excavation of the sups were to be attempted. Considering that the asphaltic material does not present any significant amount of existing or future problems, it does not appear that its excavation could be justified under any alternative.
    - The tarry, mixed and drilling mud materials would present less, but still significant excavation difficulties. However because these materials (tar and drilling mud) also represent significant existing problems they will require special design consideration and/or treatment.

    An additional major remediation goal of this report is to provide appropriate treatment to the drilling mud and tarry material so that they will not represent long term problems, but without creating excessive short term problems or risks.

## 5.2 SPECIFIC REMEDIATION GOALS

1. With consideration of the NCP criteria and the unique site-specific characteristics of the McColl site, the following specific goals are recommended as being basic requirements for developing the most appropriate remedial action:

    - Eliminate, or reduce to insignificant levels, the health risks to the public, workers and the environment.
    - Treat all arsenic that generates a human health hazard by excavating it and thereby eliminating, or reducing to insignificant levels, the potential for exposure by direct contact and particulate emissions. Excavated materials will be appropriately treated, handled and disposed.
    - Eliminate, or reduce to insignificant levels, the current seeps and eliminate the potential for new seeps so as to preclude any exposure to odor or volatile organic compound emissions associated with any seeps.
    - Treat all tarry materials that generate a human health risk by excavation and treatment, or in situ treatment, so as to eliminate, or reduce to insignificant levels, the potential for exposure to volatile organic compounds and so as to eliminate, or reduce to insignificant levels, the potential for direct contact with seeps and inhalation of volatile chemicals from those seeps.
    - Minimize excavation to avoid the generation of $SO_2$ and benzene in emissions.
    - Solidify all waste whose geotechnical properties cause the material to be unstable or prone to failure/slippage (e.g., drilling muds).




FIGURE 5.7

**RELATIVE IMPLEMENTATION PROBLEMS ASSOCIATED WITH VARIOUS MATERIALS**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

REVISED FEBRUARY 12, 1991

- Contain (cap) all waste that does not generate a significant health risk.
- Control future migration of contaminants by designing remediation redundances (e.g., RCRA equivalent cap and slurry wall in combination with emission control wells).
- Collect emissions the design, implementation and maintenance of an emissions control system.
- Design all structures/improvements to withstand maximum credible earthquake.
- Minimize infiltration into the waste.
- Monitor groundwater.
- Comply with ARARs in achieving all of the specific remediation goals set forth above.

2. A summary of preliminary design procedures to meet these goals is discussed below in Section 5.3. Chapter 6.0 describes the development of a selective excavation alternative which meets these goals. Chapter 7.0 provides details of the recommended approach. A health risk assessment of the alternative is presented in Chapter 8.0, while Chapters 9.0 and 10.0 address NCP criteria compliance and comparisons, and ARARs to be satisfied, respectively,

## 5.3 DESIGN PROCEDURES TO MEET GOALS

1. The recommended design approach focuses on the excavation, neutralization, treatment and disposal of the materials that generate site risks and avoids unnecessary and/or dangerous excavation and/or incineration of site wastes. To accomplish the remediation goals, the approach involves multiple controls during selective on-site excavation and stabilization to limit short-term risks to acceptable levels. Also, emission control systems, slope stability measures and groundwater monitoring are provided to maintain site conditions after closure 80 that long-term risks are not increased.

2. The recommended design approach also includes removal of the near-surface, elevated (i.e., greater than 50 ppm) arsenic-containing materials to reduce the risk of exposure by ingestion or wind-borne inhalation. The depth of removal recommended is 3 feet; the risk assessment performed for the site indicates that even without protective measures such as the cap, there is no risk from the arsenic below 3 feet. But to provide additional assurance, the recommended design approach calls for the removal of the top 3 feet of arsenic which is to be replaced by clean backfill, prior to treating the underlying drilling muds. With these

provisions and the permanent closure cap and drainage control systems, there would be no opportunity for ingestion or wind erosion of any remaining arsenic-containing soil. The criterion of removing those materials containing greater than 50 ppm arsenic is based on dilution factors for the 5 mg/L TCLP standard.

3. The remedial actions are designed to meet ARARs (see Chapter 10.0) and protect the health and safety of all on-site workers and nearby residents. The protections include:
   - Site perimeter fencing or walls to be excavated to reduce $SO_2$ and VOC emissions.
   - Preneutralizing materials to be excavated to reduce $SO_2$ and VOC emissions.
   - Performing all excavations and in situ treatment within positive air pressure enclosures with redundant air collection and purification systems.
   - Continuous monitoring of emissions within the enclosures, around the enclosures, and at site perimeters.
   - Training of necessary workers in health and safety per OSHA standards and use of the appropriate types of personal protective equipment (PPE) at all times.
   - On-site health and safety monitoring and response by trained experts during all remediation work.
   - Establishing equipment decontamination areas and procedures, designating exclusion areas and site entry/exit controls in accordance with a specifically enforced site health and safety plan.
   - Carefully planning equipment operation and traffic control to limit potential for accidents.
   - Carefully collecting air treatment residues and decontamination liquids/sludges, and spent PPE or supplies, for appropriate treatment or offsite disposal under manifest.
   - Health risks and analysis of the remedial actions proposed are discussed in greater detail in Chapter 8.0.

4. For long-term geotechnical stability of sump materials, it is proposed that the material properties, as existing or after solidification, be such that differential settlements under planned loading conditions (including earthquake conditions) do not exceed 3 inches in 10 feet. This criteria will limit the potential for surface irregularities which could pond water and/or disturb surface runoff controls and reduce operation and maintenance requirements of the cap surface (e,g., small cracks, grading). Otherwise, a specially designed capping system will be required to accommodate greater differential settlement.

5. Immobility of the tarry material, as existing or after partial solidification, will be determined according to shear strength or cone penetrometer resistance. Materials with undrained shear strength of at least 500 psf, or cone tip resistance of about 25 $kg/cm^2$, are equivalent to "firm" soil and will not "flow" into or through overlying or adjacent materials, under expected loading conditions. If these criteria cannot be met by solidification, the cap system will be designed to accommodate the partially solidified conditions or the materials will be excavated.

6. Excavated materials will be incinerated offsite, or will be treated and redisposed at an off site landfill, or will be treated and redisposed on-site depending on their chemical and physical characteristics. The criteria for making this decision are:
   - Materials with a total petroleum hydrocarbon (TPH) value of greater than 100,000 ppm (10 percent) will be evaluated on a case-by-case basis to determine if they should be treated and disposed at a landfill or incinerated off-site. This concentration is selected because materials with significantly higher TPH concentrations can become difficult to handle and may not be accepted at landfills.
   - Materials with a TPH of between 10,000 ppm to 100,000 ppm will be treated and redisposed at a landfill.
   - Materials with a TPH of less than 10,000 ppm will be treated and redisposed onsite. This criteria is based on the California leaky Underground Fuel Tank (LUFT) Manual (DHS, 1989) for diesel fuel. The diesel criterion is selected because the VOCs will have been removed by in situ and aboveground treatment processes.

7. The design includes emission control systems in the cap and around the sump perimeters which preclude emissions or lateral gas migration. Collected emissions will be treated and required to satisfy air quality ARARs (see Chapter 10.0).

8. To prevent rainfall infiltration, the RCRA equivalent system will include demonstrated elements having the following characteristics:
   - RCRA equivalent cap with $10^{-7}$ cm/sec or less permeability.
   - Vegetative cover and rainfall run-off collection system.
   - Surface grading and drainage to direct rain water away from sumps.
   - Cement/bentonite containment wall extending below the sump materials around the sump perimeters.
   - Groundwater monitoring system to confirm no long-term impact by the site.

9. Slope stabilizing systems (backfills and crib walls) implemented prior to and/or after remediation will be designed to resist the short- and long-term static and seismic loading conditions associated with the maximum credible earthquake. The systems will be designed by state-of-the-art procedures and for conditions similar to those described in the Lindval, Richter & Associates seismic evaluation of the site (Lindval, et al. 1987).

6.0

# 6.0 DEVELOPMENT OF SELECTIVE EXCAVATION ALTERNATIVE

## 6.1 GENERAL

1. This chapter justifies a selective excavation alternative as the approach that satisfies the goals described in Chapter 5.0 (see Table 6.1). The procedure is aimed specifically toward accomplishing the following remediation requirements:

- **Requirement**:
  - Materials within 3 feet of the surface of Sump R-1 with arsenic concentrations above 50 ppm will be excavated and transported offsite for disposal at an acceptable landfill. This material will be solidified onsite or at the landfill to satisfy BDAT requirements of the federal land ban regulations.
  - Goals Satisfied:
    - Treatment of relevant materials without creating a high risk.
    - Eliminate or reduce health risks.
    - Excavate arsenic.
    - Minimize excavation.
    - Solidify waste.
    - Comply with ARARs.
- **Requirement**:
  - Drilling muds and tarry material will be excavated, or treated and solidified in situ, where required to eliminate geotechnical instability (differential settlement) and tarry material mobility (potential to cause surface seep) conditions.
  - Goals Satisfied:
    - Treatment of relevant materials without creating a high risk
    - Reduce tarry material mobility and toxicity.
    - Treatment of drilling muds.
    - Eliminate or reduce health risks.
    - Eliminate or reduce seeps.
    - Treatment of tarry materials.
    - Minimize excavation.
    - Solidify waste.
    - Contain waste.
    - Remediation redundancies to control any future migration.
    - Control any emissions.
    - Comply with ARARs.
- **Requirement**:
  - Excavation of tarry material will not be undertaken under any conditions where safety of workers and residents cannot be reliably assured. Specifically, this includes excavations which result in expansive excavation faces under large enclosures, because of the exposure to potential risks for illness or death to both onsite workers and nearby residents.

# TABLE 6.1

## ESTIMATED ADMIXTURE REQUIREMENTS

| MATERIAL | PURPOSE | TREATMENT TYPE | ESTIMATED ADDITIVES(1) | REFERENCES |
|---|---|---|---|---|
| Materials with Elevated Arsenic | • Satisfy Federal Land Ban Regulations | BDAT Solidification | • 10% Portland Cement | EPA, 1989a<br>EPA, 1988e |
| Drilling Muds | • Improve Geotechnical Properties | Solidification | • 15% Silicate<br>• 30% Portland Cement | EPA, 1988d<br>EPA, 1979g<br>EPA, 1989b |
| Tarry Material | • Reduce Acidity and Improve Handling Characteristics | Neutralization | • 30% Fly Ash<br>• 10% Lime | Patterson, 1985 |
| | • Improve Geotechnical Properties | Solidification | • 20% Fly Ash<br>• 30% Portland Cement<br>• 10% Lime | EPA, 1986f<br>EPA, 1986f<br>EPA, 1986f |
| Soil and Drilling Mud Mixed with Tarry Material | • Improve Geotechnical Properties | Solidification | • 30% Portland Cement<br>• 10% Lime | EPA, 1988c<br>EPA, 1986f |

(1) The volumes and types of additives will be optimized based on bench and demonstration tests conducted during predesign studies (see Section 7.2.10).

REFERENCES:

EPA, 1989a. Stabilization/Solidification of CERCLA and RCRA Wastes, Physical Tests, Chemical Testing Procedures, Technology Screening, and Field Activities, EPA/625/6-89/022. U.S. Environmental Protection Agency, Office of Research and Development, Center for Environmental Research Information and Risk Reduction Engineering Laboratory, Cincinnati, OH. May 1989.

EPA, 1989b. The Superfund Innovative Technology Evaluation Program: Technology Profiles, EPA/540/5-89/013. U.S. Environmental Protection Agency, Office of Research and Development, Risk Reduction Engineering Laboratory, Cincinnati, OH. November 1989.

EPA, 1988c. Technology Screening Guide for Treatment of CERCLA. Soils and Sludges, EPA/540/2-88/004. National Technical Information Services, Springfield, VA. September 1988.

EPA, 1988d. The Superfund Innovative Technology Evaluation Program: Technology Profiles, EPA/540/5-88/003. U.S. Environmental Protection Agency, Office of Research and Development, Risk Reduction Engineering Laboratory, Cincinnati, OH. November 1988.

EPA, 1988e. Revised Draft Report, Evaluation of Test Protocols for Stabilization/Solidification Technology Demonstrations, Prepared by PRC Environmental Management, Contract No. 68-03-3483. U.S. Environmental Protection Agency, Office of Research and Development, Cincinnati, OH. April 1988.

EPA, 1986f. Handbook for Stabilization/Solidification of Hazardous Waste, EPA/540/2-86/001. U.S. Environmental Protection Agency, Office of Research and Development, Hazardous Waste Engineering Research Laboratory. June 1986.

EPA, 1979g. Survey of Solidification/Stabilization Technology for Hazardous Industrial Waste by Environmental Laboratory, EPA/600/2-79-056. U.S. Environmental Protection Agency, Risk Reduction Engineering Laboratory, Cincinnati, OH.

Industrial Waste Treatment Technology, Second Edition. James W. Patterson, 1985. Butterworth Publishing, London, U.K.



90-336A (2/12/91/mh)

- Major Goals:
  - Treatment of relevant materials without creating a high risk.
  - Eliminate or reduce health risks.
  - Minimize excavation.
  - Control emissions.
  - Comply with ARARs.

- **Requirement:**
  - Excavation of tarry material will be accomplished only in small, discrete areas under conditions which provide very high assurance that workers and residents are not exposed to unnecessary risks.
  - Goals Satisfied:
    - Treatment of relevant materials without creating a high risk.
    - Eliminate or reduce health risks.
    - Minimize excavation.
    - Control any emissions.
    - Comply with ARARs.

- **Requirement:**
  - Excavated materials will be redeposited onsite, disposed at an offsite landfill, or transported offsite for incineration, according to the following criteria:
    - Dispose onsite if TPH < 10,000 ppm.
    - Dispose at landfill if TPH is 10,000 to 100,000 ppm.
    - Incinerate offsite or dispose at landfill if TPH > 100,000 ppm.
  - Goals Satisfied:
    - Treatment of relevant wastes without creating a high risk.
    - Treatment of arsenic containing waste.
    - Reduce tarry material mobility and toxicity.
    - Eliminate or reduce health risks.
    - Excavate arsenic.
    - Eliminate or reduce seeps.
    - Treatment of tarry materials.
    - Solidify waste.
    - Comply with ARARs.

- **Requirement:**
  - The hard asphaltic materials at the bottom portion of each sump, which do not pose geotechnical or mobility concerns, will not be excavated or treated in situ. Disturbance of these materials would pose unjustifiably large risks to both the public and workers, with no residual benefit.
  - Goals Satisfied:
    - Treatment of relevant materials without creating a high risk.
    - Eliminate or reduce health risks.
    - Minimize excavation.
    - Control any waste.
    - Control emissions.
    - Comply with ARARs.

- **Requirement:**
  - Remediated site closure procedures will assure: long-term protection of public health and the environment; elimination of potential nuisance odors', and an aesthetic condition compatible with the surrounding residential neighborhood. The main closure elements should include:
    - A RCRA equivalent cap to preclude the infiltration of water or the escape of emissions. If selective excavation cannot be undertaken safely, the cap will be designed for the geotechnical characteristics of the partially stabilized material or seeps which are not completely eliminated by in situ treatment and solidification.
    - A positive subsurface cutoff wall surrounding the sump areas to preclude outward emissions migration and infiltration of adjacent perched water.
    - Crib wall, or equivalent, embankment stability mechanisms (designed for maximum credible earthquake) at sump area boundaries with steep slopes.
    - Appropriate vegetation to provide both a park-like setting and protection of the RCRA equivalent cap components.
    - Curb and sidewalk improvements on the south side of Rosecrans Avenue and a site boundary wall.
  - Goals Satisfied:
    - Reduce tarry material mobility and toxicity.
    - Eliminate or reduce health risks.
    - Eliminate or reduce seeps.
    - Minimize excavation.
    - Contain waste.
    - Remediation redundancies to control any future migration.
    - Control any emissions.
    - Withstand maximum credible earthquake.
    - Minimize infiltration.
    - Comply with ARARs.

Selective excavation is the most appropriate balance between reducing risk and satisfying the remediation goals.

2. Figure 6.1 illustrates a remediation program which satisfies each of the requirements, with built-in flexibility to assure that unnecessary risk conditions are avoided, while accounting for benefits of predesign site characterization and field demonstration activities. The alternative's flexibility is based upon establishment of several "types" of conditions which collectively account for all potential sump characteristics. Section 6.2 describes the manner in which various types of conditions are established. Section 6.3 describes the individual remediation activities to be used for each type of area. Details for implementing the selective excavation alternative are described in Chapter 7.0.




FIGURE 6.1
**SELECTIVE EXCAVATION ALTERNATIVE FLOW DIAGRAM**
McCOLL SITE
ENVIRONMENTAL SOLUTIONS, INC.

## 6.2 TYPES OF SUMP CONDITIONS

1. Five types of characteristics are defined to account for the range of conditions anticipated for various sump areas. These are based on the sump characterizations described in Chapter 2.0, and determined from the available subsurface data and the 1990 test excavation. Section 7.2.9 describes the predesign characterization program recommended to subdivide each sump into the five area types as input to the final remediation design. Section 7.2.1 discusses waste material volumes determined from the available data used for estimating costs and implementing schedule requirements.

2. The **Type 1 Area** is designated to the portion of Sump R-1 which contains shallow arsenic concentrations. This material is expected to be just beneath a thin layer of overburden and within the top portion of the drilling mud. It is not anticipated that significant concentrations of $SO_2$ or VOC emissions will result from the shallow excavation of this material. The conservative estimated volume considered for this material in Section 7.2.1 is based on the requirement to remove 3 feet of material from one-third of the Sump R-1 area.

3. **Type 2 Areas** are those locations where selective excavation is planned because either:
   - There is an existing seep, or
   - The tarry material is several feet thick so that: (1) the potential for a future seep to occur is high, and (2) the potential for complete in situ solidification cannot be verified without successful field demonstration testing.

   As a minimum, it is estimated that selective excavation will be required at each of the existing seeps. The maximum estimate includes 24 locations of 1,250 square feet each (an average of two per sump, representing approximately one-third of the controlled sump areas) where complete solidification of the tarry material may not be possible.

4. **Type 3 Areas** are those locations where:
   - The tarry material is sufficiently thick and shallow so that the tar could potentially create a seep condition when additional weight is added by site grading and the closure cap.
   - The tar is relatively thin in comparison with the overburden thickness so that the potential for successful solidification is high. Anticipated in situ solidifying procedures and additives are discussed in Section 6.3.3.

   The exact configuration and depth of tar falling within this category will be finalized during the predesign program, as the detailed sump characteristics are developed. The analysis will be based on comparisons of tar conditions (depth and thickness) in existing seep areas and the

pressures which will be applied to zones with similar thickness at closure. Based on available boring data, it is conservatively assumed that tar thickness great enough to result in the combination of Type 2 and 3 areas will exist for about 75 percent of the total sump areas.

5. **Type 4 Areas** are those locations with thick drilling mud (Sumps R-1, -2, and -3) which could cause significant differential settlement to occur beneath the cap. These materials are expected to be readily solidified using procedures and additives discussed in Section 6.3.3.

6. **Type 5 Areas** are those locations which do not contain either drilling mud or a significant thickness of tar, so that no treatment will be required to improve geotechnical properties or reduce mobility potential. A significant number of the available borings outside of Sumps R-1, -2, and -4 (with drilling mud) indicate that this may be the case. For estimating purposes, it is assumed that approximately 25 percent of the total sump areas will not require either selective excavation or in situ treatment and solidification.

## 6.3 DESCRIPTION OF INDIVIDUAL REMEDIATION ACTIVITIES

### 6.3.1 ELEVATED ARSENIC MATERIAL EXCAVATION (TYPE 1 AREA)

1. Excavation will be performed in areas with arsenic concentrations above 50 ppm within 3 feet of the surface. Arsenic emissions during excavation are not a concern as long as conventional dust controls are implemented. However, pending confirmation of requirements during final design, it is assumed that this excavation will be performed under a small, 88-foot diameter enclosure. The enclosure will be connected to a treatment facility designed to remove particulate matter and any unexpected $SO_2$ or VOC emissions encountered during the excavation process.

2. Excavation of this shallow material will be accomplished using an excavator or gradeall type equipment. This equipment will work from a fixed position while excavating and loading to avoid the need for wheel or track mount which could create dust within the enclosure. Additional risk reduction factors will include:
   - Excavating at a low rate (10 to 15 cubic yards per hour) only in small areas at a time to minimize the dust generated; although particulate emissions will be naturally very low because the elevated arsenic is located at the top of wet drilling mud.
   - Prewetting dry overburden soil within the scheduled work area the night before excavation is to be implemented.
   - Use of fog spray equipment to minimize dust during truck loading.

- Maintaining at slight negative pressure on the enclosure to avoid outside dust migration. Air collected will be processed through a wet scrubber to remove dust which may be generated.
- Sealing of the transport truck inside the enclosure.
- Controlling the access door so that it is opened only when there are no significant dust-producing activities being implemented.

3. The excavated material will probably be hauled by the transport truck, following decontamination, directly to an acceptable landfill for BDAT solidification, to satisfy federal land ban requirements, and disposal. Table 6.1 shows the additives anticipated to be used to satisfy the BDAT requirements. If results of the predesign investigations indicate that onsite treatment of this material is preferable, the affected drilling mud would be partially solidified in situ before excavation, using procedures described below for drilling muds and portions of the tarry material.

6.3.2 IN SITU TREATMENT AND SOLIDIFICATION PROCEDURES (TYPE 3 AREAS)

1. The procedures for treatment and solidification (Type 3 Areas) are discussed before those for selective excavation (Type 2 Areas) because the in situ process is used to precondition material to be excavated. Procedures for the Type 2 Areas are described in Section 6.3.3.

2. The goals for in situ treatment and solidification at Type 3 Areas are:
   - Improve the geotechnical stability characteristics of the drilling mud and tarry material by improving their strength characteristics, so that they behave in a soil-like manner.
   - Eliminate the potential for tarry material mobility through overlying or adjacent materials by increasing its shear strength (viscosity) to that of a solid soil-like material.
   - Reduce or eliminate the potential for $SO_2$ generation and emissions from treated tarry and mixed tarry material, by raising the pH to above 7.0.
   - Reduce the $SO_2$ trapped in the material pore spaces through a combination of a pH increase and collection of emissions into a vacuum controlled shroud, provided at the ground surface above the material being treated.
   - Reduce the volatile organic compound (VOC) concentrations in the materials to levels significantly below those which presently exist, by also collecting vapors emitted from the solidification in the ground surface shroud. The VOC removal would be naturally enhanced by the hydration temperature increases resulting from neutralization and solidification activities.

3. The type of in situ treatment and solidification rig used will be similar to those presently available from Geocon (Figure 6.2) or Haliburton (Figure 6.3), or other remediation companies such as Toxic Treatment, U.S.A., who presently have equipment in operation for gas emission control, and equipment under development for adding solidification additives. Figure 6.4 illustrates the rig configuration for in situ treatment of the McColl sump materials. A 5-foot diameter auger blender will be used to treat cylindrical zones in an overlapping pattern which assures that 100 percent coverage is achieved. Table 6.1 provides admixtures estimated to be required to satisfy the solidification goals and criteria established in Chapter 5.0.

4. Normally a single shroud, such as that used and patented by Toxic Treatment, U.S.A. for emission control, is adequate, even when steam is injected to enhance VOC removal. However, to satisfy the specific McColl conditions and goals, the in situ operation for this site will be accomplished within a double enclosure system, illustrated in Figure 6.4. The internal enclosure would be a conventional steel shroud, hydraulically pushed from the crane rotary table, several inches into the existing ground surface. This shroud will be placed under vacuum, with one volume change per minute, to collect the emissions rising from the central, "kelly bar," drive for the auger blender. The vacuum system will transmit the emissions to a cleaning system consisting of: (1) a wet scrubber for dust control adjacent to the crane, and (2) a centralized $SO_2$ scrubber and VOC destruction system.

5. The outside enclosure, approximately 15 feet wide by 40 feet long (Figure 6.4), will collect any small emissions escaping from the shroud or the immediately adjacent ground surface. This redundant enclosure is not connected directly to the crane, but instead is supported on skids and pulled by a small dozer as the crane is moved from one treatment cylinder to the next. The structural form within the secondary enclosures, immediately outside of the excavation zone, is provided to temporarily contain the excess volume of material developed by the treatment and solidification process. This form extends sufficiently far behind the excavation zone to allow the material to undergo its initial "set", thus avoiding the potential for slurry materials to flow uncontrolled onto the site working area.

6. A blanket emission control system is shown immediately above the last several solidification cylinders, to collect any small remaining emissions which might occur as the material cures. This blanket will be connected directly to the enclosure vacuum system so that these remaining emissions are also directed to the air treatment system. The blanket will also protect the partially cured material against rainfall run-off.

90-336A/ETCR REV. 2/6/91



REFERENCE: GEO-CON, INC.

FIGURE 6.2

SHALLOW SOIL MIXER

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

90 336A/ETCR REV 2/10/91



REFERENCE HALIBURTON ENVIRONMENTAL TECHNOLOGIES

FIGURE 6.3

## IN SITU BLENDER

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

90-336A/ETC Rev 01/23/91




FIGURE 6.4

**IN SITU TREATMENT AND SOLIDIFICATION EQUIPMENT**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

7. Cost and schedule estimates discussed in Chapter 7.0 are based on treating and solidifying an average 5-foot diameter by 12-feet deep cylinder in 20 minutes. This equates to a production rate of 0.6 feet per minute or 25 cubic yards per hour, which is the lowest production rate expected for the in situ processing equipment currently available.

8. For solidification in the sumps containing thick drilling mud, the pattern of cylinders will be configured to allow the crane to "walk" across presolidified areas. This configuration avoids the need for the crane to be operated directly over the soft drilling mud.

### 6.3.3 TARRY MATERIAL EXCAVATION (TYPE 2 AREAS)

1. To satisfy both the goals and requirements described above, selective excavation of tarry material will be undertaken only where: (1) it is necessary to address where the volume of tar creates geotechnical stability and tar mobility issues, and (2) the work can be performed in a sufficiently small and defined area so that workers and residents are not exposed to significant risks.

2. Further, since most of the geotechnical and mobility problems can be resolved by in situ treatment and solidification, the selective excavation activities will be limited to only Type 2 areas; at existing tar seeps where mobility is known to occur, and locations where predesigned demonstrations cannot positively show that adequate in situ solidification is possible. Based on the examination of aerial photographs, it is estimated that there are approximately 51 existing seeps. The number of areas, if any, where the tar thickness will inhibit complete tarry material solidification is not known. The available boring data do not indicate any areas of thick tar, but the 1990 trial excavation (EPA 1990) did encounter a location where the tarry material is about 4 feet thick.

3. Figure 6.5 illustrates the selective excavation procedure for Type 2 areas which accomplishes the required goals and minimizes risks to workers and residents. The procedure includes the following special precautions:
   - The area of excavation will always be small, limited only to that necessary to address the geotechnical and mobility issues.
   - The excavation will be undertaken only after it is shown by predesign demonstrations that the process can be accomplished in a manner safe to both workers and residents.

90-336A/ETCR-08 Rev. 02/12/91




STEP 1. NEUTRALIZATION/PARTIAL SOLIDIFICATION OF TYPE 2 AREA




STEP 2. SAMPLING/TESTING




STEP 3. EXCAVATION BASED ON CRITERIA




STEP 4. REMEDIATED SUMP

FIGURE 6.5

**EXCAVATION SEQUENCE AT TYPE 2 SEEP OR POTENTIAL SEEP AREA**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

- Prior to excavation, the tarry and overlying mixed materials will first be neutralized and at least partially solidified using in situ techniques with a double emissions containment system as described in Section 6.3.2. Activities used for this purpose will be the same as those shown in Table 6.1 for in situ treatment and solidification.
- The actual excavation will always be conducted within a small enclosure, with strictly controlled activities and personnel. Equipment entry and egress from the enclosure will only occur after at least 1 foot of clay backfill is placed over any exposed asphaltic material.
- The excavation will be backfilled with clay concurrently with the excavation process (within the enclosure) so that the maximum exposed asphaltic material surface will always be less than about 15 square feet.

The overall selective excavation process is further described in the following paragraphs.

4. Tarry material preconditioning would be accomplished utilizing the in situ solidification equipment shown in Figure 6.4. The large diameter auger blender would first mix neutralizing materials into the tarry material to raise the pH above 7.0.

5. The process will be performed using a procedure which minimizes at any time the excavation opening size. This could be accomplished by using an excavator and hoe ram in tandem, for simultaneously excavating and backfilling, as illustrated in Figure 6.5. An alternative procedure would be to utilize a bucket auger rig to remove the treated and partially stabilized soil, followed immediately by backfilling so that only one cylinder would be opened at any given time. Potential disadvantages of the bucket auger option are that a drilling rig would have to be modified to operate within the enclosure and a special material handling system would be required to transfer material from the auger to a truck. During predesign, options will be evaluated so that the best approach is selected.

6. The excavation and backfilling process will take place within an enclosure anticipated to be approximately 88 feet in diameter and 24 feet high, illustrated in Figure 6.6. The assembled enclosure would be moveable by a single crane to various areas requiring excavation. This will avoid delays due to dismantling and remantling of the enclosure.

7. Excavated partially solidified material will be moved from the excavation enclosure to a second enclosure by dedicated onsite trucks or a conveyor system, which would be moved with the enclosure. Selection of the transportation mode during predesign will be based on verification of an arrangement which allows trucks to be easily moved into and out of the enclosure and across sumps which may not have been totally solidified.

90-336A/ETCR-09 REV. 02/12/91




NOT TO SCALE

FIGURE 6.6

**CURING AND SOLIDIFICATION ENCLOSURE**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

8. Once inside the second enclosure, the excavated material will be fed through a pug mill for additional conditioning and solidification. It is anticipated that after the in situ neutralization and pug mill conditioning, $SO_2$ and VOC emissions will be negligible. The conditioned material will be tested for TPH content to decide which of the following three disposal options would be appropriate, based on criteria established in Chapter 5.0:

   - Relatively clean, solidified materials with a total petroleum hydrocarbon content (TOC) of less than 10,000 ppm, will be transported back to the sump area and disposed on top of in situ solidified material for inclusion under the RCRA equivalent cap.
   - Materials with a TPH greater than 10,000 ppm but less than 100,000 ppm (10 percent organic material) will be removed offsite and disposed at an acceptable landfill.
   - Materials with a TPH exceeding 100,000 ppm will either be disposed at an acceptable landfill or incinerated at an offsite facility. The incineration versus landfill determination will be made during the predesign program based on the toxic characteristics of the material after excavation and treatment (expected to be very low), cost, and the recommendations of incinerators regarding their ability to appropriately treat the material.

## 6.3.4 SPECIAL CLOSURE CAP DESIGN CONSIDERATIONS

1. If it is possible to safely excavate the Type 2 Area, the entire RCRA equivalent cap will be constructed above material which is completely stable. In that event, geotechnical requirements for the cap will be related to the selection and construction of materials to satisfy performance specifications. However, if it is determined during predesign that excavation cannot be safely performed at some or all of the Type 2 Areas, appropriate portions of the cap will be designed to account for the actual degree of solidification and mobility reduction accomplished. It is anticipated that tarry material mobility reduction will be satisfactorily accomplished even with only partial solidification.

2. As a minimum, it is anticipated that the partial solidification activities will essentially eliminate the provision for significant volumes of tarry material to be mobile, and the degree of solidification will reduce potential differential settlement which might occur. This section describes engineering factors for this special design, if required. Differential settlement conditions, if any, will be accommodated by:

   - Providing an adequate cap slope at locations with potential for differential settlement, to assure a positive drainage. Conservative predictions of displacements would be developed based upon properties of partially solidified materials determined during the predesign program.

- Providing piping systems from materials which will deform without cracking, buckling, or breaking at couplings.
- Specifying clay water content and compaction criteria which assure sufficient material pliability so that excessive cracking due to settlement deformation does not occur.
- Providing synthetic liner materials, including seams, which allow elongation without tearing.

Designing of clay and synthetic cover and emission control systems to account for significant settlement is a relatively routine requirement for many landfill closures, particularly those which consist of municipal trash. Settlement of these landfills frequently exceeds 10 feet, and sometimes is as much as 50 or more feet as the trash volume reduces due to its natural biological degradation. Differential movements in those cases are many times greater than the few inches which could be expected for partially solidified materials at the McColl sumps.

### 6.3.5 FINAL CLOSURE ACTIVITIES

1. Final closure includes the following components, most of which are illustrated in Figure 6.7.
   - The RCRA equivalent cap with a configuration similar to that shown in the Figure. The gravel and perforated pipe layer at the base of the cap system would be utilized for the control of emissions which may occur from the sump areas. The clay and synthetic liner composite layer would function as an impermeable zone for preventing: (1) downward infiltration of water, and (2) the escape of vapors flowing within the emissions collection system. The drainage collection layer would collect water infiltrating through the top vegetative layer for discharge into the site's storm drainage system. The vegetative soil layer would be specified to support vegetation, which aesthetically complements overall site landscaping but does not have root depths which could affect other cap components.
   - A subsurface cement/bentonite (or equivalent) cutoff wall and emissions control system surrounding the sump areas as illustrated in the Figure. The wall will be 30 to 40 feet deep to extend below the bottom of the sump configurations. The perimeter emissions control system will consist of a row of extraction wells inside of and adjacent to the cutoff wall. The emissions control system will preclude the outward migration of emissions, and the cutoff wall will prevent the inward infiltration of perched water.
   - Crib walls, or equivalent slope stabilizing systems, constructed adjacent to the Lower Ramparts sumps and Los Coyotes Sump 1 where existing sump berms abut the property line. These would be designed to assure stability under maximum credible earthquake conditions as determined for the McColl site by Lindvall, Richter and Associates, 1987 (MSG, 1990). The slope stability enhancement external configuration would be designed by a landscape architect to assure its acceptable aesthetics and adequate provisions for growing proper vegetation.

6 11a




FIGURE 6 7

**ILLUSTRATION OF RCRA EQUIVALENT CAP CLOSURE ELEMENTS**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

- The installation of a small centralized, long-term air cleaning system, and a small operational office and parts warehouse in the central northern portion of the site, away from residences and site boundaries. The exterior of these facilities will be designed to blend into the landscaping. The air cleaning system will only be that required for the cap and perimeter emission control systems.
- Onsite grading and landscaping to safely control rainfall run-off and provide the park-like setting. Vegetation outside of the sump areas would include a sufficient number of large, decorative trees to create the desired aesthetics and especially to blend into the adjacent park and residential areas.
- Curbing and sidewalk construction along the south side of Rosecrans Avenue and a slump stone type wall along the site boundary at Frank B. Clark Park, Rosecrans Avenue and Sunny Ridge Drive. The design of these improvements will be compatible with similar features in the residential areas.

The landscape architecture elements of the closure are more fully described in Chapter 7.0.

2. The majority of the closure activities would be accomplished after selective excavation and in situ treatment activities are completed. To the extent possible from a geotechnical standpoint, the crib wall (or other slope stabilizing system) and related landscaping would be installed as part of the first construction activities to begin development of the desired buffer between the residences and the remediation activities.

7.0

# 7.0 RECOMMENDED ALTERNATIVE DESCRIPTION

## 7.1 GENERAL

This chapter describes the selective excavation alternative and its implementation process (Section 7.2), predesign activities to support implementation (Section 7.2.10), and a cost evaluation of the alternative (Section 7.3).

## 7.2 SELECTIVE EXCAVATION ALTERNATIVE DESCRIPTION

### 7.2.1 GENERAL

1. Major elements of the recommended alternative and its implementation are illustrated in Figure 6.1. The main activities include:

   - Prior to commencing remediation activities in the sumps, berm reinforcement and grade modifications will be performed to provide slope stability improvements. A combination of backfill and reinforced crib walls are planned to modify existing berms, which are as steep as 1-1/2 horizontal to 1 vertical, to withstand the maximum credible earthquake. Backfill will be used wherever possible and designed so as not to encroach on adjacent properties. Other areas will require crib walls (e.g., concrete-beam, reinforced earth structures) constructed on the existing berms within the site property limits. Crib wall construction will not require excavation of sump materials (wastes). The backfills and crib walls will be designed so that they can be extended to provide support to the final closure cap, as well and carefully integrated with the containment (cement bentonite cut-off wall) and closure cover elements. These slope stabilizing features have the advantage of providing a buffer from remediation activities and the base for attractive landscaping.

   - Materials in the 12 sumps, above the hard asphaltic layers, will be divided during predesign site characterization into five "types" of areas and handled as follows:

     - <u>Type 1 Areas</u>: Materials within the top 3 feet of any sump with arsenic concentrations greater than 50 ppm will be excavated, treated, and disposed at an acceptable landfill. The 50 ppm action level is based on dilution factors for the 5 mg/L TCLP standard. With 3 feet of backfill, the permanent closure cap, and drainage control systems, there would be no opportunity for ingestion or wind erosion of any remaining arsenic-containing soil. The material will be stabilized onsite or at the landfill location using procedures which satisfy BDAT requirements of the Federal land ban regulations. Based on available site date, it is expected that elevated arsenic material will be excavated only from Sump R-1.

- Type 2 Areas: These areas will consist of the existing seeps and tar zones where solidification may not satisfy differential settlement/ immobility criteria. Each area will be assessed as to whether or not it can safely be excavated after neutralization and partial solidification, and the following appropriate actions will be taken:
  - If excavation is determined to be safe, the area and a surrounding several-foot buffer zone will be preneutralized and partially solidified, excavated, and backfilled. Excavated and treated materials will then be disposed onsite, transported offsite for disposal, or incinerated depending on TPH.
  - If excavation is not safe, the area will be treated and solidified in situ to the extent possible and tested for its solidification characteristics (i.e., strength and consolidation). An evaluation of potential differential settlement will be performed to determine whether or not a special cap design is needed in this area. The special cap design, if required, will accommodate predicted settlements.
- Type 3 Areas: Zones which have a thickness and depth of tarry material which could pose stability/mobility problems, but in which solidification success is anticipated, will be treated and solidified in situ. Post-treatment testing will be performed to confirm that the degree of solidification required has been achieved. If solidification is satisfactory, no further special treatment will be required. If not successful, a closure cap will be designed to accommodate the partially-solidified conditions in the area.
- Type 4 Areas: These areas contain zones of drilling muds which require solidification to eliminate differential settlement potential. They will be solidified in situ, tested and evaluated. If predicted differential settlements after testing do not meet the design criteria for the normal RCRA equivalent cap, a special cap design will be installed which accommodates the remaining predicted settlements.
- Type 5 Areas: These are the remaining sump areas where predesign characterization and analysis indicate that no improvements are required.

Table 7.1 provides estimates, based on the currently available data, of the sump volumes expected to be grouped into each area type. Two estimates are provided based on interpretation of the minimum and maximum volumes expected to be excavated.

- After excavation and in situ treatment activities are completed, a RCRA equivalent closure system will be provided consisting of the following containment, slope stabilizing and aesthetic features:
  - A cement/bentonite containment wall constructed entirely around the sump areas and extending below the treated materials to prevent outward gas migration and inward infiltration of perched water.
  - Installation of a RCRA equivalent cap over the sump areas with integral impermeable layers, emission control system, surface water collection system and vegetative cover layer to provide redundant containment of gas migration and water infiltration.
  - Placement of a network of vertical emission control wells along the inside face of the cement/bentonite containment wall.

# TABLE 7.1

## ESTIMATED SUMP AREA WASTE MATERIAL VOLUMES BY TYPE

| MATERIAL TYPE | ESTIMATED VOLUME OF MATERIAL[1] | | | |
|---|---|---|---|---|
| | CASE 1 SELECTIVE EXCAVATION AT EXISTING SEEP AREAS | | CASE 2 SELECTIVE EXCAVATIONS AT EXISTING SEEP AREAS AND 24 PARTIALLY SOLIDIFIED LOCATIONS | |
| | IN PLACE VOLUME (Bank Cubic Yards) | VOLUME AFTER EXCAVATION AND SOLIDIFICATION (Loose Cubic Yards) | IN PLACE VOLUME (Bank Cubic Yards) | VOLUME AFTER EXCAVATION AND SOLIDIFICATION (Loose Cubic Yards) |
| ELEVATED ARSENIC MATERIAL - TYPE 1 | 1,800 | 2,300 | 1,800 | 2,300 |
| TYPE 2 | | | | |
| • Excavated, Treated, and Disposed at Offsite Landfill | 1,960 | 3,140 | NA | NA |
| • Excavated and Incinerated Offsite | NA | NA | 4,230 | 6,770 |
| • Excavated, Treated, and Redisposed Onsite | 2,120 | 3,490 | 9,930 | 15,990 |
| TYPE 2 SUBTOTAL | 4,080 | 6,630 | 14,160 | 22,760 |
| TYPE 3 - In Situ Solidified Tarry Material and Soil and Drilling Mud Mixed with Tarry Material | 14,640 | NA | 8,080 | NA |
| TYPE 4 - In Situ Solidified Drilling Mud | 9,380 | NA | 5,860 | NA |
| TYPE 5 - Materials with No Required Improvement | 8,700 | NA | 8,700 | NA |
| TOTAL | 38,600 | 8,930 | 38,600 | 25,060 |

NA = Not Applicable

(1) These estimated volumes were used in cost estimate.

90-336A (2/12/91/mh)

- Site grading and construction of drainage systems to collect and direct rainfall run-on and run-off for erosion control and additional infiltration prevention.
- Extension and completion of backfills and crib walls, and site grading to provide adequate factor of safety for long-term slope stability under both static and earthquake loading conditions.
- Installation and implementation of ground water monitoring system to confirm no long-term impact from the closed site.
- Final landscape contouring and tree/shrub planting to provide an aesthetically pleasing "park-like" setting which integrates with the surrounding community.

2. The following sections (7.2.2 through 7.2.9) describe details for the recommended selective excavation alternative and its implementation, which will be refined and improved as part of the predesign activities. A summary schedule and a preliminary schedule of predesign, design, and implementation are shown in Figures 7.1 and 7.2, respectively. The discussions follow the sequence of graphics illustrated in Figures 7.3 through 7.12 to illustrate site conditions and the types and sequencing of equipment operations to be used for actual remediation.

3. Section 7.2.10 describes the recommended predesign activities to provide data for the final remediation design. A cost evaluation for the alternative is presented in Section 7.3.

## 7.2.2 SITE CONDITION NO. 1 - EXISTING CONDITIONS

1. Figure 7.3 shows "Site Condition No. 1" which is the existing condition as determined from aerial photographs and topographic maps developed in November 1990. Key features shown are:

   - The relatively steep existing slope between the Upper Rampart and Lower Rampart sumps which will require that these two areas be handled at separate times.
   - The relatively steep slope adjacent to the southwestern boundary of the Lower Rampart sumps, immediately adjacent to the property boundary and the nearby residences. The slope represents an area where special considerations may be required for supporting an environmental enclosure and establishing excavation boundaries.
   - The existence of a large drainage culvert near the southwest portion of the site (west of the Los Coyotes sumps) which can continue to be utilized as the main drainage path for run-off from most of the site.
   - The existing decontamination facility near the center of the site which will be upgraded and utilized as part of the work described in the following sections.

# FIGURE 7.1

## SUMMARY PROJECT SCHEDULE
## SELECTIVE EXCAVATION ALTERNATIVE

| LINE | ACTIVITIES |
|---|---|
| 1 | **PRE-EXCAVATION/SOLIDIFICATION ACTIVITIES** |
| 2 | Prepare Work Plan |
| 3 | Predesign Phase |
| 4 | Design Engineering Phase |
| 5 | Equipment and Material Procurement |
| 6 | Permitting and Approvals (ARAR Satisfaction) |
| 7 | General Site Facilities and Infrastructure |
| 8 | Construct Enclosure Air Treatment Facility |
| 9 | Install Solidification and Curing Enclosure and Equipment |
| 10 | Construct Movable Excavation Enclosure |
| 11 | Construct Crib Walls |
| 12 | |
| 13 | **STAGE I EXCAVATION/SOLIDIFICATION (RAMPARTS)** |
| 14 | |
| 15 | **STAGE II EXCAVATION/SOLIDIFICATION (EAST LOS COYOTES)** |
| 16 | |
| 17 | **STAGE III EXCAVATION/SOLIDIFICATION (WEST LOS COYOTES)** |
| 18 | |
| 19 | **SITE CLOSURE ACTIVITIES** |
| 20 | RAMPARTS CLOSURE |
| 21 | LOS COYOTES CLOSURE |
| 22 | |
| 23 | Installation Permanent Gas Treatment and Irrigation Systems |
| 24 | Final Site Grading and Landscaping |
| 25 | Demobilization and Final Site Cleanup |




90-336A (2/12/91/dh)

7-3a

FIGURE 7.2

PRELIMINARY PROJECT SCHEDULE
SELECTIVE EXCAVATION ALTERNATIVE

Page 1 of 1




Exhibit 43
5952

90-336A (2/12/91/mh)



Exhibit 43




FIGURE 7.3

SITE CONDITION NO. 1
EXISTING CONDITIONS

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

90-336A/ETC, REV 02/12/91




FIGURE 7.4

**SITE CONDITION NO. 2**
**SITE INFRASTRUCTURE AND**
**PERIMETER CRIB WALLS**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

7-3d




FIGURE 7.5

**AIR TREATMENT SYSTEM FLOW DIAGRAM**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 43
5956

90-336A/ETCR-12 REV 02/12/91




FIGURE 7.6

**SITE CONDITION NO. 3**
**TYPE I AREA**
**ELEVATED ARSENIC REMOVAL**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

7-3f

90 336A/ETCH-14 REV 02/12/91




FIGURE 7.7

**SITE CONDITION NO. 4**
**NEUTRALIZATION,**
**PARTIAL STABILIZATION**
**AND SELECTIVE EXCAVATION**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

7-38

90-336A/ETCr REV 02/12/91




FIGURE 7.8

**SITE CONDITION NO. 5**
**IN SITU TREATMENT**
**AND SOLIDIFICATION**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

7-3h

Rev 02/10/91

90-336A/E"




FIGURE 7.9

**OVERLAPPING PATTERN OF IN SITU TREATMENT CYLINDERS**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

90-336A/ETCR-10 REV. 02/12/91




FIGURE 7.10

## SITE CONDITION NO. 6
## COMMENCE CLOSURE ACTIVITIES

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

7-3j

90-336A/ETCR-7.10 REV 2/11/91




FIGURE 7.11

**SITE CONDITION NO. 7**
**COMMENCE CAP INSTALLATION**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

7-3k

- The area with existing trial excavation material stockpiles and drum storage area will be cleared, including removal of all materials and drums to appropriate offsite disposal facilities.
- The existing site facilities area which will be reworked and utilized for remediation.

2. Earthquake slope stability improvements (e.g., backfill against slopes and crib wall) will be started as early as possible to provide short-term stability during construction, added buffer from operations, and improved aesthetics. Predesign activities will include evaluation of the feasibility of performing these improvements in conjunction with infrastructure preparation.

### 7.2.3 SITE CONDITION NO. 2 - INFRASTRUCTURE REQUIREMENTS

1. Figure 7.4, "Site Condition No. 2", shows the general arrangement of the site infrastructure required to complete field activities. Table 7.2 summarizes the main components of the general facilities.

2. A fence will initially be constructed to subdivide the site into the following two basic areas:
   - The northwest portion of the site will be an unrestricted area, accessible to suppliers, truck drivers, etc., who do not have 40-hour health and safety training required to enter a hazardous waste site.
   - The entire remainder of the site, where excavation and materials handling activities will take place, will be classified as an exclusion area with limited access.

3. The site personnel facility, personnel decon building, and laboratory are sized to accommodate the number of site employees (average 46, maximum of 70) anticipated. The maintenance and materials receiving building and warehouse are sized to accommodate spare materials and perform routine maintenance of site equipment. The bulk material storage area has access from both the unrestricted and exclusion areas so that materials can be: (1) brought onto the site by truck drivers without 40 hours of health and safety training, and (2) then removed to working areas by persons with appropriate training. The northernmost portion of the site is designated as a parking and truck staging area. This area is necessary to avoid having either supply trucks (e.g., lime, cement, fly ash trucks) or waste haulage trucks being staged along Rosecrans Avenue.

90 336A/ETCR 7 12 REV 2/11/91




FIGURE 7.12

**PERSPECTIVE VIEW AFTER CLOSURE**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

# TABLE 7.2

## SUMMARY OF INFRASTRUCTURE ITEMS

| FACILITY | SIZE | DESCRIPTION |
|---|---|---|
| Air Treatment Area | 5,000 S.F. | • Air Scrubbing, Blower, and Incinerator Units |
| Security Gate | 160 S.F. | • Prefabricated Structure<br>• Controlled Site Entrance |
| Personnel Break Room Remote Area | 400 S.F. | • Prefabricated Structures<br>• Break Facilities |
| Laboratory | 1,100 S.F. Laboratory/ 1,100 S.F. Storage | • Prefabricated Structure<br>• Chemical Analysis; Health and Safety Equipment Storage |
| Bulk Materials Storage | 15,000 S.F. | • Bulk Storage of Cement, Lime, Fly Ash<br>• Bulk Storage of Gasoline, Diesel, Lubricants |
| Personnel Decontamination Facility | 2,900 S.F. | • Prefabricated Structure<br>• Provide Controlled Access to Contaminated/Uncontaminated Areas |
| Personnel Break Room Work Area | 2,800 S.F. | • Prefabricated Structure<br>• Lunch Room and Break Facilities |
| Maintenance Building | 2,200 S.F. | • Prefabricated Structure<br>• Provide Maintenance of Decontaminated Equipment |
| Warehouse | 2,900 S.F. | • Prefabricated Structure<br>• Spare Parts Storage |
| Site Operations and Administration | 2,900 S.F. | • Prefabricated Structure<br>• Facilities Administration |

4. The main structures within the exclusion area will be the emission control system and the curing enclosure for treated and solidified materials to be replaced onto the site or hauled offsite for appropriate disposal. The air treatment facility is centrally located to be relatively close to operations at any of the sumps, and will remain at the same location for the entire remediation program. If a stack location is required to be separate from the treatment facility, an additional blower and duct will be provided so that the treated air could be moved from the fixed treatment facility to the exhaust location.

5. Figure 7.5 shows an example flow diagram for the emission control system anticipated for in situ stabilization and selective excavation. The following two parallel systems will be provided:

   - The first system will be designed to handle contaminated air from two auger stabilization units operating at once. The system will operate in the following way:
     - Air from the steel shroud surrounding the Kelly bar of the auger will be extracted by a liquid jet scrubber (the primary scrubber) which will operate using caustic soda solution. This scrubber will remove the dust and some sulfur dioxide.
     - Air from the secondary containment enclosure, which surrounds the Kelly bar shroud, will bypass the primary scrubber because it is dust free and low in $SO_2$. This air will mix with the exhaust air from the primary scrubber and the combined mixture will be scrubbed in a packed tower secondary scrubber. The secondary scrubber will use circulating caustic soda as a scrubbing medium.
     - A ground emission control blanket will also be provided to remove any emissions which might remain after in situ stabilization. This blanket will be designed for an air flow of 300 cubic feet per minute (cfm) and will be connected to the main scrubber duct.
     - The air from the secondary scrubber which still contains VOCs will be treated in an incinerator designed to attain 99.99 percent destruction of the volatile organics.
   - The second air treatment system will treat air from the excavation enclosure and from the solidification enclosure.
     - The excavation enclosure will be designed for two air changes per hour, which amounts to 5,000 cfm. It will be provided with a separate diesel exhaust system sized for 1,000 cfm.
     - The solidification enclosure will be provided with one-fourth of an air change per hour, amounting to 5,000 cfm. It also will have a separate fume extraction hood over the solidification pug mill, where 1,500 cfm of air will be extracted.
     - The extractor hood air and the diesel exhaust air will both be treated in particulate jet scrubbers to remove dust and soot, respectively.
     - The exhaust from the dust scrubbers will join the main air extracted from the enclosures. This air, which will contain some sulfur dioxide, will be treated in a packed scrubber. The exhaust from the scrubber will pass through a second incinerator to destroy VOCs.

- The packed tower scrubbers (S-3 and S-6) and the incinerators will be at one central location. The jet scrubber (S-1, S-2 and S-5) will be skid mounted and capable of being moved, probably daily. The exhaust from the jet scrubbers will be connected to a central duct which has multiple quick disconnect connectors or flanges.
- All condensate tanks will be monitored, replaced as necessary, and the collected waste materials properly handled and transported under manifest to the appropriate toxic substance treatment or disposal facility.

The two air treatment systems will be cross-connected to provide redundancy in the event of the breakdown of a component from either of the systems. For example, if the treatment system for the air within the steel shroud has a component failure, this will be detected by the monitors and augering will terminate. However, the secondary air treatment system will then continue to treat all air within the collection lines to prevent any emissions.

6. The curing facility will be located adjacent to the clean area to avoid the need for offsite trucks to move throughout the remainder of the site.

### 7.2.4 SITE CONDITION NO. 3 - ELEVATED ARSENIC REMOVAL

1. The initial excavation activity to be accomplished will be removal of the materials with elevated arsenic concentrations within an enclosure as shown in Figure 7.6.

2. Because of the potential for $SO_2$ or VOC emissions associated with this relatively minor excavation (i.e., 2,000 cubic yards or less), it will be accomplished under the small enclosure, discussed below for the selective tarry material excavation activities. Because the elevated arsenic is expected to exist within the drilling muds, it is anticipated that some degree of pretreatment or solidification onsite may be required to prepare this material for transport to an offsite landfill. This pretreatment activity will be accomplished within the curing enclosure and may also include the level of stabilization necessary to satisfy BDAT requirements of Federal land ban regulations unless it is determined that stabilization can be accomplished more effectively at the ultimate landfill disposal area. In that event, the material will simply be solidified adequately for transport.

### 7.2.5 SITE CONDITION NO. 4 - NEUTRALIZATION, PARTIAL STABILIZATION, AND SELECTIVE EXCAVATION

1. The next activity, illustrated in Figure 7.7, will be the selective excavation of tarry material (Type 2 Areas) where required, because of existing seep conditions and/or concern that in situ stabilization may not adequately satisfy the established criteria for all locations. Excavation will be accomplished by the following procedures illustrated as Steps 1 through 4 in Figure 6.5 and further described as follows:

   - Step 1 will consist of utilizing the in situ treatment and solidification rig (see Figure 6.4) to inject additives into the tarry material and adjacent mixed materials (buffer zone) in order to neutralize and solidify the materials adequately for materials handling. Neutralization and solidification activities will extend across the questionable zone plus a buffer zone of several feet in all directions.
   - Step 2 will involve careful examination and testing of the solidified areas to determine the zones, if any, where adequate solidification has not been accomplished to satisfy the differential settlement or mobility criteria established during predesign engineering.
   - Step 3, the selective excavation operation, will consist of the actual removal of the materials using procedures as previously discussed in Section 6.0 and illustrated in Figure 6.5. It is anticipated that the majority of the excavated material near the ground surface will be relatively clean and therefore in a condition for backfilling into a sump area onsite. Material with significant concentrations of organics will be removed to the curing enclosure and prepared for offsite disposal. The offsite destination will be either a landfill or incinerator. The following criteria will be used to determine the material disposition:
     - TPH <10,000 ppm, onsite redeposit.
     - TPH 10,000-100,000 ppm, disposal at appropriate landfill.
     - TPH >100,000 ppm, incineration offsite or disposal at appropriate landfill.

### 7.2.6 SITE CONDITION NO. 5 - COMMENCEMENT OF IN SITU TREATMENT AND SOLIDIFICATION ACTIVITIES

1. Figure 7.8 illustrates how in situ treatment and solidification will be accomplished using two auger rig setups operating in different portions of the site. The purpose of two rigs is primarily to reduce the overall project schedule. These operations will occur in: (1) those locations (Type 4 Areas) where drilling muds exist (Sumps R-1, R-2 and R-4), and (2) where predesign probing indicated that tarry material exists at a depth, configuration and volume which could ultimately result in a seep or differential settlement condition (Type 3 Areas); including those locations of existing seeps where it was determined that excavation was not safe (Type 2 Areas). The exact sequence for moving the in situ solidification rig over a designated area requiring this treatment will be determined during predesign and design

stages. Figure 7.9 illustrates the type of solidification pattern which could be utilized to assure that all areas within the selected zone were covered and to provide a procedure for the in situ solidification crane to work over previously solidified materials whenever possible.

2. As each designated in situ treatment and solidification area is completed, the auger rig will be moved to a new designated location. Subsequently, within a specified period, closely spaced probing will be accomplished in the completed area to assure that conditions required for the differential settlement and mobility criteria are satisfied. If locations of inadequate solidification are identified, those areas will have a specially designed cap installed to accommodate the partially solidified conditions.

3. Based on admixture requirements (Table 6.1), it is estimated that 13,000 cy of lime, cement and fly ash will be required to solidify the estimated quantities of sump materials.

7.2.7 SITE CONDITION NO. 6 - COMMENCEMENT OF CLOSURE ACTIVITIES

1. After approximately 12 months, the in situ work will have been completed, and closure activities will be started as discussed in the following paragraphs and illustrated in Figure 7.10.

2. A cement bentonite slurry wall (or an equivalent system determined during predesign) will initially be constructed around the Rampart sumps. This operation includes excavation of a trench to a depth of 30 to 40 feet into the natural soil and dike materials. Trench sidewall stability will be temporarily provided by a bentonite slurry. Cost estimates for the cement bentonite wall is based on handling of the materials within contained transport and mixing units to avoid risks associated with the more typical procedure of mixing materials in open sumps prior to trench backfilling.

3. An emission control system will be installed on the inside face of the cement bentonite wall to provide an active control system for removing emissions, which could potentially migrate internally from the closed sumps. The configuration of these wells is shown in Figure 6.7.

4. Initial closure activities will include completion of additional crib walls, if required, in areas where improved long-term slope stability is determined to be desirable or necessary. The locations may include a portion of the berm at the south side of the Lower Rampart sumps, at the steepest portion of remaining slope near Sump R-4, and possibly at the northeastern end of

the East Los Coyotes sumps, where the excavation will have occurred near to the property line and adjacent residences and along the west side of Sump L-3. As discussed in Section 7.2.1, the majority of the crib walls adjacent to the residences will be constructed in conjunction with initial infrastructure development, if possible.

### 7.2.8 SITE CONDITION NO. 7 - COMMENCEMENT OF CAP INSTALLATION

1. Figure 7.11 illustrates that after the cement bentonite wall is completed in the Rampart sump area, the trenching equipment will be relocated to the Los Coyotes sump area. Final cap construction will then be initiated in the Ramparts area.

2. Figure 6.7 shows a typical cross section through the final cap. Pending final design, it is assumed that the cap will include the following elements (from top to bottom):
   - Vegetation and Irrigation System
   - Vegetative Soil Cover
   - Infiltration Seepage Collection, Geocomposite Layer
   - Low Permeability Layer - Composite of Clay and Synthetic Membrane
   - Gas Collection Layer - Geotextile Filter Layer, Gravel and Perforated Pipes

3. Most of the main emission control facility will be removed at this time. A small portion of the emission control facility is required for long-term emission controls for the cap and perimeter emission control systems.

### 7.2.9 SITE CONDITION NO. 8 - SITE CONDITION AFTER CLOSURE

1. Figures 7.12 illustrates site conditions after the cap is completed over both sump areas, and landscaping is completed. Most of the buildings required during remediation activities will be removed and the entire area will be graded for drainage. The remaining structures will include the small long-term emission control facility (Figure 7.13) and a site operations and administration office. These facilities will be either remodeled or reconstructed to have the appearance of "park administration" buildings to compatibly blend into the landscaping, discussed below. The landscaping and irrigation system will be designed by a landscape architect with special expertise for developing parks in southern California.

90-336A/ETCR 7 2 REV 2/12/91




FIGURE 7.13

**SCHEMATIC OF SULFUR DIOXIDE SCRUBBER AND HYDROCARBON-ACTIVATED CARBON ADSORPTION SYSTEM**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

7-9a

2. At least the following four types of vegetation will be provided:

   - Vegetation directly above the cap will consist of a variety of grasses and shallow root shrubs which will provide an "open area" park appearance, without the potential to damage the seepage or low permeability layer portion of the cap system. These areas could either consist of vegetation requiring year-round irrigation or could be California native species which are dormant during the summer period.
   - Vegetation provided on the crib walls, adjacent to the residences will provide an attractive vegetative covering.
   - Large decorative trees located along Rosecrans Avenue and Sunny Ridge Drive to provide a park-like image to the entire site property. These trees will be selected to be compatible with vegetation in the nearby communities, the Los Coyotes Golf Course, and the Frank B. Clark Park.
   - A variety of smaller shrubbery compatible with the local area, for locations outside the sump areas. These plants and related ground cover will be selected to blend into the surrounding land uses and control site erosion.
   - Improvement along Rosecrans Avenue including curb and gutter, sidewalks, and a slump stone wall.

### 7.2.10 PREDESIGN ACTIVITIES

1. The predesign activities recommended below have the following purposes:

   - To define the area within Sump R-1 which needs elevated arsenic-containing materials removed.
   - To evaluate sumps against settlement and mobility criteria and volume for refining our understanding to characterize sump conditions for subdividing the sump areas into Types 1 through 5.
   - To develop final criteria and post-treatment tests for acceptable differential settlement and mobility.
   - To finalize type and amount of additives required for neutralization and solidification.
   - To acquire data to aid in equipment selection and performance verification.

2. The scope of predesign activities will include:

   - Workplan preparation.
   - Sump characterization.
   - Bench scale treatment/solidification tests.
   - In situ treatment and solidification demonstration.
   - Data evaluation.
   - Sump subdivision into treatment area types.
   - Preparation of final remediation Workplan.
   - Preparation of Predesign Report.

3. The predesign program is needed to finalize the remedy in accordance with the pre-established criteria.

4. For sump characterization, additional data is needed on material distribution, physical properties, and chemical properties of the tarry waste. This will be accomplished by a preplanned program of selective cone penetrometer probes, soil borings and sample collections, and laboratory chemical and physical (mechanical) property tests.

5. Using actual bulk samples of the sump materials, laboratory bench scale tests will be performed to evaluate the beneficial effects (neutralizing and solidifying) of different types and amounts of additives (e.g., lime, cement, fly ash).

6. In situ treatment and solidification tests will be planned and performed at selective areas representing the range of conditions within the sumps. These may include cone penetrometer tests, plate load bearing tests, laboratory shear strength on cones, and chemical analyses. The equipment used will be selected from available demonstrated processes with some minor modifications to fit site conditions.

7. Data from the sump characterization, bench scale and in situ treatment tests will be evaluated in total to provide the design criteria, equipment selection, performance verification techniques, and to delineate each treatment type area on the site plan. Further, the data and test results will be used to refine and finalize the implementation process and equipment/operations sequencing.

8. Methods, data results, and conclusions will be summarized in a documentation report. Also, the final Workplan for remediation will be prepared.

## 7.3 RECOMMENDED ALTERNATIVE COST EVALUATION

1. Preliminary cost estimates (Table 7.3) for the selective excavation procedures discussed above have been developed for the following two cases, which are expected to limit the range of potential for seeps and tarry material which may exist:

   - **Case 1 - Minimum Costs** considering:
     - Selective excavation of approximately 4,100 bcy (bank cubic yards - unexcavated or treated) of material at approximately 50 existing seeps identified in aerial photos.
     - The onsite redisposal of 3,500 cy of solidified material with TPH <10,000 ppm.
     - Offsite landfill redisposal of 3,100 cy of solidified material with TPH >10,000 ppm.

# TABLE 7.3

## ESTIMATED COSTS FOR SELECTIVE EXCAVATION OPTION

| ITEM | CASE 1 ELEVATED ARSENIC, MATERIAL AT EXISTING TAR SEEPS ONLY ($) | CASE 2 ELEVATED ARSENIC, MATERIAL AT 24 TYPE 1 AREAS AND REMAINING EXISTING TAR SEEPS ($) |
|---|---|---|
| Engineering, Procurement and Permitting (predesign and design)(1) | 6,089,000 | 6,089,000 |
| Site Management, Services and Operations | 6,554,000 | 6,554,000 |
| General Site Facilities and Infrastructure | 5,205,000 | 5,400,000 |
| Emissions Control Enclosures and Air Treatment Facilities | 6,281,000 | 5,507,000 |
| Material Excavation, Treatment/Processing/Loadout Operations | 935,000 | 1,970,000 |
| In Situ Treatment and Solidification Equipment and Facilities | 6,709,000 | 6,709,000 |
| Offsite Waste Handling/Treatment/Disposal | 2,242,000 | 11,361,000 |
| Site Closure Activities | 5,050,000 | 5,050,000 |
| Demobilization (including equipment decon) | 539,000 | 539,000 |
| Net Salvage Value (40% of plant equipment) | (1,750,000) | (1,750,000) |
| **Subtotal Costs** | 36,854,000 | 47,429,000 |
| General Contractors Fee (5% excluding offsite disposal costs) | 1,818,000 | 1,891,000 |
| **Subtotal Costs** | 38,672,000 | 49,320,000 |
| Contingency for Estimate Uncertainties (15%) | 5,801,000 | 7,398,000 |
| **Subtotal Costs** | 44,723,000 | 56,718,000 |
| McColl Site Group Costs | 2,250,000 | 2,250,000 |
| **Subtotal Costs** | 46,723,000 | 58,968,000 |
| Allowance for Escalation (5% per year) | 7,592,000 | 9,582,000 |
| **TOTAL ESTIMATED PROJECT COST THROUGH CLOSURE(2)** | 54,315,000 | 68,550,000 |
| Estimated 30-Year Post-Closure O&M(3) | 19,800,000 | 19,800,000 |
| **TOTAL ESTIMATED PROJECT COST** | $74,115,000 | $88,350,000 |

(1) Includes Predesign Site Investigation, Bench/Pilot Studies and Solidification Demonstrations
(2) Estimated cost including an allowance for escalation based upon the proposed implementation schedule (see Figure 7.2).
(3) Present worth value for 30-year post-closure operations and maintenance cost at 5% is approximately equivalent to $3,280,000.

90-336A (2/12/91/mb)

- **Case 2 - Maximum Costs** considering:
  - Selective excavation of 12 isolated seep areas consisting of 1,000 bcy of material.
  - Selective excavation of 24 Type 2 tarry zones, consisting of a 13,200 bcy.
  - The onsite redisposal of 16,000 cy of solidified material with TPH <10,000 ppm.
  - The offsite incineration of 6,800 cy of solidified material with TPH >10,000 ppm.

Both cases include the excavation of approximately 1,800 cy of material with elevated arsenic from the top portion of Sump R-1. This will be stabilized and disposed at an offsite landfill.

8.0

# 8.0 PUBLIC HEALTH ASSESSMENT EXPOSURE AND TOXICITY ASSESSMENTS, RISK CHARACTERIZATION AND ALTERNATIVE RISK EVALUATION

## 8.1 INTRODUCTION

1. Chapter 4.0 describes the overall health/environmental considerations associated with remediation of the McColl site. The chapter illustrates the important characteristic that except for the potential for elevated arsenic near the surface of one of the sumps, the site presently represents a relatively low health risk to the public, well within the $10^{-4}$ to $10^{-6}$ cancer risk criteria typically established for Superfund sites. The risks attributed to surficial arsenic do not appear to exist today because the available data show that areas with elevated arsenic levels are now covered by a layer of clean soil. Aside from the risks attributed to surficial arsenic in the SROA, a cancer risk of $1 \times 10^{-6}$ was attributed to emissions of VOCs (methylene chloride and benzene) from the site. Additional concerns expressed about the site include the potential for direct contact with acidic seep material that occasionally appears at the site surface and intermittent odors (ATSDR 1989, CDHS 1983).

2. Further, analyses described in the SROA show that when properly closed, with or without any excavation, the long-term health risks associated with the site would be low, on the order of $10^{-8}$ cancer risk. This is two orders of magnitude below the generally acceptable range. In addition, with proper closure, nuisance odors would be completely eliminated, and the occurrence of seeps significantly reduced.

3. The most important aspect of the evaluation is that the most health risk and nuisance exposures occur during the remediation process. Based on available data from site exploration and the 1990 Trial Excavation, it is conclusive that the risks associated with large excavation of the tarry and/or asphaltic materials would pose an unacceptable risk to workers and nearby residences. The benefits achieved from such major excavation actions could not be justified in consideration of the potential for deaths to the workers and illnesses to residents in the event there was an accident associated with the enclosed excavation procedures.

4. The recommended selective excavation remedy with in situ treatment and solidification is directed specifically toward minimizing the risks to workers and the public during remediation implementation while eliminating geotechnical instability and mobility concerns with respect to the wastes. The following discussion, prepared by ENVIRON (Section 8.2) for this report,

illustrates that carefully designed procedures for in situ solidification and selective excavation can be developed so that during the remediation period the risk does not exceed a level of about 8 x $10^{-8}$. The long-term residual cancer risk attributed to emissions from the emissions control system would be less than 1 x $10^{-11}$.

5. Section 8.2 provides a discussion of the ENVIRON risk estimates for the recommended remedial alternative and provides a comparison of risks associated with the recommended selective excavation alternative, with risks related to the four solutions studied and described in the SROA.

## 8.2 PUBLIC HEALTH ASSESSMENT

### 8.2.1 BACKGROUND ON PREFERRED ALTERNATIVE

1. In February 1989, the U.S. Environmental Protection Agency (EPA) and the California Department of Health Services (DHS) issued the SROA for the McColl site cleanup. The SROA included a Risk Assessment for all 5 alternatives considered, including the preferred alternative, complete excavation and on-site incineration of the wastes. Major activities related to the EPA remedy alternative:

   - Excavation
     - Complete excavation of overburden, drilling mud, tar and char
     - On-site waste handling and temporary decontamination
   - On-site Incineration
     - On-site waste transportation
     - Construction of an on-site incinerator
     - Feed preparation for incineration
     - Operation of the on-site incinerator
     - Construction of an on-site landfill for residues after incineration or off-site disposal of residues
     - Backfill and re-grade the site

   Although the agency appears to have redefined its preferred alternative as one of thermal destruction, as opposed to the incineration alternative described in the SROA, the only information upon which we could rely in performing our risk analysis is that provided in the SROA on incineration.

2. The EPA conducted a trial excavation at the McColl site in June 1990. EPA subsequently released their Trial Excavation Report in September 1990. After analyzing the trial excavation data contained in the EPA Report, the Companies concluded that total site excavation, as a

component of any remedial alternative, would not be protective of human health and the environment, cost-effective, nor readily implementable. The Companies are therefore considering a Selective Excavation, Treatment, and RCRA-Equivalent Closure alternative remedy consisting of a combination of the following activities:

- Excavation of arsenic-contaminated surface soil
- Off-site treatment and disposal of arsenic-contaminated surface soil
- Selective excavation of tarry wastes where necessary or practical
- In situ neutralization of excavated materials to be excavated
- Off-site incineration of neutralized materials
- Off-site disposal of the neutralized materials
- On-site disposal of some neutralized, excavated materials
- Closure uses a RCRA equivalent cap, subsurface slurry walls and active emissions control system.

3. If selective excavation of tarry waste produces an environment too hazardous for the workers or nearby residents, then the pockets of tarry wastes (seeps) will be neutralized in situ, excavated, stabilized further, and disposed of either through off-site incineration, off-site disposal or disposed on-site.

4. This evaluation identifies emission sources and estimates the resultant on-site and off-site air concentrations for various remedial activities of the Total Excavation and Incineration alternative and the proposed Selective Excavation alternative. The objectives are:
   - To evaluate the implementation health risks associated with the two remedial alternatives to on-site workers and off-site residents.
   - To evaluate the residual health risks associated with the two remedial alternatives to off-site residents.
   - To evaluate the transportation risks posed by the two remedial alternatives.

5. Further, health risks posed by the above two remedial alternatives are compared with the EPA's other three remedial alternatives, total excavation and redisposal, RCRA-equivalent containment, and RCRA-equivalent closure, as described in the SROA.

6. A preliminary risk assessment was conducted for the two identified remedial alternatives to achieve the objectives outlined above. The risk assessment was revised from the previous health evaluation of the four proposed alternatives for the McColl site in conjunction with the references cited in Section 8.2.6.

7. Comparisons between the two proposed remedies were made and the Selective Evaluation remedial alternative was concluded to be more protective of the health and safety of workers and community residents than the Total Excavation and Incineration remedy. The following results summarize the conclusions of this evaluation:
   - The likelihood of worker fatalities is increased many fold due to the longer length of time spent in conditions immediately dangerous to life or health for alternatives requiring the total excavation of the site.
   - The estimated incremental lifetime cancer risk for residents for the Selective Excavation remedy is below 8 x $10^{-8}$ whereas for the Total Excavation and Incineration remedy it is above 1 x $10^{-6}$.

8. The rest of this chapter addresses implementation risks to workers and the community, residual risks and transportation risks associated with the remedial alternatives under consideration.

## 8.2.2 IMPLEMENTATION RISKS

1. The term "implementation risks" is used here to refer to health risks anticipated to occur during the implementation phase of a remedial alternative. Both the risks to workers engaged in remediation and the risks to residents in the surrounding community are addressed below for alternatives requiring total excavation and the Selective Excavation, Treatment, and RCRA-Equivalent Closure remedial alternative.

### 8.2.2.1 Total Excavation and Incineration Remedial Alternative

Workers Risks

1. The McColl site contains approximately 86,000 cubic yards (cy) of waste materials; 1,800 cy of arsenic containing materials, 11,000 cy of drilling muds, 19,000 cy of mixed soil or drilling muds and tarry materials, 6,000 cy of tarry material, and 48,000 cy of asphaltic wastes. The arsenic-containing materials are located at a depth of 1 to 5 feet in Sump R-1 followed by drilling muds, mixed materials, tarry materials, and asphaltic wastes at the bottom. The SROA estimated that 97,100 to 265,800 cy of materials may need to be excavated. The SROA did not, however, estimate implementation risks to workers under the assumption of total excavation. Based on the trial excavation conducted by EPA in 1990, total excavation of the McColl site wastes would result in serious health and safety work conditions potentially causing irreversible health damage or death to remediation workers. Among these

conditions include excessive exposure to $SO_2$, total hydrocarbons (THC), and tetrahydrothiophene (THT), the necessity to use Level A or B personal protective equipment (PPE), and potentially intolerable temperatures resulting in heat stress.

2. Based on the trial excavation experience, ENVIRON estimated that the $SO_2$ levels in the enclosure would reach unmitigated levels of 4,000 to 40,000 ppm during the full excavation operation. The upper end of this range is 400-fold higher than the 100 ppm level and (for 30 minutes) considered immediately dangerous to life or health (IDLH) (NIOSH, 1990) and 20,000-fold higher than OSHA's permissible exposure level (PEL) of 2 ppm. Even given optimistic projections regarding the degree of protection afforded by Level A or B PPE, workers may be exposed to $SO_2$ concentrations exceeding the PEL. If the Level A or B PPE were to fail, workers could be exposed to $SO_2$ concentrations capable of causing serious irreversible injuries or even death. Fatalities have been reported at $SO_2$ exposures of 3,000 ppm (for 5 minutes) and 1,000 ppm (for 10 minutes).

3. It is not possible to predict the frequency of respiratory protection failure during full-scale excavation. However, the hazardous conditions to be encountered within the enclosure increase the likelihood of such problems. For example, the high concentrations of $SO_2$ within the enclosure coupled with the large volume of foams used for emission suppression could mix to form sulfuric and sulfurous acid and degrade the PPE. Furthermore, there is an increased potential for rips and tears in the PPE due to the slippery conditions caused by the use of foam. If failures were to occur it may be very difficult for a worker to escape from the enclosures given the depth of excavation, slippery surfaces, and cumbersome nature of Level A or B PPE.

4. Total hydrocarbon samples collected during the trial excavation suggested that levels may have exceeded 200 ppm at the scrubber inlet. Based on this, higher levels would be expected at the workers' breathing zones, which are nearer to the excavation face. Radian (1983) reported that 6 to 80 percent of the THC may be the carcinogen, benzene. If correct, this would suggest benzene levels of 12 to 160 ppm at the workers' breathing zones, many times higher than OSHA's PEL for benzene of 1 ppm.

5. ENVIRON's McColl Site Risk Assessment (MSRA Environ, April 1990) estimated benzene levels within the enclosure during full-scale excavation to be between 1.7 to 19 ppm, assuming a 60 percent vapor emission suppressant efficiency of a foam proposed to be used

at the site. Because the foam performed much more poorly than this during the trial excavation, benzene levels would be expected to be much higher than the predicted range of 1.7 to 19 ppm. Thus, both the trial excavation experience and the MSRA (Environ 1990, p. 292) suggest that Level A or B PPE may be necessary to protect against excessive benzene exposure during full-scale excavation.

6. Tetrahydrothiophene (and other homologs) are highly malodorous compounds which will be released during excavation. Tetrahydrothiophene (THT) levels were not addressed during the trial excavation or in the SROA. The MSRA (1990, p. 292) estimated THT (and homologs) levels within the enclosure during full-scale excavation to be between 5 and 43 ppm, again assuming 60 percent foam efficiency. These levels exceed THT's odor threshold of $1.5 \times 10^{-4}$ ppm by 33,000 to 280,000-fold. Odors of this level would make work impractical. A protection factor of 10,000 afforded by Level A or B PPE would not be adequate to protect against THT odors during full-scale excavation.

7. Emissions of $SO_2$, THC, THT, and other contaminants within the enclosure would necessitate workers wearing Level A or B PPE. Although such PPE will mitigate routine exposures to toxic chemicals, it will increase the risk of heat stress and accidents. During the trial excavation, the temperature within the enclosure routinely exceeded 90° F, and reached 100° F or more on some of the few occasions temperatures are recorded in the EPA log operations. The heat stress experienced at such high temperatures would be exacerbated by the use of Level A or B PPE, which can increase the effective temperature to the worker by 10° to 20° F. Using this adjustment, temperatures to the worker can be expected to be routinely above 120° F. At effective temperatures of 90° F or higher, the American Conference of Governmental Industrial Hygienists (ACGIH) recommends 15 minutes of work and 45 minutes of rest each hour. NIOSH has proposed an effective temperature ceiling of 104° F for light work. Thus, it is clear that the risk of heat stress to workers would be very significant unless work could be conducted only during cool days or nights, or with frequent, extended rest periods.

8. Based on the excavation rates achieved during the trial excavation, it is estimated that approximately 475,000 man-hours of work in Level A or B PPE would be needed to complete total excavation. If the higher excavation rates projected by EPA prior to the trial excavation were achieved, over 60,000 man-hours in Level A or B PPE would still be needed. This large number of man-hours in Level A or B PPE would be highly unusual, if not totally

unprecedented. The higher number of man-hours in Level A or B PPE indicates that the corresponding risk of chemical exposure, heat stress and accidents is also relatively high. The higher excavation rates projected by EPA if they could be achieved, while decreasing the total time required in PPE, could also increase the risks of accidents due to larger equipment and more congested work areas.

Community Risks

1. The SROA estimated that $SO_2$ levels in nearby communities would not exceed 5 ppb (.005 ppm) during excavation of the McColl site due to routine enclosure leakage. Based on the trial excavation experience, ENVIRON estimated that nighttime 1-hour average $SO_2$ levels are expected to exceed 0.5 ppm at a distance of approximately 0.5 miles downwind of the enclosure; during the day, 1-hour average $SO_2$ levels may exceed 0.5 ppm at a distance of approximately 400 feet downwind of the enclosure. These $SO_2$ levels are above the 0.25 ppm 1-hour California Ambient Air Quality Standard for $SO_2$ and above the 0.4 ppm 1-hour National Ambient Air Quality Standard (53 FR 80, April 26, 1988, p. 14926). Exceedance of the California Standard represents significant adverse impact, according to guidelines of the South Coast Air Quality Management District (SCAQMD, "Air Quality Handbook for Preparing Environmental Impact Report").

2. The SROA also estimated the incremental lifetime inhalation cancer risk due to exposure to methylene chloride and benzene to community residents during total excavation to be $2 \times 10^{-7}$. The SROA did not consider potential odor problems associated with the release of THT and related compounds during total excavation. The MSRA (1990, p. 258) estimated that THT levels may reach $3.2 \times 10^{-2}$ ppm at a distance of 200 feet downwind of the enclosure during total excavation. The odor threshold of THT of $1.5 \times 10^{-4}$ ppm is exceeded by over 200-fold.

3. The SROA estimated a Hazard Index (HI) of less than 0.1 for non-cancer effects by the inhalation route to residents for total excavation. (An HI less than 1 is considered safe and greater than 1, unsafe). In the event of a catastrophic failure resulting from either major leakage or complete collapse of the enclosure, contaminant concentrations could remain virtually undiluted up to 200 feet downwind under certain conditions. Citizens in the

surrounding community could thus be exposed to levels nearly as high as those experienced within the enclosure during full-scale excavation. Such exposures would cause serious respiratory problems or death.

8.2.2.2 Selective Excavation, Treatment and RCRA-Equivalent Closure Remedial Alternative

Worker Risks

1. During implementation of the Selective Excavation alternative, the same types of worker health and safety concerns raised during EPA's alternative will also be present, but to a much lesser extent. This is primarily because excavation will only occur in small, discrete areas which will allow for controls to be easily established. Also, much of the $SO_2$ will be eliminated or collected directly during the excavation process. Under the Selective Excavation alternative, the asphaltic wastes, which are a large portion of the wastes at the McColl site, will not be excavated. Furthermore, under the Selective Excavation alternative, the rate of excavation as well as the excavation surface area will be greatly reduced when compared to alternatives requiring total excavation.

2. During the Selective Excavation alternative, ENVIRON estimated that the $SO_2$ levels will be insignificant during arsenic excavation. The maximum possible level of $SO_2$ would be 0.5 to 5.0 ppm during seep neutralization and stabilization, 5.7 to 57 ppm during the excavation of partially stabilized soils, and 8.4 to 84 ppm during further treatment of excavated soils, respectively. These levels were estimated assuming a 90 percent decrease in $SO_2$ emissions due to neutralization, no application of vapor suppressing foams, and a relatively low ventilation rate in the enclosure and therefore, represent the maximum levels that may be expected.

3. Based on the planned procedures and schedules, it is estimated that 2,000 to 7,400 man-hours of work in Level A or B PPE would be needed, assuming 5 people inside of the excavation enclosure and stockpile portion of the curing enclosure. This is only 3 percent of the lower estimate for man-hours in Level A or B PPE needed for total excavation. Thus, the risks of chemical exposure, heat stress and accidents under selective excavation would clearly be significantly lower than for the total excavation.

4. Exposure to carcinogenic volatile organic compounds and metals may occur during excavation. The methylene chloride and benzene level is not expected to exceed 0.006 ppm and 0.09 ppm, respectively. These levels are below OSHA's PEL of 50 ppm and 1 ppm, respectively. The airborne particulate level within the enclosure is not expected to exceed 42.4 $mg/m^3$. Assuming that the arsenic concentration in airborne particulates is the same as in surface soil and the average site concentration estimated for arsenic by the SROA of 210 ppm, the arsenic level within the enclosure is not expected to exceed 0.009 $mg/m^3$. This is below the current OSHA PEL for arsenic of 0.01 $mg/m^3$.

5. The maximum particulate concentration within the enclosure of 42.4 $mg/m^3$ during selective excavation exceeds OSHA's PEL for particulates of 15 $mg/m^3$. Because of this, the use of water spray and other dust control practices are proposed to decrease airborne particulate dispersion. EPA (1989) provided information on the percent efficiency of airborne particulate dispersion with increasing soil moisture content. Efficiencies up to 95 percent can be achieved. Assuming 90 percent dust suppressing efficiency by water spray, the airborne particulate and arsenic concentration would be 4.24 $mg/m^3$ and 0.0009 $mg/m^3$, well below OSHA's respective PELs.

Community Risks

1. Under the Selective Excavation alternative, ENVIRON estimated that $SO_2$ levels would be no higher than 0.12 ppm at the nearest residence from the enclosure. This complies with both State and national air quality standards for $SO_2$. The THT level was estimated to be no higher than $9.1 \times 10^{-7}$ ppm, over 150 times lower than the THT odor threshold of $1.5 \times 10^{-4}$ ppm.

2. Limited exposure to carcinogenic metals and volatiles will occur during Selective Excavation. Based on MSRA (Environ 1990, p. 251), the residential cancer risks for total excavation was $8 \times 10^{-8}$. The cancer risk for partial excavation would necessarily be lower than $8 \times 10^{-8}$. Based on the SROA, the residential cancer risk would be between the $1 \times 10^{-8}$ level estimated for RCRA-Equivalent Closure where no waste is excavated and the $2 \times 10^{-7}$ level estimated for Excavation and Redisposal where all the wastes are excavated.

3. Based on the MSRA, the HI for non-cancer effects to residents for total excavation was less than 0.01. The HI for the Selective Excavation alternative would also therefore be expected to be even less than this and therefore not of concern.

8.2.2.3 Comparison of Alternatives

1. From a worker health and safety standpoint, the Selective Excavation alternative is preferred over any alternative requiring total excavation. Under total excavation, the $SO_2$ levels may be so high that even the use of Level A or B PPE may not be adequately protective. With $SO_2$ levels possibly as high as 40,000 ppm, and a protection factor of 10,000 for Level A or B PPE, the resultant exposure may be as high as 4 ppm, or twice OSHA's PEL of 2 ppm.

2. The Selective Excavation alternative may result is $SO_2$ levels as high as 84 ppm (during further treatment of excavated soils). The large reduction in $SO_2$ levels can be attributed to leaving much of the $SO_2$ containing wastes undisturbed under this alternative. Furthermore, because the excavation volume under the Selective Excavation remedy is much smaller than for total excavation, the rate of excavation can more easily be adjusted to minimize $SO_2$ emissions, if it becomes a concern, than for total excavation. In any event, under the Selective Excavation alternative, the length of time requiring Level A or B PPE will be greatly reduced when compared to alternatives requiring total excavation.

3. Another major concern with remedial activities at the McColl site is heat stress. The temperature within the enclosure during the trial excavation often reached 90° F. At this temperature, the worker efficiency level is substantially reduced. ACGIH recommends a 45-minute rest break for every 15 minutes of work. If Level A or B PPE is needed, the heat stress burden is further increased, further reducing worker efficiency.

4. At least 60,000 man-hours, and perhaps more than 475,000 man-hours of work in Level A or B gear would be necessary under total excavation. Approximately 2,000 to 7,400 man-hours in Level A or B gear would be required under the Selective Excavation alternative. Thus the Selective Excavation remedy clearly poses much lower risks of chemical exposure, heat stress and accidents.

5. The hazardousness of working under conditions where the $SO_2$ levels may be life-threatening under the Selective Excavation and total excavation alternatives can be compared by the following approach. The IDLH level for $SO_2$ is defined as 100 ppm of exposure for 0.5 hour, multiplying these two values gives 50 ppm-hr. This could be considered as an "IDLH unit" (NIOSH, 1990). If the $SO_2$ level during full-scale excavation is close to the

higher end of the estimated range of 4,000 to 40,000 ppm and 475,000 man-hours in Level A or B PPE as projected after the trial excavation experience is used, then under this scenario, the number of IDLH units is 3.8x $10^8$ (40,000 ppm x 475,000 ÷ 50 ppm/hr).

6. Under the Selective Excavation alternative the maximum range of $SO_2$ levels anticipated is not greater than 8.4 to 84 ppm. The number of man-hours estimated in Level A or B PPE is 2,200 to 7,400 hours. Using the higher end of the range of the $SO_2$ level, the number of IDLH units is 3.7 x $10^3$ (84 ppm x 2,200 hr ÷ 50 ppm-hr). Thus, total excavation is over 100,000 times more likely to cause a fatality than the Selective Excavation alternative. Using this comparison, the rate of PPE failure is assumed to be the same in the two alternatives and does not have to be known.

7. A third major concern with excavating the McColl site is the odor problem. Under total excavation, the concentration due to THT is at least 30,000-fold higher than the odor threshold. The odor threshold within the enclosure would be exceeded by at least 3-fold even using Level A or B PPE, assuming a protection factor of 10,000. It is estimated that during further treatment of excavated materials under the Selective Excavation alternative, THT's odor threshold may be exceeded by 220-fold. Wearing Level A or B PPE would therefore be effective in dealing with the odor problem.

8. Therefore, the Selective Excavation alternative is preferred over any alternative requiring total excavation from a worker health and safety standpoint in that under Selective Excavation, adverse health effects from $SO_2$ and THT exposures can be protected by the use of Level A or B PPE and the heat stress concern is greatly reduced by fewer hours requiring Level A or B PPE. On the other hand, under total excavation, even Level A or B PPE may not be sufficient to protect workers from the potentially irreversible and noxious effects of $SO_2$ and THT.

9. From a community health and safety standpoint, the Selective Excavation alternative is also preferred over any excavation alternative. The total excavation and incineration alternative would result in an incremental lifetime cancer risk to nearby community residents as high as 6 x $10^{-6}$ from the inhalation of incinerator emissions (SROA). This level is six times higher than the one-in-a-million risk level. In contrast, because the Selective Excavation alternative does not entail on-site incineration of the waste, but the redisposal of excavated wastes in a RCRA approved Type I landfill, the nearby community residents are spared from these risks. The $SO_2$ levels in nearby communities downwind of the enclosure are higher under total

excavation alternative than under Selective Excavation. ENVIRON estimated that the $SO_2$ level may reach 0.5 ppm at a distance of 0.5 miles downwind of the enclosure under total excavation. These levels exceed State and national ambient air quality standards for $SO_2$ of 0.25 and 0.4 ppm, respectively. Under Selective Excavation, the $SO_2$ level at the nearest downwind residence of the enclosure was estimated to be no greater than 0.11 ppm.

10. Because the asphaltic wastes are not disturbed under the Selective Excavation alternative, the downwind THT levels are anticipated to be below its odor threshold whereas under the total excavation alternative the downwind THT levels are expected to be well above its odor threshold. The MSRA (1990) estimated that under total excavation, the THT level 200 feet downwind of the enclosure would be $3.2 \times 10^{-2}$ ppm, over 200-fold higher than THT's odor threshold. Under Selective Excavation, ENVIRON estimated that THT levels at the nearest residential dwelling from the enclosure would be at least 50 times lower than THT's odor threshold.

11. Therefore, the Selective Excavation alternative is superior to the total excavation from a community health and safety standpoint in that under Selective Excavation the risks from exposure to carcinogenic metals is well below $1 \times 10^{-6}$, the $SO_2$ levels are below the California and national ambient air quality standards, and the THT levels are below THT's odor threshold. On the other hand, total excavation is expected to produce $SO_2$ levels above the California and national ambient air quality standards and THT levels well above its odor threshold.

### 8.2.3 RESIDUAL RISKS

1. The term "residual risks" is used here to refer to health risks anticipated to remain at the site after implementation of a remedial alternative is achieved. Because the residual risks are the basis for evaluating the long-term effectiveness of an alternative, they are an important consideration in the selection of a remedial alternative. The residual risks are addressed below by evaluating how each of the significant risks associated with current conditions at the site would be affected by the Selective Excavation alternative and by total excavation.

2. The largest risk attributed to the site in its current condition is that of a person assumed to gain access to the site and ingest arsenic-bearing soil on a daily basis. The risk for this scenario is $5 \times 10^{-4}$ (SROA). The second largest risk ($2 \times 10^{-4}$) is attributed to the inhalation of arsenic-

bearing dust by people living in houses adjacent to the site (SROA). Both of these risks stem from arsenic in surface soil at the site. The assumption of ingestion or inhalation of arsenic containing material is very conservative since the arsenic containing materials are now at a depth of 1 to 5 feet. The inhalation of volatile organics (benzene and methylene chloride) released from the site in its current condition contribute a much smaller lifetime cancer risk of $1 \times 10^{-6}$ (SROA). The SROA also notes that if 5 feet of surface soil were to erode from the site, the estimated risk associated with the emissions of volatile chemicals would increase to as much as $2 \times 10^{-3}$ (SROA). Additional concerns with the site expressed by the California Department of Health Services (DHS, 1983), the Agency for Toxic Substances and Disease Registry (ATSDR, 1989), and the community are related to the intermittent appearance of waste seeps on the site surface and intermittent occurrence of nuisance odors.

8.2.3.1 Total Excavation

1. The complete excavation of materials would eliminate the presence of the surface arsenic that, according to the SROA (1989) is responsible for virtually all (98 percent) of the risk associated with the site in its current condition. In addition, the small risk ($1 \times 10^{-6}$) attributed by the SROA (1989) to volatile emissions would be eliminated by excavating the wastes.

2. The primary concern expressed about the seeps is that of direct dermal contact with the acidic seep materials (ATSDR, 1989). It is also possible that seeps would be associated with the emission of volatile chemicals that could contribute to health risk or odor nuisance. The complete excavation of waste materials called for in this remedial alternative would eliminate any possibility of the periodic appearance of waste seeps and their attendant concerns. Similarly, complete excavation of the waste material would eliminate any possibility of odor nuisance from buried material, once all of the waste is completely removed.

3. One of the remedial alternatives evaluated in the SROA (1989) included incineration following total excavation of the wastes. Some residual risk would be expected from incineration. As noted in Comments on the SROA (Companies, 1989), metallic waste constituents such as arsenic and chromium are not destroyed by incineration. Air emissions from an incinerator will include such carcinogenic elements as arsenic and chromium. These metals will be dispersed throughout the local community and will eventually settle to the ground or surface water where people can be exposed. The health risk associated with the dispersed metals will depend on several factors including the volume of metals put into the incinerator.

4. Because all of the waste would be excavated under this remedial alternative and because ash is assumed to be disposed of at an off-site location, the residual risks associated with the site itself are expected to be virtually nil (SROA, 1990). The metals emitted by an incinerator are deposited in the community would, however, result in a higher level community exposure to metals. Exposure to these metals would represent a residual risk in the community adjacent to the incinerator. We note that incineration may not occur at the McColl site and that the residents in the region of the McColl site would not be exposed to these residual risks if incineration occurred off-site. Nonetheless, there would be residual risks associated with the incinerator emissions and byproducts (e.g., ash). The magnitude of these risks would depend on several specific factors not yet known including the type of incineration used, the amount of metals in the incinerated waste, and other factors (e.g., air dispersion patterns and demographics) associated with the location of the incineration unit.

5. The SROA did not consider the possibility of secondary exposure to incinerator ash and thus did not estimate a cancer risk or hazard index. The MSRA (1990) estimated the residual cancer risks from secondary exposure to incinerator emissions (inhalation of incinerator emissions was considered part of the implementation risks) by soil ingestion, fish ingestion, vegetable ingestion, soil dermal contact, and pond water dermal contact to be $2 \times 10^{-5}$.

8.2.3.2 <u>Selective Excavation, Treatment and RCRA-Equivalent Closure Remedial Alternative</u>

1. Under the Selective Excavation alternative, surface soils with the highest arsenic concentrations would be selectively excavated and removed from the site. In addition, seeps, and tarry waste which may result in seeps, which will be identified and excavated. The seep materials will first be neutralized in situ, excavated and treated by incineration or solidification off-site. Finally, a RCRA equivalent cap with an emission control system would be placed over the site. Removal of arsenic-bearing soils and the installation of a cap over the site would eliminate exposure to the surface arsenic that is responsible for the risks associated with the ingestion of surface soil and the inhalation of dust from the site. Thus, risks associated these two exposure pathways would be reduced to zero.

2. The low-level risk attributed to volatile emissions from the site would be reduced by selective excavation of seeps and potential seeps and by the emission collection system. Because the pockets of tarry material thought to be responsible for the seeps contains fairly high benzene concentrations, removal or treatment of these pockets of tarry material as part of the selective

excavation aspect of this alternative will reduce the volume of benzene present in the waste sumps. The vapor collection and treatment system will further reduced the volatile emissions from the site to levels below levels currently emitted from the site.

3. The MSRA (Environ, 1990) estimated a residual cancer risk of 1 x $10^{-11}$ from exposure to emissions escaping the gas collection system under the RCRA-Equivalent Closure alternative. Under Selective Excavation, the risks would be inherently lower because some of the source material would be removed. As previously discussed, an active emission control system will be built into the cap for the site. This system will collect the vaporous emissions from the site and channel them to an emissions control system. The emissions control system will be designed to eliminate the intermittent odor nuisance currently posed by the site. By removing known and potential seeps, this remedial alternative will eliminate the occurrence of seeps at the site.

4. The residual HI calculated by the MSRA (1990) for the RCRA-Equivalent Closure alternative was much lower than 0.01. For the reasons discussed above, emissions following the implementation of the Selective Excavation alternative would be lower than those from RCRA-Equivalent Closure. Thus, for Selective Excavation the HI would be even lower than 0.01.

5. Although the wastes were disposed of more than 40 years ago, ground water monitoring has not conclusively identified any releases from the McColl Site to the regional ground water. Furthermore, monitoring wells located downgradient from the site in the shallow regional aquifer do not contain any contaminants in concentrations that exceed applicable standards. It is not anticipated that the ground water will be contaminated by site compounds in the future. The unlikelihood of future ground water contamination is further mitigated by the installation of a multi layer RCRA equivalent cap stabilization of the berms, drilling muds, and tarry waste, and in situ waste containment with cement-bentonite cut-off walls extending to below the wastes.

8.2.3.3 Comparison of Alternatives

1. The dominant risk posed by the site in its current condition, exposure to surface arsenic, is eliminated by remedial alternatives involving the total excavation as well as alternatives involving capping of the site, such as the Selective Excavation alternative. The incineration phase of the total excavation and incineration alternative resulted in a $2 \times 10^{-5}$ cancer risk to residents in the vicinity of the incinerator as estimated by the MSRA (1990). The magnitude of the residual risk posed by the arsenic would depend in a large part to the extent to which high arsenic content wastes are treated or disposed of and the type of incineration. The residual risk due to volatile organic emissions would be eliminated under alternatives involving the total excavation alternative and would reduced to below $1 \times 10^{-11}$ under selective excavation (Environ, 1990). The total excavation of wastes would eliminate future seeps and odors at the site. Selective excavation of known and potential seeps is also expected to eliminate the occurrence of seeps. The vapor collection and treatment system is a demonstrated technology that would be designed to eliminate odors. Future ground water contamination under total excavation would be eliminated and under the Selective Excavation alternative would be improbable since water permeation will be prevented by a cap and slurry walls. Other alternatives involving the installation of a clay cap over the site would also be expected to eliminate potential for ground water contamination.

8.2.4 TRANSPORTATION RISK

1. An additional area of health and safety to be considered in the evaluation and selection of a remedial alternative for the McColl site is the risk associated with transporting materials to and from the site. Accidents, spills, and fatalities can be expected from transporting waste, incinerator ash, or chemical reagents. The number of accidents, spills, and fatalities will depend on the volume of materials transported and the distances over which they are transported.

8.2.4.1 Total Excavation

1. The transportation risks associated with alternatives involving total excavation would depend in part on whether the wastes are landfilled or incinerated, and if incinerated, the location of the incineration facility. Because of concerns of impacts on regional air quality, it is likely that the incinerator would not be located at the McColl site and would therefore require transporting waste materials to an off-site incinerator.

2. The SROA does not include any discussions of risks associated with material transport. However, the California Department of Health Services (DHS, 1989) developed its own environmental impact report for the McColl site which included an analysis of increased accidents associated with the off-site transportation of waste or ash. However, that analysis is not based on a worst-case volume and may greatly underestimate the actual remediation volume. In 1983, EPA selected the Excavation and Redisposal alternative as the preferred remedial alternative at the McColl site. At that time, the estimated excavation volume was 139,000 cubic yards (cy) (USEPA, 1984, Record of Decision, McColl Site). Since that time, EPA has neither established cleanup levels nor performed sufficient soil analysis to determine the amount of materials which must be excavated to achieve those cleanup levels. While the SROA repeatedly stated its reliance on the 1983 study, which estimated an excavation volume of 139,000 cy, it inexplicably used an excavation volume of 97,100 cy and used this volume to estimate transportation risks. Furthermore, the SROA did not consider the volume of chemical reagents needed to stabilize the excavated wastes.

3. The EPA recently concluded from its trial excavation at the McColl site that a 1:7 ratio of wastes to chemical additives may be required for on-site waste treatment. Thus, the volume of wastes to be transported to an off-site incineration facility may increase to 605,300 cy, using SROA's low excavation volume estimate of 72,600 cy of waste requiring chemical treatment times 8 + 24,500 cy of excavated materials not requiring chemical treatment. The volume to be transported may increase to 774,000 cy, using SROA's worst-case excavation volume estimate of 72,600 cy of waste times 8 + 193,200 cy of excavated materials not requiring chemical treatment.

4. If the waste materials are to be incinerated off-site, the location of this incinerator has not been identified. Assuming that the facility is located as far away as three landfills, PWI, CWM, and USPCI, and assuming that the remediation volume estimated in the SROA is not increased by the addition of chemicals, the expected number of accidents, spills, and fatalities were estimated and are presented in Table 8.1.

5. Assuming that the incinerator is located at the McColl site, the transport of incinerators residue to a landfill would need to be considered. Disregarding the likelihood that a greater number of truck loads may be required because the volume of residue ash may be increased or that the volume and weight of residue ash will increase due to

# TABLE 8.1

## PROBABILITY OF ACCIDENTS, SPILLS, AND FATALITIES WHILE TRANSPORTING McCOLL SITE WASTE FOR OFFSITE INCINERATION

| TRANSPORT VOLUME (cy) | VOLUME SOURCE | WEIGHT (Tons)(1) | TRUCKLOADS(2) | EXPECTED ACCIDENTS(3) | | EXPECTED SPILLS(4) | EXPECTED FATALITIES(5) | |
|---|---|---|---|---|---|---|---|---|
| 97,100 | SROA | 126,000 | 5,700 | PWI(6) | 4.7 | 0.1 | PWI | 0.07 |
| | | | | CWM(7) | 6.4 | 0.1 | CWM | 0.09 |
| | | | | USPCI(8) | 22 | 0.4 | USPCI | 0.33 |
| 265,800 | SROA | 384,000 | 17,000 | PWI | 14 | 0.3 | PWI | 0.2 |
| | | | | CWM | 19 | 0.4 | CWM | 0.3 |
| | | | | USPCI | 66 | 1.3 | USPCI | 1.0 |

(1) Based on demolition before bulking of 1.53 tons/cy for soil, 1.22 tons/cy for waste, and waste volume of 72,600 cy ($CH_2M$ Hill, 1989).
(2) Based on a truck loading capacity of 22 tons (DEIR, 1989, p. 3-26).
(3) Based on an accident rate of 2.7 per 1 million truck miles (National Accident Sampling System, 1987), and round-trip distances:
PWI: 306 miles
CWM: 415 miles
USPCI: 1,430 miles (DEIR, 1989, pp. 3-27, 5-191)
(4) Based on an "accident with spill" rate of 0.11 per 1 million truck miles (DEIR, 1989, p. 5-191) and one way distances:
PWI: 153 miles
CWM: 208 miles
USPCI: 715 miles
(5) Based on a fatality rate for accidents involving trucks of 0.04 per 1 million truck miles (Fatal Accident Reporting System, 1987). National Highway Traffic Safety Administration.
(6) Petroleum Waste, Inc., Kern County, California
(7) Chemical Waste Management, Kings County, California
(8) U.S. Pollution Control, Inc., Clive, Utah

chemically treating some of the excavated materials, the number of accidents, spills, and fatalities expected from transporting the ash to three landfill facilities are presented in Table 8.2.

8.2.4.2 Selective Excavation, Treatment and RCRA-Equivalent Closure Remedial Alternative

1. The Selective Excavation alternative proposes to transport 2,300 cy of arsenic containing soil and 6,770 cy of fully neutralized and solidified wastes off-site for disposal (see Table 7.1). Transport of approximately 1,300 cy of chemical additives to the McColl site is required (see Chapter 7.0). It is assumed that the chemical additives (lime, cement, fly ash, ammonia) can be purchased within a 50 mile radius from the McColl site.

2. The transportation risks associated with the Selective Excavation alternative are presented in Tables 8.3 and 8.4.

8.2.4.3 Comparison of Alternatives

1. If the incinerator is located 715 miles away from the McColl site, the Total Excavation and Incineration alternatives is at least 41 to 125 times more likely to cause a fatality than the Selective Excavation alternative. The same would be true for excavation and off-site redisposal. If incineration takes place at the McColl site, the Total Excavation and Incineration alternative is at least 25 to 112 times more likely to cause a fatality than the Selective Excavation alternative.

8.2.5 RISK COMPARISONS FOR THE FIVE PROPOSED REMEDIATION ALTERNATIVES

1. Table 8.5 shows the very serious dangers posed by the alternatives involving total excavation, especially the total excavation and incineration alternative. That alternative has an estimated lifetime cancer risk for the community of greater than one in a million; for the exposed population of 3 million, 3 cancer deaths can be expected as a direct result of implementing the total excavation alternative. The total excavation alternative also involves significant dangers to workers: Table 8.5 shows that under total excavation conditions, workers could be exposed to 4,000 to 40,000 ppm of $SO_2$, well -- perhaps fatally -- above the acceptable IDLH level of

# TABLE 8.2

## PROBABILITY OF ACCIDENTS, SPILLS, AND FATALITIES WHILE TRANSPORTING McCOLL SITE INCINERATOR ASH FOR OFFSITE DISPOSAL

| TRANSPORT VOLUME (cy) | VOLUME SOURCE | WEIGHT (Tons)(1) | TRUCKLOADS(2) | EXPECTED ACCIDENTS(3) | | EXPECTED SPILLS(4) | EXPECTED FATALITIES(5) | |
|---|---|---|---|---|---|---|---|---|
| 97,100 | SROA | 89,000 | 4,000 | PWI(6) | 3 | 0.1 | PWI | 0.05 |
| | | | | CWM(7) | 5 | 0.1 | CWM | 0.1 |
| | | | | USPCI(8) | 16 | 0.3 | USPCI | 0.2 |
| 265,800 | SROA | 329,000 | 15,000 | PWI | 12 | 0.3 | PWI | 0.2 |
| | | | | CWM | 17 | 0.3 | CWM | 0.2 |
| | | | | USPCI | 58 | 1.2 | USPCI | 0.9 |

(1) Derived from Tables C-3 and C-4 of the Draft SROA ($CH_2M$ Hill, 1989). Assurance that ash is dried before transporting. If ash is not dried, then risks would increase approximately two-fold, since weight would be double that stated.

(2) Based on a truck loading capacity of 22 tons (DEIR, 1989, p. 3-26). If the truck loading capacity is 15 tons (as shown on p. 5-118 of the DEIR), then risks would increase by approximately 50 percent (one-half).

(3) Based on an accident rate of 2.7 per 1 million truck miles (National Accident Sampling System, 1987), and round-trip distances:
PWI: 306 miles
CWM: 425 miles
USPCI: 1,430 miles (DEIR, 1989, pp. 3-27, 5-191)

(4) Based on an "accident with spill" rate of 0.11 per 1 million truck miles (DEIR, 1989, p. 5-191) and one way distances:
PWI: 153 miles
CWM: 208 miles
USPCI: 715 miles

(5) Based on a fatality rate for accidents involving trucks of 0.04 per 1 million truck miles (Fatal Accident Reporting System, 1987). National Highway Traffic Safety Administration.

(6) Petroleum Waste, Inc., Kern County, California.

(7) U.S. Pollution Control, Inc., Clive, Utah.

(8) Weight of chemical additives ash not included.

# TABLE 8.3

## PROBABILITY OF ACCIDENTS, SPILLS, AND FATALITIES WHILE TRANSPORTING McCOLL SITE WASTE FOR OFFSITE DISPOSAL

| TRANSPORT VOLUME (cy)(1) | TRUCKLOADS(2) | EXPECTED ACCIDENTS(3) | EXPECTED SPILLS(4) | EXPECTED FATALITIES(5) |
|---|---|---|---|---|
| 9,070 | 380 | 0.43 | 0.009 | 0.006 |

(1) Based on volume of material from Table 7.1 expected to be transported offsite (2,300 cy Type 1 waste plus 6,770 cy Type 2 waste).
(2) Based on a truck loading capacity of 24 cy.
(3) Based on an accident rate of 2.7 per 1 million truck miles (National Accident Sampling System, 1987), and round-trip distance of 415 miles.
(4) Based on an "accident with spill" rate of 0.11 per 1 million truck miles (DEIR, 1989, p. 5-191) and one way distance of 208 miles.
(5) Based on a fatality rate for accidents involving trucks of 0.04 per 1 million truck miles (Fatal Accident Reporting System, 1987). National Highway Traffic Safety Administration.

# TABLE 8.4

## PROBABILITY OF ACCIDENTS, SPILLS, AND FATALITIES WHILE TRANSPORTING CHEMICAL ADDITIVES TO THE McCOLL SITE

| TRANSPORT VOLUME (cy)(1) | TRUCKLOADS(2) | EXPECTED ACCIDENTS(3) | EXPECTED SPILLS(4) | EXPECTED FATALITIES(5) |
|---|---|---|---|---|
| 13,000 | 1,100 | 0.15 | 0.003 | 0.002 |

(1) Based on volume of chemical additives estimated in Chapter 7.0.
(2) Based on a truck loading capacity of 12 cy.
(3) Based on an accident rate of 2.7 per 1 million truck miles (National Accident Sampling System, 1987), and round-trip distance of 50 miles.
(4) Based on an "accident with spill" rate of 0.11 per 1 million truck miles (DEIR, 1989, p. 5-191) and one way distance of 25 miles.
(5) Based on a fatality rate for accidents involving trucks of 0.04 per 1 million truck miles (Fatal Accident Reporting System, 1987). National Highway Traffic Safety Administration.

# TABLE 8.5

## COMPARISON OF HEALTH RISKS AMONG THE FIVE REMEDIAL ALTERNATIVES FOR THE McCOLL SITE

| HAZARD | REMEDIAL ALTERNATIVE | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION | TOTAL EXCAVATION AND INCINERATION | RCRA-EQUIVALENT CONTAINMENT | RCRA-EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL |
| Cancer Risk (Community) | <8 x $10^{-8}$(1) | 6 x $10^{-6}$(2) | 2 x $10^{-7}$(2) | 3 x $10^{-8}$(2) | 2 x $10^{-7}$(2) |
| Non-Cancer Hazard Index (Community) | <0.01(1) | <0.1(2) | <0.01(2) | <0.01(2) | <0.01(2) |
| Sulfur Dioxide (Workers) | 8.4 - 84 ppm(3) | 4,000-40,000 ppm(3) | ~4,000-40,000 ppm(4) | <8.4-84 ppm(5) | ~4,000-40,000 ppm(4) |
| Man-Hours in Level A/B | 2,200-7,400 man-hours(3) | 475,000 man-hours(3) | ~475,000 man-hours(4) | <2,200 man-hours(5) | ~475,000 man-hours(4) |
| IDLH Units(6) | 3.7 x $10^3$ | 3.8 x $10^8$ | ~3.7 x $10^8$(4) | <3.7 x $10^3$(5) | ~3.8 x $10^8$(4) |

(1) Derived from McColl Site Risk Assessment (MSRA, April 1990).
(2) Derived from Supplemental Reevaluation of Alternatives (1989).
(3) Based on data from EPA Trial Excavation Report (1990).
(4) Not Calculated, but expected to be similar to Total Excavation and Incineration.
(5) Not Calculated, but expected to be less than Selective Excavation.
(6) IDLH Units calculated as follows [(man-hours) x (maximum $SO_2$ level)] + [0.5 hr x 100 ppm]) where 0.5 hr x 100 ppm is indicated by NIOSH (1990) as representing a condition that is IDLH for $SO_2$.

90-336A (2/12/91/dms)

100 ppm. Additionally, because of the size and duration of the excavation, workers would be exposed to those $SO_2$ conditions for 475,000 man-hours, some 467,000 to 473,000 more hours than under the Selective Excavation alternative.

2. Table 8.5 also shows that the Selective Excavation alternative has an insignificant residual cancer risk to the community of $8 \times 10^{-8}$ (well below the EPA acceptable range of $1 \times 10^{-4}$ to $1 \times 10^{-6}$). $SO_2$ exposure levels are also in the insignificant range and well below the acceptable IDLH level of 100 ppm. In sum, the Selective Excavation alternative presents no quantifiable healthrisks to either the community or workers.

# 9.0 NCP ANALYSIS

## 9.1 INTRODUCTION

1. This section provides a detailed two-pronged evaluation, with accompanying charts, of the selective excavation alternative. The first part of the evaluation analyzes the selective excavation alternative against the nine NCP criteria used in choosing a remedy. The second part analyzes and compares all five alternatives (the selective excavation alternative and the four alternatives analyzed in the SROA) against the NCP criteria to enable the reader to weigh the relative strengths and weaknesses of each alternative. In the second chart, all of the alternatives are judged against the NCP criteria but the discussion preceding that chart emphasizes the comparison between the selective excavation alternative and the total excavation and incineration alternative, which the EPA has identified as its preferred alternative.

## 9.2 FORMULATION OF THE SELECTIVE EXCAVATION ALTERNATIVE

1. The selective excavation alternative was formulated in light of the trial excavation and Ogden test burn, the problems and failures associated therewith, and the comments to the 1989 SROA, and to respond to the concerns and question which have been raised by EPA and some members of the community.

2. The trial excavation and Ogden test burn manifested new, more serious and more complex problems associated with the total excavation alternative than had been studied in the SROA. Lack of worker safety -- and possibly worker fatalities, lack of community safety -- and possible cancer episodes, and the likely infeasibility of the total excavation remedy were just some of the major problems with total excavation as pointed out by the trial excavation.

3. Resolving these issues (without accepting RCRA equivalent closure) required the consideration and development of a new approach to the site. That approach was also developed in light of concerns that have been expressed by EPA and community and closure.

4. EPA has raised two primary concerns about RCRA equivalent closure. First, EPA is concerned that the long-term effects of leaving contaminants, especially arsenic, in the ground are uncertain and create the potential for long-term contamination problems. The selective alternative assumes, for purposes of developing an approach, the potential for long-term contamination effects and requires the removal of the highest risk contaminants.

5. Second, EPA believes that CERCLA states a preference for treatment (see 42 U.S.C. Section 9621), a preference which is not satisfied by closure. Again the MSG disagree that CERCLA prefers a treatment alternative that poses serious risks to the workers and community over a remedy that avoids such risks. However, to resolve EPA's concerns, the selective excavation alternative highlights and mandates treatment of the most toxic and appropriate substances yet still avoids the problems associated with total excavation and incineration.

6. Equally important are the concerns of the community about the tarry seeps which presently occur at the site and about the possibility of additional seeps occurring in the future. The selective excavation alternative addresses these issues by eliminating all current seeps and by eliminating (through excavation, disposal, neutralization, solidification and/or stabilization) the possibility of seeps in the future.

7. In this way, both the seep odors and the potential for direct contact with the seeps will be eliminated and the concerns of EPA and the community are satisfied yet the risks and problems of total excavation are still avoided.

## 9.3 NCP CRITERIA

1. Section 300.430(e)(9) of the NCP requires that a detailed analysis be conducted on the viable approaches to remedial action at a site. This detailed analysis consists of an assessment of each alternative against each of the nine evaluation criteria outlined in the NCP and a comparative analysis that focuses upon the relative performance of each alternative against those criteria. Paragraph 2 below provides an overview of the nine NCP criteria. Section 9.4 below provides an assessment of the recommended Selective Excavation, Treatment and RCRA Equivalent Closure alternative against the nine NCP evaluation criteria. Section 9.5 below provides a comparative analysis of the alternatives described in the 1989 SROA and the selective excavation, treatment and RCRA equivalent closure alternative.

2. The nine NCP evaluation criteria are (a) overall protection of human health and the environment, (b) compliance with ARARs, (c) long-term effectiveness and permanence, (d) reduction of toxicity, mobility or volume through treatment, (e) short-term effectiveness, (f) implementability, (g) cost effectiveness, (h) State acceptance, and (i) community acceptance. The NCP elaborates upon each of the elements to be considered in assessing alternatives against each of the nine criteria.

9.3.1 OVERALL PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT

1. An alternative provides protection of human health and the environment if it can adequately protect human health and the environment from unacceptable risks--in both the short- and long-term--posed by hazardous materials present at the site by eliminating, reducing or controlling exposure levels. Overall protection of human health and the environment draws on the assessments of other evaluation criteria, including long-term effectiveness and permanence, short-term effectiveness and compliance with ARARs.

9.3.2 COMPLIANCE WITH ARARS

1. The ARAR criterion requires that alternatives be assessed to determine whether they attain applicable or relevant and appropriate requirements under federal and state environmental laws. If they do not meet those ARARs, grounds for invoking an ARAR waiver must be provided in the analysis of the alternative.

9.3.3 LONG-TERM EFFECTIVENESS AND PERMANENCE

1. The long-term effectiveness and permanence criterion requires an assessment of the long-term effectiveness and permanence the remedy affords, along with the degree of certainty that the alternative will prove successful. This assessment includes a consideration of the magnitude of residual risk that will remain from untreated waste or treatment residuals at the site of redisposal, taking into account the volume, toxicity, and mobility of the remaining hazardous waste and its propensity to bioaccumulate, as well as the adequacy and reliability of controls used to manage residuals and untreated waste.

9.3.4 REDUCTION OF TOXICITY, MOBILITY OR VOLUME THROUGH TREATMENT

1. The degree to which alternatives reduce toxicity, mobility or volume through treatment is assessed by considering (a) the treatment or recycling processes the alternatives employ and materials they will treat, (b) the amount of hazardous materials that will be destroyed, treated or recycled, (c) the expected degree of toxicity, mobility or volume reduction due to treatment or recycling, (d) the degree to which the treatment is irreversible, (e) the type and quantity of materials that will remain following treatment, and (f) the degree to which treatment reduces the inherent hazards posed by principal threats at the site.

### 9.3.5 SHORT-TERM EFFECTIVENESS

1. Short-term effectiveness of a remedy is assessed by considering the short-term risks that might be posed to the community during implementation, potential impacts on workers during remedial actions and the effectiveness and reliability of protective measures, potential environmental impacts of the remedial action and the effectiveness and reliability of mitigative measures during implementation, and the time it will take before protection is achieved.

### 9.3.6 IMPLEMENTABILITY

1. The ease or difficulty of implementing alternatives is assessed by considering the alternative's technical and administrative feasibility, as well as the availability of services and materials. This analysis includes consideration of technical difficulties and unknowns, technology reliability, availability of offsite treatment, storage and disposal capacity and services, and the availability of prospective technologies.

### 9.3.7 COST EFFECTIVENESS

1. Cost effectiveness is assessed by considering the capital costs, annual operation and maintenance costs, and the net present value of capital, operation and maintenance costs associated with the given alternative.

### 9.3.8 STATE ACCEPTANCE

1. State acceptance involves assessing the State's position and key concerns related to the alternatives and the State's comments on ARARs or proposed use of waivers. This criterion is generally addressed in the Record of Decision once comments on the RI/FS and proposed plan have been received.

### 9.3.9 COMMUNITY ACCEPTANCE

1. Community acceptance includes determining which interested persons in the community support, have reservations about or oppose the remedy being proposed. Like the State acceptance criterion, this criterion is generally addressed in the Record of Decision once comments on the RI/FS and proposed plan have been received.

## 9.4 NCP ANALYSIS OF THE RECOMMENDED APPROACH - SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE ALTERNATIVE

1. The selective excavation alternative satisfies each of the nine NCP criteria. The narrative set forth below highlights the alternative's compliance with the NCP. Following that narrative is a chart in which the alternative is judged against each of the NCP criteria.

2. Summarizing the narrative and the table, the selective excavation alternative meets each of the NCP criteria and does not present any of the additional dangers associated with a total excavation and incineration or thermal destruction alternative.

### 9.4.1 OVERALL PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT

1. The selective excavation alternative would protect both human health and the environment. The principal risks posed by the site would be eliminated by excavating, treating and redisposing the arsenic-containing materials, the tarry seep materials and other appropriate tarry materials that can be safely excavated, thereby eliminating the potential for direct contact with these wastes. The drilling muds and remaining tarry materials that are appropriate for stabilization would be rendered immobile by in situ stabilization/solidification treatment, thereby eliminating any migration potential of such wastes and eliminating any threat such wastes might pose to ground water. The toxicity of those materials will be reduced by chemically neutralizing $SO_2$ and driving off benzene and other VOCs which are then captured and treated via the emissions control system. The potential for air emissions and odors to impact the community and environment would be eliminated by excavation of the seeps, and the installation of an active emission control system and multi-layer RCRA equivalent cover. The community and environment would be protected from direct contact with the waste. The potential contamination of groundwater would be eliminated through the slurry walls and multi-layer RCRA equivalent cover. Risks to the community, workers and environment would be minimized during implementation by minimizing the amount of waste disturbance, thereby minimizing air emissions and odors.

2. The site total lifetime carcinogenic risk of this alternative is less than $8 \times 10^{-8}$, well below the EPA acceptable risk range of $1 \times 10^{-4}$ to $1 \times 10^{-6}$.

9.4.2 COMPLIANCE WITH ARARS

1. The selective excavation, treatment and RCRA equivalent closure alternative would meet all ARARs and would not require any ARAR waivers. The limited excavation activities would assure that air quality emission standards are complied with during implementation and would allow OSHA safety standards to be met. The active emission control system would assure SCAQMD air quality standards are satisfied during and after implementation of this alternative and would meet all RCRA requirements. All excavated materials would be treated prior to redisposal to comply with the land disposal restrictions. BDAT treatment would be used to treat arsenic-containing materials and portions of the tarry materials. Residue from the emission collection system would be transferred to a TSD facility for treatment and disposal. The RCRA equivalent closure system would comply with all relevant and appropriate closure requirements. The groundwater protection afforded by the slurry walls and RCRA equivalent cover would avoid exceedance of all applicable water quality standards.

9.4.3 LONG-TERM EFFECTIVENESS AND PERMANENCE

1. Long-term effectiveness and permanence would be achieved with the selective excavation alternative. The magnitude of residual risk would be less than $1 \times 10^{-11}$, well below acceptable risk levels by several orders of magnitude because the principal risks posed by the site would be removed from the site, the drilling muds and tarry materials that are appropriate would be neutralized and immobilized through the in situ treatment of stabilization/ solidification, and all remaining materials would be beneath a 5 feet deep multi-layer RCRA equivalent cover. As the SROA states, even in an unremediated state, the site emissions pose an insignificant risk to the community and environment. With the selective excavation, treatment and RCRA equivalent closure remediation approach, any residual risk is well below EPA's acceptable risk range.

2. The long-term controls, both technological and institutional, recommended in the selective excavation alternative would protect against the remaining risks. Those controls are proven, reliable and enhance the long-term effectiveness of this alternative. Proven technologies would be used for the emission collection system, multi-layer RCRA equivalent cover, isolating slurry walls and system monitoring. A comprehensive long-term operations and maintenance program would be instituted to identify potential anomalies and prevent system failure. A ground water monitoring program would be instituted to assure groundwater is being protected by the closure system. The alternative would also be subject to a five year review under Section 121(c) of CERCLA. The multi-layer RCRA equivalent cover would

contain redundant components to virtually eliminate the potential for system failure and is designed to withstand a maximum credible earthquake. Even in the unlikely event of a system failure, an environmental or public health impact would not be likely. The materials remaining on-site would be immobile and the residual risk of those materials minimal, given that the unremediated site has not caused significant groundwater contamination, if any, in over 40 years and that the site emissions today pose an insignificant risk to the community and environment. The arid nature of the area, the migration rate of rainwater and the 5-foot cover make rainfall contact with the remaining material extremely unlikely.

### 9.4.4 REDUCTION OF TOXICITY, MOBILITY OR VOLUME THROUGH TREATMENT

1. The statutory preference for treatment, where practicable, as the principal element of a remedy is satisfied by the selective excavation alternative. The principal threats posed by the site would be eliminated through the excavation, treatment (including BDAT and/or neutralization where appropriate) and redisposal of the arsenic-containing materials, the tarry seeps and all other appropriate tarry materials that can be excavated safely. The unstable materials that are not removed would be immobilized by in situ stabilization/solidification treatment and the immobile remaining materials would be treated with an active emission control system. The bentonite and cement slurry walls and multi-layer RCRA equivalent cover would prevent any perched water from contacting the remaining materials and percolating to groundwater.

2. The selective excavation approach utilizes a combination of treatment technologies to achieve the reductions suggested by this criterion. EPA recognizes and supports the use of such technology combination "treatment trains" to achieve effective treatment (see EPA Response to Comments on Proposed Rule § 300.430(e)(9), 55 Fed. Reg. 8721, [1990]).

3. The arsenic-containing materials would be treated with BDAT stabilization, the tarry seeps treated through neutralization, stabilization and/or thermal destruction, a portion of the drilling muds and remaining tarry materials treated through in situ stabilization/solidification and the remaining immobile materials treated with an active emission control system.

4. All of the arsenic-containing materials with concentrations in excess of 50 ppm lying within the top three feet of any sump will be excavated, stabilized and disposed offsite. All known tarry seeps will be neutralized and partially solidified, excavated and redisposed or thermally destroyed. All appropriate tarry materials that can be safely excavated will be neutralized and partially solidified, excavated and redisposed or thermally destroyed. All remaining tarry

materials and drilling mads that are appropriate for solidification will be treated in situ by stabilization/solidification. All remaining materials will be treated by the emission control system.

5. The toxicity concerns associated with the arsenic-containing materials will be eliminated by stabilization and offsite disposal. The toxicity of the tarry materials that are thermally destroyed will be eliminated. The toxicity of the tarry materials and drilling muds that are treated through stabilization will be reduced by chemically neutralizing $SO_2$ and driving off benzene and other VOCs which are then captured and treated. The toxicity of emissions from the remaining materials will be eliminated by capture and treatment.

6. The mobility of arsenic-containing material will be eliminated by stabilization and offsite disposal. The mobility of the tarry materials that are thermally destroyed will be eliminated. The mobility of the tarry materials and drilling muds that are treated through stabilization will be eliminated. The mobility of the remaining material will be eliminated through the slurry walls and multi-layer RCRA equivalent cover.

7. Approximately 1,800 cubic yards of arsenic-containing materials will be excavated, stabilized and disposed offsite. With respect to tarry waste, up to 4,230 cubic yards will be excavated and thermally destroyed offsite, up to 1,960 cubic yards will be excavated, stabilized and disposed offsite and between 2,120 and 9,930 cubic yards will be excavated, stabilized and disposed onsite. (The volume ranges are based on reasonable upper and lower bounds for anticipated subsurface conditions as discussed in Chapters 2.0, 6.0 and 7.0.) The remaining tarry waste and drilling muds that are appropriate for solidification will be detoxified and solidified in situ, rendering those materials immobile.

8. The tarry materials that are thermally destroyed will be irreversibly treated. The $SO_2$, $H_2S$, volatile and semi-volatile organics from the site will be irreversibly treated and removed as part of the emission control system.

9. The cancer risk of the remaining materials is less than $1 \times 10^{-11}$, well below the EPA acceptable risk range ($1 \times 10^{-4}$ to $1 \times 10^{-6}$). The hazard index of the remaining materials is less than .01. A hazard index of less than 1.0 is considered to be non-hazardous.

### 9.4.5 SHORT-TERM EFFECTIVENESS

1. The selective excavation alternative achieves the short-term effectiveness criterion. The selective excavation of the treated materials would be done at calculated rates consistent with information derived from the EPA's 1990 trial excavation to assure that emissions can be controlled. This approach to excavation would prevent adverse impacts to the community, workers and the environment.

2. The community would be protected during implementation because waste disturbance would be minimal, thereby limiting odors and $SO_2$ and benzene emissions. Implementation would be relatively uncomplicated and accomplished quickly, thereby minimizing the length of time for implementation accidents and minimizing potential exposure to the community.

3. Selective excavation prevents high levels of exposure to workers and allows OSHA safety standards to be met. Work would be accomplished safely and quickly by limiting the excavation activities. Placement of workers in deep excavation holes would be avoided by limiting the depth and extent of excavation activities. Exposure to high concentrations of benzene and $SO_2$ would be avoided by not disturbing the asphaltic waste and neutralizing the tarry waste materials in place, prior to excavation. Workers would be protected from emissions during implementation by wearing protective equipment, the use of fume hoods over the augers and a small enclosure.

4. Impacts to the environment during implementation of the selective excavation alternative would be minimal. The existing vegetation would be removed, and there would be few, if any, $SO_2$ and hydrocarbon emissions released to the atmosphere. Truck traffic would be minimal.

5. Total implementation time for this alternative is estimated to be between 42 and 48 months. The actual length of excavation is estimated to be between eleven and fourteen months.

### 9.4.6 IMPLEMENTABILITY

1. The selective excavation, treatment and RCRA equivalent closure alternative would involve the use of augers, off-site treatment, in situ stabilization/solidification treatment, RCRA equivalent closure, slurry walls and an active emission control system, all of which are demonstrated and reliable technologies.

2. The limited excavation activities and non-disturbance of the asphaltic materials would serve to minimize the chance of technical problems such as uncontrollable emissions or waste handling problems that could lead to delay. Limited excavation and such non-disturbance also minimizes the potential impacts to the nearby community. The approvals and permits required to implement this alternative are available and would be obtained. Due to the limited excavation, there would be minimal need for off-site services and redisposal capacity.

3. Technical expertise is available to implement the selective excavation alternative. The technologies required to implement the selective excavation alternative are proven and have been demonstrated at other Superfund sites. Materials required to implement the selective excavation alternative are readily available within the area. Considering the implementation risk, the site lifetime risk and the residual risk, the selective excavation alternative is clearly more cost effective than total excavation.

### 9.4.7 COST EFFECTIVENESS

1. The estimated capital costs for the selective excavation alternative ranges from $55 million to $69 million. The 30 year cost is estimated to be in the range of $74 million to $89 million.

### 9.4.8 STATE ACCEPTANCE

1. The State's acceptance of the selective excavation alternative is unknown. However, the MSG anticipates that a remedial alternative that meets the NCP criteria would be acceptable to the State.

### 9.4.9 COMMUNITY ACCEPTANCE

1. Community support of the selective excavation alternative is anticipated. In Spring 1990, interested persons in the community circulated a petition and obtained the strong support for the Companies' 1990 Stabilization and Closure Plan of those living close to the site. On December 17, 1990, interested persons in the community met with Congressman William Dannemeyer to support a selective excavation, treatment and closure remedial approach for McColl and to present to him their petition. Congressman Dannemeyer agreed to submit this petition to EPA, for its administrative record, on behalf of the community. All of these activities indicate that the community would support this alternative.

# NCP ANALYSIS OF SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH

## I. THRESHOLD CRITERIA

### PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT

- Eliminates the principal health risks posed by the site (as identified by EPA) through excavation, BDAT stabilization treatment, and offsite disposal of arsenic-containing materials.
- Eliminates the principal odor source from the site, the tarry seeps, through neutralization and partial solidification, excavation and a combination of the most appropriate of the following techniques: thermal destruction, offsite disposal, or onsite disposal.
- Eliminates other appropriate tarry materials that can be excavated safely through neutralization and partial solidification, excavation, and a combination of the most appropriate of the following techniques: thermal destruction, offsite disposal, or onsite disposal.
- Treats the remaining tarry materials that are not appropriate for excavation but are appropriate for solidification, and the drilling muds that are appropriate for solidification, through in situ treatment of stabilization/solidification, rendering them immobile, and reducing their toxicity by chemically neutralizing $SO_2$ and driving off benzene and other VOCs which are then captured and treated.
- Eliminates potential for air emissions and odors both during implementation and in the future through an active emission collection system and post-implementation through engineering control consisting of a multi-layer RCRA equivalent cover.
- Eliminates possibility of contact with the remaining waste by capping these materials.
- Eliminates potential for contamination of ground water and leachate development by isolating the remaining materials with slurry walls and a multi-layer RCRA equivalent cover.
- Minimizes implementation risks to workers, the community, and environment by minimizing waste disturbance and handling.
- Site total lifetime carcinogenic risk is less than $8 \times 10^{-8}$, well below the EPA acceptable risk range

### COMPLIANCE WITH ARARS

- Selective excavation prevents high levels of exposure to workers and allows OSHA safety standards to be met.
- Limited excavation activities assure air quality emission standards are not exceeded.
- Excavated arsenic-containing materials and tarry materials will be treated to comply with the land disposal restrictions, including BDAT where appropriate.
- Will meet all closure requirements applicable to a multi-layer RCRA equivalent cover.
- Multi-layer RCRA equivalent cover prevents rainwater and surface water from contacting wastes.
- Multi-layer RCRA equivalent cover prevents migration of contaminants to ground water.
- Emission control system collects and treats emissions and odors to meet all applicable air quality standards and will comply with all RCRA requirements.

# NCP ANALYSIS OF SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)

## II. PRIMARY CRITERIA

### LONG-TERM EFFECTIVENESS AND PERMANENCE

- Magnitude of Residual Risk
  - Principal health risks posed by the site (as identified by EPA) will be eliminated.
  - Residual risk of remaining materials (less than $1 \times 10^{-11}$) is well below acceptable EPA risk range ($1 \times 10^{-4}$ to $1 \times 10^{-6}$).
  - Tarry materials that are not appropriate for excavation but are appropriate for solidification, and drilling muds that are appropriate for solidification, will be immobilized through in situ treatment of stabilization/solidification.
  - Remaining immobile materials will be under a 5-foot multi-layer RCRA equivalent cover with an active emission control system.
  - Even in the unlikely event the multi-layer RCRA equivalent cover fails, it is still unlikely that there will be an environmental or public health impact in the time it takes to make repairs:
    - As designed, the cover provides 5 feet of protection to prevent contact with the remaining materials.
    - The arid nature of the area and the migration rate of rainwater makes rainwater contact with the remaining materials extremely unlikely.
    - Remaining material is immobile, which prevents percolation of contaminants to ground water.
  - Even if a temporary failure of the emission collection system were to occur, emissions from the site pose insignificant risks as shown by EPA's no action risk assessment.
- Adequacy and Reliability of Controls
  - Proven technologies are being used for the emission collection system, multi-layer RCRA equivalent cover, isolating slurry walls and system monitoring.
  - Multi-layer RCRA equivalent cover with redundant components minimizes potential for system failure and will be designed to withstand a maximum credible earthquake.
  - Long-term operation and maintenance program serves to pre-identify potential anomalies and prevent system failure.
  - 5-year statutory review by the agency ensures the closure system remains protective of human health and the environment.
  - Ground water will be monitored to assure no percolation of contaminants is occurring.

# NCP ANALYSIS OF SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH

## II. PRIMARY CRITERIA (Continued)

REDUCTION OF MOBILITY, TOXICITY OR VOLUME THROUGH TREATMENT

- Satisfies statutory preference for treatment as the principal element of remedy because it eliminates the principal health threat posed by the site (as identified by EPA) through excavation, BDAT stabilization treatment, and offsite disposal of arsenic-containing materials.
- Satisfies statutory preference for treatment as principal element of remedy because it treats the appropriate tarry waste that can be excavated safely through neutralization and partial solidification, excavation, and a combination of the most appropriate of the following techniques: thermal destruction, offsite disposal, or onsite disposal.
- Satisfies statutory preference for treatment as principal element of remedy because it treats the remaining tarry wastes and drilling mud that are appropriate for solidification by in situ treatment of stabilization/ solidification.
- Satisfies statutory preference for treatment as principal element of remedy because it treats remaining immobile material with an active emission control system.
- Multi-layer RCRA equivalent cover prevents surface and rainwater from contacting the remaining materials that could percolate to ground water.
- Slurry walls prevent perched water from contacting the remaining materials and percolating to ground water.
- Treatment Process Used and Materials Treated
  - Arsenic will be treated with BDAT stabilization.
  - Appropriate tarry materials that can be excavated safely will be treated by neutralization and partial solidification, excavation, and a combination of the most appropriate of the following techniques: thermal destruction, offsite disposal, or onsite disposal.
  - Drilling muds and remaining tarry material that are appropriate for solidification will be treated by in situ stabilization/solidification.
  - Remaining immobile material will be treated through active emission control system.
  - Multi-layer RCRA equivalent cover consisting of vegetation and irrigation system, vegetative soil cover, infiltration seepage collection, geocomposite layer, low permeability clay and synthetic membrane layer, and emission collection geotextile layer including gravel and perforated pipes--all proven technologies.
  - Slurry walls will be constructed of bentonite and cement.
- Amount of Hazardous Materials Destroyed or Treated
  - All arsenic-containing materials with concentrations in excess of 50 ppm lying within the top 3 feet of a sump will be excavated, treated and redisposed offsite.
  - All known tarry seeps will be neutralized and partially solidified, excavated and redisposed or thermally destroyed.
  - All appropriate tarry materials that can be safely excavated will be neutralized and partially solidified, excavated and redisposed or thermally destroyed.
  - All remaining tarry materials and drilling muds that are appropriate for solidification will be treated in situ by stabilization/solidification.
  - All remaining materials will be treated by the emission control system.

# NCP ANALYSIS OF SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH

## II. PRIMARY CRITERIA (Continued)

- Degree of Expected Reductions in Toxicity, Mobility or Volume
  - A combination of treatment technologies--"treatment trains"--utilized to effect treatment, a procedure supported by the EPA.
  - Concerns associated with toxicity of arsenic eliminated by stabilization and offsite disposal.
  - Toxicity of tarry materials that are thermally destroyed is eliminated.
  - Toxicity of tarry materials and drilling muds that are treated through stabilization is reduced by chemically neutralizing $SO_2$.
  - Toxicity of tarry materials and drilling muds that are treated through stabilization is reduced by driving off benzene and other VOCs which are then captured and treated.
  - Toxicity of emissions from remaining material is eliminated by capture and treatment.
  - Mobility of arsenic is eliminated by stabilization and offsite disposal.
  - Mobility of tarry materials that are thermally destroyed is eliminated.
  - Mobility of tarry materials and drilling muds that are treated through stabilization is eliminated.
  - Mobility of remaining materials is eliminated through multi-layer RCRA equivalent cover and slurry walls.
  - Approximately 1,800 cubic yards of arsenic-containing materials will be excavated, stabilized, and disposed offsite.
  - Up to 4,230 cubic yards of tarry waste will be excavated and thermally destroyed offsite.
  - Up to 1,960 cubic yards of tarry waste will be excavated, stabilized and disposed offsite.
  - Between 2,120 and 9,930 cubic yards of tarry waste will be stabilized, excavated, and disposed onsite.
  - The remaining tarry waste and drilling muds that are appropriate for solidification will be detoxified and solidified in situ to render them immobile.
  - The mobility potential of the remaining materials will be further reduced by the multi-layer RCRA equivalent cover and slurry walls.
- Degree to Which Treatment Irreversible
  - Tarry materials that are thermally destroyed are irreversibly treated.
  - $SO_2$, $H_2S$, volatile and semivolatile organics are irreversibly treated and removed as part of the air treatment system.
- Type and Quantity of Residuals Remaining After Treatment
  - Cancer risk of remaining materials is less than $1 \times 10^{-11}$, well below the EPA acceptable risk range ($1 \times 10^{-4}$ to $1 \times 10^{-6}$).
  - Hazard index of remaining materials is less than .01, a hazardous index of less than 1.0 is considered safe.
- Remaining drilling mud and tarry material and all of asphaltic material will be immobile.

# NCP ANALYSIS OF SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH

## II. PRIMARY CRITERIA (Continued)

### SHORT-TERM EFFECTIVENESS

- Selective excavation at slow rates assures that emissions are controllable and thereby prevents negative impact to the community, workers, and the environment.
- Protection of Community During Remedial Actions
  - Community protected from emissions and odors during implementation because minimal waste is disturbed.
  - Implementation is less complicated and is accomplished quickly so implementation failure and length of time for potential exposure is minimized.
  - $SO_2$ and benzene emissions minimized by not disturbing asphaltic waste.
- Protection of Workers During Remedial Actions
  - Selective excavation prevents high levels of exposure to workers and allows OSHA safety standards to be met.
  - Workers protected from high concentrations of $SO_2$ and other emissions during implementation by feasible use of protective equipment, fume hoods, small enclosures, and by minimal waste excavation and short implementation period.
  - High concentrations of $SO_2$ and benzene avoided by not disturbing asphaltic waste.
  - Workers will not be placed into deep excavation holes.
  - Waste to be neutralized prior to excavation
- Environmental Impacts
  - Removal of vegetation.
  - Minimal $SO_2$ and hydrocarbon emissions in the sensitive Los Angeles air basin.
  - Minimal truck traffic.
- Time Until Remedial Action Objectives Are Achieved
  - Approximately 42 to 48 months until remedy is completed.
  - Crib walls installed as an initial construction element, if possible, to provide seismic stability.
  - Onsite construction activities limited to approximately 27 months.

### IMPLEMENTABILITY

- Technical Feasibility
  - Auger, in situ stabilization/ solidification, RCRA equivalent closure, slurry walls and the emission collection system are all demonstrated technologies.
  - Minimal excavation and non-disturbance of asphaltic waste minimizes chance of delay and potential impacts to the nearby community.
  - No additional surface remedial actions anticipated--all risks addressed by the alternative.
  - Large scale excavation of the waste is an unproven technology and worker and community risk make it impractical.
- Administrative Feasibility
  - Required approvals and permits can be obtained.
- Availability of Services and Materials
  - Minimal need for offsite services and redisposal capacity due to limited excavation.
- Proven technologies, materials and expertise are available to implement this approach.

### COST EFFECTIVENESS

- Estimated capital costs between $55 and $69 million.
- Operations and maintenance costs $19.8 million.
- Total cost between $74 and $89 million.

# NCP ANALYSIS OF SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH

## III. BALANCING CRITERIA

### STATE ACCEPTANCE

- Unknown.

### COMMUNITY ACCEPTANCE

- Interested persons in community circulated petition supporting closure and obtained 89 signatures. The majority of the signators live in the neighborhood adjacent to the site.
- Interested persons in community met with Congressman Dannemeyer on December 17, 1990 to discuss this approach.

## 9.5 COMPARATIVE NCP ANALYSIS OF ALTERNATIVES

1. The alternatives identified in the 1989 SROA and the selective excavation alternative are evaluated (in the discussion below and in the following chart) against each other and each of the nine NCP evaluation criteria. The purpose of this analysis is to identify the relative advantages and disadvantages of each alternative. The discussion analysis emphasizes the comparison between the selective excavation alternative and the total excavation and incineration alternative. This emphasis is made for three reasons. EPA has stated that total excavation and incineration is the "preferred" remedy for the site. Given that, it is appropriate to evaluate that alternative in comparison to the selective excavation alternative. Additionally, new information (which applies to all of the alternatives which include excavation and/or incineration) has been obtained from the Ogden test burn and 1990 trial excavation, information which was not available in the 1989 SROA and information which is critical in determining which remedy best complies with the NCP and best serves the needs of the community. Finally, because the alternatives set forth in the 1989 SROA have already been discussed and commented upon at length, it is appropriate to focus on the selective excavation alternative (which is new) and the total excavation and incineration alternative (about which new information has been generated).

2. The MSG incorporate by this reference: the MSG's comments to EPA's Pre-Publication Report, Technology Evaluation Report, Site Program Demonstration of a Trial Excavation at the McColl Superfund Site dated September 12, 1990; and their comments on the Ogden test burn. Although EPA appears to have substantially redefined its preferred alternative as one of "excavation and thermal destruction" as opposed to the excavation and incineration alternative described in the SROA, the only information upon which the MSG could rely in performing this comparative NCP analysis is that provided in the SROA on incineration. Either incineration is representative of thermal destruction and, therefore, the MSG's comments on incineration are applicable to an evaluation of thermal destruction, or incineration is not representative of thermal destruction and, therefore, EPA must supplement the feasibility study and issue a new proposed plan. The MSG believe, given the broad range of technologies encompassed within the thermal destruction class, that their comments on incineration are in fact applicable to many of these technologies. Even as to those technologies, however, issues would be raised which have never been identified or addressed by EPA and have never been opened to public comment. Furthermore, many technologies within this class (e.g., in situ vitrification), are so distinctly different from incineration that it would be necessary for EPA to perform an entirely new analysis. While the approach being

recommended in this document involves selective excavation of the site waste, the MSG's ongoing technical evaluation of the site continues to demonstrate that closure of the site is the best remedial alternative. Notwithstanding this conclusion, the MSG have arrived at the selective excavation approach by taking into consideration EPA's concerns with the statutory preference for treatment where practicable, the long term effectiveness of the remedy at the site, and the risks posed by disturbance of waste at the site.

### 9.5.1 OVERALL PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT

1. Compared to all other alternatives (except RCRA equivalent closure), the selective excavation alternative poses much lower risks, and risks to a much smaller population. Site total lifetime carcinogenic risk is less than $8 \times 10^{-8}$. This risk is substantially lower than that presented by the total excavation and incineration alternative. There, site total lifetime carcinogenic risk is at least $6 \times 10^{-6}$, according to the SROA. In fact, the McColl site risk assessment prepared by ENVIRON indicates total lifetime risk could reach $8 \times 10^{-6}$. The resulting potential total population risk would be more than three additional cases of cancer. To certain individuals within the risk population, the cancer risk would approach $1 \times 10^{-4}$. Moreover, emissions of $SO_2$, THC, THT and other toxic substances caused by the excavation pose potentially serious and conceivably fatal health risks to workers and the surrounding community. The trial excavation indicated that a total excavation will generate $SO_2$ levels that are consistently above Immediately Dangerous to Life or Health levels. See the Companies' Comments to EPA's Pre-Publication Report, Technology Evaluation Report, Site Program Demonstration of a Trial Excavation at the McColl Superfund Site dated February 12, 1991. The full extent of the risks associated with total excavation and incineration are still unknown and will in all probability get worse. The full extent of the problems associated with total excavation and incineration is not even known. For example, the invalidation of crucial THC speciation data, which would have quantified the presence of carcinogens in the released emissions, leaves unanswered crucial questions regarding health risks to the surrounding community. Further health impacts could result from the excavation of the sumps, at depths of 40 feet, as close as 60 feet to certain residences. There is no data to calculate the health effects of such excavation to nearby residences. The data indicates the likelihood of worker fatalities and of one or more persons developing cancer because of total excavation. These risks are discussed more fully below. In contrast, the short term health effects for workers and the community will be substantially less, and possibly eliminated, under the selective excavation alternative because of the limited amount of excavation, the protective equipment utilized and the controlled excavation rate.

### 9.5.2 COMPLIANCE WITH ARARS

1. The selective excavation alternative will comply with all ARARs. The limited excavation at controlled rates allows sensitive air, noise and OSHA ARARs to be complied with. No ARARs waivers are anticipated. The total excavation and incineration alternative will not comply with ARARs as proposed in the SROA due to exceedances of federal, state and SCAQMD $SO_2$ and $NO_2$ air quality standards. In fact, as discussed by the MSG in their comments to the SROA, $SO_2$ emissions from the proposed incinerator could put the South Coast Air Quality District out of compliance with the Clean Air Act. Additionally, OSHA regulations and SCAQMD Regulation XIII will be violated. Further violations will exist if the $SO_2$ levels are consistently above Immediately Dangerous to Life or Health levels. If the ash remains hazardous, the total excavation alternative will not comply with land disposal regulations.

### 9.5.3 LONG-TERM EFFECTIVENESS AND PERMANENCE

1. The selective excavation alternative has a residual cancer risk of less than $1 \times 10^{-11}$, well below the EPA acceptable risk range ($1 \times 10^{-4}$ to $1 \times 10^{-6}$). The selective excavation alternative also has a negligible non-cancer risk. The residual risk of the total excavation and incineration alternative was not calculated in the SROA and, therefore no estimate was made regarding metals that may be emitted from the stack into the nearby neighborhood. In contrast, ENVIRON actually did the risk analysis and estimated the cancer risk of total excavation at $2 \times 10^{-5}$. The selective excavation alternative is likely to meet performance standards and can be implemented. A crucial factor is that the excavation will be selective and accomplished at controlled and calculated rates. Conversely, based upon the results of the trial excavation, it is very likely that total excavation will not meet performance standards and cannot be implemented. Excavating at the low rates necessary to meet performance standards would result in total excavation taking 16 to 21 years, not a practical solution in a residential community. If total excavation cannot be implemented, then serious problems result including how to redesign the remedy and how to ensure community and worker safety in the interim. There is a high degree of confidence that the controls for the selective excavation alternative are adequate and effective for long term protection because the technologies used are proven technologies. The controls necessary for the total excavation and incineration alternative have yet to be identified and, therefore, their effectiveness is unverifiable. Given the results of the trial excavation, it is uncertain at best whether the total excavation remedy can be implemented in a safe manner or whether it can be implemented at all.

### 9.5.4 REDUCTION OF MOBILITY, TOXICITY, OR VOLUME THROUGH TREATMENT

1. The selective excavation alternative addresses and eliminates the principal contaminants of concern associated with the site through a combination of excavation, BDAT treatment, neutralization, in situ solidification/stabilization and redisposal. By selectively excavating, at a controlled rate, the selective excavation alternative avoids the problems and risks of total excavation. There are not feasible scientific processes by which the toxicity of arsenic can be eliminated or reduced. However, the selective excavation alternative directly addresses the toxicity concerns associated with arsenic by treating the arsenic with BDAT, binding it with cement, flyash or other stabilizing material, and disposing of it off-site, thereby eliminating the toxicity concerns associated with arsenic. In contrast, the total excavation alternative does not even address the arsenic issue and may exacerbate the arsenic problem. Because arsenic (and other metals) does not burn, attempting to incinerate arsenic does not reduce its toxicity. To the contrary, burning arsenic causes a loss of control over the arsenic and could cause the arsenic to be dispersed over the community, creating greater and more complex exposure problems. Thus, total excavation ignores the principal contaminants of concern at the site which are metals and which are not treated by incineration. Adding to this risk is the uncertainty that comes with excavation technology which has yet to be proven or identified. The mobility of certain contaminants, especially arsenic, will be increased under the total excavation and incineration approach. By contrast, the selective excavation approach is designed to eliminate and/or immobilize all materials which could possibly pose a danger at the site.

### 9.5.5 SHORT-TERM EFFECTIVENESS

1. The total excavation and incineration alternative presents new, extreme dangers to both the community and the workers at the site. The actual EPA data for the limited trial excavation showed an Immediately Dangerous to Life or Health ("IDLH") level 10 times greater than that which is acceptable. For total excavation, ENVIRON's validated model shows that even this is a low number; ENVIRON estimates that the actual IDLH level could be 4,000 to 40,000 times higher than the acceptable level. Because of the size of the total excavation, a failure of the remedy could lead to disastrous and even fatal results.

2. Other short-term effects of total excavation include transportation risks, structural failure, risk of explosion or fire due to the high concentration of THCs, risk of failure or damage of the excavation containment structure, dispersal of arsenic and heavy metals into the community during incineration, and exposure to noise. The short-term community risks of the selective

excavation alternative are much less both in number and in degree. Because of the limited excavation, gaseous emissions, transportation risks and the failure of the enclosure are all much more limited and controllable. Additionally, by not disturbing the asphaltic waste and by using shrouded auger systems with an emissions capture system plus a redundant small enclosure, the excavation risks to the community will be much smaller and will be controllable. The results are seen in the site lifetime total risks: For selective excavation, the site lifetime total risk is less than $8 \times 10^{-8}$; for total excavation and incineration the site lifetime total risk is at least $6 \times 10^{-6}$, and this risk does not consider any products of incomplete combustion or non-inhalation exposures. Moreover, for total excavation and incineration, significant transportation risks result. If incineration is done off-site, the total excavation alternative is 41 to 125 times more likely to cause a transportation fatality than the se[illegible] excavation alternative. If incineration is done on-site, the total excavation alternative is 25 to 112 times more likely to cause a transportation fatality.

3. The differences between total excavation and selective excavation are even more pronounced when the risks to workers are analyzed: The total excavation and incineration alternative will cause major occupational health and safety risks to workers. OSHA standards will inevitably be violated. There will be significant $SO_2$, THT and hydrocarbons emanating from the disturbance of the waste. During the trial excavation, $SO_2$ levels were measured at lethal levels. Other dangers to workers which were demonstrated during the trial excavation included potential heat stress, extreme difficulty of emergency egress from the enclosure, considerable noise, and cumbersome personal protective equipment (PPE) which caused communication problems, hampered mobility, and caused poor visibility, all of which would likely lead to accidents. These dangers are explained more fully in the Companies' Comments to EPA's Pre-Publication Report, Technology Evaluation Report, Site Program Demonstration of a Trial Excavation at the McColl Superfund Site dated February 12, 1991. Because the major dangers to workers are associated with excavation, the less amount of excavation that is undertaken, the less is the risk for the workers. Thus, the selective excavation alternative presents far less dangers to workers, and no risks that cannot be controlled by proper planning and mitigation measures. The comparative dangers of total excavation are perhaps most clearly brought into focus when it is considered that total excavation poses a risk of cancerous death to three people and a transportation risk of death to one or two more people, while selective excavation is not expected to produce a single cancer death within more than a million years and not one transportation death.

4. In conclusion, the risks to workers under the total excavation alternative are so great that death or other serious injuries are predictable using EPA's own risk assessment guidance, and it is unlikely that the total excavation approach will even receive OSHA approval. These risks are compounded when the difficulties of completing the alternative and the time that such completion will take are considered. If, as is possible, the remedy cannot be implemented in less than 16 to 21 years, the chances for serious worker injury and fatalities are increased even more. On the other hand, the selective excavation alternative will meet all OSHA standards and will entail only limited potential risk to workers, and can be accomplished within 42 to 48 months.

9.5.6 IMPLEMENTABILITY

1. It is very possible, even likely, that the total excavation and incineration alternative cannot be implemented. In light of the trial excavation, the excavation rates in the SROA have been proven incorrect and unreliable. Potentially toxic emission levels, associated PPE requirements and other factors will lead to excavation rates radically lower than those anticipated by EPA thereby significantly extending the excavation schedule and dramatically increasing the cost for full-scale excavation. Moreover, use of Level-A PPE under the conditions and for the duration of a full-scale excavation would be unprecedented. Total excavation at the site is unfeasible, among other reasons, because the feasibility of an adequate emission control system has not been demonstrated; excavation of the sumps at depths of 40 feet, as close as 60 feet to residences, will be extremely difficult; and because of the size of the enclosure needed to conduct a full-scale excavation.

2. Based on the data from the trial excavation, the time to implement the total excavation remedy could run as long as 16 to 21 years. During a full-scale excavation when ambient temperatures exceed 70°, workers will likely be limited to 15 minutes of work per hour due to heat stress associated with wearing Level-A PPE and the required health monitoring. In higher temperatures, work may not be able to proceed at all. Other issues indicate the fact that the foam relied upon by EPA to control toxic emissions from the waste during excavation was ineffective and costly. EPA's contention that all the problems in the trial excavation can be resolved in the design phase of the full excavation is not supported by the test results; in fact, if anything, it appears that problems which were not considered in the SROA have arisen, and exist to an extent that they present serious risks to the community and to workers. Similar implementability problems like those experienced at the trial excavation have shut down remediations at the Petro Processors site in Louisiana, and have lead to changes in remediation

selection at the Hardage site in Oklahoma, the Tyson's Lagoon site in Pennsylvania, and the Seymour Recycling site in Indiana. As noted above, where there are implementation problems or other delays, the risks to the community and to workers are greatly increased.

3. The selective excavation alternative, on the other hand, is fully implementable. It uses proven technologies to accomplish expected results. Additionally, because the amount of excavation is limited and undertaken at a controlled rate, the excavation and worker problems that exist under total site excavation will not occur. Thus, while the mobilization/demobilization of a temporary excavation enclosure will be possible under the selective excavation approach, it will likely not be possible under the total excavation approach because of the difficulty of constructing such a large, irregularly shaped enclosure with a resulting inability to meet air emission requirements for exhaust gases. These risks for total excavation and incineration are increased when it is considered that this approach contemplates excavating all the tar and acidic asphaltic waste, a handling process that will be complex and may exacerbate the risks involved. From an engineering standpoint, it is not possible to simply up-scale the trial excavation to a full-scale excavation. There are many more problems and complexities that must be addressed. For example, if a full-size, effective containment structure cannot be constructed or if an air handling system cannot be designed, the total excavation alternative cannot be implemented. Nor can that alternative be implemented if incinerator emission controls cannot meet applicable air quality standards.

### 9.5.7 COST EFFECTIVENESS

1. Neither the selective excavation alternative nor the total excavation and incineration alternative is inexpensive. The capital costs including escalation of the selective excavation alternative will range from about $54 million to $69 million. Operation and maintenance costs are expected to cost approximately $20 million for 30 years, making the total cost between about $74 million and $89 million. The cost of the total excavation alternative is even greater. Capital costs are estimated to range from $117 million to $173 million. Operation and maintenance costs could range anywhere from $0 to $7 million. The total costs, in present value, according to the SROA, could range anywhere from $120 million to $400 million. These numbers were calculated on the basis that the total excavation and incineration remedy could be completed in 5 to 8 years. The trial excavation indicates that, based on excavation issues alone, implementation of the remedy may take from 16 to 21 years. The cost ineffectiveness of the total excavation alternative becomes magnified when the community and worker risks, as shown by the test burn and trial excavation, are considered.

2. Clearly, the selective excavation alternative is more cost effective than the total excavation alternative because total excavation is less protective of public health and the environment while costing substantially more.

### 9.5.8 STATE ACCEPTANCE

1. It is unknown, but anticipated, that the State will accept the selective excavation alternative. In the 1989 Draft Environmental Impact Report and Remedial Action Plan on the McColl site, the State expressed a preference for the total excavation and incineration alternative. This, however, was prior to EPA's redefinition of the remedial approach as one of excavation and thermal destruction and prior to performance of the trial excavation and the Ogden test burn. In light of the problems and failures of the trial excavation and test burn, it is questionable whether the State's support will continue. The dangers to the community and to workers, coupled with the uncertainties of the excavation process and unidentified and unproven technologies, make the total excavation alternative difficult, if not impossible, to evaluate.

### 9.5.9 COMMUNITY ACCEPTANCE

1. It is anticipated that the community will accept the selective excavation approach. The community has already given strong support to the RCRA equivalent enclosure remedy and favored closure over total excavation and incineration. Similarly, it is anticipated that, due to the problems and failures associated with the trial excavation and test burn, that the community will find the total excavation and incineration alternative unacceptable.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| **THRESHOLD CRITERIA** | | | | | |
| • Protection of Human Health and the Environment | • Compared to all other alternatives (except RCRA equivalent closure) and especially compared to excavation and incineration, this remedy poses much lower risks to a much smaller population. Site total lifetime carcinogenic risk is less than $8 \times 10^{-8}$. | • Site total lifetime carcinogenic risk is $2 \times 10^{-7}$*. | • Site total lifetime carcinogenic risk is $2 \times 10^{-7}$*. | • Site total lifetime carcinogenic risk is $3 \times 10^{-8}$*. | • Least protective alternative - site total lifetime carcinogenic risk is $6 \times 10^{-6}$*. ENVIRON's risk analysis shows that a population of 3 to 5 million residents would be exposed to incinerator emissions. Maximum individual risks would approach $85 \times 10^{-6}$. The resulting potential total population risk would be more than 3 additional cases of cancer. |
| | • Minimal, if any, short-term health effects are expected to workers and no short-term health effects are expected for community; all health effects are minimized by the limited extent of excavation, the protective equipment utilized and the controlled excavation rate. | • Emissions of $SO_2$, THC, THT and other toxic substances caused by the excavation pose potentially serious and conceivably fatal health risks to workers and the surrounding community based on the results of the trial excavation. | • Emissions of $SO_2$, THC, THT and other toxic substances caused by the excavation pose potentially serious and conceivably fatal health risks to workers and the surrounding community based on the results of the trial excavation. | • No short-term health effects are expected. | • Emissions of $SO_2$, THC, THT and other toxic substances caused by the excavation pose potentially serious and conceivably fatal health risks to workers and the surrounding community based on the results of the trial excavation. |
| • Compliance with ARARs | • Will comply with all ARARs - limited excavation at controlled rates allows sensitive air, noise and OSHA ARARs to be complied with and redisposed waste will be treated to meet land disposal restrictions. | • Will not comply with ARARs as proposed in the SROA due to exceedances of SCAQMD $SO_2$ and $NO_2$ air quality standards, odor and nuisance rules, noise restrictions, OSHA regulations and the land disposal restrictions. | • Will not comply with ARARs as proposed in the SROA due to exceedances of SCAQMD $SO_2$ and $NO_2$ air quality standards, odor and nuisance rules, noise restrictions, OSHA regulations and the land disposal restrictions. | • Will comply with all ARARs - non-disturbance of waste allows ARARs to be complied with. | • Will not comply with ARARs as proposed in the SROA due to exceedances of federal, state and SCAQMD $SO_2$ and $NO_2$ air quality standards, odor and nuisance rules, noise restrictions, SCAQMD Regulation 13 and OSHA regulations. Also will not comply with the land disposal restrictions if ash remains hazardous. |

9-25a

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • No waivers are anticipated.<br>• Will consider all TBCs. | • Although no waivers were identified as appropriate in the SROA, it appears the trial excavation results make ARAR non-compliance likely. Additionally, the land ban would restrict redisposal without treatment. It appears waivers would be needed and there is no likelihood they would be granted.<br>• Consideration of TBCs is uncertain - explicit excavation criteria are not identified in the SROA. | • Although no waivers were identified as appropriate in the SROA, it appears the trial excavation results make ARAR non-compliance likely. Additionally, the land ban would restrict redisposal without treatment. It appears waivers would be needed and there is no likelihood they would be granted.<br>• Consideration of TBCs is uncertain - explicit excavation criteria are not identified in the SROA. | • No waivers are required.<br>• Will consider all TBCs. | • Although no waivers were identified as appropriate in the SROA, it appears the trial excavation results make ARAR non-compliance likely. Additionally, the land ban would restrict redisposal without treatment. It appears waivers would be needed and there is no likelihood they would be granted.<br>• Consideration of TBCs is uncertain - explicit excavation criteria are not identified in the SROA. |
| **PRIMARY CRITERIA** | | | | | |
| • Long-Term Effectiveness and Permanence<br>- Magnitude of Residual Risks | • Residual cancer risk of less than 1 x $10^{-11}$, well below EPA acceptable risk range ($10^{-4}$ to $10^{-6}$) and negligible non-cancer risk. | • Not specifically calculated in the SROA. | • Not specifically calculated in the SROA. | • Not specifically calculated in the SROA. | • Not specifically calculated in the SROA because it was assumed no hazard from organics remaining onsite. No estimate was made regarding metals that may be emitted from the stack into the nearby neighborhood. Cancer risk estimated at 2 x $10^{-5}$ in the 1990 McColl Site Risk Assessment prepared by ENVIRON. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Residual risk from remaining materials consists largely of emissions that will be controlled through the RCRA equivalent cap and treated by the active emission control system. | • No remaining sources of risks; all contaminated materials are assumed to be removed. | • Possibility of gaseous emissions from the cap and dangerous sulfuric acid emissions from the flare. | • Possibility of gaseous emissions from the cap and dangerous sulfuric acid emissions from the flare. | • A residual risk will remain if ash is disposed onsite and metals are distributed around neighborhood. |
| - Adequacy and Reliability of Controls | | | | | |
| • Ability to Meet Performance Standards | • Likely that limited excavation will meet performance standards because excavation will be selective and done at controlled and calculated rates. | • Very likely that total excavation required to implement this alternative will not meet performance standards based on the results of the trial excavation. | • Very likely that total excavation required to implement this alternative will not meet performance standards based on the results of the trial excavation. | | • Very likely that total excavation required to implement this alternative will not meet performance standards based on the results of the trial excavation. |
| | • Multi-layer RCRA equivalent cap with redundant components minimizes the potential for system failure. | | • Multi-layer cover minimizes the potential for system failure. | • Multi-layer cover minimizes the potential for system failure. | |
| | • Likely that active emission control system will meet performance standards because technology is proven. | | • Gas flare could convert sulfur dioxide to sulfuric acid, a dangerous result not addressed in the SROA. | • Gas flare could convert sulfur dioxide to sulfuric acid, a dangerous result not addressed in the SROA. | |
| • Operation and Maintenance | • Care and maintenance of the cover and active emission control system. | • No specific long-term operations and maintenance required. | • Care and maintenance of the cover, the leachate collection system, and the gas flare system. | • Care and maintenance of the cover, the leachate collection system, and the gas flare system. | • Care and maintenance of the cover (if needed for the redisposed ash) the leachate collection system, and the gas treatment system if used. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| • Monitoring | • Will require long-term post-closure inspection and maintenance consistent with RCRA. | • No requirements for long-term post-closure inspection and monitoring (other than ground water monitoring) if all contaminated materials are removed. | • Will require long-term post-closure inspection and maintenance consistent with RCRA. | • Will require long-term post-closure inspection and maintenance consistent with RCRA. | • Will require long-term post-closure inspection and maintenance consistent with RCRA for ash placed onsite. |
| • | • Will require 5-year agency review under CERCLA. | | • Will require 5-year agency review under CERCLA. | • Will require 5-year agency review under CERCLA. | • Will require 5-year agency review under CERCLA if hazardous ash is redisposed onsite. |
| | • Ground water monitoring will be necessary. | • Ground water monitoring will be necessary. | • Ground water monitoring will be necessary. | • Ground water monitoring will be necessary. | • Ground water monitoring will be necessary. |
| • Difficulties/ Uncertainties With Operation and Maintenance | • No difficulties or uncertainties with operation and maintenance. | • No long-term operations and maintenance required. | • No difficulties or uncertainties with operation and maintenance. | • No difficulties or uncertainties with operation and maintenance. | • No difficulties or uncertainties with operation and maintenance. |
| • Technical Component Replacement Needs | • Some replacement of the emission control components may be needed. | | • Some replacement of the gas emission system components may be needed. | • Some replacement of the gas emission system components may be needed. | |
| | • Some replacement of cover components may be needed. | | • Some replacement of cover components may be needed. | • Some replacement of cover components may be needed. | • Dependent upon the disposition of the ash; some replacements of the cover components may be needed. |
| | • Monitoring wells may need the replacement of equipment. | • Monitoring wells may need the replacement of equipment. | • Monitoring wells may need the replacement of equipment. | • Monitoring wells may need the replacement of equipment. | • Monitoring wells may need the replacement of equipment. |
| • Magnitude of Risks if the Remedial Action Needs Replacement | • Failure of the remedy will not lead to catastrophic effects. | • Not applicable. | • Failure of the remedy will not lead to catastrophic effects. | • Failure of the remedy will not lead to catastrophic effects. | • Depends on disposition of the ash. The threat will be via ingestion of ash particles and leachate containing metals. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Odors may occur if the cover is breached and the emission collection system fails; however this is unlikely because the remedial action uses a proven emission collection system and a cover of 5 feet. Also, with stabilized materials, odors will be less than if material was untreated. | | • Some odor problems may occur if the cover is breached and the gas flare system fails. | • Some odor problems may occur if the cover is breached and the gas flare system fails. | |
| • Degree of Confidence that Controls Can Adequately Handle Problems | • High confidence that the controls are adequate and effective for long-term protection because technologies used are proven technologies. | • Not applicable. | • Cover control should be adequate and effective for long-term protection because proposed technology is proven; gas flare system will not be effective due to sulfuric acid releases. | • Cover control should be adequate and effective for long-term protection because proposed technology is proven; gas flare system will not be effective due to sulfuric acid releases. | • Uncertain because of metals dispersed by incinerator emissions using a new, unproven technology. Other controls should be adequate and effective for long-term protection. |
| • Uncertainties Associated with Land Disposal of Residuals and Untreated Wastes | | • Wastes must be placed in a disposal site that conforms to RCRA requirements. RCRA land disposal ban will require pretreatment (unspecified in SROA) before redisposal. | • Redeposited wastes must comply with the land disposal restrictions. | | • Metals content of ash will effect classification as hazardous or nonhazardous; if hazardous, must comply with land disposal restrictions including required pre-treatment (unspecified in SROA). |
| | • Earthquake hazard; however, system is designed to withstand maximum credible earthquake. | | • Earthquake hazard; however, system is designed to withstand maximum credible earthquake. | • Earthquake hazard; however, system is designed to withstand maximum credible earthquake. | |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| • Reduction of Mobility, Toxicity, or Volume Through Treatment | • The treatment process employed eliminates the principal threats - principal health threat is from arsenic and the principal nuisance is from seeps. | • Restricts mobility through containment.<br>• Does not reduce toxicity or volume - in fact, volume increases by bulking from excavation. | • Restricts mobility through containment.<br>• Does not reduce volume - in fact, volume is increased by lime additives and bulking from excavation.<br>• Lime neutralization treatment may reduce toxicity. | • Mobility reduced by cover.<br>• Does not reduce toxicity or volume. | • The treatment process employed does not address the principal health threats which are from metals and which are not treated by incineration. |
| - Treatment Process Used and Materials Treated | • Arsenic treated with BDAT stabilization. | • No treatment involved. | • Lime additive would neutralize the waste materials. | • Gas treatment system used to treat remaining materials but may convert sulfur dioxide to sulfuric acid - a dangerous result. | • The treatment process is uncertain and unproven; it will have to be specially designed to be able to burn the high-sulfur, acidic wastes. |
| | • Tarry seeps and other appropriate tar materials treated by neutralization, partial solidification, excavation and an appropriate combination of the following technologies: thermal treatment, off-site disposal or onsite disposal.<br>• Drilling muds and remaining tar material that is appropriate for solidification treated through <u>in situ</u> stabilization/solidification.<br>• Remaining immobile material treated through active emission control system. | • No stabilization or other treatment of wastes proposed prior to transportation. | • Gas treatment system used to treat remaining materials but may convert sulfur dioxide to sulfuric acid - a dangerous result. | | • Uncertain which treatment, if any, will be applied to residue from burn of acidic wastes. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| - Amount of Hazardous Materials Destroyed or Treated | • The actual quantity of hazardous materials that will be destroyed will depend on the ultimate selective excavation approach selected, but all of the waste material will be treated in some manner. | • No treatment involved. | • Materials treated through lime neutralization and gas treatment. | • No treatment involved other than gas treatment. | • The organic fraction of the wastes will be destroyed to a large extent; the ash, if it is hazardous, will require treatment to comply with the RCRA land disposal restrictions - this requirement is not addressed in the SROA. |
| - Degree of Expected Reductions in Toxicity, Mobility and Volume | • Toxicity concerns associated with arsenic eliminated by stabilization; toxicity of tarry materials eliminated by thermal destruction and reduced by neutralization; toxicity of drilling muds reduced by neutralization; and toxicity of emissions eliminated by capture and treatment. | • No reduction in toxicity will be achieved. | • Toxicity may be reduced by lime treatment. | • No reduction in toxicity will be achieved. | • Uncertain to what extent the total mass of toxic contaminants is reduced, but volume of incinerator residuals exceeds volume of waste by 50 percent and may be toxic. |
| | • Mobility of arsenic eliminated by stabilization and disposal, mobility of some excavated tarry materials eliminated through thermal destruction, mobility of other tarry materials and drilling muds reduced by solidification/stabilization and mobility of remaining materials reduced by multi-layer RCRA equivalent cover and slurry walls. | • Mobility will be reduced by containment in a proper facility. | • Mobility should be restricted by containment. | • Mobility would be reduced by cover and cutoff walls. | • Uncertain as to the extent mobility reduced, but mobility of arsenic, metals probably increased. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Significant reduction in volume of onsite materials will be achieved.<br>• Utilizes a combination of technologies--"treatment trains"--to effect treatment--an approach recognized and supported by EPA. | • Reduction in volume onsite will be achieved. | • No reduction in volume will be achieved - in fact volume increases from lime additives. | • No reduction in volume will be achieved. | • Uncertain to what extent the total mass of toxic contaminants is reduced, but volume of incinerator residuals exceeds volume of waste by 50 percent and may be toxic. |
| - Degree to Which Treatment is Irreversible | • $SO_2$, $H_2S$, volatile and semi-volatile organics irreversibly treated and removed as part of the emission control system.<br>• Thermally destroyed tarry materials are irreversibly treated. | • No treatment involved. | • $SO_2$, $H_2S$, volatile and semi-volatile organics irreversibly treated and removed as part of air treatment system. | • $SO_2$, $H_2S$, volatile and semi-volatile organics irreversibly treated and removed as part of air treatment system. | • The extent to which the effects of treatment are irreversible is uncertain for the inorganics - organics would be destroyed. |
| - Type and Quantity of Residuals Remaining after Treatment | • Remaining drilling mud, tarry material and asphaltic material will be immobile. | • Assumed all materials redisposed offsite. | • Waste which is redisposed onsite will have increased in volume due to expansion caused by excavation, plus lime additions but should be neutralized. | • No change in waste volume or toxicity will occur - all materials will remain. | • Ash and scrubbers solids containing inorganic contaminants will remain.<br>• 207,000 tons of ash and sludges, possibly toxic due to metals by TCLP or EP Toxics test.<br>• Unknown quantity of arsenic and other metals dispersed into the environment by incineration.<br>• Inhalation of arsenic from particulates may occur. Ingestion of arsenic may occur due to particulates on plants, soils or environmental surfaces. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| • Short-Term Effectiveness<br>- Protection of Community During Remedial Actions | | | | | |
| * Risks to Community | • Gaseous emissions during implementation are limited due to limited excavation. | • Significant gaseous emissions during implementation due to extensive excavation and waste handling as experienced in the trial excavation. | • Significant gaseous emissions during implementation due to extensive excavation and waste handling as experienced in the trial excavation. | • Minimal gaseous and dust emissions during RCRA equivalent closure. | • Significant gaseous emissions during implementation due to extensive excavation (as experienced in the trial excavation), waste hauling and incineration. |
| | • Odorous emissions during implementation are limited due to limited excavation. | • Exposure to highly irritating and potentially dangerous odors. | • Exposure to highly irritating and potentially dangerous odors. | | • Exposure to highly irritating and potentially dangerous odors. |
| | • Transportation-related risks are limited due to the limited waste transportation required. | • Highest transportation-related risks due to high volume of waste to be transported offsite. | • High transportation-related risks due to waste movement. | • Limited transportation-related risks from fill components being transported to site. | • High transportation-related risks due to waste movement - risks increase if ash is redisposed offsite. |
| | • Failure or damage of enclosure could expose community to toxic emissions but emissions will be limited by the limited excavation. | • Failure or damage of enclosure could expose community to extremely high concentrations of toxic emissions. | • Failure or damage of enclosure could expose community to extremely high concentrations of toxic emissions. | | • Failure or damage of enclosure could expose community to extremely high concentrations of toxic emissions. |
| | | • Risk of structural failure of the sumps caused by extensive excavation could affect nearby residences. | • Risk of structural failure of the sumps caused by extensive excavation could affect nearby residences. | • Heavy equipment disturbing present cap. | • Risk of structural failure of the sumps caused by extensive excavation could affect nearby residences. |
| | | • Risk of failure or damage of excavation containment structure. | • Risk of failure or damage of excavation containment structure. | | • Risk of failure or damage of excavation containment structure. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | | • Risk of explosion or fire due to high concentration of THCs generated by extensive excavation within enclosure. | • Risk of explosion or fire due to high concentration of THCs generated by extensive excavation within enclosure. | | • Risk of explosion or fire due to high concentration of THCs generated by extensive excavation within enclosure. |
| | • Exposure to noise. | • Exposure to noise. | • Exposure to noise. | • Exposure to noise. | • Exposure to noise. |
| | | | | | • Dispersal of arsenic, products of incomplete combustion, and heavy metals into the community during incineration. |
| | | • Risks increase at night due to prevalent meteorological conditions. | • Risks increase at night due to prevalent meteorological conditions. | | • Risks increase at night due to prevalent meteorological conditions. |
| • Mitigation of Community Risks | • Emissions will be controlled by limiting excavation activities, not disturbing the asphaltic waste and by using shrouded auger system with emissions capture system plus a redundant small enclosure. | • Special enclosure with exhaust gas treatment systems should reduce the risk of exposure to emissions during excavation. However, trial excavation indicates system will not adequately reduce emission risks. | • Special enclosure with exhaust gas treatment systems should reduce the risk of exposure to emissions during excavation. However, trial excavation indicates system will not adequately reduce emission risks. | • Care and oversight during construction will reduce threats of disturbing present cap and wastes and generations of gas and dust emissions. | • Special enclosure with exhaust gas treatment systems should reduce the risk of exposure to emissions during excavation. However, trial excavation indicates system will not adequately reduce emission risks. |
| | • Procedure to mitigate transportation risks would be developed, but risks will be lower than other excavation alternatives because significantly less material is being transported. | • Procedure to mitigate transportation risks would need to be developed but risks will be high due to high volume of waste to be transported. | • Procedure to mitigate transportation risks would need to be developed but risks will be high due to required waste movement. | • Procedure to mitigate transportation risks would need to be developed--lowest level of material being transported. | • Procedure to mitigate transportation risks would need to be developed but risks will be high due to high volume of waste to be transported - risks increase more if ash is redisposed offsite. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | | • Sheeting and shoring of side walls of excavation may reduce the risk of structural failure; however, the trial excavation indicates the reliability of these measures is uncertain. | • Sheeting and shoring of side walls of excavation may reduce the risk of structural failure; however, the trial excavation indicates the reliability of these measures is uncertain. | | • Sheeting and shoring of side walls of excavation may reduce the risk of structural failure; however, the trial excavation indicates the reliability of these measures is uncertain.<br>• Up to 85 percent of arsenic may volatilize and potentially impact the community.<br>• Gaseous and particulate control equipment may reduce risks to the community during incineration. |
| • Uncon-trollable Community Risks | • The implementation cancer risk is less than 8 x $10^{-8}$. | • The implementation cancer risk is less than 2 x $10^{-7}$.* | • The implementation cancer risk is less than 2 x $10^{-7}$.* | • The implementation cancer risk was not specifically calculated in the SROA. | • The implementation cancer risk is less than 6 x $10^{-6}$*. This does not consider products of incomplete combustion or non-inhalation exposures. |
| | | • THC speciation data were invalidated during trial excavation, leaving questions regarding health risks to community from total excavation unanswered, especially with regard to benzene. | • THC speciation data were invalidated during trial excavation, leaving questions regarding health risks to community from total excavation unanswered, especially with regard to benzene. | | • THC speciation data were invalidated during trial excavation, leaving questions regarding health risks to community from total excavation unanswered, especially with regard to benzene. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Limited transportation risks. | • Significant transportation risks. | • Significant transportation risks. | • Limited transportation risks. | • Significant transportation risks - if incineration is done offsite, this alternative is 41 to 125 times more likely to cause a transportation fatality than the selective excavation approach - if incineration is done onsite, this alternative is 25 to 112 times more likely to cause a transportation fatality than the selective excavation approach - depending on the ultimate destination of the ash, there would be between 12 and 38 accidents during transport of the ash, which leads to an expected number of spills between .3 and 1.2 and an expected number of fatalities between .2 and .9. |
| | | • Noise.<br>• Odor. | • Noise.<br>• Odor. | | • Noise.<br>• Odor. |
| - Protection of Workers during Remedial Actions<br>• Risks to Workers | • Occupational health and safety concerns associated with excavation are minimized by limited excavation; meets OSHA standards. | • Will cause major occupational health and safety risks associated with complete excavation as demonstrated in the trial excavation; OSHA standards will be violated. | • Will cause major occupational health and safety risks associated with complete excavation as demonstrated in the trial excavation; OSHA standards will be violated. | • Usual occupation health and safety concerns for construction projects. | • Will cause major occupational health and safety risks associated with complete excavation as demonstrated in the trial excavation; OSHA standards will be violated. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Limited sulfur dioxide, THT and hydrocarbon emissions emanating from the disturbed tarry wastes. | • Significant sulfur dioxide, THT and hydrocarbon emissions emanating from the disturbance of tarry and asphaltic wastes; sulfur dioxide levels during the trial excavation were measured at lethal levels. | • Significant sulfur dioxide, THT and hydrocarbon emissions emanating from the disturbance of tarry and asphaltic wastes; sulfur dioxide levels during the trial excavation were measured at lethal levels. | | • Significant sulfur dioxide, THT and hydrocarbon emissions emanating from the disturbance of tarry and asphaltic wastes; sulfur dioxide levels during the trial excavation were measured at lethal levels. |
| | | • Hydrocarbon and other air contaminants emanating from the vehicles and equipment operating in the enclosure. | • Hydrocarbon and other air contaminants emanating from the vehicles and equipment operating in the enclosure. | | • Hydrocarbon and other air contaminants emanating from the vehicles and equipment operating in the enclosure. |
| | • Dangers from personal protective equipment. | • Dangers from personal protective equipment as experienced in the trial excavation. | • Dangers from personal protective equipment as experienced in the trial excavation. | • Some personal protective equipment may be required during initial phases of closure. | • Dangers from personal protective equipment as experienced in the trial excavation. |
| | - Potential heat stress, though less than other excavation alternatives because limited work in enclosure and minimal use of Level A. | - Heat stress is a major concern due to the effects of Level A PPE. Workers could be endangered when outside temperatures exceed 65 to 75°F. | - Heat stress is a major concern due to the effects of Level A PPE. Workers could be endangered when outside temperatures exceed 65 to 75°F. | | - Heat stress is a major concern due to the effects of Level A PPE. Workers could be endangered when outside temperatures exceed 65 to 75°F. |
| | | - Emergency egress from the enclosure. | - Emergency egress from the enclosure. | | - Emergency egress from the enclosure. |
| | | - Cumbersome personal protective equipment causes communication problems, hampered mobility, poor visibility, leading to accidents. | - Cumbersome personal protective equipment causes communication problems, hampered mobility, poor visibility, leading to accidents. | | - Cumbersome personal protective equipment causes communication problems, hampered mobility, poor visibility, leading to accidents. |
| | | • Potential for hydrocarbon concentrations exceeding explosive limits in the excavation within the enclosure. | • Potential for hydrocarbon concentrations exceeding explosive limits in the excavation within the enclosure. | | • Potential for hydrocarbon concentrations exceeding explosive limits in the excavation within the enclosure. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| • | • Noise from operations.<br>• Transportation accidents but risks will be lower than other alternatives involving total excavation. | • Noise exposure from large ventilation and equipment as experienced in the trial excavation.<br>• Transportation accidents.<br>• Trial excavation indicates $SO_2$ levels will exceed Level B standards if total excavation is done and hence Level A protection will be required. | • Noise exposure from large ventilation and equipment as experienced in the trial excavation.<br>• Transportation accidents.<br>• Trial excavation indicates $SO_2$ levels will exceed Level B standards if total excavation is done and hence Level A protection will be required. | • Noise from operations.<br>• Transportation accidents. | • Noise exposure from large ventilation and equipment as experienced in the trial excavation.<br>• Transportation accidents.<br>• Trial excavation indicates $SO_2$ levels will exceed Level B standards if total excavation is done and hence Level A protection will be required.<br>• Emissions in the material storage building.<br>• Heat exposure from the incinerator and afterburner. |
| • Mitigation of Worker Risks | • Workers will wear Level D protection for auger work and Level A for enclosure work.<br>• Emissions will be controlled through an internal steel shroud and a small redundant outside enclosure for auger work and a small enclosure for backhoe work.<br>• Noise will be controlled by using appropriate noise control technology. | • Workers will have to wear Level A protection inside the enclosure (this will add to the heat stress) based on the results of the trial excavation.<br>• Noise reduction devices will be used on the blowers - trial excavation indicates noise levels would be dangerous to workers and require ear protection to be worn but ear protection will further hamper communication. | • Workers will have to wear Level A protection inside the enclosure (this will add to the heat stress) based on the results of the trial excavation.<br>• Noise reduction devices will be used on the blowers - trial excavation indicates noise levels would be dangerous to workers and require ear protection to be worn but ear protection will further hamper communication. | • A site health and safety plan will be developed. | • Workers will have to wear Level A protection inside the enclosure (this will add to the heat stress) based on the results of the trial excavation.<br>• Noise reduction devices will be used on the blowers - trial excavation indicates noise levels would be dangerous to workers and require ear protection to be worn but ear protection will further hamper communication. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Transportation plans will be developed - risks will be less due to limited transportation. | • Transportation plans will be developed but risks will be highest of all alternatives due to amount of transportation required. | • Transportation plans will be developed but risks will be high due to amount of transportation required. | • Transportation plans will be developed - risks will be less due to limited transportation. | • Transportation plans will be developed but risks will be high due to amount of transportation required and will increase further if ash is disposed offsite. |
| | | | | | • Metal shielding around incinerator and afterburner. |
| • Uncon-trollable Worker Risk | • Limited heat stress. | • Heat stress. | • Heat stress. | • Limited heat stress. | • Heat stress. |
| | | • Emergency egress. | • Emergency egress. | | • Emergency egress. |
| | • Very limited fire hazard. | • Fire hazard. | • Fire hazard. | | • Fire hazard. |
| | | • Exposure to toxic emissions. | • Exposure to toxic emissions. | | • Exposure to toxic emissions. |
| | • Usual health and safety concerns and special concerns associated with limited excavation activities within an enclosure. | • Occupational health and safety concerns associated with total excavation and special concerns due to the enclosure. | • Occupational health and safety concerns associated with total excavation and special concerns due to the enclosure. | • Usual health and safety concerns. | • Occupational health and safety concerns associated with total excavation and special concerns due to the enclosure. |
| | • Earthquake - risk is low during implementation and post-implementation. | • Earthquake - risk is high during implementation and insignificant post-implementation. | • Earthquake - risk is high during implementation and low post-implementation. | • Earthquake - risk is low during implementation and post-implementation. | • Earthquake - risk is high during implementation and insignificant post-implementation. |
| | • Transportation risks; however, risks will be less than for other excavation alternatives because of the limited amount of waste requiring transport. | • Transportation risks. | • Transportation risks. | • Very limited transportation risks. | • Transportation risks. |
| • Environ-mental Impacts | • Removal of vegetation. | • Removal of vegetation. | • Removal of vegetation. | • Removal of vegetation. | • Removal of vegetation. |
| | • Potential increased $SO_2$ and hydrocarbon emissions. | • Increased $SO_2$ and hydrocarbon emissions. | • Increased $SO_2$ and hydrocarbon emissions. | | • Increased $SO_2$ and hydrocarbon emissions. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| • Mitigative Measures | • Truck traffic, construction noise.<br>• Wastewater discharge.<br>• Odors.<br>• Limited excavation by auger system with steel shroud enclosure and redundant outer hood.<br>• Limited excavation under small enclosure.<br>• Wastewater treatment.<br>• Limit activity to daytime, weekdays. | • Truck traffic, construction noise.<br>• Wastewater discharge.<br>• Odors.<br>• Excavation under enclosure and gas exhaust treatment systems to limit emissions; however, unlikely to be effective based on results of trial excavation and may be infeasible.<br>• Wastewater treatment - disposal option undetermined. | • Truck traffic, construction noise.<br>• Wastewater discharge.<br>• Odors.<br>• Excavation under enclosure and gas exhaust treatment systems to limit emissions; however, unlikely to be effective based on results of trial excavation and may be infeasible.<br>• Wastewater treatment - disposal option undetermined. | • Truck traffic, construction noise.<br>• Limit activity to daytime, weekdays. | • Truck traffic, construction noise.<br>• Lights, maximum equipment requirement leads to noise during nighttime incinerator operation.<br>• Wastewater discharge.<br>• Odors.<br>• Excavation under enclosure and gas exhaust treatment systems to limit emissions however, unlikely to be effective based on results of trial excavation and may be infeasible.<br>• Wastewater treatment - disposal option undetermined.<br>• Uncertain whether unforeseen effects can be mitigated because of use of unproven technology. |
| • Remaining Impacts | • Removal of vegetation. | • Removal of vegetation.<br>• Increased $SO_2$ and hydrocarbon emissions.<br>• Truck traffic.<br>• Odors. | • Removal of vegetation.<br>• Increased $SO_2$ and hydrocarbon emissions.<br>• Odors. | • Removal of vegetation. | • Removal of vegetation.<br>• Increased $SO_2$ and hydrocarbon emissions.<br>• Truck traffic.<br>• Lights, noise during nighttime.<br>• Odors. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| - Time Until Remedial Action Objectives are Achieved | • From 42 to 48 months. | • From 33 to 69 months,* probably longer based on trial excavation - could take as long as 16 to 21 years. | • From 46 to 70 months,* probably longer based on trial excavation - could take as long as 16 to 21 years. | • From 24 to 30 months,* the shortest implementation time. | • From 63 to 94 months,* probably longer. The longest implementation time; based on trial excavation plus unsuccessful trial burn could take 16 to 21 years or longer. |
| • Time Until Remaining Threats Addressed | • No time for implementation of any potentially needed remedial response has been determined nor is any remedial response anticipated. | • No remaining threats unless all contaminated materials cannot be excavated. | • No remaining threats unless all contaminated materials cannot be excavated. | • No time for implementation of any potentially needed remedial response has been determined nor is any remedial response anticipated. | • SROA did not address arsenic and heavy metal dispersion into the community during incineration; uncertain how or when these problems will be addressed or how long it will take it to address them.<br>• Assumed no remaining threats unless all contaminated materials cannot be excavated. |
| • Time Until Remaining Response Objectives Achieved | • No remaining response unless further studies and monitoring show the actual contamination of ground waters. | • No remaining response unless further studies and monitoring show the actual contamination of ground waters. | • No remaining response unless further studies and monitoring show the actual contamination of ground waters. | • No remaining response unless further studies and monitoring show the actual contamination of ground waters. | • No remaining response unless further studies and monitoring show the actual contamination of ground waters. |
| • Implementability<br>- Technical Feasibility<br>• Difficulties Associated With Construction | • $SO_2$ scrubber system design.<br>• Installation of crib walls on exterior slopes. | • Special enclosure required.<br>• $SO_2$ scrubber system must be designed for worst-case condition corresponding to peak concentrations based on results of the trial excavation.<br>• Installation of crib walls on exterior slopes. | • Special enclosure required.<br>• $SO_2$ scrubber system must be designed for worst-case condition corresponding to peak concentrations based on results of the trial excavation.<br>• Installation of crib walls on exterior slopes. | • Installation of crib walls on exterior slopes. | • Special enclosure required.<br>• $SO_2$ scrubber system must be designed for worst-case condition corresponding to peak concentrations based on results of the trial excavation.<br>• Installation of crib walls on exterior slopes. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Movement of excavation enclosure and adjustments and coordinated movement of inner and outer shroud during solidification process. | • Movement of excavation enclosure and adjustments. | • Movement of excavation enclosure and adjustments. | | • Movement of excavation enclosure and adjustments. |
| | • Excavation technology is available for this approach. | • Excavation technology - a critical aspect of this alternative - is uncertain and failed during trial excavation. | • Excavation technology - a critical aspect of this alternative - is uncertain and failed during trial excavation. | | • Excavation technology - a critical aspect of this alternative - is uncertain and failed during trial excavation. |
| | • Will require ventilation and exhaust system, but system will be smaller. | • Adequate ventilation and exhaust gas treatment system will be unwieldy and costly. | • Adequate ventilation and exhaust gas treatment system will be unwieldy and costly. | | • Adequate ventilation and exhaust gas treatment system will be unwieldy and costly. |
| | | | | | • Rotary kiln did not prove successful on McColl materials in Ogden test burn and further studies needed. |
| | | • Shoring or sheet piling of side walls - the trial excavation left unanswered several questions related to the feasibility of these technologies. | • Shoring or sheet piling of side walls - the trial excavation left unanswered several questions related to the feasibility of these technologies. | | • Shoring or sheet piling of side walls - the trial excavation left unanswered several questions related to the feasibility of these technologies. |
| | | • Small enclosure may not accommodate equipment needed for total excavation. | • Small enclosure may not accommodate equipment needed for total excavation. | | • Small enclosure may not accommodate equipment needed for total excavation. |
| | • Mobilization/demobilization of temporary enclosure during construction. | • Mobilization/demobilization of enclosure during construction, irregular sump boundaries make complete enclosure difficult. | • Mobilization/demobilization of enclosure during construction, irregular sump boundaries make complete enclosure difficult. | | • Mobilization/demobilization of enclosure during construction, irregular sump boundaries make complete enclosure difficult. |
| | • Earthquake protection needed during implementation - risk posed is low and proven technology exists. | • Earthquake protection needed during implementation - risk posed is high. | • Earthquake protection needed during implementation - risk posed is high. | • Earthquake protection needed during implementation - risk posed is low. | • Earthquake protection needed during implementation - risk posed is high. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | | | • May be difficult to fit containment cell, excavation staging area onsite for maximum projected waste/ soil volume. | | |
| * | | • Alternative to protective foam will be required for emission control since foams failed in trial excavation. | • Alternative to protective foam will be required for emission control since foams failed in trial excavation. | | • Alternative to protective foam will be required for emission control since foams failed in trial excavation. |
| - Uncertainties Related to Construction | • $SO_2$, $H_2S$ and hydrocarbon emission rates. | • $SO_2$, $H_2S$ and hydrocarbon emission rates but anticipated to be extremely high based on results of trial excavation. | • $SO_2$, $H_2S$ and hydrocarbon emission rates but anticipated to be extremely high based on results of trial excavation. | | • $SO_2$, $H_2S$ and hydrocarbon emission rates but anticipated to be extremely high based on results of trial excavation. |
| | | • Difficulty of constructing effective excavation enclosure. | • Difficulty of constructing effective excavation enclosure. | | • Difficulty of constructing effective excavation enclosure. |
| | | • Inability to meet air emissions requirements for exhaust gases based on results of the trial excavation. | • Inability to meet air emissions requirements for exhaust gases based on results of the trial excavation. | | • Inability to meet air emissions requirements for exhaust gases on enclosure and incinerator (based on results of the trial excavation). |
| | • Volume of waste to be selectively excavated is not definitively known at this time. | • Volume of wastes and soils to be excavated is unknown. | • Volume of wastes and soils to be excavated is unknown. | | • Volume of wastes and soils to be excavated is unknown. |
| | | • Ability to excavate tar and asphaltic waste - materials handling will be complex and may exacerbate risks based on the results of the trial excavation. | • Ability to excavate tar and asphaltic waste - materials handling will be complex and may exacerbate risks based on the results of the trial excavation. | | • Ability to excavate tar and asphaltic waste - materials handling will be complex and may exacerbate risks based on the results of the trial excavation. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| - Reliability That Technology Will Meet Efficiency and Performance Goals | • Selective excavation and in situ treatment rates unknown but completion of remedy estimated to be in four years or less.<br>• Emission control systems effectively and reliably minimize inhalation risks.<br>• Capping is a demonstrated reliable method of preventing direct exposure threats.<br>• Design life of remedy is expected to be at least 30 years. | • There is insufficient information to allow scaling up of the trial excavation to a full-scale excavation.<br>• Availability of offsite disposal capacity is unknown.<br>• Excavation rates unknown - could take 16 to 21 years based on the results of the trial excavation.<br>• Exhaust gas treatment system has not been designed to address the problems experienced in the trial excavation.<br>• Design life of remedy is based on care exercised by offsite disposal facility. | • There is insufficient information to allow scaling up of the trial excavation to a full-scale excavation.<br>• Effectiveness of bags to control emissions while filling containment cell is unknown.<br>• Excavation rates unknown - could take 16 to 21 years based on the results of the trial excavation.<br>• Exhaust gas treatment system has not been designed to address the problems experienced in the trial excavation.<br>• Capping is a demonstrated reliable method of preventing direct exposure threats.<br>• Design life of remedy is expected to be at least 30 years. | • Capping is a demonstrated reliable method of preventing direct exposure threats.<br>• Design life of remedy is expected to be at least 30 years. | • There is insufficient information to allow scaling up of the trial excavation to a full-scale excavation.<br>• Availability of offsite disposal capacity is unknown.<br>• Excavation rates unknown - could take 16 to 21 years based on the results of the trial excavation.<br>• Exhaust gas treatment system has not been designed to address the problems experienced in the trial excavation.<br>• High sulfur and ash content of waste materials makes reliability of incinerator and emissions control equipment questionable.<br>• Variability of waste characteristics and other constituents may cause incinerator shutdown, and require extensive pretreatment and handling. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| - Likelihood of Technical Problems Leading to Delays | • Because of use of proven technologies, delays appear unlikely, but predesign activities may uncover issues needing further analysis, leading to some delays. | • Exceedance of air emissions limits likely to delay implementation based on results of the trial excavation. | • Exceedance of air emissions limits likely to delay implementation based on results of the trial excavation. | | • Exceedance of air emissions limits likely to delay implementation based on results of the trial excavation. |
| | | • Buildup of flammable or explosive gases in the sumps may delay implementation. | • Buildup of flammable or explosive gases in the sumps may delay implementation. | | • Buildup of flammable or explosive gases in the sumps may delay implementation. |
| | • Excavation rates from trial excavation indicate completion of remedy in four years or less. | • Excavation rates from trial excavation indicate total excavation will take 16 to 21 years. | • Excavation rates from trial excavation indicate total excavation will take 16 to 21 years. | | • Excavation rates from trial excavation indicate total excavation will take 16 to 21 years. |
| | • Potentially difficult working conditions around shroud area, but activities are limited in duration. | • Difficult working conditions associated with personal protective equipment (e.g., heat stress) as demonstrated in the trial excavation -- workers could only be expected to work 15 minutes per hour due to health monitoring and rest requirements. | • Difficult working conditions associated with personal protective equipment (e.g., heat stress) as demonstrated in the trial excavation -- workers could only be expected to work 15 minutes per hour due to health monitoring and rest requirements. | | • Difficult working conditions associated with personal protective equipment (e.g., heat stress) as demonstrated in the trial excavation -- workers could only be expected to work 15 minutes per hour due to health monitoring and rest requirements. |
| | | • Time required to move waste and equipment in and out of enclosure. | • Time required to move waste and equipment in and out of enclosure. | | • Time required to move waste and equipment in and out of enclosure. |
| | | | | | • Waste feed handling equipment problem may cause delays. |
| | • Odors should be controllable due to limited excavation. | • Odors from disturbed waste cause nuisance requiring abatement as experienced by residents during the trial excavation. | • Odors from disturbed waste cause nuisance requiring abatement as experienced by residents during the trial excavation. | • No odors will be emitted if the wastes are not disturbed. | • Odors from disturbed waste cause nuisance requiring abatement as experienced by residents during the trial excavation. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | | • Noise from activities may require abatement or additional design. | • Noise from activities may require abatement or additional design. | | • Noise from activities may require abatement or additional design. |
| - Anticipated Future Remedial Actions | • No future surface remedial actions appear necessary at this time. Ground water monitoring and perhaps remedial measures, may be needed. | • No future surface remedial actions appear necessary at this time. Ground water monitoring, and perhaps remedial measures, may be needed. | • No future surface remedial actions appear necessary at this time. Ground water monitoring, and perhaps remedial measures, may be needed. | • No future surface remedial actions appear necessary at this time. Ground water monitoring, and perhaps remedial measures, may be needed. | • Ground water monitoring, and perhaps remedial measures, may be needed. |
| - Difficulty of Implementing Additional Remedial Actions | • Not difficult to implement additional remedial actions, unless such actions require excavation. | • Not difficult to implement additional remedial actions, unless any additional *contaminated materials* require excavation. | • Not difficult to implement additional remedial actions, unless any additional *contaminated materials* require excavation. | • Not difficult to implement additional remedial actions, unless such actions require excavation. | • Not difficult to implement additional remedial actions, unless any additional *contaminated materials* require excavation; treatment of ash if it remains hazardous. |
| - Migration or Exposure Pathways That Cannot Be Monitored Adequately | • No migration or exposure pathways exist that cannot be monitored adequately. | • No migration or exposure pathways exist that cannot be monitored adequately. | • No migration or exposure pathways exist that cannot be monitored adequately. | • No migration or exposure pathways exist that cannot be monitored adequately. | • Migration or exposure pathways for dispersion of arsenic throughout community from incinerator emissions difficult, if not impossible, to monitor. |
| - Risks of Exposure if Monitoring is Insufficient or Fails | • Gaseous emissions and odors from the remaining materials. | • No monitoring required, unless all contaminated materials cannot be excavated. | • Gaseous emissions and odors from the remaining materials. | • Gaseous emissions and odors from the remaining materials. | • Inhalation of arsenic from incinerator emissions. |
| | | | | | • Ingestion of arsenic particulates from various sources. |
| | | | • Potential for contamination of soils if double liner and monitoring system fail and materials require excavation. | | • Potential arsenic and heavy metal contamination of ground waters if onsite ash disposal alternated is implemented. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | • Potential ground water contamination. | • No risks from pathways addressed in the SROA but if all contaminated materials cannot be excavated, potential ground water contamination. | • Potential for ground water contamination. | • Potential for ground water contamination. | • If all contaminated materials cannot be excavated or if ash remains onsite, potential ground water contamination. |
| • Administrative Feasibility | | | | | |
| - Steps Required to Coordinate With Other Agencies | • Development and approval of a transportation plan. | • Development and approval of a transportation plan. | • Development and approval of a transportation plan. | | • Development and approval of a transportation plan for any offsite transportation activities. |
| | • SARWQCB Discharge Permit. | • SARWQCB Discharge Permit. | • SARWQCB Discharge Permit. | • SARWQCB Discharge Permit. | • SARWQCB Discharge Permit. |
| | • SCAQMD Air Emissions Permit. | • SCAQMD Air Emissions Permit. | • SCAQMD Air Emissions Permit. | • SCAQMD Air Emissions Permit. | • SCAQMD Air Emissions Permit. |
| | • CSDOC Sewer Discharge Permit. | • CSDOC Sewer Discharge Permit. | • CSDOC Sewer Discharge Permit. | • CSDOC Sewer Discharge Permit. | • CSDOC Sewer Discharge Permit. |
| | • EPA Hazardous Waste Generator Identification Number. | • EPA Hazardous Waste Generator Identification Number. | | | • EPA Hazardous Waste Generator Identification Number. |
| - Steps Required to Set Up Long-Term Coordination With Other Agencies | • Planning activities under SARA Title III. | • Planning activities under SARA Title III. | • Planning activities under SARA Title III. | • Planning activities under SARA Title III. | • Planning activities under SARA Title III. |
| | • Long-term air monitoring coordination with SCAQMD during implementation of remedy. | • Long-term air monitoring coordination with SCAQMD during implementation of remedy. | • Long-term air monitoring coordination with SCAQMD during implementation of remedy. | • Long-term air monitoring coordination with SCAQMD during implementation of remedy. | • Long-term air monitoring coordination with SCAQMD during implementation of remedy. |
| | • Ground water monitoring. | • Ground water monitoring. | • Ground water monitoring. | • Ground water monitoring. | • Ground water monitoring. |
| - Availability of Permits for Off-Site Activities | • Permits should be available for limited waste excavation activities. | • RCRA land disposal restrictions may prevent redisposal. | | | • RCRA land disposal restrictions may prevent redisposal of ash or require further treatment. |

* Information from the 1989 SROA..

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| • Availability of Services and Materials | | | | | |
| - Availability of Adequate Treatment, Storage, and Disposal Capacity and Services | • Capacity is available at Class I landfill. | • Capacity may not be available at Class I landfill. | • Adequate capacity will be constructed onsite. | • Adequate treatment, storage, and disposal capacity and services are not needed. | • Uncertain whether incinerator capacity or capability exists to undertake task.<br>• Capacity for ash disposal will be constructed onsite if that is the option chosen; otherwise, Class I disposal facility will be needed. |
| - Additional Capacity Needed | • Approximately 5,440 to 9,070 cubic yards.<br>• Lack of capacity does not prevent implementation. | • 97,100 to 265,800 cubic yards.*<br>• Limited available capacity will affect implementation. | • 97,100 to 139,500 cubic yards.*<br>• Limited available capacity will affect implementation. | • Additional capacity is not needed.<br>• Lack of capacity does not prevent implementation. | • At least 207,000 tons of ash/sludge.<br>• Lack of capacity probably prevents implementation. |
| - Measures Required to Assure the Additional Capacity | • Permitting offsite TSD facility.<br>• Treatment of wastes to eliminate reactivity, corrosivity, EP Toxicity. | • Permitting offsite TSD facility.<br>• Treatment of wastes to eliminate reactivity, corrosivity, EP Toxicity. | • Permitting offsite TSD facility.<br>• Treatment of wastes to eliminate reactivity, corrosivity, EP Toxicity. | • No measures required to assure additional capacity. | • Probably permitting of offsite TSD facility.<br>• If ash remains hazardous, treatment will be required. |
| - Availability of Necessary Equipment and Specialists | • Auger system is generally available - specialty enclosures are required but much smaller.<br>• Some modification of existing specialty equipment is needed for in situ treatment and selective excavation. | • Specialty enclosure and emission control system is needed for excavation of sumps.<br>• Specialty equipment required for deep excavation; may require special prototype manufacture. | • Specialty enclosure and emission control system is needed for excavation of sumps.<br>• Specialty equipment required for deep excavation; may require special prototype manufacture. | • No special equipment is needed. | • Specialty enclosure and emission control system is needed for excavation of sumps.<br>• Specialty equipment required for deep excavation; may require special prototype manufacture.<br>• Specialty materials handling trains, with air emissions control, are required. |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| - Additional Equipment and Specialists Requirements | • Specialty excavation containment structures.<br>• Special enclosures for the in situ treatment unit. | • Specialty excavation containment structures. | • Specialty excavation containment structures. | • No special equipment is needed. | • Specialty excavation containment structures. |
| - Lack of Equipment and Specialists That Prevent Implementation | • None. | • If an effective enclosure structure cannot be constructed and air handling system designed, this alternative cannot be implemented. | • If an effective enclosure structure cannot be constructed and air handling system designed, this alternative cannot be implemented. | • None. | • If an effective enclosure structure cannot be constructed and air handling system designed, this alternative cannot be implemented.<br>• If incinerator emission controls cannot meet applicable (e.g., As, $SO_2$ and $NO_2$) standards, this alternative cannot be implemented unless an ARAR waiver applies. |
| - Additional Provisions Required to Ensure Needed Equipment and Specialists | • None. | • No additional provisions can be taken if the enclosure structure is technically infeasible. | • No additional provisions can be taken if the enclosure structure is technically infeasible. | • None. | • No additional provisions can be taken if the enclosure structure is technically infeasible.<br>• Uncertain if additional APC equipment is technically feasible. |
| - General Availability and Demonstration of Technologies Under Consideration | • All technologies considered are generally available and have been demonstrated to be effective. | • Extensive excavation within an enclosure is unique, complex and a technology that is unproven and not generally available.<br>• Air emissions control devices of this size and complexity will be specially constructed; they are not generally available and are probably not feasible. | • Extensive excavation within an enclosure is unique, complex and a technology that is unproven and not generally available.<br>• Air emissions control devices of this size and complexity will be specially constructed; they are not generally available and are probably not feasible. | • All technologies considered are generally available and have been demonstrated to be effective. | • Extensive excavation within an enclosure is unique, complex and a technology that is unproven and not generally available.<br>• Air emissions control devices of this size and complexity will be specially constructed; they are not generally available and are probably not feasible. |

* *Information from the 1989 SROA.*

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| | | • Use of Level A PPE for extended periods of time under conditions anticipated during a full scale excavation would be unprecedented. | • Use of Level A PPE for extended periods of time under conditions anticipated during a full scale excavation would be unprecedented. | | • Use of Level A PPE for extended periods of time under conditions anticipated during a full scale excavation would be unprecedented. |
| - Technologies That Require Further Development Before They Can Be Applied Full-Scale | • All equipment is available.<br>• Feasibility studies may be required to fully optimize some technologies. | • Gas emissions treatment systems must be designed.<br>• Excavation equipment.<br>• Operator protection. | • Gas emissions treatment systems must be designed.<br>• Excavation equipment.<br>• Operator protection. | • All equipment is available. | • Gas emissions treatment systems must be designed.<br>• Excavation equipment.<br>• Operator protection.<br>• Another test burn is required to demonstrate this technology which failed in the Ogden test burn.<br>• Gaseous emissions treatment systems and materials handling equipment and structures need to be fabricated. |
| - Availability of Technology For Full-Scale Use | • In situ treatment unit enclosures will require fabrication. | • Enclosure will have to be fabricated. | • Enclosure will have to be fabricated. | | • Enclosure will have to be fabricated. |
| - More Than One Vendor Available to Provide a Competitive Bid | • More than one vendor will be available to provide a competitive bid. | • More than one vendor will be available to provide a competitive bid. | • More than one vendor will be available to provide a competitive bid. | • More than one vendor will be available to provide a competitive bid. | • More than one vendor will be available to provide a competitive bid. |
| • Cost Effectiveness | | | | | |
| - Capital Costs | • $46,723,000 to $58,968,000 | • $76,178,000* | • $76,011,000* | • $11,612,000* | • $117,044,000 to $172,717,000* |
| - Operations and Maintenance (@ i = 5%) (t = 30 years) | • $19,800,000 | • $0* | • $8,930,000* | • $10,375,000* | • $0 to $7,162,000* |

* Information from the 1989 SROA.

# COMPARATIVE NCP ANALYSIS OF ALTERNATIVES PRESENTED IN THE 1989 SROA AND THE SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH (Continued)



| CRITERIA | ALTERNATIVES | | | | |
|---|---|---|---|---|---|
| | SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE | EXCAVATION AND REDISPOSAL | RCRA EQUIVALENT CONTAINMENT | RCRA EQUIVALENT CLOSURE | EXCAVATION AND INCINERATION |
| - Total Cost (Present Worth) | • $50,008,000 to $62,248,000 | • $76,000,000 to $170,000,000* | • $85,000,000 to $170,000,000* | • $22,000,000* | • $120,000,000 to $400,000,000* |
| - Sensitivity of Costs to Assumed Conditions | • Reliable based on information known to date.<br>• Sensitive to the volume of waste types identified in pre-design. | • High: Cost can be 2.2 times the low cost.<br>• Sensitive to amount of material excavated, distance to disposal facility, fee for disposal and emission control system. | • High: Cost can be double the low cost estimate.<br>• Sensitive to the amount of material to be excavated and emission control system. | • No sensitivity to assumed conditions.<br>• Most specific, least sensitive to assumptions. | • High: Cost can be 3.3 times the low cost.<br>• Sensitive to:<br>- excavation difficulty<br>- amount of excavated material<br>- ash disposal<br>- final design<br>- emission control system<br>• Least specific and reliable. |
| **BALANCING CRITERIA** | | | | | |
| • State Acceptance | • Unknown | • The State considered this alternative in the 1989 Draft RAP. | • The State considered this alternative in the 1989 Draft RAP. | • The State considered this alternative in the 1989 Draft RAP. | • The State expressed a preference for this alternative in the 1989 Draft RAP. |
| • Community Acceptance | • Anticipated<br>- 89 interested persons in community signed a petition supporting closure, the majority of whom live in the neighborhood immediately adjacent to the site.<br>- Interested persons in community met with Congressman Dannemeyer on December 17, 1990 to discuss this approach. | • Public comments received in response to SROA mixed, but appears to be lacking support. | • Public comments received in response to SROA mixed, but appears to be lacking support. | • Public comments received in response to SROA favored this alternative over all other alternatives identified in SROA. | • Over 50% of the individuals who submitted comments on the SROA specifically opposed this alternative. Given the unsuccessful Ogden test burn and the unsuccessful trial excavation, it is anticipated that even greater opposition to an incinerator could be expected today. |

* Information from the 1989 SROA.

10.0

# 10.0 ARAR ANALYSIS

1. Tables 10.1 and 10.2 provide a comprehensive listing of each of the individual Federal and State/Local ARARs, respectively, based on a thorough evaluation of data provided in the SROA, the MSG comments to the SROA, and an evaluation of each regulation in relationship to the specific activities to be included in the recommended alternative.

2. The ARARs provided in this section are assigned one of the following categories:

   - An "applicable" ARAR refers to those cleanup standards, standards of control, and other substantive environmental protection requirements, criteria, or limitations promulgated under federal or state law that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance at a Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) site, (Office of Solid Waste and Emergency Response [OSWER] Directive No. 9234.0-05, July 9, 1987).
   - A "relevant and appropriate" ARAR refers to cleanup standards, standards of control, and other substantive environmental protection requirements, criteria, or limitations promulgated under federal or state law that, while not "applicable" to a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance at a CERCLA site, address problems or situations sufficiently similar to those encountered at the CERCLA site that their use is well suited to the particular site (OSWER Directive No. 9234.0-05, July 9, 1987).
   - "To Be Considered" (TBC) ARARs apply where ARARs are not promulgated for specific contaminants, locations, or remedial actions, or are not considered sufficiently protective of human health and the environment, and other criteria and advisories (particularly those that are health- or risk-based) are to be considered. Such additional criteria or advisories should be considered in all remedial studies when appropriate.

   The ARARs are subdivided into contaminant-specific, location-specific, and action-specific categories on each of the tables. Contaminant-specific requirements set health- or risk-based concentration limits or discharge limitations on specific chemicals. Location-specific requirements are restrictions placed on activities due to their particular locations (e.g., flood plains, faults, etc.). Action-specific requirements are performance, design, or other similar criteria related to remedial action.

3. Special evaluations will be required throughout the predesign and design phases of the project to determine the appropriateness of the last two categories for specific site conditions and remediation techniques. It is possible that some of these ARARs will be found to not actually be appropriate for the site specific conditions.

# TABLE 10.1

## FEDERAL ARARs



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **CONTAMINANT SPECIFIC** | | | | | |
| **40 CFR Part 300 National Oil and Hazardous Substances Pollution Contingency Plan (NCP)** | The remedy selection portions of the NCP (300-430) require certain contaminant specific criteria to be established such as acceptable exposure levels for systemic toxicants and suspected carcinogens. Acceptable excess upper bound lifetime cancer risks to an individual are required to be between $10^{-4}$ and $10^{-6}$. (A more complete discussion of the NCP requirement is provided under the Action Specific ARARs). | These provisions are applicable to the remedy selected for the site. | ● | | |
| **The Resource Conservation and Recovery Act of 1976 (RCRA) (42 USC 6901 et. seq.) Subtitle C - Hazardous Waste Management** | Amongst other things, this act provides for the safe disposal of discarded materials, and for the regulation of the management of hazardous waste. Section 3001 of the act requires that criteria be developed for the identification of the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to the hazardous waste management provisions of the act. These are criteria included in the following regulations. (Additional discussion of RCRA is provided under the Action Specific ARARs.) | The requirements of this act resulted in criteria for identifying excavated wastes and controlled emissions at the McColl site. | ● | | |
| **40 CFR Part 261 Identification and Listing of Hazardous Waste**<br><br>Subpart C<br>Characteristic of Hazardous Waste<br>261.21 Characteristic of Ignitability<br>261.22 Characteristic of Corrosivity<br>261.23 Characteristic of Reactivity<br>261.24 Toxicity Characteristic | A solid waste is a hazardous waste if it exhibits any of the characteristics identified in Subpart C. A partial listing of the criteria that are applicable to the McColl wastes includes the following:<br><br>Corrosivity:<br>pH ≤2<br><br>Toxicity Characteristics:(1)<br>As 5.0 mg/L<br>Ba 100.0 mg/L<br>Benzene 0.5 mg/L<br>Cd 1.0 mg/L<br>Cr 5.0 mg/L | The wastes that are affected by these regulations include the excavated arsenic-containing and seep area material, controlled emissions, emission control residue, and decontaminated solids and liquids resulting from excavation and onsite treatment. | ●<br>Offsite disposal or treatment of hazardous wastes | ●<br>Site closure and the management of onsite hazardous excavated wastes and controlled emissions | |
| **Clean Air Act (42 USC 7401-7642)** | Title I (Air Pollution Prevention and Control) of the Clean Air Act encourages and assists the development and operation of regional air pollution programs, including the establishment of air quality control regions. | These requirements of the Clean Air Act resulted in the establishment of the South Coast Air Quality Management District (SCAQMD), which regulates air quality at the McColl site. | ● | | |



(1) As determined by the Toxicity Characteristic Leaching Procedure (TCLP)

# TABLE 10.1

## FEDERAL ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **CONTAMINANT SPECIFIC (Continued)** | | | | | |
| **40 CFR Subchapter C - Air Programs**<br>**Part 50 - National Primary and Secondary Ambient Air Quality Standards**<br>Sections 50.4 - 50.12 | These sections establish national primary ambient air quality standards for the protection of public health. They also include secondary ambient air quality standards necessary for the protection of public welfare from any known or anticipated adverse effects of a pollutant. The more relevant constituents that are dealt with include sulfur dioxide, particulate matter, carbon monoxide, ozone, and nitrogen dioxide. The ambient air quality standards listed are as follows:(5)<br>• $SO_2$<br>- Primary: 0.03 ppm (annual arithmetic mean); 0.14 ppm (max. 24-hr value)(6)<br>- Secondary: .5 ppm (max. 3-hr value)(6)<br>• Particulate Matter ($PM_{10}$) (Primary and Secondary): 50 $\mu g/m^3$ (annual arithmetic mean); 150 $\mu g/m^3$ (24-hr. avg.)(6)<br>• CO (Primary)(7): 9 ppm (8-hr average)(6); 35 ppm (1-hr average)(6)<br>• $O_3$ (Primary and Secondary): .12 ppm (max. hourly)(6)<br>• $NO_2$ (Primary and Secondary): 0.053 ppm (annual arithmetic mean)<br>Ambient air is defined as that portion of the atmosphere, external to buildings, to which the general public has access. | These standards apply to the site during the closure and post-closure period and to those areas in which the general public has access.<br>State emission standards and modeling requirements, also outlined in this table, are also applicable, and may be more stringent than those presented here. | ● | | |

(5) For accurate definitions of the basis for calculations of the mean values, the reference should be made to the regulations.
(6) Not to be exceeded more than once per year.
(7) No secondary standards are provided.

TABLE 10.1

FEDERAL ARARs
(Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **LOCATION SPECIFIC** | | | | | |
| Clean Air Act (42 USC 7401-7642) | As mentioned above, Title I (Air Pollution Prevention and Control) of the Clean Air Act encourages and assists the development and operation of regional air pollution programs, including the establishment of air quality control regions. | These requirements of the Clean Air Act resulted in the establishment of the South Coast Air Quality Management District (SCAQMD), which regulates air quality at the McColl site. | ● | | |
| RCRA (42 USC 6901 et. seq.) 40 CFR Part 264 Standards for Owners and Operators of Hazardous Waste Treatment, Storage and Disposal Facilities | Among other provisions, this act supports the development of regulations for the management of hazardous waste. Included in these requirements is the establishment of standards for the location, design, and construction of hazardous waste treatment, disposal, or storage facilities. | This act provided for the regulations outlined below that affect the location of new hazardous waste facilities. | ● | | |
| Subpart B General Facility Standards Section 264.18(a) | This section requires new facilities where treatment of hazardous waste is conducted must not be located within the 61 meters (200 feet) of a fault which has had displacement in Holocene time. | This requirement will be met by onsite facilities, as the closest fault which has potentially had displacement in Holocene time is the Norwalk fault, which is located approximately 1 mile south of the McColl site. | ● | | |
| **ACTION SPECIFIC** | | | | | |
| The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980 as amended by the Superfund Amendments and Reauthorization Act (SARA) of 1986 (42 USC 9600 et. seq.) 9621 Cleanup Standard | CERCLA requires the selection of a remedy that is protective of human health and the environment, complies with ARARs and is cost effective. Remedial actions that provide for treatment that reduce volume, toxicity or mobility are preferred to the extent practicable. Key considerations are land disposal capacity, RCRA, the persistence, toxicity, mobility and propensity to bioaccumulate of hazardous substances, short and long term potential for adverse health effects from human exposure, long-term maintenance costs, future remedial action costs and potential threats associated with excavation, transportation, redisposal or containment. In evaluating compliance with ARARs, key considerations include whether compliance will result in greater risk to human health and the environment, and whether the alternatives are technical impractical from an engineering perspective. | These goals govern the selection, design and implementation of site remedial measures. The selective in situ treatment excavation and RCRA equivalent closure approach was developed with these goals in mind. | ● | | |

**TABLE 10.1**

**FEDERAL ARARs (Continued)**



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **40 CFR Part 300 National Oil and Hazardous Substances Pollution Contingency Plan (NCP)**<br>300.430 Remedial Investigation/ Feasibility Studies and Selection of Remedy | The purpose of the remedy selection process outlined in Section 300.430 is to implement remedies that eliminate, reduce, or control risks to human health and the environment.<br>It requires that remedial alternatives be developed that protect human health and the environment by recycling waste or by eliminating, reducing, and/or controlling risks posed by each contaminant migration pathway.<br>Section 300.430 requires that remediation goals establish acceptable exposure levels that are protective of human health and the environment and that they be developed by considering the applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws, if available, as well as the following factors:<br>• For systemic toxicants, acceptable exposure levels shall represent concentration levels to which the human population, including sensitive subgroups, may be exposed without adverse effect during a lifetime or part of a lifetime.<br>• For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$.<br>• Factors related to technical limitations such as detection limits for contaminants.<br>• Factors related to uncertainty.<br>In selecting a suitable remedy, the following alternatives, among others, should be evaluated:<br>• Alternatives which treat the principal threats posed by the site but vary in the degree of treatment employed and the quantities and characteristics of the treatment residuals and untreated waste that must be managed.<br>• Alternatives that involve little or no treatment, but provide protection of human health and the environment by controlling exposure to hazardous substances, through engineering controls, and institutional controls to protect human health and the environment.<br>Section 300.430 furthermore defines the following criteria for guiding the development and screening of remedial alternatives:<br>• Effectiveness which focuses on the degree to which toxicity, mobility, or volume are reduced, residual risks are minimized, long-term protection is afforded, ARARs are complied with, short-term impacts are minimized, and how quickly protection is achieved.<br>• Implementability which focuses on the technical feasibility.<br>• The costs of construction and any long-term costs to operate and maintain the alternatives. | The provisions of the NCP apply to the process used to select the appropriate site remedy. Some of the aspects of that are included in the nine criteria for detailed evaluation, and that are particularly relevant to the McColl site, include:<br>• Short-term risks that might be imposed in the community during implementation of the remedy.<br>• Potential impact on workers during remedial action.<br>• Potential environmental impacts of the remediation.<br>• Technical feasibility including technical difficulties and unknowns.<br>• The ability and time required to obtain any necessary approvals and permits.<br>• Availability of services and materials, including the availability of adequate offsite treatment, storage, and disposal capacity. | ● | | |

# TABLE 10.1

## FEDERAL ARARs
## (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| The Resource Conservation and Recovery Act of 1976 (RCRA) (42 USC 6901 et. seq.) Subtitle C - Hazardous Waste Management | This act provides technical and financial assistance for the development of management plans and facilities for the recovery of energy and other resources from discarded materials and for the safe disposal of discarded materials, and for the regulation of the management of hazardous waste, including the establishment of standards for hazardous waste generation (Section 3002), and for the owners and operators of hazardous waste facilities (Section 3004). | The requirements of this act resulted in the regulations outlined below that affect hazardous waste that is generated onsite. | | | |
| 40 CFR Part 262 Standards Applicable to Generators of Hazardous Waste<br>Subpart A General (Sections 262.10-262.12)<br>Subpart B The Manifest (Sections 262.20-262.23)<br>Subpart C Pre-Transport Requirements (Sections 262.30-262.34)<br>Subpart D Recordkeeping and Reporting (Sections 262.40-262.44) | These sections establish standards for generators of hazardous waste which is being disposed of or treated offsite. They include requirements for hazardous waste characterization, obtaining EPA identification numbers, and other requirements as described by the listed subpart titles. A shorter list of requirements applies to hazardous wastes that are generated and treated onsite, i.e.,:<br>262.11 Hazardous Waste Determination<br>262.12 EPA Identification Numbers<br>262.34 Accumulation Time<br>262.40 Recordkeeping<br>262.43 Additional Reporting | These requirements apply to excavated wastes and controlled emissions that are hazardous wastes in terms of 40 CFR Part 261, and are intended for offsite disposal. These wastes likely will include the arsenic-containing material, emission control system residue, and decontamination solids and liquids. | ●<br>Offsite disposal or treatment of hazardous wastes | ●<br>Management of onsite hazardous excavated wastes and controlled emissions | |

# TABLE 10.1

## FEDERAL ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **40 CFR Part 264 Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities** | | | | | |
| Subpart B General Facility Standards (Sections 264.10 - 264.18)<br>Subpart C Preparedness and Prevention (Sections 264.30 - 264.37)<br>Subpart D Contingency Plan and Emergency Procedures (Sections 264.50 - 264.56)<br>Subpart E Manifest System, Recordkeeping and Reporting (Sections 264.70 - 264.77)<br>Subpart G Closure and Post-Closure (Sections 264.110 - 264.120)<br>Subpart I Use and Management of Containers (Sections 264.170 - 264.178)<br>Subpart J Tank Systems (Sections 264.190 - 264.199) | These subparts represent the general requirements governing the siting, design, construction, operation and closure of a facility that treats hazardous waste. | These requirements are relevant to onsite facilities provided to control emissions, to treat the excavated seep area materials, and to collect decontaminated solids and liquids. The ground water monitoring requirements, which are included in Subpart F, would not apply to these facilities and is therefore not included.<br><br>The Subpart G standards are also relevant to the closure of the site. Activities that are affected include the in situ treatment of materials, and the design, construction, and long-term maintenance of the site cover and other site containment features such as crib and slurry walls. The Subpart G requirements also include a 30-year monitoring, maintenance, and reporting period after the facility is closed. | | ● | |
| Subpart K Surface Impoundments<br><br>Section 264.228 Closure and Post-Closure Care Paragraphs: a(2), b, and c | The requirements apply to the closure of a surface impoundment and include the following:<br>• Eliminate any free liquids by removal or solidification.<br>• Stabilize wastes to provide sufficient load-bearing capacity to support a final cover.<br>• Minimize migration of any free liquids.<br>• Minimize maintenance of the cover.<br>• Promote surface drainage and minimize erosion or abrasion of the cover.<br>• Accommodate settling and subsidence of the cover.<br>• Provide a cover that has lower permeability than underlying formations.<br>*Additional requirements are included which apply to the post-closure period. These include:*<br>• Maintenance of the cap<br>• Prevention of run-on and run-off from damaging the cap. | These requirements are relevant to the in situ treatment of materials and the design, construction, and long-term maintenance of the site cover and other site containment features such as crib and slurry walls. | | ● | |

TABLE 10.1

FEDERAL ARARs
(Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| Subpart O<br>Incinerators<br>Sections 264.340,-264.343, 264.345, 264.347, and 264.351 | These regulations prescribe the performance standards for the emission control system. They require the identification of principal organic hazardous constituents (POHCs). The emission control system is required to have a destruction and removal efficiency (DRE) of 99.99% for each POHC. An additional requirement includes a limit on particulate matter emissions of 180 $mg/m^3$ from the emission control system. | These requirements would be relevant to the construction and operation of components of the onsite emission control system. | | ● | |
| **Part 268**<br>**Land Disposal Restrictions**<br>Subpart D - Treatment Standards<br>268.43 Treatment Standards Expressed as Waste Concentrations | These sections identify the restricted wastes. They include concentrations of the hazardous constituents which may not be exceeded by the waste or treatment residual for allowable land disposal of such wastes or residual. Selected pertinent standards, which are determined by the TCLP procedure, include:<br>• As: 5 mg/L<br>• Benzene: 0.5 mg/L<br>Other standards include:<br>• pH: ≤ 2 | These treatment standards apply to the excavated wastes that are intended for offsite disposal as hazardous wastes. | ● | | |
| **EPA TECHNICAL GUIDANCE DOCUMENT "Final Covers on Hazardous Waste Landfills and Surface Impoundments"** | These guidelines recommend a multilayer cover consisting of the following layers from top to bottom:<br>• Vegetation/Soil: 60 cm (2 ft.)<br>• Filter (Nominal Thickness)<br>• Drainage: 30 cm (1 ft.)<br>• Low permeability FML(2): 20 mil (minimum)<br>• Low Permeability Soil: 60 cm (2 ft.)<br>Optional layers and layer modifications include the addition of a gravel top surface for erosion control and the removal of the drainage layer in arid climates, the addition of biotic barriers to prevent damage by animals, and the addition of a gas vent layer to control gas emissions. | The design of the cap for site closure. | | | ● |
| **Clean Water Act (CWA) (33 USC 1251-1376)** | The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective the Act outlines seven goals. Those pertinent to the McColl site include:<br>• Discharge of toxic pollutants in toxic amounts are to be prohibited.<br>• Programs for the control of nonpoint sources of pollution are to be developed. | These goals affect the discharge of flood water from the site and of any waste water introduced to publicly owned water treatment plants (POTWs). | ●<br>Potentially | | |

(2) Flexible Membrane Liner.

# TABLE 10.1

## FEDERAL ARARs
## (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **40 CFR Part 122 EPA Administered Permit Programs: The National Pollutant Discharge Elimination System (NPDES)** <br> Subpart B Permit Application and Special NPDES Program Requirements(3) <br> 122.21 - Application for a Permit <br> 122.22 - Signatories to Permit Applications and Reports <br> 122.26 - Storm Water Discharges | Unless EPA establishes a general or industry-specific permit or a group permit is obtained that covers the proposed site remediation, closure and waste treatment activities, it is likely that an individual storm water runoff permit will be required. These regulations apply, among others, to storm water runoff from construction areas larger than 5 acres and any hazardous waste treatment facilities. They require that the constituent concentrations of any discharge meet specified criteria which would be established at a future date. | These regulations affect any storm water runoff derived from the following areas and discharged offsite: disturbed land surfaces associated with the site remediation and closure, the emission control system, other onsite waste treatment activities and the immediate access roads. These requirements do not need to be met for any runoff discharged from those portions of the site that are closed and contain no active waste treatment, and from any site run-on that is diverted around the disturbed surfaces. | ● <br> Potentially after October 1, 1992 | | |
| **40 CFR Part 403 General Pretreatment Regulations for Existing and New Sources of Pollution** <br> Sections 403.1 - 403.18 | These pretreatment regulations establish a system for the control of pollutants entering publicly owned treatment works (POTWs). They include a discussion of the purpose, applicability, objectives, national pretreatment standards including both discharge prohibitions and categorical standards, as well as other issues dealing with removal credits, pretreatment programs, approval procedures for pretreatment standards, and variances from these standards. These regulations require that pretreatment standards be established in conjunction with state and local agencies and that these standards be at least as stringent as those referenced in Part 403. <br> The specific discharge prohibitions contained in Part 403 include pollutants which: <br> • Create a fire or explosion hazard. <br> • Cause a corrosion problem and have a pH of less than 5 (unless the POTW can accommodate lower values). <br> • Are solid or viscous. <br> • Will cause interference with the POTW. <br> • Cause heating in excess of 104°F unless alternative temperature is specifically approved. <br> For numerical standards reference should be made to the County of Orange Sanitation District standards discussed in this set of tables. | These regulations would be applicable to any surface run-off from the disturbed areas which is collected and discharged, or treated and discharged, or other onsite liquids discharged to a POTW. | ● | | |
| **Noise Control Act of 1972 (42 USC 1972) as Amended by the Quiet Community Act of 1978** | Construction and transportation equipment noise levels (e.g., portable air compressors, and medium and heavy trucks), process equipment noise levels, and noise levels at the property boundaries of the project are regulated under this act. State or local agencies typically enforce these levels. See the Fullerton Noise Ordinance contained in this set of tables for more detail. | This act applies to all activities of the selected remedy. | ● | | |

(3) Final Rule, November 16, 1990

# TABLE 10.1

## FEDERAL ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **40 CFR Subchapter G - Noise Abatement Programs**<br><br>Part 204 Noise Emission Standards for Construction Equipment | This part requires that portable air compressors with a rated capacity equal to or above 75 cfm which deliver air at a pressure greater than 50 psi meet specific noise emission standards of 76 dBA. These standards do not apply to pneumatic tools or equipment that the air compressor uses. | Any portable air compressors, and medium and heavy trucks that may be used onsite during site closure. | ● | | |
| Part 205 Transportation Equipment Noise Emission Control | This part requires that medium and heavy trucks (gross weights in excess of 10,000 pounds) meet specified noise emission standards of 80 to 83 dBA depending on the date of manufacture. | Any medium and heavy trucks that are used onsite. | ● | | |
| **29 CFR**<br><br>**Subpart H Section 1910.120 - Hazardous Waste Operations and Emergency Response** | This rule mandates certain requirements for monitoring instrumentation, site safety plans, respirators and personal protective equipment, medical surveillance, engineering controls, work practices, other operational functions, and training requirements. It is applicable to the health and safety aspects associated with hazardous waste management.<br><br>The rule requires that worker protective clothing and equipment at various locations within a site include one of the following:<br>• Level D (no respiratory protection, 10 hour average)<br>• Level C (cartridge respirator)<br>• Level B (supplied air)<br>• Level A (totally encapsulated chemical protection suit plus self-contained breathing apparatus) | This rule covers activities involving personnel on the site engaged in site investigations, remediation and closure, as well as certain post-closure and monitoring activities. It requires that site health and safety plans be prepared and implemented. The appropriate level of protective clothing will have to be worn by site personnel. Medical surveillance of all site personnel will also be necessary. | ● | | |

# TABLE 10.2

## STATE ARARs



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **CONTAMINANT SPECIFIC** | | | | | |
| **Hazardous Waste Control Act (HWCA) (Health and Safety Code Section 25100-25395)** | HWCA is an EPA-approved state law which mandates controls for hazardous wastes from their point of generation through accumulation, transportation, treatment, storage, and ultimate disposal. | This act established the regulations outlined below that determine if wastes generated at the McColl site are hazardous. | ● | | |
| **CCR, Title 22, Social Security Division 4, Environmental Health, Chapter 30, Minimum Standards for Hazardous and Extremely Hazardous Waste**<br>• **ARTICLE 11**<br>**Criteria for Identification of Hazardous and Extremely Hazardous Wastes**<br>Sections<br>66693 Applicability of Hazardous Waste Criteria<br>66694 Sampling and Sample Management<br>66696 Toxicity Criteria<br>66699 Persistent and Bioaccumulative Toxic Substance<br>66700 Waste Extraction Test (WET)<br>66702 Ignitability Criteria<br>66705 Reactivity Criteria<br>66708 Corrosivity Criteria | A solid waste is a hazardous waste if it exhibits any of the characteristics identified in this Article.<br>A waste is toxic and hazardous if it:<br>• Has an acute oral $LD_{50}$ less than 5,000 milligrams per kilogram, or<br>• Has an accurate dermal $LD_{50}$ less than 4,300 milligrams per kilogram, or<br>• Has an acute inhalation $LC_{50}$ less than 10,000 parts per million as a gas or vapor, or<br>• Has an acute aquatic 96-hour $LC_{50}$ less than 500 milligrams per liter, or<br>• Contains any of a select list of substances at a single or combined concentration equal to or exceeding 0.001 percent by weight, or<br>• Has been shown to pose a hazard to human health or environment because of its carcinogenicity, acute toxicity, chronic toxicity, bioaccumulative properties, or persistence in the environment, or<br>• Is listed in 40 CFR 261 as a hazardous waste.<br>Any waste is a hazardous waste which exceeds its listed soluble threshold limit concentration (STLC), or exceeds its listed total threshold limit concentration (TTLC). A partial listing of the important constituents and associated standards include the following:<br>Substance — STLC(9) mg/L — TTLC(8) Wet-Weight mg/kg<br>Arsenic and/or arsenic compounds — 5.0 — 500<br>Barium — 100 — 10,000<br>Cadmium — 1.0 — 100 | These characteristics and the associated testing protocols are for evaluating the wastes that are generated by excavating materials or controlling emissions onsite to determine whether they are hazardous wastes. | ● | | |

10-1b

(8) Determined by

(9) Determined by CAM WET procedure.

# TABLE 10.2

## STATE ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **CONTAMINANT SPECIFIC** (Continued) | | | | | |
| **Porter-Cologne Water Quality Control Act (WC 13000-13806) CCR, Title 23 Waters Division 3, Chapter 15 Discharge of Waste to Land** | Among other provisions, this act requires that standards applicable to waste discharges to land and water quality protection standards be established by the State and Regional Boards respectively. | These requirements pertain to the onsite disposal of any wastes and the discharge of any site wastes. | | ● | |
| **ARTICLE 2** **Waste Classification and Management** <u>Section</u> 2520 Applicability and Classification Criteria | A waste classification system is described which applies to wastes that cannot be discharged directly or indirectly to waters of the state and which therefore must be discharged to land for treatment, storage or disposal. This waste classification system provides the basis for determining containment and closure standards for different types of wastes. | This article describes waste classification for which disposal facility construction standards are provided in the Action Specific ARARs under Article 4, CCR Title 23. Any wastes that may be considered for onsite disposal are likely to be classified as either wet or designated. | | | ● |
| **Santa Ana Regional Water Quality Control Board (RWQCB) Final Discharge Standards for Waste Disposal** | The RWQCB often references and uses DHS action levels (ALs) when the RWQCB determines wastewater discharge standards for site-specific discharges. The DHS ALs by themselves are guidance and therefore are to be considered.<br>DHS ALs which may be specified by the RWQCB as wastewater treatment standards for toxins found in treated wastewater at the site are shown below:<br>• Benzene 0.7 ppb<br>• Toluene 100 ppb<br>• Xylene 620 ppb | Should offsite discharge of any onsite rainwater accumulation be contemplated, these ALs should be considered in determining acceptable concentration levels for constituents in these waters. | | | ● |
| **County Sanitation District of Orange County (CSDOC)** | CSDOC regulations of September, 1989, prohibit the discharge of wastewater to sewage facilities owned by the District which, among other things, obstructs the flow or damages the facilities, is toxic, or violates any statute, regulation or ordinance of any public or regulatory agency with jurisdiction over the discharge of wastewater. The regulations place limits on wastewater strength and characteristics and limit local discharges to concentrations, among others, noted below:<br><u>(mg/L)</u><br>• Arsenic 2.0<br>• Cadmium 1.0<br>• Chromium (total) 2.0<br>• Total Toxic Organics (as defined by EPA) 0.58<br>• Oil or grease of mineral or petroleum origin 100.0<br>CSDOC regulations for Use of District Sewage Facilities (July 1, 1983) require detailed plans and operating procedures for pretreatment facilities, including accidental discharge procedures, be submitted to the CSDOC for review. | These standards are potentially applicable to any surface run-off from disturbed areas which is collected and discharged or treated and discharged to a POTW. | ● | | |

# TABLE 10.2

## STATE ARARs
## (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **CONTAMINANT SPECIFIC (Continued)** | | | | | |
| **Title 17 Public Health Division 3 Chapter 3 Local Health Services Mulford - Carrel Air Resources Act (Health and Safety Code Sections 39000-39570)** | The regulations of CCR, Title 17, Sections 70200 and 70200.5 set standards for ambient air quality as a basis to prevent or abate the effects of air pollution. Effects on health, aesthetics and the economy are not usually associated with levels less than those indicated below (September, 1989):<br>Substance / Conc. / Duration<br>Ozone .09 ppm 1 hr<br>CO 9.0 ppm 8 hrs; 20.0 ppm 1 hr<br>$SO_2$ .25 ppm 1 hr; .05 ppm 24 hrs<br>$NO_2$ .25 ppm 1 hr<br>$PM_{10}$ (suspended particulate matter) 50.0 ug/m3 24 hrs; 30.0 ug/m3 (annual mean) 24 hrs<br>Benzene and hexavalent chromium are also identified as toxic air contaminants.<br>This act assigns responsibility for the identification of air pollutants to the State Department of Health Services (DHS) and the State Air Resources Board (ARB). The ARB and local air pollution control districts must then develop control measures reducing emissions of the identified pollutants. Although it sets no standards, this law is applicable because it gives authority to local agencies. | These standards apply to the site during the closure and post-closure period and to those areas in which the general public has access. | ● | | |
| **LOCATION SPECIFIC** | | | | | |
| **Porter-Cologne Water Quality Control Act (WC 13000-13806) CCR, Title 23, Waters, Division 3, Chapter 15, Discharges of Waste to Land**<br>**Article 3 Waste Management Unit Classification and Siting**<br>Section 2532(d), and 2533(d) | The pertinent sections of the act deal with the requirement for the establishment of standards applicable to waste discharge to land.<br>Article 3 states that new waste management units shall have a 200-foot setback from any known Holocene earthquake fault. | These requirements pertain to the onsite disposal of any wastes. | | | ● |

## TABLE 10.2

## STATE ARARs
(Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC** | | | | | |
| **Hazardous Waste Control Act (HWCA) (Health and Safety Code Section 25100-25395)** | HWCA is an EPA-approved state law which mandates controls for hazardous wastes from their point of generation through accumulation, transportation, treatment, storage, and ultimate disposal. | These requirements affect site closure, hazardous excavated wastes and controlled emissions, and the offsite disposal of hazardous wastes. | ● Offsite disposal or treatment of hazardous wastes | ● Site closured the management of onsite hazardous excavated wastes and controlled emissions | |
| **CCR, Title 22 Social Security, Division 4, Environmental Health**<br>**Chapter 30 Minimum Standards for Hazardous and Extremely Hazardous Waste**<br>**ARTICLE 2**<br>**Scope and Procedures (Sections 66300 and 66305)** | The provisions of Chapter 30 apply to the management of any liquid, semisolid, solid, or gaseous hazardous waste, unless the waste is granted a variance. Wherever the regulations in this chapter require specific design standards or criteria, the owner or operator shall design in accordance with those standards and criteria or provide a design that provides for an equivalent level of protection for public health and the environment. | Site closure and the generation, treatment and offsite disposal of hazardous wastes. | ● Offsite disposal or treatment of hazardous wastes | ● Site closure and the management of onsite hazardous excavated wastes and controlled emissions | |

# TABLE 10.2

## STATE ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **ARTICLE 6** **Requirements for Generators of Hazardous Waste**<br>Sections<br>66470 Scope and Applicability<br>66471 Hazardous Waste Determination Requirement for the Generator<br>66472 EPA Identification Numbers for the Generator<br>66480 General Requirements for Manifest Use by the Generator<br>66481 Hazardous Waste Manifest<br>66482 Information Required on the Manifest<br>66484 Generator Use of the Manifest<br>66492 Recordkeeping Requirements for the Generator<br>66504 Packaging, Labeling, Placarding and Marking Requirements for the Generator<br>66508 Accumulation Time for the Generator | This article establishes standards for generators of hazardous waste.<br>An owner or operator who initiates a shipment of hazardous waste from a treatment, storage or disposal facility shall comply with the generator standards established in this article. A person who generates a waste shall determine if that waste is a hazardous waste as defined by the testing protocols established in Article 11.<br>Any generator of hazardous waste shall apply for and receive an EPA identification number.<br>A generator who transports, or offers for transportation, hazardous waste shall prepare a manifest before transporting the waste offsite. Hazardous waste may be accumulated onsite for 90 days or less without a permit or without having interim status, provided that it is appropriately contained and labeled, and suitable prevention and contingency plans are established. | The requirements are applicable to hazardous wastes that are excavated or collected or otherwise generated onsite. The wastes affected will likely include the arsenic-containing material, incinerator ash, and decontamination solids and liquids. The seep area material, which is excavated, may not be hazardous after in situ treatment. | ●<br>Offsite disposal or treatment of hazardous wastes | ●<br>Onsite hazardous excavated wastes and controlled emissions | |
| **ARTICLE 18** **General Facility Standards for Interim Status and Permitted Facilities (Sections 67100, 67102-67108)** | These general standards include requirements for waste analyses, facility security and inspection, training of personnel, requirements for handling ignitable, reactive or incompatible wastes, as well as seismic and precipitation design standards. | These requirements are applicable to onsite hazardous waste treatment facilities. | ● | | |
| **ARTICLE 19** **Preparedness and Prevention for Interim Status and Permitted Facilities (Sections 67120-67126)** | Facility shall be designed, constructed, maintained, and operated to minimize the possibility of fire, explosion, or release of hazardous waste. Other requirements deal with necessary equipment that must be provided, testing and maintenance of equipment, access to communications or alarm systems, aisle space, and arrangements with local authorities. | | | | |

# TABLE 10.2

## STATE ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC** (Continued) | | | | | |
| **ARTICLE 20** Contingency Plan and Emergency procedures for Interim Status and Permitted Facilities (Sections 67140-67145) | These sections outline the purpose of the contingency plan, its content, availability of copies, and amendments as well as requirements for an emergency coordinator and procedures. | | | | |
| **ARTICLE 21** Manifest System, Recordkeeping and Reporting for Interim Status and Permitted Facilities (Sections 67160, 67164, 67165, 67167, and 67169) | These requirements include the maintenance of operating records, the availability of these records, as well as for annual and additional reports. | | | | |
| **ARTICLE 22** Environmental Monitoring for Interim Status and Permitted Facilities (Sections 67180-67185, 67188-67190) | This article contains the requirements for the environmental monitoring of air, soil and water for onsite facilities that treat hazardous waste. The general requirements include: <br>• Detection monitoring programs. <br>• Compliance monitoring programs. <br>• Environmental protection standards for hazardous constituents. <br>• Concentration limits (Generally soil and soil vapor constituent concentrations outside the facility shall not exceed background level. Air constituent concentrations shall not exceed those established by the California Air Resources Board.) <br>• Point of compliance. <br>• Corrective action program. <br>The regulations also allow for the Department to establish alternative concentration limits for a hazardous constituent if it is found not to pose a substantial hazard to human health or the environment. | It is anticipated that the monitoring requirements pertaining to air and possibly soil would be applicable to the onsite hazardous waste treatment facilities. | ● | | |
| **ARTICLE 23** Closure and Post-Closure for Interim Status and Permitted Facilities (Sections 67210-67217) | This Article deals with closure performance standards, disposal or decontamination of equipment, and post-closure care and use of property. It is relevant to owners and operators of hazardous waste management facilities. <br>It requires that the facility be closed in a manner that minimizes the need for further maintenance, and controls, and minimizes or eliminates (to the extent necessary to protect human health and the environment), post-closure migration of hazardous waste constituents, leachate, rainfall, or waste decomposition products to the ground or surface waters or to the atmosphere. <br>When closure is completed, all facility equipment and structures shall be properly disposed of, or decontaminated by removing all hazardous waste and residues. <br>At facilities where hazardous waste will remain after closure, post-closure care shall continue for 30 years after the date of completing closure and shall consist of at least the following: <br>• Monitoring and reporting. <br>• Maintenance, post-closure care and monitoring of waste containment systems. | These closure performance standards and requirements for disposal or decontamination of equipment are relevant or applicable to site closure as well as the dismantling and closure of onsite hazardous waste treatment facilities. The post-closure requirements would only be relevant to site closure. | ● Onsite Hazardous Waste Treatment Facilities | ● Site Closure | |

TABLE 10.2

STATE ARARs
(Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **Porter-Cologne Water Quality Control Act (Including 1980 Amendment) (WC 13000-13806)** | The Porter-Cologne Water Quality Control Act establishes control boards which exercise the regulatory functions of the state in the field of water resources. It also required the promulgation of the Title 23 regulations which govern discharges of wastes to land. | The Title 23 regulations governing discharge of waste to land affect the onsite disposal of any waste. | | ● | |
| **CCR, Title 23 Waters, Division 3, Chapter 15, Discharges of Waste to Land**<br>**ARTICLE 1**<br>**General**<br>Section<br>2510 Applicability | Chapter 15 establishes waste and site classification procedures, waste management requirements, and prescriptive construction standards for waste treatment, storage, or disposal in landfills, surface impoundments, waste piles, and land treatment facilities. It covers siting, design and construction of new facilities, monitoring and closure, and post-closure maintenance requirements.<br>Alternatives to construction or prescriptive standards contained in this chapter may be considered, provided they provide an equivalent level of protection. | As detailed below, selected construction or prescribed standards would be TCBs for site closure and any onsite disposal of excavated materials which are wastes pursuant to Article 2. | | | ● |
| **ARTICLE 4**<br>**Construction Standards**<br>Selection / Portions of Sections<br>2541 General Criteria for Containment Structures<br>2545 Subsurface Barriers<br>2547 Seismic Design | Selected criteria for containment structures and subsurface barriers should be considered as they provide general guidelines for the design of engineered waste containment facilities. These criteria are summarized below.<br>Materials used in containment structures are to have appropriate chemical and physical properties. Permeabilities specified for final cover are to be relative to water and are to be determined primarily by appropriate field test methods.<br>Earthen materials used in containment structures other than cutoff walls and grout curtains are to consist of a mixture of clay and other suitable fine-grained soils. At least 30 percent of the material, by weight, are to pass a No. 200 U.S. Standard sieve. The materials shall be fine-grained soils with a significant clay content and without organic matter, in the "SC," "CL," or "CH" classes of the Unified Soil Classification system.<br>Cutoff walls shall be:<br>• A minimum of 2 feet thick for clay materials; or<br>• A minimum of 40 mils thick for synthetic materials.<br>Waste management units, containment structures, diversion and drainage facilities are to be designed and constructed to limit, to the greatest extent possible, ponding, infiltration, inundation, erosion, slope failure, washout, and overtopping under the 1,000-year, 24-hour precipitation. (This standard pertains to a waste management unit containing a designated waste.)<br>Surface and subsurface drainage from outside of a waste management unit is to be diverted from the waste management unit. Cover materials are to be graded to divert precipitation from the waste management unit, to prevent ponding of surface water over wastes, and to resist erosion.<br>Facilities should be designed to withstand the maximum credible earthquake without damage to the foundation or to the structures which control leachate, surface drainage, erosion, or gas. | Selected criteria should be considered for the design and construction of site closure components such as the cap, crib walls, and the slurry walls, and also for the onsite disposal of materials which are designated wastes pursuant to Article 2. There are no management requirements for inert wastes. | | | ● |

# TABLE 10.2

## STATE ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| ARTICLE 8<br>General<br>Sections<br>2580 General Closure Requirements<br>2581 Landfill Closure Requirements<br>2582 Surface Impoundment Closure Requirements | This article deals with general that pertain to facilities containing a designated waste, as well as more detailed landfill and surface impoundment closure requirements it also includes requirements for a post-closure maintenance period as long as the wastes pose a threat to water quality.<br>Closed waste management units are to be provided with at least two permanent monuments from which the location and elevation of wastes can be determined throughout the post-closure maintenance period. Vegetation for closed waste management units is to require minimum irrigation and maintenance.<br>Final Cover requirements indicate:<br>• Closed landfills are to be provided with not less than 2 feet of appropriate materials as a foundation layer for the final cover. A lesser thickness may be allowed for if differential settlement of waste, and ultimate land use will not affect the structural integrity of the final cover.<br>• Closed landfills are to be provided with not less than 1 foot of soil, placed on top of the foundation layer and compacted to attain a permeability of either $1 \times 10^{-6}$ cm/sec or less, or equal to the permeability of any bottom liner system or underlying natural geologic materials, whichever is less.<br>• Closed landfills are to be provided with not less than 1 foot of soil placed on top of the low permeability layer. The rooting depth of any vegetation planted on the cover is not to exceed the depth to the low permeability layer.<br>• The cover is to be designed and constructed to function with the minimum maintenance possible.<br>The surface of the closed impoundments is to be graded and maintained to prevent ponding. Areas with slopes greater than 10 percent are to be protected or designed and constructed to prevent erosion.<br>Throughout the post-closure maintenance period, the structural integrity and effectiveness of all containment structures is to be maintained, erosion and related damage of the final cover due to drainage is to be prevented, and survey monuments protected.<br>All residual liquid is to be treated to eliminate free liquid. | Selected criteria, should be considered for the design and construction of site closure components such as the cap crib walls, and the cutoff walls, and also for the onsite disposal of excavated materials which are designated wastes pursuant to Article 2. | | | ● |
| Title 17 Public Health Division 3, Chapter 3 Local Health Service Mulford - Carrel Air Resources Act (Health and Safety Code Sections 39000 - 39570) | This act assigns responsibility for the identification of air pollutants to the CDHS and ARB. The ARB and local air pollution control districts must then develop control measures reducing emissions of the identified pollutants. | Although it sets no standards, this law is applicable because it gives authority to local agencies. | ● | | |

# TABLE 10.2

## STATE ARARs (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **South Coast Air Quality Management District (SCAQMD)** **Regulation IV - Prohibitions** | | These prohibitions apply to the onsite construction and waste treatment activities. They pertain to operations and facilities such as in situ treatment, site grading, road construction, cap and cutoff wall construction, and the emission control systems. | ● | | |
| Rule 401 - Visible Emissions | Emission for an aggregate period of more than three minutes in any one hour shall not be as dark or darker in shade than No. 1 on the Ringelmann Chart. | | | | |
| Rule 402 - Nuisance | Prohibits the discharge from any source of any material (including odorous compounds) that causes injury, or annoyance to the public, property, or businesses or endangers human health, comfort, repose or safety, or which causes injury or damage to business property. | | | | |
| Rule 403 - Fugitive Dust | Fugitive dust from onsite activities must not remain visible beyond the property line of the emission source. Downwind particulate concentrations must not be more than 100 micrograms per cubic meter, averaged over 5 hours, above the upwind particulate concentrations. The above rules do not apply if the wind speed, averaged over 15 minutes, is above 15 mph. Every reasonable precaution must be taken to minimize fugitive dust, and to prevent particulate matter from being deposited on public roadways. | | | | |
| Rules 404 and 405 - Solid Particulate Matter (Concentration and Weight) | This rule establishes standards for discharge of particulate matter into the atmosphere from any source. The standard is dependent upon the volume of air or dry gas discharged and ranges from 23 $mg/m^3$ to 450 $mg/m^3$ (see Table 404[a1]) or 0.99 to 30 lb/hour (see Table 405[a]). These standards apply to an average over one cycle of operation or one hour, whichever is less. | | | | |
| Rule 407 - Liquid and Gaseous Air Contaminants | This rule prohibits the discharge from any equipment of:<br>• CO exceeding 2,000 ppm by volume (averaged over 15 consecutive minutes).<br>• Sulfur compounds, calculated as $SO_2$ exceeding 500 ppm (averaged over 15 consecutive minutes)<br>These provisions do not apply to stationary internal combustion engines, propulsion of mobile equipment, or emergency venting due to equipment failure. | | | | |
| Rule 409 - Combustion Contaminants | Combustion contaminants from the burning of fuel are not to exceed 0.23 grams per cubic meter (0.1 grain per cubic foot) of gas calculated to 12 percent of carbon dioxide ($CO_2$) averaged over a minimum of 15 consecutive minutes. | | | | |
| Rule 474 - Fuel Burning Equipment Oxides of Nitrogen | This rule limits the discharge of oxides of nitrogen into the atmosphere from any stationary fuel burning equipment. A range of concentration limits are provided which are based on the BTU input rate per hour. | | | | |
| Rule 480 - Natural Gas-Fired Control Devices | An Air Pollution Control Device which operates on natural gas is to include the capability to cause the equipment or source generating the emissions to be taken out of service during a natural gas shortage or curtailment, or be provided with an alternative fuel system for use during a natural gas shortage or curtailment. | | | | |

# TABLE 10.2

## STATE ARARs
## (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| Addendum to Regulation IV Rule 53 - Orange County - Sulfur Compounds - Concentration | Sulfur compounds which exist as a liquid or gas at standard conditions are not to be discharged into the atmosphere in concentrations at the point of discharge exceeding 500 parts per million by volume calculated as sulfur dioxide ($SO_2$). | | | | |
| Regulation XI - Source Specific Standards<br>Rule 1150 - Excavation of a Landfill Site | This rule requires that an Excavation Management Plan approved by the Executive Officer of SCAQMD be put in place before any excavation is initiated. The plan shall provide information regarding the quantity and characteristics of the material to be excavated and transported and shall identify mitigation measures including gas collection and disposal, bailing, encapsulation, covering of the material, and chemical neutralizing. | These requirements are applicable to the excavation of waste onsite and to the in situ treatment activities. | ● | | |
| Rule 1150.2 - Control of Gaseous Emissions From Inactive Landfills | Rule 1150.2 states that gaseous emissions from inactive landfills shall be limited in Total Organic Carbon (TOC) to 500 ppm measured as methane ($CH_4$) at any point on the surface of the landfill and to 50 ppm measured as total organic compounds over a surface area of the landfill. | These requirements are applicable to the design of the site closure cap. | ● | | |
| Rule 1166 - Volatile Organic Compound Emissions From Decontamination of Soil | This rule limits the emission of Volatile Organic Compounds (VOC) from soil contaminated with VOC during site remediation activities.<br>Treatment or handling VOC-contaminated soil requires implementation of measures which result in Best Available Control Technology and include at least one of the following:<br>• Underground VOC collection system and a disposal system prior to excavation.<br>• Collection and disposal of the VOC from the excavated soil onsite.<br>• Any approved equivalent VOC-contaminated soil control measure.<br>Onsite or offsite spreading of VOC-contaminated soil which results in uncontrolled evaporation of VOC to the atmosphere shall not be allowed.<br>The above provisions shall not apply to decontamination of soil containing organic compounds having a Reid vapor pressure (RVP) less than 80 mm Hg (1.55 pounds per square inch), or an absolute vapor pressure (AVP) less than 36 mm HG (0.7 psi) at 20°C. | These requirements are applicable to onsite excavation and treatment of contaminated soils. | ● | | |

# TABLE 10.2

## STATE ARARs
## (Continued)



| REQUIREMENTS | COMMENTS: REQUIREMENTS AND CRITERIA | COMMENTS: REMEDIATION ELEMENTS AFFECTED | APPLICABLE | RELEVANT AND APPROPRIATE | TO BE CONSIDERED |
|---|---|---|---|---|---|
| **ACTION SPECIFIC (Continued)** | | | | | |
| **Regulation XIII - New Source Review**<br>Rules 1301, 1302, 1303, 1306, 1309, 1309.1 | This regulation sets forth preconstruction review requirements for new or modified stationary sources, to ensure that the operation of such stationary sources does not interfere with progress in attainment of the national and state ambient air quality standards, without unnecessarily restricting the future economic growth within the district. The individual rules deal with definitions, requirements, exemptions, emission calculations, emission reduction credits, Community Bank, and analysis and reporting.<br>The basic requirements are that any new facility which results in a net emission increase of any nonattainment air contaminant or halogenated hydrocarbon be denied a permit unless each of the following requirements is met:<br>• Best Available Control Technology (BACT) is employed.<br>• Modeling demonstrates that ambient air quality standards will not be violated or any existing violations made significantly worse.<br>• The accumulated emissions are offset by emission reduction credits or allocations from the Community Bank.<br>• The facility complies with applicable rules and regulations of the District.<br>• The facility complies with the requirements of 40 CFR, Part 51, Subpart I. | These requirements apply to portions of the emission control system. The site is in a non-attainment area for the following constituents:<br>• Ozone<br>• Carbon monoxide<br>• Nitrogen dioxide<br>• Suspended particulate matter<br>• Sulfates | ● | | |
| **Regulation XIV - Toxics**<br>Rule 1401 - New Source Review of Carcinogenic Air Contaminants | The rule specifies limits for cancer risk and excess cancer cases from new permit units and modifications to existing sources that emit carcinogenic air contaminants. The rule establishes allowable emission impacts for all such stationary sources. Best Available Control Technology for toxins (T-BACT) will be required for any system where a lifetime (70 year) maximum individual cancer risk of one in one million or greater is estimated to occur. Limits are calculated using unit risk factors for specific contaminants. | These requirements apply to the design and operation of portions of the emission control system. | ● | | |
| **Fullerton Municipal Code Chapter 15.90 Fullerton Noise Control** | This ordinance protects community residents from excessive noise levels at the project property boundary.<br>The ordinance specifies that noise levels not exceed 55 dBA for more than a 30-minute period between the hours of 7 a.m. through 10 p.m. as measured at the property boundary. From the hours of 10 p.m. through 7 a.m., noise levels should not exceed 50 dBA for more than a 30-minute period. Other noise limits are specified for shorter periods of time.<br>Noise sources associated with construction or grading of any real property are exempted provided these activities do not take place between the hours of 8 p.m. and 7 a.m., weekdays including Saturday, or at any time on Sunday or a federal holiday. | The exemption from these standards would be applicable to the site remediation period. The standards would be applicable during the post-closure period. | ● | | |
| **California Environmental Quality Act (CEQA), Public Resources Code, Division 13, Section 21000 et seq. (14 CCR Division 6, Chapter 3)** | CEQA requires agencies to consider the possible environmental effects of the proposed project, alternatives to the proposal, and measures to mitigate the project's significant adverse effects. | A court order requiring that an Environmental Impact Report (EIR) be prepared for excavation and offsite disposal in accordance with the California Environmental Quality Act (CEQA) was issued in 1985. The EIR was to evaluate impacts of activities at both the area receiving the waste and along the transportation corridors, as well as those at the McColl site itself | ● | | |

# 11.0 REFERENCES

Agency for Toxic Substances and Disease Registry (ATSDR). 1989. Preliminary Health Assessment. McColl Site. Fullerton, California. CERCLIS No. 09CAD980498695.

Alliance Technology Corp: Sampling and Analytical Results for the Preliminary Test Burn Treatability Study of McColl Superfund Waste in Ogden's Circulating Bed Combuster Plant in San Diego, CA. Revised Final Report. Vols. I and II. Undated.

Beychock. 1990. Personal Communication.

Brown and Caldwell. May 1987. Remedial Action and Stabilization Plan. McColl Site, Fullerton, California.

Bryant, Crisp, Litzenberg Associates. 1980. Environmental Assessment of Soils.

Canonie Engineers. December 1983. Cover Letter Proposal and Bid Remedial Action - McColl Site Contract No. 2 - Excavation and Redisposal.

Canonie Engineers. December 1985. Proposed Transportation Plan for Excavation and Redisposal.

$CH_2M$ Hill. September 1986. Work Plan McColl Site - Various Tasks to Supplement the Previous RI/FS Efforts.

$CH_2M$ Hill. February 1987. Quality Assurance Project Plan for Wastes and Soils Investigation.

$CH_2M$ Hill. March 1987. Final Field Sampling Plan, Waste and Soil Investigation.

$CH_2M$ Hill. September 1987. Final Draft Groundwater Investigation Report.

$CH_2M$ Hill. 1987. Appendix A to Field Report. McColl Site, Fullerton, California. Various Tasks to Supplement the Previous RI/FS Efforts. October.

$CH_2M$ Hill. September 1987. Final Draft McColl Site IRM/FS, WA No. 11-9L04.2 Analysis of Lower Ramparts Slope Stability.

$CH_2M$ Hill. August 1988. IAC Review Draft Supplemental Reevaluation of Alternatives and Appendices.

$CH_2M$ Hill. 1989. Final Draft Supplemental Reevaluation of Alternatives and Appendices, McColl Site, Fullerton, California (SROA).

$CH_2M$ Hill. November 1989. Request for Proposal for Treatability Studies for the Purity Oil and Superfund Site and the McColl Superfund Site.

Comments to Final Groundwater Investigation Report for EPA Sampling at the McColl Superfund Site; Declaration of Robert L. Powell of ENVIRON. November 8, 1990.

Department of Health Services (DHS). 1980. Analysis of McColl Site Soil Samples.

DHS. 1981. Boring Logs at McColl Site.

DHS. 1983. The McColl Site Health Survey. An Epidemiological and Toxicological Assessment of the McColl Site in Fullerton, California. The Epidemiological Studies Section. April.

DHS. 1987. California Leaky Underground Fuel Tank (LUFT) Manual.

DHS. 1989. Draft Remedial Action Plan for Remediation of the McColl Hazardous Waste Site.

DHS. 1989. Draft Environmental Impact Report for Remediation of the McColl Hazardous Waste Site. January 31.

Earth Tech Corp. July 1987. Geotechnical Laboratory Testing - Waste and Soil Investigation Data and Samples, Volumes I, II, III and IV.

ENVIRON. 1990. McColl Site Risk Assessment (MSRA).

Environmental Protection Agency. 1979. Survey of Solidification/Stabilization Technology for Hazardous Industrial Waste by Environmental Laboratory, EPA/600/2-79-056. U.S. Environmental Protection Agency, Risk Reduction Engineering Laboratory, Cincinnati, OH.

EPA. 1980. EPA - Aerial Reconnaissance of McColl.

EPA. 1984. Record of Decision - Remedial Alternative Selection, McColl Site, Fullerton, California.

EPA. 1986. Handbook for Stabilization/Solidification of Hazardous Waste, EPA/540/2-86/001. U.S. Environmental Protection Agency, Office of Research and Development, Hazardous Waste Engineering Research Laboratory. June 1986.

EPA. 1988. Revised Draft Report, Evaluation of Test Protocols for Stabilization/Solidification Technology Demonstrations, Prepared by PRC Environmental Management, Contract No. 68-03-3483. U.S. Environmental Protection Agency, Office of Research and Development, Cincinnati, OH. April 1988.

EPA. 1988. Technology Screening Guide for Treatment of CERCLA. Soils and Sludges, EPA/540-2-88/004. National Technical Information Services, Springfield, VA. September 1988.

EPA. 1988. The Superfund Innovative Technology Evaluation Program: Technology Profiles, EPA/540-5-88/003. U.S. Environmental Protection Agency, Office of Research and Development, Risk Reduction Engineering Laboratory, Cincinnati, OH. November 1988.

EPA. 1989. EPA - Treatability Study Report: Results of Treating McColl Superfund Waste in Ogden's Circulating Bed Combustor Research Facility.

EPA. 1989. Hazardous Waste TSDF - Fugitive Particulate Matter Air Emissions Guidance Document. USEPA, Research Triangle Park.

EPA. 1989. Stabilization/Solidification of CERCLA and RCRA Wastes, Physical Tests, Chemical Testing Procedures, Technology Screening, and Field Activities, EPA/625/6-89/022. U.S. Environmental Protection Agency, Office of Research and Development, Center for Environmental Research Information and Risk Reduction Engineering Laboratory, Cincinnati, OH. May 1989.

EPA. 1989. The Superfund Innovative Technology Evaluation Program: Technology Profiles, EPA/540/5-89/013. U.S. Environmental Protection Agency, Office of Research and Development, Risk Reduction Engineering Laboratory, Cincinnati, OH. November 1989.

EPA. 1990. Pre-Publication Report, Technology Evaluation Report, Site Program Demonstration of a Trial Excavation at the McColl Superfund Site (EPA Report).

EPA. 1990. Final Ground Water Investigation Report for EPA Sampling at the McColl Superfund Site.

Industrial Waste Treatment Technology. 1985. Second Edition. James W. Patterson. Butterworth Publishing, London, U.K.

Lindall, Richter, and Associates, 1987. Seismic Evaluation of the McColl Hazardous Waste Site, Fullerton, California. Prepared by Lindall, Richter and Associates for Brown and Caldwell Consulting Engineers.

McColl Site Group (MSG). 1989. Comments on the SROA, DEIR and Draft RAP.

MSG. April 1990. 1990 Stabilization and Closure Plan.

MSG. April 1990. Response to Section 122 Special Notice.

MSG. June 1990. Response to Section 106 Order.

MSG. February 1991. Comments to the EPA's Pre-Publication Report, Technology Evaluation Report, Site Program Demonstration of a Trial Excavation at the McColl Superfund Site.

National Institute of Safety and Health (NIOSH). 1990. Pocket Guide to Chemical Hazards.

Office of Solid Waste and Emergency Response (OSWER) Directive No. 9234.0-05, July 9, 1987.

PEI Associates. April 1990. Draft - Excavation Management Plan for Trial Excavation at the McColl Superfund Site.

QualTec, Inc. December 1989. Proposal for Treatability Studies for the Purity Oil and McColl Superfund Sites Region IX, California.

Radian Corp. July 1982. McColl Site Investigation Appendices - Part 1.

Radian Corp. October 1982. McColl Site Investigation, Final Report Phase 1, Parts 1 and 2 and Appendices.

Radian Corp. November 1982. McColl Site Investigation - Phase 1.

Radian Corp. January 1983. McColl Phase 2 - Remedial Technology Identification, Screening and Description.

Radian Corp. February 1983. Criteria for Evaluation of Remedial Alternatives at the McColl Hazardous Waste Site.

Radian Corp. February 1983. McColl Phase II - Additional Testing of Select McColl Waste Samples.

Radian Corp. February 1983. McColl Phase II Characterization of the Atmospheric Contaminant Emissions from the McColl Site.

Radian Corp. February 1983. McColl Phase II Physical and Chemical Characterization and Distribution of the Waste at the McColl Site.

Radian Corp. March 1983. McColl Phase II - Environmental Setting of the McColl Site.

Radian Corp. March 1983. McColl Phase II - Hydrogeologic Aspects of the McColl Site.

Radian Corp. March 1983. McColl Phase II - Modeling of the Air Emissions from the McColl Site Investigation.

Radian Corp. March 1983. McColl Phase II - Summary of the Nature and Extent of the Problem at the McColl Site.

Radian Corp. March 1983. Remedial Action Alternatives for the McColl Site.

Radian Corp. May 1983. Emission Control Test Plan and Workbook Task 4.0, Stage 5 - McColl Phase II.

Radian Corp. May 1983. McColl Site Cost-Effectiveness, Re-Evaluation, Remedial Alternatives - 6 Attachments.

Radian Corp. May 1983. McColl Phase II - Emission Control Test Data Summary.

Radian Corp. May 1983. Results from Phase II Task 4 Stage 3: Investigative Laboratory Testing for Remedial Alternatives and Technology Design.

Radian Corp. May 1983. Results from Stage 4: Formal Laboratory Testing in Support of Remedial Design.

Radian Corp. June 1983. Cost-Effectiveness Evaluation of Remedial Action Alternatives for the McColl Site Final Report.

Radian Corp. June 1983. Environmental Assessment of the Remedial Action Alternatives for the McColl Site Final Report.

Radian Corp. June 1983. McColl Phase II Emission Control Test Final Report.

Radian Corp. August 1986. 3M Foam Evaluation for Vapor Migration.

Superfund Amendments and Reauthorization Act of 1986.

# APPENDIX I

## The Reactions Occurring in the McColl Superfund Site

# THE REACTIONS OCCURRING

# IN THE McCOLL SUPERFUND SITE

Charles N. Satterfield
October 11, 1991

# The Reactions Occurring

# in the McColl Superfund Site

Charles N. Satterfield

October 11, 1991

## Executive Summary

The McColl site contains twelve sumps into which acidic petroleum waste was deposited between 1942 and 1946. This waste was a by-product from the manufacturing of high octane aviation fuel during World War II. Site investigations conducted since 1980 have found that the waste has converted to a hard asphaltic cement-like material ("asphaltic cement") with relatively high ash content. Tar material, generally found above the denser asphaltic cement, is also found within the sumps. This tar is an intermediate product and represents waste that has not been completely transformed into asphaltic cement.

The reactions that are responsible for changing the waste into the asphaltic cement are:

(1) acid-catalyzed polymerization and polycondensation of organic material;

(2) the above reactions, accelerated by autoxidation; and

(3) the above reactions, accelerated by acidified clay, and reaction with clay.

These reactions, which are continuing to occur, are not reversible under conditions existing at the McColl Site.

Clay, which is contained in the soils surrounding the sumps and other materials placed on top of the waste, has played a key role in the reactions and is the likely source of the ash found in the asphaltic cement-like material. By acidification from the sulfuric acid, the clay became a catalyst for polymerization/condensation reactions and this, combined with the clay's high adsorbent capabilities, led to the formation of an asphaltic

cement-like material.

## 1. Introduction

The McColl Site is an inactive waste disposal facility located in the city Fullerton, California. According to McColl Site records, the facility accepted aci. petroleum waste between 1942 and 1946 (Radian, February 4, 1983), which was placed in twelve excavated sumps.

During the 1950's at least three of the sumps in the Ramparts area were covered with drilling mud from various California oil fields. The western sumps were later covered with natural fill materials during the construction of the Los Coyotes Country Club golf course in the late 1950's.

Various site investigations have been conducted since 1980 to identify the types and quantities of wastes at the McColl Site. Results of these investigations indicate that the waste originally placed in the sumps in the 1940's has been transformed into tar and an asphaltic cement-like material ("asphaltic cement"), the latter sometimes termed "char." The asphaltic cement is more dense than the tar. In general the more dense asphaltic cement is found at the bottom portion of the sumps, while the less dense tar is found in the upper portions. It appears that pockets of tar also exist within the asphaltic cement.

This paper addresses the possible reactions that have occurred at the McColl Site that have resulted in changing the original waste into the present composition.

## 2. Origin and Original Composition of Waste

The waste that was deposited in the McColl sumps is described as a waste product from the production of high octane aviation fuel during World War II by alkylation of

isoparaffins catalyzed by sulfuric acid. In the alkylation reaction, isobutane is mixed with $C_3$ - $C_5$ olefins at ambient pressure and a temperature in the range of 45-70 in the presence of sulfuric acid. The product consists essentially of $C_7$ - $C_9$ isoparaffins and its octane number is quite sensitive to the concentration of $H_2SO_4$. The sulfuric acid becomes diluted with water and organics dissolved in it. Fresh acid is typically charged at 98-99.5 wt% $H_2SO_4$ and is discarded typically at about 90 wt% (Putney, 1959).

The organic material in the acid can come from several sources. Mercaptans and hydrogen sulfide are present in nearly all untreated light olefin feedstocks (Putney, 1959), and these would dissolve into the acid. Water may be present in small amounts in the feedstocks, either absorbed or entrained, which dilutes the acid. Olefins can polymerize with each other, a reaction that is minimized by using a great excess of isobutane to olefins in the alkylation reactor, yet some can still occur, the resulting polymeric material going into the acid. Abraham (Vol. 1, pp. 78-79) states that concentrated sulfuric acid removes unsaturated and aromatic hydrocarbons, asphaltic bodies, and "saponifiable bases" by a complex combination of formation of sulfo derivatives, simple solutions and polymerization.

In summary, the organic constituents in the original waste consisted of undefined material of varying molecular weight and composition, formed by polymerization-condensation side reactions of the ideal feedstocks, together with other complex reactions from impurities, plus various dissolved species. The original acid concentration in the waste was probably about 90% $H_2SO_4$. More details are given, for example, in the review by Putney (1959). It is important to note that essentially no "ash" or non-combustible mineral matter would have been present in the original waste.

3. Present Composition of Waste Material

From the data available to me, there are only two sets of chemical an. ses that seem to distinguish between tar and "char" in the sumps.

In 1983 Radian, in a "McColl Phase II study," reported on samples obtaine. in an earlier Phase I study in 1982 from cores at Ramparts R-1, R-2, and R-5, and Los Coyotes L-1 and L-2. Two samples from each of the five cores were analyzed. Eight of the ten fell into a class termed W-4 and were described as (Radian, 23 Feb., p. 1-1) "a hard, black, asphaltic waste with a slight rubbery texture." The analysis showed an average ash content of 48% by weight, sulfur of 8.1%, a pH of 1.5 and a bulk density of 1.1 g/cm$^3$ (disturbed material). The Radian report did not provide data on the ash content of individual samples.

The EPA Pre-Publication Report (September, 1990) gives information on samples of "raw mud, raw tar, raw char and treated tar" from the L-4 sump. Table 1 summarizes relevant data from the report. The proximate and ultimate analyses were performed on four sets of samples. As stated on page 4-94 of the EPA report, "In all of these analyses, some volatile matter was driven off of the sample when it was heated to 105°C to determine the moisture fraction. Also, the moisture content of these samples may be higher than undisturbed waste due to the foam vapor suppressants sprayed on the waste, which contained large amounts of water."

As shown in Table 1, the EPA report notes that "the raw tar sample contained a high percentage of combustible material, . . . an ash content of less than 2 percent, and a high sulfur content of 10.6 percent" and "raw char has a fairly high ash level of about 55

percent, a sulfur level of 4.5 percent."

## TABLE 1. TRIAL EXCAVATION WASTE SAMPLE ANALYSIS

## PROXIMATE AND ULTIMATE (AS-RECEIVED BASIS)

Ref: EPA, September 1990 (Table 4-16)

| Parameter | Raw tar | Raw char |
|---|---|---|
| Proximate | | |
| Moisture, wt %[a] | 11.6 | 21.2 |
| Volatiles | 69.9 | 20.1 |
| Fixed carbon, wt %[b] | 16.9 | 4.0 |
| Ash, wt % | 1.6 | 54.7 |
| Ultimate | | |
| Carbon, wt % | 51.1 | 8.6 |
| Hydrogen, wt % | 5.4 | 3.7 |
| | (4.1)[c] | (1.3)[c] |
| Sulfur, wt % | 10.6 | 4.5 |
| Nitrogen, wt % | 0.1 | 0.1 |
| Oxygen, wt %[d] | 31.1 | 28.3 |
| | (20.8)[c] | (9.5)[c] |

---

[a] Moisture includes some volatiles lost at 105°C.
[b] Fixed carbon determined by difference in proximate analysis.
[c] Excludes hydrogen and oxygen contained in water.
[d] Oxygen determined by difference in ultimate analysis.

---

The EPA report also provides proximate and ultimate analyses performed on core samples collected from various depths in sump L-4. Results from the proximate analyses further indicate that higher ash contents are found at greater depths within the sumps. For a sample believed to be tar, the ash content was 14.7%. In comparison, two deeper samples believed to be the asphaltic cement had ash contents of 49.4% and 53.8%. Results from the ultimate analyses indicated that total sulfur content ranged from 10.4 to

14.5% for the asphaltic cement and tarry material, respectively. These ar: ses give the total sulfur present but not the form in which the sulfur is combined.

4. Presence of Clay at the McColl Site

Waste from an alkylation unit in a refinery would be expected to contain negligible amounts of ash, which is mineral matter. The one analysis in Table 1 appears to be the best available at present for "raw tar." Particularly noteworthy, however, is that all eight samples of asphaltic cement from the Radian analyses, the raw "char" from the more recent EPA study, and the lower bore samples contained large amounts of ash, averaging in the neighborhood of 50%. This suggests the possibility that substantial amounts of clay were introduced into the waste sumps from the surrounding soil as well as from drilling muds and other sources. Most of the asphaltic cement was probably formed by reactions between the waste and the clay material.

The boring logs prepared by $CH_2M$ Hill in 1987 show that material containing clay was present in all borings of soil near the sumps (LO-SO-01 through LO-SO-09 and RA-SO-01 through RA-SO-07). The soil was described in many cases as clayey silt, silty clay, clayey sand or sandy clay. Radian (Feb. 15, 1983), p. 3-23, gives a diagram of soil textural classes from a book by Hillel, "Soil and Water Physical Principles and Processes," that shows that these definitions mean that the clay content is at least 30%. According to the boring logs, almost without exception, clay was present in the top 15-20 feet of the soil and in many cases also much lower.

Drilling mud consists essentially of bentonite clay which mostly consists of a type

of clay having a chemical structure termed "montmorillonite." Radian (15 b. 1983), p. 2-1, states that in the early to mid-1950's, drilling mud was used to cover sor of the sumps in the Ramparts section while in the late 1950's the western sumps wer overed during the construction of the Los Coyotes golf course. (This cover is described, p. 3-15, as being clayey topsoil). The drilling logs of $CH_2M$ Hill give information on nine boreholes drilled in the Ramparts sumps. These show that drilling muds were disposed of in the R-1, R-2 and R-4 sumps. The $CH_2M$ Hill drilling logs also indicate the presence of clay material above the waste within sumps. The Ecology and Environment report (1991) on the subsurface investigation at sump L-1 indicated significant clay cap material, up to as much as 10 feet in thickness.

Radian (17 Mar., p. 3-15) further quotes a soil survey by Wachtell in 1978. The natural soils in the Ramparts area are described as being primarily clays and clayey loams. From the soil survey, the Los Coyotes area is reported as consisting mostly of a sandy loam with clays possibly occurring along the western edge.

5. Reactions

To obtain an understanding of the probable reactions and changes in composition of the McColl wastes over the last 45 to 50 years requires piecing together data and information from a variety of sources. Several observations and facts are pertinent:

Source of $SO_2$: It is evident that sulfuric acid is slowly reduced to $SO_2$ by organic material in the alkylation waste. Kalichevsky and Stagner (1942), p. 76, give data on the increase in $SO_2$ over a 21-day period in a waste from treatment of cracked gasoline. A

fresh acid waste from refining of heavy oils analyzed 1.37% $SO_2$ and this a ount of $SO_2$ increased as the waste aged (Kalichevsky and Stagner, p. 122). The $H_2SO_4$ he waste at McColl may still be slowly reduced to $SO_2$ by organic material present. Ho ver, $SO_2$ has a considerable solubility in $H_2SO_4$. The $SO_2$ that escapes to the atmosphere hen McColl waste is first exposed probably represents release of entrapped gas and dissolved $SO_2$.

Polymerization and Condensation: The presence of sulfuric acid will catalyze the polymerization and condensation of unsaturated compounds to form higher molecular weight material. These reactions will occur in the absence of air but are accelerated by oxygen (see "Autoxidation" below). The most reactive compounds disappear first so the process as a whole will steadily decrease in rate with time. Some compounds such as saturated hydrocarbons will never polymerize in the absence of oxygen but may become autoxidized or adsorbed onto clay. This explains why tar, which is an intermediate product between the waste and asphaltic cement, still exists within the sumps.

Autoxidation: It has been observed that tar appearing on the surface as tar seeps often hardens rapidly. This is a type of polymerization/condensation which is set off by oxygen and is termed autoxidation. Autoxidation is defined as a spontaneous, self-catalysed oxidation from air and occurs with a large variety of substances. An example of autoxidative polymerization occurring at ambient conditions is the commonly-experienced use of an oil-base paint. Upon exposure to air, the paint thickens and hardens. There are many other examples. The viscosity of a vegetable oil such as linseed oil is increased by blowing with air at moderately elevated temperature.

Similarly the viscosity of asphalt is increased by air blowing (Barth, 1962). Many years ago Kalichevsky and Kobe (p. 107) reported that lubricating oil acid wastes may be allowed to solidify on standing."

A principal purpose of sulfuric acid treatment of petroleum products is to remove components especially susceptible to autoxidative polymerization, since this reaction leads to the formation of insoluble gums in gasoline and distillate fuels and sludges in lubricating oils. The reactions are highly complex but may be divided into two types, dehydropolymerization and polycondensation. The two types may be symbolized in general as:

$$RH + R'H \xrightarrow{O_2} R{\cdot}R' + H_2O \text{ etc.} \qquad (1)$$

$$R(O)H + R'(O)H \dashrightarrow R{\cdot}R' \text{ or } R(O)R' + H_2O \text{ etc.} \qquad (2)$$

Here RH and R'H represent hydrocarbons from which, in an overall sense, hydrogen is removed by oxygen to form $H_2O$, accompanied by combination of the two hydrocarbons to form a larger molecule, R'R'. The process then repeats. R(O)H and R'(O)H represent insertion of oxygen from the air as the first step, followed by elimination of $H_2O$ and condensation. Again, the process repeats to form higher molecular weight products.

Unsaturated bonds, e.g., those in olefinic compounds and aromatics, are particularly susceptible to autoxidation but the degree of reactivity varies greatly with structure. Some sulfur and nitrogen compounds even in small amounts greatly accelerate the oxidation rate (Lundberg, Vol. II, p. 716), while other materials act as inhibitors. Thus the overall oxidative polymerization rate can vary greatly with slight changes in

composition. This explains why one tar seep at McColl may harden rapid. vhile another may remain fairly soft.

The most probable mechanism in dehydropolymerization (reaction 1) ir. ›lves initial reaction with oxygen to form a hydroperoxide which in turn decomposes tc ınitiate a polymerization reaction that proceeds by a free-radical (or ionic) chain mechanism.

In polycondensation (reaction 2) the initial reaction is that of oxygen with the organic to form an acid, alcohol or similar oxygenated structure. These then combine with the release of water. A simple example in commerce is the manufacture of polyester polymers by condensation of a dicarboxylic acid and a dihydroxy alcohol. More information on oxidative polymerizations is given in books by Scott (1965) and a two-volume compilation edited by Lundberg (1962).

Autoxidation would accelerate the conversion of the original waste to a thicker tarry material, but this would depend on the extent to which air could have access to the waste. One can visualize two extremes: (1) Waste was disposed on a rotating basis amongst several sumps, forming a relatively thin layer and with considerable intervals between disposals. This would maximize autoxidation. (2) One sump at a time was filled, reducing the opportunity for autoxidation.

Sludge Asphalts: Some further clues come from scattered information on so-called "sludge asphalts." For many years (e.g., 1910-1950) these were produced from sulfuric acid sludge resulting from treatment of a variety of petroleum products in refineries. A great variety of methods were used to treat the sludge with the objective of producing asphalt of desired physical properties. Samples of six sludge asphalts were

examined by Abraham (Abraham, p. 192). Most of his characterizations a of minor interest here, but he reports that his sludge asphalts had a high sulfur conte: from 5.4 to 8.7 wt%. He also comments that sludge asphalts significantly differ from o r asphalts in having a high percentage of oxygen, but gives no data. He also repor ed that air blowing of sludge asphalts hardens the sludge.

6. What Happens When Clays Contact An Acidic Hydrocarbon Waste?

First and foremost, clayey material at McColl, when contacted with acid waste, was transformed into a solid acid catalyst. This catalyzed polymerization/condensation and simultaneously the products were adsorbed onto the acidic clay, forming an asphaltic cement-like material. The following describes how the solid acids are formed and then how the clayey material could have contacted and converted the waste.

Clays after acid treatment have been used for decolorization of mineral oils since the 1920's and the first petroleum cracking catalysts (early 1930's) were prepared by first treating bentonite clay with sulfuric acid (Ryland et al., p. 14). The reactions of sulfuric acid with a clav are complex, but they involve replacement of exchangeable cations with hydrogen to form so-called acid-clays, together with various degrees of dissolution of the clays and precipitation of new phases. These changes depend on acid concentration, temperature and time of contact.

Clays are hydrated aluminosilicates that exist in a variety of types of structures. Two of the types commonly found are:

Kaolin (ideal) $Al_4Si_4O_{10}(OH)_8 \cdot nH_2O$

Montmorillonite (ideal) $(Al_{3.15}Mg_{0.85})Si_{8.0}O_{20}(OH)_4X_{0.85} \cdot nH_2O$

where X = monovalent cation

Drilling muds consist essentially of bentonite, a montmorillonite type of clay, which swells in water to form a thixotropic gel. The above two types are the "ideal" compositions but in nature impurities may be present.

As an example of the effects of acid treatment, Mills et al. (1950) give detailed information on the degree of removal of various cations from a variety of bentonite clays using 5-20% sulfuric acid at 93°C for times of up to 16 hours, followed by extensive washing. Impurities (Ca, Mg, Fe) in the ideal montmorillonite structure are typically present in the order of 1-4 wt.% each. For a representative case, the percent removal of various ions as reported by Mills et al. was Na, 90%; Ca, 96%; Mg, 60%; Fe, 63%; Al, 47%. In the case where a clay is mixed with McColl acidic waste, clay would be converted into the acidic form by replacement of cations, together with varying degrees of solution of alumina, followed by complex precipitation of hydroxides as pH rose with gradual disappearance of sulfuric acid.

Benesi (1956) prepared samples of hydrogen-exchanged montmorillonite and kaolinite by treatment with an ion-exchange resin in the acid form, so as to avoid the dissolution-precipitation of the clayey material. He reported that the clays had acid strengths, in terms of the Hammett acidity function, Ho, of about -5.6 to -8.2. These were determined by colorimetric indicator methods (see, e.g., Satterfield, 1991) and this acid strength is equivalent to a sulfuric acid concentration of 71 to 90% (Benesi, 1956). The acidified clays can thus catalyse the same polymerization/condensation (and other

reactions) as concentrated sulfuric acid. In addition, these acidified clays a also good adsorbents. The combination leads to the formation of an asphaltic cement-, e material.

Contact of acid waste with clayey material could have occurred at McColl a at least three different ways.

A. The sides of the sumps were sloped. As waste was deposited down the slopes there would have been opportunity for the concentrated acid in the waste to dissolve and/or suspend clayey material. Upon subsequent drop in sulfuric acid concentration by rainwater, reduction to $SO_2$, etc., converted clayey-type material would precipitate and/or coagulate with polymeric carbonaceous material to form an asphaltic cement.

B. In sumps covered with drilling mud or a clay cap, contact of waste and the clayey material could have caused the same processes as in (A) above. The EPA 1990 report in Appendix F (p. F-2) gives the density of raw char as 74 $lb/ft^3$ and raw tar as 33 $lb/ft^3$, as measured in the field by weighing a 5-gallon bucket of waste material. The value for tar seems low, but in any event the density of asphaltic cement would be expected to be greater than that of tar, so it would tend to settle, providing a mechanism for gross mixing when drilling mud was dumped on top of tar in the sumps. The difference in density between the two materials would also explain why the less dense tar material would be found above the much denser asphaltic cement. Small pockets of tar may also exist within the asphaltic cement. These could be due to non-reactive tar trapped within the asphaltic cement matrix, or tar which is only slowly converting to asphaltic cement because of lack of oxygen.

C. Other sumps are presently covered with several feet of soil. Th soil generally appears to contain clayey material that would react as in A and B ove.

As described above, it becomes evident that clays play a key role in co ersion of tar to asphaltic cement. In summary:

A. Clays are converted to the acidic form by sulfuric acid.

B. Acidified clays dissolve/disperse.

C. The converted clays precipitate and/or coagulate as acid concentration drops. Simultaneously, the clays

- catalyze polymerization reactions, and
- adsorb polymeric materials and gradually become inactive as they become coated.

The result is the formation of an asphaltic cement.

8. Can Asphaltic Cement Be Converted into Tar?

Acid catalysts such as sulfuric acid and acidified clay can catalyze a wide variety of reactions of hydrocarbons and other organics. (Satterfield, 1991, Chapter 7; Tanabe, 1970; and other sources): Polymerization and condensation reactions readily occur and the polymeric products are adsorbed onto the clay. As these products accumulate, they surround the clay particles and the clay becomes inactive.

The reactions described here all occur spontaneously at ambient conditions and are mildly exothermic (i.e., give off heat). Likewise the adsorption of waste onto clay is exothermic. Thus the reverse of these reactions cannot occur spontaneously under the

same conditions that drove them forward. To convert an asphaltic cemen nto a tar would require a high temperature pyrolysis (which is endothermic, i.e., soak p heat) or some form of hydrogenation in massive processing equipment. None of these onditions exist at the McColl site.

There is no theory or evidence that asphaltic cement in the McColl sumps will be converted back into tar under the conditions there. Everyday observations and knowledge of reactions occurring with carbonaceous materials indeed all indicate that conversions are in the opposite direction. For example, in mining coal one does not observe tarry material accompanying it, and an asphalt road gradually becomes harder rather than softer with time.

## References


1. Abraham, H., "Asphalts and Allied Substances," 6th ed., 5 volumes, van . strand, 1960.
2. Barth, E.J., "Asphalt: Science and Technology," Gordon and Breach, 1962.
3. Benesi, H., J. Am. Chem. Soc., 78, 5490 (1956).
4. Ecology and Environment, Inc., Report to the EPA dated February 20, 1991.
5. EPA Technology Evaluation Report, Pre-Publication Report, September, 1990. Section 4.7.
6. Kalichevsky, V.A. and Stagner, B.A., "Chemical Refining of Petroleum," Reinhold, 1942.
7. Kalichevsky, V.A. and Kobe, K.A. "Petroleum Refining with Chemicals," Elsevier, 1956.
8. Lundberg, W.O., ed., "Autoxidation and Antioxidants," 2 vol. Wiley, 1962.
9. Mills, G.A., Holmes, J., and Cornelius, E.B., J. Phys. Colloid Chem., 54, 1170 (1950).
10. Putney, D.H., "Sulfuric Acid Alkylation of Paraffins," in "Advances in Petroleum Chemistry and Refining," K.A. Kobe and J.J. McKetta, Jr., eds., Vol. II. 1959, p. 313.
11. Radian Report DCN 83-211-078-01-01, Technical Memorandum, 4 February 1983.
12. Radian Report DCN 83-211-078-01-03, Tech. Memorandum, 15 February 1983.
13. Radian Report DCN 211-078-04-01, Tech. Memorandum, 23 February 1983.
14. Radian Report DCN 83-211-078-01-01, Tech. Memorandum, 17 March 1983.

15. Radian, Final Report, June 1983.

16. Ryland, L.B., Tamele, M.W., and Wilson, J.N., in "Catalysis," P.H. Emmet, ed., Vol. 7, p. 1 (1960).

17. Satterfield, C.N., "Heterogeneous Catalysis in Industrial Practice," 2nd ed., McGraw-Hill, Chapter 7, 1991.

18. Scott, G., "Atmospheric Oxidation and Antioxidants," Elsevier, 1965.

19. Tanabe, K., "Solid Acids and Bases: Their Catalytic Properties," Kodansha (Tokyo), Academic, 1970.

# APPENDIX J

## Shroud System Configuration Development Task, Summary Report, Subtask 2, Technical Considerations for Developing Shroud System Configuration (Draft)

# SHROUD SYSTEM CONFIGURATION DEVELOPMENT TASK

## SUMMARY REPORT
## SUBTASK 2

## TECHNICAL CONSIDERATIONS FOR DEVELOPING SHROUD SYSTEM CONFIGURATION
## (DRAFT)

MCCOLL SUPERFUND SITE

August, 1992

# TABLE OF CONTENTS


PAGE NO.

1.0 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1

1.1 Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
1.2 Background . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
1.3 Summary of Conclusions . . . . . . . . . . . . . . . . . . . . 1-2

2.0 SITE CONDITIONS RELEVANT TO THE EVALUATION AND DEVELOPMENT OF A SHROUD SYSTEM . . . . . . . . . . . . . . . . 2-1

2.1 Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1

2.1.1 Shroud System Function and Emission Source . . . . . . . . . 2-1
2.1.2 Emission Rates . . . . . . . . . . . . . . . . . . . . . . . 2-1
2.1.3 Ground Seal . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
2.1.4 Auger Shaft Seal . . . . . . . . . . . . . . . . . . . . . . 2-7
2.1.5 Air Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-8
2.1.6 Performance Requirements . . . . . . . . . . . . . . . . . . 2-8

2.2 Boring/Mixing Equipment Interface . . . . . . . . . . . . . . . 2-8

2.2.1 Auger Size and Configuration . . . . . . . . . . . . . . . . 2-8
2.2.2 Auger Cleaning . . . . . . . . . . . . . . . . . . . . . . . . 2-9
2.2.3 Use of Liquids in Mixing Process . . . . . . . . . . . . . . 2-9
2.2.4 Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-9
2.2.5 Movement During Processing . . . . . . . . . . . . . . . . . 2-9

2.3 Swell Interface . . . . . . . . . . . . . . . . . . . . . . . . . 2-10

2.3.1 Quantity and Characteristics . . . . . . . . . . . . . . . . . 2-10
2.3.2 Handling and Retention . . . . . . . . . . . . . . . . . . . 2-11

3.0 CRITERIA AND BASIS FOR SHROUD CONFIGURATION . . . . . . . 3-1

3.1 Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1

3.1.1 Functional Requirements . . . . . . . . . . . . . . . . . . . 3-1
3.1.2 Emission Sources and Rates . . . . . . . . . . . . . . . . . 3-1
3.1.3 Ground Seal . . . . . . . . . . . . . . . . . . . . . . . . . 3-2
3.1.4 Auger Shaft Seal . . . . . . . . . . . . . . . . . . . . . . 3-2
3.1.5 Air Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4
3.1.6 Performance Requirements . . . . . . . . . . . . . . . . . . 3-4

TABLE OF CONTENTS
(Continued)

PAGE NO.

3.2 Mixing/Boring Equipment Interface . . . . . . . . . . . . . . . . . . . . 3-5
3.3 Swell Interface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5
3.4 Health and Safety Requirements . . . . . . . . . . . . . . . . . . . . . . 3-6

4.0 ADDITIONAL TECHNICAL AND ENGINEERING CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1

4.1 Technical and Engineering Considerations . . . . . . . . . . . . . . . . 4-1

4.1.1 Swell Containment and Removal Mechanisms . . . . . . . . . 4-1
4.1.2 Swell Emissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
4.1.3 Auger Cleaning and Personnel Access . . . . . . . . . . . . . 4-1
4.1.4 Ground Seal and Auger Seals . . . . . . . . . . . . . . . . . . . 4-1
4.1.5 Tertiary Containment Systems . . . . . . . . . . . . . . . . . . . 4-2
4.1.6 Materials of Construction . . . . . . . . . . . . . . . . . . . . . . 4-2

APPENDIX A ESTIMATED EMISSION RATES DURING SOLIDIFICATION

# LIST OF TABLES AND FIGURES

PAGE NO.

Table 2.1
Technical Considerations for Developing Shroud System Configuration - McColl Site . . . . . . . . . . 2-2

Table 3.1
Estimated Emission Factors . . . . . . . . . . 3-3

# 1.0 INTRODUCTION

## 1.1 Purpose

1. The purpose of Subtask 2 was to identify and evaluate relevant site conditions, technical criteria and rationale for the development of an emissions collection shroud. The goal of this subtask was to identify site conditions which affect shroud design and operating characteristics. Based on these considerations, the criteria and basis for developing a preliminary shroud configuration and operating strategy are to be developed. In addition, technical and engineering considerations which require additional evaluation prior to design in Subtask 3 were identified, including those considerations which may ultimately prevent implementation of some remedial alternatives which rely on a shroud system.

## 1.2 Background

1. The use of a shroud system to collect the emissions generated by in situ solidification was initially proposed by the McColl Site Group[1] (MSG) in the "Selective Excavation Plan".[2] The proposed shroud system consisted of the following major components:

   - A "primary" shroud to contain emissions from the area being solidified.
   - A larger "secondary" shroud which would cover the primary shroud, thereby increasing the degree of emission collection efficiency.

2. Since that time, EPA has proposed the use of a shroud in the following alternatives considered in the SROA II:

   - Full In Situ Solidification
   - Soft Material Solidification
   - Selective In Situ Solidification Without Waste Excavation

3. This report contains the results of a collaborative effort (referred to as the Shroud System Configuration Development Task) by the California Department of Toxic Substances (DTSC) and the MSG. The purpose of this effort was to further examine if and how the shroud would contain air emissions produced during in-situ solidification. The task was divided into the following three subtasks:

---

[1] The McColl Site Group is composed of Shell Oil Company, Atlantic Richfield Company, Phillips Petroleum Company, Union Oil Company of California, and Texaco Refining and Marketing, Inc.

[2] McColl Superfund Site Selective Excavation, Treatment and RCRA Equivalent Closure Report, dated February 12, 1991, prepared by Environmental Solutions, Inc. and Environ, for the MSG.

- Subtask 1: Literature Survey
- Subtask 2: Comparison of Existing Technology with McColl Site Conditions
- Subtask 3: Shroud System Preliminary Configuration

4. The Shroud System Configuration Development Task - Summary Report (Subtask 1, Literature Survey, July 1, 1992), containing a summary of the literature survey, has already been issued.

### 1.3 Summary of Conclusions

1. In the evaluation of the Technical Considerations and the Shroud Configuration Development Criteria, a number of important design issues were identified which will significantly affect the configuration of the emissions collection shroud, and which may, ultimately, prevent use of a shroud for some remedial alternatives. These areas are:

   - Emissions
   - Boring and Mixing Equipment
   - Swell Material

2. In the evaluation of emissions and their potential effects on configuration design, the following issues were identified which may, depending on the remedial alternative selected, affect the design of the shroud:

   - An effective ground seal is required to prevent emissions. Factors which significantly affect the integrity of the ground seal and the performance of the shroud include the size of the shroud, the volume of swell generated, and emissions. The volume of swell generated, and the complexity associated with both containing the swell and controlling the emissions associated with waste treatment, have a major impact on the ability to successfully operate the shroud especially as the areal extent and depth of waste/disturbance are increased. A shroud would need to be designed to contain the swell, the normal emissions, and the transient emissions, a difficult, if not impossible, proposition.

   - The shroud and emissions collection system must perform their function during both normal in-process emissions and transient emissions of steam, $SO_2$, hydrocarbons and steam which will be released during neutralization and solidification. $SO_2$ and THC emissions depend on the amount of waste disturbed and the rate of disturbance. As much as 2,800 grams of $SO_2$ per cubic yard of waste neutralized/solidified is expected to be released. In contrast to $SO_2$ emissions, THC emissions are produced during waste disturbance and by volatilization, which is enhanced by the elevated temperatures reached during neutralization/solidification. The estimated THC release is approximately 5,000 to 6,000 grams per cubic yard treated. Calculation of transient emissions indicates that

neutralization of pH -0.2 waste will generate approximately 1,400 cubic feet per minute of steam pockets which will contain puffs of $SO_2$ and other gaseous emissions. The time required for the steam to rise to the surface of the borehole is a critical factor in defining the shroud configuration. Neutralization/stabilization of the wastes down to, and including, the tarry wastes, have low potential to create significant transient emissions because of the ability to mix less acidic waste with more acidic waste. The potential for transient emissions rises dramatically as the asphaltic cement is penetrated and the potential for encountering highly acidic waste pockets increases. In addition, as the depth of treatment increases, the transient release is expected to become particularly violent due to increasing pressure. The shroud design must be able to contain any transient off gas bursts.

3. The selection and design of the boring/mixing equipment will affect the shroud design. These effects include:

   - The auger size and auger configuration will impact shroud dimensions, as will the proposed remedy and the depth of treatment.

   - The shroud design must reflect the weight and size limitations imposed by the currently available auger/crane units. The maximum shroud height and diameter is approximately 22 feet and 28 feet respectively, and maximum weight is 15,000 pounds. This will restrict the potential materials of construction and the volume of swell the shroud will be able to contain.

4. The volume of swell generated in the in-situ solidification process will have a major impact on shroud configuration. The swell volume will be a function of the swell factor (based on the volume of reagents added), and the depth to which the solidification is performed. The effects of swell volume on the shroud configuration include:

   - Using a 45 percent swell factor, the volume of swell from each 5-foot diameter borehole can range from 4.9 $yd^3$ to 18.0 $yd^3$ for solidification of 15 feet and 55 feet, respectively. The volume of swell generated by full–depth solidification will not be containable within the shroud, and will create swell management problems each time the shroud needs to be moved. The problems are aggravated as the depth and volume are increased. Balancing the shroud size, weight, strength, and materials of construction against the volume of swell and emissions may make certain remedial options non-viable.

# 2.0 SITE CONDITIONS RELEVANT TO THE EVALUATION AND DEVELOPMENT OF A SHROUD SYSTEM

1. The development of the shroud system configuration must consider the impact of the various waste types. In this section, the relevant McColl site conditions have been evaluated against the major technical considerations identified. The major technical considerations have been divided into three general categories: (1) emissions, (2) boring/mixing equipment interface, and (3) swell interface. Table 2.1 summarizes the impact of the four major waste types on the technical assumptions used in developing the shroud system. The remainder of this section contains further discussion of the various technical considerations. Figure 2.1 provides a schematic representation of the shroud unit and the relationship of a number of design elements.

2. Based on the discussions in this section, a set of preliminary criteria for evaluating and developing a shroud system is presented in Section 3.0 of this report.

## 2.1 Emissions

### 2.1.1 Shroud System Function and Emission Source

1. The primary function of a shroud would be to collect gaseous emissions during and after in-situ treatment of the McColl waste. The emission sources considered in this subtask include the four waste types, and the swell materials produced by the mixing of the wastes and the solidification reagents. These swell materials would consist of solids, slurries and/or liquids, and would contain some level of wastes and constituents of concern.

### 2.1.2 Emission Rates

1. Emission rates would be expected to vary during and after treatment. Initially, emissions would be expected to be produced by: (1) the disturbance of the wastes, and (2) increasing temperatures caused by the neutralization of the acidic materials. Neutralizing pockets of highly acidic waste would generate steam which would contain significant levels of $SO_2$ and other gaseous emissions. The generated steam could be trapped in the borehole and be released when sufficient pressure buildup occurs. A sudden and potentially explosive release of steam and other gases could, depending on volume and pressure, overwhelm the ability of the emissions control system to contain the emissions. In a severe event, this could lead to a loss of containment and an emissions release to the environment at levels high enough to constitute a short-term hazard to workers and the community.

Table 2.1
Technical Considerations for Developing Shroud System Configuration - McColl Site



| DESIGN CONSIDERATIONS | IMPACT OF SITE-SPECIFIC CONDITIONS | | | |
|---|---|---|---|---|
| | ARSENIC-CONTAMINATED MATERIAL(1) | DRILLING MUD(1) | TARRY WASTE | ASPHALTIC MATERIAL |
| SWELL INTERFACE QUANTITY AND CHARACTERISTICS<br>• Solids<br>• Slurry<br>• Liquids<br>• Effect of swell temperature and corrosivity on shroud and auger material of construction. | • Reagent formulations and mixing process will determine the swell characteristics | • Reagent formulations and mixing process will determine the swell characteristics. | • Reagent formulations and mixing process will be needed.<br>• Swell is directly proportional to the volume of reagents required to achieve stabilization.<br>• Due to density difference, untreated waste will be brought to surface. | • Reagent formulations and mixing process will be needed.<br>• Swell volume will be proportional to the volume of reagents added.<br>• Use of liquids during drilling to improve mixing will increase liquid volume of swell.<br>• Swell will increase in volume due to solids expansion during drilling.<br>• Due to density difference, untreated waste will be brought to surface. |
| HANDLING AND RETENTION:<br>• Solids<br>• Slurry<br>• Liquids | • Special safety provisions needed to prevent particulate emissions. | None | • High potential for tarry material rising to the surface. | • Due to the depth of each pass, allowances have to be made for a large volume of swell material.<br>• High potential for untreated solids to reach surface. |
| EMISSIONS<br>SHROUD SYSTEM FUNCTION:<br>• Collect emissions during and after treatment. | • Primary function is dust control. | • Due to lower potential emissions, it has a lesser impact on shroud function. | • Contains waste and constituents of primary concern.<br>• Potential for high emissions during treatment and during curing after treatment. | • Contains waste and constituents of primary concern.<br>• Potential for high emissions during treatment and during curing after treatment. |
| EMISSION SOURCE<br>• Swell Source<br>• Swell Slurry<br>• Swell Liquids<br>• Waste Layers | • Reagent formulation and mixing process impact source. | None | • Reagent formulation and mixing process impact source.<br>• Continued emissions after treatment will impact emissions control systems. | • Reagent formulation and mixing process impact source.<br>• Continued emissions after treatment will impact emissions control systems.<br>• Large volume of swell increases emission source volume. |

(1) Arsenic and drilling muds may not be found in a waste free form, and may be mixed with tarry or asphaltic materials. Mixed arsenic waste or drilling muds are considered as part of the tarry waste or asphaltic material for purposes of this evaluation.



DRAFT, 8/13/92

Table 2.1
Technical Considerations for Developing Shroud System Configuration - McColl Site
(Continued)



| DESIGN CONSIDERATIONS | IMPACT OF SITE-SPECIFIC CONDITIONS | | | |
|---|---|---|---|---|
| | ARSENIC-CONTAMINATED MATERIAL(1) | DRILLING MUD(1) | TARRY WASTE | ASPHALTIC MATERIAL |
| EMISSIONS (Cont'd)<br>EMISSION RATE:<br>• During Treatment<br>• Maximum Emission<br>• Post-operation | • Reagent formulation and boring/mixing equipment impact emission rate. | None | • Reagent formulation and boring/mixing equipment impact emissions rate.<br>• Low pH may increase emission rates due to heat of neutralization. | • Reagent formulation and boring/mixing equipment impact emission rate<br>• Higher potential for maximum emissions due to greater depth and the potential for trapping the emissions.<br>• Lower pH of asphaltic materials and inability to mix with other materials increases potential problems due to heat of neutralization.<br>• Large volume of material treated increases duration of post-operation emissions. |
| GROUND SEAL:<br>• Effect of site topography variations.<br>• Maintaining seal/potential leakages during treatment and shroud movement.<br>• Interface with tertiary shroud. | • Requires control of particulate emissions. | None | • Requires a highly leak-tight design.<br>• Swell volume will reduce effectiveness of ground seal.<br>• Liquid nature of the swell may reduce effectiveness of ground seal. | • Requires a highly leak-tight design.<br>• Large swell volumes will significantly reduce the effectiveness of the ground seal and may prevent shroud use altogether.<br>• Liquid nature of the swell may reduce effectiveness of ground seal. |

(1) Arsenic and drilling muds may not be found in a waste free form, and may be mixed with tarry or asphaltic materials. Mixed arsenic waste or drilling muds are considered as part of the tarry waste or asphaltic material for purposes of this evaluation.

# Table 2.1
## Technical Considerations for Developing Shroud System Configuration - McColl Site (Continued)



| DESIGN CONSIDERATIONS | IMPACT OF SITE-SPECIFIC CONDITIONS | | | |
|---|---|---|---|---|
| | ARSENIC-CONTAMINATED MATERIAL(1) | DRILLING MUD(1) | TARRY WASTE | ASPHALTIC MATERIAL |
| EMISSIONS (Cont'd)<br>AIR FLOW:<br>• Auger annulus conduction.<br>• Treatment system interface.<br>• Potential shaft and ground seal leakages.<br>• Temperature induced puffs.<br>• Normal and maximum emission rates.<br>• Performance requirements. | None | None | • Air flow would need to be sufficient to remove contaminants and transient steam emissions.<br>• Auger annulus would be the primary emissions pathway, which may be subject to potential plugging, creating potentially hazardous conditions. | • Air flow would need to be sufficient to remove contaminants and to remove transient emissions.<br>• Auger annulus would be the primary emissions pathway, which may be subject to potential plugging due to large swell volume, creating potentially hazardous conditions. |
| PERFORMANCE REQUIREMENTS:<br>• Fence line limits.<br>• Treatment system efficiency.<br>• Reliability during normal and unexpected conditions. | • High reliability factor is needed for control of dusts(2). | | • High reliability factor is needed for control of emissions(2) during normal and transient conditions. | • Must allow for increased auger failure and replacement during drilling operations.<br>• High reliability factor is needed for control of emissions(2) during normal and transient conditions. |
| BORING/MIXING EQUIPMENT INTERFACE<br>• Size/configuration of Shroud due to mixing element design(3) | • Single auger (large diameter) with short mixing head may be adequate. | • Single auger (large diameter) with short mixing head may be adequate. | • Single auger (large diameter) with short mixing head may be adequate. However, multiple augers may be necessary to mix the tar, given its consistency. | • Double auger (small diameter) with long mixing head may be needed.<br>• Auger head will likely have to be changed when reaching this layer, due to the need to grind the asphaltic material into small pieces, in comparison to the mixing required for the tarry layer. |

(1) Arsenic and drilling muds may not be found in a waste free form, and may be mixed with tarry or asphaltic materials. Mixed arsenic waste or drilling muds are considered as part of the tarry waste or asphaltic material for purposes of this evaluation.

(2) Required reliability factors are to be determined as part of this study. However, a safety factor of at least 2 is generally used in studies of this type.

(3) Auger selection is based on the combined requirements determined by the type of material to be augured, the treatment and potential emissions rates. Soft materials such as drilling muds may be solidified using a large diameter auger. Harder materials, such as the asphaltic cement or materials which may need greater mixing capability, may require small diameter and multiple augers.

Table 2.1
Technical Considerations for Developing Shroud System Configuration - McColl Site
(Continued)



| DESIGN CONSIDERATIONS | IMPACT OF SITE-SPECIFIC CONDITIONS: ARSENIC-CONTAMINATED MATERIAL(1) | DRILLING MUD(1) | TARRY WASTE | ASPHALTIC MATERIAL |
|---|---|---|---|---|
| BORING/MIXING EQUIPMENT INTERFACE (Cont'd)<br>AUGER CLEANING:<br>· Cleaning method<br>· Cleaning agents<br>· Secondary waste handling | · Reliable means for retaining and handling secondary waste. | None | · Removal of tarry material would require special cleaning solutions or equipment. | · Removal of tarry and asphaltic materials would require special cleaning solutions or equipment.<br>· Removal or cleaning of swell would be a problem. |
| USE OF LIQUID DURING DOWNWARD INSERTION OF AUGER | · May not be required. | · May not be required. | · May not be required. | · Large volume would likely be required to improve neutralization, mixing, and temperature control; increases swell and handling problems. |
| ACCESS DURING:<br>· Unexpected conditions<br>· Personnel entry<br>· Machinery entry | · Special safety provisions would be needed. | None | · Special safety provisions would be needed. | · Special safety provisions would be needed.<br>· Large volume of swell would complicate access.<br>· Auger replacement would require special access considerations. |
| MOVEMENT FROM ONE BOREHOLE TO ANOTHER:<br>· Maintaining seals at auger shaft and ground interface. | None | None | None | · With increasing depth, movement from one borehole to another would increase in difficulty because of continued offgasing and large swell volumes. |

(1) Arsenic and drilling muds may not be found in a waste free form, and may be mixed with tarry or asphaltic materials. Mixed arsenic waste or drilling muds are considered as part of the tarry waste or asphaltic material for purposes of this evaluation.

90-336RLS-02 REV 07/30/92




FIGURE 2.1

**TASK 2**
**SCHEMATIC OF**
**SHROUD TECHNICAL CONSIDERATIONS**

McCOLL SITE GROUP

**ENVIRONMENTAL SOLUTIONS, INC.**

**DRAFT**

2. The maximum transient emission rate is based on 1) the potential for large "puff" emissions to occur due to the disturbance of the waste and penetration into gas pockets and 2) the emissions generated by high neutralization temperatures. It is necessary to design the shroud to be able to contain the peak emission rate and to prevent a build-up of pressure and contaminants within the shroud which could disrupt the soil/shroud seal or the auger/shroud seal and could release emissions to the surrounding area, a very difficult, if not impossible, proposition. Further, a build-up of contaminants within the shroud may cause the emissions to exceed the design of the emission treatment system, potentially releasing contaminants into the environment, which could constitute a short-term hazard to workers and the community.

### 2.1.3 Ground Seal

1. The seal of the shroud to the ground surface must be considered as part of the overall design. The shroud/ground seal must be effective in containing emissions within the shroud. The shroud must be designed to adjust for variations in site topography and to prevent leaks during treatment and shroud movement. Further, due to the expected volumes of swell generated by the solidification process, and the potential for high emission rates, a build-up in pressure within the shroud could force swell materials out of the shroud, disrupting the ground seal, and releasing emissions to the environment or carrying swell material into the emission treatment system. Based on the potential for leakage at the shroud/ground interface, a highly reliable ground seal, capable of withstanding the expected pressures and swell volumes, would need to be developed, a very difficult, if not impossible, proposition.

2. Potential ground seal designs include a knife-edge type seal which can be pressed into the soil, 2 to 6 inches to create a seal, as presented in the Selective Excavation Plan. Other potential designs include the use of plastic flaps/drapes around the shroud, as presented in the SROA II, or the use of interlocking rods which may act as a skirt/seal around the shroud. Given the expected fluidity of the swell material, the use of any non-rigid ground seal is highly questionable.

### 2.1.4 Auger Shaft Seal

1. To contain emissions within the shroud, a seal must be designed to prevent emissions from escaping around the auger shaft/shroud interface. In the design of the auger/shroud seal, a number of factors affect the design. These factors include:

- Vertical shaft movement during augering and mixing.
- Lateral movement due to shaft wobble.
- Vibration of the auger unit.
- Rotation forces around the shaft.
- Waste material filling the shroud and riding up the shaft.

### 2.1.5 Air Flow

1. Control of contaminant flow is critical in removing contaminants from the shroud and transporting them to the air treatment system. The system must be designed to compensate for air leaks in the shroud, which are expected to occur at the auger shaft and ground interfaces. Air leakage is related to the concentration of contaminants within the shroud and to the volume of the shroud. As swell increases and the shroud volume decrease, the air flow rate must be altered to maintain sufficient surge volume to handle both normal emissions rates as well as the transient emissions rate previously discussed in Section 2.1.2. Because of the small surge capacity and the broad range of emission generation, air flow control may not be guaranteed at commercially practical stabilization rates. Further, air-flow control will be an integral role in controlling temperatures within the shroud.

### 2.1.6 Performance Requirements

1. Performance requirements for the shroud system must be based on the allowable emissions levels, which are the sum of the emissions from the shroud, off-gassing of treated materials, the efficiency of the air treatment system, and the reliability or safety factor required to account for unexpected occurrences. Performance must also be based on maintaining the concentration of volatile gases in the shroud below the lower explosive limits. Based on these factors, an overall performance requirement for the shroud must be developed which will protect the community, site workers and the environment. The development of emissions performance requirements will be discussed further in Section 3.0.

## 2.2 Boring/Mixing Equipment Interface

### 2.2.1 Auger Size and Configuration

1. The selection of the auger size and configuration will have a significant effect on the shroud design. Depending on the auger selection, the shroud size, the material of construction and other factors will be affected. The selection of the auger size must be based primarily on the ability of the auger to penetrate the various waste types and to effectively mix the neutralizing and stabilizing agents with the wastes.

2. For purposes of this study, it has been assumed that a single, large auger (4 to 8 feet in diameter) will be capable of solidifying arsenic containing soils and drilling mud. A smaller–diameter auger, or a multiple-auger system, may be required to effectively mix the tarry materials with the solidifying agents, due to their tar-like consistency. The use of a small–diameter auger is assumed for the asphaltic material, based on the need for higher torque to penetrate the asphaltic material. Notwithstanding the use of a smaller auger, it may prove difficult to penetrate the asphaltic material due to its hard nature and to reduce the particle

size of the asphalt to a size consistent with solidification, mass transfer and the mixing process.

3. The number and size of the augers will have an impact on the shroud design, including such features as the shape of the shroud, design of the auger shaft seal, the rate at which the auger penetrates and mixes, and the rate of emissions, which in turn affects the emission handling system. All of these factors will influence shroud selection and operation and will impact the viability of the various options.

### 2.2.2 Auger Cleaning

1. In the design of the shroud, provisions must be made to allow cleaning of the augers and shaft. The requirements for cleaning should be based on levels of cleaning that sufficiently achieve decontamination to allow access for maintenance or repair. The shroud design must therefore allow for a cleaning mechanism, which may include physical cleaning methods such as scraping or the use of cleaning agents. The shroud design must include a mechanism or process to handle the cleaning residual or secondary wastes. The cleaning process must account for handling untreated or partially treated waste. Handling of tarry material also must be considered since this material may still have the consistency of a sticky tar or paste, which may be difficult to physically or chemically remove.

### 2.2.3 Use of Liquids in Mixing Process

1. During the mixing process, the neutralization/stabilization agents may be added as a slurry or powder through the auger stem. Dry agents (powders) can generally only be pneumatically delivered to a depth of 10 feet. Depending on the consistency of the waste, the reagents and the resulting mixture, additional liquid will be required to facilitate mixing and neutralization/solidification especially at depths greater than 10 feet. The use of additional liquids will increase the swell volume, and will alter its characteristics by making it more liquid in nature, requiring additional evaluation to manage the resulting swell. Further, the use of liquids while helping to control maximum temperatures will increase the levels of steam generated during the neutralization process and, consequently, the potential for pressure buildups during processing. These problems which already tend to increase with treatment depth would be compounded.

### 2.2.4 Access

1. In the design of the shroud unit, access to the interior of the shroud must be allowed for repairs and maintenance. The shroud design would have to allow for personnel to safely and efficiently move in and out of the shroud.

### 2.2.5 Movement During Processing

1. During operation, the auger/shroud unit must be able to move from one borehole to another to maintain efficient processing. To allow movement from one borehole to another, the integrity of the auger/shroud seal must be maintained to prevent emissions from the shroud. Movement must allow for the release of swell from within the shroud while maintaining the connection between the shroud and the air treatment system. Although the bulk of the emissions are expected upon disturbance of the waste (the "puff" phenomenon), there will be longer term emissions that must be controlled as the treated waste solidifies. Depending on the type and volume of reagents and the amount of water added to the waste, "curing" of the solidified material may take several days at the surface and even longer at depth. The swell material at the surface will continue to have some level of emissions until it is "cured". This will affect the duration of the remediation. Once again, the greater the amount of waste that is disturbed, the greater the potential for long-term emissions.

## 2.3 Swell Interface

### 2.3.1 Quantity and Characteristics

1. In the design of the shroud, the quantity and characteristics of the swell materials will significantly affect the design. In the neutralization/solidification process, the reagents will determine the final treated waste characteristics. These characteristics can range from solids to slurry to liquids, depending on the mixture and the volume of liquid added to facilitate mixing and the ability of the auger to break up the waste.

2. The overall volume of swell will be a function of the neutralization/solidification mixture required to achieve the required characteristics, and the depth or volume of waste treated. As the volume of waste treated increases with increasing depth, the amount of swell generated will also increase. In the SROA II, the estimated swell volume is reported to range from 10 to 30 percent. Based on the assumption that the reagent formulation consists of 20 percent water, 10 percent lime, 10 percent Portland cement and five percent organophilic clay, the total swell volume would be at least 45 percent. The SROA II proposes a two step process. The first step would be to neutralize all the sumps. The second step would be solidification. In this two step process, the shroud would need to handle approximately one-half the total swell per step. Because the shroud must be able to handle a reasonable worst-case scenario, 45 percent swell from a single step process will be used as the estimated swell factor in this report.

3. Assuming a 5-foot diameter auger and a swell factor of 45 percent, the volume of swell would range from 4.9 $yd^3$ (132 $ft^3$) to 18.0 $yd^3$ (485.5 $ft^3$) for stabilization to a depth of 15 feet and 55 feet, respectively. Since the primary shroud must contain all of the swell volume brought to the surface, the depth of swell material within the shroud could become significant and hamper processing operations. The potential depths of swell within the primary shroud are

graphically shown in Figure 2.2 for primary shroud diameters of 7, 10, 14 and 28 feet.

4. The potential volume of swell will significantly affect the process selected to collect and handle the swell, emissions collection, as well as the shroud design. As the volume of swell increases, the ability of the shroud to contain both the swell and the emissions is compromised.

**2.3.2 Handling and Retention**

1. As discussed above, the shroud design would be required to include a system to retain and handle the swell volume generated during the treatment process. As part of this retention and handling system, the large volume of swell potentially generated would need to be collected for further treatment (if treatment is required), for disposal, or for forming within the shroud. Due to density difference between the reagents and the wastes, a potential exists for untreated materials to rise to the surface during processing, which may require further treatment and add to emissions, or may restrict final disposal.

2. When the shroud is lifted, liquid swell materials will flow out from the shroud, creating potential emissions from continued off-gassing of untreated waste materials. This liquid material will be difficult to manage and make working conditions more difficult.

90-336 TCSC REV 8/3/92




P.S.D. = PRIMARY SHROUD DIAMETER

FIGURE 2.2

**ESTIMATED SWELL HEIGHT 45%**

McCOLL SITE
FULLERTON, CALIFORNIA

ENVIRONMENTAL SOLUTIONS, INC.

**DRAFT**

# 3.0 CRITERIA AND BASIS FOR SHROUD CONFIGURATION

1. Based on the foregoing analysis, This section describes the criteria and basis for developing and evaluating a preliminary configuration for a shroud system to be used during the in situ stabilization operations at the McColl Superfund Site. The shroud system consists of gaseous emission collection enclosures and accessories required to perform the specified functions.

## 3.1 Emissions

### 3.1.1 Functional Requirements

1. The primary function of the shroud system would be to contain and collect emissions released during the disturbance and in-situ neutralization/stabilization of the waste. Emissions collected by the shroud system would need to be removed and treated by an air filtration/treatment system.

2. The shroud system would need to be able to perform its function during the normal, transient, and post–operation gaseous emissions, as specified below.

3. The shroud system function includes a primary enclosure and a secondary enclosure, the purpose of which would be to confine the waste disturbed during the boring and mixing operations, including any swell material, which may consist of solids, slurry, and liquids.

### 3.1.2 Emission Sources and Rates

1. Emissions to be collected by the shroud system include normal, transient and post-operation emissions. The shroud system must be designed to capture the peak emissions.

2. Waste consists of four general types: arsenic contaminated material, drilling mud, tarry waste, and asphaltic cement material. The waste is located within 12 sumps and is covered by a cap consisting of approximately 1 to 8 feet of soil (refer to McColl Site reference documents for physical and chemical properties of the waste). The tarry waste and the asphaltic cement material are the source of $SO_2$ and volatile organic compounds (e.g,. THC) emissions.

3. When the waste is disturbed, large volumes of $SO_2$ and THC are released. Since volatilization of volatile organic compounds is increased at elevated temperatures, THC emissions are further increased as elevated temperatures are reached during the neutralization/solidification process. Projected bulk emission factors for $SO_2$ and THC, expressed as grams per cubic yard of waste neutralized/solidified, are shown in Table 3.1. These values represent the estimated peak emission factors associated with the different waste types.

4. Additionally, it is anticipated that the neutralization heat generated by adding reagents to highly acidic wastes could result in formation of a steam pocket in the borehole. After accumulation and pressure build-up, the steam pocket would travel to the borehole surface and erupt into the shroud. The volume of the steam discharged into the shroud during a transient condition is calculated to be approximately 1,400 cubic feet in a one minute period. For a 55-foot deep borehole, at least two such transient emissions (puffs) are anticipated. These will be puff–type emissions which will release steam, $SO_2$ and hydrocarbons. For design purposes, the steam volume should be increased by at least a factor of 2.0 to allow for safety.

5. Due to the heat of hydration and off-gassing from the disturbed waste, emissions from exposed waste are expected to continue well after the stabilization operation is completed. The shroud system must ensure these emissions are captured. An estimate of the post-operation emission rate must be developed during the shroud system configuration development subtask.

6. The shroud system must include all instrumentation and other features needed to monitor gaseous emissions and control the process in a manner that gaseous concentrations and gas pressures inside the shroud are within a safe range.

### 3.1.3 Ground Seal

1. The shroud system ground seal must maintain gaseous emission leakages to the levels specified by the performance criteria (see Section 3.1.6).

2. The seal must be compatible with the site topography.

3. During the movement of the shroud from one borehole to another, the ground seal integrity must be maintained while the shroud system function is being transferred to the tertiary shroud.

### 3.1.4 Auger Shaft Seal

1. The shroud system seal with the boring/mixing equipment shaft must maintain gaseous emission leakages to the levels given by the performance criteria (see Section 3.1.6). The seal must be compatible with the boring/mixing equipment described in Section 3.3.

2. Seal material must be compatible with the high temperature and low pH environment inside the shroud.

Table 3.1
Estimated Emission Factors

| WASTE | SULFUR DIOXIDE (g/bcy) | VOLATILE ORGANIC COMPOUNDS (g/bcy) | OTHER COMPOUNDS (g/bcy) |
|---|---|---|---|
| Arsenic Contaminated Material | (1) | (1) | (1) |
| Drilling Mud | (1) | (1) | (1) |
| Tarry Waste | 220 | 6,000 | (1) |
| Asphaltic Cement Material | 2,800 | 5,500 | (1) |

(1) Emission concentrations to be determined and used for the final shroud system configuration. For the preliminary configuration efforts, it is assumed that $SO_2$ concentrations for tarry waste and asphaltic material layers would be the controlling criteria. However, odor from thiophenes, which are not life threatening, would also affect the shroud configuration development.

### 3.1.5 Air Flow

1. The shroud system enclosures must have negative air pressure with respect to the ambient conditions.

2. The flow of air must be from the least contaminated to the highest contaminated zone (i.e., from ambient to the secondary enclosure, and from the secondary to the primary enclosure).

3. The shape of the shroud system enclosures must allow for minimal air pockets and must facilitate an efficient flow of the gaseous emissions to the air filtration/treatment intake ducts.

4. The air flow rates must be sized to handle normal, transient and post-operation emissions. As an initial estimate, the flow rate must be based on one change-per-minute in the primary enclosure and four changes-per-hour in the secondary enclosure, based on the calculated $SO_2$ concentrations.

5. The air flow system must be scaled to remove excess heat from the shroud. Temperatures within the shroud must be controlled to limit the temperature increase to 20°F above ambient conditions to assure that shaft seals and other parts are not damaged by high temperatures.

### 3.1.6 Performance Requirements

1. The shroud system must perform its function while complying with the following performance requirements:

   - $SO_2$ releases: The shroud system must maintain the level of $SO_2$ measured within 10 feet distance from the outside of the secondary enclosure to no more than 0.5 ppm above the background concentration. The method for measuring the concentration must be the same as that for measuring ambient $SO_2$ levels specified in the California Air Quality Standard 953 (FR80, April 26, 1988, p.14926). This level, which is specified as the average over a one–hour period, must be maintained during normal, transient and post-operation conditions.

   - Hydrocarbon gas concentrations: The concentration of hydrocarbon gases inside the shroud must be kept to less than 25 percent of their explosive concentration limits.

## 3.2 Mixing/Boring Equipment Interface

1. The shroud system must be compatible with currently available boring/mixing equipment. Based on a preliminary survey of available standard equipment, the shroud system must consider the following:

   - A 5–foot diameter, 6–foot high mixing blade mounted on a 13–inch square Kelly bar shaft, or multiple smaller augers each mounted on its own shaft.
   - Boring/mixing blade with adjustable rotation.
   - A 2-inch maximum lateral movement of the shaft at the point where it meets the top of the shroud system enclosure.
   - Shroud size limitations:
     - must not extend more than 14 feet from center of the borehole to the front of the crane cab.
     - height limited to a 22–foot maximum.
   - Shroud system maximum weight must be limited to 15,000 pounds.
   - The shroud system must have features to allow emergency personnel access inside the primary and secondary enclosure.
   - Visual ports must be provided to allow inspection.

## 3.3 Swell Interface

1. The shroud system must be able to perform its function in the presence of swell coming from the borehole.

2. The quantity of the swell has been estimated to be about 45 percent[3] of the borehole volume.

3. The swell is assumed to be in a slurry form with approximately 2–percent free water by volume.

4. The shroud system must confine the swell material within the primary enclosure. The depth of treatment must be set by the size of the shroud so that the volume of swell does not exceed the capacity of the shroud. An effective ground seal is required to prevent emissions. The volume of swell generated has the potential to significantly affect the integrity of the ground seal and the performance of the shroud. Exceeding the capacity of the shroud will result in carryover of slurry into the emission treatment equipment, displacement of the shroud, and release of emissions. Containing the swell and containing emissions

---

[3] This criteria depends on the process selected. If lime and cement are added in two steps, the swell increase for each step is estimated, based on current information, to be approximately 23 percent. The shroud system configuration should include both single and double step processes.

associated with waste treatment are a major control challenge and may prevent implementation of some remedial alternatives. Key factors in this evaluation are the swell factor and the depth of treatment.

### 3.4 Health and Safety Requirements

At this time the following requirements have been identified:

1. A failure analysis must be performed for the shroud system. The shroud system must ensure that the emissions released in the work area during a failed condition will be less than the levels considered to be Immediately Dangerous to Life or Health (IDLH).

2. The shroud system must include evaluation of all safety features required by OSHA.

3. The shroud system configuration must be such that personnel entry inside the enclosures will not be required during a normal operating event.

# 4.0 ADDITIONAL TECHNICAL AND ENGINEERING CONSIDERATIONS

1. This section identifies additional areas which require engineering development or special studies during Subtask 3 (Preliminary Configuration Development Phase). The additional studies are required due to the complexity of the problems and relate to the depth of treatment and the total volume treated. In the development of preliminary criteria for the shroud configuration, a number of assumptions were made, as discussed in Chapter 3.0. As part of the additional studies in Subtask 3, these assumptions must be validated.

## 4.1 Technical and Engineering Considerations

### 4.1.1 Swell Containment and Removal Mechanisms

Based on the potentially large volume of swell generated in the solidification process, additional studies must be undertaken to determine if it is possible to design a shroud which will be capable of handling the swell and emissions from the in-situ remediation of the sumps. As previously indicated, solidification to a depth of 55 feet, using a 5–foot diameter auger and assuming a 45-percent swell factor, would generate approximately 18 cubic yards of swell material per hole, which would likely exceed the capacity of the shroud. The ability to construct a shroud that would simultaneously contain large volumes of swell and the emissions associated with that swell, while meeting the height, diameter, and weight restrictions, is not assured.

### 4.1.2 Swell Emissions

The potential effects of untreated wastes, which rise in the soil column due to differences in density between the wastes and the solidification reagents, and are not mixed with the solidification reagents must be evaluated.

### 4.1.3 Auger Cleaning and Personnel Access

Additional study of the design requirements for the development of the auger cleaning system is required. As described in Chapter 2.0, cleaning of the auger will be required to remove waste materials, to allow moving the shroud, or to access the augers for repair or maintenance.

### 4.1.4 Ground Seal and Auger Seals

1. The ability to seal the shroud to prevent fugitive emissions is critical for protecting human health and the environment. As discussed in Chapter 2.0, the ground seal and auger-shaft seal are subject to numerous stresses, such as the swell volume, which may affect their integrity. The swell has the potential to lift, warp, or rip the shroud, and leak unsolidified, or even untreated waste, into the environment. As the volume of swell that must be handled by the shroud

increases, the probability of breaches of the seals increases. Based on the number of variables which may affect these seals, additional study is required (prior to initiating the design) to further evaluate the potential engineering required to resolve these issues.

2. The potential types of seals for the ground/shroud interface range from a knife edge shroud, which is driven 2 to 6 inches into the ground to create a seal, to the plastic flap/drape system described in the SROA II. Due to the potential affects of the swell, negative pressures, potential pressure changes, movement and vibration of the auger unit, the shroud seal requires further evaluation prior to design.

3. As discussed above, the auger shaft/shroud seal is also a potential source of fugitive emissions, given the types of stress expected, as detailed in Section 2.0. Various types of sealing systems must be evaluated prior to design.

### 4.1.5 Tertiary Containment Systems

1. As currently described, the shroud system consists of a primary emission collection shroud and a redundant secondary shroud to be designed to prevent fugitive emissions from the primary system. In the Selective Excavation Plan, a tertiary collection system is proposed to collect emissions from the treated areas and treated materials, which will continue to off-gas or release contaminants during the curing period.

2. Prior to design, the use of a tertiary collection system must be evaluated to determine its efficiency in collecting emissions during curing, and its relationship to the collection of emissions from the primary and secondary shrouds.

### 4.1.6 Materials of Construction

1. Additional evaluation of the materials to be used in the construction of the primary and secondary shrouds is necessary prior to the Subtask 3 design. Due to the potential size of the shrouds, the weight will likely vary depending on the material of construction. In situ solidification vendors have indicated that the shroud weight should not exceed 15,000 pounds.

2. Based on the indicated maximum shroud weight of 15,000 pounds, the available construction materials must be evaluated to determine which materials would produce a shroud within the required weight specifications, while still providing sufficient structural integrity, reliability, and resistance to corrosion and fire. Therefore, additional evaluation is required prior to initiating Subtask 3 design.

# APPENDIX A
# ESTIMATED EMISSION RATES DURING SOLIDIFICATION

## A.1 Sulfur Dioxide ($SO_2$) Bulk Emission Factors

1. To estimate emissions from a volume-based in situ mixing process, the trial excavation enclosure exhaust data were used. These data include the excavation rates, outlet flows and concentrations (prior to the scrubber). In effect, the enclosure served as a large- scale flux chamber; one large enough to capture the gases instantaneously released when the track-hoe bucket penetrated the surface, fracturing soil-gas pores and gas pockets.

2. To estimate $SO_2$ emission rates (per volume of waste disturbed), a differential non-steady state mass balance over the enclosure was constructed and the $SO_2$ mass input required to duplicate the $SO_2$ concentrations in the enclosure were back-calculated. The $SO_2$ mass balance equation for the enclosure may be written as:

| Rate of change in $SO_2$ concentration in the enclosure | = | $SO_2$ Input from waste disturbance | - | $SO_2$ removal in outlet exhaust air to scrubber |
|---|---|---|---|---|

or

$$\frac{d\ C_{enc}}{d\ T} = \text{Excavation Rate} \times \text{Emissions Factor} - \text{Outlet Conc} \times \text{Flow Out}$$

3. Since all terms in this equation were measured, with the exception of the $SO_2$ emission factor, the equation was used to back-calculate the $SO_2$ source term required to make a plot of enclosure $SO_2$ concentrations match the outlet $SO_2$ measurements. This procedure was carried out for the data provided for four days reported to be typical with respect to excavation rate; these days were June 9 (tar excavation), June 12 (tar) June 15, (tar and asphaltic cement) and June 26 (asphaltic cement). During periods when foam was used, a foam control efficiency of 50 percent was assumed. The modeled concentrations and the measured data for these four cases are shown graphically in Exhibits A-1 through A-4, respectively. $SO_2$ release rates fitted to each model are listed in Table A-1.

## A.2 Volatile Organic Bulk Emission Factors

1. In contrast to $SO_2$ emissions, THC emissions are produced during waste disturbance by both gas pocket/soil pore fracturing and by volatilization from the liquid/solid phases. Thus, a similar emission factor derivation for THC, based on surface excavation, would only provide estimates of the instantaneous release and ambient temperature volatilization. Since volatilization of "volatile" organics is greatly increased at elevated temperatures, the THC levels observed during the trial excavation would only represent the lower limit for in situ neutralization/stabilization.

2. Approximately 90 to 100 percent of the volatile compounds in the waste are expected to be rapidly evaporated or steam-stripped as elevated temperatures (e.g. 100 C) are reached during the neutralization and solidification processes (e.g. Accurex, 1989). By assuming that sufficient steam and other gases are produced to flush volatilized materials to the surface, and by knowing the original concentration of volatile organics in the waste, the bulk emission factors for these compounds were estimated. Concentrations of volatile organics in the tar and asphaltic cement, and the corresponding bulk emission factors are listed in Table A-2.

## A.3 Calculation of Emission Rates.

1. Emission rates for in situ mixing and solidification are determined from the "bulk" emission factors, BEF, and the volumetric production rate by

$$ER = PR \times BEF \times (1.0 - ICE)$$

where:

PR = the volumetric production rate, bcy/min
= auger penetration rate x hole x-section
BEF = the bulk emission factor, g/bcy,
ER = the emission rate into the shroud, g/min, and
ICE = the in situ control efficiency.

2. To estimate the uncontrolled emission rate into the shroud, the in situ control efficiency (ICE) was assumed to be zero. This represents the maximum emission

rate which could be experienced (i.e., without any reduction due to addition of reagents). Exhibits A-5 and A-6 summarize the resulting peak emission rates as a function of auger penetration rate during solidification.

A.3 Steam Generation

1. When highly acidic areas are encountered during the neutralization process, a large amount of heat will be generated from the neutralization reaction. To compute the amount of steam generated, the following assumptions were made: 1) lime would be added to neutralize the sulfuric acid in the waste; 2) neutralization would be accomplished using a 5-foot diameter auger; and 3) a 1.5-ft layer of waste having a ph of -0.2 would be neutralized. The resulting heat of neutralization would generate as much as 1400 $ft^3$ per minute of steam mixed with other gases.

## REFERENCES

Accurex Corporation, 1989. Final Report: Volatile Emissions from Stabilized Waste. Prepared for the U.S. Environmental Protection Agency, Risk Reduction Engineering Laboratory, under contract 68-02-3993. May.

Parkhurst, D.L., D.C. Thortenson, and L.M. Plummer, 1908. PHREEQE - A Computer Program for Geochemical Calculations. U.S.G.S., WRI-80-96.

Radian Corporation, 1982. McColl Site Investigation, Fullerton, California, Prepared for the California Department of Health Services. November.

U.S. Environmental Protection Agency (EPA), 1990. Technology Evaluation Report: Site Program Demonstration of a Trial Excavation at the McColl Superfund Site. September 1990.

# TABLE A.1

## ESTIMATED $SO_2$ RELEASE RATES DURING TRIAL EXCAVATION

| | |
|---|---|
| Tar Excavation | |
| June 9 | 100 g/bcy |
| June 12 | 345 g/bcy |
| June 15 | 200 g/bcy |
| Average: | 220 g/bcy |
| Asphaltic Cement Excavation | |
| June 15 pm | 3750 g/bcy |
| June 26 | 1800 g/bcy |
| Average: | 2800 g/bcy |
| bcy - bank cubic yards<br>g = grams | |

90-336 (7/30/92/rmm)

DRAFT, 8/3/92

# TABLE A.2

## BULK EMISSION FACTORS FOR VOLATILE ORGANICS

| | TAR | ASPHALTIC CEMENT | SOURCE |
|---|---|---|---|
| THC Concentrations (µg/g) | 5,550 | 5,013 | (Radian, 1982)(1) |
| Bulk Emission Factor (g/bcy) | 6,042 | 5,457 | |

90-336 (7/30/92/rmm)

(1) Maximum observed levels in Dynamic Volatiles analyses, Tar Sample A-356 and Asphaltic Cement Sample A-381.

DRAFT, 8/3/92

Exhibit A-1


Enclosure/SO2 Emissions Model
Outlet SO2 for 6/09/90 Excavation
SO2 Conc. in Outlet to Scrubber, ppm
800
700
600
500
400
300
200
100
0
00:00
07:00
14:00
21:00
Time of Day, hours
Model
Measured

**Exhibit A-2**


Enclosure/SO2 Emissions Model
Outlet SO2 for 6/12/90 Excavation
SO2 Conc. in Outlet to Scrubber, ppm
1000
900
800
700
600
500
400
300
200
100
0
00:00
07:00
14:00
21:00
Time of Day, hours
Model
Measured

Exhibit A-3


Enclosure/SO2 Emissions Model
Outlet SO2 for 6/15/90 Excavation
SO2 Conc. in Outlet to Scrubber, ppm
800
700
600
500
400
300
200
100
0
00:00
07:00
14:00
21:00
Time of Day, hours
Model
Measured

**Exhibit A-4**


Enclosure/SO2 Emissions Model
Outlet SO2 for 6/26/90 Excavation
SO2 Conc. in Outlet to Scrubber, ppm
600
500
400
300
200
100
0
00:00
07:00
14:00
21:00
Time of Day, hours
Model
Measured

Exhibit A-5


Emission Rate versus Auger Penetration Rate
Tar
Emission Rate (g/min)
9000
8000
7000
6000
5000
4000
3000
2000
1000
0
0.0
0.5
1.0
1.5
2.0
Auger Penetration/Mixing Rate (ft/min)
SO2
THC

**Exhibit A-6**


Emission Rate versus Auger Penetration Rate
Asphaltic Cement
Emission Rate (g/min)
8000
7000
6000
5000
4000
3000
2000
1000
0
0.0
0.5
1.0
1.5
2.0
Auger Penetration/Mixing Rate (ft/min)
SO2
THC

# APPENDIX K

## Geochemical Analysis of Solidification Alternatives Proposed by the EPA for the McColl Site

**MORRISON KNUDSEN CORPORATION**
**ENVIRONMENTAL SERVICES DIVISION**

# Calculation Cover Sheet

Calc. Number:

Contract Number: 3891-01---107

Discipline: Geochemistry

Number of Sheets: 8

Project: McColl

Feature: Thermodynamic Calculations related to CSS treatment

Item: Enthalpy Change during lime neutralization (3)
Amount of water to prevent boiling (1)
Drainable water (1)
CSS Product Swell (3)

Sources of Data:

Conner, 1990
Robie, et al, 1979
(Please see report for complete reference)

Sources of Formulae and References:

These are standard thermodynamic or arithmetic formulae without specific references.

PHREEQE Runs attached

☐ Preliminary Calculation ☒ Final Calculation Supersedes Calculation Number ____________

| Rev. No. | Revision | Calculation By | Date | Checked By | Date | | |
|---|---|---|---|---|---|---|---|
| ) | | D.J. Conger [signature] | 10-23-92 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

#3734/89

MORRISON KNUDSEN CORPORATION
ENVIRONMENTAL SERVICES DIVISION

Sheet 1 of 3
Project McColl Contract No. 3391 File No.
Feature Temperature Change [illegible] Designed DJC Date 3-?-92
Item Acid Neutralization Checked Date

These calculations compute the enthalpy change resulting from lime neutralization of [illegible] sulfuric acid in McColl site [illegible]

Chemical Reaction

$H_2SO_4 + Ca(OH)_2 = CaSO_4 + 2H_2O$

Enthalpy data from Robie et al, 1979

| | $H_2SO_4$ | + $Ca(OH)_2$ | = $CaSO_4$ | + $2H_2O$ |
|---|---|---|---|---|
| $\Delta H^\circ f$ | -194.548 Kcal/mole | -235.8 Kcal/mole | -342.761 Kcal/mole | 2(-68.315 Kcal/mole) |

$\Delta H_{reaction} = -342.761 + 2(-68.315) - [-194.548 + -235.8]$
$= -49.04[illegible]$ Kcal/mole of reaction

PHEEQE calculations demonstrate that for:

| pH | $Ca(OH)_2$ required to neutralize | Assume $H_2SO_4$ % |
|---|---|---|
| 1.0 | .1276 moles/Kg $H_2SO_4$ | 16 |
| 0.3 | .6617 moles/Kg $H_2SO_4$ | 32 |
| 0.0 | 1.359 moles/Kg $H_2SO_4$ | 32 |

for:

pH 1.0 -49.04 Kcal/mole x .1276 mole/Kg $H_2SO_4$ = -6.26 Kcal/Kg $H_2SO_4$
0.3 -49.04 Kcal/mole x .6617 mole/Kg $H_2O_4$ = -32.45 Kcal/Kg $H_2$[illegible]
0.0 -49.04 Kcal/mole x 1.359 mole/Kg $H_2O_4$ = -66.65 Kcal/Kg $H_2$[illegible]

pH 1.0 -6.26 Kcal/Kg $H_2SO_4$ x .16 Kg $H_2SO_4$/Kg waste = -1.00 Kcal/Kg waste
0.3 -32.46 Kcal/Kg $H_2SO_4$ x .32 Kg $H_2SO_4$/Kg waste = -10.38 Kcal/Kg w[illegible]
0.0 -66.65 Kcal/Kg $H_2SO_4$ x .32 Kg $H_2SO_4$/Kg waste = -21.33 Kcal/Kg w[illegible]

CALCULATE HEAT CAPACITY OF WASTE

ASSUME NEUTRALIZED WASTE HAS FOLLOWING MAKEUP

pH 1.0

| material | mass | heat capacity (cal/K·mole) |
|---|---|---|
| $CaSO_4$ | 90 g/Kg | 23.8 |
| $H_2O$ | 270 g/Kg | 17.996 |
| Char | 510 g/Kg | 2.066 (graphite) |
| Clay | 130 g/Kg | 10.62 (Silica) |

ENG126/91 #66621/91

**MORRISON KNUDSEN CORPORATION**
ENVIRONMENTAL SERVICES DIVISION

Sheet 2 of 3
Project McColl Contract No. 2891 File No.
Feature Temp Calcs Cont. Designed D.C. Date 3-9-92
Item Checked Date

$CaSO_4$ 90g ÷ 136.14 g/mole × 23.8 cal/K·mole = 15.734 cal/K
$H_2O$ 270g ÷ 18.015 g/mole × 17.996 cal/K·mole = 269.715 cal/K
Char 510g ÷ 12.01 g/mole × 2.066 cal/K·mole = 87.732 cal/K
$SiO_2$ 130g ÷ 60.084 g/mole × 10.62 cal/K·mole = 22.978 cal/K

Total = 396.159 cal/K·Kg waste

Incremental temperature rise upon neutralization (pH 1.0)

-1.001 kcal/Kg waste ÷ 396.159 cal/K·Kg waste = 2.5 K

for pH 0.3

| material | mass |
|---|---|
| $CaSO_4$ | 320g |
| $H_2O$ | 138g |
| Char | 439g |
| Clay | 103g |

$CaSO_4$ 320g ÷ 136.14 g/mole × 23.8 cal/K·mole = 55.942 cal/K
$H_2O$ 138g ÷ 18.015 g/mole × 17.996 cal/K·mole = 137.854 cal/K
Char 439g ÷ 12.01 g/mole × 2.066 cal/K·mole = 75.518 cal/K
Clay 103g ÷ 60.084 g/mole × 10.62 cal/K·mole = 18.206 cal/K

Total 287.521 cal/K·Kg waste

Incremental temperature rise upon neutralization (pH 0.3)

-10.38 kcal/Kg waste ÷ 287.521 cal/K·Kg waste = 36 K

Assume heat capacity for pH 0.0 material = 0.3 pH material

-21.33 kcal/Kg waste ÷ 287.521 cal/K = 74 K rise

ENG126/91 #66621/91

material may cause boiling. material less than 0.3 [illegible] in boiling

Exhibit 43
6141

MORRISON KNUDSEN CORPORATION
ENVIRONMENTAL SERVICES DIVISION

Sheet 3 of 3

Project ____ Contract No. ____ File No. ____
Feature ____ Designed ____ Date ____
Item ____ Checked ____ Date ____

For pH -0.2

$Ca(OH)_2$ consumption equals 2.154 moles

-49.04 Kcals/mole x 2.154 moles/Kg $H_2SO_4$ = -105.632 Kcal/kg $H_2SO_4$
-105.632 Kcal/kg $H_2SO_4$ x .32 kg $H_2SO_4$/kg waste = -33.802 kcal/kg waste

-33.802 kcal/kg waste ÷ 287.521 cal/K · kg waste = 117 K rise
(i.e. $H_2O$ will boil)

TOTAL Heat required to warm $H_2O$

-33.802 kcal/kg waste - (287.521 cal/K * 85 K) = 9.36 kcals

Heat to boil $H_2O$ 9,360 cals ÷ 9,717 cals/mole x 18.015 g/mole = 17.358 g $H_2O$/kg waste

Assume 5' x 1.5' zone has pH = -0.2

$$\frac{17.358\ g}{18.015\ g/mole/kg\ waste} \times 24,789.2\ \frac{cm^3}{mole} \times 1660\ kg\ waste = 39.6 \times 10^6\ cm^3\ steam$$

$$39.6 \times 10^6\ cm^3 \times \frac{1\ in^3}{(2.54\ cm)^3} \times \frac{1\ ft^3}{(12\ in)^3} = 1400\ ft^3$$

ENG126/91 #66621/91

MORRISON KNUDSEN CORPORATION
ENVIRONMENTAL SERVICES DIVISION

Sheet 1 of 1
Project McColl
Contract No. 3891
File No.
Feature Calculate water volume to
Designed DJC
Date 7-17-92
Item prevent boiling
Checked
Date

BASED ON PREVIOUS CALCULATIONS IT WAS DETERMINED THAT WATER BOILING WOULD RESULT UPON NEUTRALIZATION OF 0.2 pH WASTE THE FOLLOWING CALCULATIONS DETERMINE THE AMOUNT OF WATER NECESSARY TO PREVENT BOILING.

HEAT AVAILABLE FOR WATER BOILING PER Kg of WASTE = 19,360 cals

Heat capacity of $H_2O$ (Assume 75 K temp. increase 25°C to 100°C)

17.97 cal / K · mole × 75 K = requires 1,348 cals / mole

19,360 cals ÷ 1,348 cals / mole = 6.94 moles

6.94 moles × 18.015 g / mole = 125.02 g $H_2O$ / Kg waste to prevent boiling

This represents an additional 13%, by weight, water or over twice the presumed 10% incremental water amount needed to slurry the lime.

23% total + 10% = 33%

ENG126/91

#56621/91

MORRISON KNUDSEN

JOB TITLE McColl CONTRACT NO. 3840

DESCRIPTION Drainable H2O

SHEET NO. 1 of 1

MADE BY DJC CHECKED BY DATE 7-9-92

Calculate drainable $H_2O$ from CSS product

Assumptions:

121,000 yd3 or 157,000 tons of treated [illegible].

Add 33%, by weight, $H_2O$ (to prevent) boiling

Assume 10%, by weight, $H_2O$ is consumed by Portland cement hydration reactions; the remaining 23% drains from product.

157,000 tons × .23 = 36,110 tons of $H_2O$ drains

36,110 tons × 2000 lbs/ton ÷ 8.33 lbs/g = 8.7 million gals

(or approximately 10 million)

FORM ENG 126/74

MORRISON KNUDSEN CORPORATION
ENVIRONMENTAL SERVICES DIVISION

Sheet 1 of 3
Project McColl — Contract No. 3891 — File No.
Feature CSS Product Swell — Designed DJC — Date 7-2-92
Item SBOA II Reagent Blend Swell — Checked [illegible] — Date 7-7-92

Purpose: Estimate swell associated with SBOA II reagent blend composed of, on a by weight basis:

- 10% Type V Portland cement (PC)
- 10% hydrated lime
- 5% organophilic clay
- 20% water

Calculated density of McColl waste approximately 1.5 g/cm³. Therefore to treat 1 cm³ of waste (1.5g) use the following reagent amounts

| Reagent | added proportion | x | 1.5g | = | added mass |
|---|---|---|---|---|---|
| PC | .10 | x | 1.5g | = | .15 g |
| Lime | .10 | x | 1.5g | = | .15 g |
| Clay | .05 | x | 1.5g | = | .075g |
| Water | .20 | x | 1.5g | = | .30 g |

Convert mass to volume

| Reagent | added mass (g) | ÷ | density (g/cm³) | = | added volume |
|---|---|---|---|---|---|
| PC | .15 g | ÷ | 3.17 (1) | = | .05 cm³ |
| lime | .15 g | ÷ | 2.24 (2) | = | .07 cm³ |
| Clay | .075g | ÷ | 2.59 (3) | = | .03 cm³ |
| Water | .30 g | ÷ | 1.00 (2) | = | .30 cm³ |
| | | | TOTAL | | .45 cm³ or 45% swell |

(1) Conner, 1990
(2) Robie, et al., 1979
(3) Robie, et al., 1979 for illite

ENG126/91 — #66621/91

MORRISON KNUDSEN

JOB TITLE McCall CONTRACT NO. 3891

DESCRIPTION CSC Program [illegible] (cont'd)

SHEET NO. 2 of 3

MADE BY DJC 7-15-92 CHECKED BY ______ DATE ______

Assume 10% lime and 10% water are first added.

Reagent added (proportion) x 1.5g = added mass

lime .10 x 1.5g = .15g
$H_2O$ .10 x 1.5 g = .15g

Convert mass to volume
Reagent mass (g) ÷ density (g/cm³) = added volume

lime .15g x 2.24 = .07 cm³
$H_2O$ .15g x 1.00 = .15 cm³
TOTAL = .22 cm³ or 22 % swell

Assume 20% overdrilling

22 % x 1.2 = 26.4 % (use 26%)

Upon subsequent cement addition

45 % - 22 % = 23 %

Assume 20% overdrill

23% x 1.2 = 27.6 % (use 28%)

Note: Total swell with overdrilling equals
26% + 28% = 54%

Exhibit 43
6146

MORRISON KNUDSEN

JOB TITLE McCall CONTRACT NO. [illegible]

DESCRIPTION CSS Product Swell

SHEET NO. 3 of 3

MADE BY DJC 7-15-92 CHECKED BY DATE

Volume of swell within shroud

(Assume 23% swell) (5' diameter x 30' deep column)

VOLUME OF SWELL = swell factor x (radius)$^2$ ($\pi$) x depth.

= .23 x (2.5')$^2$ $\pi$ x 30'

= 135 ft$^3$

Assume 2' maximum height

$V = \pi r^2 h$

or

$r = \sqrt{\frac{V}{\pi h}} = \sqrt{\frac{135 ft^3}{2 ft \; \pi}} = 4.64'$

or a 9.3' diameter shroud would be completely full.

Therefore a 10' diameter x 4' high shroud would be a 100% oversize unit.

```
YYYYYYYYYY   4444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444   YYYYYYYYYY
YYYYYYYYYY   4444444444444444444444  Digital Equipment Corporation - VAX/VMS Version V5.5  4444444444444444444444   YYYYYYYYYY
YYYYYYYYYY   4444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444   YYYYYYYYYY
```

```
                         N   N   III   BBBB    L       EEEEE  RRRR
                         N   N    I    B   B   L       E      R   R
                         NN  N    I    B   B   L       E      R   R
                         N N N    I    BBBB    L       EEEE   RRRR
                         N  NN    I    B   B   L       E      R R
                         N   N    I    B   B   L       E      R  R
                         N   N   III   BBBB    LLLLL   EEEEE  R   R

M   M   CCCC    CCCC    OOO   L       L                OOO   U   U  TTTTT  PPPP   U   U  TTTTT
MM MM  C       C       O   O  L       L               O   O  U   U    T    P   P  U   U    T
M M M  C       C       O   O  L       L               O   O  U   U    T    P   P  U   U    T
M   M  C       C       O   O  L       L               O   O  U   U    T    PPPP   U   U    T
M   M  C       C       O   O  L       L               O   O  U   U    T    P      U   U    T
M   M  C       C       O   O  L       L               O   O  U   U    T    P      U   U    T
M   M   CCCC    CCCC    OOO   LLLLL   LLLLL   _____    OOO   UUUUU    T    P      UUUUU    T

                              DDDD    AAA   TTTTT   ;;   4   4
                              D   D  A   A    T     ;;   4   4
                              D   D  A   A    T          4   4
                              D   D  A   A    T     ;;   44444
                              D   D  AAAAA    T     ;;       4
                         ..   D   D  A   A    T      ;       4
                         ..   DDDD   A   A    T     ;        4
```

File _$2$DKA100 [D228 S20 PHREEQE]MCCOLL_OUTPUT.DAT;4 (4719,3,0), last revised on 8-JUN-1992 14:03, is a 26 block sequential fil[e] owned by UIC [206,103]. The records are variable length with FORTRAN (FTN) carriage control. The longest record is 80 bytes

Job MCCOLL_OUTPUT (375) queued to SYS$PRINT on 8-JUN-1992 14:03 by user NIBLER, UIC [206,103], under account OVERHEAD at priority 100, started on printer _TORAH$TTA1: on 8-JUN-1992 14:03 from queue SYS$PRINT.


```
YYYYYYYYYY   4444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444   YYYYYYYYYY
YYYYYYYYYY   4444444444444444444444  Digital Equipment Corporation - VAX/VMS Version V5.5  4444444444444444444444   YYYYYYYYYY
YYYYYYYYYY   4444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444   YYYYYYYYYY
```

INPUT FILE PAGE __

```
MAXIMUM ITERATIONS =  400
ECLOSE =   1 0000000E-11
TCLOSE =   1 0000000E-07
THCLOS =   1 0000020E-07
MCLOSE =   1 0000010E-05
         DATA READ FROM DISK

ELEMENTS
SPECIES
LOOK MIN
BETAS
MIX PARS
Date  Jun 08,   92            Analyst:
Project: MCCOLL

Input file. SO4 2
Output file:

Operation:

Conditions and assumptions
  CA(OH)2 AND ANHYDRITE EQUILIBRATED W/ H2SO4 @ PH=1 & EH=781

0050100000 0 0         0.00000
SOLUTION 1

 2  0 3     1.00      13.2     25.0     1.01
   4  0.000E+00   5  9.888E+03
MINERALS
CA(OH)2       3   0.000E+00  23.1     -30.5       0            0.000
   4   1.00     3   2 00      1  -2.00
ANHYDRITE     2     6.00    -4.26    -4.26       0            0.000
   4   1.00     5   1 00
              0   0.000E+00 0.000E+00 0.000E+00   0            0.000
```

PAGE __

************************************************************************
************************************************************************

Date Jun 08, 92 Analyst:
Project MCCOLL

Input file SO4 2
Output file:

Operation.

Conditions and assumptions:
CA(OH)2 AND ANHYDRITE EQUILIBRATED W/ H2SO4 @ PH=1 & EH=781

************************************************************************
************************************************************************

INPUT SOLUTION NUMBER 1



TOTAL CONCENTRATION OF AQUEOUS COMPONENTS ******************************

| COMPONENTS | TOTAL MOLALITY | TOTAL LOG MOLALITY | TOTAL MG/KG |
|---|---|---|---|
| S | 1 0396E-01 | -0.9831 | 9 8880E+03 |

******************************************************************************

DESCRIPTION OF SOLUTION **************************************************

| | |
|---|---|
| pH | 1.000 |
| EH (mV) | 780.903 |
| PE | 13.202 |
| ACTIVITY OF H2O | 0 996 |
| IONIC STRENGTH (M) | 0.143 |
| TEMPERATURE (C) | 25.000 |
| CATION CONC. (EQ/KG H2O) | 1.234E-01 |
| ANION CONC. (EQ/KG H2O) | -1.233E-01 |
| CHARGE BALANCE (%) | 8 489E-03 |
| TOTAL ALKALINITY (EQ/KG H2O) | 1.364E-13 |
| TDS (MG/KG) | 9.888E+03 |
| DENSITY | 1.010 |
| ITERATIONS | 5 |

******************************************************************************

DISTRIBUTION OF AQUEOUS SPECIES ****************************************

| SPECIES | MOLALITY | LOG MOLALITY | ACTIVITY | LOG ACTIVITY | GAMMA | LOG GAMMA |
|---|---|---|---|---|---|---|
| E- | 6 276E-14 | -13.202 | 6 276E-14 | -13 202 | 1 000E+00 | 0 000 |
| H+ | 1 234E-01 | -0.909 | 1 000E-01 | -1 000 | 8 107E-01 | -0.091 |
| H2O | 9 961E-01 | -0.002 | 9 961E-01 | -0 002 | 1 000E+00 | 0 000 |
| HSO3- | 1 417E-28 | -27.849 | 1 079E-28 | -27 967 | 7 617E-01 | -0.118 |
| HSO4- | 8 459E-02 | -1.073 | 6 361E-02 | -1 196 | 7.520E-01 | -0 124 |
| O2(AQ) | 4.804E-30 | -29 318 | 4.964E-30 | -29.304 | 1 033E+00 | 0.014 |
| OH- | 1 364E-13 | -12 865 | 1.001E-13 | -13 000 | 7.336E-01 | -0.135 |
| SO4-2 | 1.937E-02 | -1.713 | 6.554E-03 | -2 183 | 3 384E-01 | -0.471 |

*************************************************************************************

STABILITY OF SOLID AND GAS PHASES ****************************************

| PHASE | | LOG IAP | LOG KT | LOG IAP/KT |
|---|---|---|---|---|
| H2O(LIQ) | H2O-liquid | -0.002 | 0.000 | -0 002 |
| H2O(ICE) | H2O-ICE | -0.002 | 0 000 | -0 002 |
| H2O(GAS) | H2O-GAS | -0.002 | 1 509 | -1.510 |
| O2(GAS) | IDEAL GAS | 56.806 | 83 119 | -26.313 |
| SO2(GAS) | ideal gas | -11 714 | 15 493 | -27.206 |
| SO3(GAS) | ideal gas | 16.689 | 44 633 | -27.944 |
| H2(GAS) | ideal gas | -31 484 | -3 150 | -28 334 |
| SULFUR-RHOMB | rhombic-S | -68 520 | -15.026 | -53.494 |
| H2S | ideal gas | -96.924 | -20 907 | -76.017 |
| S2(GAS) | diatomic sulfur, ide | -137.039 | -16.136 | -120.903 |
| S8(GAS) | octa-atomic sulfur, | -548.156 | -111.677 | -436.479 |

**********************************************************************

************************************************************************

EQUILIBRATING SOLUTION 1 WITH SOLID AND GAS PHASES

MAINTAIN STEADY STATE WITH THE FOLLOWING SOLID AND GAS PHASES.
CA(OH)2 (SI = 0.0000) ANHYDRITE (SI = 0.0000)

SOLUTION 1 IS

************************************************************************

PHASE CHANGES ************************************************************

| PHASE | MOLES/KG | GRAMS/KG | CM**3/KG | LOG IAP/KT |
|---|---|---|---|---|
| | ------ DELTA | PHASE ------ | | |
| CA(OH)2 | 1.276E-01 | 9.457E+00 | 4.219E+00 | 0.0000 |
| ANHYDRITE | -8.558E-02 | -1.165E+01 | -3.931E+00 | 0.0000 |

* Negative DELTA PHASE indicates removal of phase from solution
Zero value in column "cm**3/kg" indicates that no data for calculation is available.

************************************************************************

OUTPUT SOLUTION

PAGE __

TOTAL CONCENTRATION OF AQUEOUS COMPONENTS ********************************

| COMPONENTS | TOTAL MOLALITY | TOTAL LOG MOLALITY | TOTAL MG/KG |
|---|---|---|---|
| CA | 4 2057E-02 | -1.3762 | 1.6798E+03 |
| S | 1.8384E-02 | -1.7356 | 1.7599E+03 |

****************************************************************************

DESCRIPTION OF SOLUTION ************************************************

| | |
|---|---|
| pH | 12.497 |
| EH (mV) | -364.284 |
| PE | -6.159 |
| ACTIVITY OF H2O | 0.998 |
| IONIC STRENGTH (M) | 0.111 |
| TEMPERATURE (C) | 25.000 |
| CATION CONC. (EQ/KG H2O) | 6.730E-02 |
| ANION CONC. (EQ/KG H2O) | -6.728E-02 |
| CHARGE BALANCE (%) | 1.555E-02 |
| TOTAL ALKALINITY (EQ/KG H2O) | 4.733E-02 |
| TDS (MG/KG) | 3.440E+03 |
| DENSITY | 1.003 |
| ITERATIONS | 145 |

****************************************************************************

DISTRIBUTION OF AQUEOUS SPECIES ********************************************

| SPECIES | MOLALITY | LOG MOLALITY | ACTIVITY | LOG ACTIVITY | GAMMA | LOG GAMMA |
|---|---|---|---|---|---|---|
| CA+2 | 3 088E-02 | -1.510 | 1 170E-02 | -1 932 | 3 738E-01 | -0.422 |
| CAOH+ | 5 544E-03 | -2.256 | 4 376E-03 | -2 359 | 7 894E-01 | -0.103 |
| CASO4 | 5 633E-03 | -2.249 | 5 778E-03 | -2 238 | 1 026E+00 | 0.011 |
| E- | 1 441E+06 | 6.159 | 1.441E+06 | 6 159 | 1 000E+00 | 0 000 |
| H+ | 3 882E-13 | -12.411 | 3 186E-13 | -12 497 | 8 209E-01 | -0.086 |
| H2(AQ) | 1 713E-16 | -15.766 | 1.758E-16 | -15 755 | 1 026E+00 | 0 011 |
| H2O | 9 984E-01 | -0 001 | 9 984E-01 | -0 001 | 1 000E+00 | 0 000 |
| HSO3- | 1 692E-24 | -23 772 | 1 312E-24 | -23 882 | 7.751E-01 | -0 111 |
| HSO4- | 1.881E-13 | -12.726 | 1.447E-13 | -12.840 | 7.691E-01 | -0.114 |
| OH- | 4 178E-02 | -1 379 | 3.148E-02 | -1 502 | 7.533E-01 | -0.123 |
| SO3-2 | 5.983E-19 | -18 223 | 2 160E-19 | -18 666 | 3 610E-01 | -0 443 |
| SO4-2 | 1 275E-02 | -1.894 | 4 679E-03 | -2 330 | 3 669E-01 | -0.435 |

******************************************************************************

STABILITY OF SOLID AND GAS PHASES ******************************************

| PHASE | | LOG IAP | LOG KT | LOG IAP/KT |
|---|---|---|---|---|
| PORTLANDITE | Ca(OH)2 | 23 060 | 22 690 | 0.370 |
| GYPSUM | CaSO4*2H2O | -4.263 | -4 330 | 0 067 |
| CA(OH)2 | RHOMBIC-CA(OH)2 | 23 060 | 23 060 | 0 000 |
| ANHYDRITE | gamma-CaSO4 | -4 262 | -4 262 | 0.000 |
| H2O(ICE) | H2O-ICE | -0.001 | 0 000 | -0.001 |
| H2O(LIQ) | H2O-liquid | -0.001 | 0 000 | -0 001 |
| BASSANITE | CaSO4*0 5H2O | -4.262 | -3 370 | -0.892 |
| B-CASO4*0 5H | beta-CaSO4*0.5H2O | -4.262 | -3 194 | -1.068 |
| H2O(GAS) | H2O-GAS | -0.001 | 1.509 | -1.510 |
| CAO | | 23.061 | 32.808 | -9.747 |
| H2(GAS) | ideal gas | -15.755 | -3.150 | -12.605 |
| SULFUR-RHOMB | rhombic-S | -44 477 | -15.026 | -29.451 |
| SO2(GAS) | ideal gas | -19.127 | 15 493 | -34.619 |
| H2S | ideal gas | -57.153 | -20.907 | -36.246 |
| SO3(GAS) | ideal gas | -6.452 | 44.633 | -51.084 |
| O2(GAS) | IDEAL GAS | 25.350 | 83.119 | -57 768 |
| S2(GAS) | diatomic sulfur, ide | -88.954 | -16 136 | -72.818 |
| S8(GAS) | octa-atomic sulfur, | -355.816 | -111 677 | -244.139 |

*************************************************************************

```
0000000000    000000000000000000000000000000000000000000000000000000000000000000000000000000000000    0000000000
0000000000    0000000000000000000000000  Digital Equipment Corporation - VAX/VMS Version V5.5  0000000000000000000000000    0000000000
0000000000    000000000000000000000000000000000000000000000000000000000000000000000000000000000000    0000000000
```

```
N   N  III  BBBB  L      EEEEE  RRRR
N   N   I   B   B L      E      R   R
NN  N   I   B   B L      E      R   R
N N N   I   BBBB  L      EEEE   RRRR
N  NN   I   B   B L      E      R R
N   N   I   B   B L      E      R  R
N   N  III  BBBB  LLLLL  EEEEE  R   R
```

```
M   M   CCCC   CCCC   OOO   L      L              OOO   U   U  TTTTT  PPPP   U   U  TTTTT
MM MM  C      C      O   O  L      L             O   O  U   U    T    P   P  U   U    T
M M M  C      C      O   O  L      L             O   O  U   U    T    P   P  U   U    T
M   M  C      C      O   O  L      L             O   O  U   U    T    PPPP   U   U    T
M   M  C      C      O   O  L      L             O   O  U   U    T    P      U   U    T
M   M  C      C      O   O  L      L             O   O  U   U    T    P      U   U    T
M   M   CCCC   CCCC   OOO   LLLLL  LLLLL  _____   OOO   UUUUU    T    P      UUUUU    T
```

```
DDDD    AAA   TTTTT   ;;   55555
D   D  A   A    T     ;;   5
D   D  A   A    T          555
D   D  A   A    T     ;;      5
D   D  AAAAA    T     ;;      5
D   D  A   A    T      ,   5   5
DDDD   A   A    T     ,     555
```

File _$2$[KA100 [1223 SL0 PHREEGE]MCCOLL_OUTPUT DAT;5 (793,13,0), last revised on 9-JUN-1992 08 49, is a 25 block sequential file owned by UIC [206,103] The records are variable length with FORTRAN (FTN) carriage control. The longest record is 80 bytes

Job MCCOLL_OUTPUT (552) queued to SYS$PRINT on 9-JUN-1992 08:50 by user NIBLER, UIC [206,103], under account OVERHEAD at priority 100, started on printer _TORAH$TTA1: on 9-JUN-1992 08.50 from queue SYS$PRINT.

```
0000000000    000000000000000000000000000000000000000000000000000000000000000000000000000000000000    0000000000
0000000000    0000000000000000000000000  Digital Equipment Corporation - VAX/VMS Version V5 5  0000000000000000000000000    0000000000
0000000000    000000000000000000000000000000000000000000000000000000000000000000000000000000000000    0000000000
```

```
INPUT FILE                                                        PAGE __

MAXIMUM ITERATIONS =  400
ECLOSE =   1 0000000E-11
TCLOSE =   1 0000000E-07
THCLOS =   1.0000020E-07
MCLOSE =   1 0000010E-05
         DATA READ FROM DISK

ELEMENTS
SPECIES
LOOK MIN
BETAS
MIX PARS
Date   Jun 09,   92           Analyst:   GEORGE
Project: MCCOLL

Input file: SO4.2
Output file:

Operation.

Conditions and assumptions
  CA(OH)2 AND ANHYDRITE EQUIL.  W/ H2SO4 @ PH=0.3
0150000000 0 0         0.00000
SOLUTION 1

 2  0 3     0.300      13 9      25.0      1.06
   4  0.000E+00    5   5 775E+04
MINERALS
CA(OH)2        3    0 000E+00  23.1     -30.5         0              0.000
   4    1 00       3    2 00        1   -2.00
ANHYDRITE      2     6 00     -4.26     -4.26         0              0.000
   4    1 00       5    1 00
               0    0.000E+00 0.000E+00 0.000E+00     0              0.000
```

PAGE __

```
******************************************************************************
******************************************************************************

Date  Jun 09,   92          Analyst:  GEORGE
Project  MCCOLL

Input file  SO4 2
Output file.

Operation·

Conditions and assumptions
  CA(OH)2 AND ANHYDRITE EQUIL. W/ H2SO4 @ PH=0.3

******************************************************************************
******************************************************************************
```

INPUT SOLUTION NUMBER 1 PAGE __

TOTAL CONCENTRATION OF AQUEOUS COMPONENTS ******************************

| COMPONENTS | TOTAL MOLALITY | TOTAL LOG MOLALITY | TOTAL MG/KG |
|---|---|---|---|
| S | 6.3801E-01 | -0.1952 | 5.7749E+04 |

*****************************************************************************

DESCRIPTION OF SOLUTION ************************************************

| | |
|---|---|
| pH | 0.293 |
| EH (mV) | 821.899 |
| PE | 13.895 |
| ACTIVITY OF H2O | 0.978 |
| IONIC STRENGTH (M) | 0.715 |
| TEMPERATURE (C) | 25.000 |
| CATION CONC. (EQ/KG H2O) | 6.766E-01 |
| ANION CONC (EQ/KG H2O) | -6.766E-01 |
| CHARGE BALANCE (%) | -9.550E-04 |
| TOTAL ALKALINITY (EQ/KG H2O) | 3.193E-14 |
| TDS (MG/KG) | 5.775E+04 |
| DENSITY | 1.058 |
| ITERATIONS | 5 |

*****************************************************************************

PAGE __

DISTRIBUTION OF AQUEOUS SPECIES ****************************************

| SPECIES | MOLALITY | LOG MOLALITY | ACTIVITY | LOG ACTIVITY | GAMMA | LOG GAMMA |
|---|---|---|---|---|---|---|
| E- | 1 272E-14 | -13.895 | 1 272E-14 | -13.895 | 1 000E+00 | 0.000 |
| H+ | 6.766E-01 | -0.170 | 5.093E-01 | -0.293 | 7.527E-01 | -0.123 |
| H2O | 9.777E-01 | -0.010 | 9.777E-01 | -0.010 | 1.000E+00 | 0.000 |
| HSO3- | 9 434E-28 | -27.024 | 7.099E-28 | -27 149 | 7.508E-01 | -0.124 |
| HSO4- | 5.994E-01 | -0.222 | 3.853E-01 | -0 414 | 6.428E-01 | -0.192 |
| O2(AQ) | 3 570E-30 | -29 447 | 4.209E-30 | -29.376 | 1.179E+00 | 0.072 |
| OH- | 3.193E-14 | -13 496 | 1 929E-14 | -13 715 | 6.040E-01 | -0.219 |
| SO4-2 | 3.658E-02 | -1.414 | 7.796E-03 | -2.108 | 2.021E-01 | -0.695 |

************************************************************************

STABILITY OF SOLID AND GAS PHASES ****************************************

| PHASE | | LOG IAP | LOG KT | LOG IAP/KT |
|---|---|---|---|---|
| H2O(LIQ) | H2O-liquid | -0.010 | 0.000 | -0.010 |
| H2O(ICE) | H2O-ICE | -0.010 | 0.000 | -0.010 |
| H2O(GAS) | H2O-GAS | -0.010 | 1.509 | -1.519 |
| SO2(GAS) | ideal gas | -10.181 | 15.493 | -25.673 |
| O2(GAS) | IDEAL GAS | 56.734 | 83.119 | -26 385 |
| SO3(GAS) | ideal gas | 18 187 | 44 633 | -26.446 |
| H2(GAS) | ideal gas | -31.456 | -3 150 | -28.306 |
| SULFUR-RHOMB | rhombic-S | -66.915 | -15.026 | -51.889 |
| H2S | ideal gas | -95.292 | -20.907 | -74.385 |
| S2(GAS) | diatomic sulfur, ide | -133.830 | -16 136 | -117.693 |
| S8(GAS) | octa-atomic sulfur, | -535.318 | -111.677 | -423.641 |

****************************************************************************

***************************************************************************

EQUILIBRATING SOLUTION 1 WITH SOLID AND GAS PHASES

MAINTAIN STEADY STATE WITH THE FOLLOWING SOLID AND GAS PHASES:

CA(OH)2 (SI = 0.0000) ANHYDRITE (SI = 0.0000)

SOLUTION 1 IS

***************************************************************************

PHASE CHANGES ********************************************************

| PHASE | MOLES/KG | GRAMS/KG | CM**3/KG | LOG IAP/KT |
|---|---|---|---|---|
| CA(OH)2 | 6.617E-01 | 4.903E+01 | 2.187E+01 | 0.0000 |
| ANHYDRITE | -6.196E-01 | -8.436E+01 | -2.847E+01 | 0.0000 |

(Columns MOLES/KG, GRAMS/KG and CM**3/KG are grouped under "DELTA PHASE".)

* Negative DELTA PHASE indicates removal of phase from solution:
Zero value in column "cm**3/kg" indicates that no data for calculation is available

***************************************************************************

OUTPUT SOLUTION PAGE __

TOTAL CONCENTRATION OF AQUEOUS COMPONENTS ******************************

| COMPONENTS | TOTAL MOLALITY | TOTAL LOG MOLALITY | TOTAL MG/KG |
|---|---|---|---|
| CA | 4.2046E-02 | -1.3763 | 1.6794E+03 |
| S | 1.8387E-02 | -1.7355 | 1.7602E+03 |

****************************************************************************

DESCRIPTION OF SOLUTION ************************************************

| | |
|---|---|
| pH | 12.991 |
| EH (mV) | 821.899 |
| PE | 13.895 |
| ACTIVITY OF H2O | 0.320 |
| IONIC STRENGTH (M) | 0.111 |
| TEMPERATURE (C) | 25.000 |
| CATION CONC. (EQ/KG H2O) | 6.728E-02 |
| ANION CONC. (EQ/KG H2O) | -6.730E-02 |
| CHARGE BALANCE (%) | -9.608E-03 |
| TOTAL ALKALINITY (EQ/KG H2O) | 4.733E-02 |
| TDS (MG/KG) | 3.440E+03 |
| DENSITY | 1.003 |
| ITERATIONS | 66 |

****************************************************************************

PAGE __

DISTRIBUTION OF AQUEOUS SPECIES ****************************************

| SPECIES | MOLALITY | LOG MOLALITY | ACTIVITY | LOG ACTIVITY | GAMMA | LOG GAMMA |
|---|---|---|---|---|---|---|
| CA+2 | 3 087E-02 | -1.510 | 1.170E-02 | -1 932 | 3 789E-01 | -0.422 |
| CAOH+ | 5 543E-03 | -2.256 | 4 376E-03 | -2 359 | 7.894E-01 | -0 103 |
| CASO4 | 5.633E-03 | -2.249 | 5 778E-03 | -2.238 | 1.026E+00 | 0.011 |
| E- | 1.272E-14 | -13.895 | 1.272E-14 | -13 895 | 1.000E+00 | 0.000 |
| H+ | 1 244E-13 | -12.905 | 1.021E-13 | -12 991 | 8 209E-01 | -0.086 |
| H2O | 3 200E-01 | -0.495 | 3.200E-01 | -0.495 | 1.000E+00 | 0.000 |
| H2O2 | 5 660E-10 | -9 247 | 5.806E-10 | -9.236 | 1.026E+00 | 0.011 |
| HSO4- | 6 031E-14 | -13 220 | 4.639E-14 | -13 334 | 7.692E-01 | -0 114 |
| O2(AQ) | 2 719E+20 | 20 434 | 2 789E+20 | 20.445 | 1.026E+00 | 0 011 |
| OH- | 4 179E-02 | -1 379 | 3.148E-02 | -1.502 | 7 533E-01 | -0.123 |
| SO4-2 | 1 275E-02 | -1.894 | 4.680E-03 | -2.330 | 3.670E-01 | -0.435 |

**************************************************************

STABILITY OF SOLID AND GAS PHASES ****************************************

| PHASE | | LOG IAP | LOG KT | LOG IAP/KT |
|---|---|---|---|---|
| O2(GAS) | IDEAL GAS | 106.555 | 83.119 | 23.437 |
| PORTLANDITE | Ca(OH)2 | 23.060 | 22.690 | 0.370 |
| CA(OH)2 | RHOMBIC-CA(OH)2 | 23.060 | 23.060 | 0.000 |
| ANHYDRITE | gamma-CaSO4 | -4.262 | -4.262 | 0.000 |
| H2O(LIQ) | H2O-liquid | -0.495 | 0.000 | -0.495 |
| H2O(ICE) | H2O-ICE | -0.495 | 0.000 | -0.495 |
| GYPSUM | CaSO4*2H2O | -5.251 | -4.330 | -0.922 |
| BASSANITE | CaSO4*0.5H2O | -4.509 | -3.370 | -1.139 |
| B-CASO4*0.5H | beta-CaSO4*0.5H2O | -4.509 | -3.194 | -1.315 |
| H2O(GAS) | H2O-GAS | -0.495 | 1.509 | -2.004 |
| CAO | | 23.555 | 32.808 | -9.253 |
| SO3(GAS) | ideal gas | -6.946 | 44.633 | -51.578 |
| H2(GAS) | ideal gas | -56.852 | -3.150 | -53.702 |
| SO2(GAS) | ideal gas | -60.223 | 15.493 | -75.716 |
| SULFUR-RHOMB | rhombic-S | -166.779 | -15.026 | -151.753 |
| H2S | ideal gas | -220.551 | -20.907 | -199.645 |
| S2(GAS) | diatomic sulfur, ide | -333.558 | -16.136 | -317.421 |
| S8(GAS) | octa-atomic sulfur, | -1334.231 | -111.677 | -1222.554 |

************************************************************************

# APPENDIX L

## Heat Modeling of Temperatures Due to In-Situ Neutralization of McColl Waste

Heat Modeling of Temperatures due to In Situ Neutralization of McColl Waste

Because neutralization of McColl waste with a lime slurry is an integral part of many of the remediation options for the McColl Superfund site, modeling of the heat generation during neutralization and temperature expectations has been done to anticipate their effects on implementability and cost of remediation.

This model is limited to heats generated due to neutralization even though friction and hydration during cement setting also generate heat. The neutralization is expected to create the greatest temperature rise. Also, in scenarios where neutralization and solidification occur at different times, the neutralization and hydration heats, with their respective temperature effects, would not be cumulative.

As with all models and calculations, the results are theoretical and depend on assumptions as explained herein.

Initial Temperature

The rise in temperature ($T - T_{initial}$) of neutralized waste is found by

1) calculating the heat generated by the acid-base reaction (heat of reaction, $H_r$),

2) determining a heat capacity (Cp) for the waste, or waste components, and

3) relating the two by the equation

$$n*H_r = \sum m_i*Cp_i*(T - T_{initial}) \quad (1)$$

where $H_r$ = heat of reaction (kcal/mole),
$n$ = moles reacted,
$i$ = number of reacted waste components,
$m_i$ = mass of $i$th waste component (g),
$Cp_i$ = heat capacity of $i$th waste component (cal/g°C),
$T$ = final temperature,
$T_{initial}$ = ambient initial temperature (assumed to be 25°C, or 77°F).

Finding the Heat of Reaction. The heat of reaction ($H_r$) of a neutralization process is found once the reactants and products of the reaction are determined. $H_r$ is the sum of the heats of formation of the products less the heats of formation of the reactants. These heats of formation are constant values found in literature for most compounds.

The most dominant acidic reactant in McColl waste is aqueous sulfuric acid. The Unocal analysis found enough moisture in the waste to assume that the sulfuric acid is aqueous, or already reacted

with the water present. The spent acid was nearly water-free when deposited; therefore, most of the water found in the waste today is likely from the atmosphere and condensation reactions within the waste. This water would have reacted with the sulfuric acid as it was introduced, evolving heat at the time of reaction.

Hydrated lime, $Ca(OH)_2$, would be the basic reactant in a water/lime slurry. If quicklime, CaO, were used to prepare the slurry, heat would be evolved during preparation, but the hot slurry would likely be cooled before injection into the waste. If quicklime were added directly without water, then heat generation could result in extreme temperatures, provided adequate contact with the acid.

With lime as a reactant, the assumed product is synthetic gypsum (calcium sulfate dihydrate, $CaSO_4 \cdot 2H_2O$). Gypsum does not begin to decompose to the hemihydrate, $CaSO_4 \cdot \frac{1}{2}H_2O$ or plaster of Paris, until it reaches 262°F and then further to the anhydrite, $CaSO_4$, at 325°F. This decomposition scenario is significant because it indicates that the product should hold bound water until these temperatures are reached, preventing the bound water from vaporizing. Such vaporization would help cool the neutralized waste.

The simplified reaction is therefore

$$H_2SO_4(aq) + Ca(OH)_2 \rightarrow CaSO_4 \cdot 2H_2O \text{ (gypsum)} \quad (2)$$

With these expected reactants and products, the heat of reaction is 30.7 kcal per mole of $H_2SO_4$ that reacts. The heat of reaction must be expressed in terms of a component of the reaction, and not in terms of the waste which varies in acid concentration. This generated heat (30.7 kcal for every mole of neutralized acid in the treated waste) must be dissipated into the reacted waste products and excess materials present, resulting in a rise in temperature that is dependent in part on the ability of the reacted waste to absorb the heat.

Estimating the Heat Capacity. The ability to absorb heat is empirically expressed as the heat capacity, Cp, and has units of energy per mass per temperature increase. (A simple example is that of water with a defined Cp of 1.0 cal/g°C, meaning that one calorie applied to one gram of water will raise the temperature one degree Celsius.) A mixture of materials will have an overall Cp calculated from the Cp of each component by a weighted average. An effective overall Cp is mathematically expressed as the summation term of equation 1:

$$\sum m_i * Cp_i$$

The term must be evaluated for the reacted waste because the reaction results in a composite waste of excess water, gypsum product, and residual waste, all of which have different heat capacities. The residual waste component is itself composed of water, ash, and an organic component. Evaluating the overall Cp term then becomes a question of finding a Cp for the residual waste organic component alone--since the capacities for water, gypsum, and ash (as clay or sand) are already well documented in literature--and finding each component's contribution to the total mass. (This is further explained and presented graphically in the Appendix.)

Kopp's rule was used to estimate the Cp for this residual waste organic component. The rule uses elemental composition of compounds and is explained in the Appendix along with a sample

calculation. Results from 21 samples previously tested at Unocal were thus treated. Using the classifications of waste types developed by Morrison Knudsen, the resulting averages for Cp for residual "asphaltic cement" waste and for residual tar waste were 0.4 cal/g°C and 0.5 cal/g°C, respectively. The calculated heat capacities are tabulated by sample in Table 1.

Comparable literature values (measured) for similar materials include asphalt--0.22, coarse, gravelly soil--0.44, clay--0.224, coal--0.26 to 0.37, coal tars--0.35, engine oil (@100°C)--0.52, kerosene--0.47, all in cal/g°C. Note that water and hydrocarbons generally have higher heat capacities than clay and soil. Because McColl tar has a higher hydrocarbon content than does asphaltic cement, the tar heat capacity is expected to be higher.

Estimating the Temperature. The heat of reaction results in a temperature rise in the reacted waste, dependant on the waste's heat capacity and its ability to dissipate the heat. The assumption of an adiabatic system (no heat dissipation through conduction) is appropriate for initial temperature estimations because soil is such a good insulator.

The temperature rise for multiple scenarios was calculated using equation 1. Each component mass, $m_i$, was determined for each model scenario. With a basis of one mole of reacted acid, the unreacted waste mass is determined by the set acid concentration. Concentrations of lime in the reagent slurry enable calculation of the mass of slurry needed to stoichiometrically neutralize the acid, and this sets the excess water added to the system. The calculations using these masses and the calculated Cp's result in Tables 2 and 3 for asphaltic cement and tar, respectively. The temperatures increase from upper left to lower right because in that direction there is always less slurry water and less residual waste to soak up the generated heat. The partitions within the tables indicate the conditions at which the excess water boils (upper partition) and at which the water is effectively boiled away (lower partition), resulting in temperatures rising above the boiling point. Any condition within, above, or to the left of the boxed area results in excess slurry water, either subcooled (above or left) or at boiling point (within).

Dissipation of much of the heat is ensured through the act of augering and mixing during neutralization, releasing vaporized slurry water as steam. These calculations assume that all of the slurry water is vaporized, even though some water will be trapped by physical absorption and chemical dissolution. This total vaporization assumption makes some estimated temperatures conservatively low. Because of the effects of physical adsorption and chemical dissolution, temperatures above the boiling point of water (superheat) are possible even with water present.

The temperature rise differences between asphaltic cement and tar are due to the difference in heat capacities. The higher tar heat capacity means that tar can absorb heat without as large a temperature rise as would result in the asphaltic cement. This means that the temperature rise in the asphaltic cement will be greater than in tar of equivalent acid content.

Expected Temperature Rise. As determined by the Unocal analysis, the acidity of waste ranges from mild (pH of over 4) to very high (pH of -0.2, or equivalent to over 31 weight percent as sulfuric acid). Upon neutralization with lime, these acid concentrations would result in a wide range of temperature expectations as can be predicted using Tables 2 and 3. However, as explained earlier, Tables 2 and

3 were created using the average heat capacities (Table 1) for each waste type, and the heat capacities themselves ranged significantly. If these individually calculated heat capacities were used for estimating the corresponding sample's temperature rise, then even a wider temperature range would be expected.

A realistic scenario would be that all temperatures within the range will occur somewhere, even if only as a hot spot. Unfortunately the efficiency of mixing and overall average acidity, two relative unknowns, will be factors vital to the calculation of average initial temperature of the entire column. Vertical mixing is expected to be limited, resulting in varied temperatures along an augered column, dependent on the local acid concentration within the column.

Conclusions

1) McColl waste may reach hot-spot temperatures that will boil water when neutralized with lime, depending on slurry water content. (Temperatures above the boiling point of water may be reached due to physical adsorption and chemical dissolution, even with water present.)

2) The temperature resulting from neutralization is very dependent on the water content of the reagent slurry.

3) The temperature rise will be more severe in asphaltic cement than in tar of equivalent acidity. This is due to the asphaltic cement's lower heat capacity.

Table 1

Residual Waste Heat Capacity (Cp) Estimates using Kopp's Rule

| Sample | Material | Cp (cal/g°C) Ash as "clay" | Cp (cal/g°C) Ash as "sand" |
|---|---|---|---|
| BJ | Asphaltic Cement | 0.46 | 0.46 |
| A | Asphaltic Cement | 0.42 | 0.41 |
| D | Asphaltic Cement | 0.50 | 0.50 |
| E | Asphaltic Cement | 0.35 | 0.33 |
| F | Asphaltic Cement | 0.31 | 0.28 |
| R-2-5 | Asphaltic Cement | 0.36 | 0.34 |
| R-3-5 | Asphaltic Cement | 0.33 | 0.30 |
| R-3-3 | Asphaltic Cement | 0.50 | 0.49 |
| AJ | Asphaltic Cement | 0.40 | 0.39 |
| I-1-CS | Asphaltic Cement | 0.36 | 0.33 |
| R-3-2 | Mud | 0.57 | 0.56 |
| R-2-2 | Mud/Tar | 0.57 | 0.57 |
| LJ | Soil | 0.33 | 0.31 |
| R3-J | Soil | 0.29 | 0.27 |
| DJ2 | Tar | 0.51 | 0.51 |
| DJ | Tar | 0.51 | 0.50 |
| PJ | Tar | 0.37 | 0.36 |
| B | Tar | 0.43 | 0.43 |
| C | Tar | 0.42 | 0.42 |
| R-2-1 | Tar | 0.51 | 0.50 |
| R2/R3 SSS | Tar | 0.56 | 0.55 |
| Averages | Asphaltic Cement | 0.40 | 0.38 |
| | Tar | 0.47 | 0.47 |

Table 2. Initial Asphaltic Cement Temperatures (degrees F) after Neutralization

H2SO4(aq) + Ca(OH)2 + slurryH2O ------> CaSO4.2H2O + slurryH2O(g,l)

Acid as weight percentage of waste

| % lime in lime slurry | 1 | 5 | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 45 |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 88 | 102 | 108 | 110 | 111 | 112 | 113 | 113 | 113 | 114 |
| 10 | 89 | 115 | 129 | 136 | 140 | 143 | 145 | 147 | 148 | 149 |
| 15 | 90 | 123 | 145 | 158 | 166 | 172 | 176 | 179 | 182 | 184 |
| 20 | 90 | 129 | 157 | 176 | 188 | 197 | 205 | 210 | 212 | 212 |
| 25 | 91 | 133 | 167 | 191 | 208 | 212 | 212 | 212 | 212 | 212 |
| 30 | 91 | 135 | 175 | 204 | 212 | 212 | 212 | 212 | 212 | 212 |
| 35 | 91 | 138 | 182 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 40 | 91 | 140 | 187 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 45 | 91 | 141 | 192 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 50 | 91 | 142 | 196 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 55 | 91 | 143 | 200 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 60 | 91 | 144 | 203 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 65 | 91 | 145 | 206 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 70 | 91 | 146 | 208 | 212 | 212 | 212 | 229 | 256 | 284 | 312 |
| 80 | 91 | 147 | 212 | 212 | 256 | 303 | 351 | 400 | 449 | 500 |
| 90 | 91 | 148 | 212 | 256 | 318 | 381 | 445 | 511 | 578 | 647 |
| 100 | 91 | 149 | 219 | 293 | 367 | 444 | 521 | 601 | 682 | 764 |

Parameters:

Initial temperature 77 F
Heat of reaction 30.71 kcal/mol of H2SO4
Heat of vaporization 0.539 kcal/g of H2O
Heat capacity of residual waste 0.39 cal/gK (asphaltic cement)

Table 3. Initial Tar Temperatures (degrees F) after Neutralization

H2SO4(aq) + Ca(OH)2 + slurryH2O ------> CaSO4.2H2O + slurryH2O(g,l)

Acid as weight percentage of waste

| % lime in lime slurry | 1 | 5 | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 45 |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 86 | 101 | 106 | 109 | 110 | 111 | 112 | 113 | 113 | 113 |
| 10 | 87 | 112 | 126 | 133 | 138 | 142 | 144 | 146 | 147 | 148 |
| 15 | 88 | 118 | 140 | 153 | 162 | 168 | 173 | 177 | 180 | 182 |
| 20 | 88 | 122 | 150 | 168 | 182 | 192 | 199 | 206 | 211 | 212 |
| 25 | 88 | 125 | 158 | 181 | 199 | 212 | 212 | 212 | 212 | 212 |
| 30 | 89 | 127 | 164 | 192 | 212 | 212 | 212 | 212 | 212 | 212 |
| 35 | 89 | 129 | 169 | 201 | 212 | 212 | 212 | 212 | 212 | 212 |
| 40 | 89 | 131 | 174 | 209 | 212 | 212 | 212 | 212 | 212 | 212 |
| 45 | 89 | 132 | 177 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 50 | 89 | 133 | 180 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 55 | 89 | 133 | 183 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 60 | 89 | 134 | 185 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 65 | 89 | 135 | 188 | 212 | 212 | 212 | 212 | 212 | 212 | 212 |
| 70 | 89 | 135 | 189 | 212 | 212 | 212 | 212 | 234 | 259 | 286 |
| 80 | 89 | 136 | 193 | 212 | 230 | 271 | 315 | 359 | 406 | 454 |
| 90 | 89 | 137 | 195 | 229 | 283 | 339 | 397 | 457 | 519 | 584 |
| 100 | 89 | 137 | 197 | 260 | 325 | 393 | 463 | 535 | 610 | 689 |

Parameters:

Initial temperature 77 F
Heat of reaction 30.71 kcal/mol of H2SO4
Heat of vaporization 0.539 kcal/g of H2O
Heat capacity of residual waste 0.47 cal/gK (tar)

# Appendix

Determination of Waste Heat Capacity, Cp. To enable the range of conditions and flexibility built into Tables 2 and 3, the heat capacity of the reacted waste must be estimable at any condition. There is no practical way to experimentally determine the Cp for reacted waste at all conditions due to the number of tests that would be needed. However, an estimate of Cp can be made using Kopp's rule which allows such estimates based on the elemental makeup of a compound. The elemental makeup of the waste is discernable through the analysis done at Unocal (although the analysis was not specifically tailored for this purpose).

The unreacted waste was analyzed for carbon, hydrogen, nitrogen, sulfur, ash, moisture, and sulfuric acid. Since it is the reacted waste that will be absorbing the heat of reaction, this reacted waste must be characterized as a step to estimating its heat capacity.

As the summation term of equation 1 of the text indicates, the heat capacity of the mixture is found by taking a weighted average of the heat capacities of each component. Therefore, each capacity and the mass of the corresponding material must be found. The unreacted and reacted wastes are schematically depicted below (not to scale). Known heat capacities are indicated, and the corresponding masses are found by material balances.

Unreacted Waste and Lime Slurry before Mixing

| | | |
|---|---|---|
| Unreacted Waste (tested material)<br>C, H, S, ash, water, $H_2SO_4$ | Lime<br>[$Ca(OH)_2$] | Slurry Water |

Reacted Waste and Gypsum after Mixing

<table>
<tr><td colspan="3">Residual Waste<br>C, H, S, ash, water<br>(unknown Cp)</td><td rowspan="2">Gypsum<br><br>Cp=0.26</td><td rowspan="2">Slurry water<br><br>Cp=1</td></tr>
<tr><td>Organic component<br>C, H, S<br>(unknown Cp)</td><td>Ash<br>"clay" or "sand"<br>Cp=0.22 or 0.19</td><td>Water<br><br>Cp=1</td></tr>
</table>

The elemental composition of the reacted waste was estimated from the test results by the steps that follow.

1) Assume stoichiometric addition of lime which reacts with the sulfuric acid as follows

$$H_2SO_4 + Ca(OH)_2 \rightarrow CaSO_4 \cdot 2H_2O \text{ (gypsum)} \qquad (2)$$

(Note that the water produced by the neutralization remains bound to the gypsum product, hence the slurry water is effectively inert and serves only as a carrier and heat sink. This also means that the residual waste component of the reacted waste

will have a water component equivalent to the initial waste water content since the slurry water is chemically inert.)

2) Assume that the ash component is either clay or sand, and neglect oxide formation during ashing. Assume that the moisture component is water.

3) Regroup the elements into gypsum product, slurry water, waste water, ash and residual waste organic component while taking into account the reaction. This includes treating the elemental makeup of the total waste sample by accounting for elements that would be counted twice in the analysis such as hydrogen also found in the moisture, acid and clay and sulfur found in the acid. The remaining carbon, hydrogen, nitrogen and sulfur define the elemental makeup of the residual waste organic component. All of the carbon is assumed to be part of the organic component. Nitrogen content is neglected since in was not detected or detected at the minimum detection level in all samples. The entire oxygen content of the total samples (not measured) is assumed to be in the ash, water, and acid components.

4) Convert the weight percentage data to fractions of total atoms. This results in an average composition for the residual waste organic component that can be expressed as a chemical formula.

5) Apply Kopp's rule to this chemical formula to estimate its heat capacity. This is done by assigning each element its respective contribution to the overall heat capacity. Expressed in terms of calories per gram molecular weight, the individual atomic heat capacities are: C, 1.8; H, 2.3; S, 5.4. These capacities are multiplied by the number of atoms in the formula, summed, then divided by the molecular weight of the compound, resulting in a heat capacity expressed in calories per gram of material per degree C.

As a specific example of how Kopp's rule is applied, a sample calculation follows for the sample "E". The Unocal testing data show that "E", a core sample of asphaltic cement, has the composition:

| | |
|---|---|
| Carbon | 14.4 wt.% |
| Hydrogen | 3.1 wt.% |
| Nitrogen | none |
| Sulfur | 5.31 wt.% |
| Adj. ash | 54.6 wt.% |
| $H_2SO_4$ | 9.18 wt.% |
| Moisture | 10.7 wt.% |

The ash percentage in the list was adjusted to account for dehydration during ashing since the ash component lost water that was not accounted for in the moisture data.

adjusted ash = 51.4 * (552/520) = 54.6 wt.%

The sulfuric acid reacts with the lime to form the gypsum product and is therefore not found in the

reacted waste. The hydrogen in the moisture and acid (each determined by ratios of molecular weight) is subtracted from the total hydrogen, leaving the hydrogen that is associated with the organic component of the residual waste. Likewise the sulfur in the sulfuric acid is subtracted from the total sulfur, leaving the sulfur that is associated with the organic component.

adjusted hydrogen = 3.1 - (2/18) * 10.7 - (2/98) * 9.18 = 1.72 wt.%

adjusted sulfur = 5.31 - (32/98) * 9.18 = 2.31 wt.%

These adjustments result in the composition of the organic component of the residual waste, expressed as percentage of the total unreacted waste:

| | |
|---|---|
| carbon | 14.4 wt.% |
| hydrogen | 1.72 wt.% |
| sulfur | 2.31 wt.% |

This composition is then converted to moles and normalized to 100 percent to reflect the true molar composition of the organic component alone, resulting in

| | |
|---|---|
| carbon | 40 mole % |
| hydrogen | 58 mole % |
| sulfur | 2 mole % |

This molecular composition reflects a material with a chemical formula of $C_{40}H_{58}S_2$, or $C_{20}H_{29}S$. The heat capacity estimate is found by assigning each atom its respective atomic heat capacity and then dividing by the "molecular weight," or

[(Cp-Carbon) * 40 + (Cp-Hydrogen) * 58 + (Cp-Sulfur) * 2] / 602 or

(1.8 * 40 + 2.3 * 58 + 5.4 * 2) / 602 = 0.35 cal/g°C

This heat capacity is used with the known heat capacities of the ash (0.224) and water (1.0) components to find the heat capacity of the residual waste. This is done by using the weighted average, or

Cp(residual waste) = organic * Cp(organic) + ash * Cp(ash) + water * Cp(water)
each component being expressed as a weight fraction of the whole.

The weight fractions are taken from the original data (percentages) and are

| | |
|---|---|
| water | 0.107 |
| Adj. ash | 0.546 |
| Organic | 0.184 |
| total | 0.837 |

Theoretically the total would be 1, but experimental error rarely allows full accounting for all the elements. The calculated residual waste Cp is therefore divided by the total recovery to correct the

value.

$$Cp(\text{residual waste}) = (0.184 * 0.35 + 0.546 * 0.224 + 0.107 * 1.0) / 0.837 = 0.35 \text{ cal/g°C}$$

Results from 21 samples analyzed at Unocal were thus treated. Using the classifications of waste types developed by Morrison Knudsen, the resulting averages for Cp for residual "asphaltic cement" and "tar" waste were 0.39 and 0.47 cal/g°C, respectively.