# EXHIBIT 46

Exhibit 46
6186

ALLEN, MATKINS, LECK, GAMBLE & MALLORY

ATTORNEYS AT LAW

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

18400 VON KARMAN, FOURTH FLOOR

IRVINE, CALIFORNIA 92715-1597

TELEPHONE (714) 553-1313

TELECOPIER (714) 553-8354

FREDERICK L. ALLEN
JOHN C. GAMBLE
BRIAN C. LECK
RICHARD C. MALLORY
MICHAEL L. MATKINS
MARVIN E. GARRETT
MICHAEL E. GLEASON*
MARK SHIPLEY
O'MALLEY M. MILLER
THOMAS C. FOSTER
ROBERT J. CATHCART
R. MICHAEL JOYCE
GERBEN HOEKSMA
THOMAS W HENNING
PATRICK E. BREEN
LAWRENCE D. LEWIS*
GEORGE T. MCDONNELL
MICHAEL F. SFREGOLA
JOSEPH E. MCKEEVER
GLENN A SONNENBERG*
DAVID A B BURTON*
MONICA OLSON
THOMAS E GIBBS
VERNON C. GAUNTT
DWIGHT L. ARMSTRONG
PAUL O. O'CONNOR
S LEE HANCOCK
BRUCE P. HOWARD
CYNTHIA L. BURCH
DAVID L OSIAS
DEBRA DISON HALL
ANTON N. NATSIS
ARCHIE T. WRIGHT III
MICHAEL C. PRUTER
MICHAEL H. CERRINA
RICHARD E. STINEHART
STEPHEN R. THAMES
JOHN K. MCKAY
DANA I SCHIFFMAN
ANNE E. KLOKOW
LINDA K. ENSBURY
NEIL N. GLUCK
CHERYL S. RIVERS
JOSEPH S. KLEIN
DAVID W. WENSLEY
GARY S. MCKITTERICK
SALLY STIRES
PATRICK J. GRADY

WILLIAM J. HARRIS
TIMISH M. CHAIKOVSKY
RAY B. GLINER
PAUL C. GRACEY, JR.
ANTHONY S. SOUZA
CHARLES N. KENWORTHY
ROBERT M. HAMILTON
MICHAEL J. MURPHY
ANTHONY J. OLIVA
DAVID R. ZARO
JEFFREY R. PATTERSON
JOHN B. BERTERO, III
JANET A WINNICK
KARINA M. BROWN
JEFFREY A. HEINTZ
CRAIG D SWANSON
DEAN E. ROEPER
RAMONA G SEE
BRADLEY N SCHWEITZER
BENNET M. VAN DE BUNT
MICHAEL L. ABNEY
J. CRAIG WILLIAMS
ALEXANDER SHIPMAN
GRETCHEN K. HUDSON
DIONNE E. CHRISTIAN
ROBYN B. GRANT
MARK R. HARTNEY
PAMELA L. ANDES
RICHARD L. MILLER
BRIAN M. HOYE
PHILIP M. MOREMEN
REBECCA L. GILBERT
THOMAS GALLI
JOHN M TIPTON
MELISSA K. GERARD
DAVID M. GOOSENBERG
BRIAN J. MOONEY
CLARA Y. RUYAN
SCOTT S. WELTMAN
GREGORY B. TRATTNER
CATHERINE M. PAGE
MARK W. HARRIGIAN
MICHAEL L. SCHENKMAN
LEE ALI SHIRANI
ROBERT J. SYKES
MATTHEW W. KOART
FREDRICK J. ROSENTHAL

*A PROFESSIONAL CORPORATION

SFUND RECORDS CTR
1654-04618

LOS ANGELES OFFICE

515 SOUTH FIGUEROA STREET, EIGHTH FLOOR

LOS ANGELES, CALIFORNIA 90071-3398

TELEPHONE (213) 622-5555

TELECOPIER (213) 620-8816

SAN DIEGO OFFICE

4370 LA JOLLA VILLAGE DRIVE, SUITE 300

SAN DIEGO, CALIFORNIA 92122

TELEPHONE (619) 552-1515

TELECOPIER (619) 552-1516

WEST LOS ANGELES OFFICE

11111 SANTA MONICA BLVD., SUITE 1220

LOS ANGELES, CALIFORNIA 90025-3342

TELEPHONE (213) 477-3581

TELECOPIER (213) 478-7162

OUR FILE NUMBER:

S7694-002
1356/2PLA

WRITER'S DIRECT DIAL NUMBER:

714/851-5406

AR2554

December 26, 1991

SFUND RECORDS CTR
88103163

Ms. Pamela Wieman
Project Manager
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California  94105

Re: <u>McColl Superfund Site, Fullerton, California</u>

Dear Pam:

Enclosed are various handouts, viewgraphs, reports and papers which the McColl Site Group ("MSG") has provided to the EPA in connection with the EPA/MSG Technical meetings. We would like these materials submitted into the administrative record for McColl, if you have not already included them. The enclosed materials consist of the following:

A.  Handouts from the January 15, 1991, Technical Meeting;

B.  Handouts from the April 12, 1991, Technical Meeting;

C.  Handouts from the May 21, 1991, Technical Meeting;

D.  Handouts from the July 16, 1991, Technical Meeting;

E.  Paper entitled "Rationale for Rejecting Total Solidification in Place" distributed at the July 16, 1991 Technical Meeting, with accompanying references;

Exhibit 46
6187

LAW OFFICES
ALLEN, MATKINS, LECK, GAMBLE & MALLORY
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Ms. Pamela Wieman
December 26, 1991
Page 2

F.  Summary of and handouts from the August 6, 1991,
Technical Meeting;

G.  Summary of and handouts from the August 29, 1991,
Technical Meeting;

H.  Handouts from the September 10, 1991, Technical
Meeting (the Summary is in the process of being
finalized and will be forwarded to you when it is
completed);

I.  Paper entitled "Personal Protective Equipment
Considerations During the Implementation of the
Selective Excavation Remedial Alternative" provided
to the EPA after the September 10, 1991 Technical
Meeting; and

J.  Handouts from the October 21, 1991, meeting among
Dave Jones, John Blevins, Bill Duchie and John
Zannos.

In addition, we have enclosed copies of the following
ancillary materials for submittal into the McColl administrative
record if you have not already done so:

K.  Chart entitled "Six Months to Clean-Up" with
accompanying attachment;

L.  Letter to John Blevins dated August 23, 1991,
regarding "Analysis of Onsite Incineration Costs";

M.  Letter dated October 4, 1991, to John Blevins
regarding proposed melded schedule;

N.  Report of Dr. Charles Satterfield entitled
"Reactions Occurring in the McColl Superfund Site"
and accompanying letter to John Blevins dated
October 18, 1991;

O.  Analytical Testing Protocols and Analytical Test
Results and accompanying letter to John Blevins
submitted to EPA on October 30, 1991;

Exhibit 46
6188

LAW OFFICES

ALLEN, MATKINS, LECK, GAMBLE & MALLORY
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Ms. Pamela Wieman
December 26, 1991
Page 3

P.  Report of Environmental Solutions, Inc. entitled
"Responses to EPA Questions Regarding Tar
Definition and Emission Control Under the
February 12, 1991 Selective Excavation, Treatment
and RCRA Equivalent Closure Approach" and
accompanying letter to John Blevins dated
October 31, 1991;

Q.  Letter dated November 1, 1991, to John Blevins
regarding the biological process at McColl;

R.  Letter dated November 18, 1991, to Pam Wieman, with
accompanying photographs, regarding the October 23,
1991 site visit;

S.  Letter dated November 20, 1991, to David B. Jones
regarding screening out on-site incineration;

T.  Report of ENSR Consulting and Engineering entitled
"Review of the START Report for the McColl
Superfund Site in Fullerton, California" and
accompanying letter to Pam Wieman dated
November 27, 1991; and

U.  Letter dated December 20, 1991, to David B. Jones
regarding on-site incineration.

Thank you in advance for your assistance in this matter.

Very truly yours,

Cynthia L. Burch, on behalf of
Shell Oil Company,
Union Oil Company of California,
Atlantic Richfield Company,
Texaco Refining and Marketing, Inc.,
and Phillips Petroleum Company

CLB/ceb
Enclosures

Exhibit 46
6189

Exhibit 46
6190

A

# AGENDA

I.   SITE SITUATION

II.  CONCERNS WITH TOTAL EXCAVATION AND THERMAL DESTRUCTION

III. SELECTIVE EXCAVATION/TREATMENT APPROACH

IV.  NCP EVALUATION OF SELECTIVE EXCAVATION/TREATMENT APPROACH

V.   CONCLUSIONS

Exhibit 46
6191

**MSG January 15, 1991**

# SITE HEALTH STUDIES

- ## ATSDR  HEALTH  ASSESSMENT

- ## ORANGE  COUNTY
  - BIRTH OUTCOMES
  - COMMUNITY HEALTH SURVEY
  - CANCER STUDY

- ## DHS
  - HEALTH SURVEYS (1983 & 1988)
  - CANCER STUDY

- ## EPA
  - PUBLIC HEALTH AND ENVIRONMENTAL ASSESSMENT

- ## MSG
  - RISK ASSESSMENT

**MSG January 15, 1991**

Exhibit 46
6192

# I.    SITE SITUATION

## II.   CONCERNS WITH TOTAL EXCAVATION AND THERMAL DESTRUCTION

## III.  SELECTIVE EXCAVATION/TREATMENT APPROACH

## IV.   NCP EVALUATION OF SELECTIVE EXCAVATION/TREATMENT APPROACH

## V.    CONCLUSIONS

Exhibit 46
6193

MSG JANUARY 15, 1991

# EXISTING SITE PLAN



REFERENCE: TOPOGRAPHY BY HAMMON, JENSEN AND WALLEN
DATE OF PHOTOGRAPHY, NOVEMBER 12, 1990.

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
FOR THE McCOLL SITE GROUP.

MSG JANUARY 15, 1991

Exhibit 46
6194

# ESTIMATED AVERAGE CONDITIONS



**LOS COYOTES AND UPPER RAMPART SUMPS**
**(And Possibly Lower Ramparts Sump R-3)**



**LOWER RAMPART SUMPS R-1, R-2, AND R-4**

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
 FOR THE McCOLL SITE GROUP.

Exhibit 46
6195

MSG JANUARY 15, 1991



# COMPOSITE EXAMPLE FOR ALL SUMPS

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC
  FOR THE McCOLL SITE GROUP

MSG JANUARY 15, 1991

Exhibit 46
6196



SHALLOW ELEVATED ARSENIC

- **Arsenic - 50 to 5,000 ppm**
- **$SO_2$ Emission Rate - None/Low**
- **Average Depth - 2.5 ft.**
- **Volume - 1,800 c.y.**
- **Migration Potential - None/Low**
- **Existing Geotechnical Instability Potential - Low**

# CHARACTERISTICS OF ELEVATED ARSENIC

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC
  FOR THE McCOLL SITE GROUP BASED ON AVAILABLE DATA.

Exhibit 46
6197

MSG JANUARY 15, 1991



- **Arsenic - Low**
- **SO$_2$ Emission Rate - Low**
- **Maximum Depth - 13 ft.**
- **Volume - 10,900 c.y.**
- **Migration Potential - None**
- **Existing Geotechnical Instability Potential - High**

# CHARACTERISTICS OF DRILLING MUD

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC. FOR THE McCOLL SITE GROUP BASED ON AVAILABLE DATA.

Exhibit 46
6198

MSG JANUARY 15, 1991

5d



MIXED SOIL/DRILLING MUD/ AND TARRY MATERIAL

- **Arsenic - Low**
- **SO$_2$ Emission Rate - Moderate**
- **Maximum Depth - 16 ft.**
- **Volume - 19,100 c.y.**
- **Migration Potential - Low**
- **Existing Geotechnical Instability Potential - Low**

# CHARACTERISTICS OF
# MIXED SOIL/DRILLING MUD AND TARRY MATERIAL

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
FOR THE McCOLL SITE GROUP BASED ON AVAILABLE DATA.

MSG JANUARY 15, 1991

Exhibit 46
6199

5e



TARRY MATERIAL

- **Arsenic - None**
- **$SO_2$ Emission Rate - High ($\approx$1,200 ppm)**
- **Maximum Depth - 17 ft.**
- **Volume - 5,900 c.y.**
- **Migration Potential - High**
- **Existing Geotechnical Instability Potential - High**

# CHARACTERISTICS OF TARRY MATERIAL

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
FOR THE McCOLL SITE GROUP BASED ON AVAILABLE DATA.

Exhibit 46
6200

MSG JANUARY 15, 1991



- **Arsenic - None**
- **SO$_2$ Emission Rate - High (≈1,000 ppm)**
- **Maximum Depth - 30 ft.**
- **Volume - 48,000 c.y.**
- **Migration Potential - None**
- **Existing Geotechnical Instability Potential - None**

# CHARACTERISTICS OF ASPHALTIC MATERIAL

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
FOR THE McCOLL SITE GROUP BASED ON AVAILABLE DATA.

Exhibit 46
6201

MSG JANUARY 15, 1991

# SITE RISK COMPARED TO REMEDIATION ALTERNATIVES



Exhibit 46
6202

* BASED ON SROA DATA CONSIDERING CANCER RISKS ONLY.
  IMPLEMENTATION RISKS ARE NOT INCLUDED.

MSG JANUARY 15, 1991

# McCOLL SITE WASTE
## VOLUME & RISK



**WASTE VOLUME ESTIMATE**



**ASSOCIATED RISK FOR
UNREMEDIATED SITE**

DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC. IN
ASSOCIATION WITH ENVIRON FOR THE McCOLL SITE GROUP
BASED ON DATA FROM THE SROA

**MSG JANUARY 15, 1991**

Exhibit 46
6203



# RISK LEVELS BY CHEMICAL GROUPS
## UNREMEDIATED SITE

* DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC
IN ASSOCIATION WITH ENVIRON FOR THE McCOLL SITE GROUP
BASED ON DATA FROM THE SROA

Exhibit 46
6204

MSG JANUARY 15, 1991



# UNREMEDIATED SITE RISKS
# BY EXPOSURE ROUTE

* DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
IN ASSOCIATION WITH ENVIRON FOR THE McCOLL SITE GROUP
BASED ON DATA FROM THE SROA

Exhibit 46
6205

**MSG JANUARY 15, 1991**

I.   SITE SITUATION

## II.   CONCERNS WITH TOTAL EXCAVATION AND THERMAL DESTRUCTION

III.   SELECTIVE EXCAVATION/TREATMENT APPROACH

IV.   NCP EVALUATION OF SELECTIVE EXCAVATION/TREATMENT APPROACH

V.   CONCLUSIONS

Exhibit 46
6206

**MSG JANUARY 15, 1991**

10

# WASTE EXCAVATION IMPLEMENTATION PROBLEMS

- **PROJECT IMPLEMENTATION**
  - **Large Scale Operations within Enclosures**
  - **Material Segregation**
  - **Waste Material Stability**
  - **Waste Handling to Truck Load-Out**
  - **Complex Ventilation/Air Treatment System**
  - **Worker Inefficiencies Due to Safety Equipment**
  - **Depth of Excavation/Side Wall Instability**
  - **Access for Confirmatory Testing**
  - **Long Project Duration**
  - **Environmental Effects on Equipment**

- **WORKER HEALTH AND SAFETY**
  - **Potential Worker Exposure**
    - Lethal $SO_2$ Levels
    - Corrosive Materials
  - **Slippery Conditions**
  - **Heat Stress**
  - **Noise Levels**
  - **Visibility Limitations**

- **PUBLIC HEALTH AND ENVIRONMENT**
  - **$SO_2$, $H_2S$ Odors and Hydrocarbon Releases**
  - **Transportation Accidents**
  - **Noise and Visual Disruption for Long Duration**
  - **Fire, Explosion, and Other Accidents**

* Developed by Environmental Solutions, Inc. for the McColl Site Group.

MSG January 15, 1991

Exhibit 46
6207

# IMPORTANT LESSONS FROM TRIAL EXCAVATION

- **SO$_2$ EMISSIONS (up to 1,200 ppm) FAR EXCEED:**
  - OSHA Standards (2 ppm)
  - IDLH Levels (100 ppm)
  - Lethal concentration levels (300 ppm for 15 minutes)

- **WORKER CONDITIONS WOULD BE UNUSUALLY DIFFICULT**
  - Unusually risky work will require extreme health and safety control.
  - Satisfaction of OSHA.

- **FOAMS CANNOT BE RELIED UPON**

- **CONVENTIONAL (TESTED) AIR COLLECTION, HANDLING, AND CLEANING SYSTEMS WOULD NOT BE ADEQUATE**

- **INCINERATION AFTER SCRUBBING IS PROBABLE FOR VOCS**

- **TARRY MATERIAL EXCAVATION WOULD BE VERY DIFFICULT ON LARGE SCALE BASIS**

- **LARGE WASTE VOLUME INCREASES WOULD RESULT FROM WASTE HANDLING**

- **USE OF CONVENTIONAL EXCAVATING EQUIPMENT IS UNLIKELY TO BE FEASIBLE**

- **PRODUCTION RATES WOULD BE VERY SLOW**

* Developed by Environmental Solutions, Inc. for the
  McColl Site Group, based on the 1990 trial excavation.

MSG January 15, 1991

Exhibit 46
6208



**DISTANCE TO
POTENTIALLY AFFECTED AREAS
DUE TO EXCAVATION**

# ILLUSTRATION OF HEALTH RISKS
## VS.
# EXCAVATION PROBLEMS

**HEALTH RISKS
VS.
EXCAVATION PROBLEMS**



ELEVATED ARSENIC

DRILLING MUD

MIXED TARRY SOIL/MUD

TARRY MATERIAL

ASPHALTIC MATERIAL

0%          RISK/PROBLEM          100%

LEGEND

POTENTIAL HEALTH RISK [1]

POTENTIAL EXCAVATION PROBLEMS

**OPTIONAL APPROACHES
TO SOLVE EXISTING
GEOTECHNICAL PROBLEMS**

|  | DESIGN CAP FOR SETTLEMENT | DESIGN CAP FOR SEEPS | SOLIDIFY MATERIAL | EXCAVATE |
|---|---|---|---|---|
| ELEVATED ARSENIC | - | - | - | - |
| DRILLING MUD | X | - | X | X |
| MIXED TARRY SOIL/MUD | X | - | X | - |
| TARRY MATERIAL | X | X | X | X |
| ASPHALTIC MATERIAL | - | - | - | - |

[1] BASED ON DATA FROM THE SROA.

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
FOR THE McCOLL SITE GROUP.

MSG JANUARY 15, 1991

Exhibit 46
6210

I.     SITE SITUATION

II.    CONCERNS WITH TOTAL EXCAVATION AND
       THERMAL DESTRUCTION

## III.    SELECTIVE EXCAVATION/TREATMENT
       APPROACH

IV.    NCP EVALUATION OF SELECTIVE
       EXCAVATION/TREATMENT APPROACH

V.     CONCLUSIONS

Exhibit 46
6211

MSG JANUARY 15, 1991

# NCP ALLOWS FOR SELECTIVE EXCAVATION/TREATMENT APPROACH

**8846**   Federal Register / Vol. 55, No. 46 / Thursday, March 8, 1990 / Rules and Regulations

(A) EPA expects to use treatment to address the principal threats posed by a site, wherever practicable.

(B) EPA expects to use engineering controls, such as containment, for waste that poses a relatively low long-term threat or where treatment is impracticable.

(C) EPA expects to use a combination of methods, as appropriate, to achieve protection of human health and the environment ... treatment of the principal threats posed by a site ... combined with engineering controls ...

Exhibit 46
6212

MSG JANUARY 15, 1991



SHALLOW ELEVATED ARSENIC

- **Volume - 1,800 c.y.**

- **Average Depth - 2.5 ft.**

- **Rationale for Considering Treatment/Excavation of Material:**
  - **Arsenic is the major contributor (98%) to health risk of unremediated site.**

# REMEDIATION CONSIDERATIONS

18

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC
FOR THE McCOLL SITE GROUP

Exhibit 46
6213

MSG JANUARY 15, 1991



DRILLING MUD

- **Volume - 10,900 c.y.**

- **Maximum Depth - 13 ft.**

- **Rationale for Considering Treatment/Excavation of Material:**
  - **Geotechnically unstable relative to cap.**

# REMEDIATION CONSIDERATIONS

19

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC
FOR THE McCOLL SITE GROUP

Exhibit 46
6214

**MSG JANUARY 15, 1991**

- **Volume - 19,100 c.y.**

- **Maximum Depth - 16 ft.**

- **Rationale for Considering Treatment/Excavation of Materials:**
  - **None, other than it overlays tarry waste.**
    - **Contains no chemicals which would pose a significant health risk.**
    - **Geotechnical stability relative to cap is not a major issue.**



**MIXED SOIL/DRILLING MUD AND TARRY MATERIAL**

# REMEDIATION CONSIDERATIONS

20

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC. FOR THE McCOLL SITE GROUP.

Exhibit 46
6215

**MSG JANUARY 15, 1991**

- **Volume - 5,900 c.y.**

- **Maximum Depth - 17 ft.**

- **Rationale for Considering Treatment/Excavation of Material:**
  - **Geotechnically unstable relative to cap.**
  - **Material mobility yields seeps which have:**
    - **Low pH.**
    - **Sulfur dioxide and benzene present.**



TARRY MATERIAL

# REMEDIATION CONSIDERATIONS

21

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC. FOR THE McCOLL SITE GROUP.

Exhibit 46
6216

MSG JANUARY 15, 1991



ASPHALTIC MATERIAL

- **Volume - 48,000 c.y.**

- **Maximum Depth - 30 ft.**

- **Rationale for Considering Treatment/Excavation of Materials:**
  - **None.**
    - **Geotechnically stable relative to cap.**
    - **Material is not mobile.**
    - **Material in-place does not present a pH or emission risk.**

# REMEDIATION CONSIDERATIONS

22

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
FOR THE McCOLL SITE GROUP.

MSG JANUARY 15, 1991

Exhibit 46
6217

23

# RELATIVE WASTE EXCAVATION PROBLEMS

| PROBLEM<br>MATERIAL | VOLUME | GASEOUS EMISSIONS CONTROL | HANDLING DIFFICULTIES | DEPTH RELATED PROBLEMS | SCHEDULE |
|---|---|---|---|---|---|
| Elevated Arsenic | ● | | | | |
| Drilling Mud | ⬤ | ● | ⬤ | ⬤ | ⬤ |
| Mixed Materials | ⬤ | ● | ⬤ | ● | ⬤ |
| Tar | ● | ⬤ | ⬤ | ● | ⬤ |
| Asphaltic | ⬤ | ⬤ | ⬤ | ⬤ | ⬤ |



DEPTH (FEET)

* DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
  FOR THE McCOLL SITE GROUP.

Exhibit 46
6218

MSG JANUARY 15, 1991

# RELATIVE PROBLEMS WITH EXISTING CONDITIONS



| PROBLEM / MATERIAL | POTENTIAL HEALTH RISK | POTENTIAL EXPOSURE | MIGRATION POTENTIAL | CAP INSTABILITY |
|---|---|---|---|---|
| Elevated Arsenic | ● | ● | | |
| Drilling Mud | | | | ● |
| Mixed Materials | | | • | • |
| Tar | • | ● | ● | ● |
| Asphaltic | | | | |

DEPTH (FEET)

* DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
  FOR THE McCOLL SITE GROUP BASED ON DATA FROM THE SROA.

Exhibit 46
6219

**MSG JANUARY 15, 1991**

# SELECTIVE EXCAVATION AND TREATMENT POSSIBILITIES

- ## EXCAVATION AND OFFSITE TREATMENT OF ELEVATED ARSENIC MATERIAL

- ## EXCAVATION AND TREATMENT OR IN SITU TREATMENT OF:
    - DRILLING MUD
    - MIXED MATERIAL
    - TARRY MATERIAL

- ## PROVIDE RCRA CAP WITH GAS CONTROL ON ALL REMAINING MATERIAL

**MSG January 15, 1991**

Exhibit 46
6220

I.   SITE SITUATION

II.   CONCERNS WITH TOTAL EXCAVATION AND
      THERMAL DESTRUCTION

III.   SELECTIVE EXCAVATION/TREATMENT
       APPROACH

**IV.   NCP EVALUATION OF SELECTIVE
        EXCAVATION/TREATMENT APPROACH**

V.   CONCLUSIONS

Exhibit 46
6221

# NCP ANALYSIS

| NCP CRITERIA | CLOSURE | SELECTIVE EXCAVATION/ TREATMENT AND CLOSURE | TOTAL EXCAVATION AND THERMAL DESTRUCTION |
|---|---|---|---|
| Protection of Human Health and the Environment | Yes | Yes | No<br>• Worker and Community Risk |
| Compliance With ARARs | Yes | Yes | No<br>• Air Emissions |
| Long-Term Effectiveness and Permanence | Yes | Yes | Yes |
| Reduction of Mobility, Toxicity, or Volume Through Treatment | Reduces Mobility | Reduces Mobility and Toxicity | Reduces Mobility and Toxicity |
| Short-Term Effectiveness | Yes | Yes | No<br>• Risks During Implementation |
| Implementability | Yes | Yes | No |
| Cost Effectiveness | Yes | Yes | No |
| State Acceptance | Unknown | Unknown | Unknown |
| Community Acceptance | Mixed | Anticipated | Mixed |

Exhibit 46
6222

MSG January 15, 1991

# NCP ANALYSIS OF SELECTIVE EXCAVATION/TREATMENT APPROACH

| | |
|---|---|
| Protection of Human Health and the Environment | **Yes**<br>• Flexible Approach to Excavation and Technology to Balance Short and Long Term Risks<br>• Minimum Risks to Workers, Community and Environment |
| Compliance With ARARs | **Yes**<br>• SCAQMD<br>• Titles 22 and 23<br>• RCRA Closure and Land Ban |
| Long-Term Effectiveness and Permanence | **Yes**<br>• Proven Technology Assures Certainty<br>• Treat/Stabilize High Risk and Mobile Wastes<br>• Low Residual Risk with Remaining Immobile Materials<br>• Residual Risks Well Below Acceptable Risk Range<br>• Multilayer RCRA Cap with Nondegenerative and Redundant Components |
| Reduction of Mobility, Toxicity, or Volume Through Treatment | **Yes**<br>• Contaminant Posing Principal Threat (98% of Risk at Site) Treated and Disposed Offsite; e.g., Arsenic<br>• Mobile Wastes Stabilized/Treated, e.g., Drilling Muds, Tarry Wastes<br>• Residual Waste Containing Less Than 2% of Risks Posed by the Site will be Immobilized |
| Short-Term Effectiveness | **Yes**<br>• Minimum Implementation Period Achieves Quickest Long Term Protection<br>• Impacts to Workers, Community and Environment Minimized by Limited Waste Disturbance<br>• Proven, Reliable Technology |
| Implementability | **Yes**<br>• Technically Feasible because Uses Proven Technology and Limits Excavation Depth<br>• Minimal Need for Offsite Services and Redisposal Capacity<br>• Administratively Feasible because Approvals and Permits can be Obtained |
| Cost Effectiveness | **Yes**<br>• Depends Upon Depth of Excavation |
| State Acceptance | **Unknown** |
| Community Acceptance | **Anticipated**<br>• Interested Persons in Community Circulated Petition Supporting Closure<br>• Interested Persons in Community Generated Comments on SROA Supporting Closure<br>• Interested Persons in Community Met with Congressman Dannemeyer on 12/17/90 to Discuss this Approach |

**MSG January 15, 1991**

Exhibit 46
6223

# NCP ALLOWS FOR SELECTIVE EXCAVATION/TREATMENT APPROACH

**6846**   Federal Register / Vol. 55, No. 46 / Thursday, March 8, 1990 / Rules and Regulations

(A) EPA expects to use treatment to address the principal threats posed by a site, wherever practicable.

(B) EPA expects to use engineering controls, such as containment, for waste that poses a relatively low long-term threat or where treatment is impracticable.

(C) EPA expects to use a combination of methods, as appropriate, to achieve protection of human health and the environment ... treatment of the principal threats posed by a site ... combined with engineering controls ...

Exhibit 46
6224

MSG JANUARY 15, 1991

I.    SITE SITUATION

II.   CONCERNS WITH TOTAL EXCAVATION AND
      THERMAL DESTRUCTION

III.  SELECTIVE EXCAVATION/TREATMENT
      APPROACH

IV.   NCP EVALUATION OF SELECTIVE
      EXCAVATION/TREATMENT APPROACH

V.    CONCLUSIONS

Exhibit 46
6225

MSG JANUARY 15, 1991

' 16



# QUALITATIVE SITE RISK
# VS.
# REMEDIATION METHOD

* DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC.
IN ASSOCIATION WITH ENVIRON FOR THE McCOLL SITE GROUP.

Exhibit 46
6226

# IMPLEMENTATION PROBLEMS ASSOCIATED WITH WASTE EXCAVATION



**PROBLEMS INCLUDE:**

- PROJECT IMPLEMENTATION
- WORKER HEALTH AND SAFETY
- PUBLIC HEALTH AND ENVIRONMENT

*DEVELOPED BY ENVIRONMENTAL SOLUTIONS, INC. FOR THE McCOLL SITE GROUP

**MSG JANUARY 15, 1991**

Exhibit 46
6227

Exhibit 46
6228

# COMPARISON OF SO$_2$ CONCENTRATIONS BETWEEN WORKER AREA AND SCRUBBER INLET



**Immediately Dangerous to Life or Health**

Exhibit 46
6229

# PEAK SO$_2$ CONCENTRATIONS AT THE ENCLOSURE SCRUBBER INLET



\* **Immediately Dangerous to Life or Health**

Exhibit 46
6230



Exhibit 46
6231

# ESTIMATED REMEDIATION TIME AT MCCOLL SITE



EPA I: Based on the excavation rates achieved in the trial excavation

EPA II: Based on the excavation rates anticipated by EPA

Exhibit 46
6232

# SUMMARY OF TEMPERATURE READINGS



Exhibit 46
6233

# BENZENE PERCENTAGE VERSUS MATERIAL TYPE
# McCOLL SUMPS



**TARRY WASTE**

**MIXED SOIL/TAR**

**SOIL/DRILLING MUD**

**CHAR**

**BENZENE DATA FROM SROA**

Exhibit 46
6234

# AVERAGE BENZENE CONCENTRATIONS (PPM)
## McCOLL SUMPS



15' DEPTH (˜1000 PPM)

10' DEPTH (100 PPM)

5' DEPTH (<10 PPM)
25' DEPTH (15 PPM)
20' DEPTH (30 PPM)

0-1 FT. DEPTH (<1 PPM)

BASED ON SROA DATA

Exhibit 46
6235

# AVERAGE BENZENE CONCENTRATIONS (PPM) McCOLL SUMPS



**BASED ON SROA DATA**

Exhibit 46
6236

# THC IN PPM - 1990 TRIAL EXCAVATION BY ACTIVITY AND PERCENT BENZENE



Exhibit 46
6237

# AVERAGE DAILY TEMPERATURE
## SANTA ANA FIRE STATION



DATA FOR 1948-1986

Exhibit 46
6238

# AMBIENT TEMPERATURES AND HEAT STRESS McCOLL SITE

**NIOSH-RECOMMENDED HEAT-STRESS LIMIT ▪ 90 F. FOR 15 MIN/HR.**

**NIOSH RECOMMENDED CEILING LIMIT ▪ 104 F.**

**WORKER TEMPERATURE ▪ AMBIENT + 10 F. FOR LEVEL A + 17 F. FOR ENCLOSURE (AMBIENT + 27 F)**

**DURING FULL SCALE EXCAVATION:**

- **WORKERS ENDANGERED WHEN AMBIENT TEMPERATURE › 70 F. AND WORK LIMITED TO 15 MINUTES/HOUR**
- **IN EXCESSIVELY HIGH TEMPERATURES, WORK MAY BE STOPPED**
- **RISK OF HEAT STRESS SIGNIFICANTLY REDUCES EXCAVATION RATE**

Exhibit 46
6239

# THC EMISSIONS
# McCOLL SITE

**BENZENE, A MAJOR CONSTITUENT OF THC, IS A KNOWN CARCINOGEN**

**BENZENE ESTIMATED TO BE 6 TO 80% OF THC IN AIR SAMPLES**

**AAL FOR AIRBORNE BENZENE EXCEEDED DURING TRIAL EXCAVATION:**

- **6% THC: 200,000 TIMES GREATER THAN AAL**
- **80% THC: 2,000,000 TIMES GREATER THAN AAL**

**THC, INCLUDING BENZENE, PREDICTED TO BE MUCH GREATER DURING FULL-SCALE EXCAVATION**

**COMMUNITY CONTINGENCY PLAN MANDATES THAT WORK BE STOPPED WHEN THC › 70 PPM FOR 30 MINUTES AT SITE PERIMETER**

**WORK TO BE STOPPED WHEN THC REACHES 25% OF THE LEL; BASED ON TRIAL EXCAVATION, TOTAL THC ▪ 1,800 PPM ▪ 15% OF LEL**

Exhibit 46
6240

# SERIOUS AND CONCEIVABLY FATAL HEALTH RISKS McCOLL SITE

1. DURING FULL SCALE EXCAVATION, SULFUR DIOXIDE AND THC EMISSIONS POSE POTENTIALLY FATAL HEALTH RISKS

2. UNPRECEDENTED USE OF LEVEL-A PPE

3. THT EMISSIONS COULD CAUSE:

   - SEVERE ODOR PROBLEMS OFFSITE
   - ADVERSE HEALTH EFFECTS

4. NOISE LEVELS › 100 dbA ONSITE, 75 TO 100 dbA OFFSITE WOULD:

   - EXCEED FULLERTON CITY NOISE ORDINANCE OF 55 dbA (DAY) AND 50 dbA (NIGHT)
   - CAUSE HEARING DAMAGE IF ›90 dbA FOR 8 HOURS
   - CAUSE WORKER COMMUNICATION PROBLEMS

5. EXPLOSIVITY/FLAMMABILITY CREATES SIGNIFICANT RISK TO WORKERS AND COMMUNITY

Exhibit 46
6241

# FATAL FLAWS WITH FULL-SCALE EXCAVATION

1. INABILITY TO CONTROL TOXIC EMISSIONS

2. INABILITY TO PREVENT SERIOUS RISKS TO
   WORKERS AND COMMUNITY

3. EXCESSIVE DURATION

McCOLL SITE GROUP

Exhibit 46
6242

Exhibit 46
6243

C

# KEY ELEMENTS FOR CONTROLLING EMISSIONS

- **KEEP THE EXPOSED AREA/VOLUME VERY SMALL AND COMPLETELY CONTROLLABLE**

- **PROVIDE A PRIMARY SHROUD WHICH HAS BEEN PROVEN TO BE EFFECTIVE FOR CONTROLLING EMISSIONS AT AUGER SYSTEMS**

- **PROVIDE REDUNDANT SYSTEMS UNRELATED TO OPERATION OF THE AUGER OR SHROUD:**

- **AVOID THE NEED FOR INGRESS AND EGRESS**

- **PROVIDE REDUNDANT VACUUM AND AIR CLEANING CAPABILITIES**

- **KEEP THE AIR CLEANING SYSTEMS SMALL AND EASILY CONTROLLED**

Exhibit 46
6244

# SOLIDIFICATION CONCLUSIONS

- **PHYSICAL SOLIDIFICATION POTENTIAL IS ASSURED**

- **COMPLETE COVERAGE IS ASSURED BY THE OVERLAPPING METHOD**

- **A VARIETY OF ADDITIVES COULD BE SUCCESSFULLY USED**

- **PREDESIGN BENCH TESTING AND FIELD DEMONSTRATIONS WOULD ALLOW SYSTEM OPTIMIZATION**

Exhibit 46
6245

# ELEMENTS CONTRIBUTING TO PHYSICAL SOLIDIFICATION

| **REQUIRED ACTIVITY** | **ATTRIBUTES OF IN SITU METHODS** |
|---|---|
| Tar/Soil Mixing | • Auger Loosens Material<br>• Blade Angles Provide Vertical Mixing<br>• Duration or Agitation Can be Varied |
| Lime and/or Fly Ash/Hydration and Bulking, Cement/Hydration, Silicates | • Additives Are Injected as Slurry Along Blade<br>• Blades Provide Vertical and Horizontal Mixing<br>• Duration or Agitation Can be Varied |
| Curing Time | • Procedure Does Not Require Subsequent Material Handling |

Exhibit 46
6246

# SOLIDIFYING THE TAR

- **REQUIRED RESULT IS TO PHYSICALLY SOLIDIFY TO REDUCE POTENTIAL FOR:**
  - Settlement of Drilling Mud and Tar
  - Mobility of Tar

- **SIGNIFICANT CHEMICAL STABILIZATION WILL OCCUR, BUT IT IS NOT RELIED UPON FOR THE RECOMMENDED SOLUTION**

- **NO REFERENCES OR OPINIONS CAN BE LOCATED WHICH QUESTION THE ABILITY FOR PHYSICAL SOLIDIFICATION OF TAR**

- **PHYSICAL SOLIDIFICATION HAS ROUTINELY BEEN ACCOMPLISHED ON MORE DIFFICULT MATERIALS**

Exhibit 46
6247

# Example Sump
# Cone Penetrometer Program





| | |
|---|---|
| Boring ⟶ ● | Phase 1  Cone/Continuous Sampling Calibration |
| Cone Penetrometer ⟶ ⊕ | |
| ⊕ | Phase 2  40-Foot Grid With Infill To Define Boundaries |
| ⊕ | Phase 3  20-Feet x 10-Foot Grid |
| ▲ | Phase 4  Type 2/3 Area Definitions |

Exhibit 46
6248

# REDUNDANT PROVISIONS

- **ALL ACTIVE SEEP AREAS WILL BE EXCAVATED AFTER COMPLETE OR PARTIAL SOLIDIFICATION, IF SAFE EXCAVATION IS POSSIBLE**

- **PRIOR TO EXCAVATION, A LARGER BUFFER ZONE WILL BE SOLIDIFIED TO IMPROVE MATERIAL HANDLING**

- **BACKFILLING WILL INCLUDE:**
  - **Crushed rock bottom**
  - **Compacted clay top**

- **THE COVER SYSTEM INCLUDES A LOW PERMEABILITY COMPOSITE LAYER WHICH RESTRICTS FLOW IN EITHER DIRECTION**

Exhibit 46
6249

# SPECIAL CHARACTERIZATION FACTORS

- **CONE PROBES TO BE USED**
  - **Tip Resistance**
  - **Friction Resistance**
  - **Resistivity**
  - **pH**
  - **Soil Gas Quality**

- **CONE PROBE CORROSION**

- **EVALUATIONS OF PRIOR PROGRAMS**
  - **5 ft. Sampling Limitations**
  - **L-1 Boring Data**
  - **"Old Faithful" Observations**
  - **Test Excavation Observations**

Exhibit 46
6250

# EXAMPLE
# SUMP CHARACTERIZATION
# PROGRAM

| PHASE | ACTIVITY | CONE PROBES | SMALL DIAMETER BORINGS |
|:---:|:---:|:---:|:---:|
| 1 | Cone/Continuous Sampling Calibration | 62 | 38 |
| 2 | 40 ft. Grid with Infill to Define Boundaries | 600 | 30 to 60 |
| 3 | 20 ft. x 10 ft. Grid | 600 | 30 |
| 4 | Type 2/3 Area Definitions | 400 | 40 |

Exhibit 46
6251

# CONE PENETROMETER SYSTEM



## MEASURED PARAMETERS

- TIP RESISTANCE
- FRICTION RESISTANCE
- RESISTIVITY
- pH
- GAS QUALITY

Exhibit 46
6252

# SELECTIVE EXCAVATION ALTERNATIVE
# FLOW DIAGRAM



Exhibit 46
6253

# TAR LOCATION AND DEFINITION

- **EXTENSIVE CONE PENETROMETER AND SMALL DIAMETER BORING CHARACTERIZATION TO SUBDIVIDE EACH SUMP INTO ONE OF FIVE AREA TYPES**

- **PROVIDE REDUNDANCIES WITHIN SOLUTION TO ACCOUNT FOR EACH CHARACTERIZATION FACTOR AND/OR POTENTIAL REMEDIATION LIMITATION**

Exhibit 46
6254



Exhibit 46
6255



Exhibit 46
6256



Exhibit 46
6257



Exhibit 46
6258



Exhibit 46
6259

# Detail of Neutralization and Partial Solidification Process





Exhibit 46
6260

# In Situ Treatment/Solidification Process



## <u>Plan View</u>

Exhibit 46
6261

# In Situ Treatment/Solidification Process



# <u>Cross Section View</u>

Exhibit 46
6262

# In Situ Treatment And Solidification Process



Exhibit 46
6263

# CONE PENETROMETER EXAMPLES OF PAST EXPERIENCE

**1985**   Chevron, Long Beach, California.
710 Freeway and 405 Freeway.
Mapped out perimeter of oil well sumps using
end bearing, friction and resistivity.

**1985**   Chevron, Long Beach, California.
405 Freeway and Pacific Avenue.
Defined natural layers surrounding separator ponds for
water coming from oil wells. Also looked for
seepage. Used tip and friction only.

**1985**   University of Washington, Seattle.
Performed cone tests to outline old landfill under
athletic field. Information was also used to determine
rate of settlement.

**1986**   Carlsbad Sanitary Landfill (SWAT).
Cone was used to define potential layers of methane
gas. Cone truck was used to push 2" well screen into
methane layers. Approximately 8 wells per day were
set.

**1986**   Texaco Oil Refinery, Carson, California.
Performed numerous resistivity cone tests to map out
plume of sludge pits as part of a remediation
feasibility study.

**1989**   Mississippi River Bank, Corp of Engineers - WES.
Performed numerous resistivity water samples to
determine transition point in soil between fresh
ground water and brackish water, working with
personnel from Delft, Holland.

Exhibit 46
6264

# CONVERSATIONS WITH SOLIDIFICATION/STABILIZATION CONTRACTORS OR VENDORS

- **GEO-CON**

- **MILLGARD ENVIRONMENTAL**

- **HALIBURTON**

- **IN-SITU FIXATION, INC.**

- **TOXIC TREATMENTS, INC. (NOVATERRA)**

- **ENRECO**

- **HAZCON (FUNDERBRUK)**

- **CHEM FIX**

- **VFL CORP.**

- **LSU - DR. TITTLEBAUM**

- **INTERNATIONAL WASTE TECHNOLOGY**

- **SILICATE TECHNOLOGY**

- **SIALLON CORP.**

- **REMCOR**

Exhibit 46
6265

# REFERENCES

- **STABILIZATION/SOLIDIFICATION OF CERCLA AND RCRA WASTES - EPA/625/6-89/022**

- **HANDBOOK FOR STABILIZATION/SOLIDIFICATION OF HAZARDOUS WASTE - EPA/540/2-86/001**

- **EVALUATION OF SOLIDIFICATION/STABILIZATION AS A BEST DEMONSTRATED AVAILABLE TECHNOLOGY FOR CONTAMINATED SOILS - EPA/600/2-89/013**

Exhibit 46
6266

# In Situ Treatment/Solidification Process



# Cross Section View

Exhibit 46
6267

# In Situ Treatment/Solidification Process



ROTARY TABLE

TREATMENT/
SOLIDIFICATION
AUGER

CRANE

VACUUM LINE TO
AIR TREATMENT
FACILITY

REDUNDANT
ENCLOSURE

PRIMARY EMISSIONS
CONTROL SHROUD

## Plan View

Exhibit 46
6268

# Onsite Soil Treatment



Exhibit 46
6269

Exhibit 46
6270

D

## RATIONALE FOR REJECTING TOTAL SOLIDIFICATION IN PLACE

During our analysis of remedial options for the McColl
Site, we considered, but rejected, total in-place solidification
for the following reasons:

- Depth to the Char and Lack of Hazard
- No Reduction of Mobility, an Increase in Volume,
  and No Justification for Reducing Toxicity below
  already Low Levels
- Implementability
- Risk
- Worker Safety
- Time

Our conclusion, after considering all of these factors, was that
solidification was a viable technology for treating the tarry
material found at the McColl Site and a technology that could be
part of a treatment train for remediating the Site, but that the
technology was not practicable or necessary as a global remedial
technology for the McColl Site.

Depth to Char/Lack of Hazard - Based on the depth of the
char, there is no chance of casual contact with the char, now or
in the foreseeable future.  Calculations using the Universal Soil
Loss Equation (USLE) indicated an erosion potential on the Site
of less than 1/10 of one inch of soil per year.  At this rate,
given the current depth of cover over the sumps, it would be over
1000 years before the char would be exposed and able to be
contacted.  Nominal maintenance, or a RCRA equivalent cap, would
extend this period indefinitely.  As long as the waste is
undisturbed and covered, there are minimum emissions to the
atmosphere, as shown by site testing.  In addition, the char has
low permeability, as evidenced by its containment of sulfur
dioxide and the lack of contamination in groundwater samples.
There was therefore no hazard associated with the char.

Reduction of Toxicity, Mobility or Volume - The risk
analysis conducted in the SROA concluded that, in an undisturbed
condition, the gases in the char do not pose a significant risk
of either toxicity or carcinogenicity.  The SROA indicated that
the risks from volatiles inhalation for either the no-action
alternative (1E-06) or the RCRA Equivalent closure alternative
(3E-08) were as safe or safer than those normally accepted by EPA
as protective (1E-04 to 1E-06).  Therefore, treatment to reduce
toxicity was not justified.  Since the char is immobile, it
required no treatment to reduce mobility.  In-place
solidification would involve converting one solid to another

Exhibit 46
6271

solid by rupturing and then re-solidifying the existing char
matrix with chemicals.  In addition, the added chemicals would
increase the final volume of the waste by up to 30%, creating a
site as much as 5-10 feet higher than the existing topography.

Implementability - Because of the hardness of the char
(estimated in excess of 200 blows per foot of penetration,
$CH_2M$-Hill), existing auger rigs would have difficulty penetrating
the char.  There was the concern that the auger blades would be
unable to break the char into small enough fragments for the
solidification reagents to obtain sufficient contact for the
process to work.  The effort to break up the char would greatly
increase the noise level of the solidification process, exposing
workers and the community to noise hazards for an extended period
of time.  This process would also release entrapped gases, posing
a risk to the workers and the community where none exists today.
Attempts to control these risks would entail significantly
reduced solidification rates, redundant control equipment and
attendant higher costs and extended schedules.

The sumps are as deep as 35 to 40 feet.  There was
considerable concern over the ability to maintain alignment to
assure overlap of the vertical cylinders of treatment at these
depths.  There were also concerns that the presence of foreign
materials (e.g., rubble) or especially hard asphaltic material in
the sumps would preclude penetration of an auger to the base of
the asphaltic material.  These factors would reduce the assurance
of complete solidification and require greater cost to implement.

Total in-place solidification would result in the total
break-down of the char layer and the addition of large volumes of
liquid reagents.  Any excess reagents would have direct access
into the soil beneath the waste sumps and could migrate through
the soil towards groundwater.  Although we believe the potential
for groundwater contamination is small given the depth to the
groundwater, there is an inherent risk of groundwater
contamination when liquids are introduced to a site, a risk which
increases as the volume of liquids introduced increases.
Consequently, total in-place solidification increases the
potential for groundwater problems where none currently exist.

Without assurance that the entire char mass could be
stabilized to an extent greater than the current in-place
material, which is already hard and impermeable, there was no
justification for increasing risks from emissions or liquid
injection by attempting to break up and re-solidify the char.

Risk - The SROA evaluation demonstrates that the
undisturbed char presents little risk to the community or to the
environment.  Disturbance of the char would release significant

-2-

Exhibit 46
6272

quantities of sulfur dioxide, benzene and odorous thiophenes, creating the potential for significant toxic emissions during the remediation process. The experience of the Trial Excavation demonstrated the magnitude of and difficulty for controlling emissions from the char. Management of this problem would reduce the work rate, extending the schedule and increasing the cost.

Worker Safety – Because of the high emission levels encountered when the waste is disturbed, a high level of worker health protection may be required similar to the experience during the Trial Excavation. This would increase physical and heat stress on the workers, reducing effective visibility and effective work time per worker per hour, and increasing time and cost.

Time – The estimated char volume in the sumps, coupled with the hardness of the material and the need to slow the work to control emissions, would require 10 years or more for total in-place solidification. Uncertainties with equipment downtime, coupled with slowing the processing rate to assure proper emissions treatment, worker safety, effective solidification reagent interaction with the char, and control of the increased solidified volume of material would further extend the program.

Conclusion – Given the significant number of technical issues associated with the implementation of total solidification of all the wastes, as discussed above, and the potential for increasing risks to workers and the community arising from disturbance of the char, this technology was eliminated from further consideration, prior to the development of potential treatment trains to address the variety of remediation issues associated with cleanup of the site. Solidification is merely a component of a comprehensive approach to remediation which must also address issues such as gas control and treatment, seismic stability, groundwater protection and monitoring, and site maintenance and access.

Exhibit 46
6273

**2**

Exhibit 46
6274

<u>McCOLL SUPERFUND SITE</u>

<u>THE REASONS FOR TAR REACTING TO ASPHALT</u>

- **CONCLUSION**

     A review of the chemistry occurring within the McColl
waste sumps

          (a)  suggests the principal mechanism by which tar
     converts to asphalt is a complex polymerization/condensation
     reaction, catalyzed by sulfuric acid

     and

          (b)  reveals that this reaction is irreversible at
     conditions which exist within the sumps.

- **BACKGROUND**

     Site assessments at McColl have indicated the sumps
contain distinct types of material, two of which have been
classified as tar and asphaltic material.

     The condition of the sumps, today, is clearly
differentiated, with a viscous mobile "tarry material" residing
above a harder asphaltic zone.  This condition is clearly not how
the sumps existed in their early years (late 1940's).  Complex
hydrocarbon reaction chemistry has occurred over 50 years,
reacting the original alkylation waste to today's asphalt and tar.

     The following briefly describes the tar to asphalt
conversion process.

- **DISCUSSION OF TAR TO ASPHALT REACTION CHEMISTRY**

     From a chemical engineering perspective, the McColl
sumps can be considered batch reactors.  During the 1940's, the
twelve "reactors" were filled with alkylation sludge of a
pumpable consistency.  The sludge's composition may have been
50:50 sulfuric acid to heavy hydrocarbons.

     During the ensuing half century, the hydrocarbons in the
sumps have undergone a condensation/polymerization reaction,
catalyzed by the sulfuric acid.  The hydrocarbons are reducing
agents, so some sulfur dioxide is liberated in a side reaction.
Phenomenologically, the original sludge hydrocarbons react to

July 12, 1991

Exhibit 46
6275

**3**

Exhibit 46
6276

increasingly heavier fractions, which ultimately result in the
formation of the asphalt phase, plus smaller amounts of light
hydrocarbons.

Research of the literature, coupled with consultations
with both oil company researchers and academic experts, shows
that asphalt to tar conversion could occur via two distinct
mechanisms; namely, (i) a hydrotreatment process involving
hydrogen addition typically using catalysts, and (ii) a pyrolysis
mechanism. Mechanism (i) demands high temperatures (e.g., 800°F)
and high hydrogen pressures (e.g., 100 atmospheres). Mechanism
(ii) requires temperatures in the 500-600°F range. None of these
conditions exist at McColl.

Both of the above processes are typically employed
during coal liquefaction where, in the presence of heat and
hydrogen, coal liquids are generated. Another analogy is that if
light hydrocarbons were formed from heavy hydrocarbons at McColl,
then we should expect to discover mobile liquids in coal fields
at ambient conditions. This, of course, does not happen.

- <u>SEEP ISSUE</u>

Our previous discussion has focused on tar to asphalt
reaction mechanisms in an air-free environment. The McColl Site
has seeps where tar material permeates to the surface through
weaknesses in the existing cap. It has been noted that on air
contact, the tar solidifies. This solidification mechanism
involves oxidation, which is chemically distinct from the
intra-sump mechanism.

July 12, 1991

Exhibit 46
6277

 **EPA**

# McCOLL SUPERFUND SITE

**United States Environmental Protection Agency, Region IX, San Francisco**

Fullerton, California | July 1991

# MCCOLL WASTE SAMPLES TO BE TESTED

The Environmental Protection Agency (EPA) will be working at the McColl Superfund Site during mid-July collecting samples of waste material. The samples will be combined with other materials in a laboratory to determine if the waste can be solidified and stabilized.

The goal of the solidification/stabilization process is to make the waste material less acidic and to reduce the mobility of chemicals within the waste. If it is possible to solidify and stabilize the waste, this type of treatment might be considered for use as an interim cleanup measure or a final remedy for the McColl site.

A report giving the findings of this study will be available for public review in late fall.

## GROUNDWATER MONITORING CONTINUED
### Investigation Expanded

With the continued detection of contaminants in the groundwater beneath the McColl Superfund Site, EPA has maintained its quarterly sampling schedule of that groundwater. Additionally, the EPA has begun to further investigate the extent that the groundwater has been impacted by the site. The investigation will enable the EPA to determine what action will be necessary to permanently protect the groundwater in the site's vicinity.

Contamination was first found in the deep groundwater well P-2D in February, 1987. Results of the June and October 1990 samplings continued to show benzene and thiophene compounds in well P-2D. Both of these compounds are found in the McColl waste and EPA believes these compounds continue to migrate into the groundwater from the waste material.

Residents who may be concerned about their drinking water quality should not be alarmed by the sampling results. The City of Fullerton and Orange County both conduct regular tests of all drinking water wells in the Fullerton area and there have been no indications the drinking water wells have been affected by McColl site wastes.

As the EPA conducts its quarterly monitoring of the groundwater beneath the site it will make those results public. A report on the results of the January and April 1991 sampling events will be available in August. All previous reports are available in the McColl Superfund Site Repository in the reference section of the Fullerton Public Library, 353 West Commonwealth Ave., Fullerton.

Exhibit 46
6278

## WATER QUALITY AT WELL P2D

- Certain organic chemicals (e.g., tetrahydrothiophene, benzene, toluene, ethylbenzene) are tentatively reported in only one monitoring well (P2D) in the deep regional aquifer.  However, the tentatively reported concentrations of these parameters are substantially lower than federal or state drinking water standards.

- The reported concentrations of tetrahydrothiophene and other organic parameters continue to decrease, which supports the conclusion that the chemicals in well P2D were most likely introduced into the aquifer during construction of the well.

- The tentatively reported concentrations of benzene, toluene and ethylbenzene in well P2D are below normal laboratory reporting limits.  Furthermore, these tentatively reported concentrations are refuted by duplicate analyses, which reported these chemicals to be "not detected".  The data that report these chemicals in well P2D are, therefore, quantitatively unreliable.

- Low concentrations of chlorobenzene and 1,4-dichlorobenzene (less than one ug/l) have also been reported in well P2D.  No detections of these two chemicals have been reported in other monitoring wells at the McColl site or in McColl waste.



Tetrahydrothiophene Concentration vs. Time
McColl Site
at Well P2D

Exhibit 46
6280

07-16-91

McColl Ground Water Chemistry
B/T/E and Thiophene Analyses in Well P2D

SAMPLING EVENT

| CHEMICALS | CH2M Hill '87 | | CDHS '88 | | NEIC '88 | EPA '89 | | EPA 1/90 | | EPA 6/90 | | EPA 10/90 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Benzene | 5U | 5U | | 5U | 5U | 5U | 1U | 1U | 0.3J | 1U | U | U | U | U |
| Toluene | 5U | 5U | | 5U | 5U | 0.7 | 1U | 1U | 0.4J | 1U | U | U | 1U | 1U |
| Ethylbenzene | | | | | | | 1U | 1U | 0.3J | 1U | 0.6J | U | U | U |
| Tetrahydrothiophene | 7 | 8 | 30 | 23 | 21 | 19 | 4.1 | 3.4 | 3J | 3J | 5 | 5 | 4J | 5 |
| 2-MethylTetrahydrothiophene | | | 31 | 26 | 25 | TENT | 7.8J | 5.9J | 10J | 10J | 10J | 10J | 6J | 7J |
| 3-MethylTetrahydrothiophene | | | | | | TENT | 2.2J | 1.7J | 0.9J | 0.8J | 3J | 3J | 2J | 2J |

Notes:

U — Not Detected
J — Estimated Value, Quantification may be unreliable
Duplicate Analyses Listed Together
TENT — Tentatively Identified, No Quantitation Provided

07-16-91

Exhibit 46
6281

m

Exhibit 46
6282

## RATIONALE FOR REJECTING TOTAL SOLIDIFICATION IN PLACE

During our analysis of remedial options for the McColl
Site, we considered, but rejected, total in-place solidification
for the following reasons:

- Depth to the Char and Lack of Hazard
- No Reduction of Mobility, an Increase in Volume,
  and No Justification for Reducing Toxicity below
  already Low Levels
- Implementability
- Risk
- Worker Safety
- Time

Our conclusion, after considering all of these factors, was that
solidification was a viable technology for treating the tarry
material found at the McColl Site and a technology that could be
part of a treatment train for remediating the Site, but that the
technology was not practicable or necessary as a global remedial
technology for the McColl Site.

Depth to Char/Lack of Hazard - Based on the depth of the
char, there is no chance of casual contact with the char, now or
in the foreseeable future.  Calculations using the Universal Soil
Loss Equation (USLE) indicated an erosion potential on the Site
of less than 1/10 of one inch of soil per year.  At this rate,
given the current depth of cover over the sumps, it would be over
1000 years before the char would be exposed and able to be
contacted.  Nominal maintenance, or a RCRA equivalent cap, would
extend this period indefinitely.  As long as the waste is
undisturbed and covered, there are minimum emissions to the
atmosphere, as shown by site testing.  In addition, the char has
low permeability, as evidenced by its containment of sulfur
dioxide and the lack of contamination in groundwater samples.
There was therefore no hazard associated with the char.

Reduction of Toxicity, Mobility or Volume - The risk
analysis conducted in the SROA concluded that, in an undisturbed
condition, the gases in the char do not pose a significant risk
of either toxicity or carcinogenicity.  The SROA indicated that
the risks from volatiles inhalation for either the no-action
alternative (1E-06) or the RCRA Equivalent closure alternative
(3E-08) were as safe or safer than those normally accepted by EPA
as protective (1E-04 to 1E-06).  Therefore, treatment to reduce
toxicity was not justified.  Since the char is immobile, it
required no treatment to reduce mobility.  In-place
solidification would involve converting one solid to another

Exhibit 46
6283

solid by rupturing and then re-solidifying the existing char
matrix with chemicals.  In addition, the added chemicals would
increase the final volume of the waste by up to 30%, creating a
site as much as 5-10 feet higher than the existing topography.

Implementability - Because of the hardness of the char
(estimated in excess of 200 blows per foot of penetration,
$CH_2M$-Hill), existing auger rigs would have difficulty penetrating
the char.  There was the concern that the auger blades would be
unable to break the char into small enough fragments for the
solidification reagents to obtain sufficient contact for the
process to work.  The effort to break up the char would greatly
increase the noise level of the solidification process, exposing
workers and the community to noise hazards for an extended period
of time.  This process would also release entrapped gases, posing
a risk to the workers and the community where none exists today.
Attempts to control these risks would entail significantly
reduced solidification rates, redundant control equipment and
attendant higher costs and extended schedules.

The sumps are as deep as 35 to 40 feet.  There was
considerable concern over the ability to maintain alignment to
assure overlap of the vertical cylinders of treatment at these
depths.  There were also concerns that the presence of foreign
materials (e.g., rubble) or especially hard asphaltic material in
the sumps would preclude penetration of an auger to the base of
the asphaltic material.  These factors would reduce the assurance
of complete solidification and require greater cost to implement.

Total in-place solidification would result in the total
break-down of the char layer and the addition of large volumes of
liquid reagents.  Any excess reagents would have direct access
into the soil beneath the waste sumps and could migrate through
the soil towards groundwater.  Although we believe the potential
for groundwater contamination is small given the depth to the
groundwater, there is an inherent risk of groundwater
contamination when liquids are introduced to a site, a risk which
increases as the volume of liquids introduced increases.
Consequently, total in-place solidification increases the
potential for groundwater problems where none currently exist.

Without assurance that the entire char mass could be
stabilized to an extent greater than the current in-place
material, which is already hard and impermeable, there was no
justification for increasing risks from emissions or liquid
injection by attempting to break up and re-solidify the char.

Risk - The SROA evaluation demonstrates that the
undisturbed char presents little risk to the community or to the
environment.  Disturbance of the char would release significant

-2-

Exhibit 46
6284

quantities of sulfur dioxide, benzene and odorous thiophenes, creating the potential for significant toxic emissions during the remediation process.  The experience of the Trial Excavation demonstrated the magnitude of and difficulty for controlling emissions from the char.  Management of this problem would reduce the work rate, extending the schedule and increasing the cost.

Worker Safety - Because of the high emission levels encountered when the waste is disturbed, a high level of worker health protection may be required similar to the experience during the Trial Excavation.  This would increase physical and heat stress on the workers, reducing effective visibility and effective work time per worker per hour, and increasing time and cost.

Time - The estimated char volume in the sumps, coupled with the hardness of the material and the need to slow the work to control emissions, would require 10 years or more for total in-place solidification.  Uncertainties with equipment downtime, coupled with slowing the processing rate to assure proper emissions treatment, worker safety, effective solidification reagent interaction with the char, and control of the increased solidified volume of material would further extend the program.

Conclusion - Given the significant number of technical issues associated with the implementation of total solidification of all the wastes, as discussed above, and the potential for increasing risks to workers and the community arising from disturbance of the char, this technology was eliminated from further consideration, prior to the development of potential treatment trains to address the variety of remediation issues associated with cleanup of the site.  Solidification is merely a component of a comprehensive approach to remediation which must also address issues such as gas control and treatment, seismic stability, groundwater protection and monitoring, and site maintenance and access.

-3-

Exhibit 46
6285

REFERENCES FOR MSG PAPER ON REJECTION OF TOTAL SOLIDIFICATION

At our meeting in Fullerton on July 16, 1991 the EPA requested references for certain items in the MSG paper entitled Rejection of Total Solidification. The items questioned by EPA and the corresponding references are listed below:

1.    Erosion potential on the site is less than 1/10 of one inch of soil per year.

      This value was estimated using the Universal Soil Loss Equation for estimating soil erosion losses (see attached calculation).

      References:
              Israelsen, C.E., Clyde, C.G., Fletcher, J.E., Israelsen, E.K., Haws, F.W., Packer, P.E. and E.E. Farmer. 1980.   "Erosion Control During Highway Construction - Manual on Principles and Practices." Transportation Research Board, National Research Council, Washington D.C. April 1980.

              Wischmeier, W.H., 1959. " A Rainfall Erosion Index for a Universal Soil Loss Equation." Proceedings, Soil Science Society of America, Volume 23, pp. 246-249.

2.    Addition of chemicals would increase the final volume of the waste by up to 30%.

      From discussions with vendors, the amount of solidification reagent that would be required would be roughly 20 to 30 percent by volume.   The volume required is dependent on various factors which include the specific chemicals to be added and the physical and chemical characteristics of the material to be solidified.

      In addition, EPA's Handbook on In Situ Treatment of Hazardous Waste-Contaminated Soils, January, 1990 (EPA/540/2-90/002) provides some general guidance on volume increases due to solidification. For the selected case studies presented, the volume increase varied from zero to greater than 35%.

McColl Site Group  September 13, 1991

1

Exhibit 46
6286

3.  The hardness of the char is estimated to be in excess of 200 blows per foot of penetration.  ·

    Reference:  CH$_2$M Hill's 1987 boring logs.

4.  The sumps are as deep as 35 to 40 feet.

    References:
        CH$_2$M Hill, 1989.  Supplemental Reevaluation of Alternatives, Final Draft. Table 2-1;

        Borehole logs from CH$_2$M Hill, 1987.

5.  Presence of foreign materials (rubble) in the sumps.

    Reference:
        Based on photographs taken of the site, which are attached.

6.  Ten years or more for total in-place solidification.

    This was an engineering estimate based on volumes of waste to be solidified and recognizing the hardness of the asphaltic material.  Since the partial solidification approach would take approximately 42 to 48 months to accomplish, it was estimated that ten years or more would be required for total solidification.

McColl Site Group  September 13, 1991

Exhibit 46
6287

## ATTACHMENT A

### Use of the Universal Soil Loss Equation
### for Estimating Soil Erosional Losses at the McColl Site

The Universal Soil Loss Equation (USLE) is a predictive tool to estimate soil loss at a site. This tool was developed by Wischmeier (1959) primarily for use with agricultural lands. The equation was subsequently modified by the Transportation Research Board of the National Research Council in 1980 (Israelsen at al, 1980) to provide a more rapid technique for estimating soil erosion. The equation is:

$$A = R * K * LS * VM$$

where:

- A = the computed amount of soil loss per unit area for the time interval represented by factor R, measured in tons per acre per year;
- R = Rainfall factor;
- K = Soil Erodibility Factor in tons per acre per year per unit of R;
- LS = Topographic Factor (Length, in feet, and Steepness, in % gradient, of the surface of the sump); and
- VM = Erosion Control Factor (Vegetative and Mechanical measures).

The document by Isrealsen et al. provides factors for R, K, LS, and VM that are applicable to the McColl site. The factors that we used are based on the site as it exists today and are as follows:

- R = 70 (mean annual value for the site area);
- K = 0.37 to 0.49 for Orange County; we used an average value of 0.43;
- LS = 0.15 to 0.89, depending on the slope of the sump cover as it exists today and the length of the sump over which water could flow. The average LS for the sumps is 0.32 for the McColl site. Most of the sumps are quite flat, with very low gradients; one corner of Sump R-5 currently has a steeper gradient but the cover thickness also appears to be greater in this corner; and
- VM = Ranges from approximately 0 (full vegetative cover) to 1 (no vegetative cover); given the lack of vegetative cover over most of the site, we assigned a value of 1 to the calculation.

To convert from tons per year to inches per year we assumed an average soil density of 100 pounds per cubic foot, yielding a conversion factor of 0.0055 to convert tons/acre/year to inches/year.

McColl Site Group  September 13, 1991

A-1

Exhibit 46
6288

Using the above numbers, we developed the following calculation:

$$A = 70 * 0.43 * 0.32 * 1 * 0.0055 = 0.053 \text{ inches per year}$$

On the areas of greatest slope, a value of 0.19 inches per year is possible, but over the bulk of the site, values as low as 0.02 inches per year would be expected. All of the above assumes no erosion protection provided by vegetation. Erosion levels would decrease in proportion to the amount of vegetative cover that was added to the site. Even weedy vegetation can provide VM values of 0.5, thus reducing the erosion potential at McColl to 0.1 inches per year or less.

Taking Sump L-1 as an example, the average calculated erosion rate of 0.05 inches per year was compared against a cover thickness of 6 feet (per CH2M-Hill borehole log LO-WA-02). This yielded an erosion time of 1440 years for this unprotected sump. Any sort of erosion protection (grading to reduce slope, soil additives to decrease the erodibility factor, or vegetation to decrease rainfall impact and erodibility) would decrease the erosion rate.

## References

Israelsen, C.E., Clyde, C.G., Fletcher, J.E., Israelsen, E.K. Haws, F.W., Packer, P.E. and E.E. Farmer, 1980. "Erosion Control During Highway Construction - Manual on Principles and Practices." Transportation Research Board, National Research Council, Washington D.C. April 1980

Wischmeier, W.H., 1959. "A Rainfall Erosion Index for a Universal Soil Loss Equation." Proceedings, Soil Science Society of America, Volume 23, pp. 246-249

Exhibit 46
6289



215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391





Exhibit 46
6290

The McColl Site Group is composed of
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665 7391





Exhibit 46
6291

Exhibit 46
6292   **F**

# SUMMARY
## of
## 8-6-91 TECHNICAL MEETING BETWEEN EPA AND MSG

| Issue | Status |
|---|---|
| Materials Present at McColl | EPA and MSG agree on the types of materials present at McColl.  EPA does not divide the materials into the same categories as MSG.  EPA has three categories:  (i) tar and asphalt, (ii) contaminated material and (iii) clean fill.  MSG believes the materials can be categorized into five types based on pathways and waste characteristics: (i) arsenic, (ii) drilling muds, (iii) tarry material, (iv) asphaltic material and (v) contaminated soil. |
| Contaminants of Concern at McColl | EPA and MSG agree that benzene, thiophenes, $SO_2$, arsenic and acidic materials are the potential risk "drivers" at the site.  EPA believes these contaminants are the potential "drivers" in a broad sense and that other contaminants such as other sulfur compounds ($H_2S$), toluene and xylene will be considered as well. This issue will require further discussion in meetings regarding remedial action objectives and risk assessment. |
| Pathways | EPA and MSG agree that direct contact, ingestion, inhalation, surface water and groundwater are the potential exposure pathways to be evaluated at McColl. Historically, EPA has viewed inhalation and ingestion as the major potential pathways.  ICF is looking at pathways on behalf of EPA in the context of the risk assessment.  EPA currently views ingestion, inhalation and groundwater as the major potential pathways of concern.  The surface |

Exhibit 46
6293

|  | water pathway will be investigated as part of the groundwater risk assessment. |
|---|---|
| Tar/Asphalt Relationship | EPA and MSG agree the tar to asphalt irreversible conversion process hypothesis is sound. EPA and DHS have asked some questions about how the chemistry process actually works at McColl. EPA is interested in any variation in ash content within the asphaltic material and in obtaining Professor Satterfield's paper on this issue. MSG will provide Professor Satterfield's paper by early September. |
| Remediation of Tar and Asphalt | MSG believes the tar and asphalt are two distinct materials that should be analyzed individually in developing remediation. EPA currently believes remediation of the tar and asphalt should be the same. EPA wishes to review Professor Satterfield's paper on the tar and asphaltic materials. Further discussion needs to take place between EPA and MSG on this issue. |
| Remedial Action Objectives | EPA has two broad remedial objectives for McColl: (i) prevent exposure through direct contact, inhalation and ingestion, and (ii) prevent potential future migration to groundwater. EPA believes MSG's remedial objectives are more specific in that they consider different waste types. EPA does not consider MSG objectives (h), (i) and (j) as primary remediation objectives (See Attachment A). Another meeting needs to take place between EPA and MSG to discuss this issue. |
| Selective Excavation Approach | EPA agrees the selective excavation approach meets the EPA's remedial objectives, but has yet to agree with the MSG that it is a remedy |

Exhibit 46
6294

that treats the waste to the maximum extent practicable. EPA believes it must do more work on the MSG approach to confirm the proposed technologies will work (e.g., the shroud). EPA also believes it must redo the NCP nine criteria analysis on this alternative.

Excavation and
Incineration

EPA advised it has screened out excavation and off-site incineration as this alternative is not cost-effective ($700-800 million). EPA is continuing to study on-site incineration. MSG believes the cost of this alternative also makes it inappropriate. The cost of $150/yd$^3$ is considered by MSG to be inappropriately low for a portable incinerator in the L.A. Basin.

Schedule

EPA does not agree that the decision-making process at McColl can be completed in 6 months due to internal process and resource constraints. EPA currently believes all of the SROA alternatives need to be updated and the new alternatives fully evaluated. MSG believes the selective excavation alternative needs to be evaluated and added to the SROA. DHS does not believe the EIR can be redone until the Proposed Plan has been issued. MSG believes the EIR can be placed on a parallel track with preparation of the Proposed Plan. The schedule needs to be discussed further between MSG and DHS, with follow-up discussions with EPA.

Risk Assessment

EPA is still analyzing whether the SROA risk assessment needs to be redone to satisfy new guidance. MSG believes the risk assessment need only address the new alternative, selective excavation. EPA has asked ICF, its risk assessment contractor, to determine whether EPA needs to redo the SROA risk assessment in order to comply with the new risk assessment guidance. MSG requested

-3-

Exhibit 46
6295

|  | that EPA and MSG contractors meet soon to discuss the underlying premises for the risk assessment. |
|---|---|
| Trial Excavation - Site Applications Analysis Report | EPA's contractor, Edward Aul, made a presentation on the initial work regarding scaling up the trial excavation to a full scale excavation.  MSG will review the materials provided and communicate any questions or comments to EPA. |
| Next Meeting Date | EPA and MSG have agreed to meet on August 29 and September 10. |

McColl
MSG/EPA TECHNICAL MEETING

## WASTE CHARACTERISTICS

- Tarry Wastes:  Semi fluid in nature, these wastes periodically flow to the surface through fractures in the cover.  Upon reaching the surface, the material hardens as a result of oxidation and volatilization of the volatile organics and off-gassing of the sulfur dioxide.  It has the same general chemical characteristics as the asphaltic wastes although higher levels of volatile organics.  Tarry materials have been characterized as the source of odors experienced by the community.

- Drilling Mud:  Drilling muds were placed on the site to neutralize and stabilize the acidic wastes.  They are mixed with the site wastes and hence contain the same contaminants but at lower concentrations.

- Asphaltic Wastes: This material makes up the largest volume of waste.  Due to its hard physical nature, this material is immobile.  The asphaltic waste was originally more fluid in nature.  The shift to the asphaltic condition has occurred over time and is a result of the chemicals which are present and site conditions.  Chemical composition is similar to that of the tarry wastes, although the volatile organics are lower and SO2 higher.  The wastes are relatively impermeable to movement of the SO2.  Disturbance of the waste releases large amounts of SO2.

- Arsenic: Not a component of the original waste, it is thought to be a result of midnight dumping in the lower Ramparts sumps, possibly the washings from an insecticide truck after placement of the drilling muds.  It is found only near the surface.

- Contaminated Soil:  Soils in the surface or underlying the waste which have contacted the wastes and contain contaminants.  Surface soils are contaminated by the tarry wastes passing through the soil.  Underlying soils having been contaminated when liquid wastes were initially placed at the site.  Contaminants are characterized by tarry materials, volatile organics and low pH.

McColl Site Group 8/6/91

Exhibit 46
6297

McColl
## MSG/EPA TECHNICAL MEETING

CONTAMINANTS OF CONCERN

- Volatile Organics:
  Benzene
  Thiophenes


- Inorganic:
  Acidic Nature (low pH)
  Sulfur Dioxide
  Arsenic

McColl Site Group 8/6/91

Exhibit 46
6298

McColl
MSG/EPA TECHNICAL MEETING

## PATHWAYS

- Contact:  Limited to onsite exposure to tarry materials which periodically seep to the surface.  Other wastes, including hot spots of arsenic, are under several feet of soil and thus not accessible.  Soil erosion (wind and water) or a seismic event could potentially expose waste.

- Air:  Air borne contaminants (volatile organics, sulfur dioxide and arsenic) from the waste mass or periodic surface seeps.

    - Undisturbed Waste - Onsite emission impact from undisturbed waste varies from minimal (uncovered waste) to nondetectable (covered waste).  Effects limited to odor.  Offsite emission impact from undisturbed waste is limited to periodic odors from uncovered wastes.

    - Disturbed Waste - Onsite emission impact varies from moderate to extreme depending upon the level of waste disturbance and engineering controls.  Failure of engineering controls poses offsite risk.  Soil erosion (wind and water) or a seismic event could potentially expose the waste and increase emissions.

- Surface Water:  Leaching of volatile organics and metals into the surface water where it could flow offsite.  Water contacting waste is limited to periodic rainfall contacting tarry waste that has seeped to the surface.  Analysis of surface runoff has yielded very low to non detect levels of McColl contaminants.

- Groundwater:  Leaching of contaminants through the vadose zone to ground water and which could potentially limit its uses.  After 40 years, there is no contaminant pattern found in the monitoring well system which indicates contaminates are leaching into ground water.

McColl Site Group 8/6/91

Exhibit 46
6299

McColl
## MSG/EPA TECHNICAL MEETING

### REMEDIATION OBJECTIVES

In the development of remedial alternatives for the McColl Site, the overall objective is to protect human health and the environment.   Any remediation alternative proposed for the McColl site must attain residual risk levels within the NCP cancer risks criterion of $1 \times 10^{-6}$ to $1 \times 10^{-4}$ and a hazard index for non-cancer effects of less than 1.0.   Potential odor and other aesthetic problems also should be mitigated. Thus, an appropriate remedial alternative at the McColl site should:

a.   Eliminate exposure by direct contact and particulate emissions from arsenic-containing materials.
b.   Eliminate exposure to volatile organic compounds and inorganic gases.
c.   Eliminate the potential for direct contact with seeps and inhaling volatile chemicals from seeps.
d.   Prevent leaching of contaminants into ground water.
e.   Prevent migration of contaminants offsite via surface water.
f.   Eliminate community exposure to site odors.
g.   Prevent contact and exposure to emissions from asphaltic wastes.
h.   Protect against seismic events
i.   Provide a site that is compatible with the surrounding community.
j.   Balance the reduction in residual risk against any implementation risk to workers and nearby residents

McColl Site Group 8/6/91

Exhibit 46
6300

McColl
MSG/EPA TECHNICAL MEETING

## RESPONSE ACTIONS

The MSG approach will protect human health and the environment by satisfying the remedial action objectives as follows.

• Exposure to arsenic materials will be eliminated by excavating material within 3 feet of the surface with concentrations above 50 ppm. This material will be solidified to satisfy BDAT requirements of the federal land ban regulations and disposed of offsite. A RCRA-equivalent cap will be installed over remaining materials.

• Exposure to volatile organic compounds (VOCs) and inorganic gases will be eliminated by removing the seeps, installing a RCRA-equivalent cap over the site and installing an active emission collection and treatment system.

• Direct contact with seeps and associated exposure to odor, VOC emissions and acidic material will be eliminated by 1) pre-treating, excavating, and thermally destroying or redisposing existing seeps and select tar zones, or 2) in-situ solidification of select tarry material. In addition, the site will be capped and have an active emission collection and treatment system.

• Contamination of ground water will be prevented by eliminating infiltration, which will be accomplished by installing a RCRA-equivalent cap with a permeability of less than $10^{-7}$ cm/sec. There will be surface grading and drainage to direct rain water away from the sumps. Slurry walls around the sumps will prevent lateral migration of any perched ground water. Long-term monitoring of ground water quality will also be performed.

• Migration of contaminants offsite via surface water will be prevented by installing a RCRA-equivalent cap and runoff collection system over the remaining materials.

• The community's exposure to odors from the site will be prevented by installing a RCRA-equivalent cap over the sumps and an emission collection/treatment system.

• Exposure to emissions from the asphaltic waste will be prevented by the installation of a RCRA-equivalent cap and an emission collection/treatment system.

• Creation of a park-like site that is compatible with the surrounding community will be accomplished by landscaping, including the installation of sidewalks, slumpstone walls, modifications to Rosecrans Boulevard and planting of trees and shrubs. Operation and maintenance will be performed to assure continuous site operation and appearance.

McColl Site Group 8/6/91

Exhibit 46
6301

- Protection from seismic events will be achieved by solidifying drilling muds and installing backfills and crib walls designed to withstand a maximum credible earthquake.

- Risks to workers and residents during implementation will be minimized by avoiding disturbance of the asphaltic materials and controlling the excavation rate to limit emissions released. All excavations and in-situ treatment will be performed within positive air pressure enclosure with redundant air collection and purification systems. Continuous monitoring of emissions within the enclosures, around the enclosures and at site perimeters will be performed to ensure protection of workers and the community.

McColl Site Group 8/6/91

Exhibit 46
6302

# DEPOSITED WASTES AT McCOLL

- **ARSENIC MATERIAL**

- **DRILLING MUD**

- **TARRY MATERIAL**

- **ASPHALTIC MATERIAL**

**McColl Site Group 8/6/91**

Exhibit 46
6303

90 336A/LICH 2 5 REV 2/12/91



SHALLOW ELEVATED ARSENIC

- **Arsenic - 50 to 5,000 ppm**
- **$SO_2$ Emission Rate - None/Low**
- **Average Depth - 2.5 ft.**
- **Volume - 1,800 c.y.**
- **Migration Potential - None/Low**
- **Existing Geotechnical Instability Potential - Low**

**CHARACTERISTICS OF ELEVATED ARSENIC**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

Exhibit 46
6304

8/6/91

90 336A/E ICH 2 6 REV 2/12/91



DRILLING MUD

- **Arsenic - Low**
- **SO$_2$ Emission Rate - Low**
- **Maximum Depth - 13 ft.**
- **Volume - 10,900 c.y.**
- **Migration Potential - None**
- **Existing Geotechnical Instability Potential - High**

**CHARACTERISTICS OF DRILLING MUD**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

8/6/91

Exhibit 46
6305

90-116A/LTCR-2 8 REV 2/12/91



TARRY MATERIAL

- **Arsenic - None**
- **SO$_2$ Emission Rate - High**
- **Maximum Depth - 17 ft.**
- **Volume - 5,900 c.y.**
- **Migration Potential - High**
- **Existing Geotechnical Instability Potential - High**

**CHARACTERISTICS OF
TARRY MATERIAL**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

Exhibit 46
6306

8/6/91

90 316A/LICH 2 9 REV  2/12/91



**ASPHALTIC MATERIAL**

- **Arsenic - None**
- **SO$_2$ Emission Rate - High**
- **Maximum Depth - 30 ft.**
- **Volume - 48,000 c.y.**
- **Migration Potential - None**
- **Existing Geotechnical Instability Potential - None**

**CHARACTERISTICS OF
ASPHALTIC MATERIAL**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

**8/6/91**

Exhibit 46
6307

# WASTE CONCERNS AT McCOLL

- **ODORS**

- **LOW pH**

- **SO2**

- **BENZENE**

- **ARSENIC**

**McColl Site Group 8/6/91**

Exhibit 46
6308

# EXPOSURE PATHWAYS AT McCOLL

- **DIRECT CONTACT**

- **INGESTION**

- **INHALATION**

- **SURFACE WATER**

- **GROUND WATER**

**McColl Site Group 8/6/91**

Exhibit 46
6309

# OVERALL OBJECTIVE:  PROTECT HUMAN HEALTH AND ENVIRONMENT $(10^{-4}$ TO $10^{-6})$

## McCOLL REMEDIAL ACTION OBJECTIVES:

- **ELIMINATE EXPOSURE TO ARSENIC**
- **ELIMINATE EXPOSURE TO VOCs AND INORGANIC GASES**
- **ELIMINATE CONTACT WITH SEEPS**
- **PREVENT CONTAMINATION OF GROUND WATER**
- **PREVENT OFFSITE MIGRATION VIA SURFACE WATER**
- **ELIMINATE COMMUNITY EXPOSURE TO ODORS**
- **PREVENT CONTACT/EMISSIONS FROM ASPHALTIC WASTES**
- **PROVIDE A SITE COMPATIBLE WITH SURROUNDING COMMUNITY**
- **MINIMIZE IMPLEMENTATION RISKS**

**McColl Site Group 8/6/91**

Exhibit 46
6310

## REMEDIATION GOAL:

## ELIMINATE EXPOSURE TO ARSENIC MATERIALS

## RESPONSE:

- **EXCAVATE AND TREAT THE SHALLOW ELEVATED ARSENIC MATERIAL AND DISPOSE IT OFFSITE**

- **INSTALL RCRA-EQUIVALENT CAP**

**McColl Site Group 8/6/91**

Exhibit 46
6311

# REMEDIATION GOAL:

# ELIMINATE EXPOSURE TO VOCs AND INORGANIC GASES

# RESPONSE:

- **EXCAVATE/TREAT SEEPS**

- **INSTALL RCRA-EQUIVALENT CAP**

- **COLLECT AND TREAT EMISSIONS**

**McColl Site Group 8/6/91**

Exhibit 46
6312

## REMEDIATION GOAL:

## ELIMINATE APPEARANCE OF SEEPS AND EXPOSURE TO ODORS, VOCs AND ACIDIC MATERIALS

## RESPONSE:

- **PRE-TREAT, EXCAVATE AND THERMALLY DESTROY OR REDISPOSE EXISTING SEEPS AND SELECT TAR ZONES**

- **IN-SITU TREAT/SOLIDIFY SMALLER POTENTIALLY MOBILE TARRY ZONES**

- **INSTALL RCRA-EQUIVALENT CAP**

- **COLLECT AND TREAT EMISSIONS**

McColl Site Group 8/6/91

Exhibit 46
6313

## REMEDIATION GOAL:

## PREVENT LEACHING OF CONTAMINANTS INTO GROUND WATER

## RESPONSE:

- **INSTALL RCRA-EQUIVALENT CAP**
  **+ <$10^{-7}$ CM/SEC COVER**
  **+ SURFACE GRADING AND DRAINAGE TO DIRECT RAIN WATER AWAY FROM SUMPS**

- **INSTALL SLURRY WALLS AROUND REMAINING MATERIALS TO ISOLATE FROM PERCHED WATER**

- **MONITOR GROUND WATER QUALITY**

McColl Site Group 8/6/91

Exhibit 46
6314

## REMEDIATION GOAL:

## PREVENT OFFSITE MIGRATION OF CONTAMINANTS VIA SURFACE WATER

## RESPONSE:

- **INSTALL RCRA-EQUIVALENT CAP AND RUNOFF COLLECTION SYSTEM**

- **SURFACE GRADING AND DRAINAGE TO DIRECT SURFACE WATER AWAY FROM SUMPS**

McColl Site Group 8/6/91

Exhibit 46
6315

# REMEDIATION GOAL:

# ELIMINATE COMMUNITY EXPOSURE TO ODORS

# RESPONSE:

- **INSTALL RCRA-EQUIVALENT CAP**

- **COLLECT AND TREAT EMISSIONS**

**McColl Site Group 8/6/91**

Exhibit 46
6316

## REMEDIATION GOAL:

## PREVENT CONTACT AND EXPOSURE TO EMISSIONS FROM ASPHALTIC WASTES

## RESPONSE:

- **INSTALL RCRA-EQUIVALENT CAP**

- **COLLECT AND TREAT EMISSIONS**

- **INSTALL BACKFILLS AND CRIB WALLS DESIGNED TO WITHSTAND A MAXIMUM CREDIBLE EARTHQUAKE**

McColl Site Group 8/6/91

Exhibit 46
6317

## REMEDIATION GOAL:

## PROTECT AGAINST SEISMIC EVENTS

## RESPONSE:

- **SOLIDIFY DRILLING MUDS**

- **INSTALL BACKFILLS AND CRIB WALLS DESIGNED TO WITHSTAND A MAXIMUM CREDIBLE EARTHQUAKE**

McColl Site Group 8/6/91

Exhibit 46
6318

## REMEDIATION GOAL:

## MINIMIZE RISK TO WORKERS/RESIDENTS DURING IMPLEMENTATION

## RESPONSE:

- **AVOID DISTURBANCE OF THE ASPHALTIC MATERIALS**

- **MINIMIZE AND CONTROL RATE OF EXCAVATION TO LIMIT EMISSIONS**

- **PERFORM ALL EXCAVATION/IN-SITU TREATMENT WITHIN POSITIVE AIR PRESSURE ENCLOSURE WITH REDUNDANT AIR COLLECTION/PURIFICATION SYSTEMS**

- **CONTINUOUS MONITORING OF EMISSIONS**

- **ADOPT COMMUNITY CONTINGENCY PLAN**

**McColl Site Group 8/6/91**

Exhibit 46
6319

## REMEDIATION GOAL:

## PROVIDE A SITE THAT IS COMPATIBLE WITH COMMUNITY

## RESPONSE:

- **LANDSCAPING**

- **SIDEWALKS AND WALLS**

- **O & M**

McColl Site Group 8/6/91

Exhibit 46
6320

# EPA'S 2½ YEAR SCHEDULE FOR MCCOLL

| ITEM: | DATE: |
|---|---|
| FINALIZE FS | FEBRUARY 1992 |
| FINALIZE NINE CRITERIA ANALYSIS | AUGUST 1992 |
| ISSUE PROPOSED PLAN | NOVEMBER 1992 |
| ISSUE ROD | DECEMBER 1993 |

**McColl Site Group 8/6/91**

Exhibit 46
6321

# MSG's SIX-MONTH SCHEDULE FOR MCCOLL

| ITEM: | DATE: |
|---|---|
| MEETINGS BETWEEN EPA AND MSG TO AMEND SROA | AUG-OCT 1991 |
| ISSUE AMENDED SROA, PROPOSED PLAN & DEIR | END OCT 1991 |
| PUBLIC COMMENTS BEGIN CONSENT DECREE NEGOTIATION | NOVEMBER 1991 |
| ISSUE ROD & EIR SIGN CONSENT DECREE | FEBRUARY 1992 |

McColl Site Group 8/6/91

Exhibit 46
6322

# SUGGESTED 1991 MEETINGS BETWEEN EPA & MSG

| ITEM/MEETING | DATE |
|---|---|
| DISCUSSION OF PRINCIPAL THREAT | AUG 5-16 |
| REMEDIAL ACTION OBJECTIVES | AUG 5-16 |
| HOW MSG ALTERNATIVE MEETS OBJECTIVES | AUG 5-16 |
| SROA ALTERNATIVES AGAINST NEW NCP | AUG 12-23 |
| TECHNICAL STUDIES/REMEDIAL ACTION OBJECTIVES | AUG 12-23 |
| REVIEW OF RISK ASSESSMENT | AUG 12-23 |
| DISCUSSION OF DEIR | AUG 12-23 |
| REVIEW OF ARARS | AUG 12-23 |
| TECHNICAL EVALUATION OF SELECTIVE EXCAVATION | AUG 19-SEP 13 |
| COMMENCE AMENDMENT OF SROA AND DEIR AND DRAFTING OF PROPOSED PLAN | AUG 19-SEP 13 |
| REVIEW MSG ALTERNATIVE COSTS | AUG 30-SEP 13 |
| INDIVIDUAL & COMPARATIVE ANALYSIS | AUG 30-SEP 20 |
| ISSUE AMENDED SROA, PROPOSED PLAN AND DEIR | OCT 1991 |
| PUBLIC COMMENTS ON PROPOSED PLAN | NOV 1991 |
| ISSUE ROD & EIR | FEB 1992 |

McColl Site Group 8/6/91

Exhibit 46
6323

Exhibit 46
6324

**G**

## SUMMARY OF 8/29/91 EPA/MSG TECHNICAL MEETING

Agenda attached as <u>Attachment A</u>

Attendance List attached as <u>Attachment B</u>

1.   <u>Schedule</u>:  After the August 6 meeting with the community, the EPA McColl Project Managers had a briefing with management to discuss the 2-1/2 year schedule.  EPA has agreed to meet with the community after Interagency Committee meetings. EPA will meet with the community on September 9 and has agreed to provide the community with a detailed schedule describing activities to take place over the next 2-1/2 years in that meeting.  EPA will provide the MSG with a copy of the schedule before September 9.  EPA and MSG will discuss the schedule in the next technical meeting.  MSG proposed to meet with the EPA every week to discuss technical issues.  EPA said it cannot commit to meeting with the MSG once a week and still maintain the Agency's internal schedule.  EPA has agreed to meet with the MSG every three weeks to discuss technical issues and to have conference calls with the MSG to discuss isolated issues on an as-needed basis.  EPA and MSG have agreed to meet in Fullerton on September 10 and to meet in San Francisco on September 30.  Agendas for technical meetings will be developed based on results of the prior meetings and suggestions from EPA and the MSG.

- <u>Accomplishments</u>:

    -EPA and MSG have agreed to meet every three weeks to discuss technical issues.

    -EPA and MSG have agreed to have conference calls on an as-needed basis to discuss technical issues.

    -EPA and MSG have agreed to meet on September 10 in Fullerton and on September 30 in San Francisco.

- <u>Action Item</u>:

    -EPA to provide MSG with a copy of the Agency's detailed 2 1/2 year schedule before September 9.

2.   <u>Tar/Asphalt Relationship</u>:  Professor Satterfield of MIT gave a presentation on the reactions occurring at the McColl Site (See <u>Attachment C</u>).  The MSG will provide EPA with a detailed paper describing these reactions in September.  EPA

-1-

Exhibit 46
6325

agrees with the reactions described by Professor Satterfield. EPA believes Professor Satterfield's presentation explains a great deal about the tar. EPA would like further information about why tar is still found at the Site if these reactions have been occurring since the sludge was placed in the sumps. MSG agreed to discuss these issues in greater detail with EPA in the next technical meeting.

- **Accomplishment:**

  -EPA and MSG agree on the reactions occurring at the McColl Site and agree the tar to asphalt conversion process is irreversible.

- **Action Item:**

  -MSG will provide EPA with further information regarding the presence of tar at the Site.

3. **Pathways, Waste Description and Remediation Objectives:** EPA and MSG agree that direct contact, ingestion, inhalation, surface water and groundwater are the potential exposure pathways to be evaluated at McColl. EPA intends to look at the surface water and groundwater potential exposure pathways as part of the risk assessment for the groundwater operable unit. EPA intends to consider the direct contact, ingestion and inhalation potential exposure pathways as part of the surface remedy. With respect to materials present at the Site, EPA and the MSG agree there are five different physical materials present at the Site (arsenic, drilling muds, tar, asphalt and contaminated soil). EPA, however, groups the materials differently than the MSG for purposes of remediation considerations. EPA would group the five physical material categories into two categories for purposes of remediation:  (i) arsenic and (ii) drilling muds, tar, asphalt and contaminated soil. Currently, EPA is expressing its remedial action objectives in terms of the contaminants present at the Site rather than waste characteristics. The MSG also considers the toxicity of the contaminants present at the Site in developing its remediation goals for the Site, but found the potential exposure pathways varied with the different categories of waste. This leads the MSG to believe the material types should be categorized differently for purposes of remediation. EPA explained that the Agency is still evaluating the toxicity of the different materials. EPA stated that the MSG remedial action objectives are similar to the Agency's but that EPA views the MSG objectives as subsets of broader EPA objectives. EPA agreed to write down its remedial action objectives for McColl and to provide the list for discussion at the next Technical Meeting.

-2-

Exhibit 46
6326

- **Accomplishments:**

  -EPA and MSG agree on the potential exposure pathways.

  -EPA and MSG agree on the materials present at the McColl Site.

  -EPA and MSG agree their remedial action objectives are similar.

- **Action Item:**

  -EPA to provide MSG with a list of the Agency's remedial action objectives and discuss them in the September 10 meeting.

4.  **Selective Excavation and Remediation Objectives:** EPA raised the following questions about Selective Excavation: (i) How does the MSG define tar? (ii) How does MSG intend to find the tar? (iii) Who determines if excavation is "safe"? (iv) What are the acceptable "safety" levels and what are the trigger points for determining those levels? and (v) What happens if the MSG is unable to locate and treat all of the tar? MSG agreed to provide EPA with further information on these questions in the upcoming technical meetings.

- **Accomplishment:**

  -EPA identified specific questions it has on the Selective Excavation approach.

- **Action Item:**

  -MSG will provide EPA with further information on these issues in upcoming technical meetings.

5.  **Integration of Technical Studies into Current Process:** The MSG presented its logic for integrating new technical studies into the decision-making process (See Attachment D). EPA agrees with the logic set forth in the decision-tree and understands the MSG position that it is important to screen alternatives out of the process early if they are not viable alternatives. EPA agreed with this approach and stated the Agency intends to screen non-viable alternatives early in the process. EPA cited the screening out of off-site incineration as an illustration of this point. EPA suggested the MSG tell the Agency when the MSG believes an alternative should

-3-

Exhibit 46
6327

be screened out of the process and provide the reasons for the conclusion so EPA can consider the information.  The MSG agreed to do so and noted that its current efforts in this regard, citing the recent letter sent to John Blevins regarding on-site incineration costs (<u>Attachment E</u>).  EPA believes it must update the costs of all of the SROA alternatives.  EPA does not believe its plans to update the costs of the SROA alternatives will take much time in the scheme of the 2-1/2 year schedule.  EPA believes developing the new alternatives and performing the risk assessments on the new alternatives (total solidification, discrete layer solidification and Selective Excavation) are the critical path issues which will take a large amount of time to complete.  The MSG believes risk assessment work need only be done on the new alternative, Selective Excavation, and that the other two new alternatives EPA is currently considering fail NCP criteria and should be screened out of the process.  EPA and the MSG agreed to have their respective contractors discuss the risk assessment in upcoming technical meetings.

- <u>Accomplishments</u>:

  -EPA and MSG agree on the logic for integrating new technical studies into the decision-making process.

  -EPA and MSG agree that non-viable alternatives should be screened out of the process as soon as possible.

- <u>Action Item</u>:

  -EPA and MSG contractors to discuss risk assessment issues in upcoming technical meetings.

McColl Site
Proposed Agenda for EPA/MSG Technical Meeting
August 29, 1991
9 a.m. - 3 p.m.
Baldwin Park Hilton
14635 Baldwin Park Town Center
Baldwin Park, CA 91706
Telephone:  (818) 962-6000

1.  Discussion as to How to Integrate the EPA and MSG McColl Schedules for Presentation to Community on September 9th

   EPA and MSG agreed to a community request to review their respective schedules regarding the time and steps necessary to select an alternative at McColl.

2.  MSG Presentation on Tar - Asphalt Relationship - 1 hour

   While EPA recognizes the differences between the tar and asphalt, they currently view the tar and asphalt as a single waste category.  MSG believes the waste chemistry and characteristics warrant separate categories.  MSG will bring Prof. Satterfield (MIT) to make a presentation on the "tar - asphalt" relationship in advance of issuance of the technical paper.

3.  EPA Presentation of: Pathways, Waste Description and Remediation Objectives - 1 hour

   At the last meeting, in response to the MSG presentation, EPA provided a broad, global overview of their approach to these issues.  EPA would provide a more focused picture of their approach.  From this and the MSG presentation earlier this month, specific areas of agreement and disagreement should emerge.

4.  EPA/MSG Discussion to Develop Documentation on Pathways, Waste Description and Remediation Objectives - 2 hours

   EPA and MSG to document areas of agreement to maximize progress.  They will also identify areas of disagreement and seek to identify an approach for resolving the conflict.  Identify action items and propose schedules.

5.  EPA/MSG Discussion Concerning Selective Excavation and the Remediation Objectives - 1 hour

   Based on the presentation of MSG on 8/6 and EPA (item 2 above) come to agreement as to how the objectives are met.  If there are areas of disagreement, identify them for resolution.  Identify action items and proposed schedules.

ATTACHMENT A
Page 1 of 2

Exhibit 46
6329

Proposed Agenda, EPA/MSG Technical Meeting
(August 29, 1991)
Page 2

6.   MSG Lead Discussion as to an Appropriate Response for Impact of New
     Information on the SROA Alternatives of 1989 - 1 hour

     MSG provides logic for integrating the results of technical studies;
     revised NCP and the remedial objectives into the SROA alternatives.
     Emphasis will be on a screening evaluation to identify the significance
     of the new information to the work included in the SROA.

C:\WP51\AGENDA8

ATTACHMENT A
Page 2 of 2

Exhibit 46
6330

# Attendance List
## August 29, 1991

| _Name_ | _Firm_ | _Phone_ |
|---|---|---|
| Pam Andes | Allen, Matkins | (714) 851-5402 |
| Barry Eaton | CITY OF FULLERTON | (714) 738-6552 |
| BARRY BROWN | FULLERTON HILLS COMM. ASSOC.<br>BAB-CAN CONSULTING | (714) 594-0500 |
| IAN WEBSTER | UNOCAL | (213) 977-6382 |
| CHARLES N. SATTERFIELD | M.I.T. | (617)-253-4584 |
| Anne Connell | MK | (415)-442-7000 |
| Dave Jones | EPA | 415-744-2266 |
| Bill Duchie | Shell | (714) 520-3462 |
| Glen Rasmussen | Morrison-Knudsen | (415) 442-7600 |
| DES GARNER | EPA TAT | (415) 777-2811 |
| ADAM NG | ICF Tech. | (415) 882-3042 |
| STEVEN LINDER | EPA | (415) 744-2243 |
| Steve Gaytan | State of CA<br>DTSC/Special Proj | (916) 324-2432 |
| Caroline Rudolph | DTSC/Special Projects | (916) 324-2857 |
| John Blevins | EPA | (415) 744-2241 |
| Pam Wieman | EPA | 415 744-2242 |
| JOHN A.A. ZANNOS | EPA | 213-486-3685 |

**ATTACHMENT B**

Exhibit 46
6331

## REACTIONS IN THE McCOLL SUPERFUND SITE

SUMMARY - Present products have been formed by:

A. Acid-catalyzed polymerization and polycondensation of organic material.

R. Above reactions, accelerated by autoxidation

C. Above reactions, accelerated by acidified clay which also adsorbs products to form an asphaltic cement.

D. These reactions are not reversible under existing conditions

    1. Original composition of sludge

        (a) 90% $H_2SO_4$
        (b) undefined organic material of varying molecular weight and composition.
        (c) essentially no "ash"

    2. Present composition, from L-4 EPA Pre-publication Report, 1990

|     | raw tar      | raw char |
| --- | ------------ | -------- |
| C   | 51.1 wt%     | 8.6      |
| H   | 4.1 (net)    | 3.7      |
| S   | 10.6         | 4.5      |
| N   | 0.1          | 0.1      |
| O   | 20.8 (net)   | 28.3     |
| ash | 1.6          | 55       |

    Radian - Cores from R-1, R-2, R-5. L-1 and L-2

    Two samples of each of five. Eight of the ten described as a "hard, black asphaltic waste with a slight rubbery texture."

Average analysis: 48% ash
(variation amongst individual samples apparently not available)

    3. Clay was present in all $CH_2M$ borings (1987) of soil near pits. (L0-S0-01 through L0-S0-09 and RA-S0-01 through RA-S0-07)

## ATTACHMENT C
### Page 1 of 2

Exhibit 46
6332

Drilling muds (essentially bentonite clay) also
disposed of in some pits (Bentonite is a
montmorillonite type of clay).

4.   Reactions

Dehydropolymerization

$$RH+R'H \xrightarrow{\phantom{xx}O_2\phantom{xx}} R \cdot R' + H_2O, \text{ etc.}$$

Polycondensation

$$R(0)H + R'(0)H \xrightarrow{\phantom{xxxxxx}} R \cdot R' \text{ or } R(0)R' + H_2O,$$
etc.

Polymerization reactions are catalyzed by acids

5.   Contact of clays with an acidic hydrocarbon sludge

Kaolin (ideal) $Al_4Si_4O_{10}(OH)_8 \cdot nH_2O$

Montmorillonite (ideal)

$(Al_{3.15}Mg_{0.85})Si_{8.0}O_{20}(OH)_4X_{0.85} \cdot nH_2O$

X= monovalent cation

A.   clays are converted to the acidic form

B.   they dissolve/disperse

C.   they reprecipitate as acid concentration drops

simultaneously
- they catalyze polymerization reactions
- they adsorb polymeric materials and
  gradually become inactive

Result:  Formation of an asphaltic cement
structure

D.   These processes are exothermic and occur
spontaneously at ambient conditions.  They cannot
occur in the reverse direction under the same
conditions that drive them forward.

ATTACHMENT C
Page 2 of 2

Exhibit 46
6333

McCOLL SITE STUDIES
DECISION TREE



McColl Site Group
August 29, 1991

ATTACHMENT D
Page 1 of 2
Exhibit 46
6334

**McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

August 23, 1991

Mr. John Blevins
U.S. EPA, Region IX
75 Hawthorne Street, H-6-1
San Francisco, California  94105

       Re:  McColl Superfund Site - Analysis of Onsite
              Incineration Costs

Dear John:

       The EPA has stated in the Interagency Committee (IAC)
letter dated August 2, 1991, that costs for onsite incineration
are currently running approximately $150 per ton.  We do not
believe a $150 per ton estimate is appropriate for incineration
and ash disposal at the McColl Site.  A recent fixed price
estimate for the Brio NPL site indicates that the incineration
component alone, not including ash handling, for the site was
$150 per ton.  Further, this site is less complex than McColl and
is located in a less restrictive air quality area.

       In our comments to the Supplemental Reevaluation of
Alternatives, we cited a 1988 paper by John H. Lanier in the
Hazardous Materials Control Research Institute's Superfund '88
which states: "Incineration prices (for transportable units)
range from $200/ton for dry contaminated soil to $1000/ton for
sludges with high heating values."  We believe that transportable
incinerator costs will increase significantly in the future, just
as the costs of fixed base units have, and that the McColl Site
wastes will be on the upper end of the cost range.

       Science Applications International Corporation, in their
START program report of May, 1991, estimated that the cost for
incineration at McColl, using a transportable rotary kiln system,
would be $249 per ton in 1987 dollars, or approximately $300 per
ton in 1991 dollars.  However, this number assumes " . . . no
capital or annual costs involved in procuring such a system," nor
does it account for the ash handling.  It is unrealistic to
expect that a company would provide an incinerator for six years
without looking to recover the capital cost of that unit.  This
would add up to $100 per ton to amortize the cost of the unit.
In addition, the ash handling for other sites costs approximately

ATTACHMENT E
Page 1 of 3

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

Exhibit 46
6335

**THE McCOLL
SITE
GROUP**
215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. John Blevins
August 23, 1991
Page 2

$65 per ton. The total cost for incineration and ash handling
would be at least $465 per ton. We believe the cost of meeting
air quality standards in the South Coast Air Quality Management
District ("SCAQMD") would require additional capital cost, but do
not have any specific estimate at this time.

Although we are not convinced that incineration is even
possible within the SCAQMD, given the above, we have developed an
illustrative cost analysis for an onsite incineration program.
For ease of comparison, we have used the costs EPA quoted in the
Interagency Committee letter for excavation and storage, tar
treatment, char treatment and contingency percentage. Even
though we believe EPA's cost estimates are substantially low, and
the air quality issues associated with such a program have not
been adequately addressed, we have used them for illustration
purposes and have found that the lower range of costs for an
onsite incineration program at McColl would be $215-$330 million
(see Attachment 1). Adjustments for air quality facilities and
waste excavation and handling would substantially increase the
final cost and clearly result in this alternative not being
cost-effective.

We would be glad to discuss the foregoing with you in
detail. We expect the foregoing information will be used in your
decision-making process at McColl.

Very truly yours,

*William J. Duchie/RM*

William J. Duchie

WJD:mf1

cc:  David Jones
     Pam Wieman
     Steve Linder
     Barry Eaton
     David Bushey
     Barry Brown

**ATTACHMENT E**
Page 2 of 3

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL ●◀▶●

Exhibit 46
6336



215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

## ATTACHMENT 1
## COST FOR ONSITE INCINERATION

| ITEM | COST ($MILLIONS) |
|------|------------------|
| Excavation and Storage | $ 62* |
| Tar Treatment | 5* |
| Char Treatment | 16* |
| Transportation | 0 |
| Incineration and Ash Disposal** | 70-150 |

==============================================================

| | |
|------|------------------|
| TOTAL | $153-233 |
| CONTINGENCIES*** | $18-28 |
| TOTAL PLUS CONTINGENCIES*** | $171-261 |
| TOTAL COST WITH 5%/YEAR ESCALATION*** | $215-330 |

\*      THESE NUMBERS HAVE BEEN TAKEN FROM EPA LETTER TO THE INTERAGENCY COMMITTEE (8/2/91) FOR CONSISTENCY. THE MCCOLL SITE GROUP <u>DOES NOT AGREE</u> WITH THE EXCAVATION AND TREATMENT NUMBERS CITED ABOVE AND BELIEVES THAT EXCAVATION WILL BE SIGNIFICANTLY MORE COSTLY.

\*\*      BASED ON 150,000 TONS AT $465-$1000 PER TON

\*\*\*      MULTIPLIERS TAKEN FROM EPA LETTER TO INTERAGENCY COMMITTEE (8/2/91)

## ATTACHMENT E
## Page 3 of 3

Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

Exhibit 46
6337

Exhibit 46
6338

H

AGENDA FOR SEPTEMBER 10 EPA/MSG TECHNICAL MEETING

TIME:       10:00 a.m. to 3:00 p.m.
LOCATION:   Fullerton Hunt Branch Library
            201 South Basque (from Euclid go west on
              Valencia to Basque and follow the signs)
            Fullerton, California
            (714)738-3121

I.   TAR - ASPHALT RELATIONSHIP   (1/2 hour)

     After Professor Satterfield's presentation at the August
     29, 1991 meeting regarding the reactions occurring at
     the McColl Site which have led to the sludge becoming an
     asphaltic cement material, the EPA asked for further
     discussion as to why tar is still present at the Site.
     The MSG will lead the discussion.

II.  DISTRIBUTION AND AMOUNT OF TAR   (1 hour)

     In the August 29, 1991 meeting, EPA raised questions the
     Agency has regarding the Selective Excavation, Treatment
     and RCRA-Equivalent Closure approach.  Issues which EPA
     would like further information about include:  (i) how
     does the MSG define tar, (ii) how much tar does the MSG
     believe is present at the Site, (iii) where does the MSG
     believe the tar is located, (iv) how does the MSG intend
     to find the tar, and (v) how will the Selective
     Excavation alternative be impacted, if at all, if the
     MSG is unable to locate and treat all of the tar.  The
     MSG will lead the discussion.

III. REMEDIAL ACTION OBJECTIVES   (1 1/2 hours)

     In the August 29, 1991 meeting, EPA stated the MSG
     objectives were similar to EPA's, just more detailed.
     EPA will present a list of the objectives to the MSG and
     lead a follow-up discussion of the Agency's remedial
     action objectives for the Site.

IV.  SCHEDULE   (1/2 hour)

     EPA and MSG will discuss the detailed schedule that EPA
     will be providing to the community on September 9.
     Dates and agendas for the next technical meetings will
     be set, along with any conference calls.

V.   RISK ASSESSMENT   (1/2 hour)

     EPA and MSG will begin initial discussions as to the
     need for or lack of need for new risk assessments.
     Unfortunately, MSG's contractor will not be available to
     participate in this meeting and detailed discussions
     between the respective contractors will need to be
     deferred to the September 30 meeting.

Exhibit 46
ATTACHMENT "A"

Attendance List
September 10, 1991
EPA/MSG Meeting

| | | |
|---|---|---|
| Pam Andes | Allen, Matkins | (714) 851-5402 |
| JOHN FT ZANNOS | ARCO | 213  433 3635 |
| Ham Wieman | EPA | (415) 744-2242 |
| John Blevins | EPA | (415) 744-2241 |
| Adam Ng | ToF | (415) 882-3042 |
| BARRY A SHAW | FULLERTON HILLS Comm. Assoc / BAB-CLAN CONSULTING | (714) 594-0500 |
| BARRY EATON | CITY OF FULLERTON | (714) 738-6544 |
| Anne Connell | MK | (415) 442-7600 |
| Glen Rasmussen | MK | (415) 442-7600 |
| LARRY LAWTON | Air Force Reg. Counsel Ofc. | 415/705-166 |
| GORDON A. TURL | Texaco Inc. | 818.505.2635 |
| IAN A. WEBSTER | UNOCAL | (213) 977-6382 |
| Caroline Rudolph | CAL-EPA Dept of Toxics / special Projects | (916) 324-2357 |
| BILL VANCE | CAL-CIA OFFIC of Environ. Health | (916) 324-2829 |
| BILL ORNER | DTSC | 916 ___-___ |
| Steve Gayton | DTSC / Special Projects | (916) 324-2432 |
| Bill Duchie | Shell | (714) 520-3462 |
| Cynthia Burch | AMLGM | 714 851-5406 |

## DISCUSSION OF SELECT ISSUES REGARDING TAR AT McCOLL

I.   INTRODUCTION

     During the August 29, 1991 meeting with the EPA, the
McColl Site Group (MSG) described the processes by which acidic
sludge at McColl has been and is being converted to asphalt and
tar.  Further clarification was requested on the distribution of
the tar within the sumps, why some pockets of tar appear to be
found within the asphalt, and whether it is critical to find and
solidify all of the tar to successfully close the site.  The
following paragraphs describe the acidic sludge conversion
process, relate that process to the observations from sampling
programs at McColl, and explain why it is not necessary to find
and solidify all of the tar.

II.   ACIDIC SLUDGE CONVERSION PROCESS

     Dr. Charles Satterfield, in his presentation to the EPA
on August 29, 1991, identified the three reactions by which
acidic sludges are converted to asphalt:

     1.   acid catalyzed polymerization/condensation;
     2.   acid catalyzed polymerization/condensation,
          accelerated by acidified clay; and
     3.   acid catalyzed polymerization/condensation,
          accelerated by autoxidation.

     Initially, the reactions occurred rapidly.  This is due
to the exposure of the acidic sludge to air, the presence of
concentrated sulfuric acid, the presence of clay from the sides
and bottom of the sumps, and the presence of drilling muds in
some of the sumps.  The high ash content of the asphalt confirms
acidic clay catalysis as a primary mechanism for the formation of
the asphalt.  The tar is an intermediate product that has not
been completely transformed to asphalt due to: (i) the presence
of saturated hydrocarbons that will not polymerize, or (ii)
reduction in the reaction rate due to lack of oxygen.

III.   WHAT IS TAR?

     Tar is an intermediate product from acidic sludge that
has not been transformed to asphalt.

     Physically, the tar is black and semi-fluid in nature.
The viscosity of the tar varies depending on the stage of
transformation the material has reached, which is determined by
the original composition of the sludge and the amount of

commingling with clay and oxygen.  The variation in tar
characteristics is exemplified by the waste descriptions used
during the EPA drilling in Sump L-1, as shown in Tables 1 and 2.

The tar has organic characteristics similar to those of
the asphalt, but with much lower ash content, indicative of the
absence of clay.  Data from the EPA (1990) indicate that tar
samples had an ash content of less than 2 percent, while
asphaltic samples had ash levels of about 55 percent.  The tar is
acidic, with pH ranging from less than 1.0 to 2.0.

IV.     WHERE IS THE TAR?

Tar is found primarily in localized areas above or in
the upper portions of the asphalt, in areas near where seeps have
occurred.

Due to density differences between tar and asphalt, the
majority of the tar is found above the asphalt.  As the acidic
sludge converted into tar and asphalt, the denser asphalt sank to
the bottom of the sump, while the lighter asphalt moved toward
the top.  While small droplets of tar may be trapped within the
asphalt, the majority of tar is found above the asphalt.
Separating the relatively pure tar and asphalt phases is a
transition zone.  Because of the small density variations, both
tar and asphalt would be found in this zone.  The EPA Subsurface
Investigation Report (Ecology and Environment, 1991) shows that
virtually all of the tar in Sump L-1 was found either immediately
above the asphalt or in the transition zone.  The transition zone
is approximately one to two feet thick.

Large tar deposits are found near seeps.  The Ecology
and Environment Report showed that tar was found in the vicinity
of "Old Faithful" (see Figure 1).  Cone penetrometer data
(Ecology and Environment, 1989) confirmed a tar zone in this
area.  The tar is believed to move to the surface through cracks
in the overlying material as pressure extrudes the tar.

Tar distribution above the asphalt is consistent with
the MSG "mud wave" theory (MSG, 1991), in which overburden soils
or drilling muds pushed into the sumps from one side of the sump
displaced the tar.  This activity would result in more
concentrated zones of tar, which could be thicker at some
locations, as indicated by the available data.  Figure 2, a
cross-section through Sump L-1, shows that the thickest tar
occurs toward the sump edges.  The predesign investigations will
define these localized areas of tar within the sumps which will
require treatment.

-2-

V.    HOW MUCH TAR IS THERE?

Based on the L-1 drilling program, the boring logs by Radian (1983) and CH$_2$M Hill (1987), and MSG mapping of the tar seeps (MSG, 1991), the volume of tar within the McColl sumps is predicted at 5,000 to 10,000 cubic yards.  A more precise estimate of the volume and location of the tar will be obtained during the cone penetrometer study.

From information obtained during the recent drilling program conducted at the McColl Site, it is known that Sump L-1 contains tar in areas above the asphalt, in the transition zone and in isolated pockets within the asphalt.  The amount of tar in Sump L-1 is less than 10% of the total carbonaceous waste in the sump.  Since the sumps are all of similar origin and age, this distribution should be similar for the other sumps.  It is possible, however, that there may not be as much tar in upper Ramparts because there are very few seeps in that area.

VI.    CONCLUSIONS AND RELEVANCE TO McCOLL.

The Selective Excavation, Treatment and RCRA Equivalent Closure plan has identified a process for locating, solidifying and/or excavating significant areas of tar at the McColl Site. The plan will work for the following reasons:

(a)    The asphaltic waste does not reconvert to tar;

(b)    The tar in the sumps is primarily located at the top of the asphalt;

(c)    The plan will allow tar to be located through a combined cone penetrometer and drilling program.  The plan will locate all of the significant tar areas above the asphalt and in the transition zone.  Any remaining material will be of an isolated nature and of too small of a volume to contribute to seeps or cause geotechnical instability;

(d)    The plan will allow backfilling of the spots where tar is removed with crushed rock.  The void space in this crushed rock would be sufficient to assimilate any remaining tar; and

(e)    Tar which is currently trapped within the asphalt is immobile.  The asphalt itself will withstand the weight of the overlying material and will resist "squeezing out" any small residual amounts of tar, just as it contains the sulfur dioxide.  Therefore, isolated pockets of tar within the asphalt will not impact the integrity of the plan, and permanence will be achieved.

-3-

## REFERENCES:

- CH$_2$M Hill.  1987. Field Report, McColl Site Fullerton, California  Various Tasks to Supplement the Previous RI/FS Efforts.  Waste and Contaminated Soil Investigation.  October 9, 1987.

- Ecology and Environment.  1991.  McColl Site Assessment, TDD #T098810-019.  May 8, 1989.

- Ecology and Environment.  1991.  McColl Site Subsurface Investigation, TDD #T099010-016.  February 20, 1991.

- Environmental Protection Agency.  1990.  Technology Evaluation Report.  Pre-Publication Report.  September, 1990.

- McColl Site Group.  1991.  Selective Excavation, Treatment and RCRA Equivalent Closure Report.  February 12, 1991.

- Radian Corporation.  1983.  McColl Phase II - Physical and Chemical Characterization and Distribution of the Waste at the McColl Site, Fullerton, California.  February 23, 1983b.

### TABLE 1
### POSSIBLE TAR ENCOUNTERS
### DURING AUGUST 1990 BOREHOLE DRIILING AT LOS COYOTES PIT L01

| BOREHOLE NUMBER | GEOLOGIST | DEPTH INTERVAL (FT) | | | DESCRIPTION |
|---|---|---|---|---|---|
| 3 | VR | 7.5 | – | 9 | Black, plastic material mixed with brown silt |
| | | 14 | – | 15 | Brown clay intermixed with black tar |
| | | 15 | – | 19 | Brown clay mixed with black tar |
| 4 | VR | 8.5 | – | 10 | Black char, granular, with stringers of plastic tar |
| 8 | AF | 8.5 | – | 9 | Moist char layer |
| 12 | AF | 1 | – | 5 | Hard silty clay, tar ball stuck in sampler |
| | | 5 | – | 6.5 | Clay mixed with tar lense |
| | | 6.5 | – | 7 | Tar lense |
| 13 | AF | 10 | – | 12 | Tar |
| | | 12 | – | 12.5 | Tar and char |
| 15 | DW | 5.9 | – | 15 | Char, initially with moisture then becoming hard |
| | | 15 | – | 16.8 | Char, initially with moisture then becoming hard |
| 16 | DW | 7 | – | 7.5 | Tar and clay mixed |
| 17 | VR | 8.5 | – | 9.5 | Tar |
| | | 10 | – | 11 | Tar |
| 18 | VR | 4 | – | 5 | Tarry clay |
| | | 5 | – | 7 | Tar, non-liquid, soft, consolidated and cohesive. |
| 19 | VR | 6 | – | 7.5 | Soft Char |
| | | 7.5 | – | 8 | Char with tar lenses |
| 22 | AF | 5 | – | 6 | Soft char, pliable and moist |
| | | 7.5 | – | 8 | Tar lens, liquid |
| | | 9 | – | 10 | Softer char |
| | | 10 | – | 12.5 | Oily flowing tar |
| | | 13 | – | 14 | New tar flow |
| | | 14 | – | 14.5 | Soft char |
| 31 | VR | 7 | – | 7.8 | Moist soft char |
| 32 | VR | 9 | – | 10 | Char, sticky at barrier |
| 34 | VR | 9 | – | 10 | Black soft char, pliable, not friable |
| | | 10 | – | 11.5 | Soft pliable char |
| 35 | VR | 7.5 | – | 8 | Soft pliable char |
| | | 8 | – | 8.5 | Soft liquid char |
| 36 | VR | 7 | – | 7.5 | Soft pliable char mixed with hard platy char |
| 37 | VR | 7 | – | 7.3 | Sticky char, non-flowing |
| 39 | VR | 6.5 | – | 7 | 2 inch lens of gooey sticky tar consistency of frosting |
| | | 9.5 | – | 10 | Soft tar, mostly oily saturation |
| | | 10 | – | 10.4 | Soft tar |
| 40 | AF | 6 | – | 7.5 | Slightly sticky semi-soft char; breaking into wafers |
| | | 7.5 | – | 8.5 | Friable char, oily and dripping |
| 43 | VR | 9.5 | – | 10 | Moist, platy, vitreous char |
| | | 11 | – | 12 | Soft pliable/friable char |
| 44 | VR | 7 | – | 7.5 | Black tarry char, vitreous amd pliable |

ATTACHMENT "C"
Exhibit 16
Page 5 of 58

## TABLE 2

```
┌─────────────────────────────────────────────┐
│                                             │
│         DESCRIPTIONS USED BY E&E            │
│       AND TRANSLATED AS TAR BY MSG          │
│                                             │
└─────────────────────────────────────────────┘
```

Black, plastic material mixed with brown silt
Black char, granular, with stringers of plastic tar
Moist char
Hard silty clay, tar ball stuck in sampler
Clay mixed with tar lense
Tar lense
Tar
Tar and char
Tar and clay mixed
Tarry clay
Tar, non–liquid, soft, consolidated and cohesive.
Soft Char
Char with tar lenses
Soft char, pliable and moist
Tar lens, liquid
Softer char
Oily flowing tar
New tar flow
Darker brown clay with small char stringers
Charry silty clay
Moist soft char
Char, sticky at barrier
Black soft char, pliable, not friable
Soft pliable char
Soft liquid char
Soft pliable char mixed with hard platy char
Sticky char, non–flowing
2 inch lens of gooey sticky tar consistency of frosting
Soft tar, mostly oily saturation
Soft tar
Slightly sticky semi–soft char; breaking into wafers
Friable char, oily and dripping
Moist, platy, vitreous char
Soft pliable/friable char
Black tarry char, vitreous amd pliable

McColl Site Group

ATTACHMENT "C"
Exhibit 46
Page 6 of 8
P. 468

Sept. 10, 1991

ATTACHMENT "C"
Page 7 of 8



**Figure 1**   *ISOPACH MAP OF TARRY MATERIAL THICKNESS (FT)*

McColl Site Group

Exhibit 46
6347

Sept. 10, 1991

McColl Site Group

Sept. 10, 1991



Distance – ft

FIGURE 2
CROSS-SECTION THROUGH SEEP AREA
AT PIT LOI

based on borehole logs

ATTACHMENT "C"
Page 8 of 8

Exhibit 46
6348

## PURPOSE OF A BASELINE RISK ASSESSMENT

- Help determine whether additional response is necessary at the Site

- Modify preliminary remediation goals

- Help support selection of the "no action" remedial alternative, where appropriate

- Document the magnitude of risk at the Site, and the primary causes of that risk

Exhibit 46
6349

## EXPOSURE

RAGS - Reasonable Maximum Exposure

Former Guidance - Worst case analyses

Examples:
    30 years versus 70 years exposure
    0.2 mg/day ingestion versus 1 mg/day

RESULT:  Drives risk of all alternatives down

**ATTACHMENT "D"**
**Page 2 of 6**
Exhibit 46
6350

## RISK: CHEMICALS AND PATHWAYS

Primary cause of risk for no-action alternative will not change

Chemicals:
        Arsenic
        Benzene

Pathway
        Inhalation of vapors and dust

RESULT:  No significant impact on risk assessment

## LAND USE

RAGS requires risk estimate based on current and future
Site uses

- Assume recreation

- Would not change SROA conclusions that:
  - remediation is needed
  - arsenic ingestion poses a risk

## GROUNDWATER

- Groundwater was not addressed in the SROA

- It is a separate operable unit

- Therefore, omission from the SROA of exposure to groundwater chemicals does not mandate a new baseline risk assessment

<u>PRECEDENT</u>

There is precedent within Region IX for relying on Baseline Risk Assessments performed in accordance with old guidelines.  (South Bay Multi-Site Cooperative Superfund Program)

Harriet
John Blevins
9-10-91

Environmental
Media

Air

Prevent inhalation
of benzene in
excess of $10^{-4}$
to $10^{-6}$ excess
cancer risk.

Prevent inhalation
of sulfur dioxide
in excess of _____
ppb.

Prevent inhalation
of arsenic in excess
of 1 ug/kg-day

MSG
A, C, G, B

Exhibit 46
0355

Environmental
Media

Soil

Prevent ingestion / direct
contact with soil having
arsenic in concentrations
in excess of 1 µg/kg·day.

Prevent ingestion / direct
contact with soil having
excess cancer risk of
$10^{-4}$ to $10^{-6}$ for benzene.
[ 1 ppb for $10^{-6}$ risk from
oral ingestion.]

Prevent inhalation of
benzene posing excess
cancer risk of $10^{-4}$ to
$10^{-6}$.

Prevent migration of
arsenic in excess of
50 ppb to surface or
groundwater.

Prevent migration of
benzene in excess of
1 ppb to surface or
groundwater.

MSG

A, B, D, E

Environmental
Media

Solid Wastes

Prevent ingestion/
direct contact with
wastes having
arsenic in excess
of 1 ug-kg/day

Prevent ingestion/
direct contact with
wastes having
benzene in excess
of $10^{-4}$ to $10^{-6}$
excess cancer risk
[1 ppb for $10^{-4}$ risk
from oral ingestion].

Prevent inhalation
of benzene posing
excess cancer risk
of $10^{-4}$ to $10^{-6}$.

Prevent migration
of benzene in excess
of 1 ppb to surface/
groundwater.

Environmental
Media

Solid Wastes

Prevent migration
of arsenic in
excess of 50 ppb
to surface / ground-
water

MSG

B, C, D, E, G

Environmental
Media

Groundwater

Prevent migration of
benzene to groundwater
aquifer in concentrations
greater than 1 ppb.

Prevent migration of
ARSENIC to groundwater
Aquifer in concentrations
greater than 50 ppb.

MSG

D

Environmental
Media

Surface water

Prevent migration
of benzene to
surface water
in concentrations
greater than 1 ppb.

Prevent migration
of arsenic to
surface water
in concentrations
greater than 50 ppb.

MSG
E

Remedial Action Objectives Not Addressed:

(1)  Eliminate community exposure to site odors
(2)  Protect against seismic events
(3)  Provide a site that is compatible with the surrounding community
(4)  Balance the reduction in residual risk against any implementation risk to workers and nearby residents

# D R A F T

## DETAILED SCHEDULE FOR THE NCCOLL SUPERFUND SITE

**Thermal Destruction Analysis Report**

Final to EPA - 9/91

**Off-sets Letter Report**

1st draft to EPA - 9/91
Final to EPA - 10/91

**Excavation Enclosure Letter Report**

1st draft to EPA - 10/91
Final to EPA - 11/91

**Fluidized Bed Emissions Letter Report**

1st draft to EPA - 11/91
Final to EPA - 12/91

**Response to Comments on Incineration Letter from PRPs**

1st draft to EPA - 9/91
Final to EPA - 9/91

**Baseline Risk Assessment Letter Report**

1st draft to EPA - 1/92
2nd draft to EPA - 2/92
Final to EPA - 2/92

**Risk Assessment**

1st draft to EPA - 3/92
2nd draft to EPA - 4/92
Final to EPA - 5/92

**ARARS Analysis**

1st draft to EPA - 1/92
2nd draft to EPA - 2/92
Final to EPA - 3/92

**Cost Update**

1st draft to EPA - 1/92
2nd draft to EPA - 2/92
Final to EPA - 3/92

ATTACHMENT "F"
Page 1 Exhibit 44
6363

**SROA II**

1st draft to EPA - <u>4/92</u>
2nd draft to EPA - <u>5/92</u>
Final to EPA - <u>5/92</u>

**Applications Analysis Report (ORD)**

1st draft to EPA - <u>10/91</u>
2nd draft to EPA - <u>11/91</u>
Final to EPA - <u>12/91</u>

**Treatability Study Report (SAIC)**

1st draft to EPA - <u>11/91</u>
2nd draft to EPA - <u>1/92</u>
Final to EPA - <u>2/92</u>

**Treatability Study Report (B.Lewis)**

Final <u>11/91</u>

**Update Community Relations Plan**

Final - <u>1/92</u>

**Fact sheets**

One per month

**9 Criteria Analysis**

Start - <u>5/92</u>
Complete - <u>8/92</u>

**Proposed Plan**

Start - <u>8/92</u>
Complete - <u>11/92</u>

**Public Comment Period**

Start - <u>11/92</u>
Complete - <u>2/93</u>

**Responsiveness Summary**

Start - <u>2/93</u>
Complete - <u>3/93</u>

Exhibit 46
6364

Record of Decision

Start - 9/93
Complete - 12/93

Administrative Record

Start - ongoing
Complete - 12/93

## MEETINGS

South Coast Air Quality Management District

1 per month

Interagency Meetings

1 per month

McColl Site Group

Once every 3 weeks

Meetings with the Community

1 per month

Federal OSHA

10/91

12/91

Meeting with Fullerton City Council

10/91

In-Situ Conference

9/25 & 9/26

## Site Maintanance

Groundwater Sampling

Once a quarter

**Seep Removal**

<u>11/91</u>

Drums to be covered

<u>11/91</u>

---

<u>**Groundwater Activities**</u>

Groundwater Monitoring Workplan

<u>10/91</u>

Monitoring Well Repair Letter Report

<u>12/91</u>

Data Workplan

1st draft to EPA - <u>11/91</u>
2nd draft to EPA - <u>12/91</u>
Final draft to EPA - <u>2/92</u>

Data Report

1st draft to EPA - <u>3/92</u>
2nd draft to EPA - <u>4/92</u>
Final to EPA - <u>5/92</u>

Exhibit 46
6367

PERSONAL PROTECTIVE EQUIPMENT CONSIDERATIONS
DURING THE IMPLEMENTATION OF THE SELECTIVE
EXCAVATION REMEDIAL ALTERNATIVE

It is anticipated that protection of workers from exposure to sulfur dioxide will dictate the type of personal protective equipment (PPE) needed during the implementation of the selective excavation remedial alternative.  Selective excavation will be performed in an enclosure.  Table 1 shows the PPE needs at different sulfur dioxide levels.

For sulfur dioxide levels below 25 ppm, Level C PPE, using a full faced air purifying respirator (APR), is recommended.  The APR cartridges against sulfur dioxide are approved by NIOSH for sulfur dioxide levels below 50 ppm.  By using 25 ppm as the cut-off for Level C PPE, we have incorporated a safety factor of 2.  Workers should be able to work under such exposure conditions for their entire shift.

For sulfur dioxide levels between 25 and 50 ppm, Level B PPE, using a self contained breathing apparatus (SCBA), is recommended.  Fifty ppm is one-half of the NIOSH-recommended IDLH level.  Even in the event of equipment failure, at most only one-half of the IDLH level could be reached and the workers will be able to evacuate the enclosure without developing adverse health effects.  (Because sulfur dioxide is irritating to the upper respiratory tract, workers will quickly recognize when their PPE is not working properly).

The sulfur dioxide levels can be between 50 to 100 ppm for up to 10 minutes without having to evacuate.  In the event of equipment failure, these levels will allow shutdown of the operation and will protect the community.  If the sulfur dioxide levels exceed 100 ppm for any duration, we recommend that workers evacuate the site.

Exposure to the carcinogenic organic chemicals, benzene and methylene chloride, may occur during the implementation of the selective excavation remedial alternative.  It is anticipated that airborne levels of benzene and methylene chloride will mirror airborne levels of sulfur dioxide and that protecting workers from excessive sulfur dioxide exposure also will protect workers against excessive benzene exposure.  It is anticipated that methylene chloride levels will be below the CalOSHA PEL of 100 ppm.

Exposure to tetrahydrothiophene (THT) may occur during the implementation of the selective excavation remedial

Exhibit 46
6368

McCall Site Group September 10, 1991

alternative.  Because of its low odor threshold, the primary concern is odor impacts to nearby residents in the event of enclosure failure.  It is anticipated that airborne levels of THT will mirror airborne levels of sulfur dioxide and that protecting workers from excessive sulfur dioxide exposure will also protect workers from excessive THT odors.

-2-

## SULFUR DIOXIDE ACTION LEVELS FOR SELECTIVE EXCAVATION

| Concentration* | Duration | Personal Protective Equipment (PPE) | Rationale |
|---|---|---|---|
| less than 25 ppm | Full work shift | Level C PPE with full faced air purifying respirator | Cartridges good to 50 ppm; safety factor of 2 |
| 25 to 50 ppm | Full work shift | Level B PPE with self contained breathing apparatus | 50 ppm is one-half of IDLH level; safety factor of 2 |
| 50 to 100 ppm | 10 minutes | Level B PPE with self contained breathing apparatus | Range allows cessation of activities without endangering workers or community |
| greater than 100 ppm | None | Stop work and evacuate | Work environment becoming too risky; evaluate implementing additional engineering or administrative controls |

* Measured at the breathing zone

Exhibit 46
6370

McColl Site Group September 10, 1991

Exhibit 46
6371

J

Exhibit 46
6372

# McCOLL SITE GROUP MEETING
## AT
## EPA OFFICES

## OCTOBER 21, 1991

Exhibit 46
6373

## TABLE OF CONTENTS

1.   Comparative Analysis: Implementability of Selective Excavation, Total Solidification, Excavation and Incineration

2.   Estimate of Flux from McColl Wastes

3.   Comments on Edward Aul's Presentation

4.   Analysis of SAIC Report

5.   Re-estimation of Costs for On-site Incineration

6.   Electromagnetic Survey and Ground Penetrating Radar Investigations

1

Exhibit 46
6374

# IMPLEMENTABILITY OF REMEDIATION OPTIONS

## ATTACHED TABLE SHOWING SELECTIVE EXCAVATION OPTION, TOTAL SOLIDIFICATION OPTION , AND TOTAL EXCAVATION AND INCINERATION OPTION

McColl Site Group
October 21, 1991

1

Exhibit 46
6375

COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION,
TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION

### ALTERNATIVES

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| • Technical Feasibility<br>  - Difficulties Associated with Implementation | • SO$_2$ scrubber system design | • SO$_2$ scrubber system design. Larger size unit needed to deal with increased SO$_2$ quantity. | • Special large enclosure required.<br><br>• SO$_2$ scrubber system must be designed for worst-case condition corresponding to peak concentrations based on results of the trial excavation.<br><br>• Alternative to protective foam will be required for emission control since foams failed in the trial excavation. |
| | • Excavation technology is available for this approach. | • Excavation technology is available for this approach. | • Excavation technology - a critical aspect of this alternative - is uncertain and failed during the trial excavation.  May require multiple incinerators. |
| | | • Not clear that auger technology is available to penetrate and treat all waste. | |
| | | | • Incinerator did not prove successful on McColl materials in Ogden test burn and further studies are needed. |

Exhibit 46
6376

**COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION, TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION**

**ALTERNATIVES**

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| | | | • Insufficient information for SCAQMD to review for substantive compliance with agency criteria. Preliminary data from START report indicates it would not pass. |
| | | | • Shoring or sheet piling of side walls to protect workers and limit flow into work area. |
| | | | • Small enclosure may not accommodate large equipment needed for total excavation. |
| | • Earthquake protection needed during implementation - risk posed is low and proven technology exists. | • Earthquake protection needed during implementation - risk posed is low and proven technology exists. | • Earthquake protection needed during implementation - risk posed is high because of depth of excavation. |
| - Uncertainties Related to Implementation | • $SO_2$, $H_2S$ and hydrocarbon emission rates. | • $SO_2$, $H_2S$ and hydrocarbon emission rates unknown but anticipated to be high because all waste will be disturbed. | • $SO_2$, $H_2S$ and hydrocarbon emission rates unknown but anticipated to be extremely high based on results of the trial excavation. |
| | | | • Inability to meet air emissions requirements for exhaust gases on enclosure and incinerator (based on results of the trial excavation). |

McColl Site Group
October 21, 1991

2

Exhibit 46
6377

COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION,
TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION

ALTERNATIVES

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| | · Volume of waste requiring solidification is not definitely known at this time but estimated to be 25,000 to 30,000 cy.<br><br>· Increase in topography due to solidification reagents partially offset by excavation.<br><br>· Volume of waste to be selectively excavated is not definitively known at this time but believed to be 5,000 to 10,000 cy. | · Uncertain how much of waste and soil can be solidified because of subsurface obstacles and hardness of asphaltic waste.<br><br>· Greater change in site topography due to addition of solidification reagents to treat entire waste volume. | · Volume of wastes and contaminated soils adjacent to and underlying wastes to be excavated is unknown.<br><br>· Ability to excavate all tar and asphaltic waste - materials handling will be complex and may exacerbate risks based on the results of the trial excavation.<br><br>· There is insufficient information to allow scaling up of the trial excavation to a full-scale excavation.<br><br>· Availability of offsite disposal capacity for ash is unknown. |
| | · Selective excavation and in situ treatment rates uncertain but completion of remedy estimated to be in four years or less because of amount of material treated. | · In situ treatment rates uncertain, but estimated completion of remedy is between 6-10 years because of volume of waste treated and the potential for encountering subsurface obstacles. | · Excavation rates uncertain--could take 16 to 21 years based on the results of the trial excavation and limits to working hours due to proximity to community. |
| - Reliability that Technology will meet Efficiency and Performance Goals | · Emission control systems effectively and reliably minimize inhalation risks. | · Exhaust gas treatment system has not been designed to address the problems associated with disturbance of all waste. | · Exhaust gas treatment system has not been designed to address the problems experienced in the trial excavation. |

McColl Site Group
October 21, 1991

3

Exhibit 46
6378

## COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION, TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION

### ALTERNATIVES

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| | • Capping is a demonstrated reliable method of preventing direct exposure threats. | • Capping is a demonstrated reliable method of preventing direct exposure threats. | • High sulfur and ash content of waste materials makes reliability of incinerator and emissions control equipment questionable. |
| | • Design life of remedy is expected to be at least 30 years. | • Design life of remedy is expected to be at least 30 years. | • Variability of waste characteristics and other constituents will require extensive pretreatment and handling and cause incinerator shutdown. |
| - Likelihood of Technical Problems Leading to Delays | • Because of use of proven technologies and minimal waste disturbance, delays appear unlikely. | • Penetrability of asphaltic cement and subsurface obstacles will limit application and lead to delays. | • Exceedance of air emissions limits likely to delay implementation based on results of the trial excavation. |
| | | | • Buildup of flammable or explosive gases in the sumps may delay implementation. |
| | • Potentially difficult working conditions around shroud area, but activities are limited in duration and relatively small volumes of waste handled. | • Potentially difficult working conditions around shroud are more significant because of extent of waste disturbance. | • Difficult working conditions associated with personal protective equipment (e.g., heat stress) as demonstrated in the trial excavation - workers could only be expected to work 15 minutes per hour due to health monitoring and rest requirements. |
| | | | • Time required to move waste and equipment in and out of enclosure. |

Exhibit 46
6379

COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION,
TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION

ALTERNATIVES

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| | | | · Waste feed handling equipment problem may cause delays. |
| | · Odors should be controllable due to limited excavation and greater flexibility to adjust rate of waste disturbance. | · Odor control is a bigger potential problem because of greater volume of waste to be disturbed. | · Odors from disturbed waste cause nuisance requiring abatement as experienced by residents during the trial excavation. |
| | · Noise from solidification and equipment will require abatement. | · Noise from stabilization equipment will be of longer duration due to treatment of entire mass. Higher noise levels when drilling through asphaltic cement and when encountering subsurface obstacles. 24-hour operation unlikely. | · Noise from broad range of activities and large equipment will require abatement or additional design. 24-hour operation unlikely. |
| - Additional Remedial Actions | · Not difficult to implement additional remedial actions. | · Not difficult to implement additional remedial actions. | · Treatment of ash if it remains hazardous. |
| - Migration or Exposure Pathways that cannot be Monitored Adequately | · No migration or exposure pathways exist that cannot be monitored adequately. | · No migration or exposure pathways exist that cannot be monitored adequately. | · Migration or exposure pathways for dispersion of inorganic heavy metals throughout community from incinerator emissions very difficult to monitor. |
| - Risks of Exposure if Monitoring is Insufficient or Fails | | | · Inhalation or ingestion of heavy metals or particulates from incinerator emissions. |

McColl Site Group
October 21, 1991

5

Exhibit 46
6380

# COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION, TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION

## ALTERNATIVES

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| · Administrative Feasibility | · Potential ground water contamination. | · Potential for ground water contamination. | · Potential for ground water contamination. |
| | · SCAQMD Air Emissions Permit Requirements. | · SCAQMD Air Emissions Permit Requirements. Level of uncertainty is greater because of more waste disturbance. | · SCAQMD Air Emissions Permit Requirements. Significant level of uncertainty because of large scale waste disturbance and incineration. |
| · Availability of Services and Materials | · Permits should be available for limited waste excavation activities (eg. Arsenic and solidified tar). | · Permits should be available for limited waste excavation activities (eg. Arsenic). | · RCRA land disposal restrictions may prevent redisposal of ash or require further treatment. |
| - Disposal Capacity Needed. | · Approximately 5,440 to 9,070 cubic yards. | · Approximately 1,800 cubic yards of arsenic. | · At least 207,000 tons of ash/sludge. |
| - Availability of Necessary Equipment and Specialists | · Shallow auger system is generally available - specialty enclosures are required but much smaller than other alternatives. | · Significant concerns regarding obstructions and depth required to auger into the asphaltic cement. | · Specialty enclosure and emission control system is needed for excavation of sumps. |

McColl Site Group
October 21, 1991

6

Exhibit 46
6381

COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION,
TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION

## ALTERNATIVES

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| | | | · Specialty equipment required for deep excavation; may require special prototype manufacture. |
| | | | · Specialty materials handling trains, with air emissions control, are required. |
| - Special Equipment Requirements | · Specialty excavation containment structures. | · Specialty excavation containment structures. | · Specialty excavation containment structures. |
| | · Special enclosures for the in situ treatment unit. | · Special enclosures for the in situ treatment unit. | |
| - Lack of Equipment and Specialists That Prevent Implementation | · None | · Obstructions in sumps and structural integrity of asphaltic cement may make use of conventional augering equipment infeasible. | · If incinerator emission controls cannot meet applicable (e.g., As, $SO_2$ and $NO_2$) standards, this alternative cannot be implemented unless an ARAR waiver applies. |
| - Technologies that Require Further Development Before They Can Be Applied Full-Scale | · All equipment is available. | · Equipment is available, but unproven in these conditions | |
| | | · Gas emissions treatment systems must be designed to handle large quantity of emissions. | · Gas emissions treatment systems must be designed to handle large quantity of emissions. |
| | | | · Excavation equipment. |

McColl Site Group
October 21, 1991

7

Exhibit 46
6382

COMPARATIVE ANALYSIS; IMPLEMENTABILITY OF SELECTIVE EXCAVATION,
TOTAL SOLIDIFICATION, EXCAVATION AND INCINERATION

ALTERNATIVES

| CRITERIA | SELECTIVE EXCAVATION TREATMENT AND RCRA EQUIVALENT CLOSURE | TOTAL SOLIDIFICATION | EXCAVATION AND INCINERATION |
|---|---|---|---|
| | | | · Operator protection.<br><br>· Another test burn is required to demonstrate this technology. |

Exhibit 46
6383

**2**

Exhibit 46
6384

# ESTIMATE OF FLUX FROM MCCOLL WASTES

Flux is measured in terms of $\mu g/m^2/min$ (micrograms per square meter per minute) as a rate of gas evolution from an exposed surface over a given time period. Flux is measured both as a "puff" measurement, which occurs as soon as the surface is disturbed, and as a lower steady state measurement. Radian Corporation, in their 1983 report entitled McColl Phase II - Emission Control Test, measured emission rates for $SO_2$ and THC during a waste excavation test at the McColl site. The range of values for this work is provided below:

Sulfur Dioxide ($SO_2$):

> $2.9 \times 10^3 - 9.6 \times 10^6 \ \mu g/m^2/min$

Total Hydrocarbons (THC)

> $1.3 \times 10^3 - 4.7 \times 10^5 \ \mu g/m^2/min$

These values represent the most definitive study for the McColl site, and would be representative of the range of flux that would be expected from excavation. Because of the neutralization effects coming from the addition of solidification reagent, the flux of $SO_2$ from in-situ solidification would be expected to be less. Based on the solubility of $SO_2$ in aqueous media, we would expect complete mixing to reduce $SO_2$ concentration by approximately 20%. This, however, is a very complex mass transfer problem and cannot be confirmed without testing. The THC flux would not be affected by the solidification reagents and would therefore be equal for both in-situ solidification or excavation.

Since emission rates are based on related to an exposed surface area, it is clear that the larger the area that is disturbed, whether in total or at a given time, the greater the emissions and amount of emissions that will have to be treated. It is also clear from the Sump L-4 excavation that the $SO_2$ and THC are in the tarry and asphaltic cement materials but not in the drilling mud and overburden. The amount of $SO_2$ and THC from the tarry material and the asphaltic cement is approximately equal, based on the emissions monitoring from L-1 and L-4. Emission rates are thus tied to the amount of tarry material or asphaltic cement that is disturbed, the rate of disturbance, and the surface area exposed at any one time.

Therefore, since there are an estimated 5,000 - 10,000 cubic yards (cy) of tarry material and approximately 50,000 cy of "asphaltic cement," there is 5-10 times more total $SO_2$ and THC in the asphaltic cement than in the tarry material. The Selective Excavation plan calls for in-situ neutralization, with subsequent selective excavation,

McColl Site Group
October 21, 1991                                    1

Exhibit 46
6385

of the significant (areas greater than 200 sq. ft. and greater than or equal to 3" thick)
tarry material, a volume estimated at $\leq$ 5000 - 10,000 cy.  Total Solidification, as well
as Excavation and Incineration, will involve the disruption of the tarry material plus
the asphaltic cement and material immediately adjacent to the sumps.  Total
emissions from just the waste handling during either the Total Solidification option or
the Excavation and Incineration option will be 5 to 10+ times greater than for
Selective Excavation.  This would require either a significantly larger emission
treatment system with constant operation or a substantially longer project life if the
treatment system were kept at the size projected for working in the tar only.  The
subsequent incineration of the waste in the Excavate and Incinerate option will
generate another large volume of $SO_2$, as described in the SAIC report.

Exhibit 46
6386

3

Exhibit 46
6387

## COMMENTS ON EDWARD AUL PRESENTATION

On August 6, Mr Edward Aul gave a short presentation to the MSG and EPA
regarding the technical feasibility of excavating under an enclosure. Our initial
comments regarding Mr. Aul's presentation are set forth below:

(1)     Table 4-1 contains data on sump geometry, in-place volume, excess
        excavation percentage, and a number of enclosure re-positioning required
        to excavate the sump. For example, Sump R-6 requires the enclosure to be
        moved and placed 7 separate times. Although the in-place volumes look
        reasonable, we do not believe it is feasible to excavate only a small piece
        of the sump at one time, given the mobility of the tar and of the drilling
        mud (in 3 of the sumps). Additionally, we do not understand how excess
        excavation volumes can be as low as 0.7%. Excavation is simply not that
        precise an activity, as evidenced by the fact that the excess excavation
        volume predicted by Mr. Aul for one sump (R-2) is 144.9%.

(2)     Figures 4-1 and 4-2 show a cross-section depicting excavation of the north
        half and center columns of Sump R-2. Figure 4-1 depicts a 1 ½:1 slope
        through the drilling mud, a vertical face in the waste and a slope of
        approximately 66% in the "questionable material" (soil underlying the
        waste zone). Personnel would be working at depths up to 24 feet below
        ground surface. We have previously expressed our serious reservations
        about the safety of working that far below ground surface in the presence
        of drilling mud and/or tarry material which has mobility, and in the
        presence of potentially high concentrations of sulfur dioxide and other
        chemicals. We are very uncomfortable with the idea of anchoring one side
        of the structure on top of the drilling mud, which we all recognize is not
        secure from a geotechnical standpoint. The consequences of collapse of
        the enclosure are simply too great to seriously consider this option. Finally, we are very uncomfortable with the idea of working around a
        vertical waste face. OSHA regulations require shoring of any excavation
        greater than 3 feet in depth. There is no indication of such shoring in this
        drawing. For the 14-foot vertical work face shown, substantial shoring
        would be required.

(3)     We recognize that the EPA questions MSG estimates of $SO_2$ emission, and
        are using lower $SO_2$ emissions as a working premise. Although we do not
        know what "puff" levels Ed Aul is employing, we recognize he is looking at
        maintaining $SO_2$ levels at or below 50 ppm within the enclosure. During
        the trial excavation at average excavation rates of 4.3 cubic yards per hour
        (cy/hr) for tar and 2.6 cy/hr for asphaltic cement, $SO_2$ emissions greater
        than 100 ppm were experienced on all 8 days on which tar or asphaltic

McColl Site Group
October 21, 1991                        1

Exhibit 46
6388

cement was excavated. In a letter to the EPA dated September 13, 1991, we provided our guidelines for selecting appropriate PPE at different sulfur dioxide levels. We recommend that for $SO_2$ levels between 25 and 50 ppm (as measured at the breathing zone), level B PPE using a self contained breathing apparatus (SCBA) should be used. For $SO_2$ levels between 50 and 100 ppm, we recommend that workers only continue working for up to 10 minutes. In our previous comments to the 1990 Trial Excavation, we described in some detail the consequences of working in Level B or A:

- shortened work times (as low as 15 minutes per hour)
- heat stress
- decreased visibility
- large crew sizes
- dramatically increased excavation schedule

(4)   Table 2.1 - Technical Feasibility Issues Regarding Excavation Under an Enclosure, augmented by Figures 4-1 and 4-2, provides information on equipment sizing. As you are aware from previous comments on the 1990 Trial Excavation, we have the following concerns:

- Excavating with a 3 yd bucket is inconsistent with an excavation rate of 100 tons/day;
- The materials did not provide sufficient information for us to understand the selection of a 130,000 ACFM system. In light of the potential "puffs" of $SO_2$, we believe that this system is substantially underdesigned;
- Stabilized foam has been demonstrated as ineffective;
- The Granular Activated Carbon (GAC) system and the $SO_2$/Particulate Scrubber were not effective in the 1990 Trial Excavation. Scaling up those units without consideration of venturi scrubbers for the particulates is inappropriate. There is no indication in the materials, nor do we believe the use of a 1 million Btu/hr duct-burner will comply with SCAQMD guidelines.

(5)   A two page table provides "Assumptions for Discussion with PRPs on Application Analysis Report." Comments on these pages are as follows:

- The assumption that 90% of the feed will be contaminated material with only 10% additives is inconsistent with the 1990 Trial Excavation, wherein mixes up to 1:1 were employed.
- There appears to be no provision in the drawings or assumptions for roadways to get large vehicles down into the excavation.
- Based on the cited production rates of 110 cy/day and 100 tons/day, the density of the material would be 67.3 pounds per cubic foot. This is

Exhibit 46
6389

much less than the 90 pounds per cubic foot value for waste previously provided in the February 1989 SROA.

- The ability to operate 50-ton off-highway trucks within the confines of the enclosure is questionable.

As you know, the MSG is very concerned that total excavation of the McColl site is not feasible. We do not believe that such an alternative is cost-effective or necessary. We believe that $SO_2$ emissions within the enclosure have been significantly underestimated. As we stated in a September 13, 1991 letter to the EPA, we do not feel that it is appropriate to perform long-term operations at 50 ppm $SO_2$ levels.

While our analysis continues, the MSG would be interested in further conversation with Mr. Aul to understand how the excavation assumptions and equipment selection were made. We also would be happy to discuss our thoughts on why we believe total excavation is not feasible at McColl.

Exhibit 46
6390

**DRAFT**

TABLE 4-1. PLANNING RESULTS FOR EXCAVATION UNDER AN ENCLOSURE AT MCCOLL

| Sump | Number of enclosure positions | Depth[a] ft | Length[b] x width ft | In-place volume yd³ | Excess excavation volume,[c] % | Total excavation volume, yd³ |
|---|---|---|---|---|---|---|
| Los Coyotes Area | | | | | | |
| L-1 | 4 | 31 | 272 x 151 | 13,800 | 18.4 | 16,300 |
| L-2 | 2 | 35 | 163 x 125 | 10,500 | 18.4 | 12,400 |
| L-3 | 2 | 37 | 142 x 118 | 12,500 | 13.2 | 14,100 |
| L-4 | 1 | 33 | 128 x 76 | 6,200 | 0.7 | 6,600 |
| L-5 | 1 | 45 | 97 x 66 | 5,700 | 6.7 | 6,100 |
| L-6 | 1 | 35 | 118 x 65 | 8,400 | 2.2 | 8,600 |
| Ramparts Area | | | | | | |
| R-1 | 4 | 28 | 144 x 132 | 8,800 | 7.2 | 9,400 |
| R-2 | 3 | 55 | 144 x 142 | 9,800 | 144.9 | 21,100 |
| R-3 | 2 | 31 | 161 x 142 | 6,800 | 5.9 | 7,200 |
| R-4 | 2 | 30 | 146 x 116 | 7,300 | 10 | 8,000 |
| R-5 | 2 | 35 | 170 x 87 | 11,800 | 23.3 | 14,500 |
| R-6 | 7 | 45 | 234 x 148 | 19,600 | 39.8 | 27,400 |
| Totals | 31 | -- | -- | 121,200 | -- | 151,700 |

[a] Depth of contaminated material.

[b] Length and width of sump at grade level.

[c] Volume to be excavated in excess of in-place volume (including covers).

[d] Based on (CH2M-Hill 1988).

42

Exhibit 46
6391



Figure 4-1.  Excavation of North Half of Sump R-2.

38

Exhibit 46
6392



**Figure 4-2.  Excavation of Center Column in Sump R-2.**

39

Exhibit 46
6393

**DRAFT**

## TABLE 2.1

## TECHNICAL FEASIBILITY ISSUES REGARDING EXCAVATION UNDER AN ENCLOSURE

| System Components | Trial Excavation | Full-Scale Remediation | Reason For Change |
|---|---|---|---|
| **Excavation Equipment** | | | |
| - Backhoe | Track-mounted, with 20 ft digging depth and 1 yd$^3$ bucket | Track-mounted, with 31 ft digging depth and 3 yd$^3$ bucket | Need to excavate deeper sumps and move more material efficiently |
| - Loader | Wheel-mounted with 1 yd$^3$ bucket | Track-mounted with 3 yd$^3$ bucket | Sloped terrain and the need to move more material efficiently |
| **Enclosure** | | | |
| - Size | 120 ft x 60 ft x 25 ft | 300 ft x 120 ft x 60 ft | Need to excavate entire sumps and accommodate larger equipment |
| - Number required | One | Four | Maximize operations flexibility, productivity, and safety |
| - Airlocks | One personnel airlock; no vehicle airlocks | One personnel air lock and two vehicle airlocks | Trucks will regularly move into and out of enclosures for material transport |
| **Air Ventilation System** | | | |
| - Size | Nominal 1,000 ACFM | Nominal 130,000 ACFM | Greater surface area exposed, maintain lower pollutant concentration levels |

Exhibit 46
6394

DRAFT

| | | | |
|---|---|---|---|
| - Air exhaust and delivery design | Air delivery and exhaust portals in enclosure walls | Fresh air will be delivered to the work areas via flexible ducting, exhaust hoods with flexible ducting will capture pollutants near sources | Reduce effective concentrations of pollutants within enclosure to which workers are exposed |
| **Foam System** | | | |
| - Temporary foam | Used on moving waste surfaces | Will not be used | Ineffective in suppressing emissions; discharged water to floor areas, complicating operations |
| - Stabilized foam | Used on stationary waste surfaces | Will be used on stationary waste surfaces | N/A |
| **SO$_x$/Particulate Scrubber** | | | |
| - Number/capacity | One/1,000 ACFM | Four/35,000 ACFM each for excavation enclosure | Accommodate higher air ventilation rate |
| - Liquor pH/blowdown control | Manual | Automatic | Avoid foaming and plugging |
| **Granular Activated Carbon Unit** | | | |
| - Number/capacity | One/1500 ACFM | 16 (12 operating/4 spare)/12,000 ACFM each for excavation enclosure | Accommodate higher air ventilation rate |
| - Duct burner | None | One natural gas-fired burner in each of four APCD trains for excavation enclosure | Avoid moisture condensation in GAC unit, increase adsorption efficiency |

Exhibit 46
6395

# DRAFT

## TABLE 4-2. AIR VENTILATION SYSTEM SPECIFICATIONS AND COSTS

**Component/specifications**

Air Supply Blower
  32,522-cfm throughput
  4 inches water pressure drop
  40 HP motor

Air Supply Ducting
  200 ft in length
  3 ft in diameter
  FRP construction

$SO_2$ Scrubber
  35,000-cfm throughput
  2 to 4 inches water pressure drop
  10-ft packed bed
  300-gpm recirculation pump
  Automatic controls for pH and sump level
  Blowdown pump
  Reagent metering pump
  Mist eliminator
  HPDE construction

Inducted-Draft Fan
  32,500-cfm throughput
  20 inches water suction pressure
  200-hp motor

Reagent Storage Tank
  2000-gallon capacity
  FRP construction

Blowdown Wastewater Storage Tank
  550-gallon capacity
  FRP construction

Duct Burner
  20°F temperature rise
  1 million BTU/h heat input

GAC Adsorber Modules
  3 operating modules/1 spare
  12,000-cfm throughput each
  5-7 inches water pressure drop
  5100-lb carbon each
  0.8-second residence time

Air Exhaust Ducting
  150 ft in length
  3 ft in diameter
  316 stainless steel construction

46

Exhibit 46
6396

**4**

Exhibit 46
6397

## ANALYSIS OF SAIC REPORT

Science Applications International Corporation (SAIC), in their Superfund Technical Assistance Response Team (START) Program report dated May 1991, concluded that an onsite incinerator would comply with the SCAQMD requirements. There is no basis for believing that the SCAQMD will approve an onsite incinerator at McColl. SAIC has failed to address significant issues and has made a number of overly optimistic assumptions. Specific comments are as follows:

(1)   Emission Sources - The SAIC report fails to consider all emissions from the site. During remediation, there will be multiple emission sources in the event that excavation and incineration are employed. These include:

- excavation
- pretreatment/blending emissions
- fugitive emissions from the tent and along the emission control pipelines
- emissions from the incinerator(s), including ash particulate

Multiple incinerators, for different waste streams (solids and emissions), are likely to be required and have not been evaluated. The SAIC report did not encompass and address the emissions from all of these sources.

(2)   Blending - Blending of other materials will be required to achieve 5.4% $SO_2$ content in the incinerator feedstock. The $CH_2$M-Hill report indicates that the McColl waste has 14-17% sulfur content. In order to achieve the 5.4% projection, approximately 2 times the volume of material will have to be imported and blended. The addition of such materials will dramatically increase the amount of ash requiring treatment and disposal, increase the time required to complete the project, increase the costs for the site, and increase the danger for accidents caused by trucks bringing imported materials to the site. The difficulties associated with blending, and the infrastructure required, were not considered.

(3)   Risk assessment - The Screening Level risk assessment performed in this document is not sufficient. A risk assessment for this option requires a multi-pathway analysis. SAIC looked only at the inhalation pathway; the deposition, and associated ingestion, pathway is critical for an analysis where an incinerator is involved and must be considered.

(4)   Health impacts from particulates - Health impacts from particulates have not been addressed. Most of the particulate from this type of waste would be expected to be <10 microns and may be <1 micron. Blending of other materials would most likely introduce larger particulates. A treatability study

would be required to show particulate size distribution. Particles of this size would be respirable, could create health problems, and need to be addressed in a risk assessment.

(5)    Downwash - Downwash from the stack, and the associated effect of the increased contaminants on the community, was not addressed in the SAIC report. Downwash was not factored into either the dispersion analysis or the risk analysis and thus they are significantly under estimated. The surrounding terrain and the presence of nearby residents makes this a significant concern.

(6)    Products of Incomplete Combustion (PIC's) - A boiler is proposed as a means of controlling gas temperatures within the proposed SAIC document. The use of a boiler has the potential to result in the production of products of incomplete combustion (PIC's). This was not considered on the preliminary design or the emissions analysis prepared by SAIC. The steam generated will likely have to be vented, creating a potential nuisance this close to the local community. Add waste water

(7)    NOx - Nitrogen oxides emissions have not been fully addressed. The non-catalytic reduction of nitrogen compounds using ammonia presents issues of (1) storage of ammonia on the site and (2) the potential for creation of a plume of ammonium sulfate. Such a plume would cause visibility problems and potential respiratory problems for both workers and residents.

(8)    Offsets - The cost of offsets are estimated to be $15,000 to $25,000 per ton. The SAIC report has concluded that there could be 719 tons of $SO_2$ per year based on incinerator alone, raising this as a significant cost issue that has not been addressed. In addition, it is not clear that offsets are even available for the region defined by SCAQMD Rule 13.

(9)    PSD Rule - The SAIC report ignores PSD rules. The issues of whether BACT and MACT can be met cannot be determined from the very preliminary state of the proposed incinerator design. SAIC cannot prove BACT for each of the compounds under the PSD rule. In addition, MACT is a moving target. The SAIC report does not carry the design process far enough to have the level of detail required to illustrate a high level of confidence that the permitting process will be successfully completed. In fact, it would appear to be just the opposite.

(10)    Selection of Kiln - A rotary kiln has never been permitted in the SCAQMD, has not demonstrated that it would comply with the SCAQMD's stringent requirements, and has not been demonstrated to be the optimal unit for burning McColl waste. A kiln is generally the best unit for contaminated soils but may not be the best type for combustion of organic materials or metals.

McColl Site Group
October 21, 1991                                        2

Exhibit 46
6399

(11) Equipment efficiencies - The SAIC report quotes very optimistic equipment efficiencies. The efficiencies quoted for all of the control units are maximum efficiencies which are not achievable for either long periods of time or for mobile units.

(12) Scaling Up - There is no basis in the SAIC analysis for indicating that an incinerator could be scaled up to cover the following issues:

- Ability to blend
- High sulfur content of the feed
- High solids content of the feed
- Metals content of the feed and incinerator dilutent
- VOC's in the waste

(13) Permit Timing - It has taken 7 years to permit a proven incinerator in Ohio, which had previously demonstrated its applicability for the proposed waste stream. No such demonstration has ever been performed with McColl type wastes. The SAIC report conclusions regarding constructability of an incinerator for McColl seems to be based solely on a marketing brochure from a vendor.

(14) Time - The treatability studies that would be required to address the above issues are not currently factored into EPA's 2 1/2 year schedule for selecting an alternative.

Exhibit 46
6400

**5**

Exhibit 46
6401

## RE-ESTIMATION OF COSTS FOR ON-SITE INCINERATION

On August 23, 1991, the MSG provided EPA with comments on EPA's estimated onsite incineration costs, which were set forth in the August 2, 1991 letter to the Interagency Committee (IAC). In that letter, we indicated that the total cost for incineration and ash handling should be at least $465 per ton, rather than the $249 per ton quoted in the SAIC START program report of May 1991.

In reviewing the SAIC report in further detail we have identified a calculation error in the report that affects the cost calculation included in the report. This error is on page 14 of the SAIC report, which provides a total cost of $36,329,000. For 97,100 cubic yards of material, the report incorrectly states that the cost would be $249 per ton. The correct unit cost should be $374 per ton in 1987 dollars (36,329,000/97,100), or $450 per ton in 1991 dollars. If amortization of the unit ($100/ton), and ash handling ($65/ton) are then added, the total cost per ton rises to $615 per ton. This would result in a lower range cost of at least $260 to $330 million for this alternative, as opposed to the $215 million cost estimate we originally projected. In order to meet BACT and MACT within the SCAQMD, the cost for air treatment would also represent a significant addition to the above cost, increasing the total cost above the $260 to $330 million estimate.

A summary of the costs breakdown is provided in the attached Table.

McColl Site Group
October 21, 1991

1

Exhibit 46
6402

## REVISED COST FOR ONSITE INCINERATION

| ITEM | COST ($MILLIONS) |
|---|---|
| Excavation and Storage | $ 62* |
| Tar Treatment | $ 5* |
| Asphaltic Cement Treatment | $ 16* |
| Transportation | $ 0 |
| Incineration and Ash Handling** | $ 97-150 |

========================================

| | |
|---|---|
| TOTAL | $ 180-233 |
| CONTINGENCIES*** | $ 21-28 |
| TOTAL PLUS CONTINGENCIES*** | $ 211-261 |
| TOTAL COST WITH 5%/YEAR ESCALATION*** | $ 260-330 |

\*     These numbers have been taken from an EPA letter to the Interagency Committee (8/2/91) for consistency. The McColl Site Group Does Not Agree with the Excavation and Treatment numbers cited in the above and believes that Excavation and Treatment will be significantly more costly.

\*\*     Based on 150,000 Tons at $615 - $1000 Per Ton. Emissions control costs within the SCAQMD would be expected to be high. The costs of meeting BACT and MACT within the SCAQMD will add significantly to the cost.

\*\*\*     Multipliers taken from EPA letter to Interagency Committee (8/2/91)

McColl Site Group
October 21, 1991

2

Exhibit 46
6403

**6**

Exhibit 46
6404

## Electromagnetic Survey and Ground Penetrating Radar Investigations

The EPA conducted an electromagnetic (EM) survey (geonics EM 31) and ground penetrating radar (GPR) investigation at the McColl site during the period January 1988 to February 1989.  The data and results were summarized in a report prepared by Ecology & Environment dated May 8, 1989 (TDD098810-019).

The EM survey utilized a Geonics EM31 Electromagnetic Meter and covered the entire Los Coyotes area and Ramparts Sump R-1.  The report concluded that the EM "survey resulted in an accurate account of submerged conductors."  The report further stated "subsurface conductors are very prominent within the pits."

The EM data provided in the report thus indicate that zones of high conductivity exist within the sumps.  Sump L-2 appears to have the most extensive zone of high conductivity (see Figure 1).  The report did not identify the depth at which the "conductors" were found, so there is no way to affirm whether the conductors are in the tar or asphaltic cement zones.

The GPR survey was conducted only in the Los Coyotes area.  The report concluded "the data generated from the OYO GPR was "inconclusive and of marginal quality."  Difficulties are attributed to the "inherent properties of the waste [which] limit the effectiveness of the GPR to penetrate any appreciable depth at this site."

In conclusion, the GPR and EM surveys provide no basis for determining whether the high conductivity areas are in the tarry or asphaltic cement zones.  However, zones of high conductivity can be indicative of disposed metal material.  This is consistent with the site history.  GeoCon has indicated they cannot solidify the waste if large (18") objects are present.  Thus, it is unlikely that total solidification is possible.

**K**

Exhibit 46
6406

# Six Months To Clean-Up



**3 Months**

**1 Month**

**2 Months**

**EPA REVIEWS AND AMENDS SROA; ISSUES PROPOSED PLAN & DRAFT EIR**

**PUBLIC COMMENT PERIOD; CONSENT DECREE NEGOTIATIONS COMMENCE**

**EPA PREPARES & ISSUES RESPONSIVENESS SUMMARY, ROD & EIR; CONSENT DECREE SIGNED**

**MSG IMPLEMENTS CLEAN-UP PLAN**

Exhibit 46
6407

L

Exhibit 46
6408

**THE
McCOLL
SITE
GROUP**   215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

August 23, 1991

Mr. John Blevins
U.S. EPA, Region IX
75 Hawthorne Street, H-6-1
San Francisco, California  94105

> Re:  McColl Superfund Site - Analysis of Onsite
>       Incineration Costs

Dear John:

        The EPA has stated in the Interagency Committee (IAC)
letter dated August 2, 1991, that costs for onsite incineration
are currently running approximately $150 per ton.  We do not
believe a $150 per ton estimate is appropriate for incineration
and ash disposal at the McColl Site.  A recent fixed price
estimate for the Brio NPL site indicates that the incineration
component alone, not including ash handling, for the site was
$150 per ton.  Further, this site is less complex than McColl and
is located in a less restrictive air quality area.

        In our comments to the Supplemental Reevaluation of
Alternatives, we cited a 1988 paper by John H. Lanier in the
Hazardous Materials Control Research Institute's Superfund '88
which states:  "Incineration prices (for transportable units)
range from $200/ton for dry contaminated soil to $1000/ton for
sludges with high heating values."  We believe that transportable
incinerator costs will increase significantly in the future, just
as the costs of fixed base units have, and that the McColl Site
wastes will be on the upper end of the cost range.

        Science Applications International Corporation, in their
START program report of May, 1991, estimated that the cost for
incineration at McColl, using a transportable rotary kiln system,
would be $249 per ton in 1987 dollars, or approximately $300 per
ton in 1991 dollars.  However, this number assumes " . . . no
capital or annual costs involved in procuring such a system," nor
does it account for the ash handling.  It is unrealistic to
expect that a company would provide an incinerator for six years
without looking to recover the capital cost of that unit.  This
would add up to $100 per ton to amortize the cost of the unit.
In addition, the ash handling for other sites costs approximately



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. John Blevins
August 23, 1991
Page 2

$65 per ton.  The total cost for incineration and ash handling would be at least $465 per ton.  We believe the cost of meeting air quality standards in the South Coast Air Quality Management District ("SCAQMD") would require additional capital cost, but do not have any specific estimate at this time.

Although we are not convinced that incineration is even possible within the SCAQMD, given the above, we have developed an illustrative cost analysis for an onsite incineration program.  For ease of comparison, we have used the costs EPA quoted in the Interagency Committee letter for excavation and storage, tar treatment, char treatment and contingency percentage.  Even though we believe EPA's cost estimates are substantially low, and the air quality issues associated with such a program have not been adequately addressed, we have used them for illustration purposes and have found that the lower range of costs for an onsite incineration program at McColl would be $215-$330 million (see Attachment 1).  Adjustments for air quality facilities and waste excavation and handling would substantially increase the final cost and clearly result in this alternative not being cost-effective.

We would be glad to discuss the foregoing with you in detail.  We expect the foregoing information will be used in your decision-making process at McColl.

Very truly yours,

William J. Duchie/RM

William J. Duchie

WJD:mfl

cc:  David Jones
     Pam Wieman
     Steve Linder
     Barry Eaton
     David Bushey
     Barry Brown



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

ATTACHMENT 1
COST FOR ONSITE INCINERATION

| ITEM | COST ($MILLIONS) |
|------|------------------|
| Excavation and Storage | $    62* |
| Tar Treatment | 5* |
| Char Treatment | 16* |
| Transportation | 0 |
| Incineration and Ash Disposal** | 70-150 |

=============================================================

| | |
|---|---|
| TOTAL | $153-233 |
| CONTINGENCIES*** | $18-28 |
| TOTAL PLUS CONTINGENCIES*** | $171-261 |
| TOTAL COST WITH 5%/YEAR ESCALATION*** | $215-330 |

\*        THESE NUMBERS HAVE BEEN TAKEN FROM EPA LETTER TO THE INTERAGENCY COMMITTEE (8/2/91) FOR CONSISTENCY.  THE MCCOLL SITE GROUP <u>DOES NOT AGREE</u> WITH THE EXCAVATION AND TREATMENT NUMBERS CITED ABOVE AND BELIEVES THAT EXCAVATION WILL BE SIGNIFICANTLY MORE COSTLY.

\*\*       BASED ON 150,000 TONS AT $465-$1000 PER TON

\*\*\*      MULTIPLIERS TAKEN FROM EPA LETTER TO INTERAGENCY COMMITTEE (8/2/91)

Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL
6411
6746

Exhibit 46
6412

M



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

October 4, 1991

Mr. John Blevins
Director of South Coast Region
Chief Southern California Section
U.S. EPA, Region IX
75 Hawthorne Street, H-6-1
San Francisco, California  94105

      Re:  <u>McColl Superfund Site, Fullerton, California</u>

Dear John:

     The MSG made a commitment to the community in August to work with the EPA to develop a mutually agreeable schedule.  In the September 9, 1991, residents' meeting, we again committed to attempt to meld the respective schedules of the EPA and the MSG. We have now had a chance to review your proposed schedule and have attached our proposed "melding" of the two.  The melded schedule allows the Record of Decision to be issued in April 1992.  Although we still believe a six-month schedule is feasible, we understand there are a few tasks which may require additional time to reach closure among the parties, and which may ultimately add several months to the schedule.  We continue, however, to believe EPA's 2-1/2 year schedule could be compressed considerably.  The melded schedule is based on the following approach:

- All tasks listed on the EPA's schedule will be performed.

- Much of the extensive work performed by the EPA, Cal EPA, their contractors and the MSG over the past ten years is directly applicable to the process or can be applied with very minor adjustments for new information (<u>i.e.</u>, ARARs analysis, SROA).

- Much of the work can and usually is performed on parallel tracks because:

   - different parties are responsible for the tasks; and

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL.

Exhibit 46
0013



215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. John Blevins
October 4, 1991
Page 2

> • many of the activities are interrelated and should be developed concurrently so the iterative process can be enhanced rather than completing the tasks in series which will result in a loss of the iterative process and lengthen the process.

We have set forth in footnotes to the schedule our logic for the dates we have proposed.

We believe the selection process can be significantly enhanced through open dialogue between the EPA, the MSG and the community at all stages of the process. As the agency proceeds, we encourage you to keep us informed of your progress so that important dialogue can take place in issue identification as well as resolution. Such an exchange will facilitate and expedite the selection process. We believe that this approach will allow the EPA to meet the melded schedule we have attached.

Very truly yours,

William J. Duchie

WJD/ceb
Enclosure
cc:  Congressman William Dannemeyer
     Mr. David B. Jones
     Ms. Pamela Wieman
     Mr. Steve Linder
     Ms. Caroline Rudolph
     Mr. Steve Gaytan
     Mr. David Bushey
     Mr. Kenneth Ritter
     Ms. Alana Knaster
     Mr. Barry Eaton

The McColl Site Group is composed of.
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

Exhibit 46
44 46

## MELDING OF EPA/MSG SCHEDULES

| TASK | RESPONSIBLE PARTY | TIME FRAME |
|------|-------------------|------------|
| Thermal Destruction Analysis Report | ICF Incineration Personnel | Final draft:  Should be complete |
| Response to Comments on Incineration Letter from PRPs | EPA Technical | Final draft:  Should be complete |
| Off-sets Letter Report | ICF Incineration Personnel | 1st draft:  Should be complete<br>Final draft: 10/91 |
| Baseline Risk Assessment Letter Report[1] | ICF Risk Assessment Personnel | **1st draft:  10/91**<br>**2nd draft:  None needed**<br>**Final draft:  10/91** |
| Excavation Enclosure Letter Report | Aul and Associates | 1st draft: 10/91<br>Final draft: 11/91 |
| Treatability Study Report (Solidification) | Bill Lewis | Final:  11/91 |
| Update Community Relations Plan[2] | EPA Public Relations | **Final:  11/91** |
| Fluidized Bed Emissions Letter Report | ICF Incineration Personnel | 1st draft: 11/91<br>Final draft: 12/91 |
| Applications Analysis Report | ORD | 1st draft: 10/91<br>2nd draft: 11/91<br>Final draft: 12/91 |
| Treatability Study Report[3] (Thermal Treatment) | SAIC | **1st draft:  10/91**<br>**2nd draft:  11/91**<br>**Final draft:  12/91** |

\*  Bold type indicates a change from EPA's Proposed Schedule.

Exhibit 46
6415

| <u>TASK</u> | <u>RESPONSIBLE PARTY</u> | <u>TIME FRAME</u> |
|---|---|---|
| Fact Sheets | EPA Public Relations | Monthly |
| SROA II[4]/ | ICF | **1st draft: 1/92**<br>**2nd draft: 2/92**<br>**Final draft: 2/92** |
| ARARs Analysis[5]/ | ICF | **1st draft: 10/91**<br>**2nd draft: 11/91**<br>**Final draft: 12/91** |
| Cost Update[6]/ | ICF | **1st draft: 10/91**<br>**2nd draft: 11/91**<br>**Final draft: 12/91** |
| 9 Criteria Analysis[7]/ | EPA Technical | **Start:  10/91**<br>**Complete: 2/92** |
| Risk Assessment[8]/ | ICF Risk Assessment Personnel | **1st draft:  11/91**<br>**2nd draft:  12/91**<br>**Final draft: 1/92** |
| Proposed Plan[9]/ | EPA Technical | **Start:  12/91**<br>**Complete: 2/92** |
| Public Comment Period[10]/ | Public | **Start:  2/92**<br>**Complete: 3/92** |
| Responsiveness Summary | EPA Technical | **Start:  3/92**<br>**Complete: 4/92** |
| Record of Decision | EPA Technical | **Start:  3/92**<br>**Complete: 4/92** |
| Administrative Record | EPA/PRPs | **Start:  Ongoing**<br>**Complete: 4/92** |

\*  Bold type indicates a change from EPA's Proposed Schedule.

-2-

Exhibit 46<br>6416

## ASSUMPTIONS USED TO MELD SCHEDULES

- Work on tasks can be on parallel tracks because different parties are responsible.

- All tasks listed on EPA's schedule will be performed.

### FOOTNOTES

[1]/The EPA and MSG have been discussing the issue of whether a baseline risk assessment is needed for several months.  The MSG made a presentation in the September 10, 1991 EPA/MSG technical meeting explaining why the MSG does not believe the new risk assessment guidance creates an independent basis for redoing the SROA risk assessment.  The EPA tasked ICF to evaluate this issue some time ago.  Based on previous McColl Site risk work and ICF experience in this field, there is no reason why ICF should not be in a position to make a recommendation on this issue in October.  The MSG does not believe an interim draft of this letter is necessary.

[2]/The EPA conducted community interviews in September.  The EPA public relations personnel should be able to update the plan, which is an integral part of the process, by the end of November.

[3]/This work has been outstanding for over two years.  The information to be obtained from this report should be considered by the EPA in the screening stage, which occurs in the early stages of the remedy selection process.

[4]/The analysis for this document has already begun.  Considering the level of previous work, a first draft could be completed in January.

[5]/An extensive amount of work has been done on identifying and compiling ARARs by both the MSG and the EPA.  There are very few, if

Exhibit 46
6417

any, new ARARs.  The EPA has already defined the alternatives it will consider in the SROA II.  ARARs on the SROA alternatives and Selective Excavation have already been compiled.  The ARARS for the new alternatives being considered by the EPA will not be significantly different than the ARARs on the SROA alternatives and the Selective Excavation alternative.

6/The EPA has already defined the alternatives it will consider in the SROA II.  Cost information is available on the SROA alternatives and Selective Excavation so work on this task should be commenced immediately.

7/This analysis should be part of the SROA II.  The EPA should be working on this analysis on an ongoing basis and updating the analysis as new information is developed, rather than deferring this task until the end of the process.

8/The MSG does not believe the new risk assessment guidance creates an independent basis for redoing the SROA risk assessment.  ICF is currently evaluating this issue for the EPA.  The EPA has already defined the alternatives to be included in the SROA II.  The MSG has performed a risk assessment of the Selective Excavation alternative which EPA could be independently evaluating now.  Additionally, EPA could be performing risk assessments on the other new alternatives now.  If ICF recommends the SROA risk assessment be updated, the EPA could begin that task after the recommendation is made and evaluated by the agency.

9/The majority of the information needed for this document will be contained in the SROA II.  The EPA should begin the document based on the SROA description of those alternatives and the Selective Excavation proposal.  The preferred alternative will be known at the time of the first draft of the SROA II, allowing the Proposed Plan to be completed concurrently with the SROA II.

10/This assumes the minimum public comment period required under the NCP.  The EPA must extend the comment period a minimum of 30 days if a timely request to do so is made by the public.  The EPA could extend the comment period further at its discretion.

Exhibit 46
6418

N

Exhibit 46
6419



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

October 18, 1991

Mr. John Blevins
U.S. EPA, Region IX
75 Hawthorne Street, H-6-1
San Francisco, California  94105

      Re:  <u>McColl Superfund Site</u>

Dear John:

      Enclosed is Dr. Charles Satterfield's paper entitled "The Reactions Occurring In the McColl Superfund Site."  As we have discussed in recent technical meetings, Dr. Satterfield has reviewed the McColl Site data and has concluded:

- The original acidic petroleum waste deposited in the sumps has converted over time to a tarry material and an asphaltic cement-like material ("asphaltic cement");

- Three reactions are responsible for converting the original waste into asphaltic cement: (i) acid-catalyzed polymerization and polycondensation of organic material, (ii) acid-catalyzed polymerization and polycondensation of organic material, accelerated by autoxidation, and (iii) acid-catalyzed polymerization and polycondensation of organic material, accelerated by acidified clay and reaction with clay;

- The tarry material is an intermediate product of the reaction mechanisms occurring at the Site and represents waste that has not completely transformed into asphaltic cement; and

- The reactions responsible for converting the original waste into asphaltic cement are not reversible under conditions existing at McColl.

Exhibit 46

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. John Blevins
October 18, 1991
Page 2


        We believe this particular work product is a good example of our joint technical effort to further understand the McColl Site.  We request that this work be submitted into the administrative record for McColl.

                        Very truly yours,

                        William J. Duchie

Enclosures

cc:  Mr. David B. Jones
     Ms. Pamela Wieman
     Mr. Steve Linder
     Ms. Caroline Rudolph
     Mr. Steve Gaytan
     Mr. Barry Eaton
     Mr. David Bushey
     Mr. Kenneth Ritter
     Mr. Barry Brown
     Mr. Robert Wilson
     Larry Lawton, Esq.

Exhibit 46

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

## THE REACTIONS OCCURRING

## IN THE McCOLL SUPERFUND SITE

Charles N. Satterfield
October 11, 1991

Exhibit 46
6422

## The Reactions Occurring

## in the McColl Superfund Site

Charles N. Satterfield

October 11, 1991

<u>Executive Summary</u>

The McColl site contains twelve sumps into which acidic petroleum waste was deposited between 1942 and 1946. This waste was a by-product from the manufacturing of high octane aviation fuel during World War II. Site investigations conducted since 1980 have found that the waste has converted to a hard asphaltic cement-like material ("asphaltic cement") with relatively high ash content. Tar material, generally found above the denser asphaltic cement, is also found within the sumps. This tar is an intermediate product and represents waste that has not been completely transformed into asphaltic cement.

The reactions that are responsible for changing the waste into the asphaltic cement are:

(1) acid-catalyzed polymerization and polycondensation of organic material;

(2) the above reactions, accelerated by autoxidation; and

(3) the above reactions, accelerated by acidified clay, and reaction with clay.

These reactions, which are continuing to occur, are not reversible under conditions existing at the McColl Site.

Clay, which is contained in the soils surrounding the sumps and other materials placed on top of the waste, has played a key role in the reactions and is the likely source of the ash found in the asphaltic cement-like material. By acidification from the sulfuric acid, the clay became a catalyst for polymerization/condensation reactions and this, combined with the clay's high adsorbent capabilities, led to the formation of an asphaltic

Exhibit 46
6423

cement-like material.

## 1. Introduction

The McColl Site is an inactive waste disposal facility located in the city of Fullerton, California.  According to McColl Site records, the facility accepted acid petroleum waste between 1942 and 1946 (Radian, February 4, 1983), which was placed in twelve excavated sumps.

During the 1950's at least three of the sumps in the Ramparts area were covered with drilling mud from various California oil fields.  The western sumps were later covered with natural fill materials during the construction of the Los Coyotes Country Club golf course in the late 1950's.

Various site investigations have been conducted since 1980 to identify the types and quantities of wastes at the McColl Site.  Results of these investigations indicate that the waste originally placed in the sumps in the 1940's has been transformed into tar and an asphaltic cement-like material ("asphaltic cement"), the latter sometimes termed "char."  The asphaltic cement is more dense than the tar.  In general the more dense asphaltic cement is found at the bottom portion of the sumps, while the less dense tar is found in the upper portions.  It appears that pockets of tar also exist within the asphaltic cement.

This paper addresses the possible reactions that have occurred at the McColl Site that have resulted in changing the original waste into the present composition.

## 2. Origin and Original Composition of Waste

The waste that was deposited in the McColl sumps is described as a waste product from the production of high octane aviation fuel during World War II by alkylation of

**2**

Exhibit 46
6424

isoparaffins catalyzed by sulfuric acid. In the alkylation reaction, isobutane is mixed with $C_3$ - $C_5$ olefins at ambient pressure and a temperature in the range of 45-70°F, in the presence of sulfuric acid. The product consists essentially of $C_7$ - $C_9$ isoparaffins and its octane number is quite sensitive to the concentration of $H_2SO_4$. The sulfuric acid becomes diluted with water and organics dissolved in it. Fresh acid is typically charged at 98-99.5 wt% $H_2SO_4$ and is discarded typically at about 90 wt% (Putney, 1959).

The organic material in the acid can come from several sources. Mercaptans and hydrogen sulfide are present in nearly all untreated light olefin feedstocks (Putney, 1959), and these would dissolve into the acid. Water may be present in small amounts in the feedstocks, either absorbed or entrained, which dilutes the acid. Olefins can polymerize with each other, a reaction that is minimized by using a great excess of isobutane to olefins in the alkylation reactor, yet some can still occur, the resulting polymeric material going into the acid. Abraham (Vol. 1, pp. 78-79) states that concentrated sulfuric acid removes unsaturated and aromatic hydrocarbons, asphaltic bodies, and "saponifiable bases" by a complex combination of formation of sulfo derivatives, simple solutions and polymerization.

In summary, the organic constituents in the original waste consisted of undefined material of varying molecular weight and composition, formed by polymerization-condensation side reactions of the ideal feedstocks, together with other complex reactions from impurities, plus various dissolved species. The original acid concentration in the waste was probably about 90% $H_2SO_4$. More details are given, for example, in the review by Putney (1959). It is important to note that essentially no "ash" or non-combustible mineral matter would have been present in the original waste.

3

Exhibit 46
6425

## 3. Present Composition of Waste Material

From the data available to me, there are only two sets of chemical analyses that seem to distinguish between tar and "char" in the sumps.

In 1983 Radian, in a "McColl Phase II study," reported on samples obtained in an earlier Phase I study in 1982 from cores at Ramparts R-1, R-2, and R-5, and Los Coyotes L-1 and L-2. Two samples from each of the five cores were analyzed. Eight of the ten fell into a class termed W-4 and were described as (Radian, 23 Feb., p. 1-1) "a hard, black, asphaltic waste with a slight rubbery texture." The analysis showed an average ash content of 48% by weight, sulfur of 8.1%, a pH of 1.5 and a bulk density of 1.1 g/cm$^3$ (disturbed material). The Radian report did not provide data on the ash content of individual samples.

The EPA Pre-Publication Report (September, 1990) gives information on samples of "raw mud, raw tar, raw char and treated tar" from the L-4 sump. Table 1 summarizes relevant data from the report. The proximate and ultimate analyses were performed on four sets of samples. As stated on page 4-94 of the EPA report, "In all of these analyses, some volatile matter was driven off of the sample when it was heated to 105°C to determine the moisture fraction. Also, the moisture content of these samples may be higher than undisturbed waste due to the foam vapor suppressants sprayed on the waste, which contained large amounts of water."

As shown in Table 1, the EPA report notes that "the raw tar sample contained a high percentage of combustible material, . . . an ash content of less than 2 percent, and a high sulfur content of 10.6 percent" and "raw char has a fairly high ash level of about 55

**4**

Exhibit 46
6426

percent, a sulfur level of 4.5 percent."

## TABLE 1.  TRIAL EXCAVATION WASTE SAMPLE ANALYSIS

### PROXIMATE AND ULTIMATE (AS-RECEIVED BASIS)

Ref: EPA, September 1990 (Table 4-16)

| Parameter | Raw tar | Raw char |
|---|---|---|
| Proximate | | |
| Moisture, wt %[a] | 11.6 | 21.2 |
| Volatiles | 69.9 | 20.1 |
| Fixed carbon, wt %[b] | 16.9 | 4.0 |
| Ash, wt % | 1.6 | 54.7 |
| | | |
| Ultimate | | |
| Carbon, wt % | 51.1 | 8.6 |
| Hydrogen, wt % | 5.4 | 3.7 |
| | (4.1)[c] | (1.3)[c] |
| Sulfur, wt % | 10.6 | 4.5 |
| Nitrogen, wt % | 0.1 | 0.1 |
| Oxygen, wt %[d] | 31.1 | 28.3 |
| | (20.8)[c] | (9.5)[c] |

-------------------------------------------------------------------------------
[a]  Moisture includes some volatiles lost at 105°C.
[b]  Fixed carbon determined by difference in proximate analysis.
[c]  Excludes hydrogen and oxygen contained in water.
[d]  Oxygen determined by difference in ultimate analysis.
-------------------------------------------------------------------------------

The EPA report also provides proximate and ultimate analyses performed on core samples collected from various depths in sump L-4.  Results from the proximate analyses further indicate that higher ash contents are found at greater depths within the sumps. For a sample believed to be tar, the ash content was 14.7%.  In comparison, two deeper samples believed to be the asphaltic cement had ash contents of 49.4% and 53.8%. Results from the ultimate analyses indicated that total sulfur content ranged from 10.4 to

**5**

Exhibit 46
6427

14.5% for the asphaltic cement and tarry material, respectively. These analyses give the total sulfur present but not the form in which the sulfur is combined.

## 4. Presence of Clay at the McColl Site

Waste from an alkylation unit in a refinery would be expected to contain negligible amounts of ash, which is mineral matter. The one analysis in Table 1 appears to be the best available at present for "raw tar." Particularly noteworthy, however, is that all eight samples of asphaltic cement from the Radian analyses, the raw "char" from the more recent EPA study, and the lower bore samples contained large amounts of ash, averaging in the neighborhood of 50%. This suggests the possibility that substantial amounts of clay were introduced into the waste sumps from the surrounding soil as well as from drilling muds and other sources. Most of the asphaltic cement was probably formed by reactions between the waste and the clay material.

The boring logs prepared by CH$_2$M Hill in 1987 show that material containing clay was present in all borings of soil near the sumps (LO-SO-01 through LO-SO-09 and RA-SO-01 through RA-SO-07). The soil was described in many cases as clayey silt, silty clay, clayey sand or sandy clay. Radian (Feb. 15, 1983), p. 3-23, gives a diagram of soil textural classes from a book by Hillel, "Soil and Water Physical Principles and Processes," that shows that these definitions mean that the clay content is at least 30%. According to the boring logs, almost without exception, clay was present in the top 15-20 feet of the soil and in many cases also much lower.

Drilling mud consists essentially of bentonite clay which mostly consists of a type

**6**

Exhibit 46
6428

of clay having a chemical structure termed "montmorillonite." Radian (15 Feb. 1983), p. 2-1, states that in the early to mid-1950's, drilling mud was used to cover some of the sumps in the Ramparts section while in the late 1950's the western sumps were covered during the construction of the Los Coyotes golf course. (This cover is described, p. 3-15, as being clayey topsoil). The drilling logs of $CH_2M$ Hill give information on nine boreholes drilled in the Ramparts sumps. These show that drilling muds were disposed of in the R-1, R-2 and R-4 sumps. The $CH_2M$ Hill drilling logs also indicate the presence of clay material above the waste within sumps. The Ecology and Environment report (1991) on the subsurface investigation at sump L-1 indicated significant clay cap material, up to as much as 10 feet in thickness.

Radian (17 Mar., p. 3-15) further quotes a soil survey by Wachtell in 1978. The natural soils in the Ramparts area are described as being primarily clays and clayey loams. From the soil survey, the Los Coyotes area is reported as consisting mostly of a sandy loam with clays possibly occurring along the western edge.

## 5. Reactions

To obtain an understanding of the probable reactions and changes in composition of the McColl wastes over the last 45 to 50 years requires piecing together data and information from a variety of sources. Several observations and facts are pertinent:

Source of $SO_2$: It is evident that sulfuric acid is slowly reduced to $SO_2$ by organic material in the alkylation waste. Kalichevsky and Stagner (1942), p. 76, give data on the increase in $SO_2$ over a 21-day period in a waste from treatment of cracked gasoline. A

7

Exhibit 46
6429

fresh acid waste from refining of heavy oils analyzed 1.37% $SO_2$ and this amount of $SO_2$ increased as the waste aged (Kalichevsky and Stagner, p. 122). The $H_2SO_4$ in the waste at McColl may still be slowly reduced to $SO_2$ by organic material present. However, $SO_2$ has a considerable solubility in $H_2SO_4$. The $SO_2$ that escapes to the atmosphere when McColl waste is first exposed probably represents release of entrapped gas and dissolved $SO_2$.

Polymerization and Condensation: The presence of sulfuric acid will catalyze the polymerization and condensation of unsaturated compounds to form higher molecular weight material. These reactions will occur in the absence of air but are accelerated by oxygen (see "Autoxidation" below). The most reactive compounds disappear first so the process as a whole will steadily decrease in rate with time. Some compounds such as saturated hydrocarbons will never polymerize in the absence of oxygen but may become autoxidized or adsorbed onto clay. This explains why tar, which is an intermediate product between the waste and asphaltic cement, still exists within the sumps.

Autoxidation: It has been observed that tar appearing on the surface as tar seeps often hardens rapidly. This is a type of polymerization/condensation which is set off by oxygen and is termed autoxidation. Autoxidation is defined as a spontaneous, self-catalysed oxidation from air and occurs with a large variety of substances. An example of autoxidative polymerization occurring at ambient conditions is the commonly-experienced use of an oil-base paint. Upon exposure to air, the paint thickens and hardens. There are many other examples. The viscosity of a vegetable oil such as linseed oil is increased by blowing with air at moderately elevated temperature.

**8**

Exhibit 46
6430

Similarly the viscosity of asphalt is increased by air blowing (Barth, 1962).  Many years ago Kalichevsky and Kobe (p. 107) reported that lubricating oil acid wastes "may be allowed to solidify on standing."

A principal purpose of sulfuric acid treatment of petroleum products is to remove components especially susceptible to autoxidative polymerization, since this reaction leads to the formation of insoluble gums in gasoline and distillate fuels and sludges in lubricating oils.  The reactions are highly complex but may be divided into two types, dehydropolymerization and polycondensation.  The two types may be symbolized in general as:

$$RH + R'H \xrightarrow{O_2} R \cdot R' + H_2O \text{ etc.} \tag{1}$$

$$R(O)H + R'(O)H \longrightarrow R \cdot R' \text{ or } R(O)R' + H_2O \text{ etc.} \tag{2}$$

Here RH and R'H represent hydrocarbons from which, in an overall sense, hydrogen is removed by oxygen to form $H_2O$, accompanied by combination of the two hydrocarbons to form a larger molecule, R'R'.  The process then repeats.  R(O)H and R'(O)H represent insertion of oxygen from the air as the first step, followed by elimination of $H_2O$ and condensation.  Again, the process repeats to form higher molecular weight products.

Unsaturated bonds, e.g., those in olefinic compounds and aromatics, are particularly susceptible to autoxidation but the degree of reactivity varies greatly with structure.  Some sulfur and nitrogen compounds even in small amounts greatly accelerate the oxidation rate (Lundberg, Vol. II, p. 716), while other materials act as inhibitors.  Thus the overall oxidative polymerization rate can vary greatly with slight changes in

2

Exhibit 46
6431

composition.  This explains why one tar seep at McColl may harden rapidly while another may remain fairly soft.

The most probable mechanism in dehydropolymerization (reaction 1) involves initial reaction with oxygen to form a hydroperoxide which in turn decomposes to initiate a polymerization reaction that proceeds by a free-radical (or ionic) chain mechanism.

In polycondensation (reaction 2) the initial reaction is that of oxygen with the organic to form an acid, alcohol or similar oxygenated structure.  These then combine with the release of water.  A simple example in commerce is the manufacture of polyester polymers by condensation of a dicarboxylic acid and a dihydroxy alcohol.  More information on oxidative polymerizations is given in books by Scott (1965) and a two-volume compilation edited by Lundberg (1962).

Autoxidation would accelerate the conversion of the original waste to a thicker tarry material, but this would depend on the extent to which air could have access to the waste.  One can visualize two extremes: (1)  Waste was disposed on a rotating basis amongst several sumps, forming a relatively thin layer and with considerable intervals between disposals.  This would maximize autoxidation. (2)  One sump at a time was filled, reducing the opportunity for autoxidation.

Sludge Asphalts:  Some further clues come from scattered information on so-called "sludge asphalts."  For many years (e.g., 1910-1950) these were produced from sulfuric acid sludge resulting from treatment of a variety of petroleum products in refineries.  A great variety of methods were used to treat the sludge with the objective of producing asphalt of desired physical properties.  Samples of six sludge asphalts were

**10**

Exhibit 46
6432

examined by Abraham (Abraham, p. 192). Most of his characterizations are of minor interest here, but he reports that his sludge asphalts had a high sulfur content, from 5.4 to 8.7 wt%. He also comments that sludge asphalts significantly differ from other asphalts in having a high percentage of oxygen, but gives no data. He also reported that air blowing of sludge asphalts hardens the sludge.

### 6. What Happens When Clays Contact An Acidic Hydrocarbon Waste?

First and foremost, clayey material at McColl, when contacted with acid waste, was transformed into a solid acid catalyst. This catalyzed polymerization/condensation and simultaneously the products were adsorbed onto the acidic clay, forming an asphaltic cement-like material. The following describes how the solid acids are formed and then how the clayey material could have contacted and converted the waste.

Clays after acid treatment have been used for decolorization of mineral oils since the 1920's and the first petroleum cracking catalysts (early 1930's) were prepared by first treating bentonite clay with sulfuric acid (Ryland et al., p. 14). The reactions of sulfuric acid with a clay are complex, but they involve replacement of exchangeable cations with hydrogen to form so-called acid-clays, together with various degrees of dissolution of the clays and precipitation of new phases. These changes depend on acid concentration, temperature and time of contact.

Clays are hydrated aluminosilicates that exist in a variety of types of structures. Two of the types commonly found are:

Kaolin (ideal) $Al_4Si_4O_{10}(OH)_8 \cdot nH_2O$

<u>11</u>

Exhibit 46
6433

Montmorillonite (ideal) $(Al_{3.15}Mg_{0.85})Si_{8.0}O_{20}(OH)_4X_{0.85} \cdot nH_2O$

where X = monovalent cation

Drilling muds consist essentially of bentonite, a montmorillonite type of clay, which swells in water to form a thixotropic gel.  The above two types are the "ideal" compositions but in nature impurities may be present.

As an example of the effects of acid treatment, Mills et al. (1950) give detailed information on the degree of removal of various cations from a variety of bentonite clays using 5-20% sulfuric acid at 93°C for times of up to 16 hours, followed by extensive washing.  Impurities (Ca, Mg, Fe) in the ideal montmorillonite structure are typically present in the order of 1-4 wt.% each.  For a representative case, the percent removal of various ions as reported by Mills et al. was Na, 90%; Ca, 96%; Mg, 60%; Fe, 63%; Al, 47%.  In the case where a clay is mixed with McColl acidic waste, clay would be converted into the acidic form by replacement of cations, together with varying degrees of solution of alumina, followed by complex precipitation of hydroxides as pH rose with gradual disappearance of sulfuric acid.

Benesi (1956) prepared samples of hydrogen-exchanged montmorillonite and kaolinite by treatment with an ion-exchange resin in the acid form, so as to avoid the dissolution-precipitation of the clayey material.  He reported that the clays had acid strengths, in terms of the Hammett acidity function, Ho, of about -5.6 to -8.2.  These were determined by colorimetric indicator methods (see, e.g., Satterfield, 1991) and this acid strength is equivalent to a sulfuric acid concentration of 71 to 90% (Benesi, 1956).  The acidified clays can thus catalyse the same polymerization/condensation (and other

**12**

Exhibit 46
6434

reactions) as concentrated sulfuric acid.  In addition, these acidified clays are also good adsorbents.  The combination leads to the formation of an asphaltic cement-like material.

Contact of acid waste with clayey material could have occurred at McColl in at least three different ways.

A.  The sides of the sumps were sloped.  As waste was deposited down the slopes there would have been opportunity for the concentrated acid in the waste to dissolve and/or suspend clayey material.  Upon subsequent drop in sulfuric acid concentration by rainwater, reduction to $SO_2$, etc., converted clayey-type material would precipitate and/or coagulate with polymeric carbonaceous material to form an asphaltic cement.

B.  In sumps covered with drilling mud or a clay cap, contact of waste and the clayey material could have caused the same processes as in (A) above.  The EPA 1990 report in Appendix F (p. F-2) gives the density of raw char as 74 lb/ft$^3$ and raw tar as 33 lb/ft$^3$, as measured in the field by weighing a 5-gallon bucket of waste material.  The value for tar seems low, but in any event the density of asphaltic cement would be expected to be greater than that of tar, so it would tend to settle, providing a mechanism for gross mixing when drilling mud was dumped on top of tar in the sumps.  The difference in density between the two materials would also explain why the less dense tar material would be found above the much denser asphaltic cement.  Small pockets of tar may also exist within the asphaltic cement.  These could be due to non-reactive tar trapped within the asphaltic cement matrix, or tar which is only slowly converting to asphaltic cement because of lack of oxygen.

<u>13</u>

Exhibit 46
6435

C. Other sumps are presently covered with several feet of soil.  This soil generally appears to contain clayey material that would react as in A and B above.

As described above, it becomes evident that clays play a key role in conversion of tar to asphaltic cement.  In summary:

A. Clays are converted to the acidic form by sulfuric acid.

B. Acidified clays dissolve/disperse.

C. The converted clays precipitate and/or coagulate as acid concentration drops. Simultaneously, the clays

· catalyze polymerization reactions, and

· adsorb polymeric materials and gradually become inactive as they

become coated.

The result is the formation of an asphaltic cement.

## 8.  Can Asphaltic Cement Be Converted into Tar?

Acid catalysts such as sulfuric acid and acidified clay can catalyze a wide variety of reactions of hydrocarbons and other organics.   (Satterfield, 1991, Chapter 7; Tanabe, 1970; and other sources):  Polymerization and condensation reactions readily occur and the polymeric products are adsorbed onto the clay.  As these products accumulate, they surround the clay particles and the clay becomes inactive.

The reactions described here all occur spontaneously at ambient conditions and are mildly exothermic (i.e., give off heat).  Likewise the adsorption of waste onto clay is exothermic.  Thus the reverse of these reactions cannot occur spontaneously under the

**14**

Exhibit 46
6436

same conditions that drove them forward.  To convert an asphaltic cement into a tar would require a high temperature pyrolysis (which is endothermic, i.e., soaks up heat) or some form of hydrogenation in massive processing equipment.  None of these conditions exist at the McColl site.

There is no theory or evidence that asphaltic cement in the McColl sumps will be converted back into tar under the conditions there.  Everyday observations and knowledge of reactions occurring with carbonaceous materials indeed all indicate that conversions are in the opposite direction.  For example, in mining coal one does not observe tarry material accompanying it, and an asphalt road gradually becomes harder rather than softer with time.

**15**

Exhibit 46
6437

## References

1.  Abraham, H., "Asphalts and Allied Substances," 6th ed., 5 volumes, van Nostrand, 1960.

2.  Barth, E.J., "Asphalt: Science and Technology," Gordon and Breach, 1962.

3.  Benesi, H., J. Am. Chem. Soc., 78, 5490 (1956).

4.  Ecology and Environment, Inc., Report to the EPA dated February 20, 1991.

5.  EPA Technology Evaluation Report, Pre-Publication Report, September, 1990. Section 4.7.

6.  Kalichevsky, V.A. and Stagner, B.A., "Chemical Refining of Petroleum," Reinhold, 1942.

7.  Kalichevsky, V.A. and Kobe, K.A. "Petroleum Refining with Chemicals," Elsevier, 1956.

8.  Lundberg, W.O., ed., "Autoxidation and Antioxidants," 2 vol. Wiley, 1962.

9.  Mills, G.A., Holmes, J., and Cornelius, E.B., J. Phys. Colloid Chem., 54, 1170 (1950).

10. Putney, D.H., "Sulfuric Acid Alkylation of Paraffins," in "Advances in Petroleum Chemistry and Refining," K.A. Kobe and J.J. McKetta, Jr., eds., Vol. II, 1959, p. 313.

11. Radian Report DCN 83-211-078-01-01, Technical Memorandum, 4 February 1983.

12. Radian Report DCN 83-211-078-01-03, Tech. Memorandum, 15 February 1983.

13. Radian Report DCN 211-078-04-01, Tech. Memorandum, 23 February 1983.

14. Radian Report DCN 83-211-078-01-01, Tech. Memorandum, 17 March 1983.

Exhibit 46
6438

15.   Radian, Final Report, June 1983.

16.   Ryland, L.B., Tamele, M.W., and Wilson, J.N., in "Catalysis," P.H. Emmett, ed.,
      Vol. 7, p. 1 (1960).

17.   Satterfield, C.N., "Heterogeneous Catalysis in Industrial Practice," 2nd ed.,
      McGraw-Hill, Chapter 7, 1991.

18.   Scott, G., "Atmospheric Oxidation and Antioxidants," Elsevier, 1965.

19.   Tanabe, K., "Solid Acids and Bases:  Their Catalytic Properties," Kodansha
      (Tokyo), Academic, 1970.

Exhibit 46
6439

Exhibit 46
6440

O



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

October 30, 1991

Mr. John Blevins
U.S. EPA, Region IX
75 Hawthorne Street, H-6-1
San Francisco, California  94105

        Re:  McColl Superfund Site, Fullerton, California

Dear John:

        Enclosed for your review is a copy of the Analytical
Testing Protocols which contains the testing protocols for six of
the tests which are being run on the McColl waste samples
collected during the July drilling and sampling program.  The
protocols for the other tests were provided to you in August.
Also enclosed is a copy of Analytical Test Results, Volume I,
which contains results from five of the eight tests performed on
the waste samples.  Results from the other tests will be provided
upon their completion.  We ask that this data be submitted into
the administrative record for McColl.

        Please call me if you have any questions regarding the
above.

                        Very truly yours,

                        William J. Duchie

                        William J. Duchie

WJD/ceb
Enclosure

Exhibit 46
6441

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

# McCOLL SUPERFUND SITE

# ANALYTICAL TESTING PROTOCOLS

## McCOLL SITE GROUP

### October 7, 1991

Exhibit 46
6442

## McCOLL SUPERFUND SITE
## ANALYTICAL TESTING PROTOCOLS

Enclosed are the analytical testing protocols for the laboratory methods listed below in Table 1. The MSG is utilizing these methods to test McColl waste samples collected during the July 15-18, 1991 drilling and sampling program. A complete list of the eight tests to be performed is included in Table 2. Testing protocols for other tests were provided earlier (see MSG August 29, 1991).

Table 1

| MSG Test No. | Test Result | Laboratory Method |
|---|---|---|
| 3 | Viscosity | ASTM D 445 |
| 4 | Sulfate | EPA Method 300.0 |
| 5 | Heat of Neutralization | Heat of Neutralization |
| 6 | Sample Weight loss vs. time at specified heating rate and volatiles | Thermogravimetric Analysis - Mass Spectrometry (TGA/MS) |
| | Ash | EPA Method 160.4 ASTM D 482-87 |
| 7 | Density | Unocal Testing Method 601-83 |
| 8 | Treatability | Treatability |

McColl Site Group
10/7/91

f:\mccoll\wp\analyti

Exhibit 46
6443

**TABLE 2**

## McCOLL SUPERFUND SITE LIST OF ANALYTICAL TECHNIQUES

| Test No. | Method | Rationale for Requiring Test | Material Type to be Tested | Outputs |
|---|---|---|---|---|
| 1. | pH or equivalent titration procedure | Solidification involves neutralization of waste | Tar and Char | pH |
| 2. | Bearing/Shear Strength | Gain understanding of waste's mechanical strength | Char/Tar/Mud | Compressibility strength |
| 3. | Viscosity Measurement | Seeps' occurrence dictated by Tar mobility | Tar | Viscosity |
| 4. | Sulfur/Sulfide Analysis (X-Ray fluorescence) | $SO_2$ emissions are major site concern. How much sulfur could theoretically be released? | Tar and Char | Sulfur concentration |
| 5. | Heat of Neutralization | Solidification involves waste neutralization | Tar and Char | Temperature rise on mixing specified reagents |

McColl Site Group
8/29/91

Exhibit 46
6444

| Test No. | Method | Rationale for Requiring Test | Material Type to be Tested | Outputs |
|---|---|---|---|---|
| 6. | Thermogravimetric analysis (TGA) or simulated distillation for volatiles | Neutralization of waste will cause temperature rise; outgassing features of wastes are important if wastes are disturbed. | Char Tar | Sample weight loss versus time at specified heating rate (in °F/min)  Off gasses can be speciated using, for example, GC-MS |
| 7. | Density | Waste Characteristic | Tar/Char/Mud/Soil | Density as function of depth |
| 8. | Solidification Treatability | Solidification is a major component of selective excavation plan | Tar/Mud | Reagents and concentrations for solidification/ fixation |

McColl Site Group
8/29/91

Exhibit 46
6445

Exhibit 46
46



**Designation: D 445 – 88**

An American National Standard
British Standard 4785

**Designation: 71/84**

# Standard Test Method for
# Kinematic Viscosity of Transparent and Opaque Liquids (and
# the Calculation of Dynamic Viscosity)[1]

This standard is issued under the fixed designation D 445; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval. This is also a standard of the Institute of Petroleum issued under the fixed designation IP 71. The final number indicates the year of last revision.

*This test method has been approved by the sponsoring committee and accepted by the Cooperating Societies in accordance with established procedures.*

*This standard has been approved for use by agencies of the Department of Defense and replaces Method 305.6 of Federal Test Method Standard 791b. Consult the DoD Index of Specifications and Standards for the specific year of issue which has been adopted by the Department of Defense.*

## 1. Scope

1.1 This test method covers the determination of the kinematic viscosity of liquid petroleum products (Note 1), both transparent and opaque, by measuring the time for a volume of liquid to flow under gravity through a calibrated glass capillary viscometer. The dynamic viscosity can be obtained by multiplying the measured kinematic viscosity by the density of the liquid.

NOTE 1—For the measurement of the viscosity of bitumens, see also Test Method D 2170 and Test Method D 2171.

1.2 This test method is intended primarily for application to liquids for which the shear stress and shear rates are proportional.

1.2.1 This test method depends on the behavior of the sample, and ideally the coefficient of viscosity should be independent of the rate of shear (this is commonly called Newtonian flow behavior). If, however, the coefficient of viscosity varies significantly with the rate of shear, different results may be obtained from viscometers of different capillary diameters.

1.3 This test method also includes the determination of the kinematic viscosity of fuel oils which often exhibit non-Newtonian properties.

1.4 *This standard may involve hazardous materials, operations, and equipment. This standard does not purport to address all of the safety problems associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*

D 446 Specifications and Operating Instructions for Glass Capillary Kinematic Viscometers[2]
D 2170 Test Method for Kinematic Viscosity of Asphalts (Bitumens)[3]
D 2171 Test Method for Viscosity of Asphalts by Vacuum Capillary Viscometer[3]
E 1 Specification for ASTM Thermometers[4]
E 77 Method for Inspection and Verification of Liquid-in-Glass Thermometers[5]

## 3. Terminology

3.1 *Definitions:*

3.1.1 *kinematic viscosity*—a measure of the resistive flow of a fluid under gravity, the pressure head being proportional to the density, $\rho$, of the fluid: for gravity flow under a given hydrostatic head, the pressure head of a liquid is proportional to its density, $\rho$. For any particular viscometer, the time of flow of a fixed volume of fluid is directly proportional to its kinematic viscosity, $\nu = \eta/\rho$, where $\eta$ is the dynamic viscosity coefficient. The kinematic viscosity coefficient has the dimension $L^2/T$, where $L$ is a length, and $T$ is a time. The cgs unit of kinematic viscosity is one centimetre squared per second and is called one stokes (symbol St). The SI unit of kinematic viscosity is one metre squared per second and is equivalent to $10^4$ St. Frequently, the centistokes (symbol cSt) is used ($1 \text{ cSt} = 10^{-2} \text{ St} = 1 \text{ mm}^2/\text{s}$).

3.1.2 *density*—the mass per unit volume of the fluid. The dimension of density is $M/L^3$, where $M$ is a mass. The cgs unit of density ($\rho$) is one gram per millilitre, and the SI unit of density is one kilogram per cubic metre.

3.1.3 *dynamic viscosity* (coefficient of)—the ratio between the applied shear stress and rate of shear. This coefficient, $\eta$, is thus a measure of the resistance to flow of the fluid; it is commonly called the viscosity of the liquid. The dimension of the coefficient of dynamic viscosity is $M/LT = FT/L^2$

[1] This test method is under the jurisdiction of ASTM Committee D-2 on Petroleum Products and Lubricants and is the direct responsibility of Subcommittee D02.07 on Flow Properties.
Current edition approved Oct. 31, 1988. Published December 1988. Originally published as D 445 – 37 T. Last previous edition D 445 – 86[1]
In the IP, this test method is under the jurisdiction of the Standardization Committee.

[2] Annual Book of ASTM Standards, Vol 05.01.
[3] Annual Book of ASTM Standards, Vol 04.03.
[4] Annual Book of ASTM Standards, Vols 05.01 and 14.03.
[5] Annual Book of ASTM Standards, Vol 14.01.

Exhibit 16
6447

🏛️ D 445 - ⓓ 71

## TABLE 1  Viscometer Types

| Viscometer Identification | Range, cSt (mm²/s) |
|---|---|
| **A Ostwald Types for Transparent Liquids:** | |
| 1 Cannon-Fenske Routine[c] | 0.5[a] to 20 000 |
| 2 Zeitfuchs[c] | 0.6 to 3 000 |
| 3 SIL[c] | 0.6 to 10 000 |
| 4 Cannon-Manning Semi-micro[d] | 0.4 to 20 000 |
| 5 BS/IP U-tube[d] | 0.9[a] to 10 000 |
| 6 BS/IP U-tube Miniature[d] | 0.2 to 100 |
| 7 Pinkevitch[c] | 0.6[a] to 17 000 |
| **B Suspended-Level Types for Transparent Liquids:** | |
| 1 Ubbelohde[c] | 0.3[a] to 100 000 |
| 2 FitzSimons[c] | 0.6 to 1 200 |
| 3 Atlantic[c] | 0.75[a] to 5 000 |
| 4 Cannon-Ubbelohde, Cannon-Ubbelohde Dilution[c] | 0.5[a] to 100 000 |
| 5 Cannon-Ubbelohde Semi-micro[c] | 0.4 to 20 000 |
| 6 BS/IP Suspended Level[d] | 3.5[a] to 10 000 |
| 7 BS/IP Suspended Level, Shortened Form[d] | 1.05[a] to 10 000 |
| 8 BS/IP Miniature Suspended Level[d] | 0.6 to 3 000 |
| **C Reverse-Flow Types for Transparent and Opaque Liquids:** | |
| 1 Zeitfuchs Cross-Arm[c] | 0.6 to 100 000 |
| 2 Cannon-Fenske Opaque[c] | 0.4 to 20 000 |
| 3 Lantz-Zeitfuchs[c] | 60 to 100 000 |
| 4 BS/IP U-tube Reverse Flow[d] | 0.6 to 300 000 |

[a] Each range quoted requires a series of viscometers. To avoid the necessity of making a kinetic energy correction, these viscometers are designed for a flow time in excess of 200 s except where noted in Table 4.

[b] In each of these series, the minimum flow time for the viscometers with the lowest constant exceeds 200 s.

[c] Specifications and operating instructions for these viscometers have been assembled in Specifications and Operating Instructions D 446.

[d] Specifications for these are given in Appendixes to IP 71.

---

Depending on whether the dimension of viscosity is based on the $M\cdot L\cdot T$ system or the $F\cdot L\cdot T$ system (where $F$ represents a force). The cgs unit of dynamic viscosity is one gram per centimetre per second = one dyne-second per centimetre squared and is called one poise (symbol P). Frequently, the centipoise (symbol cP) is used (1 cP = $10^{-2}$ P). The SI unit of dynamic viscosity is one pascal-second; for convenience this submultiple of millipascal-second is frequently used (1 mPa·s = 1 cP).

Note 2—Dynamic viscosity also denotes a frequency-dependent quantity in which shear stress and shear rate have a sinusoidal time dependence; it is hoped that this dual use of the same term will not be confusing.

## 4. Summary of Test Method

4.1 The time is measured in seconds for a fixed volume of liquid to flow under gravity through the capillary of a calibrated viscometer under a reproducible driving head and at a closely controlled temperature. The kinematic viscosity is the product of the measured flow time and the calibration constant of the viscometer.

## 5. Significance and Use

5.1 Many petroleum products, as well as nonpetroleum materials, are used as lubricants for bearings, gears, compressor cylinders, hydraulic equipment, etc. The proper operation of the equipment depends upon the proper kinematic viscosity or viscosity (sometimes called dynamic viscosity) of the liquid. Thus, the accurate measurement of kinematic viscosity and viscosity is essential to many product specifications.

5.2 The kinematic viscosity of many petroleum fuels is important for their proper use, for example, flow of fuels through pipe lines, injection nozzles and orifices, and the determination of the temperature range for proper operation of the fuel in burners.

## 6. Apparatus

6.1 *Viscometers* of the glass capillary type, calibrated and capable of measuring kinematic viscosity within the limits of precision given in Section 15 are acceptable. Viscometers listed in Table 1 meet these requirements.

6.1.1 Automated assemblies that measure kinematic viscosity within the limits of precision given in Section 15 are acceptable alternatives; kinematic viscosities less than 10 cSt (mm²/s) and flow times less than 200 s may require a kinetic energy correction (see Specification D 446).

6.2 *Viscometer Holders* to enable the viscometer to be suspended in a similar position as when calibrated. The proper alignment of vertical parts may be confirmed by using a plumb line.

6.3 *Viscometer Thermostat and Bath*—Any transparent liquid or vapor bath may be used, provided that it is of sufficient depth that at no time during the measurement will any portion of the sample in the viscometer be less than 20 mm below the surface of the bath liquid or less than 20 mm above the bottom of the bath.

6.3.1 The temperature control must be such that for the range from 15 to 100°C (60 to 212°F) the temperature of the bath medium does not vary by more than 0.01°C (0.02°F) over the length of the viscometers, or between the position of each viscometer, or at the location of the thermometer. For

## TABLE 2  Kinematic Viscosity Test Thermometers[d]

| Test Temperature[b] Scale Error[b] | | Thermometer Number | |
|---|---|---|---|
| °F | °C | ASTM[c] | IP[d] |
| -65 | -53.9 | 74F. C† | 69F. C |
| -60 to -35 | -51 to -35 | 43F | 85F. C |
| -40 | -40 | 73F. C | 68F. C |
| -15 | -26.1 | 126F. C | 71F. C |
| | -20 | 127C | 99C |
| 0 | -17.8 | 72F. C† | 67F. C |
| 32 | 0 | 128F. C | 33F. C |
| 68 and 70 | 20 and 21.1 | 44F. C | 29F. C |
| 77 | 25 | 45F. C | 30F. C |
| 86 | 30 | 118F. C | |
| 100 | 37.8 | 28F. C | 31F. C |
| | 40 | 120C | 92C |
| 122 | 50 | 48F. C | 35F. C |
| 130 | 54.4 | 29F. C† | 34F. C |
| 140 | 60 | 47F. C | 35F. C |
| | 60 | | 100C |
| 180 | 82.2 | 48F. C | 90F. C |
| 200 | 93.3 | 129F. C | 36F. C |
| 210 and 212 | 98.9 and 100 | 30F | 32F. C |
| | 100 | 121C | |
| 275 | 135 | 110F. C | |

[a] The smallest graduation of the Fahrenheit thermometers is 0.1°F and for the Celsius thermometers is 0.05°C except for ASTM 43F and IP 95F for which it is 0.2°F.

[b] Scale error for the Fahrenheit thermometers is not to exceed ±0.2°F (except for ASTM 110F which is ±0.3°F); for the Celsius thermometers it is ±0.1°C. These scale errors are required to apply only at the given test temperature.

[c] Complete construction detail is given in Specification E 1.

[d] Complete construction detail is given in Part 1 of IP Standards for Petroleum and its Products.

† Editorially corrected.

| Viscosity Standard Conforming to ASTM Standards[a] | Approximate Kinematic Viscosity, cSt (mm²/s) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | At -40°C (-40°F) | At 20°C (68°F) | At 25°C (77°F) | At[a] 37.78°C (100°F) | At 40°C (104°F) | At 50°C (122°F) | At[a] 98.89°C (210°F) | At 100°C (212°F) |
| S-3 | 80 | 4.8 | 4.0 | 3.0 | 2.9 | | 1.2 | 1.2 |
| S-6 | | 11 | 8.6 | 6.0 | 5.7 | | 1.8 | 1.8 |
| S-20 | | 44 | 34 | 20 | 18 | | 4.0 | 3.9 |
| S-60 | | 170 | 120 | 60 | 54 | | 7.4 | 7.2 |
| S-200 | | 640 | 450 | 250 | 180 | | 17 | 17 |
| S-600 | | 2400 | 1600 | 600 | 520 | 280 | 33 | 32 |
| S-2000 | | 8700 | 5600 | 2000 | 1700 | | 78 | 75 |
| S-8000 | | 37 000 | 23 000 | 8000 | 8700 | | | |
| S-30 000 | | | 81 000 | 27 000 | 23 000 | 11 000 | | |

**TABLE 3  Values of the Several ASTM Viscosity Oil Standards**

[a] The actual values for the standards listed above are established and annually reaffirmed by cooperative tests. In 1985 tests were made using 16 different types of viscometers in 28 laboratories located in 13 countries.

[b] Standardizations at 37.78°C and 98.89°C may be discontinued January 1, 1987.

temperatures outside this range, the variation must not exceed 0.03°C (0.05°F).

6.4 *Temperature-Measuring Device*—Standardized liquid-in-glass thermometers (Table 2) of an accuracy after correction of 0.02°C (0.04°F) can be used, or any other thermometric device of equal or better accuracy. If standardized liquid-in-glass thermometers are used, it is recommended (but not required) that two thermometers is used; they must agree within 0.04°C (0.07°F).

6.5 *Timing Device*—Any timing device may be used provided that the readings can be taken with a discrimination of 0.2 s or better, and that it has an accuracy within ±0.07 % when tested over intervals of 15 min.

6.5.1 Electrical timing devices may be used if the current frequency is controlled to an accuracy of 0.05 % or better. Alternating currents, as provided by some public power systems, are intermittently rather than continuously controlled. When used to actuate electrical timing devices, such control can cause large errors in viscosity flow measurements.

## 7. Reagents and Materials

7.1 *Appropriate Solvent*, completely miscible with the sample, petroleum ether.

7.2 *Appropriate Volatile Solvent*, completely miscible with the solvent described in 7.1.

7.3 *Chromic Acid Solution* for cleaning glassware.

## 8. Calibration

8.1 *Viscometers*—Use only calibrated viscometers with constants measured and provided to the nearest 0.1 % of their value.

8.2 *Thermometers*—Routine liquid-in-glass thermometers should be checked to the nearest 0.01°C (0.02°F) by direct comparison with a suitable calibrated thermometer.

**TABLE 5  Minimum Flow Times**

NOTE—All sizes of all viscometers tested in Specification D 446 are designed for a flow-time in excess of 200 s, except as listed below. The minimum flow times for the six BS/IP viscometers rated in Table 1 are given in the appendices to IP71.

| Viscometer identification | ASTM Size | Minimum Flow-Time, s |
|---|---|---|
| Cannon-Fenske routine | 25 | 200 |
| Ubbelohde | 0 | 300 |
| Atlantic | OC | 250 |
| Cannon-Ubbelohde, Cannon-Ubbelohde dilution | 25 | 250 |

8.2.1 Kinematic viscosity test thermometers shall be standardized at total immersion which means immersion to the top of the mercury column, with the remainder of the stem and the expansion chamber at the top of the thermometer exposed to room temperature. Do not submerge the expansion bulb at the top of the thermometer.

8.2.2 It is essential that the ice point of standardized thermometers be determined periodically and that the official corrections be adjusted to conform to the change in ice point.

8.3 *Timers*—Standard time signals available in some countries may be used for checking accuracy of timing devices.

8.4 *Viscosity Standards[b]* (Table 3)—These may be used as confirmatory checks on the procedure in the laboratory. If the measured kinematic viscosity does not agree within ±0.35 % of the certified value, each step in the procedure should be rechecked, including thermometer and viscometer calibration, to locate the source of error. It must be appreciated that a correct result obtained on a standard oil does not preclude the possibility of a counterbalancing combination of the possible sources of error.

8.4.1 *Viscosity Oil Standards*, ASTM, having the approximate kinematic viscosity shown in Table 3 are available.[b] Certified kinematic viscosity values are compared by annual cooperative tests by a number of laboratories. The current values are supplied with each portion.

## 9. General Procedure for Kinematic Viscosity

9.1 The specific details of operation vary for the different types of viscometers listed in Table 1. The operating instructions for the different types of viscometers are given in Specification D 446.

9.2 Maintain the bath at the test temperature within the limits given in 6.3.1 taking account of the precautions given in Appendix X1 and of the correction supplied on the certificates of calibration.

9.2.1 In order to obtain the most reliable temperature measurement, it is recommended that two thermometers with valid calibration certificates be used. The thermometers should be held in an upright position under the same

[b] The ASTM Viscosity Oil Standards are available in 1-pt (0.47 L) containers. Purchase orders should be addressed to the Cannon Instrument Co., P.O. Box 16, State College, PA, 16804. Shipment will be made as specified or by best means.

170

Exhibit 46

**D 445 – 71**

conditions of immersion as when calibrated. They should be viewed with a lens assembly giving about five times magnification and which should be arranged to eliminate parallax errors.

9.3 Select a clean dry, calibrated viscometer having a range covering the estimated kinematic viscosity (that is, a wide capillary for a very viscous liquid and a narrower capillary for a more fluid liquid). The flow time should not be less than 200 s, or as noted in Table 4.

9.3.1 When the test temperature is below the dew point, affix loosely packed drying tubes to the open ends of the viscometer. The drying tubes must fit the design of the viscometer and not restrict the flow of the sample by pressures created in the instrument. Carefully flush the moist room air from the viscometer by applying vacuum to one of the drying tubes. Finally, before placing the viscometer in the bath, draw up the sample into the working capillary and timing bulb and allow to drain back as an additional safeguard against moisture condensing or freezing on the walls.

9.3.2 Viscometers used for silicone fluids, fluoro-carbons, and other liquids which are difficult to remove by the use of a cleaning agent, should be reserved for the exclusive use of those fluids except when calibrating. Such viscometers should be subjected to calibration checks at frequent intervals. The solvent washings from these viscometers should not be used for the cleaning of other viscometers.

**10. Procedure for Transparent Liquids**

10.1 In general, the viscometers used for transparent liquids are of the type listed in Table 1, A and B.

10.2 Charge the viscometer in the manner dictated by the design of the instrument, this operation being in conformity with that employed when the instrument was calibrated. If the sample contains solid particles, filter during charging through a 200 mesh (75-μm) filter.

10.2.1 With certain products that exhibit "gel-like" behavior, take care that measurements are made at sufficiently high temperatures for such materials to flow freely, so that similar results will be obtained in viscometers of different capillary diameters.

10.2.2 Allow the charged viscometer to remain in the bath long enough to reach the test temperature. Because the time varies for the different instruments and temperatures, establish a safe equilibrium time by trial (30 min should be sufficient). One bath is often used to accommodate several viscometers. Never add or withdraw a viscometer while any other viscometer is in use for measuring a flow time.

10.2.3 Where the design of the viscometer requires it, adjust the volume of the sample to the mark.

10.3 Use suction (if the sample contains no volatile constituents) or pressure to adjust the head level of the test sample to a position in the capillary arm of the instrument about 5 mm ahead of the first timing mark. With the sample flowing freely, measure, in seconds to within 0.2 s (see 6.5), the time required for the meniscus to pass from the first to the second timing mark. If this flow time is less than the specified minimum (see 9.3) select a viscometer with a capillary of smaller diameter and repeat the operation.

10.3.1 Repeat the procedure described in 10.3 to make a second measurement of flow time.

10.3.2 If two measurements agree within 0.2 %, use the average for calculating the kinematic viscosity to be reported. If the measurements do not agree, repeat the determination after thorough cleaning and drying of the viscometers and filtering of the sample.

**11. Procedure for Opaque Liquids**

11.1 In general, the viscometers used for opaque liquids are of the reverse-flow type listed in Table 1, C.

11.2 For steam refined cylinder oils and black lubricating oils, proceed to 11.4 ensuring a thoroughly representative sample is used. The viscosity of residual fuel oils and similar waxy products can be affected by the previous thermal history and the following procedure shall be followed to minimize this.

11.2.1 Heat in the original container, in an oven, at 60 ± 2°C for 1 h.

11.2.2 Thoroughly stir the sample with a nonmetallic rod of sufficient length to reach the bottom of the container. Continue stirring until there is no sludge or wax adhering to the rod.

11.2.3 Recap the container tightly and shake vigorously for 1 min to complete the mixing.

NOTE 3—With samples of a very waxy nature or oils of high viscosity, it may be necessary to increase the heating temperature to achieve proper mixing. The sample should be sufficiently fluid for ease of stirring and shaking.

11.3 Immediately after completing 11.2.3, pour a sufficient sample to fill two viscometers into a 100-mL glass flask and loosely stopper.

11.3.1 Immerse the flask in a bath of boiling water for 30 min.

NOTE 4: Caution—Vigorous boil-over may occur when opaque liquids that contain high levels of water are heated to high temperatures.

11.3.2 Remove the flask from the water, stopper tightly and shake for 1 min.

11.4 Charge two viscometers in the manner dictated by the design of the instrument. For example, for the cross-arm or the BS U-tube viscometers for opaque liquids, filter the sample through a 200 mesh (75-μm) filter into two viscometers previously placed in the bath. For samples subjected to heat treatment, use preheated filter to prevent the sample coagulating during the filtration. Viscometers that are charged before being inserted into the bath may need to be preheated in an oven prior to charging the sample to ensure the sample will not be cooled below test temperature.

11.4.1 After 10 min, adjust the volume of the sample to coincide with the filling marks as in the viscometer specification. For example, for the cross-arm viscometer for opaque liquids, this is described in the annex of Specification D 446. The Cannon-Fenske Opaque Viscometer design does not require further adjustment of sample volume. Allow the viscometers to reach test temperature. Because this time will vary for the different instruments and for different test temperatures, establish a safe equilibrium time by trial (30 min is normally sufficient). One bath is often used to accommodate several viscometers. Never add or withdraw a viscometer while any other viscometer is in use for measuring a flow time.

171

Exhibit 46
6450

11.5 With the sample flowing freely, measure in seconds to within 0.2 s (see 6.5), the time required for the advancing ring of contact to pass from the first timing mark to the second.

11.5.1 In the case of samples requiring heat treatment described in 11.2 through 11.3.2, complete the determinations within 1 h of completing 11.3.2.

11.6 Calculate the mean kinematic viscosity $v$ in centistokes (millimetres squared per second) from the two determinations. For fuel oils, the two determinations should not differ by more than 1.7 % of $v$ at 50°C and 1.1 % of ($v$ + 8) at 80 and 100°C. If the two determinations exceed these limits, repeat the operation from 11.2.1. For some opaque liquids which may be non-Newtonian, the precision has not been determined.

11.6.1 Report the mean of the two determinations as the kinematic viscosity.

## 12. Cleaning of Viscometer

12.1 Between successive determinations, clean the viscometer thoroughly by several rinsings with an appropriate solvent completely miscible with the sample, followed by a completely volatile solvent. Dry the tube by passing a slow stream of filtered dry air through the viscometer for 2 min or until the last trace of solvent is removed.

12.2 Periodically clean the viscometer with chromic acid cleaning solution for at least twelve hours to remove residual traces of organic deposits; nonchromium-containing, strongly-oxidizing acid cleaning solutions[7] may be substituted so as to avoid disposal problems of chromium-containing solutions. Rinse thoroughly with distilled water followed by acetone, and dry with clean, dry air. Inorganic deposits may be removed by hydrochloric acid treatment before use of cleaning acid, particularly if barium salts are suspected. The use of alkaline cleaning solutions is not recommended as this can enlarge the working capillary and necessitate recalibration.

## 13. Procedure for Dynamic Viscosity

13.1 Determine the kinematic viscosity as described in Section 10 or 11.

13.2 Determine the density of the sample, to the nearest 0.001 g/mL at the same temperature as the viscosity, in accordance with any applicable method.

## 14. Calculation and Report

14.1 Calculate the kinematic viscosity, $v$, from the measured flow time, $t$, and the instrument constant, $C$, by means of the following equation:

$$v = Ct$$

where:
$v$ = kinematic viscosity, cSt (mm$^2$/s)
$C$ = calibration constant of the viscometer, cSt/s, and
$t$ = flow time, s.

14.2 Calculate the viscosity, $\eta$, from the calculated kinematic viscosity, $v$, and the density, $\rho$, by means of the following equation:

$$\eta = \rho v$$

where:
$\eta$ = dynamic viscosity, cP (mPa·s)
$\rho$ = density, g/mL, at the same temperature used for measuring the flow time $t$, and
$v$ = kinematic viscosity, cSt (mm$^2$/s)

14.3 Report test results for both the kinematic and dynamic viscosity rounded to the nearest one part per thousand of the value measured or calculated, respectively.

## 15. Precision and Bias

15.1 The precision of this test method as obtained by statistical examination of interlaboratory test results for clean, transparent oils tested over the range from 15 to 100°C (59 to 212°F) using the procedure described in Section 10 is as follows:

15.1.1 Repeatability—The difference between successive test results, obtained by the same apparatus under constant operating conditions on identical test material would, in the long run, in the normal and correct operation of this test method, exceed 0.35 % of their mean only in one case in twenty. Differences greater than this should be considered suspect.

15.1.2 Reproducibility—The difference between two single and independent test results obtained by different operators working in different laboratories on identical test material would, in the long run, in normal and correct operation of this test method, exceed 0.70 % of their mean only in one case in twenty. Differences greater than this should be considered suspect.

15.1.3 The precision data[8] in 15.1.1 and 15.1.2 were obtained using five mineral oils covering the kinematic viscosity range from 3 to 1200 cSt (mm$^2$/s) at temperatures from 38 and 99°C.

15.2 The precision[9] of this test method as obtained by statistical examination of interlaboratory test results for residual fuel oils of 30 to 1300 cSt (mm$^2$/s) at 50°C and of 5 to 170 cSt (mm$^2$/s) at 80 and 100°C, using the procedure described in Section 11 is as follows:

15.2.1 Repeatability—The difference between successive test results, obtained by the same apparatus under constant operating conditions on identical test material would, in the long run, in the normal and correct operation of this test method, exceed 1.5 % of their mean for results at 50°C and 1.3 % of their mean plus 8 cSt [that is, 1.3 % of (mean + 8 cSt (mm$^2$/s))] for results at 80 and 100°C only in one case in twenty. Differences greater than this should be considered suspect.

15.2.2 Reproducibility—The difference between two single and independent test results obtained by different operators working in different laboratories on identical test material would, in the long run, in normal and correct operation of the test method, exceed 7.4 % of their mean for results at 50°C and 4.0 % of their mean plus 8 cSt (mm$^2$/s) [that is, 4.0 % of (mean + 8 cSt (mm$^2$/s))] for results at 80 and 100°C only in one case in twenty. Differences greater

---

[7] A commercial source for a non-chromium containing cleaning solution is Godax Laboratories Inc., 460 Canal Street, New York, NY 10013.

[8] Supporting data are available from ASTM Headquarters. Request RR:D02-1132.

[9] Supporting data are available from ASTM Headquarters. Request RR:D02-1198.

**D 445 – 71**

than this should be considered suspect.

15.3 *Bias*—No justifiable statement can be made on the bias of the procedure in Test Method D 445 for measuring kinematic viscosity because all determinations are relative to a calibration fluid.

# APPENDIX

## (Nonmandatory Information)

## X1. ICE POINT DETERMINATION

X1.1 To achieve an accuracy of ±0.02°C for calibrated kinematic viscosity thermometers, it is required that a check at the ice point be made. It is recommended that the interval of checking be every six months; for a new thermometer, check monthly for the first six months.

X1.2 A detailed procedure for the measurement of the ice point is described in Method E 77. The suggestions in the following sections of this appendix are given specifically for the mercury-in-glass "kinematic viscosity" thermometers described in Table 2, and may not apply to other thermometers.

X1.2.1 The ice point reading of kinematic viscosity thermometers shall be taken 5 min after being at test temperature for not less than 3 min. The ice point reading shall be expressed to the nearest 0.01°C or 0.02°F.

X1.2.2 Select clear pieces of ice, preferably made from pure water. Discard any cloudy or unsound portions. Rinse the ice with distilled water and shave or crush into small pieces, avoiding direct contact with the hands or any chemically unclean objects. Fill the Dewar vessel with the crushed ice and add sufficient distilled and preferably precooled water to form a slush, but not enough to float the ice. Insert the thermometer packing the ice gently about the stem, to a depth sufficient to cover the 0°C (32°F) graduation. As the ice melts, drain off some of the water and add more crushed ice.

X1.2.3 Raise the thermometer a few millimetres after at least 3 min have elapsed, tap the stem gently, and observe the reading. Successive readings taken at least 1 min apart should agree within one tenth of a division.

X1.2.4 Alternatively, some of the ice may be heaped around the stem above the ice point and a deep narrow channel formed to permit observation of the meniscus which is thus kept well below the general level of the ice. Observations may then be made as described above without, however, raising the thermometer.

X1.2.5 Record the readings and compare with previous readings. If the readings are found to be higher or lower than the reading corresponding to a previous calibration, readings at all other temperatures will be correspondingly increased or decreased.

The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, 1916 Race St., Philadelphia, PA 19103.

Exhibit 46
6452

4

Exhibit 46
6453

United States
Environmental Protection
Agency

Environmental Monitoring and
Support Laboratory
Cincinnati OH 45268

Research and Development

EPA-600/4-84-017   Mar. 1984

&EPA

# Test Method
# The Determination of Inorganic Anions in Water by Ion Chromatography — Method 300.0

James W. O'Dell, John D. Pfaff, Morris E. Gales, and Gerald D. McKee

## 1. Scope and Application

**1.1** This method covers the determination of the following inorganic anions.

| Analyte | Stoat No. | |
| --- | --- | --- |
| | Total | Dissolved |
| Chloride | 00940 | — |
| Fluoride | 00951 | 00950 |
| Nitrate-N | 00620 | — |
| Nitrite-N | 00615 | — |
| Ortho-Phosphate-P | — | 00671 |
| Sulfate | 00945 | — |

**1.2** This is an ion chromatographic (IC) method applicable to the determination of the anions listed above in drinking water, surface water, and mixed domestic and industrial wastewater.

**1.3** The Method Detection Limit (MDL, defined in Section 13) for the above analytes is listed in Table 1. The MDL for a specific matrix may differ from those listed, depending upon the nature of the sample.

**1.4** This method is restricted to use by or under the supervision of analysts experienced in the use of ion chromatography and in the interpretation of the resulting ion chromatogram. Each analyst must demonstrate the ability to generate acceptable results with this method, using the procedure described in Section 10.2.

**1.5** When this method is used to analyze unfamiliar samples for any of the above anions, anion identification should be supported by the addition of spike solutions covering the anions of interest. The spike procedure is described in Section 11.6.

## 2. Summary of Method

**2.1** A small volume of sample, typically 2 to 3 mL, is introduced into an ion chromatograph. The anions of interest are separated and measured, using a system comprised of a guard column, separator column, suppressor column, and conductivity detector.

## 3. Definitions

**3.1** Stock standard solution — a concentrated solution containing a certified standard that is a method analyte. Stock standard solutions are used to prepare secondary standard solutions.

**3.2** Calibration standards — a solution of analytes prepared in the laboratory from stock standard solutions and diluted as needed to prepare aqueous calibration solutions.

**3.3** Quality control check sample — a solution containing known concentrations of analytes, prepared by a laboratory other than the laboratory performing the analysis. The analyzing laboratory uses this solution to demonstrate that it can

Exhibit 46
6454

obtain acceptable identifications and measurements with a method.

3.4 Performance evaluation sample — a solution of method analytes distributed by the Quality Assurance Branch (QAB), Environmental Monitoring and Support Laboratory (EMSL-Cincinnati), USEPA, Cincinnati, Ohio. to multiple laboratories for analysis. A volume of the solution is added to a known volume of reagent water and analyzed with procedures used for samples. Results of analyses are used by the QAB to determine statistically the accuracy and precision that can be expected when a method is performed by a competent analyst. Analyte true values are unknown to the analyst.

3.5 Laboratory control standards — a solution of analytes prepared in the laboratory by adding appropriate volumes of the stock standard solutions to reagent water.

3.6 Laboratory duplicates — two aliquots of the same sample that are treated exactly the same throughout laboratory analytical procedures. Analyses of laboratory duplicates indicate precision associated with laboratory procedures but not the sample collection, preservation, or storage procedures.

3.7 Field duplicates — two samples taken at the same time and place under identical circumstances and treated exactly the same throughout field and laboratory procedures. Analyses of field duplicates indicate the precision associated with sample collection, preservation and storage, as well as with laboratory procedures.

## 4. Interferences

4.1 Interferences can be caused by substances with retention times that are similar to and overlap those of the anion of interest. Large amounts of an anion can interfere with the peak resolution of an adjacent anion. Sample dilution and/or spiking can be used to solve most interference problems.

4.2 The water dip or negative peak that elutes near and can interfere with the fluoride peak can be eliminated by the addition of the equivalent of 1 mL of concentrated eluent (7.3 100X) to 100 mL of each standard and sample.

4.3 Method interferences may be caused by contaminants in the reagent water, reagents, glassware, and other sample processing

apparatus that lead to discrete artifacts or elevated baseline in ion chromatograms.

4.4 Samples that contain particles larger than 0.45 microns and reagent solutions that contain particles larger than 0.20 microns require filtration to prevent damage to instrument columns and flow systems.

## 5. Safety

5.1 Normal, accepted laboratory safety practices should be followed during reagent preparation and instrument operation. No known carcinogenic materials are used in this method.

## 6. Apparatus and Materials

6.1 Balance — Analytical, capable of accurately weighing to the nearest 0.0001 g.

6.2 Ion chromatograph — Analytical system complete with ion chromatograph and all required accessories including syringes, analytical columns, compressed air, detector, and stripchart recorder. A data system is recommended for peak integration.

6.2.1 Anion guard column: 4 x 50 mm, Dionex P/N 030825, or equivalent.

6.2.2 Anion separator column: 4 x 250 mm, Dionex P/N 030827, or equivalent.

6.2.3 Anion suppressor column: fiber, Dionex P/N 35350, or equivalent.

6.2.4 Detector — Conductivity cell: approximately 6 $\mu$L volume, Dionex, or equivalent.

## 7. Reagents and Consumable Materials

7.1 Sample bottles: Glass or polyethylene of sufficient volume to allow replicate analyses of anions of interest.

7.2 Reagent water: Distilled or deionized water, free of the anions of interest. Water should contain particles no larger than 0.20 microns.

7.3 Eluent solution: Sodium bicarbonate (CAS RN 144-55-8) 0.003 M, sodium carbonate (CAS RN 497-19-8) 0.0024M. Dissolve 1.0081 g sodium bicarbonate (NaHCO₃) and 1.0176 g of sodium carbonate (Na₂CO₃) in reagent water and dilute to 4 liters.

7.4 Regeneration solution (fiber suppressor): Sulfuric acid (CAS RN 7664-93-9) 0.025N. Dilute 2.8 mL conc. sulfuric acid (H₂SO₄) to 4 lits. with reagent water.

7.5 Stock standard solutions, 100 mg/L (1 mg/mL): Stock standard solutions may be purchased as certified solutions or prepared from ACS reagent grade materials (dried at 105°C for 30 min.) as listed below.

7.5.1 Chloride (Cl⁻) 1000 mg/L: Dissolve 1.6485 g sodium chloride (NaCl, CAS RN 7647-14-5) in reagent water and dilute to 1 liter.

7.5.2 Fluoride (F⁻) 1000 mg/L: Dissolve 2.2100 g sodium fluoride (NaF, CAS RN 7681-49-4) in reagent water and dilute to 1 liter.

7.5.3 Nitrate (NO₃-N) 1000 mg/L: Dissolve 6.0679 g sodium nitrate (NaNO₃, CAS RN 7631-99-4) in reagent water and dilute to 1 liter.

7.5.4 Nitrite (NO₂-N) 1000 mg/L: Dissolve 4.9257 g sodium nitrite (NaNO₂, CAS RN 7632-00-0) in reagent water and dilute to 1 liter.

7.5.5 Phosphate (PO₄-P) 1000 mg Dissolve 4.3937 g potassium phosphate (KH₂PO₄, CAS RN 7778-77-0) in reagent water and dilute to 1 liter.

7.5.6 Sulfate (SO₄) 1000 mg/L: Dissolve 1.8141 g potassium sulfate (K₂SO₄, CAS RN 7778-80-5) in reagent water and dilute to 1 liter.

7.5.7 Stability of standards: Stock standards (7.5) are stable for at least one month when stored at 4°C. Dilute working standards should be prepared weekly, except those that contain nitrite and phosphate which should be prepared fresh daily.

## 8. Sample Collection, Preservation and Storage

8.1 Samples should be collected in scrupulously clean glass or polyethylene bottles.

8.2 Sample preservation and holding times for the anions that can be determined by this method are as follows:

| Analyte | Preservation | Holding T. |
|---|---|---|
| Chloride | None required | 28 |
| Fluoride | None required | 28 |
| Nitrate-N | Cool to 4°C | 48 |
| Nitrite-N | Cool to 4°C | 48 |
| O-Phosphate-P | Filter and cool to 4°C | 48 |
| Sulfate | Cool to 4°C | 28 |

Exhibit 46
6455

8.3   The method of preservation and the holding time for samples analyzed by this method are determined by the anions of interest. In a given sample, the anion that requires the most preservation treatment and the shortest holding time will determine the preservation treatment and holding time for the total sample.

## 9.   Calibration and Standardization

9.1   Establish ion chromatographic operating parameters equivalent to those indicated in Table 1.

9.2   For each analyte of interest, prepare calibration standards at a minimum of three concentration levels and a blank by adding accurately measured volumes of one or more stock standards (7.5) to a volumetric flask and diluting to volume with reagent water. If the working range exceeds the linear range of the system, a sufficient number of standards must be analyzed to allow an accurate calibration curve to be established. One of the standards should be representative of a concentration near, but above, the method detection limit if the system is operated on an applicable attenuator range. The other standards should correspond to the range of concentrations expected in the sample or should define the working range of the detector. Unless the attenuator range settings are proven to be linear, each setting must be calibrated individually.

9.3   Using injections of 0.1 to 1.0 mL (determined by injection loop volume) of each calibration standard, tabulate peak height or area responses against the concentration. The results are used to prepare a calibration curve for each analyte. During this procedure, retention times must be recorded. The retention time is inversely proportional to the concentration.

9.4   The working calibration curve must be verified on each working day, or whenever the anion eluent is changed, and after every 20 samples. If the response or retention time for any analyte varies from the expected values by more than ± 10%, the test must be repeated, using fresh calibration standards. If the results are still more than ± 10%, an entire new calibration curve must be prepared for that analyte.

9.5   Nonlinear response can result when the separator column capacity is exceeded (overloading). Maximum column loading (all anions) should not exceed about 400 ppm.

## 10.   Quality Control

10.1   Each laboratory using this method should have a formal quality control program. The minimum requirements of this program consist of an initial demonstration of laboratory capability (10.2) and the analysis of spiked samples as a continuing check on performance. The laboratory should maintain performance records to define the quality of data that are generated.

10.1.1   In recognition of the rapid advances occurring in chromatography, the analyst is permitted certain options to improve the separations or lower the cost of measurements. Each time such modifications to the method are made, the analyst is required to repeat the procedure in Section 10.2

10.1.2   The laboratory should spike and analyze a minimum of 10% of all samples to monitor continuing laboratory performance. Field and laboratory duplicates should also be analysed.

10.2   Before performing any analyses, the analyst should demonstrate the ability to generate acceptable accuracy and precision with this method, using a laboratory control standard.

10.2.1   Select a representative spike concentration for each analyte to be measured. Using stock standards, prepare a quality control check sample concentrate in reagent water 100 times more concentrated than the selected concentrations.

10.2.2   Using a pipet, add 1.00 mL of the check sample concentrate (10.2.1) to each of a minimum of four 100-mL aliquots of reagent water. Analyze the aliquots according to the procedure in Section 11.

10.2.3   Calculate the average percent recovery (R), and the standard deviation(s) of the percent recovery, for the results.

10.2.4   Using the appropriate data from Table 2, determine the recovery and single operator precision expected for the method, and compare these results to the values calculated in Section 10.2.3. If the data are not comparable within control limits (10.3.1), review potential problem areas and repeat the test.

10.3   The analyst must calculate method performance criteria and define the performance of the laboratory for each spike concentration of analyte being measured.

10.3.1   Calculate upper and lower control limits for method performance as follows:

Upper Control Limit (UCL) = R + 3 s
Lower Control Limit (LCL) = R - 3 s

where R and s are calculated as in Section 10.2.3. The UCL and LCL can be used to construct control charts that are useful in observing trends in performance.

10.4   The laboratory should develop and maintain separate accuracy statements of laboratory performance for water and wastewater samples. An accuracy statement for the method is defined as R ± s. The accuracy statement should be developed by the analyses of four aliquots of water or wastewater, as described in Section 10.2.2, followed by the calculation of R and s.

10.5   Before processing any samples, the analyst must demonstrate through the analysis of an aliquot of reagent water that all glassware and reagent interferences are under control. Each time there is a change in reagents, a laboratory reagent blank must be processed as a safeguard against laboratory contamination.

10.6   It is recommended that the laboratory adopt additional quality assurance practices for use with this method. The specific practices that are most productive depend upon the needs of the laboratory and the nature of the samples. Field duplicates may be analyzed to monitor the precision of the sampling technique. When doubt exists over the identification of a peak in the chromatogram, confirmatory techniques such as sample dilution and spiking, must be used. Whenever possible, the laboratory should perform analysis of quality control check samples and participate in relevant performance evaluation sample studies.

## 11.   Procedure

11.1   Table 1 summarizes the recommended operating conditions for the ion chromatograph. Included in this table are estimated retention times that can be achieved by this method. Other columns, chromatographic conditions, or

Exhibit 46
6456

detectors may be used if the requirements of Section 10.2 are met.

**11.2** Check system calibration daily and, if required, recalibrate as described in Section 9

**11.3** Load and inject a fixed amount of well mixed sample. Flush injection loop thoroughly, using each new sample. Use the same size loop for standards and samples. Record the resulting peak size in area or peak height units. An automated constant volume injection system may also be used.

**11.4** The width of the retention time window used to make identifications should be based upon measurements of actual retention time variations of standards over the course of a day. Three times the standard deviation of a retention time can be used to calculate a suggested window size for a compound. However, the experience of the analyst should weigh heavily in the interpretation of chromatograms.

**11.5** If the response for the peak exceeds the working range of the system, dilute the sample with an appropriate amount of reagent water and reanalyze.

**11.6** If the resulting chromatogram fails to produce adequate resolution, or if identification of specific anions is questionable, spike the sample with an appropriate amount of standard and reanalyze.

*Note: Retention time is inversely proportional to concentration. Nitrate and sulfate exhibit the greatest amount of change, although all anions are affected to some degree. In some cases, this peak migration can produce poor resolution or misidentification.*

## 12.   Calculation

**12.1** Prepare separate calibration curves for each anion of interest by plotting peak size in area, or peak height units of standards against concentration values. Compute sample concentration by comparing sample peak response with the standard curve.

**12.2** Report results in mg/L.

## 13.   Precision and Accuracy — Method Detection Limit

**13.1** The method detection limit (MDL) is defined as the minimum concentration of a substance that can be measured and reported with 99% confidence that the value is above

zero. The MDL concentrations listed in Table 1 were obtained using reagent water.

**13.2** Single-operator accuracy and precision for reagent, drinking and surface water, and mixed domestic and industrial wastewater are listed in Table 2.

## 14.   References

**14.1** Annual Book of ASTM Standards. Part 31 Water, proposed test method for "Anions in Water by Ion Chromatography," p. 1485-1492 (1982).

**14.2** Standard Methods for the Examination of Water and Wastewater. Method 400Z, "Anions by I. n Chromatography" proposed for the 16th Edition of Standard Methods.

**14.3** Dionex. IC 16 operation and maintenance manual. PN 30579, Dionex Corp., Sunnyvale, California 94086.

**14.4** Method detection limit (MDL) as described in "Trace Analyses for Wastewater," J. Glaser, D. Foerst, G. McKee, S. Quave, W. Budde. *Environmental Science and Technology*, Vol. 15, Number 12. p. 1426, December 1981.

**Table 1.  Chromatographic Conditions and Method Detection Limits in Reagent Water**

| Analyte | Retention Time (Min) | Relative Retention Time | Method Detection Limit mg/L |
|---|---|---|---|
| Fluoride | 1.2 | 1.0 | 0.005 |
| Fluoride | 3.4 | 2.8 | 0.015 |
| Nitrite-N | 4.6 | 3.8 | 0.004 |
| O-Phosphate-P | 9.0 | 7.5 | 0.081 |
| Nitrate-N | 11.3 | 9.4 | 0.013 |
| Sulfate | 21.4 | 17.8 | 0.208 |

Standard Conditions:
Columns — As specified in 6.2
Detector — As specified in 6.2
Eluent — As specified in 7.3

Sample Loop — 100 µL
Pump Volume — 2.30 mL/Min

Concentrations of mixed standard (mg/L)
Fluoride 3.0    O-Phosphate-P 9.0
Chloride 4.0    Nitrate-N 30.0
Nitrate-N 10.0    Sulfate 50.0

MDL calculated from data obtained using an attenuator setting of 1 µMHO full scale. Other settings would produce an MDL proportional to their value.

**Table 2.  Single-Operator Accuracy and Precision**

| Analyte | Sample Type | Spike (mg/L) | Number of Replicates | Mean Recovery % | Standard Deviation (mg/L) |
|---|---|---|---|---|---|
| Chloride | RW | 0.060 | 7 | 97.7 | 0.0047 |
| | DW | 10.0 | 7 | 98.2 | 0.289 |
| | SW | 1.0 | 7 | 105.0 | 0.139 |
| | WW | 7.5 | 7 | 82.7 | 0.445 |
| Fluoride | RW | 0.24 | 7 | 103.1 | 0.005 |
| | DW | 9.3 | 7 | 97.7 | 0.075 |
| | SW | 0.50 | 7 | 74.0 | 0.038 |
| | WW | 1.0 | 7 | 92.0 | 0.011 |
| Nitrate-N | RW | 0.10 | 7 | 100.9 | 0.0041 |
| | DW | 31.0 | 7 | 100.7 | 0.386 |
| | SW | 0.50 | 7 | 100.0 | 0.0058 |
| | WW | 4.0 | 7 | 94.3 | 0.058 |
| Nitrite-N | RW | 0.10 | 7 | 97.7 | 0.0014 |
| | DW | 19.6 | 7 | 103.3 | 0.160 |
| | SW | 0.61 | 7 | 86.2 | 0.0053 |
| | WW | 0.52 | 7 | 100.0 | 0.018 |
| O-Phosphate-P | RW | 0.60 | 7 | 100.4 | 0.019 |
| | DW | 45.7 | 7 | 102.8 | 0.386 |
| | SW | 0.81 | 7 | 84.1 | 0.020 |
| | WW | 4.0 | 7 | 87.3 | 0.04 |
| Sulfate | RW | 1.02 | 7 | 103.1 | 0.056 |
| | DW | 98.8 | 7 | 104.3 | 1.175 |
| | SW | 10.0 | 7 | 111.8 | 0.709 |
| | WW | 12.6 | 7 | 134.9 | 0.466 |

RW = Reagent Water    SW = Surface Water
DW = Drinking Water    WW = Wastewater

USEPA:1984-750-102-863

Exhibit 46
6458

5

Exhibit 46
6459

## TESTING PROTOCOL FOR HEAT OF NEUTRALIZATION

The tests are being carried out in plastic containers which are 3 inches in diameter and about 3 1/4 inches high. These containers are placed inside of an "adiabatic" chamber of styrofoam insulation material which has been made just big enough to accept the reaction container. There is a minimum of 1 inch of styrofoam insulation on top, bottom and all sides of the reaction vessel. There are provisions made so that a thermometer and a mechanical stirrer shaft can be put through the top layer of the styrofoam insulation.

A 100 gram portion of waste is placed in the reaction vessel for each test. In a separate container, coarse ground limestone is mixed with deionized water. The temperatures of both the waste sample in the reaction vessel and the limestone slurry are monitored until they are identical. When these two materials have reached the same temperature, the top of the chamber is opened and the limestone slurry is added to the waste sample. The top of the chamber is immediately replaced and the mechanical stirrer is started. The temperature in the reaction vessel is monitored closely. The highest temperature which is stable is recorded as the final temperature.

Exhibit 46
6460

# RESIDUE, VOLATILE

## Method 160.4 (Gravimetric, Ignition at 550°C)

STORET NO. Total 00505
Non-Filterable 00535
Filterable 00520

I. Scope and Application

1.1 This method determines the weight of solid material combustible at 550°C.

1.2 The test is useful in obtaining a rough approximation of the amount of organic matter present in the solid fraction of sewage, activated sludge, industrial wastes, or bottom sediments.

2. Summary of Method

2.1 The residue obtained from the determination of total, filterable or non-filterable residue is ignited at 550°C in a muffle furnace. The loss of weight on ignition is reported as mg/l volatile residue.

3. Comments

3.1 The test is subject to many errors due to loss of water of crystallization, loss of volatile organic matter prior to combustion, incomplete oxidation of certain complex organics, and decomposition of mineral salts during combustion.

3.2 The results should not be considered an accurate measure of organic carbon in the sample, but may be useful in the control of plant operations.

3.3 The principal source of error in the determination is failure to obtain a representative sample.

4. Sample Handling and Preservation

4.1 Preservation of the sample is not practical; analysis should begin as soon as possible. Refrigeration or icing to 4°C, to minimize microbiological decompostion of solids is recommended.

5. Precision and Accuracy

5.1 A collaborative study involving three laboratories examining four samples by means of ten replicates showed a standard deviation of ±11 mg/l at 170 mg/l volatile residue concentration.

6. Reference

6.1 The procedure to be used for this determination is found in:

Standard Methods for the Examination of Water and Wastewater, 14th Edition, p 95, Method 208E, (1975).

Approved for NPDES
Issued 1971

160.4-1

Exhibit 46
6461

 **Designation: D 482 – 87[11]**

An American National Standard
British Standard 4450

**Designation: 4/81**

# Standard Test Method for
# Ash from Petroleum Products[1]

This standard is issued under the fixed designation D 482; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision, a number in parenthesis indicates the year of last reapproval. This is also a standard of the Institute of Petroleum issued under the fixed designation IP 4. The final number indicates the year of last revision.

*This test method was adopted as a joint ASTM-IP standard in 1965*

*This test method has been adopted for use by government agencies to replace Method 5421 of Federal Test Method Standard No. 791b*

[1] NOTE—An editorial correction was made in Note 3 in December 1988.

## 1. Scope

1.1  This test method covers the determination of ash from distillate and residual fuels, gas turbine fuels, crude oils, lubricating oils, waxes, and other petroleum products, in which any ash-forming materials present are normally considered to be undesirable impurities or contaminants (Note 1). The method is limited to petroleum products which are free from added ash-forming additives, including certain phosphorus compounds (Note 2).

NOTE 1—In certain types of samples, all of the ash-forming metals may not be retained quantitatively in the ash. This is particularly true of distillate oils, which require a special ash procedure in order to retain metals quantitatively.

NOTE 2—This test method is not intended for the analysis of unused lubricating oils containing additives; for such samples use Test Method D 874 neither is it intended for the analysis of lubricating oils containing lead nor for used engine crankcase oils.

1.2  *This test method may involve hazardous materials, operations, and equipment. This standard does not purport to address all of the safety problems associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

1.3  The preferred units are mass percent.

## 2. Referenced Documents

2.1  *ASTM Standard:*

D 874 Test Method for Sulfated Ash from Lubricating Oils and Additives[2]

A 4057/API MPMS 8.1 Practice for Manual Sampling of Petroleum and Petroleum Products[2]

## 3. Summary of Test Method

3.1  The sample contained in a suitable vessel is ignited and allowed to burn until only ash and carbon remain. The carbonaceous residue is reduced to an ash by heating in a muffle furnace at 775°C, cooled and weighed.

## 4. Significance and Use

4.1  Knowledge of the amount of ash-forming material present in a product may provide information as to whether or not the product is suitable for use in a given application. Ash can result from oil or water-soluble metallic compounds or from extraneous solids such as dirt and rust.

## 5. Apparatus

5.1  *Evaporating Dish or Crucible*, made of platinum, silica, or porcelain, of 90 to 120-mL capacity.

5.2  *Electric Muffle Furnace*, capable of maintaining a temperature of 775 ± 25°C and preferably having suitable apertures at the front and rear so as to allow a slow natural draught of air to pass through.

## 6. Sampling

6.1  Take samples in accordance with the instructions in Practice D 4057. Before transferring the portion of the sample to be ashed to the evaporating dish or crucible, take particular care to assure that the portion taken is truly representative of the larger portion. Vigorous shaking may be necessary.

## 7. Procedure

7.1  Heat the evaporating dish or crucible at 700 to 800°C for 10 min or more. Cool to room temperature in a suitable container, and weigh to the nearest 0.1 mg.

NOTE 3—The container in which the dish or crucible is cooled can be a desiccator should not contain a desiccating agent. In addition, all weighings of the crucibles should be performed as soon as the crucibles have cooled. If it should be necessary that the crucibles remain in the desiccator for a longer period, then all subsequent weighings should be made after allowing the crucibles and contents to remain in the desiccator for the same length of time.

7.2  The quantity of sample to be taken will depend upon the ash content of the material. Weigh into the dish or

[1] This test method is under the jurisdiction of ASTM Committee D-2 on Petroleum Products and Lubricants and is the direct responsibility of Subcommittee D 02.03 on Elemental Analysis.

Current edition approved Oct. 30, 1987. Published December 1987. Originally published as D 482 – 38 T. Last previous edition D 482 – 80.

In the IP, this method is under the jurisdiction of the Standardization Committee.

[2] *Annual Book of ASTM Standards*, Vol 05.01.

[3] *Annual Book of ASTM Standards*, Vol 05.03.

**D 482**

crucible sufficient sample (up to a maximum of 100 g) to give up to 20 mg of ash. For sample weights which require more than one filling of the dish, obtain the weight from the difference between the initial and final weights of a suitable sample container. Weigh the sample to the nearest 0.1 %. Heat the dish or crucible and sample until the contents can be ignited with a flame. Maintain at such a temperature that the sample continues to burn at a uniform and moderate rate, leaving only ash and carbon when the burning ceases.

Note 4 Precaution—The sample may contain water, which can cause spattering. The operator should heat the sample cautiously in a hood while wearing safety goggles.

Note 5—If the sample contains sufficient moisture to cause foaming and loss of material, discard the sample, and to an additional sample add 1 to 2 mL of 99 % isopropyl alcohol (Warning—Flammable) before heating. If this is not satisfactory, add 10 mL of an equivolume mixture of toluene (Warning—Flammable) and isopropyl alcohol and mix thoroughly. Place several strips of ashless filter paper in the mixture and heat; when the paper begins to burn, the greater part of the water will have been removed.

7.3 Heat the residue in the muffle furnace at 775 ± 25°C until all carbonaceous material has disappeared. Cool the dish to room temperature in a suitable container (Note 3), and weigh to the nearest 0.1 mg.

7.4 Reheat the dish at 775°C for 20 to 30 min, cool in a suitable container (Note 3), and reweigh. Repeat the heating and weighing until consecutive weighings differ by not more than 0.5 mg.

## 8. Calculation

8.1 Calculate the mass of the ash as a percentage of the original samples as follows:

$$\text{Ash}, \% = (w/W') \times 100$$

where:
$w$ = mass of ash, g, and

$W$ = mass of sample, g.

## 9. Report

9.1 Report the result to two significant figures as the ash, ASTM D 482 stating the weight of the sample taken.

## 10. Precision and Bias

10.1 The precision of this test method as obtained by statistical examination of interlaboratory test results is as follows:

10.1.1 *Repeatability*—The difference between successive tests results, obtained by the same operator with the same apparatus under constant operating conditions on identical test material would, in the long run, in the normal and correct operation of the test method, exceed the following values only in one case in twenty:

| Ash, % | Repeatability |
|---|---|
| 0.001 to 0.079 | 0.003 |
| 0.080 to 0.180 | 0.007 |

10.1.2 *Reproducibility*—The difference between two single and independent results obtained by different operators in different laboratories on identical test material would, in the long run, in the normal and correct operation of the test method, exceed the following values only in one case in twenty:

| Ash, % | Reproducibility |
|---|---|
| 0.001 to 0.079 | 0.005 |
| 0.080 to 0.180 | 0.024 |

10.2 *Bias*—The bias of this test method cannot be determined since an appropriate standard reference material containing a known level of ash in liquid petroleum hydrocarbon is not available.

The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, 1916 Race St., Philadelphia, PA 19103.

Exhibit 46
646 97

Exhibit 6
6464

## THERMOGRAVIMETRIC ANALYSIS - MASS SPECTROMETRY

TGA-MS (thermogravimetric analysis - mass spectrometry) is an analytical technique which monitors the decomposition and weight loss of a sample as a function of temperature and identifies the volatile decomposition products. In the TGA module the sample is heated in a furnace at a pre-programmed linear rate. The final temperature and time of heating are specified in the program. The weight of the sample is measured continuously with a Cahn electrical microbalance. The volatile decomposition products are swept by carrier gas to a UTI quadrupole mass spectrometer. The mass spectrometer has a mass range from 1-200 amu (atomic mass units) and unit resolution. The mass spectrometer scans and data acquisition are controlled by computer software purchased from Shrader Analytical and Consulting Laboratories Inc. (Detroit, MI). Analog electronic signals for weight, mass ion intensities, and temperature are digitized and stored on computer hard disk or floppy disk. Mass ions for up to 38 different mass-to-charge ratios may be monitored during a single TGA-MS analysis run. Reports may be generated in graphical or tabular form as weight, temperature, and/or mass ion intensities as a function of time. Sample sizes up to 100 milligrams may be analyzed with this method.

Limited quantitative analyses are available with the mass spectrometer data. With information on the thermogram peak areas, relative ion intensities among the various fragment ions for each component identified, and the relative parent ion intensities for one mole of each component present, relative ratios (or molar ratios) among the various sample components can be calculated. If the concentration of one component is determined with another independent technique (i.e., moisture content), then the concentrations of the other volatile decomposition products can be calculated relative to the sample weight. Because the TGA-MS technique is primarily suited to qualitative identification, no determinations on the precision or accuracy of mass spectral measurements have been made. Precision and accuracy are expected to vary with the sample matrix. TGA measurements, however, are quite precise and accurate to the nearest microgram.

Exhibit 46
6465

Exhibit 46
6466

Analytical Method

Union Oil Company of California



UTM    601-83

## DENSITY OF COKE
### (Hogarth Pycnometer)

### SCOPE

1.    This method is applicable to the determination of the real density of coke by means of a Hogarth pycnometer.

### METHOD SUMMARY

2.    An accurately-weighed sample, ground to pass a 200-mesh screen and dried at 105°C, is introduced into a calibrated Hogarth pycnometer along with a sufficient quantity of distilled water containing surfactant to fill the pycnometer about one-half full.  The solution is boiled, cooled and diluted to the mark with more of the same solution which has also been freshly boiled and cooled.  The pycnometer is then wiped dry, weighed and the temperature of the contents taken immediately.  From the values obtained the density of the coke is calculated.

### REAGENTS

3.    a.    Surfactant Solution, 0.1 percent.  Dissolve $1.00 \pm 0.01$ g of Triton X-100 surfactant in recently boiled distilled water and dilute to one liter.  Mix thoroughly.

b.    Triton X-100 Surfactant.  Fisher Scientific Co. Catalog No. CS-282-4M.

### APPARATUS

4.    a.    Pycnometer, Hogarth, 100-ml capacity.

b.    Thermometer

### PRELIMINARY PROCEDURE

5.    a.    Calibration of Hogarth Pycnometer.  Weigh to the nearest 0.1 mg, the clean dry pycnometer empty, then fill to the mark with freshly-boiled distilled water which has been cooled to 24°C (75°F) and reweigh.  From these values, calculate the pycnometer volume, and from table values for the density of water at various temperatures and corrections for the expansion of glass with temperature changes, prepare a table giving the weight of the pycnometer and the water required to fill it at the various room temperatures likely to occur in the laboratory.

Exhibit 46
6467

UFM F-OCO1

UTM 601-83
Page 2 of 3

## PROCEDURE

6.   Carefully introduce into the pycnometer an accurately weighed, 5-gram representative sample of coke which has been ground to pass a 200-mesh screen and dried for one hour at 105°C.  Fill the pycnometer about one-half full with distilled water containing 0.1 wt.% Triton X-100 surfactant.  Place the pycnometer on a hot plate and gently boil the contents for 15 to 30 minutes during which time all of the coke particles should settle to the bottom of the pycnometer (NOTE 1).

> NOTE 1:   Settling of the coke particles to the bottom of the pycnometer can best be observed by lifting the pycnometer from the hot plate which momentarily suspends the boiling process and allows the sample particles to settle.

Remove the bottle from the hot plate, fill it to the tubular with recently boiled and cooled 0.1 percent surfactant solution and insert the stopper.  Permit the pycnometer to stand until the contents have cooled to room temperature (NOTE 2); then fill the bottle to slightly above the mark on the capillary of the stopper with recently boiled 0.1 percent surfactant solution which has been cooled to room temperature. (NOTE 3).  Adjust the solution level to the mark on the capillary by touching a piece of filter paper to the end of the tubular.  Then wipe the pycnometer dry and weigh it immediately.  As soon as the weighing has been made, remove the stopper and measure the temperature of the contents.  From the table determine the weight of the pycnometer filled with water at this temperature.

> NOTE 2:   Cooling may be hastened by placing the pycnometer in water.

> NOTE 3:   This is conveniently done by inserting the end of the tubular in a small beaker of the surfactant solution and applying a slight suction on the stopper.

## CALCULATIONS

7.   Calculate the true density of the coke as follows:

$$\text{True Density} = \frac{W}{W - (W^1 - P)} \times D$$

where:   $W$ = weight of coke sample taken, g.

$W^1$ = weight of pycnometer + coke + surfactant solution, g.

$D$ = Density of water at test temperature, T

and:   $P$ = weight of pycnometer + water required to fill it at temperature measured on pycnometer solution, g (from table).

Exhibit 46
6468

UTM 601-83
Page 3 of 3

## PRECISION

8.  a.  Repeatability.  Duplicate results by the same operator should not differ from each other by more than 0.01.

b.  Reproducibility.  Results obtained by 2 operators from different laboratories should not differ from each other by more than 0.02.

## REFERENCES

9.  ASTM Method D-167 "Specific Gravity and Porosity of Lump Coke" Annual Book, of ASTM Standards, Part 26.

Union Oil Company of California
Science and Technology Division
Chemicals Research Department
Analytical Research and Service Group
Written by:   LWB
Approved by:  NWL/JMF
Date:      April 12, 1983:1vb

Exhibit 46
6469

Exhibit 46
6470

## TESTING PROTOCOL FOR TREATABILITY

In order to determine the amount of reagent which will be needed to neutralize a given amount of waste the following approach is used. A sample (approx. 40 grams) is weighed into a 500 ml volumetric flask. Approximately 400 ml of deionized water is added to the flask and the flask shaken well. The mixture is allowed to leach like this for a minimum of 24 hours. The solution is diluted to the 500 ml mark with deionized water and again mixed well. The flask is allowed to sit overnight so the solids can settle out. An aliquot of the supernatant liquid is then pipetted into an erlenmeyer flask and titrated with N/10 NaOH to a pH of 7.0 using a pH meter to determine the endpoint.

Based on the acid value of the waste per unit weight from this experiment, the amount of reagent required to treat a given amount of waste can be calculated.

Exhibit 46
6471

# McCOLL SUPERFUND SITE

# ANALYTICAL TEST RESULTS

# VOLUME I

# McCOLL SITE GROUP

## October 7, 1991

Exhibit 46
6472

# McCOLL SUPERFUND SITE

# ANALYTICAL TEST RESULTS

# VOLUME I

# McCOLL SITE GROUP

## October 7, 1991

Exhibit 46
6473

# McCOLL SUPERFUND SITE

# ANALYTICAL TEST RESULTS

# VOLUME I

# McCOLL SITE GROUP

## October 7, 1991

Exhibit 46
6474

# McCOLL SUPERFUND SITE
## ANALYTICAL TEST RESULTS
### VOLUME I

The MSG has completed five of the eight tests that are being performed on McColl waste samples received in July 1991. Enclosed are the results from the following analytical tests.

| | |
|---|---|
| Test 1- | EPA Method 9045A (ph) |
| Test 2- | Compressibility |
| Test 3 - | Viscosity |
| Test 4- | EPA Method 300.0 (sulfate) ASTM D 1552-90 (sulfur) |
| Test 6- | EPA Method 160.4 (ash) ASTM D 482-87 (ash) |
| Test 7 - | Unocal Testing Method 601-83 (density) |

The heat of neutralization (Test 5), thermogravimetric analysis - mass spectrometry (Test 6) and treatability (Test 8) tests are still in progress. Results will be forwarded when they are available.

McColl Site Group
10/7/91

Exhibit 46
6475

Exhibit 46
6476

# TERRA TECH LABS, Inc.

## E N V I R O N M E N T A L   T E S T I N G

Suite 130
Santa Ana
California
92705
Tel 714 757 7022
Fax 714 757 7274

## LABORATORY REPORT

| | | | |
|---|---|---|---|
| Client: | UNOCAL Science & Technology | Report Date: | 8/22/91 |
| Client Address: | 376 S. Valencia Avenue | Lab P.N.: | 2189 |
| | Brea, CA 92621 | Client P.N.: | 160866 |
| Contact: | Dan Wellman | | |
| Project Name: | McColl | Date Sampled: | 8/5/91 |
| | | Date Received: | 8/6/91 |
| | | Date Analyzed: | 8/6/91 |
| | | Physical State: | Solid |

The samples were received by Terra Tech Labs, Inc in a chilled state, intact and with the Chain-of-Custody Record attached.

Please note that ND means not detected at the detection limit expressed.

Solid Samples are reported on an "as received" basis.

M = Matrix Spike / Spike Duplicate                    L = Laboratory Control Sample Spike / Spike Duplicate

Reviewed                                             Approved

The samples were received by TERRA TECH LABS, Inc. in a chilled state, intact and accompanied by the Chain-of-Custody Record.
Acceptance of samples by Terra Tech Labs, Inc. is not an indication of condition upon receipt.
Laboratory Results apply only to the sample matrix analyzed and may not apply to an apparently identical or similar sample.
The Laboratory Report is the property of the client to whom it is addressed.
The Laboratory Results are only a portion of the Laboratory Report.





# TERRA TECH LABS Inc.

E N V I R O N M E N T A L   T E S T I N G

## LABORATORY RESULTS

| | | | |
|---|---|---|---|
| Client: | UNOCAL Science & Technology | Report Date: | 8/22/91 |
| Client Address: | 376 S. Valencia Avenue | Lab P.N.: | 2189 |
| | Brea, CA 92621 | Client P N.: | 160866 |

| | | | |
|---|---|---|---|
| Project Name: | McColl | Date Sampled: | 8/5/91 |
| Project Address: | | Date Analyzed: | 8/6/91 |
| | | Physical State: | Solid |

| Sample ID | pH<br>EPA 9045<br>mg/kg |
|---|---|
| R3-555 | <2 |
| R3-35J | 2.8 |
| R2-9 | <2 |
| R2-18 | <2 |
| R2-25 | <2 |
| PRP3-55 | <2 |
| PRP3-7 | <2 |
| PRP3-10 | <2 |
| PRP3-16 | <2 |
| PRPL1-12 | <2 |
| PRPL1-17 | <2 |
| PRPL1-19 | <2 |
| PRP1-10 | 3.2 |

ND: Not Detectable
The Laboratory Results are only a portion of the Laboratory Report.



## DETERMINATION OF pH BY EPA 9045A

| Sample Identification | pH (units) |
|---|---|
| A | 2.3 |
| B | 0.4 |
| C | 0.5 |
| D | -0.2 |
| E | 0.4 |
| F | 0.5 |
| AJ | 0.7 |
| BJ | -0.1 |
| DJ | -0.1 |
| DJ2 | -0.2 |
| LJ | 2.1 |
| PJ | 2.3 |
| I-1-CS | 2.9 |
| I-1-TS | -0.1 |
| R-2-1 | 0.4 |
| R-2-2 | 0.7 |
| R-2-5 | 0.5 |
| R-3-2 | 4.2 |
| R-3-3 | 0.5 |
| R-3-5 | 2.6 |
| R3-J | 2.7 |
| R2/R3 SSS | 1.5 |

1. No sample preparation was performed and temperature was controlled by room temperature.

Exhibit 46
6479

Exhibit 46
6480

UNOCAL SCIENCE & TECHNOLOGY DIVISION
ADVANCED ROCK PROPERTIES
ENVIRONMENTAL SAMPLES(RAMP #2 & PRP #3)
CL FILE # 910043

Performed by:

Core Laboratories
3430 Unicorn Road
Bakersfield, California 93308
(805) 392-8600

September 25, 1991

Exhibit 46
6481

## PROGRAM PARTICIPANTS

**Task Performed**                                    **Analyst**

1) Bulk Compressibility                               F. Ene

2) Data Evaluation and
   Report Preparation                                 F. Ene

Reviewed by

J. King
ADVANCED ROCK PROPERTIES SUPERVISOR

Exhibit 46
6482

# TABLE OF CONTENTS

| Section | | Page |
|---------|--|------|
| 1 | Introduction | 1 |
| 2 | Compressibility Procedures | 2-3 |
| 3 | Compressibility Results | 4-6 |
| 4 | Observation and Discussion | 7 |

Exhibit 46
6483

# SECTION 1

# INTRODUCTION

Two environmental core samples were released to our Bakersfield, California facility for compressibility study. The results of the study are presented in this report. A description of the test protocol and results are presented in the accompanying pages.

1

Exhibit 46
6484

## SECTION 2

## TEST PROCEDURES

## BULK VOLUME COMPRESSIBILITY

### Sample Preparation

Plug specimens of approximately two inches in length and one and
one-inch in diameter were obtained from bulk core samples.  The plug
specimens were inserted into lead sleeves with 120 mesh screens.  The
sleeves were set to the samples at a pressure of 200 psig.

### Fluid Preparation

Deionized Water was used in the test and was vacuum filtered to
0.2 microns.

### Bulk Volume Compressibility

Initially, attempts were made on removing the salts and
hydrocarbons from the samples by the Dean-Stark method using toluene
as the solvent.  Due to the dissolution of the samples in the presence
of the solvents, this process was terminated.  Also pore volume,
porosity and air permeability determinations could not be performed on
the samples because the samples were too tight for these measurements.
Since the impervious tendency of the samples did not allow for them to
be miscibly saturated with the deionized water(to establish liquid
continuity throughout the system), the deionized water was introduced
into the pipet tube and the confining stress increased to the first
pressure point of 200 psi. After a twenty-four hour period, the volume

-2-

Exhibit 46
6485

of deionized water expelled was recorded.  This process was repeated for at least five additional pressure steps for each sample.

Initial bulk volume measurements were calculated using the Archimedes Principle.  Bulk volumes at each stress were determined by subtracting the expelled volume from the initial stressed bulk volume according to Equation 1.  The bulk volumes were plotted as a function of stress(figure 1).

$$V_{bs} = (V_{bi} - V_w) \tag{1}$$

Where:

$V_{bs}$  =  Stressed bulk volume

$V_{bi}$  =  Initial stressed bulk volume

$V_w$  =  Cummulative volume of deionized water produced

-3-

Exhibit 46
6486

# SECTION 1

## TEST RESULTS

o     Bulk Volume Compressibility Results          Table    1-1

o     Bulk Volume Versus Net Overburden            Figure   1-1

-4-

Exhibit 46
6487

## TABLE 1 - 1

### BULK VOLUME COMPRESSIBILITY

| SAMPLE # | RAMP #2 | PRP #3 |
|---|---|---|
| Pressure(psi) | $V_b$(cc) | $V_b$(cc) |
| 200 | 34.90 | 43.42 |
| 300 | 34.62 | 43.03 |
| 600 | 34.40 | 42.90 |
| 900 | 34.19 | 42.88 |
| 1200 | 34.06 | 42.87 |
| 1500 | 33.82 | 42.78 |

Exhibit 46
6488



# FIGURE 1 – 1
## BULK VOLUME COMPRESSIBILITY VS.PRESSURE

Exhibit 46
6489

## SECTION 4
## OBSERVATION AND DISCUSSION

Bulk volume values ranged from a measured high of 34.90 cc at 200 psig for the Ramp #2 sample at a depth of 9.50 feet to a low of 33.82 cc for the same depth at 1500 psig.  The bulk volume changed from a high of 43.42 cc at a depth of 7.5 feet at 200 psig for the PRP #3 sample to a low of 42.78 cc at a net confining stress of 1500 psig.   The compressibility of the PRP #3 samples changed the least amount.  Average overall compaction was approximately 3 percent from 200 psi to 1500 psi for the compression forces used in the laboratory.

-7-

Exhibit 46
6490

Exhibit 46
6491

TEST RESULTS
8/28/1991
VALIDATED BY: STEVEN R ROSS

| SAMPLE NAME | LIMS NO. | CODE | COMPONENT NAME | RESULT | | COMMENT |
|---|---|---|---|---|---|---|
| B | 91062889 | PT9055 | VISCOSITY | $$$$$$$$ | CST | at 275 f  does not flow at this temperature |
| | | | VISCOSITY | $$$$$$$$ | SUS | |
| | | PT9055 | VISCOSITY | $$$$$$$$ | CST | at 125 f  solid at this temperature |
| | | | VISCOSITY | $$$$$$$$ | SUS | |
| C | 91062890 | PT9055 | VISCOSITY | $$$$$$$$ | CST | at 275 f  does not flow at this temperature |
| | | | VISCOSITY | $$$$$$$$ | SUS | |
| | | PT9055 | VISCOSITY | $$$$$$$$ | CST | at 125 f  solid at this temperature |
| | | | VISCOSITY | $$$$$$$$ | SUS | |
| PJ | 91062876 | PT9055 | VISCOSITY | $$$$$$$$ | CST | at 125 f  solid at this temperature |
| | | | VISCOSITY | $$$$$$$$ | SUS | |
| | | PT9055 | VISCOSITY | $$$$$$$$ | CST | at 275 f  does not flow at this temperature |
| | | | VISCOSITY | $$$$$$$$ | SUS | |

Exhibit 46
6492

4

Exhibit 46
6493



### Enseco – CRL

440 Lincoln Way • Garden Grove, CA 92641
(714) 898-6370 • (213) 598-0458 • (800) LAB-1-CRL
FAX. (714) 891-5917

August 19, 1991

TERRA TECH LAB, INC.
1920 EAST DEERE AVENUE, SUITE 130
SANTA ANA, CA  92705
ATTN: MS. RUTH WILSON

Analysis No.: G-9122127-001/013
Date Sampled: 5-AUG-1991
Date Sample Rec'd: 9-AUG-1991
Project: (TTL#2189/160866) UNOCAL/BREA

Enclosed with this letter is the report on the chemical and physical analyses on the
samples from ANALYSIS NO: G-9122127-001/013 shown above.

The samples were received by CRL in a chilled state, intact and with the chain-of-custody
record attached.

Note that ND means not detected at the reporting limit expressed. The reporting limit
is raised to reflect the dilution factor of the sample.

Solid samples are reported on "as received" basis.

Preliminary data were provided on August 16,1991 at 2:20 P.M.

Reviewed                              Approved

**The Report Cover Letter is an integral part of this report.**

This report pertains only to the samples investigated and does not necessarily apply to other apparently identical or similar materials. This report is submitted for the exclusive
use of the client to whom it is addressed. Any reproduction of this report or use of this Laboratory's name for advertising or publicity purposes without authorization is prohibited.

Exhibit 46
6494



Laboratory Report

```
---------------------------------------------------------------------------
TERRA TECH LABS, INC.
1920 EAST DEERE AVENUE, SUITE 130      Analysis No.: G-9122127-001/013
SANTA ANA, CA 92705                    Date Sampled:  5-AUG-1991
ATTN: MS. RUTH WILSON                                 16-AUG-1991
                                       Date Sample Rec'd:  9-AUG-1991
                                       Date Analyzed:  15-AUG-1991
                                       Sample Type: SOLID
   Project: (TTL#2189/160866) UNOCAL/BREA
---------------------------------------------------------------------------
```

| Sample ID | Sulfate (Soluble) mg/kg EPA 300.0 |
|-----------|-----------------------------------|
| R3-SSS | 15500 |
| R3-35J | 11800 |
| R2-9 | 107000 |
| R2-18 | 222000 |
| R2-25 | 155000 |
| PRP3-55 | 7300 |
| PRP3-7 | 29100 |
| PRP3-10 | 128000 |
| PRP3-16 | 80600 |
| PRPL1-12 | 283000 |
| PRPL1-17 | 226000 |
| PRPL1-19 | 178000 |
| PRPL1-10 | 9850 |
| Blank | ND(10) |

Exhibit 46
6495



Laboratory Report

```
---------------------------------------------------------------------------
TERRA TECH LABS, INC.                Analysis No.: G-9122127-001/013
1920 EAST DEERE AVENUE, SUITE 130    Date Sampled:  5-AUG-1991
SANTA ANA, CA 92705                                 16-AUG-1991
ATTN: MS. RUTH WILSON                Date Sample Rec'd:  9-AUG-1991
                                     Sample Type: SOLID
    Project: (TTL#2189/160866) UNOCAL/BREA
---------------------------------------------------------------------------
```

Matrix Spike/Matrix Spike Duplicate Report

| Sample Number | Parameter (Method) | Units | Observed Concentration Sample | MS | MSD | Amt. Spiked | % Recovery MS | MSD | Avg. | % RPD |
|---|---|---|---|---|---|---|---|---|---|---|
| 9122127-002 | SULFATE (EPA 300.0) | mg/kg | 11800 | 68600 | 69000 | 50000 | 114 | 114 | 114 | 1 |

Exhibit 46
6496



Matrix Spike/Matrix Spike Duplicate Report Cross-Reference

| QC Batch | Date | Parameter (Method) | Sample Nos. |
|----------|------|---------------------|-------------|
| 9122127-002 | 15-AUG-1991 | SULFATE (EPA 300.0) | G-9122127-001 |
| | | | G-9122127-002 |
| | | | G-9122127-003 |
| | | | G-9122127-004 |
| | | | G-9122127-005 |
| | | | G-9122127-006 |
| | | | G-9122127-007 |
| | | | G-9122127-008 |
| | | | G-9122127-009 |
| | | | G-9122127-010 |
| | | | G-9122127-011 |
| | | | G-9122127-012 |
| | | | G-9122127-013 |

Exhibit 46
6497



Laboratory Report

```
--------------------------------------------------------------------------------
TERRA TECH LABS, INC.                    Analysis No.: G-9122127-001/013
1920 EAST DEERE AVENUE, SUITE 130        Date Sampled:  5-AUG-1991
SANTA ANA, CA 92705                                     16-AUG-1991
ATTN: MS. RUTH WILSON                    Date Sample Rec'd:  9-AUG-1991
                                         Sample Type: SOLID
   Project: (TTL#2189/160866) UNOCAL/BREA
--------------------------------------------------------------------------------
```

Laboratory Control Sample Report

| QC Batch | Parameter (Method) | Amt. Spiked | Units | Avg. Spike Recov. | Acceptable Range | Rel. Pct. Diff. | Acceptable Range |
|----------|--------------------|-------------|-------|-------------------|------------------|-----------------|------------------|
| L91228004 | SULFATE (EPA 300.0) | 10.0 | mg/kg | 102 | 88-130 | 1 | 15 |

Exhibit 46
6498


Enseco
A Corning Company

Laboratory Control Sample Report Cross-Reference

| QC Batch | Date | Parameter (Method) | Sample Nos. |
|---|---|---|---|
| L91228004 | 15-AUG-1991 | SULFATE (EPA 300.0) | G-9122127-001 |
| | | | G-9122127-002 |
| | | | G-9122127-003 |
| | | | G-9122127-004 |
| | | | G-9122127-005 |
| | | | G-9122127-006 |
| | | | G-9122127-007 |
| | | | G-9122127-008 |
| | | | G-9122127-009 |
| | | | G-9122127-010 |
| | | | G-9122127-011 |
| | | | G-9122127-012 |
| | | | G-9122127-013 |

Exhibit 46
6499

## DETERMINATION OF SULFUR BY ASTM D-1552

| Sample Identification | Sulfur (wt%) |
| --- | --- |
| A | 4.04 |
| B | 12.15 |
| C | 12.40 |
| D | 17.80 |
| E | 5.31 |
| F | 5.96 |
| AJ | 5.89 |
| BJ | 13.9 |
| DJ | 15.7 |
| DJ2 | 15.55 |
| LJ | 1.38 |
| PJ | 5.38 |
| I-1-CS | 1.43 |
| I-1-TS | 16.7 |
| R-2-1 | 8.96 |
| R-2-2 | 7.77 |
| R-2-5 | 7.73 |
| R-3-2 | 1.76 |
| R-3-3 | 8.83 |
| R-3-5 | 1.49 |
| R3-J | 0.85 |
| R2/R3 SSS | 5.18 |

1. Determined using a resistance furnace with infrared detection. Calibrated with 10N sulfuric acid.

Exhibit 46
6500

Exhibit 6
6501

# TERRA TECH LABS, Inc.

### E N V I R O N M E N T A L   T E S T I N G

Suite 130

Santa Ana

California

92705

Tel 714 757 7022

Fax 714 757 7274

## LABORATORY REPORT

| | | | |
|---|---|---|---|
| Client: | UNOCAL Science & Technology | Report Date: | 8/23/91 |
| Client Address: | 376 S. Valencia Avenue | Lab P.N.: | 2218 |
| | Brea, CA 92621 | Client P.N.: | 160868 |
| Contact: | Dan Wellman | | |
| Project Name: | McColl | Date Sampled: | 8/9/91 |
| | | Date Received: | 8/12/91 |
| | | Date Analyzed: | 8/14/91 |
| | | Physical State: | Solid |

The samples were received by Terra Tech Labs, Inc intact and with the Chain-of-Custody Record attached.

Please note that ND means not detected at the detection limit expressed.

Solid Samples are reported on an "as received" basis.

M = Matrix Spike / Spike Duplicate                    L = Laboratory Control Sample Spike / Spike Duplicate

Reviewed

Approved

The samples were received by TERRA TECH LABS, Inc. In a chilled state, intact and accompanied by the Chain-of-Custody Record.
Acceptance of samples by Terra Tech Labs, Inc. is not an indication of condition upon receipt.
Laboratory Results apply only to the sample matrix analyzed and may not apply to an apparently identical or similar sample.
The Laboratory Report is the property of the client to whom it is addressed.
The Laboratory Results are only a portion of the Laboratory Report.





E N V I R O N M E N T A L   T E S T I N G



## LABORATORY RESULTS

| | | | |
|---|---|---|---|
| Client: | UNOCAL Science & Technology | Report Date: | 8/23/91 |
| Client Address: | 376 S. Valencia Avenue | Lab P.N.: | 2218 |
| | Brea, CA 92621 | Client P.N.: | 160868 |

| | | | |
|---|---|---|---|
| Project Name: | McColl | Date Sampled: | 8/9/91 |
| Project Address: | | Date Analyzed: | 8/14/91 |
| | | Physical State: | Solid |

| Sample ID | pH<br>EPA 9045<br>mg/kg | Percent Ash<br>EPA 160.4 |
|---|---|---|
| R-2-5 | <2 | 57.6% |
| R-2-2 | <2 | 21.5% |
| EE1-WA | <2 | 21.4% |
| EE1-BOT | <2 | 83.9% |
| PL | 2.0 | 33.2% |
| Hole J-1 6.5-7 | <2 | 0.9% |
| Hole I-1 6-6.5 | <2 | 73.5% |
| Hole D 9-9.5 | 3.7 | 81.4% |
| PRP1 9-9.5 | 2.4 | 34.0% |
| PRP1 9.5-10 | <2 | 49.1% |
| PRP3-J | <2 | 1.0% |
| PRP3 13-13.5 | <2 | 61.2% |

ND: Not Detectable
The Laboratory Results are only a portion of the Laboratory Report.

# DETERMINATION OF ASH BY ASTM D-482

| Sample Identification | Ash (wt%) |
|---|---|
| A | 45.2 |
| B | 0.1 |
| C | 0.1 |
| D | 0.12 |
| E | 51.4 |
| F | 68 |
| AJ | 37.9 |
| BJ | 6.7 |
| DJ | 4.4 |
| DJ2 | 3.9 |
| LJ | 76.1 |
| PJ | 37.3 |
| I-1-CS | 74.3 |
| I-1-TS | 13 |
| R-2-1 | 9.6 |
| R-2-2 | 20.6 |
| R-2-5 | 56.3 |
| R-3-2 | 45 |
| R-3-3 | 23.2 |
| R-3-5 | 78.5 |
| R3-J | 85.3 |
| R2/R3 SSS | 20.3 |

Exhibit 46
6504

Exhibit 46
6505

## DETERMINATION OF DENSITY BY UTM 601-83

| Sample Identification | Density (g/mL) | Test Temperature (°F) |
|---|---|---|
| A | 1.2907 | 75 |
| B | 1.1686 | 75 |
| C | 1.1517 | 75 |
| D | 1.3131 | 75 |
| E | 1.9141 | 75 |
| F | 2.0132 | 75 |
| AJ | 1.2774 | 75 |
| BJ | 1.3011 | 75 |
| DJ | 1.3222 | 75 |
| DJ2 | 1.2984 | 75 |
| LJ | 1.8693 | 72 |
| PJ | 1.3275 | 72 |
| I-1-CS | 2.0043 | 72 |
| I-1-TS | 1.4199 | 75 |
| R-2-1 | 1.2138 | 75 |
| R-2-2 | 1.2708 | 75 |
| R-2-5 | 1.6642 | 72 |
| R-3-2 | 1.4330 | 72 |
| R-3-3 | 1.2601 | 75 |
| R-3-5 | 1.9330 | 72 |
| R3-J | 2.0682 | 72 |
| R2/R3 SSS | 1.2131 | 72 |

1.  Noncalcareous option used.

Exhibit 46
6506

Exhibit 46
6507
P

**THE
McCOLL
SITE
GROUP**          215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

October 31, 1991

**VIA FEDERAL EXPRESS**

Mr. John Blevins
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California  94105

         Re:  McColl Superfund Site, Fullerton, California

Dear John:

         In our recent technical meetings, the EPA requested
additional information regarding the McColl Site Group's proposed
remedy described in the February 12, 1991 submittal entitled
"Selective Excavation, Treatment and RCRA Equivalent Closure
Report" (the "February Report").  In response to this request,
the MSG submits herewith the enclosed document entitled
"Responses to EPA Questions Regarding Tar Definition and Emission
Control Under the February 12, 1991 Selective Excavation,
Treatment and RCRA Equivalent Closure Approach."  This document
specifically addresses the following questions posed by the EPA:

         1.    How are the tarry zones of interest defined?

         2.    How will the tarry zones of interest be located?

         3.    What is the basis for the 5,000 to 10,000 cubic
               yard tar volume estimate?

         4.    What is the basis of the assumed solidification and
               excavation quantities?

         5.    What is the effect of tar which may not be detected?

         6.    How reliable will the emissions control shroud be?

         If you have any questions regarding the enclosed
document, please give me a call.  We would be happy to discuss
the program with you in more detail.  In addition, we ask that



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. John Blevins
October 31, 1991
Page 2


you submit the enclosed document to the McColl administrative record with the February Report.

Very truly yours,

*William J. Duchie, PE*

William J. Duchie

WJD:pla
Enclosures
cc:  Mr. David B. Jones
     Mr. John Blevins
     Ms. Pamela Wieman
     Mr. Steve Linder
     Ms. Caroline Rudolph
     Mr. Steve Gaytan
     Mr. Barry Eaton
     Mr. David Bushey
     Mr. Kenneth Ritter
     Mr. Barry Brown
     Mr. Robert Wilson
     Larry Lawton, Esq.

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

Exhibit 46
659

# RESPONSES TO EPA QUESTIONS REGARDING TAR DEFINITION AND EMISSION CONTROL UNDER THE FEBRUARY 12, 1991 SELECTIVE EXCAVATION, TREATMENT AND RCRA EQUIVALENT CLOSURE APPROACH

October 23, 1991

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6510

# TABLE OF CONTENTS

|  | PAGE NO. |
|---|---|
| LIST OF TABLES/FIGURES | ii |
| 1.0  INTRODUCTION | 1-1 |
| 2.0  BASIC PHILOSOPHY FOR REMEDIATING THE TAR | 2-1 |
| 3.0  HOW ARE TARRY ZONES OF INTEREST DEFINED? | 3-1 |
| 4.0  HOW WILL TARRY ZONES OF INTEREST BE LOCATED? | 4-1 |
| 5.0  WHAT IS THE BASIS FOR THE 5,000 TO 10,000 CUBIC YARD TAR VOLUME ESTIMATE? | 5-1 |
| 6.0  WHAT IS THE BASIS FOR THE ASSUMED SOLIDIFICATION AND EXCAVATION QUANTITIES? | 6-1 |
| 7.0  WHAT IS THE IMPACT OF TAR WHICH MAY NOT BE DETECTED? | 7-1 |
| 8.0  HOW RELIABLE WILL THE EMISSIONS CONTROL SHROUD BE? | 8-1 |

APPENDIX A:  REFERENCES
APPENDIX B:  BORING LOGS
APPENDIX C:  EXAMPLE SUMP CONE PENETROMETER PROGRAM

Exhibit 46
6511

**ENVIRONMENTAL SOLUTIONS**

# TABLE OF CONTENTS
### (Continued)

## LIST OF TABLES

| TABLE NO. | TITLE | PAGE NO. |
|---|---|---|
| 3.1 | Boring and Seep Interpretation to Estimate Solidification and Excavation Requirements | 3-3 |
| 3.2 | Standard Clay Classifications | 3-5 |
| 4.1 | CPT Data, 1989 Ecology and Environment, Inc. Report | 4-5 |
| 4.2 | Estimates of CPT Criteria for McColl Sump Materials | 4-6 |
| 5.1 | Summary of Tar Volumes as Derived for the February 12, 1991 Report | 5-3 |
| 6.1 | Summary of Estimated Selected Excavation Quantities | 6-4 |

## LIST OF FIGURES

| FIGURE NO. | TITLE | PAGE NO. |
|---|---|---|
| 3.1 | Illustration of the Impact of 3-Inch Differential Settlement on Drainage Slope | 3-4 |
| 4.1 | Cone Penetrometer Program in "Old Faithful" Seep Area | 4-2 |
| 4.2 | Approximate Thickness of "Soft" Zone in "Old Faithful" Seep Area | 4-3 |
| 4.3 | Sounding 100215 Stratigraph June 23, 1988 Cone Penetrometer Program | 4-7 |
| 4.4 | Sounding LR3CP Stratigraph June 24, 1988 Cone Penetrometer Program | 4-8 |
| 4.5 | Preliminary Guide for Estimating McColl Site Material Types from CPT Data | 4-9 |
| 5.1 | Site Plan | 5-2 |
| 5.2 | Isopach Map of Tarry Material Thickness | 5-4 |
| 6.1 | Model for Typical Case 1 Excavation Configuration at Tar Seeps | 6-2 |
| 6.2 | Model for Typical Case 2 Excavation Configuration at Tarry Zone Interest | 6-3 |
| 7.1 | Illustration of RCRA Equivalent Cover Closure Elements | 7-2 |
| 8.1 | In Situ Treatment and Solidification Equipment | 8-2 |
| 8.2 | Toxic Treatments Unit in Operation | 8-3 |
| 8.3 | Shroud Being Lowered Into Place | 8-4 |
| 8.4 | Monitoring of Emissions at Shroud Boundary | 8-5 |
| 8.5 | Air Treatment System Flow Diagram | 8-7 |

Exhibit 46
6512

**ENVIRONMENTAL SOLUTIONS**

# 1.0   INTRODUCTION

1.  The purpose of this paper is to respond to the following questions which have been raised by the EPA regarding the identification and treatment of tarry material for the remedy recommended in the February 12, 1991, report titled *Selective Excavation, Treatment and RCRA Equivalent Closure* (Selective Excavation) for the McColl Superfund site:

    - How are tarry zones of interest defined?
    - How will tarry zones of interest be located?
    - What is the basis for the 5,000 to 10,000 cubic yard tar volume estimate?
    - What is the basis for the assumed solidification and excavation quantities?
    - What is the impact of tar which may not be detected?
    - How reliable will the emissions control shroud be?

    These questions are addressed in Sections 3.0 to 8.0 of this paper.  Section 2.0 summarizes the basic engineering philosophy for remediating the tar as part of the proposed Selective Excavation remedy.

Exhibit 46
6513

**ENVIRONMENTAL SOLUTIONS**

# 2.0  BASIC PHILOSOPHY FOR REMEDIATING THE TAR

1.  The Selective Excavation plan for locating, treating, and excavating the tar has been developed
    to reliably eliminate the potential for:

    •   The tar to cause future seep or deformation problems.
    •   Health and safety risks to workers or the public during remediation.

    Highly reliable redundant procedures for each element of the remedy are provided to assure
    success of this plan.  Each procedure alone would be sufficient to provide a completely
    adequate solution.  When combined, the redundant procedures result in a solution for which
    the potential of failure is negligible.

2.  Sections 3.0 through 8.0 discuss how this philosophy of redundancy is implemented through:

    •   The predesign investigation consisting of both in situ (cone penetrometer)
        and physical sampling (boring samples) techniques.

    •   The requirement for both solidification and selective excavation with
        controlled backfilling at existing and potential seep areas.

    •   Closure provisions which would preclude migration, even if small zones
        of undetected tar were not totally solidified and/or excavated.

    •   Remediation emissions control systems, which include both redundant
        procedures and controls, each of which alone would provide safety to
        workers and the public.

    The goal of the plan has been to develop a very reliable remediation program, using proven
    technologies, with a very low potential to be affected by any events which could conceivably
    occur during or after remediation.

Exhibit 46
6514

**ENVIRONMENTAL SOLUTIONS**

# 3.0   HOW ARE TARRY ZONES OF INTEREST DEFINED?

1.  Data from boring logs (Radian, 1982; CH2M Hill, 1987; Ecology and Environment, Inc., 1991)[1] and cone penetrometer tests (CPT) (Ecology and Environment, 1989) consistently show that the tarry material (tar) is located above the "asphaltic-cement-like" (asphaltic-cement) material.  This condition is consistent with results of a recent analysis by Dr. Charles Satterfield of the reaction mechanisms occurring at the McColl site which have converted the original acid wastes to the present tar and asphaltic-cement.  The analysis concludes that the asphaltic-cement material is expected to coalesce below the tar because of density differences between the materials (Satterfield, 1991).  Dr. Satterfield also concludes that the reactions which transform the acid waste to asphaltic-cement and tar cannot be reversed under the conditions that exist at McColl, and that the asphaltic-cement material will not revert to tar over time (Satterfield, 1991).  Wetter zones within the solidified asphaltic-cement material, possibly due to some tarry-like material remaining within the pore spaces, have been observed in some of the borings.  These conditions do not represent zones of potential geotechnical instability because of the inherent strength of the competent asphaltic-cement material matrix.  Additionally, because the reaction mechanisms are irreversible and continuing, these areas will not increase in size over time and will likely get smaller as the tar continues to convert to asphaltic-cement.

2.  The tar does not exist at uniform thickness, or in all sump areas.  Where tar does occur, it varies in thickness from inches to several feet.  It is characterized as having the consistency of a roofing tar and is generally not fluid enough to flow like a liquid, but can deform and migrate when it is squeezed (e.g., existing seep conditions).  The tar occurs:  (1) within a zone of mixed tar and soil (or drilling mud) at the base of the overburden; (2) as lenses between the overburden and asphaltic-cement material; and/or (3) as lenses within the top, partially solidified, portion of the asphaltic-cement material.  Collectively, this sequence where tar may exist is referred to as the "tarry zone of interest."

3.  The thickest tarry zone which has been physically observed is about 4 feet in Sump L-4, based on both pre-excavation borings and observations during the 1990 trial excavation.  Conclusions from CPT testing near the "Old Faithful" tar seep in Sump L-1 (Ecology and Environment, Inc., 1989) indicate the existence of up to 5 feet of a soft, perhaps liquidy zone, which we interpret to include flowable tar.  The log for only one (Boring No. 22, by Ecology and Environment, 1991) out of approximately 70 borings drilled into the sumps to date

---

[1] See Appendix A for references.

Exhibit 46
6515

**ENVIRONMENTAL SOLUTIONS**

indicate evidence of tar below the level of completely solidified asphaltic-cement material. This anomaly was confirmed to be an isolated condition when closely spaced adjacent borings did not encounter tar within the surrounding asphaltic-cement material. The surrounding asphaltic-cement material, which is structurally sound, would prevent the potential for any geotechnical instability or tar mobility.

4.   Table 3.1 summarizes how boring data interpreted to estimate the volume of tarry material in the various sumps for developing cost estimates and schedules for the Selective Excavation report. Appendix B includes the logs for several of the referenced borings to illustrate how the data were interpreted.

5.   The Selective Excavation approach is founded on the premise that "significant" tarry zones of interest (i.e., zones with a thickness greater than 3 inches) should be treated to eliminate: (1) the potential for future seeps to occur; and (2) ponding of rainwater on the RCRA equivalent closure cover due to settlement of soft areas. A combination of CPT and borehole sampling procedures (see Section 4.0) will be used during predesign to accurately locate tarry zones of interest, thereby allowing "significant zones" to be identified for treatment. The CPT testing program will be conducted on at least 10 foot centers in the direction that the cover will be sloped. This criteria is based on the assumption that the settlement of any unsolidified lense at depth would cause a one-to-one displacement effect at the sump surface. A differential settlement of 3 inches in the vertical is not expected to have a significant impact on the integrity of the cover over a horizontal distance of 10 feet or less (Figure 3.1). The 3-inch criterion can be met given the accuracy of the CPT unit for tip resistance, which can be run to measure variances within 1-inch increments.

6.   For purposes of the predesign testing program, any material with an unconfined shear strength below 500 psf, which corresponds to a CPT tip resistance of 25 tsf (kg/cm$^2$) or less will be considered "tarry material of interest." The 500 psf criterion is considered conservative. In order for a material to flow when squeezed, a material must have a very low shear strength. This type of material would have to be softer than "very soft" clay, which, according to commonly used soil classifications has an unconfined shear strength less than about 250 psf (Table 3.2).

Exhibit 46
6516

**ENVIRONMENTAL SOLUTIONS**

## TABLE 3.1

### BORING AND SEEP INTERPRETATION TO ESTIMATE SOLIDIFICATION AND EXCAVATION REQUIREMENTS

| SUMP | BORING | LOCATION | SAMPLE DEPTH (Feet) | BORING LOG[1] | EVIDENCE OF DRILLING MUD OR VERY SOFT SOILS | EVIDENCE OF TAR | ESTIMATED NUMBER OF SEEPS[2] | ESTIMATED MATERIAL REQUIRING TREATMENT (BCY)[3] | CASE 1 INDIVIDUAL SEEP ZONES TO BE EXCAVATED | CASE 2 INDIVIDUAL SEEP ZONES TO BE EXCAVATED | CASE 2 TARRY ZONES TO BE EXCAVATED[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| L-1 | LO-WA-02 | Approximate Center | 5.0 - 7.0 | Soil grading at 6.0 ft. to Black, **tar like**, hard, dry to moist. | Yes | Yes | 11 | 4,300 | 11 | (5) | 6 |
| | | | 10.0 - 12.0 | Silty sandy clay grading at 10.5 to waste, black, asphaltic, dry to moist. | | | | | | | |
| L-2 | LO-WA-01 | Approximate Center | 5.0 - 7.0 | Bottom of liner 2 waste, coal like structure, solid, black, **moist, rubbery.** | No | Yes | 2 | 2,300 | 2 | 2 | – |
| L-3 | LO-WA-03 | 20 ft. West of Center | 5.0 - 7.0 | Bottom of liner 2 waste, coal like consistency, black, moist. | No | Yes | – | 3,300 | – | – | – |
| | | | 15.0 - 16.5 | Waste or chemically altered claystone, black and brown, **plastic, moist.** | | | | | | | |
| | | | 20.0 - 21.5 | Waste, coal like consistency, solid, **soft, black liquid** on surface of sample, wet. | | | | | | | |
| | LO-WA-04 | 25 ft. East of Center | 10.0 - 12.0 | Soil mixed grading at 10.5 ft. to waste, black, asphaltic, dry to moist. | | | | | | | |
| L-4 | LO-WA-05 | West of Center (Excavation Area) | 15.0 - 17.0 | **Waste, tar-like, black moist to sticky** last 6 inches:  waste, black silty clay, **moist.** | Yes | Yes | 9 | 2,800 | 9 | (5) | 5 |
| | | | 20.0 - 22.0 | Waste, black, asphaltic, material **moist to sticky.** | | | | | | | |
| | LO-WA-06 | South of Center | 5.0 - 7.0 | Interlayered clay and waste -- waste coal-like consistency, solid, black. | | | | | | | |
| | | | 10.0 - 12.0 | Waste with clay, coal-like consistency, black, solid, dry. | | | | | | | |
| L-5 | LO-WA-07 | North of Center | 10.0 - 12.0 | Bottom liner 2, waste, crystalline, asphaltic-like material, black. | No | No | – | – | – | – | – |
| | LO-WA-08 | East of Center | 5.0 - 7.0 | Sandy clay fine to medium -- plastic, brown, moist, areas of black asphaltic material. | | | | | | | |
| | | | 10.0 - 12.0 | Waste mixed with sandy clay. Waste, hard coal-like consistency. | | | | | | | |
| L-6 | LO-WA-09 | SW of Center | 10.0 - 12.0 | Bottom liner 2 waste coal-like structure, solid, black, dry. | No | Yes | 1 | 1,100 | 1 | 1 | – |
| | LO-WA-10 | NE of Center | 10.0 - 12.0 | Bottom 4 inches: waste, black charcoal-like material. | | | | | | | |
| | | | 15.0 - 16.5 | Top 8 inches clayey silt with fine sand, dark brown with black staining, bottom 10 inches, waste, asphaltic like material, black. | | | | | | | |
| R-1 | RA-WA-01 | 20 ft. NE of Center | 5.0 - 7.0 | Clay? Trace fine sand (drilling mud?) Green brown streaks of black, wet (**consistency of axle grease**). | Yes | Yes | 11 | 8,400 | 11 | (5) | 7 |
| | | | 10.0 - 12.0 | Clay? Trace fine sand (drilling mud?) Green brown streaks of black, wet (**consistency of axle grease**). | | | | | | | |
| | | | 15.0 - 17.0 | 16 ft. grading to clay, wet, with pockets of waste, **black, tar-like.  At 17.0 ft:**  Waste, asphaltic material, **black,  moist  to  wet.** | | | | | | | |
| R-2 | RA-WA-02 | Center | 10.0 - 12.0 | **Drilling mud** last 6 inches, waste, coal like structure, black, wet. | Yes | Yes | 4 | 4,100 | 4 | (5) | 3 |
| | | | 15.0 - 16.0 | Waste, solid, granular, black, dry, hard, white deposits. | | | | | | | |
| R-3 | RA-WA-03 | South Center | 1.0 - 3.0 | Silty clay (layer of waste, black, **tarry material** at 1.5 ft. - seep?) | Yes | Yes | 9 | 1,500 | 9 | 9 | – |
| | | | 5.0 - 7.0 | Waste, black, asphaltic material, **moist.** | | | | | | | |
| | RA-WA-04 | North Center | 1.0 - 3.0 | Silty clay, moist-wet with pockets of waste, **black tarry material** (seep?) | | | | | | | |
| | | | 5.0 - 7.0 | Waste, black asphaltic material moist-wet. | | | | | | | |
| R-4 | RA-WA-05 | NE of Center | 1.0 - 3.0 | Bottom liners clay, **very plastic**, black to dark brown, wet, probably drilling mud. | Yes | Yes | 4 | 2,100 | 4 | (5) | 3 |
| | | | 5.0 - 7.0 | Drilling mud, shoe, waste granular, black, solid, hard. | | | | | | | |
| | RA-WA-06 | SW of Center | 1.0 - 3.0 | Clay, highly plastic, black to dark grey, wet, probably dehydrated **drilling mud.** | | | | | | | |
| | | | 5.0 - 5.5 | Waste, granular, solid, black, dry, specs of white material. | | | | | | | |
| R-5 | RA-WA-07 | 20 ft. SW of Center | 5.0 - 7.0 | Sand with clay in shoe. | No | No | – | – | – | – | – |
| | | | 10.0 - 11.0 | Waste, granular, black, solid, dry, white specs. | | | | | | | |
| R-6 | RA-WA-08 | 20 ft. SW of Center | 10.0 - 12.0 | Clay mixed with silty clay with some pockets of waste (black asphaltic) at 11.5 ft. grading to waste, black asphaltic, dry-moist. | No | No | – | – | – | – | – |
| | RA-WA-09 | | 5.0 - 7.0 | Top 2 clay, plastic, brown, dry, bottom 2 waste, solid, dry, coal-like consistency. | | | | | | | |

[1] CH₂M Hill boring log description (CH₂M Hill, 1987).
[2] Refer to overlay to Figure 1.3 in Selective Excavation remedy (MSG, 1991).
[3] Assumed distribution of treatment for estimating purposes.  Quantity and distribution will be revised based upon actual requirements as determined by predesign activities.
[4] Volume assumed per excavation 550 Bank Cubic Yards (BCY).
[5] Seeps would be excavated with the tarry zones.

90-336A (10/19/91/mg)

Exhibit 46
6517

90-336A/TMD 08 REV  10/10/91



3" MAXIMUM DIFFERENTIAL SETTLEMENT

RCRA-EQUIVALENT COVER SURFACE SLOPES AT 5% TO DRAIN

NOTE:  FINAL GRADE AFTER MAXIMUM POTENTIAL DIFFERENTIAL SETTLEMENT STILL HAS SLOPE TO DRAIN

6" PROVIDED FOR DRAINAGE SLOPE

INITIAL SLOPE

FINAL SLOPE

10'

FIGURE 3.1

**ILLUSTRATION OF THE IMPACT OF 3" DIFFERENTIAL SETTLEMENT ON DRAINAGE SLOPE**

McCOLL SITE

NOT TO SCALE

**ENVIRONMENTAL SOLUTIONS, INC.**

3-4

Exhibit 46
6518

# TABLE 3.2

# STANDARD CLAY CLASSIFICATIONS[1]

| UNCONFINED COMPRESSIVE STRENGTH (psf) | UNCONFINED SHEAR STRENGTH (psf) | CONSISTENCY |
|---|---|---|
| <500 | <250 | Very Soft |
| 500 to 1,000 | 250 to 500 | Soft |
| 1,000 to 2,000 | 500 to 1,000 | Medium |
| 2,000 to 4,000 | 1,000 to 2,000 | Stiff |
| 4,000 to 8,000 | 2,000 to 4,000 | Very Stiff |
| >8,000 | >4,000 | Hard |

90-336A  (10/10/91/dls)

[1]   Adapted from Table 7.4 of Lambe and Whitman's *Soil Mechanics* (1969)

Exhibit 46
6519

**ENVIRONMENTAL SOLUTIONS**

7.  Based on the above discussions, the following criteria have been established for eliminating significant tarry zones of interest which have the potential to cause future geotechnical or seep problems:

- Materials above the asphaltic-cement material at all existing tar seeps will be solidified. After solidification, these areas will be excavated down to the asphaltic-cement material and backfilled, if the excavation can be safely accomplished (see MSG, 1991, for discussion of "safe" excavation).

- Materials away from seep areas with an undrained shear strength of less than 500 psf (cone tip resistance below 25 tsf) and greater than 3 inches in thickness will also be solidified. These zones will also be excavated if post-solidification tests show that the 25 tsf cone tip resistance criteria is not met, and the work can be done safely (see MSG, 1991, for discussion of "safe" excavation).

- The maximum spacing of samplings to locate soft lenses will not exceed 10 feet in the direction of planned cover slope.

Exhibit 46
6520

**ENVIRONMENTAL SOLUTIONS**

# 4.0   HOW WILL TARRY ZONES OF INTEREST BE LOCATED?

1.  In situ CPT tests, coupled with physical sampling at borings, will be used to locate tarry zones of interest and identifying the "significant" zones. This technique, which has been used by geotechnical engineers for several decades to identify differences in properties of subsurface materials, is illustrated in Appendix C. The appendix also presents an example predesign testing program for the McColl site.

2.  The CPT technique has already been used at the McColl site to evaluate a small area in Sump L-1, near the "Old Faithful" tar seep. That work was done as part of an EPA Technical Assistance Team (TAT) program to determine possible interim solutions for controlling tar seeps (Ecology and Environment, Inc., 1989). The test locations and results are shown in Figures 4.1 and 4.2, respectively. The soft zone in Figure 4.2 represents a volume of about 60 cubic yards covering an area of about 600 square feet, adjacent to the "Old Faithful" seep. An important conclusion from the TAT study was:

    > "The cone penetrometer gave a subsurface picture of the pits around 'Old Faithful.' It delineated relative soft and hard areas of waste; approximately 4 to 6 feet of clay cap on top, 0 to 5 feet of a soft perhaps liquid section, very hard area directly below that and then average hardness to the bottom of the cone hole."

    This interpretation conforms with the sump profile expected in an area with a thick tarry zone of interest; the top layer is the overburden, the "soft, perhaps liquid" zone is the tarry zone of interest; and the underlying "very hard area" zone is the competent asphaltic-cement-like (asphaltic-cement) material. The material of "average hardness" at the bottom of CPT tests seems to correspond to natural soil beneath the sump. The TAT program did not include companion sample borings near CPT locations as is proposed for the Selective Excavation predesign program to calibrate tip and skin friction ratios to physical sample observations and laboratory tests.

3.  A key recommendation from the TAT report is:

    > "To better delineate the soft spots within the pit, an expanded cone penetrometer and an undisturbed sampling survey should be incorporated. This will improve the determination of the position, volume, and geotechnical properties of the plastic constituent."

    This recommendation is consistent with the predesign investigation program.

Exhibit 46
6521

**ENVIRONMENTAL SOLUTIONS**



CLOSE UP OF McCOLL CONE DATA

FIGURE 4.1

CONE PENETROMETER PROGRAM
IN "OLD FAITHFUL" SEEP AREA

4-2

Exhibit 46
6522

90-336A/TMD-07 REV. 10/10/91



LEGEND

— — —  BOUNDARY OF SUMP

5 ●  CPT LOCATION WITH DETECTED "SOFT ZONE" THICKNESS IN FEET

⌒2.5⌒  THICKNESS OF "SOFT ZONE" IN FEET

FIGURE 4.2

**APPROXIMATE THICKNESS OF "SOFT ZONE" IN "OLD FAITHFUL" SEEP AREA**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

SOURCE: ECOLOGY AND ENVIRONMENT, INC., 1989.

0   12   24 FEET
SCALE

4-3

Exhibit 46
6523

4.  Table 4.1 provides an initial interpretation of the range of CPT results from the TAT program for various sump materials and site soils.  The ranges include only data from the CPT tests results included and identified in the TAT report.

5.  The testing program for the Selective Excavation remedy will include an extensive initial calibration program during which continuously sampled borings will be drilled immediately adjacent to cone penetrometer tests.  Table 4.2 provides estimates of CPT values which will be used to differentiate sump materials based on comparisons to the TAT testing results and estimated material properties.  The tip resistance and skin friction ratio parameters show that:

    •   CPT results for tar and drilling mud are likely to have tip resistances below 10 and 15 tsf, respectively.  A conservative value of 25 tsf as the tip resistance has been selected for determining when solidification will occur.  Use of the 25 tsf criterion will assure that even mixed soils with a high percentage of tar are identified and solidified if appropriate.

    •   Values for clean (unmixed) overburden materials will vary greatly depending on the type of material (e.g., clay or sand) and its relative degree of compaction.  This is not a key parameter, however, since the overburden consistently exhibits adequate geotechnical properties.

    •   The tip resistance for the tarry zone of interest (see Chapter 3.0) will vary from below 10 tsf where "pure" tar is encountered to as much as 100 tsf at lenses of relatively clean soil or hard portions of the top partially solidified asphaltic-cement material.  The investigation within this zone will use closely spaced (e.g., 1 to 2 inches) tip resistance test increments to assure that even very thin lenses of tar are identified.

    •   The tip resistance of the asphaltic-cement varies from 100 to greater than 500 tsf.  These values compare to very stiff or dense soils potentially with some cementation, consistent with the high structural competence of this material.

    Figures 4.3 and 4.4 illustrate example CPT logs from the TAT Program.  Figure 4.5 illustrates how these types of CPT tip resistance and the skin friction ratio data will be used to differentiate the waste materials.  Refinements to these parameters will occur during instrument calibration.

6.  Table 4.2 also includes conductivity as a potentially important CPT parameter, because this characteristic may be helpful in differentiating between tar and drilling mud in Sumps R-1, -2 and -4.  Conductivity is increasingly being used together with CPT tip and friction resistance measurements to characterize sites where subsurface chemistry is an issue.  The estimated conductivity values shown in the table are based on experience from other sites and anticipated properties of the tar.  This parameter will also be refined as part of the initial calibration program.

Exhibit 46
6524

**ENVIRONMENTAL SOLUTIONS**

# TABLE 4.1

## CPT DATA, 1989 ECOLOGY AND ENVIRONMENT, INC. REPORT McCOLL SUPERFUND SITE

| CPT MAP NO. | PARA-METERS | MATERIAL | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | OVERBURDEN AND MIXED SOIL | | ZONE OF INTEREST | | | | | | ASPHALTIC-CEMENT-LIKE MATERIAL | | UNDERLYING SOILS | | | |
| | | | | MIXED SOIL | | TAR | | UPPER ASPHALTIC-CEMENT-LIKE MATERIAL IN ZONE OF INTEREST | | | | SAND | | CLAY | |
| | | Depth (feet) | CPT Data | Depth (feet) | CPT Data | Depth (feet) | CPT Data | Depth (feet) | CPT Data | Depth (feet) | CPT Data | Depth (feet) | CPT Data | Depth (feet) | CPT Data |
| 1 | TR [1] | | | | | | | | | | | | | | |
| | SFR [2] | | | | | | | | | | | | | | |
| 2 | TR | | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 3 | TR | | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 4 | TR | MAP LOCATIONS INDEX DOES NOT AGREE WITH SOUNDING IDENTIFICATION NUMBER | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 5 | TR | | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 6 | TR | | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 7 | TR | | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 8 | TR | | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 9 | TR | | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 10 | TR | 0-1.0 | 35-78 | 1.5-4.5 | 12-27 | 5.0-6.0 | 5-10 | 6.5-7.0 | 50-60 | 7.5-8.0 | 211-323 | -- | NT | -- | NT |
| | SFR | | 1.5-5.7 | | 3.8-6.4 | | 4.9-6.3 | | 3.1-9.9 | | 6.2-6 6 | | | | |
| 11 | TR | 0-5.0 | 29-56 | -- | -- | -- | -- | 5.5-6.5 | 44-62 | 7.0-10.5 | 144-546 | -- | NT | -- | NT |
| | SFR | | 3.2-7.4 | | | | | | 2.2-3.5 | | 0.4-4.6 | | | | |
| 12 | TR | -- | 46-150 | -- | -- | -- | -- | -- | -- | 6.5-8.0 | 237-339 | -- | NT | -- | NT |
| | SFR | | 1.2-4.9 | | | | | | | | 1.8-5.4 | | | | |
| 13 | TR | 0-2.5 | 99-158 | 3.0-5.5 | 37-77 | -- | -- | 6.0-7.0 | 48-79 | 7.5-8.0 | 231-264 | -- | NT | -- | NT |
| | SFR | | 1.5-3.5 | | 2.0-6.2 | | | | 4.1-7.4 | | 4.5 | | | | |
| 14 | TR | 0-8.0 | 22-79 (10)[3] | -- | -- | -- | -- | -- | -- | 9.5-10.5 | 308-389 | -- | NT | -- | NT |
| | SFR | | 1.2-10.6 | | | | | | | | 4.0-5.6 | | | | |
| 15 | TR | 0-0.5 | 32 | 1.0-3.0 | 12-17 | 3.5-4.0 | 8-10 | 4.5-6.5 | 23-71 | 7.0 | 400 | -- | NT | -- | NT |
| | SFR | | 1.8 | | 5.0-6.5 | | 4.0-7.6 | | 2.1-8.1 | | 4.8 | | | | |
| 16 | TR | NOT WITHIN SUMP L-1 AREA | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 17 | TR | 0-0.5 | 17.5[3] | 1.0-7.5 | 10-99 | -- | -- | 8.0-11.0 | 153[3] 66-95 | 11.0-21.0 | 100-439 | 21.5-29.5 | 92-434 | -- | NT |
| | SFR | | 6.03 | | 3.2-7.39 | | | | 1.0-1.7[3] | | 0.8-17.2 | | 0.7-24[3] | | |
| 18 | TR | 0-11 | 81-202 | -- | -- | -- | -- | -- | -- | 11.5-16.0 | 319-606 | -- | NT | -- | NT |
| | SFR | | 0.9-3.4 | | | | | | | | | | | | |
| 19 | TR | NOT WITHIN SUMP L-1 AREA | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 20 | TR | 0-10 0 | 26-249 | -- | -- | -- | -- | -- | -- | 10.5 | 202 | -- | NT | -- | NT |
| | SFR | | 0.6-10.8 | | | | | | | | 4.7 | | | | |
| 21 | TR | MAP LOCATIONS INDEX DOES NOT AGREE WITH SOUNDING IDENTIFICATION NUMBER | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| 22 | TR | 0-1.0 | 20-45 | 1.5-5.5 | 12-47 | -- | -- | -- | -- | 6.0-8.5 | 101-499 | -- | NT | -- | NT |
| | SFR | | 4.3-7.3 | | 3.3-7.3 | | | | | | 1.3-8.4 | | | | |
| 23 | TR | 0-1.5 | 25-74 | 2.0-7.5 | 11-80 | -- | -- | -- | -- | 8.0-9.0 | 219-291 | -- | NT | -- | NT |
| | SFR | | 1.8-4.0 | | 2.6-10.2 | | | | | | 5.0-7.0 | | | | |
| 24 | TR | 0-8.0 | 35-176 | 8.5 | 18.2 | -- | -- | 9.0-10.0 | 30-88 | 10.5 | 238 | -- | NT | -- | NT |
| | SFR | | 1.2-5.7 | | 1.0 | | | | 0.7-1.0[3] | | 0.7 | | | | |
| 25 | TR | 0-6.0 | 54-149 | -- | -- | -- | -- | -- | -- | 6 5-7.0 | 117-453 | -- | NT | -- | NT |
| | SFR | | 0.6-4.7 | | | | | | | | 3.5-7.1 | | | | |
| 26 | TR | 0-1.5 | 26-60 | 2.0-2.5 | 10-14 | 3.0-3.5 | 5.9 | 4.0-6.0 | 14-60 | 6.5-9.5 | 111-494 | -- | NT | -- | NT |
| | SFR | | 1.7-4.9 | | 5.9-6.3 | | 4.0-6.5 | | 1.8-4.9[3] | | 0.9-4.9 | | | | |
| 27 | TR | 0-9.0 | 53-94 | -- | -- | -- | -- | -- | -- | 9.5-13.0 | 113-728 | -- | NT | -- | NT |
| | SFR | | 1.3-10.4 | | | | | | | | 0.7-1.7 | | | | |
| 28 | TR | 0-1.0 | 28-47 | 1.5-10.0 | 11-83 (145)[3] | -- | -- | 10.5-13.0 | 69-292[2] | 13.5-23.5 | 105 -294 (95.4)[3] | 24.0-30.0 | 81-279 | -- | NT |
| | SFR | | 0.4-1.5 | | 0.6-12.4 | | | | 2.2-4.7 | | 0.5-3.5 | | 0.5-2.8 | | |
| 29 | TR | 0-13.0 | 25-224 | -- | -- | -- | -- | -- | -- | 13.5-23 | 114-646 | 23.5-30 | 76-258 | -- | NT |
| | SFR | | 1.2-11.2 | | | | | | | | 0.5-2.5 | | 0.6-1.8 | | |
| 30 | TR | 0-6 5 | 33-70 | -- | -- | -- | -- | -- | -- | 7.0-18.0 | 81-432 | -- | NT | -- | NT |
| | SFR | | 2.7-10.7 | | | | | | | | 0.4-3.6 | | NT | | NT |
| 31 | TR | MAP LOCATIONS INDEX DOES NOT AGREE WITH SOUNDING IDENTIFICATION NUMBER | | | | | | | | | | | | | |
| | SFR | | | | | | | | | | | | | | |
| Range Interpretation | TR | 20-250 | | 10-100 | | <18 | | 10-100 | | >100 | | >75 | | 20-250 | |
| | SFR | Variable (5) | | Variable | | >4 | | >2 | | Variable | | <1.5 | | >1.5 | |

-- = No material detected.
NT = Not tested. Cone did not penetrate beyond asphaltic-cement-like material.
[1] Tip resistance (tons per square foot).
[2] Skin friction ratio (%).
[3] Possible anomaly. Example (1) high tip resistance rock at point of contact, (2) low tip resistance small void.
[4] Ranges of cone tip resistance and skin friction ratio do not correlate directly to each other.
[5] Variability depends upon soil content.

90-336A (10/19/91/mg)

Exhibit 46
6525

**ENVIRONMENTAL SOLUTIONS**

## TABLE 4.2

## ESTIMATES OF CPT CRITERIA
## FOR McCOLL SUMP MATERIALS

| MATERIAL | PARAMETER | | |
|---|---|---|---|
| | Tip Resistance (ton/square feet) | Friction Ratio (%) | Conductivity (m ohms) |
| Clayey Overburden | 20 to 250 | >1.5[1] | 1,000 - 5,000 |
| Sandy Overburden | >75 | <1.5 | 1,000 - 5,000 |
| Drilling Mud | <15 | >2 | 1,000 - 5,000 |
| Zone of Interest | | | |
| • Mixed Tar and Soil | 10 to 100 | [2] | 20,000 - 50,000 |
| • Tar | <10 | >4 | 0 - 200 |
| • Tar in Top of Asphaltic-Cement Like Material | 10 to 100 | >2 | 20,000 - 50,000 |
| Hardest Asphaltic Cement-Like Material | >100 | [3] | 0 - 200 |
| Natural Sandy Soil | >75 | <1.5 | >1,000 |
| Natural Clayey Soil | 20 to 250 | >1.5[1] | >1,000 |

90-336A  (10/21/91/dls)

[1] Soil friction rate varies with sand content.
[2] Material friction ratio dependent on sand or clay soils percentage in zone.
[3] Asphaltic-cement-like material friction ratio variable, possibly due to moisture content and/or material strength.

Exhibit 46
6526

**ENVIRONMENTAL SOLUTIONS**



FIGURE 4.3

**SOUNDING NO. 100215 STRATIGRAPH
JUNE 23, 1988
CONE PENETROMETER PROGRAM**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

REFERENCE:  DATA FROM ECOLOGY AND ENVIRONMENT, INC ,
MAY 8, 1989.  DRAFT REPORT - *McCOLL,
FULLERTON, CALIFORNIA - SITE ASSESSMENT*

Exhibit 46
6527



FIGURE 4.4

**SOUNDING NO. LR3CPT STRATIGRAPH**
**JUNE 24, 1988**
**CONE PENETROMETER PROGRAM**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

REFERENCE: DATA FROM ECOLOGY AND ENVIRONMENT, INC.,
MAY 8, 1989.  DRAFT REPORT - *McCOLL,*
*FULLERTON, CALIFORNIA - SITE ASSESSMENT*

90-336A/TMD-03 REV. 10/07/91

Exhibit 46
6528

90-336A/TMD-01 REV. 09/27/91



Chart with vertical axis labeled "DUTCH CONE BEARING CAPACITY (TSF OR Kg/Cm)" ranging from 2 to 1000, and horizontal axis labeled "FRICTION RATIO, (SLEEVE FRICTION/CONE BEARING), %" ranging from 0 to 7.

ASPHALTIC-CEMENT-LIKE MATERIAL

ZONE OF INTEREST
MIXED TAR AND SOIL
AND MIXED TAR AND ASPHALTIC-
CEMENT-LIKE MATERIAL

ZONE OF INTEREST
TAR

FRICTION RATIO, (SLEEVE FRICTION/CONE BEARING), %

| FIGURE 4.5 |
| --- |
| **PRELIMINARY GUIDE FOR ESTIMATING McCOLL SITE MATERIAL TYPE FROM CPT DATA** |
| McCOLL SITE |
| **ENVIRONMENTAL SOLUTIONS, INC.** |

SOURCE    GUIDELINES FOR CONE PENETRATION TEST, U S
DEPARTMENT OF TRANSPORTATION, JULY 1978

Exhibit 46
6529



FIGURE 4.5

**PRELIMINARY GUIDE FOR ESTIMATING McCOLL SITE MATERIAL TYPE FROM CPT DATA**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

SOURCE   GUIDELINES FOR CONE PENETRATION TEST, U S DEPARTMENT OF TRANSPORTATION, JULY 1978

Exhibit 46
6530

7.  Hydrocarbon emissions, $SO_2$ emissions, and/or pH measurements, also using CPT equipment, may be considered as secondary chemical parameters for differentiating materials. The benefit of using one or more of these parameters will be determined during the initial calibration testing program.

8.  The four-phase CPT program illustrated in Appendix C was developed to estimate predesign costs for the Selective Excavation report. This example provides for approximately 1,700 to 2,000 cone penetrometer sampling locations within the 12 sumps (an average of about 150 to 170 locations per sump) which will be used to:

    •   Calibrate CPT results with continuously collected boring samples.
    •   Identify key sump boundaries.
    •   Identify significant tar and drilling mud.
    •   Statistically verify a high probability that tarry zones of interest are located.
    •   Define the lateral limits of tarry zones of interest.

9.  At the unique "Old Faithful" seep, the planned program will result in about 50 CPT soundings on a 5 x 5-foot grid, and 5 to 10 continuously sampled borings to identify limits of the tarry zone of interest. This is about twice as much testing as that which was already successfully used during the TAT program (see Figure 4.2). For the predesign program, structural mats will be used to support the CPT vehicle at the softest areas to assure that these most important areas are also tested.

Exhibit 46
6531

**ENVIRONMENTAL SOLUTIONS**

# 5.0   WHAT IS THE BASIS FOR THE 5,000 TO 10,000 CUBIC YARD TAR VOLUME ESTIMATE?

1.  The 5,900 cubic yard tar volume estimate provided in the Selective Excavation report is based on calculations of sump areas determined from a 1947 aerial photograph and tarry zone thicknesses interpreted from boring logs (Radian, 1982; CH2M Hill, 1987; Ecology and Environment, 1991).  Based on this information, it is reasonable to assume that the actual volume is between 5,000 and 10,000 cubic yards.

2.  The sump areas at the level of the tarry zones of interest were estimated based on:

    •   The areas of the top of the sumps determined from a 1947 aerial photograph, taken before overburden material was placed (see Figure 5.1).

    •   Side slopes for the sump walls determined from plotting intersection points for natural soil at borings near the sump edges.  The average side slope is estimated to be 1:1.

    •   The depth to the top of the asphaltic-cement material determined from the borings in each sump.

3.  The boring logs (Radian, 1982; CH2M Hill, 1987; Ecology and Environment, 1991) showed that the tarry zone of interest is less than 1 foot, except for Sump L-4 where pre-trial excavation borings showed a tar thickness of up to 4 feet.  Except for Sump L-4, an average thickness of 1 foot was assumed across the entire sump area, even where data indicated less tar.  An average thickness of 4 feet was assumed for Sump L-4.  The resulting 5,900 cubic yard tar volume estimate is shown in Table 5.1.  The footnote to Table 5.1 shows that estimated volumes were included for Sumps R-5, R-6, and L-5 even though there are no seeps in these areas and boring logs for these sumps do not indicate the presence of tarry materials.

4.  For comparison purposes, the tar volume in Sump L-1 was recently recalculated using data from the 1990 drilling program (see Figure 5.2) by Ecology and Environment (1991).  This recalculation indicates 660 cubic yards in Sump L-1 as compared to the Selective Excavation report estimate of 600 cubic yards.  This comparison, within 10 percent, using data from a much more dense sampling provides additional justification for the 5,000 to 10,000 cubic yard tar volume estimate.

Exhibit 46
6532

ENVIRONMENTAL SOLUTIONS

ROSECRANS AVE.

N

UPPER RAMPARTS SUMPS

R-6

R-5

R-4

R-3

R-2

R-1

LOWER RAMPARTS SUMPS

WEST LOS COYOTES SUMPS

EAST LOS COYOTES SUMPS

L-6

L-5

L-4

L-1

L-3

L-2

FIGURE 5 1

SITE PLAN

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

0       200      400 FEET

SCALE

Exhibit 16
6534

## TABLE 5.1

### SUMMARY
### TAR OF INTEREST VOLUMES AS DERIVED FOR
### THE FEBRUARY 12, 1991 REPORT

| SUMP | VERTICAL THICKNESS (feet) | AREA (square feet) | ESTIMATED TAR VOLUME (cubic yards) |
|---|---|---|---|
| L-1 | 1 | 17,100 | 600 |
| L-2 | 1 | 16,700 | 600 |
| L-3 | 1 | 16,300 | 600 |
| L-4 | 4 | 7,200 | 1,100 |
| L-5 | 1 | 6,800 | 300[1] |
| L-6 | 1 | 6,500 | 200 |
| R-1 | 1 | 10,900 | 400 |
| R-2 | 1 | 8,800 | 300 |
| R-3 | 1 | 10,800 | 400 |
| R-4 | 1 | 8,100 | 300 |
| R-5 | 1 | 13,100 | 500[1] |
| R-6 | 1 | 16,500 | 600[1] |
| TOTAL | -- | -- | 5,900 |

90-336A  (10/21/91/dls)

[1]  Sumps L-5, R-5 and R-6 have no seep areas and borings at those sumps do not indicate significant tar.

Exhibit 46
6535

**ENVIRONMENTAL SOLUTIONS**



**ISOPACH MAP OF TARRY MATERIAL THICKNESS (FT)**

May 21, 1991

FIGURE 5.2

5-4

Exhibit 46
6536

# 6.0   WHAT IS THE BASIS OF THE ASSUMED SOLIDIFICATION AND EXCAVATION QUANTITIES?

1.  For the Selective Excavation report, two solidification and excavation cases (Cases 1 and 2) were developed to provide a reasonable range of remediation schedule and cost estimates. The estimates were developed using models of sump conditions illustrated in Figures 6.1 and 6.2 and summarized in Table 6.1.

2.  The minimum estimate (Case 1) is based on excavating material at each location where a tar seep is currently active or previously occurred. Fifty-one seep locations were interpreted from a November 1990 aerial photograph, supplemented by onsite observations. The locations of the identified seeps are shown as an overlay to Figure 5.1.

3.  Figure 6.1 illustrates the model used to estimate excavation volumes for Case 1. The proposed technique will solidify any tarry zones in the vicinity of a seep and cut off potential seep pathways by excavating and backfilling an average 12- x 12-foot area (approximately 150 square feet) at the level of the zone of interest underlying the seep. This redundant activity will eliminate both seep material and pathways for the other soft material to migrate to the surface. In addition, a buffer zone at least 12 feet wide (horizontal) at the base of the excavation would be solidified around each area to eliminate the potential for tar to migrate into the excavation. The extent of solidification will be even wider at any areas where the tarry zone of interest is determined to be greater than 3-inches thick beyond the planned buffer zone.

4.  Case 2 assumes that all seep areas plus any significant tarry zones of interest where adequate solidification cannot be achieved will be excavated. Adequate solidification is defined as material where post-solidification CPT tip resistance exceeds 25 tsf. The model used to calculate volumes for this case is shown in Figure 6.2. For development of this model, the larger solidification and excavation areas will sometimes encompass one or more seeps. For example, it is probable that the remediated zone around the"Old Faithful" seep will be fairly large (see Section 4.0 and Figure 4.2) completely encompassing all soft zones in this portion of Sump L-1.

Exhibit 46
6537

**ENVIRONMENTAL SOLUTIONS**

90-336A/TMD-06 REV. 10/10/91



LEGEND

⬜ MINIMUM ZONE OF SOLIDIFICATION
⬜ ZONE OF EXCAVATION AND BACKFILL

NOTE

1. BEGIN 12 FOOT BUFFER ZONE FROM AREA INTERPOLATED TO HAVE LESS THAN 3 INCHES OF TAR.

SEEP AREA ASSUMPTIONS FOR QUANTITY CALCULATIONS:

• TAR POCKET PLAN SIZE CONTRIBUTING TO SEEP IS 150 SQUARE FEET
• EXCAVATION SIDE SLOPES AT 0.5:1 (HORIZONTAL TO VERTICAL)
• AVERAGE EXCAVATION DEPTH IS 12 FEET
• EXCAVATED QUANTITY PER SEEP IS 80 BCY
• SOLIDIFICATION AND EXCAVATION VOLUME INCREASE = 60% (BCY TO LCY)

BCY = BANK CUBIC YARDS
LCY = LOOSE SOLIDIFIED CUBIC YARDS

FIGURE 6.1

**MODEL FOR TYPICAL CASE 1 EXCAVATION CONFIGURATION AT TAR SEEPS**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

6-2

EXHIBIT 46
6538

90-336A/TMD-05 REV. 10/10/91



LEGEND

▨ MINIMUM ZONE OF SOLIDIFICATION
▱ ZONE OF EXCAVATION AND BACKFILL

NOTE

1. BEGIN 12 FOOT BUFFER ZONE FROM AREA INTERPOLATED TO HAVE LESS THAN 3 INCHES OF TAR.

TAR ASSUMPTIONS FOR QUANTITY CALCULATIONS:

- THICK TAR ZONE PLAN SIZE IS 600 SQUARE FEET
- EXCAVATION SIDE SLOPES AT 0.5:1 (HORIZONTAL TO VERTICAL)
- AVERAGE EXCAVATION DEPTH IS 12 FEET
- EXCAVATED QUANTITY PER TARRY SEEP IS 550 BCY
- SOLIDIFICATION AND EXCAVATION VOLUME INCREASE = 60% (BCY TO LCY)

BCY = BANK CUBIC YARDS
LCY = LOOSE SOLIDIFIED CUBIC YARDS

| FIGURE 6.2 |
| --- |
| **MODEL FOR TYPICAL CASE 2 EXCAVATION CONFIGURATION AT TARRY ZONE OF INTEREST** |
| McCOLL SITE |
| **ENVIRONMENTAL SOLUTIONS, INC.** |

6-3

Exhibit 46
6539

## TABLE 6.1

## SUMMARY OF ESTIMATED SELECTED EXCAVATION QUANTITIES

| SUMP NUMBER | BASIC SUMP DATA | | | OVERALL AREA SOLIDIFIED | | EXCAVATED VOLUME INCLUDING SWELL FROM SOLIDIFICATION AND EXCAVATION | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | APPROXIMATE SURFACE AREA (Ft$^2$) | ESTIMATED SEEPS (TYPE 2 AREAS) | ESTIMATED ZONES OF INTEREST (TYPE 3 AREAS) | AREA (Ft$^2$) | ESTIMATED MATERIAL REQUIRING TREATMENT (BCY) | SEEPS (TYPE 2 AREAS) | ZONES OF INTEREST (TYPE 3 AREAS) | TOTAL |
| **CASE 1** | | | | | | | | |
| L-1 | 20,500 | 11 | – | 20,500 | 4,300 | 1,430 | – | 1,430 |
| L-2 | 18,300 | 2 | – | 18,300 | 2,300 | 260 | – | 260 |
| L-3 | 18,600 | – | – | 18,600 | 3,300 | – | – | – |
| L-4 | 9,300 | 9 | – | 9,300 | 2,800 | 1,170 | – | 1,170 |
| L-5 | 7,500 | – | – | – | – | – | – | – |
| L-6 | 7,700 | 1 | – | 7,700 | 1,100 | 130 | – | 130 |
| R-1 | 19,800 | 11 | – | 19,800 | 8,400 | 1,430 | – | 1,430 |
| R-2 | 13,400 | 4 | – | 13,400 | 4,100 | 520 | – | 520 |
| R-3 | 12,200 | 9 | – | 12,200 | 1,500 | 1,170 | – | 1,170 |
| R-4 | 10,200 | 4 | – | 10,200 | 2,100 | 520 | – | 520 |
| R-5 | 14,500 | – | – | – | – | – | – | – |
| R-6 | 18,700 | – | – | – | – | – | – | – |
| **TOTALS** | 170,700 | 51 | – | 130,000 | 29,900 | 6,630 | – | 6,630 |
| **CASE 2** | | | | | | | | |
| L-1 | 20,500 | – | 6 | 20,500 | 4,300 | (1) | 5,300 | 5,300 |
| L-2 | 18,300 | 2 | – | 18,300 | 2,300 | 260 | – | 260 |
| L-3 | 18,600 | – | – | 18,600 | 3,300 | – | – | – |
| L-4 | 9,300 | – | 5 | 9,300 | 2,800 | (1) | 4,400 | 4,400 |
| L-5 | 7,500 | – | – | – | – | – | – | – |
| L-6 | 7,700 | 1 | – | 7,700 | 1,100 | 130 | – | 130 |
| R-1 | 19,800 | – | 7 | 19,800 | 8,400 | (1) | 6,200 | 6,200 |
| R-2 | 13,400 | – | 3 | 13,400 | 4,100 | (1) | 2,650 | 2,650 |
| R-3 | 12,200 | 9 | – | 12,200 | 1,500 | 1,170 | – | 1,170 |
| R-4 | 10,200 | – | 3 | 10,200 | 2,100 | (1) | 2,650 | 2,650 |
| R-5 | 14,500 | – | – | – | – | – | – | – |
| R-6 | 18,700 | – | – | – | – | – | – | – |
| **TOTALS** | 170,700 | 12 | 24 | 130,000 | 29,900 | 1,560 | 21,200 | 22,760 |

90-336A  (10/9/91/dh)

(1) For Case 2, seep areas in Sumps L-1, L-4, R-1, R-2, and R-4 will be treated as part of larger zones of interest.

ENVIRONMENTAL SOLUTIONS

6-4

Exhibit 46
6540

5.  The combination of single seep and larger area excavations considered for Case 2 are shown in Table 6.1.  Based on boring data and the locations of tar seeps, it was assumed that excavation in Sumps L-2, L-6, and R-3 will only occur at isolated seep areas.  At sumps with more closely spaced seeps (Sumps L-1, L-4, R-1, R-2, and R-4), the smaller (Case 1) areas will be combined into fewer, but larger excavation areas.  No excavation is assumed for Sump L-3 where borings do not show any significant tarry zones of interest and there is no evidence of seeps.

6.  Post-solidification excavation for each of the tarry zones of interest solidified under Case 2, was estimated to extend over an average area of 600 square feet at the bottom of the excavation.  A minimum 12-foot wide (horizontally) solidification buffer is also provided to prevent the inflow of tar during excavation.  Table 6.1 summarizes excavation quantities estimated for Case 2.

Exhibit 46
6541

**ENVIRONMENTAL SOLUTIONS**

# 7.0   WHAT IS THE EFFECT OF TAR WHICH MAY NOT BE DETECTED?

1.  As discussed above, a primary remediation activity will be to solidify all significant tarry zones of interest, (i.e., those which have the potential to seep or to cause excessive differential settlement to the closure cover as discussed in Section 3.0). The planned predesign investigation program is directed toward providing a very high probability that these zones will be located.

2.  Any tar which could potentially go undetected within the tarry zone of interest would be thin, isolated small lenses (e.g., less than 1 or 2 cubic yards in size) between the tight grid of CPT tests. Also, based on data from a single boring in Sump L-1 (Reference Boring 22, Ecology and Environment, 1991), there hypothetically may be occurrences of tar within small vertical discontinuities in the asphaltic-cement-like material. Neither of these conditions will cause geotechnical instability or differential settlement condition which would distress the closure cover. In addition, the Selective Excavation plan incorporates redundant features which will prevent such conditions from causing any future surface seeps, even if tarry material theoretically were assumed to be able to migrate from their present location.

3.  The designed cover (see Figure 7.1) includes several elements which preclude any potential for tar to migrate vertically to the surface. A composite layer of low permeability clay and geosynthetic liner, included to prevent inward migration of water, in and of itself would eliminate any vertical movement of tar. In addition, a geotextile filter fabric provided beneath the underlying emissions control gravel layer would not permit tar to migrate even to the level of the impermeable liner.

4.  Lateral migration of tar through the original sump berms has not historically been a problem. The lateral migration of any small amounts of undetected tar is not considered to be possible. Even so, cement bentonite cutoff walls will be provided around the perimeter of the sump areas and will serve as a redundant precaution against any such outward migration.

5.  In summary, the redundant approach to the design provides very high reliability that tarry material will not create any short- or long-term site problems when the Selective Excavation remedy is completed. First and foremost, the plan is designed to eliminate all significant tar material with the potential to cause geotechnical instability or seep conditions. Redundant provisions are provided to counter migration, in the unlikely event small volumes of tar with mobility potential were to go undetected.

Exhibit 46
6542

ENVIRONMENTAL SOLUTIONS

90-336A/TMD-10 REV  10/10/91



NOTE:   REFER TO FIGURE 6.7 OF FEBRUARY 12, 1991
SELECTIVE EXCAVATION AND RCRA
EQUIVALENT CLOSURE REPORT.

FIGURE 7.1

**ILLUSTRATION OF RCRA
EQUIVALENT COVER CLOSURE
ELEMENTS**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

7-2

Exhibit 46
6543

# 8.0  HOW RELIABLE WILL THE EMISSIONS CONTROL SHROUD BE?

1.  The Selective Excavation report provides that significant tarry zones of interest will be solidified in situ.  Reliable control of emissions to protect workers or nearby residents is an important requirement for this solidification operation.  Redundant safety precautions provided for in the design include:

    * Keeping the working area very small (e.g., one 6-foot diameter area at a time).
    * Operating the solidification auger at its lowest rated rate.
    * Having a system which can be easily stopped at any time, with no exposed surface of tar or asphaltic-cement material.
    * Providing a degree of in situ neutralization of tar prior to its potential exposure.
    * Providing a proven, primary emission control shroud immediately surrounding the small in situ area.
    * Providing a completely separate secondary emission control enclosure in the event any significant emission were to escape from the primary shroud.

2.  Figure 8.1 (Figure 6.4 in the Selective Excavation report) shows the method planned to control emissions from the vicinity of the solidification auger.  The shroud labeled "Primary Emissions Control Shroud" in the figure is similar to one successfully employed by Nova Terra[2] (Figures 8.2 to 8.4) for in situ remediation of soils at a site in San Pedro, California.  The Nova Terra unit uses a single shroud enclosing dual augers.  During operation, emissions migrate upward along the auger shaft and into the shroud for collection and subsequent treatment.  The shroud employed by Nova Terra is 8 feet long, 5 feet wide and 5 feet high.  Both routine operations monitoring and special tests conducted as part of the EPA SITE program (EPA, June 1990) show the single shroud to be very effective for containing the emissions.  The special SITE program test results show that with an air flow of approximately 600 cfm, and an average contaminant concentration of 496 ppm within the shroud, immediately adjacent, outside concentrations were maintained at 0.16 and 0.58 ppm levels.

3.  The design for the in situ solidification portion of the Selective Excavation remedy will be based on the conservative assumption that the highest allowable operating $SO_2$ concentrations within the primary shroud will be 1,000 ppm.  If for any reason the 1,000 ppm level would be reached, the operations would be modified (e.g., the solidification rate would be reduced and/or the neutralizing agents would be adjusted) to maintain conditions below this limit.  The primary shroud will be a steel enclosure 8 feet long, 8 feet wide, and 15 feet high, operated

---

[2] Formerly Toxic Treatments (USA), Inc.

Exhibit 46
6544

**ENVIRONMENTAL SOLUTIONS**

90-336A/ETCR-07 Rev. 01/23/91



PLAN

SECTION A-A'

| | |
|---|---|
| | FIGURE 8.1 |
| | IN SITU TREATMENT AND SOLIDIFICATION EQUIPMENT |
| | McCOLL SITE |
| | ENVIRONMENTAL SOLUTIONS, INC. |

Exhibit 46
6545



Checking for emissions from treated area.

FIGURE 8.2

**TOXIC TREATMENTS UNIT
IN OPERATION**

Exhibit 46
6546



**FIGURE 8.3**

**SHROUD BEING LOWERED INTO PLACE**

Exhibit 46
6547



FIGURE 8.4

**MONITORING OF EMISSIONS AT SHROUD BOUNDARY**

8-5

Exhibit 46
6548

under a negative pressure with a ventilation rate of 1,000 cfm, equivalent to approximately one air change per minute. Under these conditions, the highest $SO_2$ concentration immediately outside of the primary shroud will be less than 2 ppm above background based on control efficiencies demonstrated by Nova Terra. This control alone would preclude the potential of any health risk to workers or residents.

4.  As a redundant safety measure, the primary shroud will be completely contained within a secondary enclosure (labeled "Redundant Enclosure" on Figure 8.1). The secondary enclosure will have an emissions control system separate from the primary shroud, sized at 1,200 cfm to provide for four air changes per hour. Concentrations of $SO_2$ leakage from the redundant system are expected to be less than 0.5 ppm above background, well below levels of concern even to workers in the immediate vicinity of the activities. Further, as a final control, an emissions control blanket will be deployed over the row of solidified holes as they are exposed, to collect any remaining emissions as the solidified mass cures.

5.  The potential for an accident to occur which could result in the release of high $SO_2$ concentrations is negligible. The primary shroud is a structural steel box which could not be significantly damaged by wind, earthquake or fire conditions. The redundant enclosure includes a structural steel frame. Its relatively small size makes the potential for its sudden failure to be very low (much less than for a single, larger enclosure above an open excavation). The redundancy of the system, coupled with the small area of exposure, will allow for rapid operation shutdown under any foreseeable accident scenarios.

6.  Figure 8.5 (Figure 7.5 from the Selective Excavation report) shows that redundancy is also built into the design of the solidification operation air treatment system such that failure of any component will not compromise emissions control. The design provides for standby blowers, and a cross tie to assure continuous vacuum conditions. In addition, emergency power generators with automatic start and power transfer are included. In the event of a treatment equipment failure, the solidification operations would be curtailed until any problem is corrected, while the redundant systems continue to treat any small residual emissions.

Exhibit 46
6549

**ENVIRONMENTAL SOLUTIONS**



**FIGURE 8.5**

**AIR TREATMENT SYSTEM FLOW DIAGRAM**

McCOLL SITE

**ENVIRONMENTAL SOLUTIONS, INC.**

Exhibit 46
6550

APPENDIX A

REFERENCES

Exhibit 46
6551

ENVIRONMENTAL SOLUTIONS

# REFERENCES

CH$_2$M Hill. 1987. Boring Logs Included in CH$_2$M Hill, 1989. Final Draft - *Supplemental Reevaluation of Alternative Report.*

CH$_2$M Hill. February, 1989. Final Draft Report - *Supplemental Reevaluation of Alternatives.*

Ecology and Environment, Inc. May 8, 1989. Draft Report - *McColl, Fullerton, California - Site Assessment.*

Ecology and Environment, Inc. February 20, 1991. Report - *McColl Subsurface Investigation, Fullerton, California.*

Environmental Solutions, Inc./Environ. February 12, 1991. Report - *McColl Superfund Site Selective Excavation, Treatment and RCRA Equivalent Closure.*

Gilbert, R.O. 1987. *Students t Values from Statistical Methods for Environmental Pollution Monitoring.* Von Nostrand. New York, NY.

Lambe, T. William and Robert V. Whitman. 1969. *Soil Mechanics.* Massachusetts Institute of Technology.

McColl Site Group. September 10, 1991. *Personal Protective Equipment Considerations During the Implementation of the Selective Excavation Remedial Alternative.*

PEI Associates. September, 1990. *Pre-Publication Report - Site Program Demonstration of a Trial Excavation at the McColl Superfund Site.*

Radian. October 29, 1982. *McColl Site Investigation Final Report, Phase I, Part 1 and 2.*

Satterfield, Charles, Dr. October 11, 1991. *The Reactions Occurring in the McColl Superfund Site.*

U.S. EPA. March 1989. *Soil Sampling Quality Assurance Users Guide.* EPA/600/8-89/046.

U.S. EPA. 1989. *Methods for Evaluating the Attainment of Clean Up Standards.* Volume I, Soils and Solid Media. Office of Policy, Planning and Evaluation. EPA/230/2-89/042.

U.S. EPA. 1990. *A Rationale for the Assessment of Errors in the Sampling of Soils.* Office of Research and Development. EPA 600/4-90/013.

U.S. EPA. June 1990. *SITE Program.*

U.S. EPA. October 1990. *Guidance for Data Usability in Risk Assessments.*

Exhibit 46
6552

**ENVIRONMENTAL SOLUTIONS**

APPENDIX B

BORING LOGS

Exhibit 46
6553

**ENVIRONMENTAL SOLUTIONS**

B-1



SAME as above to 16.0 ft grading to CLA..
wet, w/pockets of WASTE, black, tar-like.
At 17.0 ft: WASTE, asphaltic mat'l, black,
moist to wet.

FIGURE B.1

A-72

Exhibit 46
6554

B-2

FIGURE B.2



DRILLING MUD, black, very plastic, wet, not as
wet as mud in RA-WA-02.
Shoe, WASTE, granular, black, solid, hard.

Exhibit 36
6555

APPENDIX C

EXAMPLE SUMP CONE PENETROMETER PROGRAM

Exhibit 46
6556

**ENVIRONMENTAL SOLUTIONS**

## EXAMPLE SUMP CONE PENETROMETER PROGRAM
## McCOLL SUPERFUND SITE

1.  The following discussion describes the cone penetrometer test (CPT) system and an example survey program used to establish predesign cost estimates for the February 12 *Selective Excavation, Treatment and RCRA Equivalent Closure* report.

    - The CPT method is widely accepted within the technical community and its use is dictated by ASTM standard procedures. The basic CPT method is founded on the following straightforward concepts:
        - More competent materials provide greater tip resistance to the penetration of a standard cone shaped rod being pushed into the subsurface.
        - The ratio of skin friction on the side of a standard cylinder pushed into the subsurface to cone tip penetration resistance will be lowest for granular material and highest for cohesive materials.

        The equipment for the basic CPT test therefore consists of a cone tip and friction sleeve (Figure C.1) and mechanisms to measure the penetration resistance of both at the surface. Figure 4.5 illustrates the manner in which the CPT data is used to classify McColl sump material.

    - Because the CPT method relies upon in situ measurements, without the actual collection of samples, it is necessary that the procedure for each specific site be calibrated against borings drilled to recover samples immediately adjacent to CPT test locations. The goals of the borings are to obtain samples for laboratory testing and to develop site-specific CPT interpretation curves similar to those shown for general material in Figure 4.5. The number of calibration (ground truthing) borings required varies from site to site depending on prior experience in the area and complexity of the subsurface conditions.

    - During the past decade, CPT equipment developments have included procedures for measuring conductivity, pH and soil gas characteristics of the materials being penetrated, concurrent with the basic geotechnical data collection. These extensions to the basic technique have resulted primarily from environmental projects where information about subsurface chemistry is also important. At least conductivity, and possibly others of these special types of CPT measurements will be used to supplement the McColl site physical boring tests.

    - The CPT interpretation estimates shown in Table 4.2 would be refined as an initial step in the predesign program, using a carefully planned initial calibration program. Initial calibration would consist of drilling continuously sampled borings immediately adjacent to CPT tests at each sump and in representative natural soil and sump boundary embankment areas. The specific boring locations would be determined to provide calibration for a variety of conditions observed from a number of randomly located CPT tests. Many additional confirmation borings would also be drilled during each phase of the subsurface characterization program.

Exhibit 46
6557

**ENVIRONMENTAL SOLUTIONS**

# CONE PENETROMETER SYSTEM



## MEASURED PARAMETERS

- TIP RESISTANCE
- FRICTION RESISTANCE
- RESISTIVITY
- pH
- GAS QUALITY

**FIGURE C.1**

SOURCE: THE EARTH TECHNOLOGY CORPORATION
        CONE PENETROMETER TESTING

Exhibit 46
6558

2.  An example four-phase program, illustrated in Figure C.2, provides an approach for determining the approximate effort planned to adequately characterize the materials lying above the hard asphaltic-cement-like materials at the bottom of the sumps.

-   **Phase 1 - Correlation of Cone Penetrometer Logs with Borings**

    The objective of Phase 1 is to provide detailed correlations between the cone penetrometer soundings, and physical characteristics and types of the materials encountered at immediately adjacent, continuously sampled borings. This is accomplished in the following manner:

    -   Three to five CPT soundings will be performed in each sump, and in two background areas outside of the sump boundaries.
    -   Two to three CPT soundings in each sump, which show some variation in the sounding log, will be selected for adjacent correlation borings.
    -   A boring with continuous sampling capabilities will be drilled within 1 foot of each selected CPT sounding.

    The results of the CPT sounding logs and physical characterization and laboratory testing of physical samples will be evaluated and correlated to calibrate the CPT data .

-   **Phase 2 - 40-Foot Grid with Infilling to Define Sump Boundaries**

    A basic CPT sounding survey on a 40-foot by 40-foot grid will be conducted over the entire area of each sump. During this phase, infill soundings will be located to define important sump boundaries and the top of the adjacent asphaltic-cement-like material.  Phase 2 procedures will include the following activities:

    -   CPT soundings on an overall 40-foot by 40-foot grid.
    -   Soundings between grid points at known or located sump boundaries, infilled at 10-foot increments toward the sump center until hard asphaltic-cement-like material is encountered.
    -   Drilling of adjacent confirmation borings at 5 to 10 percent of the soundings.
    -   Evaluation of the information and preparation of plan and section drawings for each sump showing approximate asphaltic-cement-like material boundary, original side slope locations, overburden and upper waste limits, and general soil conditions encountered outside of the sump boundaries at confirmation borings.

-   **Phase 3 - 10- x 20-Foot Grid with Randomly Located Infill Soundings**

    This phase is directed primarily toward locating zones within the sumps where greater than 3 inches of tar exists in the zone of interest above the asphaltic-cement-like material.  It will also provide additional confirmation of the data interpretations made during Phase 2, and information required to complete the sump plan and section drawings in sufficient detail to plan the solidification operation.  This phase will include the drilling of additional correlation borings at 5 to 10 percent of the CPT sounding locations.

Exhibit 46
6559

**ENVIRONMENTAL SOLUTIONS**

# Example Sump Cone  Penetrometer Program



### Phase 1

Cone/Continuous Sampling Calibration
Cone Penetrometer (⊖), Boring (□)



### Phase 2

40-Foot Grid With Infill To Define Boundaries



### Phase 3

20-Feet x 10-Foot Grid



### Phase 4

Special Area Study 5-Foot Grid



### Composite Of Four Phases

FIGURE C.2

Exhibit 46
6560

Areas with more than 3 inches of tar will be investigated in greater detail during Phase 4 of the program. For those areas where significant tar is not encountered, additional randomly located, and intermediately spaced soundings will be made to provide a high probability that all soft zones of interest have been detected. Determination of the number and locations for the random soundings will be determined applying EPA guidelines for using statistical procedures to select sampling requirements.

- **Phase 4 - Special Area Studies on a 5-Foot Grid**

The primary objective of Phase 4 will be to define the limits of areas determined to potentially have more than 3 inches of tar during Phase 3. The tighter grid will be used to prepare detailed plans of the configuration (including buffer zones) of each area where in situ solidification will be implemented. Correlation borings will also be conducted adjacent to approximately 5 percent of these closely spaced grid soundings.

Exhibit 46
6561

**ENVIRONMENTAL SOLUTIONS**

Exhibit 46
6562

Q

Exhibit 46
6563

R

**THE
McCOLL
SITE
GROUP**       215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

November 1, 1991

Mr. John Blevins,
U.S. Environmental Protection Agency,
75 Hawthorne Street,
San Francisco, CA  94105

Dear John:

At our August 29, 1991 EPA/MSG technical exchange at Baldwin Park
we talked about tar conversion mechanisms with our expert
Professor Charles Satterfield of MIT.

At one point during the dialogue EPA/ICF suggested that another
mobile tar generation mechanism could be microbially driven.
Could microorganisms use the asphalt as a hydrocarbon substrate,
and in that process "liquify" the asphalt?

We have further investigated this mechanism, once again drawing
upon the facts we definitively know about McColl.   I have
consulted with both biochemical engineers and microbiologists at
UNOCAL's Science and Technology Division in Brea.   Our
conclusions are as follows:

•   Sulfur dioxide is not a known metabolic intermediate or end
    product of the oxidation or reduction of sulfur containing
    organic species.   During our meeting a suggestion was made
    that a potential asphalt to tar microbially catalyzed
    reaction would also result in the release of sulfur dioxide.
    We believe this type of pathway is not scientifically
    proven.

•   In general, microbes which could "liquify" asphalt or
    oxidize sulfur compounds are obligate aerobes (eg white rot
    fungus and <u>Thiobacillus</u>).   We can definitively state that
    the subsurface at the McColl site is strictly anaerobic.
    Therefore aerobic microbes could not exist at McColl and
    catalyse any asphalt to tar conversions.

If you wish to discuss the microbial route further please do not
hesitate to contact us.

*Ian*

Ian A. Webster
Manager
Superfund Technical Response

*Lori E. Patras*

Lori E. Patras
Bioremediation Specialist
Environmental Technology Group
Unocal Science and Technology
    Division
Brea, California

Exhibit 46

The McColl Site Group is composed of
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL

**THE
McCOLL
SITE
GROUP**  215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

November 18, 1991

Ms. Pamela Wieman
Project Manager
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California  94105

                 Re:  <u>McColl Superfund Site, Fullerton, California</u>

Dear Pam:

            On October 23, 1991, McColl Site Group ("MSG")
representatives visited the McColl Site.  During the visit, the
following observations were made which we would like to mention
to you:

            1.  <u>Depression Areas</u>.  There are four depressed areas on
the Site which have the potential for ponding during a
rainstorm.  Those areas, which lie in Sumps L-4, R-1, R-2 and
R-4, are noted on Figure 1 attached.  We recommend that these
depressed surface areas be graded before the rainy season to
reduce the possibility of ponding.

            2.  <u>Vapor Well</u>.  At the request of the community, MSG
representatives observed the area around well P2D in an effort to
locate a vapor extraction/gas monitoring well purported to be in
the vicinity.  We did not find such a well.  We would appreciate
it if you could provide us with any information you have
regarding the existence and location of such a well or its date
of closure.

            We have enclosed the pictures taken by our
representatives during the visit.  Thank you again for allowing
our representatives to visit the Site.

                         Very truly yours,

                         William J. Duchie /mfl

                         William J. Duchie

WJD:hpl
Enclosures

Exhibit 46
6565

**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue Suite 304 Fullerton California 92632 (714) 665-7391

Ms. Pamela Wieman
November 18, 1991
Page 2


cc:  Mr. David B. Jones (w/o enclosure)
     Mr. John Blevins (w/o enclosure)
     Mr. Steve Linder (w/o enclosure)
     Ms. Caroline Rudolph (w/o enclosure)
     Mr. Steve Gaytan (w/o enclosure)
     Mr. Barry Eaton (w/o enclosure)
     Mr. David Bushey (w/o enclosure)
     Mr. Kenneth Ritter (w/o enclosure)
     Mr. Barry Brown (w/o enclosure)
     Mr. Robert Wilson (w/o enclosure)
     Larry Lawton, Esq. (w/o enclosure)



LEGEND

DEPRESSION AREA
(POSSIBLE PONDING AREA)

FIGURE 1

SITE FIELD MAP SHOWING
DEPRESSION AREAS

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6567



**FIGURE 2**

**PHOTO VIEWPOINT LOCATIONS**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

# PHOTOGRAPH DESCRIPTIONS
## McCOLL SITE VISIT

| Figure | Viewpoint No. | Description |
|---|---|---|
| 3 | 1 | Foreground shows location of Well P2D.  Background shows area of seep excavation around Sump L-4. |
| 4 | 2 | Excavation crew at Rampart sumps. |
| 5 | 3 | Excavation at Old Faithful seep. |
| 6 | 4 | Excavated seep material being dumped on liner. |
| 7 | 5 | Surface seep at edge of Sump R-2. |
| 7 | 6 | Surface seep at edge of Sump L-1. |
| 8 | 7 | Old Faithful seep at southwestern corner of Sump L-1. |
| 8 | 8 | Surface seep at Sump L-4. |
| 9 | 9 | Surface seep near Sump L-4. |
| 9 | 10 | Hand excavation of seep near Sump L-4. |
| 10 | 11 | Backhoe excavation of seep near Sump L-4. |
| 10 | 12 | Excavated tar from seep near Sump L-4. |
| 11 | 13 | Soil cover being placed over seep area. |
| 11 | 14 | Staining and surface seep near recently drilled boring in Sump R-2. |
| 12 | 15 | Sampling of surface seep in Sump R-1. |
| 12 | 16 | Surface seep sample with litmus paper showing pH reading. |
| 13 | 17 | View of barrels storage yard. |
| 13 | 18 | Illustration of materials from July 1991 boring investigation. |

Exhibit 46
6569

138391

90-338A/MEMO 10/26/91



Viewpoint 1

FIGURE 3

**SITE VISIT PHOTOGRAPHS**
**OCTOBER 23, 1991**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6570

136391

90-336A/MEMO 10/28/91



Viewpoint 2

**FIGURE 4**

**SITE VISIT PHOTOGRAPHS**
**OCTOBER 23, 1991**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6571

136391

90-336A/MEMO 10/28/91



Viewpoint 3

FIGURE 5

SITE VISIT PHOTOGRAPHS
OCTOBER 23, 1991

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6572

136391

90-336A/MEMO 10/28/91



Viewpoint 4

FIGURE 6

SITE VISIT PHOTOGRAPHS
OCTOBER 23, 1991

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6573



**Viewpoint 5**



**Viewpoint 6**

**FIGURE 7**

**SITE VISIT PHOTOGRAPHS
OCTOBER 23, 1991**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6574



Viewpoint 7



Viewpoint 8

**FIGURE 8**

**SITE VISIT PHOTOGRAPHS**
**OCTOBER 23, 1991**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6575



Viewpoint 9



Viewpoint 10

| | |
|---|---|
| **FIGURE 9** | |
| **SITE VISIT PHOTOGRAPHS** | |
| **OCTOBER 23, 1991** | |
| McCOLL SITE | |
| **ENVIRONMENTAL SOLUTIONS, INC.** | |

Exhibit 46
6576



Viewpoint 11



Viewpoint 12

| | |
|---|---|
| | **FIGURE 10** |
| | **SITE VISIT PHOTOGRAPHS**<br>**OCTOBER 23, 1991** |
| | McCOLL SITE |
| Exhibit 46<br>6577 | ENVIRONMENTAL SOLUTIONS, INC. |



Viewpoint 13



Viewpoint 14

| | FIGURE 11 |
| --- | --- |
| | **SITE VISIT PHOTOGRAPHS**<br>**OCTOBER 23, 1991** |
| | McCOLL SITE |
| Exhibit 46<br>6578 | ENVIRONMENTAL SOLUTIONS, INC. |

90-336A/MEMO 10/28/91

138391



**Viewpoint 15**



**Viewpoint 16**

| FIGURE 12 |
| --- |
| **SITE VISIT PHOTOGRAPHS**<br>**OCTOBER 23, 1991** |
| McCOLL SITE |
| ENVIRONMENTAL SOLUTIONS, INC. |

Exhibit 46
0579



Viewpoint 17



Viewpoint 18

**FIGURE 13**

**SITE VISIT PHOTOGRAPHS
OCTOBER 23, 1991**

McCOLL SITE

ENVIRONMENTAL SOLUTIONS, INC.

Exhibit 46
6580

Exhibit 46
6581

S

**THE
McCOLL
SITE
GROUP**        215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

November 20, 1991

Mr. David B. Jones
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California  94105

          Re:  <u>McColl Superfund Site, Fullerton, California</u>

Dear Dave:

          During our October 21, 1991, meeting, John Zannos and I
expressed the McColl Site Group's ("MSG") concerns with the EPA's
continued pursuit of excavation and on-site incineration as a
remedial approach for McColl.  As we have stated previously, we
believe information gathered over the past ten years has shown
this alternative to be ineffective, unimplementable and not
cost-effective.

          As you requested, we are providing an analysis to show
how the EPA Guidance for Conducting Remedial Investigations and
Feasibility Studies Under CERCLA, EPA/540/G-89/004 (the "RI/FS
Guidance") allows screening of excavation and on-site
incineration from the process.  The purpose of the screening
process "is to reduce the number of alternatives that will
undergo a more thorough and extensive analysis . . . ."  (RI/FS
Guidance, 4-23).  We, therefore, believe excavation and on-site
incineration should be screened out of the remedy selection
process in accordance with the NCP and the RI/FS Guidance.  A
screening of the excavation and on-site incineration alternative
at this time will allow resources to be directed to the
implementable solutions.

          The EPA has indicated the agency is reluctant to screen
excavation and incineration out of the process because this
remedy is a "total treatment" remedy.  The RI/FS Guidance
specifically provides that "[i]t is not a requirement that the
entire range of alternatives originally developed be preserved if
all alternatives in a portion of the range do not represent

Exhibit 46
6582

The McColl Site Group is composed of:
Shell Oil Company  ARCO  Phillips Petroleum, Texaco and UNOCAL ➤━●●

**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. David B. Jones
November 20, 1991
Page 2

distinct viable options." (RI/FS Guidance, 4-26). The RI/FS
Guidance further provides that "[t]he target number of
alternatives to be carried through screening should be set by the
project manager and the lead agency on a <u>site-specific</u> basis."
(RI/FS Guidance, 4-26 (emphasis added)). We believe the data
collected during the past ten years at McColl and the fact the
site is located in a residential area in the South Coast Air
Basin, demonstrate that treatment of all of the waste is not
practical and that excavation and incineration is not workable at
McColl.

The RI/FS Guidance provides that the evaluation
conducted during the screening phase should be "sufficiently
detailed to distinguish among alternatives." (RI/FS Guidance,
4-23). All of the information collected over the past ten years,
including the La Jolla trial burn, the 1990 trial excavation and
other testing, provides the level of detail necessary to screen
the excavation and incineration alternative out of the process.
Further experience has repeatedly shown that a hazardous waste
incinerator will not be built in the South Coast Air Quality
Management District ("SCAQMD").

The EPA has also stated it is reluctant to screen
alternatives from the process now in the event information would
later be discovered which indicates the alternative is viable.
While we believe this has an extremely low probability, the RI/FS
Guidance specifically addresses this concern. It provides that
"[u]nselected alternatives may be reconsidered at a later step in
the detailed analysis . . . if information is developed that
identifies an additional advantage not previously apparent."
(RI/FS Guidance, 4-26).

The MSG has more site specific concerns and logic as to
why excavation and on-site incineration does not satisfy the
three screening criteria and thus should be screened out of the
process, early in the Feasibility Study preparation. We have set
forth our analysis in an attachment to this letter. As you will
see, we believe:

- <u>Excavation and on-site incineration will not be
  effective in protecting human health and the
  environment nor in achieving reductions in
  toxicity, mobility or volume.</u>  Implementation risks

Exhibit 46
6583

The McColl Site Group is composed of:
Shell Oil Company ARCO Phillips Petroleum, Texaco and UNOCAL •━◀▶•

THE
McCOLL
SITE
GROUP          215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. David B. Jones
November 20, 1991
Page 3

posed to workers and the community, including $SO_2$
emissions generated during excavation and heat
stress to workers, are a serious concern with
excavation and on-site incineration.  The EPA's own
Thermal Destruction Analysis Report indicates it is
questionable whether the incinerator will meet
particulate standards and it is doubtful a mobile
incinerator will meet $SO_x$ and $NO_x$ standards, thus
being out of compliance with ARARs.  The
implementation risks associated with this
alternative are more risky than $10^{-6}$.  The effect
of this alternative will be to transfer many of the
compounds of concern from one media to another.
This alternative will increase the volume of
material at the Site by a factor of more than
three.

- **Excavation and on-site incineration is not
  implementable at McColl**.  Excavation to depths of
  40 or more feet and incineration of the type of
  volume of McColl wastes have not been proven within
  65 feet of residences.  An assembly of containment
  equipment will be necessary to control emissions.
  These containment structures will need to be
  repositioned around the site.  No working model
  exists for many of the components needed for the
  system.  Moreover, multiple incineration systems,
  with associated control systems, will be required
  to manage the emissions from the respective
  containment structures.  Finally, on-site
  incineration within a residential neighborhood is
  not administratively feasible in the South Coast
  Air Basin as it will not be able to meet the
  SCAQMD's strict air quality requirements.  Impacted
  McColl residents and adjacent communities have made
  it clear they will resist on-site incineration with
  its associated emissions, odors, noise and traffic.

- **Excavation and on-site incineration is not a cost
  effective alternative for McColl**.  This alternative
  will be three to five times more costly than other
  alternatives providing an equivalent or greater
  level of protection.  By EPA's own numbers, cost



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. David B. Jones
November 20, 1991
Page 4

estimates for this alternative now range from $212 to $399 million. As you know, we believe, and experience at numerous Superfund sites has shown, that costs of an incinerator are consistently underestimated. We believe the costs will be even higher as the process design is modified to deal with the specified characteristics of the McColl waste, operating this close to a residential district and within the confines of the SCAQMD. Potentially toxic emission levels, associated PPE requirements and other factors will lead to excavation rates radically lower than those anticipated by the EPA, thereby significantly extending the schedule and the cost of this alternative. When you balance this with the risk range we are dealing with at McColl ($\underline{\text{i.e.}}$, $2 \times 10^{-6}$ with a one foot cover), and the fact this alternative will increase short term risks by generating $SO_2$ levels that are above Immediately Dangerous to Life or Health levels, it is undefensible.

If the cuts which need to be made are made now, not only will the process be considerably shortened, but a technically feasible remediation can begin within the next two and one-half years. We have attached the relevant pages from the RI/FS Guidance for your convenience. We would be happy to discuss our analysis further.

Very truly yours,

William J. Duchie

WJD:ceb
Enclosures

**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. David B. Jones
November 20, 1991
Page 5


cc:  Greg Ritter, Esq.
     Mr. John Blevins
     Ms. Pamela Wieman
     Mr. Steve Linder
     Ms. Caroline Rudolph
     Mr. Steve Gaytan
     Mr. David Bushey
     Mr. Kenneth Ritter
     Ms. Lydia Goldshmidt
     Mr. Barry Brown
     Larry Lawton, Esq.

I.    EFFECTIVENESS.

"Alternatives that do not provide adequate protection of human health and the environment shall be eliminated from further consideration." 40 C.F.R. § 300.430(e)(7)(i).

Excavation and incineration will not be effective in protecting the health and safety of workers and the community during implementation.  Implementation risks associated with this option are more risky than $10^{-6}$.  Based on results from the 1990 trial excavation, excavation of the waste will take 16 to 21 years to accomplish.  As stated in our comments on the 1990 trial excavation:

- Full-scale excavation will generate sulfur dioxide levels that are above Immediately Dangerous to Life or Health ("IDLH") levels.  Emissions of $SO_2$ and other potentially toxic substances through excavation and incineration pose potentially serious and conceivably fatal health risks to workers and the surrounding community.

- Heat stress to workers wearing personal protective equipment ("PPE") within the excavation enclosure is a major concern.  Due to this heat stress and the time required for associated health monitoring, the length of time a worker in modified Level B or Level A could work in the excavation enclosure is no more than 15 minutes per hour when ambient temperatures exceed 70 degrees F.

- Full-scale excavation and pug mill and incinerator(s) operation will result in noise pollution, toxic emissions ($SO_2$ and THC) and odor pollution (thiophene) in the surrounding community.

Additionally, with respect to the incineration component of the process, the ICF Thermal Destruction Analysis Report indicates it is questionable as to whether the incinerator will meet particulate standards and it is doubtful a mobile incinerator will meet $SO_x$ and $NO_x$ standards, thus being out of compliance with ARARs and not being protective of public health and the environment.

The effect of excavating and incinerating the McColl waste is basically to transfer the compounds of concern from the tarry or asphaltic cement material to the air, scrubber sludge (for the sulfur compounds) or to activated carbon (for the volatile compounds), while at the same time posing great risks to worker and community health and to the environment.

**ATTACHMENT A**
**-1-**

The purpose of excavation and on-site incineration is to ultimately reduce the toxicity of the $SO_2$ and THC contained within the waste. The tent proposed for excavation will not, however, assure capture of all the gases during the excavation process. If, as stated in the EPA's Start Program Special Investigation dated May, 1991 authored by SAIC, the volume of $SO_2$ is 14-17% by weight of the material to be excavated, and if the enclosure is 98% effective in controlling the emissions (an optimistic assumption), over 200 tons of fugitive $SO_2$ will escape the tent during the course of the excavation and impinge on the local community. This is in addition to the amount of $SO_2$ that would escape the incinerator(s) and scrubber system. The EPA, in its NSPS document for resource recovery facilities, indicates spray dryers, will, at best, remove only 90% of the $SO_2$. At this efficiency level, over 1000 tons of $SO_2$ could escape the incinerator/emissions control system. The incinerator/emissions control system is untested on McColl wastes and the efficiency and destruction removal efficiencies ("DRE") assumptions currently projected by the EPA are overly optimistic. While the individual components may reach the levels of control and operational capabilities under optimal conditions, it is seldom the case that these levels are achieved and maintained over long periods of time for the less than ideal conditions found in the field.

Although at this time it is difficult to determine whether ash is hazardous, if it is, there will be a considerable volume increase. The May 1991 SAIC Report states that the waste will have to be blended with non-sulfur containing material at an approximate 2:1 ratio to dilute the sulfur content. This will approximately triple the volume to be incinerated. In addition, there will be a substantial volume of scrubber sludge to be disposed. At this time, it is not known if the ash or sludge will test hazardous. If so, disposal will be further complicated.

Excavation and incineration may minimize residual risk to the community after the 16 to 21 year excavation and incineration period. However, we question whether this alternative could ever be implemented given the inability of the process to protect human health and environment during implementation.

## II.   IMPLEMENTABILITY.

"Alternatives that are technically or administratively infeasible or that would require equipment, specialists or facilities that are not available within a reasonable period of time may be eliminated from further consideration."
40 C.F.R. § 300.430(e)(7)(ii).

## ATTACHMENT A
-2-

Exhibit 46
6588

Excavation and onsite incineration is not a technically feasible alternative for McColl. The feasibility of excavating to depths of 40 or more feet within 65 feet of residences has not been demonstrated. The enclosure needed to conduct a full-scale excavation will either need to be larger than any such enclosure utilized to date or, alternatively, the enclosure will have to be moved multiple times for excavation of some of the sumps, a process which has not been proven. The specialized equipment required for excavation, emission control and treatment is not readily available. The debris within the sumps would more than likely slow the excavation rates and would have to be separately handled during the treatment process, further lengthening the time for this alternative. In order to control emissions, all excavation, milling, and blending operations will have to be performed within containment structures. No working model exists for many components of the system. Multiple incineration systems, with associated control systems, will be required to manage the emissions from the respective containment structures. The air treatment system used during the trial excavation was not effective and therefore could not be scaled up for full scale excavation and treatment. Significant delays during implementation are highly likely due to high emission rates and excavation difficulties.

Furthermore, it has not been shown that an incinerator will be successful in handling the type and volume of McColl wastes. The need to blend the excavated material with dilution material will extend the operation period. Intermittent use of the incinerator equipment will add to the stress on the equipment, especially on the thermally-stressed refractory. As the length of the project is extended during repair periods, other materials with working life designed to meet the original schedule will require replacement as well. This is especially a concern with the containment barrier materials exposed to internal and external stress.

Onsite incineration is also not <u>administratively</u> feasible within a residential community in the South Coast Air Basin. An onsite incinerator will not be able to meet the strict requirements of the SCAQMD. As stated on page ES-12 of the Thermal Destruction Analysis Report, "Compliance with SCAQMD particulate emission standards may be difficult to achieve." We concur with this statement. The report further states sulfur oxides and nitrogen oxides should be controllable. This presupposes the incinerator will achieve a high degree of treatment (>99.99% DRE) and that the scrubbing systems consistently operate at very high efficiencies (95-99+% for scrubbers, 90+% for activated carbon). This is not realistic for McColl wastes, which are so highly variable in sulfur content and combustible materials. Emissions control associated with

<u>ATTACHMENT A</u>
-3-

Exhibit 46
6589

excavation and blending will exacerbate the problem.  Residents
and adjacent communities have made it clear that they will resist
on-site incineration with its associated emissions, odors, noise
and traffic.  We believe that this factor should be considered in
determining the administrative implementability of this
alternative in accordance with NCP Section 300.430(e)(7)(ii).

The RI/FS Guidance provides that "[t]he determination
that an alternative is not technically feasible and is not
available will usually preclude it from further consideration"
(RI/FS Guidance, 4-24) and further provides that "this type of
'fatal flaw'" would typically have been identified during
technology screening and the "infeasible alternative would not
have been assembled." (RI/FS Guidance, 4-24).  Ten years of
studies costing nearly 20 million dollars have demonstrated that
excavation and on-site incineration is technically infeasible.
It is time to move forward with the possible.

III.    COST.

"Costs that are grossly excessive compared to the
overall effectiveness of alternatives may be considered . . . to
eliminate alternatives."  40 C.F.R. § 300.430(e)(7)(iii).

Excavation and incineration will be significantly more
costly (three to five times) than the other alternatives
providing a greater or an equivalent level of protection.  Costs
for an onsite incinerator have been grossly underestimated. In a
paper dated October 21, 1991, the MSG illustrated the lower cost
range for an onsite incinerator would be at least $260 to $330
million.  Additional requirements for air treatment to meet BACT
and MACT within the SCAQMD would be expected to increase these
costs significantly.  The Thermal Destruction Analysis Report
indicates the total cost of excavation and incineration is now
estimated at $212 to $399 million.  As you know, we believe the
higher numbers are more realistic.  Experience at numerous other
Superfund sites has shown that costs of incineration are
consistently underestimated.  In addition, potentially toxic
emission levels, associated PPE requirements and other factors,
will lead to excavation rates radically lower than those
anticipated by the EPA, thereby significantly extending the
schedule and dramatically increasing the cost for full-scale
excavation.  Based on the Thermal Destruction Analysis Report and
our own analysis, costs will increase approximately 20% per year
for each year the project is extended.  When you balance this
with the risk range we are dealing with at McColl (i.e., 2 x 10-6
with a one foot cover) and the fact this alternative will
increase volume, it is indefensible.

Exhibit 46
6590

| General Response Action | | | 1 No Action | 2 Limited Action | 3 Source Containment; No GW Controls | 4 Source Containment; GW Collection, Pretreatment, POTW | 5 In Situ Stabilization, Cap; GW Collection, Pretreatment, POTW | 6 Biodegradation, Cap; GW Collection, Pretreatment, POTW | 7 Incineration; GW Collection, Pretreatment, POTW |
|---|---|---|---|---|---|---|---|---|---|
| Medium | Technology Type | Area or Volume | | | | | | | |
| Soil | Access Restrictions (Fencing) | Entire Site | | • | | | | | |
| | Excavation | All Soil Above $10^{-6}$ | | | | | | | • |
| | | All Soil Above $10^{-4}$ | | | • | • | | | |
| | Disposal | Onsite RCRA Landfill | | | • | | | | |
| | | Offsite RCRA Landfill | | | | • | | | • |
| | Treatment Onsite | In Situ Stabilization | | | | | • | | |
| | | Bioremediation To $10^{-6}$ | | | | | | • | |
| | Incineration Offsite | | | | | | | | • |
| | Capping | All (Remaining) Soil Above $10^{-6}$ | | | • | • | • | • | |
| Ground Water[a] | Alternate Water Supply | All Residents In Affected Area | | • | • | • | • | | |
| | Monitoring | All Monitoring Wells Twice A Year | • | • | • | • | • | • | • |
| | Collection With Interceptor Trenches | All Water Above $10^{-4}$ Within 10 Yrs. | | | | • | • | | |
| | | All Water Above $10^{-6}$ Within 20 yrs | | | | | | • | • |
| | Treatment With Precipitation Onsite | Pretreatment | | | | • | • | • | • |
| | Discharge | Offsite To POTW | | | | • | • | • | • |

[a] This is a conceptual example using the example of carcinogenic risk ranges; however, in general, when MCLs are available they will apply.

Figure 4-6.   Assembling a range of alternative examples.

## 4.3 Alternatives Screening Process

### 4.3.1   Alternatives Definition

Before beginning screening, alternatives have been assembled primarily on medium-specific considerations and implementability concerns. Typically, few details of the individual process options have been identified, and the sizing requirements of

technologies or remediation timeframes have not been fully characterized (except for timeframes identified to develop ground-water action alternatives). Furthermore, interactions among media, which may influence remediation activities, have usually not been fully determined, nor have sitewide protectiveness requirements been addressed. Therefore, at this point in the process, such aspects of the alternatives may need to be further defined to

4 - 21

Exhibit 46
6591

form the basis for evaluating and comparing the alternatives before their screening.

### 4.3.1.1 Specific Objective

Alternatives are initially developed and assembled to meet a set of remedial action objectives for each medium of interest. During screening, the assembled alternatives should be evaluated to ensure that they protect human health and the environment from each potential pathway of concern at the site or those areas of the site being addressed as part of an operable unit. If more than one pathway is present, such as inhalation of airborne contaminants and ingestion of contaminants in ground water, the overall risk level to receptors should be evaluated. If it is found that an alternative is not fully protective, a reduction in exposure levels for one or more media will need to be made to attain an acceptable risk level.

In refining alternatives, it is important to note that protectiveness is achieved by reducing exposures to acceptable levels, but achieving these reductions in exposures may not always be possible by actually cleaning up a specific medium to these same levels. For example, protection of human health at a site may require that concentrations of contaminants in drinking water be reduced to levels that could not reasonably be achieved for the water supply aquifer; thus, protection could be provided by preventing exposures with the use of a wellhead treatment system. The critical selection of how risk reductions are to be achieved is part of the risk management decisionmaking process.

### 4.3.1.2 Define Media and Process Options

Alternatives should be defined to provide sufficient quantitative information to allow differentiation among alternatives with respect to effectiveness, implementability, and cost. Parameters that often require additional refinement include the extent or volume of contaminated material and the size of major technology and process options.

Refinement of volumes or areas of contaminated media is important at some sites at which ongoing releases from the source (or contaminated soils) significantly affect contaminant levels in other media (e.g., ground water) because such interactions may not have been addressed when alternatives were initially developed by grouping medium-specific response actions. If interactions among media appear to be important at a site, the effect of source control actions on the remediation levels or time frames for other media should be evaluated.

Figure 4-7 provides an example of such an analysis in which volatile organics in soil are migrating into an underlying aquifer composed of unconsolidated materials. Using a model of transport processes at the site, the effect of different soil removal actions on ground-water remediation (using a specified extraction scheme) could be estimated. In this example, development of alternatives that consider ground water actions independent of soil removal (i.e., the no-soil-removal scenario) could result in underestimating the achievable remediation level or overestimating the time frame for ground-water remediation. This could result in an overestimation of the extraction and treatment requirements for technology processes for ground water. By evaluating soil and ground water actions together, the rates and volumes of ground water extraction to achieve the target remediation levels can be refined more accurately.

After the alternatives have been refined with respect to volumes of media, the technology process options need to be considered more fully with respect to their effectiveness, implementability, and cost such that differences among alternatives can be identified. The following information should be developed, as appropriate, for the various technology processes used in an alternative:

- Size and configuration of onsite extraction and treatment systems or containment structures – For media contaminated with several hazardous substances, it may be necessary to first determine which contaminant(s) impose the greatest treatment requirements; then size or configure accordingly. Similarly, for ground-water extraction technologies at sites with multiple ground-water contaminants, it may be necessary to evaluate which compounds impose the greatest limits on extraction technologies, either because of their chemical/physical characteristic, concentration, or distribution in ground water.

- Time frame in which treatment, containment, or removal goals can be achieved – The remediation time frame is often interdependent on the size of a treatment system or configuration of a ground-water extraction system. The time frame may be determined on the basis of specific remediation goals (e.g., attaining ground-water remediation goals in 10 years), in which case the technology is sized and configured to achieve this; the time frame may also be influenced by technological limitations (such as maximum size consideration, performance capabilities, and/or availability of adequate treatment systems or disposal capacity).

- Rates or flows of treatment – These will also influence the sizing of technologies and time frame within which remediation can be achieved.

4-22

Exhibit 46
6592



TIME IN YEARS

**Figure 4-7.** Time to achieve $10^{-4}$ to $10^{-6}$ risk level for a single-contaminant for ground water cleanup under various soil removal alternatives.

- Spatial requirements for constructing treatment or containment technologies or for staging construction materials or excavated soil or waste

- Distances for disposal technologies – These include approximate transport distances to acceptable offsite treatment and disposal facilities and distances for water pipelines for discharge to a receiving stream or a POTW.

- Required permits for offsite actions and imposed limitations – These include National Pollutant Discharge Elimination System (NPDES), pretreatment, and emission control requirements; coordination with local agencies and the public;

and other legal considerations. These may also encompass some action-, location-, and chemical-specific ARARs.

### 4.3.2   Screening Evaluation

Defined alternatives are evaluated against the short- and long-term aspects of three broad criteria: effectiveness, implementability, and cost. Because the purpose of the screening evaluation is to reduce the number of alternatives that will undergo a more thorough and extensive analysis, alternatives will be evaluated more generally in this phase than during the detailed analysis. However, evaluations at this time should be sufficiently detailed to distinguish among alternatives. In addition, one should ensure

4-23

Exhibit 46
6593

that the alternatives are being compared on an equivalent basis (i.e., definitions of treatment alternatives are approximately at the same level of detail to allow preparation of comparable cost estimates).

Initially, specific technologies or process options were evaluated primarily on the basis of whether or not they could meet a particular remedial action objective. During alternative screening, the entire alternative is evaluated as to its effectiveness, implementability, and cost.

During the detailed analysis, the alternatives will be evaluated against nine specific criteria and their individual factors rather than the general criteria used in screening. Therefore, individuals conducting the FS should be familiar with the nine criteria (see Section 6.2.2) at the time of screening to better understand the direction that the analysis will be taking. The relationship between the screening criteria and the nine evaluation criteria is conceptually illustrated in Figure 4-8.

It is also important to note that comparisons during screening are usually made between similar alternatives (the most promising of which is carried forward for further analysis); whereas, comparisons during the detailed analysis will differentiate across the entire range of alternatives. The criteria used for screening are described in the following sections.

### 4.3.2.1  Effectiveness Evaluation

A key aspect of the screening evaluation is the effectiveness of each alternative in protecting human health and the environment. Each alternative should be evaluated as to its effectiveness in providing protection and the reductions in toxicity, mobility, or volume that it will achieve. Both short- and long-term components of effectiveness should be evaluated; short-term referring to the construction and implementation period, and long-term referring to the period after the remedial action is complete. Reduction of toxicity, mobility, or volume refers to changes in one or more characteristics of the hazardous substances or contaminated media by the use of treatment that decreases the inherent threats or risks associated with the hazardous material.

### 4.3.2.2  Implementability Evaluation

Implementability, as a measure of both the technical and administrative feasibility of constructing, operating, and maintaining a remedial action alternative, is used during screening to evaluate the combinations of process options with respect to conditions at a specific site. Technical feasibility refers to the ability to construct, reliably operate, and meet technology-specific regulations for process options until a remedial action is complete; it also includes operation, maintenance, replacement, and monitoring of technical components of an alternative, if required, into the future after the remedial action is complete. Administrative feasibility refers to the ability to obtain approvals from other offices and agencies, the availability of treatment, storage, and disposal services and capacity, and the requirements for and availability of specific equipment and technical specialists.

The determination that an alternative is not technically feasible and is not available will usually preclude it from further consideration unless steps can be taken to change the conditions responsible for the determination. Typically, this type of "fatal flaw" would have been identified during technology screening, and the infeasible alternative would not have been assembled. Negative factors affecting administrative feasibility will normally involve coordination steps to les -n the negative aspects of the alternative but will not necessarily eliminate an alternative from consideration.

### 4.3.2.3  Cost Evaluation

Typically, alternatives will have been defined well enough before screening that some estimates of cost are available for comparisons among alternatives. However, because uncertainties associated with the definition of alternatives often remain, it may not be practicable to define the costs of alternatives with the accuracy desired for the detailed analysis (i.e., +50 percent to -30 percent).

Absolute accuracy of cost estimates during screening is not essential. The focus should be to make comparative estimates for alternatives with relative accuracy so that cost decisions among alternatives will be sustained as the accura · · of cost e   ates improves beyond the screer 1g proces . The procedures used to develop cost estimates for alternative screening are similar to those used for the detailed analysis; the only differences would be in the degree of alternative refinement and in the degree to which cost components are developed.

Cost estimates for screening alternatives typically will be based on a variety of cost-estimating data. Bases for screening cost estimates may include cost curves, generic unit costs, vendor information, conventional cost-estimating guides, and prior similar estimates as modified by site-specific information.

Prior estimates, site-cost experience, and good engineering judgments are needed to identify those unique items in each alternative that will control these comparative estimates. Cost estimates for items common to all alternatives or indirect costs (engineering, financial, supervision, outside contractor support, contingencies) do not normally warrant

**4-24**

Exhibit 46
6594

4 - 25



**Figure 4-8.** Relationship of Screening Criteria to the Nine Evaluation Criteria.

Exhibit 46
6595

substantial effort during the alternative screening phase.

Both capital and O&M costs should be considered, where appropriate, during the screening of alternatives. The evaluation should include those O&M costs that will be incurred for as long as necessary, even after the initial remedial action is complete. In addition, potential future remedial action costs should be considered during alternative screening to the extent they can be defined. Present worth analyses should be used during alternative screening to evaluate expenditures that occur over different time periods. By discounting all costs to a common base year, the costs for different remedial action alternatives can be compared on the basis of a single figure for each alternative.

A more detailed discussion of cost evaluations is presented in Chapter 6.

### 4.3.2.4   Innovative Technologies

Technologies are classified as innovative if they are developed fully but lack sufficient cost or performance data for routine use at Superfund sites. In many cases, it will not be possible to evaluate alternatives incorporating innovative technologies on the same basis as available technologies, because insufficient data exist on innovative technologies. If treatability testing is being considered to better evaluate an innovative technology, the decision to conduct a test should be made as early in the process as possible to avoid delays in the RI/FS schedule.

Innovative technologies would normally be carried through the screening phase if there were reason to believe that the innovative technology would offer significant advantages. These advantages may be in the form of better treatment performance or implementability, fewer adverse impacts than other available approaches, or lower costs for similar levels of performance. A "reasonable belief" exists if indications from other full-scale applications under similar circumstances or from bench-scale or pilot-scale treatability testing supports the expected advantages.

### 4.3.3   Alternative Screening

### 4.3.3.1   Guidelines for Screening

Alternatives with the most favorable composite evaluation of all factors should be retained for further consideration during the detailed analysis. Alternatives selected for further evaluation should, where practicable, preserve the range of treatment and containment technologies initially developed. It is not a requirement that the entire range of alternatives originally developed be preserved if all alternatives in

a portion of the range do not represent distinct viable options.

The target number of alternatives to be carried through screening should be set by the project manager and the lead agency on a site-specific basis. It is expected that the typical target number of alternatives carried through screening (including containment and no-action alternatives) usually should not exceed 10. Fewer alternatives should be carried through screening, if possible, while adequately preserving the range of remedies. If the alternatives being screened are still medium-specific and do not address the entire site or operable unit, the number of alternatives retained for each specific medium should be considerably less than 10.

### 4.3.3.2   Selection of Alternatives for Detailed Analysis

Once the evaluation has been conducted for each of the alternatives, the lead agency and its contractor should meet with the support agency to discuss each of the alternatives being considered. This meeting does not correspond to a formal quality control review stage but provides the lead agency and its contractor with input from the support agency and serves as a forum for updating the support agency with the current direction of the FS.

The alternatives recommended for further consideration should be agreed upon at this meeting so that documentation of the results of alternative screening is complete; any additional investigations that may be necessary are identified; and the detailed analysis can commence.

Unselected alternatives may be reconsidered at a later step in the detailed analysis if similar retained alternatives continue to be evaluated favorably or if information is developed that identifies an additional advantage not previously apparent. This provides the flexibility to double check a previous decision or to review variations of alternatives being considered (e.g., consideration of other similar process options). However, it is expected that under most circumstances, once an alternative is screened out it will not be reconsidered for selection.

### 4.3.3.3   Post-screening Tasks

The completion of the screening process leads directly into the detailed analysis and may serve to identify additional investigations that may be needed to adequately evaluate alternatives. To ensure a smooth transition from the screening of alternatives to the detailed analysis, it will be necessary to identify and begin verifying action-specific ARARs and initiate treatability testing (if not done previously) and additional site characterization, as appropriate.

Exhibit 46
6596

Exhibit 46
6597

T



ENSR Consulting and Engineering

December 1991

Document Number 0162-001

# Review of the START Report for the McColl Superfund Site in Fullerton, California

Exhibit 46
6598

**ENSR Consulting and Engineering**

**November 1991**

**Document Number 0162-001**

# Review of the START Report for the McColl Superfund Site in Fullerton, California

Exhibit 46
6599

Review of the START Report

Performed by:
ENSR Consulting and Engineering
Somerset, NJ, 08873

November 1991

Report Authors:

Morris Trichon, Ph.D.
Senior Program Manager

Joyce Feldman
Senior Program Manager

Exhibit 46
6600

# EXECUTIVE SUMMARY

Science Applications International Corporation (SAIC) evaluated on-site incineration as a remedial option for the McColl Superfund Site in Fullerton, California under the Superfund Technical Assistance Response Team (START) Program. The report, developed to address the conceptual feasibility of using incineration to manage hazardous wastes located at the McColl Site and issued in May 1991, concluded that on-site incineration would comply with federal, state and local requirements for this technology. ENSR Consulting and Engineering (ENSR) performed on behalf of Shell Oil Company, Atlantic Richfield Company, Union Oil Company of California, Texaco Refining and Marketing, Inc. and Phillips Petroleum Company (the "Companies"), a critical analysis of the START Report. This review has been performed to determine, in part, whether the use of on-site incineration as a remedial technology can be performed while meeting the regulatory requirements identified in the applicable regulations.

Concerns have previously been raised regarding the application of thermal treatment technologies at the McColl Site, which is located in a residential area of the South Coast Air Basin (SCAB), an area designated by the EPA as nonattainment for nitrogen oxides, ozone, total suspended particulates, and carbon monoxide. The excavation and incineration activities will generate sulfur oxide emissions, particulate emissions and other pollutants. Due to the status of the proposed project as a major new source requiring emissions offsets, and the sulfur oxides and potential particulate matter it will generate, an evaluation of this major new source must also be performed under requirements for the Prevention of Significant Deterioration (PSD).

ENSR's review of the START Report identified four major areas of concern regarding the use of on-site incineration as the technology of choice to address the wastes found at the McColl site:

1) Environmental Compliance Issues
2) Health Risk Assessment Issues
3) Operational Issues
4) Project Duration Issues

Each of these concerns will be summarized and briefly described below. The specific comments and questions raised by the ENSR review follow in the body of this review, with locations in the text cited for reference.

1

Exhibit 46
6601

## 1. Environmental Compliance Issues

Under SARA, all regulatory requirements must be met by a Superfund-mandated remedial action process. Although acquisition of all operating permits is not essential, all regulatory requirements associated with issuance of those permits must be met. ENSR's review of the START Report indicates it is technically challenging, extremely cumbersome and--based on the existing uncertainty associated with this alternative--extremely difficult, if not impossible, to develop a remedial system that will meet all of the technical requirements associated with emissions projected from incineration and associated processes of the McColl waste:

- The physical management of the materials will require resources well beyond those identified and described in the START Report. The excavation, milling, blending, pre-incineration storage and incineration activities identified in the START Report will all result in the generation of particulate matter and gases from the contaminants present in the waste.

- The ability to control the volatile emissions from organic components of the waste, the sulfur-containing emissions, nitrogen oxides, products of incomplete combustion (PICs) and particulates has not been established.

- The PSD Rule has been ignored. The issue of whether Best Available Control Technology (BACT) or Maximum Achievable Control Technology (MACT) can be met cannot be established from the preliminary nature of the START Report. Due to the conceptual approach applied for the START Report, the description of the system fails to provide a level of detail to assure that the permitting process can proceed to successful completion. On the contrary, the results of this approach would indicate the process would not be successful.

- The non-catalytic reduction of nitrogen compounds using ammonia presents issues of (1) storage of ammonia on the site and (2) the potential for creation of an ammonium sulfate plume. This plume would cause visibility problems and potential respiratory problems for both workers and residents.

- The START Report indicated the incineration process alone would generate 719 tons of sulfur dioxide per year. It is unlikely that these offsets are available within the regulatory structure which exists in the SCAB.

2

Exhibit 46
6602

## 2.   Health Risk Assessment Issues

Although it is part of the permitting process, the concerns raised by the START Report regarding risks to the nearby residents and to the general area have not been addressed.  It is generally conceded that the incineration process results in the maximum health impact through the emission of gaseous materials (sulfur dioxide, nitrogen oxides, PICs, and particulates in this case).

- The McColl Site and its surroundings are in southern California, where the lifestyle includes extensive outdoor activities.  For this reason, the modelling performed should include all pathways of exposure, rather than the inhalation pathway only.  The area contains swimming pools, for example, that can accumulate materials deposited after emission from the facility.  Pools used by children are critical to evaluation of health impacts, since children tend to drink the water in which they swim, yielding both a dermal exposure and an ingestion hazard.  Neither deposition nor the associated ingestion pathway have been addressed in the modelling or in the risk assessment.

- No downwash assessment was included in the air modelling performed in the dispersion analysis or the risk analysis; thus, the health effects estimates to the adjacent community are severely underestimated.

- Health impacts from particulates generated by the process activities have not been addressed.  Most of the particulates generated are expected to be less than 10 microns and may even be as fine as 1 micron.  This particle size range is especially easy to inhale and may cause additional respiratory problems locally.

- Modelling also did not include emissions from any of the activities identified at the site beyond the incinerator stack emissions.  In addition to emissions associated with the disturbance of the materials, the blending and milling and the incineration process, diesel emissions will be generated by construction equipment as well as from transport vehicles.  None of these were addressed in the modelling or risk assessment.

- The modelling effort failed to reflect the longer period of operation associated with the need to blend and incinerate the blended volume of material.

3

Exhibit 46
6603

## 3. Operational Issues

The START Report indicates it is theoretically feasible to successfully address all of the issues identified in Items 1 and 2. The operational effort is far more extensive than indicated. Each of the environmental and regulatory requirements identified are interrelated and in solving one problem, additional problems may be created.

- The START Report does not explain how waste disturbance activities will be coordinated or how materials will be moved from one containment structure to the next in the operational chain.

- No working model exists for many of the components of the proposed system. While individual components, such as the respective emissions control devices, may be capable of meeting the control requirements, the cumulative operating capability will probably not be additive to the extent identified.

- A rotary kiln has never been permitted in the SCAQMD, has not demonstrated that it would comply with the SCAQMD's stringent requirements, and has not been demonstrated to be the optimal unit for burning the McColl waste.

- Equipment efficiencies are described very optimistically. While the individual components may reach the levels of control and operational capabilities under optimal conditions, it is seldom the case that these levels are achieved and maintained over long periods of time in the field. Further, the high level of utilization cited is characteristic of a stationary unit normally operating on a continuous basis, not cyclic as proposed for McColl.

- The use of containment structures further complicates the control of emissions. Opening the structures for ingress and egress of vehicular traffic will result in emission releases from the containment structure. In addition, breaks or tears in these structures due to accidents or normal activities will further compromise the security of the containment.

- Multiple incineration systems, with associated control systems, will be required to manage the emissions from the respective containment structures as well as from the waste.

4

Exhibit 46
6604

- Since it is necessary to stage waste feed materials for efficient operation of the incinerator itself, the containment structures and their emission control systems will be operating simultaneously. Associated noise and traffic nuisances will also be present.

## 4. Project Duration Issues

Many factors, in addition to those described above, will contribute to the duration of the project and cause it to be extended far beyond the initially-described one and one-half years.

- It has taken 7 years to permit an incinerator in Ohio which previously demonstrated its applicability for the proposed waste stream. No similar facility has been approved in the SCAQMD; therefore, no estimate on the timing of the approval process is available. Further, no similar demonstration of the technical capabilities of the proposed conceptual system has been performed with the McColl waste. Although a treatability study of selected waste described in the START Report indicated areas for further consideration, completion of that test protocol has not demonstrated either the treatability of the entire waste stream present or the timing requirements for the operation on a large scale.

- The plan to blend the excavated material with "clean" dilution material from offsite, tripling its volume, implicitly assumes that the operating period will be extended by a similar ratio. The volume of residues resulting from this process will similarly increase.

- There is no basis in the START Report for the conclusion that the incinerator could be scaled up to cover blending of the materials (tripling their volume), of ability to handle high sulfur- and high solids-content feed, and of manageability of the volatile compounds contained in the feed.

- Intermittent use of the incinerator equipment will add to the stress on the equipment, especially on the thermally-stressed refractory. As the length of the project is extended during repair periods, other materials with a working life designed to meet the original schedule will require replacement as well. This is especially important for containment barrier materials exposed to external and internal stress.

- During the operations, worker safety requirements will also serve to extend the period of operations. The use of Level B personnel protective equipment will place demands on workers over the prolonged period. It may be necessary to plan for replacement or rotation of workers who are to be in this work environment for extended assignment to prevent accidents due to overtired employees.

Exhibit 46
6605

- The extended period of operation associated with the activities identified above significantly increases the overall costs of the project, from a financial perspective and a societal perspective. The local community will be exposed to both environmental stress and inconvenience associated with traffic, noise and other adverse effects.

In summary, while the technical aspects of managing the McColl Superfund Site wastes are theoretically possible, the actual management of the wastes through on-site incineration have not been addressed to the extent required to assure that the project can, indeed, be accepted by either the regulatory establishment or the local community as the optimal management method. To gain such acceptance would require considerable additional study with associated significant cost and delay. In the end, it remains doubtful that local acceptance could be gained.

6

Exhibit 46
6606

**REVIEW OF START REPORT ON THE**
**EVALUATION OF INCINERATION ALTERNATIVES FOR McCOLL**

**<u>GENERAL COMMENTS</u>**

The following critical analysis of EPA's START Program Special Investigation, authored by SAIC and Cross/Tessitore & Associates (the START Report, dated May, 1991) was performed relative to the current air quality regulations as adopted and enforced by the South Coast Air Quality Management District (SCAQMD). The SCAQMD has been granted authority by the EPA to issue and enforce permits for new and modified sources that emit nonattainment pollutants and their precursors (see 46 FR 5978, January 21, 1981). The South Coast Air Basin (SCAB) is designated nonattainment for nitrogen oxides, ozone (of which volatile organic compounds (VOCs) and nitrogen oxides are precursors), total suspended particulates and carbon monoxide (see 40 CFR, Section 81.305).

The START Report improperly ignores the applicability of EPA's rule covering requirements for Prevention of Significant Deterioration (PSD). This lapse will result in a failure to complete the review requirements identified as part of the normal EPA evaluation process. Further, the SCAQMD lacks authority to issue and enforce PSD permits, which are required for major new or modified sources that emit sulfur oxides ($SO_x$) or particulate matter less than 10 microns ($PM_{10}$) in excess of specific emission thresholds. The proposed incinerator was also reviewed by ENSR relative to EPA's PSD rule (see 40 CFR Section 52.21) for $SO_x$ and $PM_{10}$. Our review has led to the conclusion that the requirements of the SCAB for incremental emissions may not be met.

Our specific comments on the START Report are presented below:

I. Introduction

Page 1, Paragraph 1:

> The assumption made in the START Report is that an incinerator can be designed with the necessary air pollution control (APC) equipment to meet the SCAQMD rules that apply to burning the waste at the McColl site. It is also assumed that the design will be satisfactory to the SCAQMD. This case has not been demonstrated: No hazardous waste facilities for third party use have been successfully sited within the SCAQMD.

7

Exhibit 46
6607

The guidelines for approval of this "conceptual" design have not been identified.  If the SCAQMD had input into the design, it is not shown that the agency agreed to the proposed configuration.  If the SCAQMD "bought into" the limits cited, this also has not been shown. There should be some recognition of concurrence with EPA by SCAQMD.

Finally, it should be noted that the level of information provided within the START Report and other support documents is not at a level of detail that would allow acceptance of the information in support of a permit application for construction of a hazardous waste facility in the SCAB, nor is the information adequate to assume or conclude that, if additional information were provided, a permit would be forthcoming.  The protocol for Superfund remediation projects normally requires that, although specific permit acquisition is not required, the _equivalent_ procedures must be followed and all offsite impacts must be equivalent to those required under applicable regulations.

Page 1, Paragraph 3:

"The incinerator configurations in the START Report are conceptual in nature and are in response to either regulatory requirement or good engineering judgement.  They are not a substitute for more and better treatability data, nor do they represent even a preliminary design."

The intent of this paragraph is unclear.  The suggestions made in the remainder of the START Report are apparently not in response to regulatory requirements.  Yet, the statement frames an important concept:  Under the system description, it appears as if the detailed preliminary design activities were carried out.  In fact, in order to demonstrate compliance with applicable regulations, this level of design is necessary.  However, in other areas of the START Report, it is not apparent that a commitment has been made to this level of detail. Indeed, at several points in the START Report there is a stress on the "conceptual" nature of the information.  The default to conceptual design precludes the presentation of detailed screening assessments of emissions or associated risk projections.  It is this information that is essential to the acceptance of the project by both the SCAQMD and the local community. The information on emission of pollutants from the entire project must be made available in order to develop the input data for the risk assessment, discussed in the ENSR evaluation of Section VI, Estimated Emissions.

Exhibit 46
6608

It is common experience in current permitting protocols that a waste burned of any type will not be approved unless there are, as part of the permit application package, a preliminary design of the unit and its APC system. It is also necessary that vendors and their respective guarantees for the unit be presented in the application package, with agreements signed prior to issuance of any permits to construct. To this end, there seems to be a major inconsistency in the START Report concerning the level of detail that exists for the proposed incineration system.

The specifications for performance and design have been set in the START Report. In addition, actual APC equipment types (e.g., Calvert) have been identified, if not selected. The assumption that a rotary kiln is the best unit by comparison is correct, since this is the device most frequently utilized for "dirt burning" or other applications requiring the tumbling effect needed to optimize exposed area. It is not valid, however, to assume that this type of system could effectively accept and burn this type of waste. There should be a statement of justification for use of the rotary kiln as the facility of choice. This statement should include some reference to an existing system operating at a level of performance reflective of the projections assumed for this unit.

The assumed volume of material (97,100 cubic yards) is not supported (except by reference to other reports). The START Report appears to question the cited level of sulfur concentrations reported (14 to 17%) which makes the volume estimate even more tenuous. For this and other reasons identified later in this review, this makes the assumption of a 1.0- to 1.4-year completion schedule highly suspect. This schedule assumes 80% on-line performance for the system as yet undesigned and untried. To date, there do not appear to be any similar systems burning similar wastes anywhere in the United States. While a treatability study would help to clarify this question, the information presented here does not present sufficient promise to justify this next step.

If one reviews hazardous waste incineration projects such as the facility in East Liverpool, Ohio, it has been more than seven years since the permit applications were submitted. That system has already been constructed and operated in other areas of the U.S. and the world. Yet, as a concept and as an actual design in operation elsewhere, with an established "track record" it has yet to be accepted for construction. To date, obstacles have included obtaining an approved permit and overcoming public opposition. In comparison, it is difficult to envision the purely "conceptual" design presented for the McColl wastes being accepted and eventually built or operated.

Exhibit 46
6609

Assuming that acceptance is possible, it is feasible to consider a 20-ton per hour unit.  It is unlikely, however, that this amount of waste can be processed, given the restrictions (identified later) regarding excavation and blending requirements [see comment on page 8].  It is unrealistic to assume that from the design to permit approval to construction, startup, and shakedown through waste incineration and demobilization will occur in less than ten years.  A shorter period is highly questionable since there is no working model for this type of proposed system.

In addition, paragraph 3 states that the incinerator design is conceptual.  It appears that flow rates and emission rates estimated for conceptual purposes were drawn from some experience base that is not cited here.  In cases where industrial entities seek approval for preliminary (e.g., "conceptual") designs, sufficient detail must be presented to establish permit limitations and provide accurate emissions estimates.  These limits are then cited as the requirements for the device to be approved for actual use.  Protocols applied for determining the criteria and parameters applied are not defined here.  The question also arises as to whether or what guarantees can be sought from the vendors that successfully bid the project.

## II.  Waste Characterization

Page 2, Paragraph 2:

It is unclear whether the "average" values were calculated based only on the measurements where some concentration of the respective contaminant was identified above a detection limit or whether a default value equal to the lower detection limit of the test method was used.  The result of this level of uncertainty is that any estimates for requisite blending to control $SO_2$ emissions during the incineration process will become suspect for two reasons: (1) the lack of definition of additional material that will be fed into the incinerator and (2) the resulting time requirements for the incinerator to handle this additional material.

Tables 1 through 4:

The presentation of data is not relevant to the estimates on which the time of incineration, and therefore of the project, are based.  The actual metals concentration of the waste and the level of blending needed to develop a waste stream that can be incinerated in the "conceptual" device in a manner that will produce acceptable emissions of trace metals is the issue that must be addressed.  (See further discussion in Section IV of these comments.)

10

Exhibit 46
6610

The logistics of the blending operation to achieve a balance of low concentrations of sulfur must be examined carefully. Given the range of sulfur concentrations and the acknowledged emission of mercaptans (and other sulfur-containing volatile compounds), it is to be expected that all excavation activities will require containment. Each of the respective activities that involve removal of materials, milling, storage and transfer, and placement into the incinerator will generate "puff" releases of volatile materials. Therefore, all activities, including storing prior to blending and the blending operation itself will need to be shown to be effectively and efficiently performed to minimize the release of volatiles and to control those that are released.

The ability to control fugitive emissions under the design described is in question: Emissions generated from the excavation activities will require "flaring" to react the reduced sulfur compounds; this activity will, in turn, require additional APC devices. Without APC devices, flaring will lead to elevated $SO_2$ levels that will exceed the SCAQMD limits. The waste excavation activity alone will therefore require both containment and scrubbers separate from the incinerator. This requirement serves to complicate both the logistics and the emissions control activities for the site, with associated increases in cost. Blending and incineration activities in separate containment structures must be planned for the activities described to allow the complete incineration of the waste. The impact of this action has not been included in considerations of the planning process. Transporting these emissions from the respective positions of the excavation structure to the APC poses significant problems in controlling the emissions.

Page 7, Table 5:

There seems to be some question that the $CH_2M$-Hill estimate of 14 to 17% "maximum" sulfur concentration reported is valid. The word "if" raises this question. Further, the range cited raises questions on the amount of blending that may be required to bring the average acceptable sulfur concentration (5.4%, a value selected by EPA to assure compliance with SCAQMD requirements for sulfur emissions, based on 98.5% $SO_2$ removal efficiency) to the waste feed. In order to achieve an average concentration of 5.4%, it will be necessary to blend three volumes of sulfur-free material with each volume of material at the maximum levels found on-site. This will consequently increase the total volume of material to be fed into the incinerator and will likely increase the total time required for incineration of the materials on the McColl site by a factor of up to three. The management of elevated sulfur concentrations in the waste materials by dilution will result in a doubling or tripling of the total volume of materials fed to the incinerator. The dilution materials will need to be brought in from off-site. Additional transport vehicles will be needed, with the associated

noise and intrusion into the neighborhood. The processing of the total volume of diluted waste, in turn, will require far more materials for the incinerator bed and APC system.

It is not clear how the concentrations will be established prior to insertion into the unit. If chemical analyses are to be performed routinely on the blended waste feed before its introduction into the incinerator, it is not shown how this step will impact operations. If the assumption is made that these concentrations can be balanced to a level that will assure that the $SO_2$ emission levels will meet the SCAQMD limits, this also has not been indicated.

III. SCAQMD Rules and Regulations Analysis

Page 7, Paragraph 2:

The statement is made that "downwash may have to be considered." Indeed, to perform the necessary complete and accurate analysis of air impacts required as input for the health risk assessment, a downwash analysis must be performed to demonstrate what the most realistic impacts are for this proposed facility.

The last statement in this paragraph says "This would impact ground level concentrations and make the modelling demonstration more difficult." This statement seems to imply that downwash considerations should be avoided in the calculations because they are difficult to address. Considering downwash will not make modelling more difficult; indeed, downwash models exist for addressing these conditions. Downwash analysis is performed regularly in dispersion analysis studies. However, it may well project increases in ground level concentrations and may make it more difficult to gain acceptance for the incinerator. Further, the "difficulties" will only present a problem if the $SO_2$ and other emitted compounds are not sufficiently scrubbed from the waste gas stream.

The application of downwash will increase ambient air impact predictions as reported in Table 11 on page 19 of the START investigation. In addition, the increase in impact will result in higher risk to exposed individuals for those levels reported in Table 12 and will make it more difficult to achieve permitting requirements. The fact that risk levels of this magnitude have been calculated without considering downwash would lead one to conclude that incineration should be abandoned at this point.

Exhibit 46
6612

Page 8, Table 6:

It is unclear how the use of natural gas supplemental fuel will control $SO_2$ emissions. While the use of natural gas instead of sulfur-containing fuels may help to keep the levels of $SO_2$ from rising, the use of natural gas will not reduce the levels of the gaseous emissions attributable to the waste.

Table 6 also contains the notation that the limit for particulate matter is 0.002 gr/DSCF. Compliance with this limit is not established anywhere in the document, even with the use of HEPA filters as BACT. In fact, the START Report states that it may be difficult to control particulate emissions to that level. Based on available test data (from the California Air Resources Board, among others,) this appears to be correct.

Page 8, Paragraph 1:

The use of lime spray drying with a fabric filter is not shown to control $SO_2$ to the levels assumed for the conceptual design presented here. The START Report indicates that a removal efficiency of 98.5% will be required to meet the $SO_2$ emission limits. Spray dryers, at best, will remove 90% of $SO_2$, as reported by EPA "Municipal Waste Combustors - Background Information for Proposed Standards: Post-Combustion Technology Performance," in its NSPS document for resource recovery facilities.

Page 8, Paragraph 2:

References made to enclosure of an area under excavation in a "mobile structure" under negative pressure that is then vented to a cyclone/secondary combustion chamber (and, hopefully, to a scrubber system as well) raises the question of how "mobile" a system will be necessary. Similarly, the emissions from this combustion process must be vented to a scrubber system as well. This requirement raises the question of how "mobile" a system can be while meeting the restraints of the APC system. If the mobile structure is to be repositioned around the site with a long hose connecting it to the incinerator, other factors must be addressed. These have not been discussed in the START Report. For example, leaks from the vent line leading to the incinerator must be prevented. There is no discussion to indicate that any similar project has ever been attempted. As noted earlier, in order to excavate and blend the materials to assure that excessive concentrations of sulfur-containing and other volatile compounds are not introduced into the system, it will probably be necessary to have a series of these structures. Each structure will, in turn, require its own APC system, which will generate a secondary waste stream in the form of treatment residues removed from the ventilation air.

13

Exhibit 46
6613

This assembly of containment equipment will then affect timing, since workers performing in respirators within containment will require additional breaks; equipment used within the containment structure will require special design (e.g., diesel-operated equipment will also require venting and emissions control; electrical equipment may not possess sufficient power to be used for heavy-duty excavation operations). Further, the excavation operation will not be the only activity requiring containment:  Storage of the excavated material and blending operations will also require containment.

IV.  System Description

Page 9, Paragraph 1:

A waste heat boiler is described as advantageous for reducing exit gas temperatures from the incinerator into the APC equipment.  Neither a source of makeup water nor the disposal of any waste water or its treatment appears to have been considered.  A boiler will add costs and complexity to the system.  Required maintenance will increase the time requirements of the project.   The venting of steam is also a potential nuisance in this residential community.

Page 11, Paragraph 1:

The utilization rate of 80% is generally applied to devices that are already up and operating. Experience seldom proves that initial operating capacity is at this level.  A vendor who will guarantee this level of performance for the period of the project should be identified prior to initiation of the project.

Further, the projected timing does not allow for segregation of the wastes, blending of those with disparate concentrations of sulfur-containing constituents, etc.  Containment structures that can accommodate excavation activities at a rate of 20 tons per hour over this period should be identified.

Paragraph 3 refers to a removal efficiency of 85% for particles in the size range $\geq 10$ $\mu m$. There is no support for this efficiency level.  It is reported that only 65 to 75% control efficiency for particles $\geq 10 \mu m$ is achieved by incinerators (Ref:  Air Pollution Control Equipment Selection and Design, Operation and Maintenance, Theodore, Buonicore, Editors, Prentice-Hall, Inc. 1982).  This may be due to the lower density of the dust for incinerator fly ash than for process particulate emissions. It appears that the START Report is overly optimistic in predicting the day-to-day operational efficiency of the proposed APC equipment.

14

Exhibit 46
6614

Page 12, Table 8:

Table 8 indicates that some level of design (beyond a conceptual level) was performed for this project. The level of detail provided in the estimates indicates that a specific model has been used for estimating the capabilities of the system. This is in conflict with the statement in the beginning of the START Report that only a conceptual design exists for this system.

Page 12 (SNCR):

The assumption that removal efficiency of 50 to 60% is achieved may be an overestimate. According to "Municipal Combustors - Background information for Proposed Standards: Control of $NO_x$ Emissions" EPA-450/3/89-27d, there is only limited operating experience for thermal DeNO$_x$. Therefore reliable data are not available. Goals of 50 to 60% removal are achieved for short-term testing durations under close to ideal conditions. The efficiency of thermal DeNO$_x$ varies greatly with temperature as well. The variability of the combustion characteristics of the McColl waste makes the performance of SNCR unpredictable. No experience currently exists to establish that a system to control $NO_x$ emissions will perform to SCAQMD specifications burning the type and variation of waste that exists on the McColl site. Without this experience, it is unlikely that a vendor will be prepared to provide guarantees for a specific level of removal. Therefore, any claim for $NO_x$ control for this specific application will be made on a "best guess" basis.

Selective Non-Catalytic Reduction (SNCR) also has the potential of ammonia slip, especially due to the temperature variations possible due to the variability of waste constituents and their associated variable characteristics.

Page 12 (Waste Heat Boiler):

Drying the waste may accelerate the emission of volatile compounds. The flares on the mobile containment structures and the APC devices must be shown to be capable of managing these emissions as well as others. Release of emissions to the atmosphere must be controlled through scrubbers. Control of these emissions has not been established, or even considered as part of the emissions projections.

15

Exhibit 46
6615

**Pages 12 & 13 (Spray Dryer & Fabric Filter):**

If temperature conditions are optimal and the waste gas stream is homogeneous, then 90% $SO_2$ removal can be achieved with a dry scrubber/fabric filter. However, the temperature of gas entering the scrubber must be below 300°F. As the temperature approaches that point, removal efficiencies have been shown to fall to 35%. The START Report does not address this sensitivity and does not establish the temperature of the waste gas exiting the boiler.

The 90% removal efficiency was not demonstrated to be continuous, and fell more often into the 70% range. It is unlikely that a vendor will guarantee compliance with removal efficiencies of ≥90% for a dry scrubber/fabric filter system for an incinerator burning McColl waste.

Again, the variable character of the McColl waste and its related combustion characteristics will make it difficult to keep the temperature constant with time. Further, the high levels of $SO_2$ removal expected for the dry scrubber also require stoichiometric levels of lime for the predicted levels of sulfur. Considering the high levels of sulfur in the waste stream, the quality of sulfur needed may be considerable for both the incinerator and the excavation control.

The START Report states that the $SO_2$ removal efficiency for the spray dryer is listed as 70%. Additional removal efficiency of 15% by the fabric filter raises this level to 75% (.70 + (.15 x .30)). It is not clear by our calculations how the additional 23% removal will be achieved to meet the 98.5% total $SO_2$ removal requirement stated in the START conclusions.

**Page 13, Table 9:**

It is not clear what the loading of $SO_2$ is that permitted a removal efficiency of 98 to 99%. Will Calvert guarantee 97% removal efficiency? Typical $SO_2$ removal efficiencies are a function of the $SO_2$ partial pressure in the waste gas stream at the point of application of the wet scrubber, the $SO_2$ partial pressure will be reduced, resulting in the reduction of scrubber removal efficiency.

Exhibit 46
6616

Page 14 (HEPA Filter):

This paragraph acknowledges the problems associated with the use of a HEPA filter system. Later discussions (e.g., page 17) note that for many of these reasons, the system does not include the HEPA filters. The emissions reduction credit is included in the presentation of data on Table 10 (SCAQMD System), yet the first paragraph on page 17 says that "the proposed system does not include the HEPA equipment." It appears, however, that credit is taken for application of HEPA equipment in the emissions estimates. The START Report is inconsistent on this issue (see p. 17). The addition of a HEPA system can, indeed, increase the particulate removal efficiency of the system. However, the addition of this APC equipment to the overall system configuration will increase the cost as well as result in additional potential "down time" during repair and replacement activities associated with its use.

Page 14 (Treatment Costs):

Paragraph 2 describes a contract that would be negotiated between the parties involved and provides estimates on the costs associated with the remedial activity. The cost figures cited do not match the figures presented in this paragraph:

If a cost of $36,329,000 is allocated for treatment of 97,100 cubic yards of materials, the cost should be

$$\frac{\$36,329,000}{97,100 \text{ ton}}, \text{ or } \$374/\text{ton, rather than the figure of } \$249 \text{ cited.}$$

The cost shown in the START Report is $249/ton. Allowing for a 5% increase due to inflation, the correct figure should be approximately $300/ton in 1991 dollars. If the higher figure is used, this translates to a cost of approximately $450/ton with a 5% inflation rate.

In either case, the cost will be significantly higher than shown in the START Report, since these figures do not apparently include the cost for excavation, blending, and other pre-treatment activities. The discussion in paragraph 3 of this section does not address these issues. The costs cited also do not include the cost of erection of the mobile covers required to prevent fugitive emissions during excavation activities, nor is any discussion presented on the costs of managing the residues remaining from the incineration treatment activities.

17

Exhibit 46
6617

## V.  System Performance and Operational Considerations

Page 14, Paragraph 1:

Standard engineering practice is a moving target in terms of incineration.  What is standard in terms of equipment and operational specifications is constantly changing as a result of ever increasing requirements in environmental laws and regulations.  To this end, BACT driven analyses has resulted in changes to both incinerator system design and operation and APC design and operation.  This has resulted in ever decreasing stack emissions and more stringent operating conditions from one project to the next.

Page 16, Paragraph 3:

Since there is "concern about waste heat boiler deposition, fouling and perhaps short-term corrosion," these considerations should be included in estimating both the cost of managing the incineration project and the timing of the completion of this activity.  This should be balanced with the "lower overall flue gas volume from the oxygen enriched system" discussed in paragraph 4.  This reduction in volume of flue gas will reduce the volume of air included in the emissions and will effectively increase the concentrations of pollutants included in the emissions from the system.  It is not clear which of these systems has been conceptually applied to determine the gas throughput of the system for purposes of risk screening.  However, any increase in concentrations will affect the risk assessment by increasing associated risks.

Paragraph 4 attempts to address $SO_2$ loading, yet cites "normal rules of thumb" for a concentration that admittedly "far exceeds" the normal levels handled by lime spray dryers.  This is clearly a case where default values or rules of thumb are inappropriate:  "Rules of thumb" should not be applied outside the accepted envelope where the concept has been tested.

## VI.  Estimated Emissions

Page 17, Paragraph 1:

The assumption that the emissions for $SO_2$ and Particulates were based on overall projected performance is not valid.  These numbers have to be verified.  It is also not appropriate to assume that the APC equipment will operate at maximum capabilities which the overall pollutant removal efficiencies used in the START Report reflect.

It is also not valid to assume that $NO_x$ emissions will comply with SCAQMD standards. There is no basis for this argument.

Page 17, Paragraphs 2 & 3:

The assumptions made for control of the metals emissions is questionable. In research conducted by the U.S. EPA 18% to 38% of the arsenic in the waste stream that was fed into the test incinerator was not recovered in the out put streams. EPA assumed that the unaccounted for metal partitioned in the same manner that the metal that was recovered. This is a highly questionable assumption, particularly when the central issue is the possible resultant health risk assessment and substantial potential impacts to public health.

Page 18 (Ambient Concentrations):

Ambient air concentrations calculations were made using the Screen model for comparison with the NAAQS. The mixing height used in Screen is for neutral and unstable conditions. The Los Angeles Basin Area is known for its inversions, which result from very stable atmospheric conditions and prevent the plume from rising to its potentially maximum elevation (that which would be reached under neutral conditions). In order to compensate for this condition, the mixing height used in the program should have been set to 1 meter above the stack height. The effects of considering this more realistic stability situation would result in higher ambient impacts of the stack emissions. It would have been more appropriate in this situation to use real meteorological data and the ISCST and ISCLT models. All of this would increase the risk above acceptable levels based on results of the screening analysis.

It was also inappropriate not to use a downwash mode as well as the complex terrain option.

While the incinerator system has only been conceptualized, as stated on the first page of the START Report, it was also determined in the START Report that the selected control method for $SO_2$ will be a dry scrubber/fabric filter configuration. Due to the high levels of $SO_2$ expected in the stack emissions, a considerable quantity of lime will be required to make the spray dryer effective. This requirement will result in the need for a large silo adjacent to the incinerator. In addition, the silo will require lime dust control (with its own bag house) usually erected on top of the silo. This configuration will result in a structure of significant height, adding to the building downwash. It should be considered in the modelling effort for the unit.

Exhibit 46
6619

The complex terrain option should also have been used for modelling. This area is hilly and dictates the requirement that the terrain be considered in selection of modelling constraints.

The modelling corrections required will also affect the risk analysis that was performed by significantly increasing the risk to the maximum exposed individual (MEI).

The Screen model does not offer options for deposition analysis. This is important if the risk analysis is to be complete and accurate. Experience indicates that deposition and resulting ingestion of hazardous materials result in greater risk to MEIs than inhalation. The risk analysis performed for the START Report includes only the inhalation pathway.

It also must be determined if SCAQMD will accept Screen as a valid analysis tool for this situation.

Page 20 (Risk Analysis):

It is not valid to perform a risk analysis only for the inhalation pathway when considering the impact of an incinerator. Although inhalation is considered a major pathway for incinerator emissions, the fact that the operation will occur in a residential area leads to the requirement that all impacts be considered; e.g., residential pools may serve to receive and increase the possibility for both dermal exposure and ingestion from the deposition of particulate emissions.

Experience has shown that the deposition portion of the emission impacts through the ingestion pathway will result in the greatest risk. When combined with the conclusions of the modelling review, this information indicates that an accurate and refined analysis will yield a far higher level of both ambient impacts and resultant risk.

The SCAQMD requires a multiple pathway health risk assessment for air emissions sources. The exposure is required to be calculated for a 70 year period for each exposure pathway for all emissions with potential carcinogenic effects.

The resulting conclusion is that this risk analysis does not serve any constructive purpose, cannot be considered reflective of the conditions that would result from the operation of the proposed incinerator, and should therefore be dismissed as insufficiently definitive to apply to this effort.

Exhibit 46
6620

**APPENDIX**

**Assessment of the Specific Incineration System for Potential Compliance
with Environmental Requirements**

1. <u>EPA PSD Requirements</u>

The START Report contains no analysis of the applicability of PSD to the proposed incinerator.
Under worst case configuration, the incinerator is estimated to release 164.16 lb/hr $SO_x$.  If
operated on a continuous basis, this translates to 719 tons/year (see START Report, Table 10).
As such, the new incinerator would be a major source of $SO_2$, and subject to PSD.  Under EPA's
PSD rule, the following analyses and requirements would apply:

- <u>Best Available Control Technology (BACT) (see 52.21(j))</u>.  BACT will be required to
  reduce emissions of $SO_2$, arsenic and benzene (see 52.21(b)(21)(ii)).  BACT is
  determined on a case-by-case basis, and under the "Top-Down" BACT principal, is
  interpreted by EPA to mean the most stringent emission limitation that is economically
  feasible, and achieved in practice for a similar source.  The START Report presents no
  such BACT analysis for these three pollutants.  These BACT analyses would likely result
  in the identification of additional process controls to reduce $SO_2$ emissions.

- <u>Ambient Air Quality Impact Modeling and Increment Consumption Analysis (52.21(k))</u>.
  Detailed ambient air quality modeling will have to be prepared to demonstrate that
  national ambient air quality standards for $SO_2$, and applicable increments, will not be
  violated.  Based on the modeling performed for the START Report, violations of both
  the $SO_2$ ambient air quality standards and the maximum allowable increments are
  predicted.  Notably, this screening analysis is not acceptable as it <u>underestimates</u> the
  increment consumption of the project.  The modeling analysis does not account for the
  portion of $SO_2$ increments consumed by other sources after the baseline date or
  existing ambient concentrations of $SO_2$.  Further, this modeling analysis must consider
  not only the emissions from the incinerator, but other pollution sources necessary to
  support the incinerator (e.g., soil excavation equipment, fugitive dust, etc.).

- <u>Results of Modelling Evaluations.</u>  The modeling performed in the START Report
  assumes source contribution only from the proposed incinerator.  Under the EPA's PSD
  regulations, a PSD permit for the incinerator would be denied if this modeling analysis
  predicts violations of either the maximum increment or ambient air quality standards
  unless sufficient emission reductions are provided to reduce ambient impacts below

21

Exhibit 46
6621

these levels.  EPA PSD regulations do not restrict the location of potential offsets to areas "upwind," as does the South Coast Air Quality Management District New Source Review Regulations.   However, if required, these offsets must be sufficient to demonstrate, through ambient air quality dispersion analyses, that potential violations of both ambient air quality standards and increments are mitigated.  Based on the screening analysis prepared for the START Report, the project cannot be permitted unless sufficient offsets are provided.  As noted in the START Report, $SO_2$ offsets in the SCAQMD are rare and if available, very costly (approximately $15,000 - $25,000/ton).

- Additional Impact Analysis (see 52.21(o)). An analysis on the impairment to visibility, soils and vegetation as a result of the project must be prepared.  If nonselective catalytic reduction is used to mitigate $NO_x$ emissions, EPA would likely require a visibility impact analysis of the secondary particulates formed from the emissions of ammonia from the incinerator.  The START Report presents no such analysis or screening. Further, an analysis on the impact to soils and vegetation must be prepared if such soil or vegetation has commercial value.

Without performing these additional impact analyses, ENSR cannot predict the potential impact of the proposed source's emissions on visibility, soils, and vegetation.  Based on past analyses performed on the potential visibility impact of ammonia slip from Selective Catalytic Reduction, there is the potential for significant increases in degradation of visibility due to secondary particulate formation.  This impact, however, may not be perceptible.  Such an analysis may indicate to regulatory authorities that more stringent ammonia slip control is required.

2.  South Coast Air Quality Management SCAQMD Regulations

Each of the SCAQMD regulations that applies to the proposed incinerator is examined in turn below.  Regulations are listed in order of relative impact on the proposed project.

**Rule 1401 - New Source Review of Carcinogenic Air Contaminants**

A "cursory, screening-level risk assessment" was conducted for the START Report to estimate the increased cancer risk associated with the McColl incinerator.  This analysis understates the potential carcinogenic impact of the incinerator and would not be accepted by the SCAQMD as demonstrating compliance with Rule 1401. Based on the emission levels presented (see START Report, Table 12), the SCAQMD's significant risk threshold (without BACT) of one increased cancer in one million people exposed over a 70-year period will be exceeded by the McColl incinerator.  (Under Rule 1401, facilities that operate less than a 70-year period must still demonstrate compliance with potential increased cancer risk normalized to this 70-year time

22

Exhibit 46
6622

frame.)  This increased cancer risk analysis is based on a risk screening calculation.  This screening, however, indicates that a refined health risk analysis is required before the START Report can conclude that the proposed remediation technology complies with District Rule 1401. Under Rule 1401, a unit may be permitted if installed with toxics BACT and the excess cancer risk is less than ten in one million.

### a.   Air Toxic Compounds and Emission Rates

The START Report presents no engineering estimate to support the emission levels cited in here. Therefore, ENSR cannot gauge the accuracy of these emissions data.  Notably, the START Report screening protocol incorrectly limits the health impact analysis to those carcinogenic compounds emitted from the incinerator.  The screening analysis does not address the potential formation of polycyclic aromatic hydrocarbons in the incinerator exhaust stream or carcinogens released in the excavation of soil or handling of waste at the site.  The SCAQMD's guidelines require the health risk analysis to include other sources which are located within 100 meters of the incinerator, and which have been permitted since June 1, 1990 (e.g., soil excavation, other internal combustion sources, fugitive emissions).  Therefore, the START analysis incorrectly limits the scope of the health risk assessment.

### b.   Health Risk Assessment Assumptions

The screening assessment also assumes the only pathway of concern is inhalation.  This directly conflicts with applicable California EPA, California Air Resources Board (ARB) and SCAQMD guidance.  A multi-pathway assessment is required to assess the potential health impact of arsenic, chromium (VI) and nickel.  To assess potential health risks from the non-inhalation exposure pathways for arsenic, the SCAQMD provides a specific multipathway adjustment factor (see Procedures for Preparing Health Risk Assessments to Comply with Air Toxic Rules of the South Coast Air Quality Management SCAQMD, April, 1991; note that the SCAQMD suggests a refined assessment should be used if multipathway adjustment factors are not available).  For the other two pollutants, in the facility prioritization phase of the statewide air toxics program (AB 2588), local air districts generally use a factor of 10 to adjust facility risk prioritization/ranking scores to account for multi-pathway effects.  ENSR has used these agency-approved assumptions in reviewing the START assessment.

The screening analysis uses accepted EPA unit risk factors for chromium (VI).  However, the SCAQMD requires that $1.46 \times 10^{-1}$ $(m^3/\mu g)^{-1}$ be used rather than the value included in the START Report risk screening.  Similarly, the SCAQMD may not accept the unit risk factor used in the START Report screening analysis for arsenic; the SCAQMD-approved value for arsenic is $3.3 \times 10^{-3}$.

Exhibit 46
6623

c.   Regulatory Requirements

ENSR did not conduct a revised risk screening analysis.  However, using data presented in the START Report, which improperly understate the relative health risk posed by an incinerator, the incinerator is estimated to cause an increased cancer risk greater than 2.6 in one million exposed, and would trigger T-BACT (see 1401).  Under the SCAQMD's rule, T-BACT, which is determined on a case-by-case basis, represents the most stringent emissions limitation or control technique that has been achieved in practice or is determined by the SCAQMD to be feasible.  No such T-BACT analysis is presented in the START Report.

d.   Practical Considerations

The analysis in the START Report makes no mention of the vigorous public opposition that will almost certainly result if an incinerator is proposed at the McColl Superfund site.  To place this potential opposition in perspective, the SCAQMD has issued permits for waste incinerators, however, these projects were challenged by public interest groups and have yet to be built.  To our knowledge, no major hazardous waste incinerator designed to process third party wastes has been permitted, or if permitted, commenced construction within the SCAQMD over the last four years.  The practical difficulty associated with permitting the incinerator must be considered when evaluating project alternatives.

**SCAQMD Regulation XIII - New Source Review**

The START Report correctly states that any net emissions increase of particulates, oxides of sulfur and nitrogen, carbon monoxide and volatile organic compounds will trigger control technology requirements (Rule 1303(a)), and will trigger emission offset requirements (1303(b)(2)).  However, the START Report fails to discuss the SCAQMD's ambient air quality impact requirements (see Rule 1303(b)(1)).  These requirements are addressed in turn below.

a.   Control Technology Requirements

Based on the emission levels cited in the START Report, Best Available Control Technology (BACT) will be required to reduce emissions of VOCs, nitrogen oxides, $SO_2$, carbon monoxide and particulate matter, as stated (see Table 6 of START Report) (see Rule 1303 (a)).  The SCAQMD maintains an engineering guideline (Best Available Control Technology Guidelines, SCAQMD), which is periodically updated and used as a guide when selecting the appropriate level of control as BACT.  We note, however, that this guideline is not binding on either the SCAQMD or applicants.  A full control technology evaluation is often necessary to be included as part of a permit application for a significant project such as a hazardous waste incinerator.

Exhibit 46
6624

The review of such applicable controls contained in the START Report is insufficient to support the proposed controls suggested in the report. At a minimum, selective catalytic reduction should be evaluated as BACT for $NO_x$. SCR is routinely required on new or modified combustion sources that trigger District New Source Review requirements.

### b. Emission Offsets

As discussed above, $SO_2$ offsets will be required to reduce the ambient impact of sulfur emissions from the incinerator below maximum ambient air quality standards and increments. Additional offsets will also be required (at a ratio of 1.2:1) to offset emissions of particulate matter, nitrogen oxides and VOCs. Additional offsets may also be required to reduce the facility's "New Source Review (NSR) Balance" to zero. The NSR balance represents the net emission increases from permitted equipment since October 8, 1976 at the facility. No discussion of the NSR balance for the facility is presented. No detailed quantification of the net emissions increase from the incinerator and related operations is provided in the START Report. Finally, no discussion of the availability or cost of these offsets is presented in the START Report. The SCAQMD limits the location of emission reduction credits which can be used to offset emissions under the New Source Review rule to certain areas relative to a source location (see Rule 1303, Appendix B); no mention is made of this fact in the START Report. As a practical matter, offsets are rare, and if available, expensive. The costs of offsets, if available, generally parallel the cost of BACT ($/ton). Unless sufficient offsets are provided, the incinerator will not be allowed to operate. ENSR cannot determine to what extent sufficient offsets are available to comply with Regulation XIII without conducting a detailed emission offset search. While the District has issued Emission Reduction Credits to sources within the Basin that would satisfy offset requirements, we cannot determine whether the owner of these Emission Reduction Credits are willing to sell them to third parties.

### c. Maximum Ambient Impacts

The air quality impact analysis performed to support estimated maximum ambient concentrations due to emissions from the proposed incinerator does not meet minimum SCAQMD or EPA requirements. The START Report fails to consider existing ambient concentrations of individual criteria pollutants, improperly limits potential emission sources to the incinerator itself, and does not address potential downwash eddy effects from the incinerator. Therefore, the START Report screening analysis understates ambient concentrations that could result from the construction and operation of the incinerator.

Even though the START Report understates ambient impacts, it can still be used to gauge
compliance with SCAQMD regulations.  Under the SCAQMD's New Source Review rule, new or
modified sources cannot increase ambient concentrations in excess of "significant change in air
quality concentration" (see Table A-2, Rule 1303(b)(1)).  These values are presented below:

| Air Contaminant | Averaging Time | Maximum Significant Change | |
|---|---|---|---|
| Nitrogen Dioxide | 1-hour | 1 pphm | $(20 \mu g/m^3)$ |
| | Annual | 0.05 pphm | $(1\ \mu g/m^3)$ |
| Carbon Monoxide | 1-hour | 1 ppm | |
| | 8-hour | 0.45 ppm | |

Additional standards are provided for sulfate and PM-10.  The analysis summarized on Table 11
of the START Report indicates that each of these maximum significant change levels cited above
will be exceeded.  The START Report makes no mention of this fact.  Under Rule 1303(b)(1), an
applicant for a new or modified source must demonstrate through modeling or other analysis
approved by the District that the new facility or modification will not cause an increase in excess
of the values summarized above.  Therefore, the emission offsets that will be required as
prerequisite to operating the incinerator must be sufficient to reduce the net increase in ambient
concentrations of nitrogen dioxide, carbon monoxide, sulfates, and $PM_{10}$ below these thresholds
listed above.  To demonstrate compliance with this provision, the START Report must contain
ambient air quality impact analyses and then document that emission offsets available proximate
to the proposed incinerator are both necessary and sufficient to reduce ambient air quality
impacts below the thresholds listed above.

3. Other SCAQMD Regulations

Outlined below are other SCAQMD regulations that will apply to the McColl Incinerator project,
which are not mentioned in the START Report:

Rule 1166 - VOC Emissions from Soils.  SCAQMD Rule 1166 is triggered where VOC-
containing soils in excess of 50 ppm are excavated.  Briefly, the SCAQMD will require that
90% vapor control efficiency will be required during excavation/remediation of the soil.  As
discussed above, the carcinogenic health risk due to soil excavation must also be evaluated.

Exhibit 46
6626

Exhibit 46
6627

U



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

December 20, 1991

Mr. David B. Jones
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California  94105

Re:  <u>McColl Superfund Site, Fullerton, California</u>

Dear Dave:

In recent conversations with John Blevins, he indicated the Agency believes the ICF Technology, Inc. ("ICF") October 1991 report entitled "Thermal Destruction Analysis Report" and the October 22, 1991 Letter Report:  McColl Thermal Destruction Alternative (collectively, the "ICF Reports") provide sufficient detail for a feasibility study analysis, detail lacking in the SAIC START Report.  We have completed our initial review of the ICF Reports and continue to have serious concerns regarding the viability of on-site incineration at McColl.  While the ICF Reports do attempt to address the problems posed by on-site incineration in more detail than the SAIC START Report by broadening the scope of facilities that will be necessary if there is any hope of meeting the South Coast Air Quality Management District's ("SCAQMD") strict air quality requirements, they contain no new information regarding the technical feasibility of the operation or emissions control.  Thus, they provide no increased assurance that the operation will work or be cost effective.  Consequently, we continue to believe on-site incineration is not practical, cost effective nor feasible at the McColl Site.

The following issues, most of which were raised in our comments on the START Report, remain outstanding in the ICF Reports:

- Multiple incinerators will be required to maintain a high on-stream factor and to deal with waste characteristics.  Two or more incinerators will be needed for the solids, and at least one gas incinerator will be needed to handle emissions

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL.

Exhibit 46

CG028



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. Dave Jones
December 20, 1991
Page 2

from the multiple containment structures.  It is
doubtful there is sufficient space available at the
Site for these facilities and the necessary air
pollution control equipment.

- The ICF Reports imply that a 100 million btu/hr
incinerator at McColl could be operated 12 hours
per day, 300 days per year, yielding an on-stream
factor in excess of 95%.  With a system of this
complexity, ICF is overly optimistic about the "on
stream factor" and the general performance of this
system.  No allowance has been made in this number
for breakdowns, adjustment for varying waste feed
properties, and normal operations and maintenance
which will result in longer operating times and
higher costs, if even practical.  We believe, at
this point in our analysis, an on-stream factor of
65% is more realistic yielding at least 4.5 years
to complete under EPA Option 1 and 10 years to
complete under EPA Option 2.

- The ICF Reports acknowledge, in several places, and
we concur, that it may not be practicable to
control air emissions within the regulatory
limits.  This is a significant concern, especially
in light of the fact that the emissions projections
included in the ICF Reports, as well as their
control, have been limited to the excavation
enclosure and the incinerator.  The waste
pre-treatment activities will, by their nature,
disturb the materials, thereby leading to even more
emissions which must be controlled.  Moreover,
since not all emissions (_e.g._, those from the
additional containment structures) have been
characterized, a complete human health risk
assessment has not been completed and the risks
posed to the community by the operation remain
unknown.

- The scrubber wastewater and spent activated carbon
from the ICF enhanced emission treatment system
_will add over 50% to the volume of waste that is
generated on-site._  Rather than attaining a



215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. Dave Jones
December 20, 1991
Page 3

significant reduction in volume of the waste, treatment by incineration will <u>increase</u> the volume of waste, a result which is inconsistent with the goals of the Superfund program.

- Because of the broad range of sulfur concentrations, blending will be extremely difficult to control, and we do not believe this is a realistic or practical approach. We believe the sulfur in the tarry materials and asphaltic cement would have to be diluted with low sulfur cement to achieve the desired incinerator input concentrations for sulfur. Approximately 65,000 tons of low sulfur cement would have to be added, more than doubling the volumes of these materials. The results are to increase the processing time approximately 40%, add to the amount of material imported to the site, and increase the ultimate volume of waste to be disposed.

- The necessity of multiple containment structures for the respective operations and the need to move the materials from one containment area to the next have not been characterized. The impact on the schedule, costs and the ability to control fugitive emissions will be significant. While theoretically possible, it is not likely to be practical.

- ICF still has not addressed the issue of noise associated with an excavation and incineration scenario. The ICF Report does not contain information on 24 hour operation of the kiln, ventilation equipment and air pollution control devices needed for each structure. The kiln temperature and rotation must be maintained to minimize damage to the refractory. Further, the complexity of the emission control system does not lend itself to startup and shutdown of operations.

We are under the impression the EPA is reluctant to screen the excavation and on-site incineration alternative from the process because the EPA believes that a great deal of work on this alternative has already been done. What the Agency fails to



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Mr. Dave Jones
December 20, 1991
Page 4

realize is how much work has yet to be done if this alternative
is to be actively considered. The work done to date has
demonstrated that on-site incineration is not a viable
alternative for McColl. All of the issues outlined above remain
outstanding and present serious implementation questions.
Addressing these issues will require significantly more work by
the Agency and we believe that despite such work, most of the
issues will remain unresolved.

As we indicated in our November 20, 1991 letter,
screening of the excavation and on-site incineration alternative
at this time will considerably shorten the remedy selection
process and allow valuable resources to be directed to
implementable solutions. We encourage the Agency to seriously
consider the significant issues that remain outstanding regarding
on-site incineration and come to the realization that this
alternative <u>must</u> be screened from the process now. We believe
any other conclusion to be inconsistent with the NCP.

We ask these comments be submitted to the McColl Site
administrative record.

Very truly yours,

*William J. Duchie, P.E.*

William J. Duchie

WJD:clw

cc:  Mr. John Blevins
     Ms. Pamela Wieman
     Mr. Steve Linder
     Ms. Caroline Rudolph
     Mr. Steve Gaytan
     Mr. David Bushey
     Mr. Kenneth Ritter
     Mr. Barry Brown
     Mr. Dick Fraser
     Timothy R. Patterson, Esq.
     Ms. Lydia Goldshmidt



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

November 27, 1991

Ms. Pam Wieman
U.S. EPA, Region IX
75 Hawthorne Street, H-6-1
San Francisco, California 94105

Re: <u>McColl Superfund Site</u>

Dear Pam:

Enclosed are five copies of ENSR Consulting and Engineering's "Review of the START Report for the McColl Superfund Site in Fullerton, California." ENSR's review identified four major areas of concern regarding the use of on-site incineration as the remedial action choice for the McColl Superfund Site.

- <u>Environmental Compliance</u>. It will be extremely difficult to develop a remedial system to meet all of the technical requirements associated with incinerator emissions and associated processes. The physical management of the waste material will require resources well beyond those identified in the START Report. The system's ability to control emissions and to comply with regulatory requirements for emission control is unproven and doubtful.

- <u>Health Risk Assessment</u>. The START Report does not address in full the health impact of the remedial system. The associated risk to local residents is thus significantly underestimated.

- <u>Operational Issues</u>. The use of containment structures complicates the control of emissions. The START Report does not explain how activities that disturb the waste (excavation, milling, blending) can all be performed in containment structures, without the escape of particulates and pollutants from the Site. In addition, no working model exists for many components of the proposed remedial system. While the individual components may theoretically meet regulatory requirements under optimal conditions, the cumulative operating



215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Ms. Pam Wieman
November 27, 1991
Page 2

efficiency of the system will likely be compromised by the interaction of the components as a whole. The proposed duration, use of containment structures and cyclical operation of the incinerator will add stress to the system creating less than optimal conditions. Moreover, it is questionable whether a rotary kiln could comply with SCAQMD requirements.

● <u>Duration</u>. The duration of the project will extend far beyond the initial estimate of one and one-half years. Many factors, such as timing of the approval process, repair periods on the system, worker safety requirements and the required blending of the waste materials, will contribute to delay of the project.

These problem areas combine to make excavation and on-site incineration an impractical alternative.

We are willing to make our contractor available for discussion of these and other specific issues after you have had an opportunity to review the information. We have included copies of the report for Steve Linder, John Blevins and your contractor. We ask that this letter and the accompanying report be submitted into the administrative record for McColl.

Very truly yours,

*William J. Duchie*

William J. Duchie

*ceb*

WJD/ceb
Enclosure

Exhibit 46

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL ●━●━●



**THE McCOLL SITE GROUP**

215 East Orangethorpe Avenue, Suite 304, Fullerton, California 92632 (714) 665-7391

Ms. Pam Wieman
November 27, 1991
Page 3


cc:  Ms. Caroline Rudolph
     Mr. Steve Gaytan
     Mr. Barry Eaton
     Mr. David Bushey
     Mr. Kenneth Ritter
     Mr. Barry Brown
     Larry Lawton, Esq.
     Ms. Lydia Goldschmidt

Exhibit 46
6634

The McColl Site Group is composed of:
Shell Oil Company, ARCO, Phillips Petroleum, Texaco and UNOCAL