WILLIAM A. WEINISCHKE
Bill.weinischke@usdoj.gov
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
MS State Bar No. 7082
4 Constitution Square
150 M Street, N.W., Suite 2.900
Washington, D.C.  20002
Telephone:  (202) 514-4592
Telefax:      (202) 514-2583

NICOLA T. HANNA
United States Attorney for the
Central District of California
Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | ) Civil No: CV 91-0589 (CJC) |
| | ) **UNITED STATES'** |
| Plaintiff, | ) **MEMORANDUM OF POINTS** |
| | ) **AND AUTHORITIES IN** |
| v. | ) **SUPPORT OF ITS MOTION** |
| | ) **FOR PARTIAL SUMMARY** |
| SHELL OIL COMPANY, et al., | ) **JUDGMENT AS TO THE** |
| | ) **AMOUNT OF RECOVERABLE** |
| Defendants. | ) **RESPONSE COSTS** |
| | ) |
| | ) Date: August 10, 2020 |
| | ) Time: 1:30 p.m. |
| | ) Honorable Cormac J. Carney |
| | ) Courtroom: 7C, First Street |
| | )                Court House |
| | ) |
| | ) |

1

## **<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION .................................................................1

II.    STANDARD FOR SUMMARY JUDGMENT ...............................2

III.   STATEMENT OF THE CASE .................................................3

    A.     Legal Authority ........................................................3

    B.     Factual Background ...................................................8

        1.     The Site ...........................................................8

        2.     Response Actions................................................9

            a.     Background and Summary of Response Activities ...........9

            b.     Involvement of Interested Parties (Stakeholders)............10

            c.     Consideration of Cleanup Alternatives............................11

        3.     Response Costs ..................................................14

IV.    ARGUMENT....................................................................15

    A.     Response Costs Incurred ............................................15

        1.     Response Costs Incurred Are Recoverable .............15

        2.     Response Costs Are Adequately Documented, Calculated and Presented ..................17

    B.     All Response Costs Are Recoverable .................................23

        1.     Legal Standard for Recovery of Response Costs ....................23

        2.     EPA Compiled Administrative Records As Prescribed by the NCP..................24

V.     CONCLUSION ................................................................25

ii

# **TABLE OF AUTHORITIES**

**Federal Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)...............................................3

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87 (1983) ........6

Browning-Ferris Industries of South Jersey, Inc. v. Muszyniski,
        899 F. 2d 151 (2nd Cir 1990), abrogated by Steel Co. v. Citizens
        for a Better Environment, 523 U.S. 83 (1998) ............................................6, 7

California ex rel. California Dept. of Toxic Services v. Neville Chemical
        Co., 213 F. Supp. 2d 1134 (C.D. Cal. 2002) aff'd, 358 F.3d 661
        (9th Cir. 2004) ...........................................................................3, 16, 18

California ex rel. California Dept. of Toxic Substances Control v. Neville
        Chemical Co., 358 F. 3d 661 (9th Cir. 2004) ...................................................5

Carson Harbor Village, Ltd. v. Unocal Corp.,
        270 F.3d 863 (9th Cir. 2001) ............................................................................4

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................3

Citizens to Protect Overton Park v. Volpe, 401 U.S. 402 (1971), overruled
        on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) ......................6

City and County of San Francisco v. United States,
        130 F.3d 873 (9th Cir. 1997).........................................................................24

Fed. Power Comm'n v. Florida Power & Light Co., 404 U.S. 453 (1972)..............7

Manzanita Park, Inc. v. Ins. Co. of North America, 857 F.2d 549
        (9th Cir. 1988) .............................................................................................3

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) ................................7

Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Ins. Co.,
        463 U.S. 29 (1983) .........................................................................................6

Occidental Eng'g Co. v. I.N.S. 753 F.2d 766 (9th Cir. 1985)................................24

State of New York v. Shore Realty Corp., 759 F.2d 1032 (2d Cir. 1985)..............16

United States v. Akzo Coatings of America, 949 F. 2d 1409 (6th Cir. 1991) .........7

United States v. Amtreco, Inc., 846 F. Supp. 1578,
        amended, 858 F. Supp. 1189 (M.D. Ga. 1994) ............................................16

United States v. Burlington Northern R.R. Co.,
        200 F. 3d 679 (10th Cir. 1999)..........................................................6, 23, 24

United States v. Chapman, 146 F.3d 1166 (9th Cir. 1998). ....3, 5, 15, 16, 18, 23, 24

United States v. Chromalloy American Corp.,
_____158 F.3d 345 (5th Cir. 1998). ...........................................................3, 16, 18

United States v. English, No. CV00-00016ACKBMK,
_____2001 WL 940946 (D. Haw. March 28, 2001) ..................................................3

United States v. Federal Reserve Corp., 30 F. Supp. 3d 979 (D. Idaho 2014),
_____aff'd in part, 691 F. App'x 441 (9th Cir. 2017) ............................................18

United States v. Findett Corp., 220 F.3d 842 (8th Cir. 2000) ......................3, 18, 21

United States v. Gurley, 43 F.3d 1188 (8th Cir. 1994) .........................................16

United States v. Hardage, 982 F.2d 1436 (10th Cir. 1992) ......................3, 5, 18, 24

United States v. Iron Mountain Mines, Inc.,
_____987 F. Supp. 1250 (E.D. Cal. 1997) ..............................................................7

United States v. Middleton, 276 F. Supp. 3d 1352 (M.D. Ga. 2017) .......................3

United States v. Monsanto Co., 858 F.2d 160 (4th Cir. 1988) ...............................16

United States v. Ottati & Goss, Inc., 900 F.2d 429 (1st Cir. 1990) .......................16

United States v. Princeton Gamma-Tech, Inc., 817 F. Supp. 488
_____(D.N.J. 1993), order reversed, 31 F.3d 138 (3rd Cir. 1994) ...........................7

United States v. R.W. Meyer, Inc., 889 F.2d 1497 (6th Cir. 1989). ..............3, 4, 16

United States v. Shell Oil Co., 841 F. Supp. 962 (C.D. Cal. 1993),
_____aff'd, 281 F.3d 812 (9th Cir. 2002) .......................................................1, 4, 8

United States v. Ward, 618 F. Supp. 884 (E.D.N.C. 1985) .....................................7

United States v. W.R. Grace & Co.-Conn., 280 F. Supp. 2d 1149
_____(D. Mont. 2003), aff'd, 429 F.3d 1224 (9th Cir. 2005)...................1, 4, 21, 24

United States v. W.R. Grace & Co., 429 F.3d 1224 (9th Cir. 2005)........................5

Washington State Dept. of Transp. v. Washington Natural Gas Co.,
_____Pacificorp, 59 F.3d 793 (9th Cir. 1995) ....................................................2, 5

## Federal Regulations

40 C.F.R. Part 300 ................................................................................. 2, 12
40 C.F.R. § 300.1 ....................................................................................... 2
40 C.F.R. § 300.415(b)(2) ......................................................................... 8
40 C.F.R. 300.430 .................................................................................... 12
40 C.F.R. 300.430(c) ............................................................................... 12
40 C.F.R. 300.430(e)(9)(iii) ............................................................... 11, 12
40 C.F.R. § 300.800(a) ............................................................................ 25
40 C.F.R. § 300.815 ................................................................................. 25
42 U.S.C. §§ 9601-9675 ............................................................................ 2
42 U.S.C. § 9601(23) ...................................................................... 4, 9, 16
42 U.S.C. § 9601(24) .......................................................................... 4, 9
42 U.S.C. § 9601(25) .................................................................. 4, 9, 15, 16
42 U.S.C. § 9604(a) ................................................................................... 4
42 U.S.C. § 9607(a) ...................................................................... 1, 15, 18
42 U.S.C. § 9607(a)(4) ................................................................... 15, 16, 22
42 U.S.C. § 9607(a)(4)(A) ......................................................................... 2
42 U.S.C. § 9613(j) .................................................................................. 23
42 U.S.C. § 9613(j)(1) ............................................................................... 5
42 U.S.C. § 9613(j)(2) ............................................................................... 5
42 U.S.C. § 9621 ..................................................................................... 11
42 U.S.C. § 9621(b)(1) ............................................................................ 10

## Federal Rules

Fed. R. Civ. P. 56(c) ................................................................................. 2
Fed. R. Evid. 803(6) ................................................................................ 19
Fed. R. Evid. 901 .................................................................................... 18
Fed. R. Evid. 1006 .................................................................................. 17

## Miscellaneous

Executive Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987), reprinted in
    42 U.S.C. § 9615 App. at 168-72 (West Supp. 1989) .................................. 4

v

# I.  INTRODUCTION

On September 28, 1993, this Court granted the United States and State of California's Motion for Summary Judgment and thereby held Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco, Inc. ("Defendants") liable under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), for the costs of response actions at the McColl Superfund Site ("Site" or "McColl Site") in Fullerton, California.  United States v. Shell Oil Co., 841 F. Supp. 962, 975 (C.D. Cal. 1993), aff'd, 294 F.3d 1045 (9th Cir. 2002).  With Defendants' liability established, the Court held that "all that remains to the cost recovery phase of this litigation is the Court's determination whether the governments' response costs are consistent with the [National Contingency Plan]."  Id. at 975.  Following that ruling, the Parties agreed that the Court's 1993 judgment and order constituted a declaratory judgment pursuant to CERCLA Section 113(g)(2) in favor of the United States (and State) against the Defendants for Ongoing Response Costs. Docket No. 270 ¶ 10 ("1994 Consent Decree").

The United States Environmental Protection Agency ("EPA") and the Department of Justice ("DOJ") have performed response actions and incurred costs in response to the release or threatened release of hazardous substances from the McColl Site.  The United States has unrecovered response costs in the amount of $53,122,779.54, of which the United States is currently seeking $49,861,337.62 from Defendants.[1]  By this motion, the United States seeks summary judgment

---

[1] This motion pertains to response activities generally speaking after 1990.  Under the 1994 Consent Decree, the Defendants paid the United States and the State $18

1

regarding the amount of response costs, plus prejudgment interest that it is entitled

to recover.  As the attached Declarations, Exhibits, Cost Summary, and Statement

of Uncontroverted Facts make clear, the United States has undertaken response

actions at the McColl Site not inconsistent with the National Oil and Hazardous

Substances Pollution Contingency Plan ("national contingency plan" or "NCP"),

40 C.F.R. Part 300, and has incurred and continues to incur recoverable costs.[2]

As discussed below, the cleanup of hazardous substances at the Site is

governed by CERCLA, 42 U.S.C. §§ 9601-9675, as amended.  If the United States

conducts a response action, it is entitled to recover "all costs of removal or

remedial action incurred by the United States Government . . . not inconsistent

with the national contingency plan."  42 U.S.C. § 9607(a)(A)(4).[3]

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings and evidence establish

that there are no genuine issues as to any material facts.  Fed. R. Civ. P. 56(c); See

_____

million, which represented a compromised amount for activities undertaken and
costs incurred through June 30, 1990, September 30, 1990, and June 30, 1991, and
interest through July 31, 1993, depending on the category of costs.

[2] See Declarations of Yvonne Fong (Ex. 1) ("Fong Decl."), Sharon Johnson (Ex. 2)
("Johnson Decl."), Lisa Ouyang (Ex. 3) ("Ouyang Decl."), Magdalen Mak (Ex. 4)
("Mak Decl."), Elaine Chan (Ex. 5) ("Chan Decl."), Christopher Osborne (Ex. 6)
("Osborne Decl."), Rusty Harris-Bishop (Ex. 7) ("Harris-Bishop Decl."),  William
Kime (Ex. 8) ("Kime Decl."), William Weinischke (Ex. 9) ("Weinischke Decl."),
Wiley Wright (Ex. 10) ("Wright Decl.").

[3] The national contingency plan "provide[s] the organizational structure and
procedures for preparing for and responding to . . . releases of hazardous
substances."  See Washington State Dep't of Transp. v. Wash. Natural Gas Co.,
Pacificorp, 59 F.3d 793, 799 (9th Cir. 1995) (quoting 40 C.F.R. § 300.1).

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); <u>Manzanita Park, Inc. v. Ins.</u>
<u>Co. of N. Am.</u>, 857 F.2d 549, 552 (9th Cir. 1988).  "A 'material' fact is one that is
relevant to an element of a claim or defense and whose existence might affect the
outcome of the suit."  857 F.2d at 552 (citation omitted).  The standard provides
that the mere existence of some alleged factual dispute will not defeat a properly
supported motion; there must be a genuine issue of material fact.  <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Summary judgment is particularly well suited for CERCLA cost recovery.
Numerous courts have granted summary judgment on the issue of the
recoverability and amount of response costs.  <u>See</u> <u>United States v. Chapman</u>, 146
F.3d 1166, 1171 (9th Cir. 1998) (declarations from EPA staff, attorneys,
accountants, and cost summaries sufficient to support grant of summary judgment
on CERCLA response costs).  Other courts have similarly granted or upheld
summary judgment on the amount of response costs.[4]

## III.  STATEMENT OF THE CASE

### A.  Legal Authority

Congress enacted CERCLA in 1980 "to protect and preserve public health

---

[4] <u>See</u> <u>United States v. Middleton</u>, 276 F. Supp. 3d 1352, 1358-59 (M.D. Ga. 2017);
<u>United States v. Chromalloy Am. Corp.</u>, 158 F.3d 345, 347-48 (5th Cir. 1998);
<u>United States v. R.W. Meyer, Inc.</u>, 889 F.2d 1497, 1499-1506 (6th Cir. 1989);
<u>United States v. Findett Corp.</u>, 220 F.3d 842, 849-50 (8th Cir. 2000); <u>United States</u>
<u>v. Hardage</u>, 982 F.2d 1436, 1442-43, 1448 (10th Cir. 1992); <u>California ex rel.</u>
<u>California Dep't of Toxic Substances v. Neville Chem. Co.</u>, 213 F. Supp. 2d 1134,
1142 (C.D. Cal. 2002), <u>aff'd</u>, 358 F.3d 661 (9th Cir. 2004); <u>United States v.</u>
<u>English</u>, No. CV00-00016ACKBMK, 2001 WL 940946, at *6 (D. Haw. Mar. 28,
2001); <u>United States v. W.R. Grace & Co.-Conn.</u>, 280 F. Supp. 2d 1149, 1180-81
(D. Mont. 2003) (citing <u>Chapman, Findett, Hardage,</u> and <u>Chromalloy</u>).

and the environment by facilitating the expeditious and efficient cleanup of hazardous waste sites." Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 880 (9th Cir. 2001) (citation omitted). The statute's purpose was twofold: "(1) to ensure the prompt and effective cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances bore the cost of remedying the conditions they created." Id. at 880 (citations omitted). CERCLA is a strict liability statute. Id. at 870; United States v. Shell Oil Co., 841 F. Supp. at 968, aff'd 281 F. 3d 812 (9th Cir. 2002).

Pursuant to CERCLA § 104(a), the President, who has delegated the majority of his authority to the Administrator of EPA,[5] is authorized to address a release or a substantial threat of release of hazardous substances into the environment. 42 U.S.C. § 9604(a). Those actions may include "removal" actions, "remedial" actions, and any other actions necessary to protect the public health or welfare or the environment. 42 U.S.C. § 9604(a). "Removal" actions include evaluative, assessment, and monitoring activities and related investigations, as well as taking actions necessary to prevent, minimize, or mitigate damage to public health or the environment. 42 U.S.C. § 9601(23). "Remedial" actions include measures taken to deal permanently with hazardous substances. 42 U.S.C. § 9601(24). CERCLA further provides that the term "response" means a removal or remedial action and that all such terms include the enforcement activities related thereto. 42 U.S.C. § 9601(25).

Judicial review of any response action taken by EPA is limited to the

---

[5] Meyer, 889 F.2d at 1500 n.7 (citing Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987), reprinted in 42 U.S.C. § 9615 App. at 168-72 (West Supp. 1989)).

4

administrative record.[6]  42 U.S.C. § 9613(j)(1); see also Order (Feb. 16, 1993) (J. Kelleher limiting review of response actions to the administrative record). Moreover, the Court shall uphold decisions made by the EPA "unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law."  42 U.S.C. § 9613(j)(2).

Established Ninth Circuit precedent has elaborated on the statutory standard of review.  Defendants have the burden of proving that EPA's choice of a particular response action is "arbitrary and capricious" based on the administrative record to maintain an assertion that the action was inconsistent with the NCP. Chapman, 146 F.3d at 1170; United States v. W.R. Grace & Co., 429 F.3d 1224, 1232 n.13, 1233 (9th Cir. 2005); see also California Dep't of Toxic Substances Control v. Neville Chem. Co., 358 F.3d 661, 673 (9th Cir. 2004) (emphasizing that opposing party must prove that the government "acted arbitrarily and capriciously in choosing a particular response action" (emphasis in original)).  The arbitrary and capricious standard is justified "because determining the appropriate removal and remedial action involves specialized knowledge and expertise, [and therefore] the choice of a particular cleanup method is a matter within the discretion of the [government]."  Washington State Dep't of Transp. v. Wash. Natural Gas Co., Pacificorp, 59 F.3d at 799 (quoting United States v. Hardage, 982 F.2d 1436, 1442 (10th Cir. 1992)).

---

[6] The Administrative Records (ARs) dated June 30, 1993 and May 15, 1996 have been certified and provided to the Defendants.  Given the voluminous number of documents (tens of thousands of pages), the United States is providing the Court the relevant portions of the administrative records as Exhibits 11-57 to this Motion.

The hallmark of the arbitrary and capricious standard is deference to the agency's technical expertise.  Under that standard of review, the inquiry is whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 105 (1983).  In reviewing the agency's evaluation of the relevant statutory factors, the court is not to substitute its judgment for that of the agency or to second-guess the agency's decision.  Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 416 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

In United States v. Burlington N. R.R. Co., the court applied the arbitrary and capricious standard of review on the administrative record to CERCLA, explaining that "[a]gency action will be set aside only if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  200 F.3d 679, 689 (10th Cir. 1999) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983)).  In Browning-Ferris Indus. of S. Jersey, Inc. v. Muszyniski, the court stated that "[c]ourts should be particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise." 899 F. 2d 151, 160 (2d Cir 1990).  The court went on to quote the Supreme Court: "Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on 'engineering and

6

scientific' considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact." Id. (quoting Fed. Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463 (1972)); see also United States v. Akzo Coatings of Am., 949 F. 2d 1409, 1424 (6th Cir. 1991) ("The federal courts have neither the time nor the expertise to [engage in a de novo review of scientific evidence], and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegatee, the EPA administrator and his staff."). In Browning-Ferris, the court found that, while the defendant's remedial action choice had some scientific merit, deference to the agency and the need to keep out of the courts such detailed scientific disputes merited a finding for EPA. 899 F.2d at 164.[7]

The Governments' response actions at the McColl Site relevant to this Motion were selected in two Records of Decision ("RODs"). The June 30, 1993 Source/Soil ROD selected soft material solidification with a contingency Resource Conservation and Recovery Act ("RCRA")-equivalent closure. (Ex. 11 at 0878.)

---

[7] See also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); United States v. Iron Mountain Mines, Inc.. 987 F. Supp. 1250, 1255 (E.D. Cal. 1997) (Section 113(j) "reflects Congress' judgment that, unlike a reviewing court, the EPA has the specialized knowledge and expertise needed to choose the appropriate cleanup method."); United States v. Princeton Gamma-Tech, Inc., 817 F. Supp. 488, 492 (D.N.J. 1993), order reversed, 31 F.3d 138 (3rd Cir. 1994) ("De novo review cannot be reconciled with the complex, technical requirements for the cleanup of hazardous waste sites. . . . [A] court 'cannot and will not substitute its layman's judgment for the scientific conclusions made by EPA after years of in-depth study of the . . . sites.'" (quoting United States v. Ward, 618 F. Supp. 884, 900 (E.D.N.C. 1985)).

This remedy was selected to treat the principal threats at the Site, such as benzene, sulfur dioxide, and arsenic.  Its objective was to minimize the seeping material and treat the acidic soft material by eliminating its corrosive characteristic.  The May 15, 1996 Groundwater ROD selected reduction of water infiltration into the ground, monitoring, and implementation of institutional controls if monitoring results exceed specified criteria.  (Ex. 12 at 1285.)[8]

**B. Factual Background**

    1. <u>The Site</u>

    In 1982, the McColl Site was placed upon the National Priorities List ("NPL"), which comprises the most contaminated sites in the country requiring cleanup.  (Ex. 15 at 1702).  The Site consists of approximately twenty-two acres within the City of Fullerton, California.  Housing developments abut two sides of the Site.  The Site was contaminated with refinery wastes (acid sludge) containing hazardous substances such as benzene, toluene and xylene.  <u>Shell Oil</u>, 841 F. Supp. at 969.  As this Court noted, "[t]he record before the Court establishes beyond dispute that the oil companies generated the hazardous waste dumped at the McColl Site, and that they contracted with Eli McColl to transport the waste to, and dump it in sumps on, the McColl Site."  <u>Id.</u> at 969-70.

---

[8] In the RODs, EPA determined that the hazardous substances at the McColl Site presented a threat to human health. (Ex. 11 at 0878; Ex. 12 at 1284.)  EPA expressly applied the criteria set forth in 40 C.F.R. § 300.415(b)(2) (Mar. 8, 1990) in reaching this conclusion. (Ex. 13 at 1462; Ex. 11 at 0880; Ex. 12 at 1285; Ex. 14 at 1606.)

8

2.  <u>Response Actions</u>

    a.  <u>Background and Summary of Response Activities</u>

Agencies began investigating the Site as a result of residents' odor and health complaints reported as early as 1978.  (Ex. 11 at 0885; Ex. 16 at 1722-1724; Ex. 17 at 1727.)  Waste repeatedly oozed from the surface and was visible from the backyards of houses adjacent to the Site.  (Ex. 15 at 1703, Ex. 11 at 0887.)

In response to the release or threatened release of hazardous substances at the Site, the United States has taken numerous response actions as authorized by CERCLA.  The United States' costs associated with the McColl Site include costs for EPA personnel, costs for EPA contractors, interagency agreements, and grants to the State of California through Site-specific cooperative agreements with the Department of Health Services or its successor the California Department of Toxic Substances Control ("DTSC").  The United States' costs also include EPA's indirect costs and DOJ's costs.  (Ex. 1, Fong Decl. ¶¶ 16 – 18; Ex. 4, Mak Decl. ¶¶ 16, 37; Ex. 6, Kime Decl. ¶¶ 17-21 & Ex. C to Kime Decl. ¶ 8.)

Over the years, EPA, working with its contractors or the State and its contractors, has performed several investigations and studies to determine the nature and extent of the releases and threatened releases of hazardous substances at the Site.  (Ex. 11 at 0881.)  These response actions are consistent with removal and remedial response actions as defined in CERCLA at 42 U.S.C. § 9601(23), (24), and (25).  EPA has gathered and evaluated information relating to proposed cleanup alternatives.  (Ex. 11.)  EPA has also conducted cleanup operations at the Site regarding the periodic seeps of sludge to the surface.  (Ex. 11; Ex. 17 at 1727; Ex. 18 at 1730.)  EPA's response actions at the McColl Site have also included:

9

evaluation of feasibility studies to identify and evaluate potential remedial alternatives (Ex. 19 at 1763; Ex. 20 at 1999; Ex. 21 at 2123; Ex. 22; Ex. 23 at 2146); conducting health studies (Ex. 24; Ex. 25 at 2167; Ex. 26; Ex. 27; Ex. 28; Ex. 29; Ex. 20; Ex. 13); conducting treatability studies to determine if certain alternatives could be implemented[9] (Ex. 30 at 3935; Ex. 31 at 4050; Ex. 32 at 4462; Ex. 33; Ex. 34; Ex. 35; Ex. 36; Ex. 37); performing a Remedial Investigation/Feasibility Study for groundwater (Ex. 38; Ex. 39; Ex. 14); arranging for Site operation and maintenance (Ex. 7, Harris-Bishop Decl. ¶ 21, 22); performing community relations work, including keeping the residents informed and encouraging their participation in the remedy selection process (Ex. 40 at 5789); undertaking various enforcement activities, including identification of potentially responsible parties, negotiations, extensive discovery and litigation with responsible parties and cost recovery efforts; and conducting other response actions relating to the release and threatened release of hazardous substances at the Site. (Ex. 7, Harris-Bishop Decl. ¶¶ 9-23; <u>see generally</u> Ex. 9, Weinischke Decl.)

        b. <u>Involvement of Interested Parties (Stakeholders)</u>

From the time Government Plaintiffs began investigating the Site, the community was actively involved in the process of selecting cleanup activities at the Site. (Ex. 11 at 0885.) Starting in 1986, EPA held regular meetings in

---

[9] In 1986, CERCLA was amended to require EPA to give preference to "[r]emedial actions in which treatment which permanently and significantly reduces the volume, toxicity or mobility of the hazardous substances, pollutants, and contaminants is a principal element." 42 U.S.C. § 9621(b)(1). Such actions "are to be preferred over remedial actions not involving such treatment." <u>Id</u>. EPA is required to the maximum extent practicable to select a remedial action that is permanent and utilizes treatment technologies. 42 U.S.C. § 9621(b)(1).

connection with the McColl Site with the Interagency Committee, which comprised:  EPA, DTSC, the City of Fullerton, South Coast Air Quality Management District, City of Buena Park, Orange County Environmental Health, California Regional Water Quality Control Board, California Department of Health Services' Drinking Water Branch, and the California Environmental Protection Agency's Office of Environmental Health Hazard Assessment.  (Ex. 11 at 0886.)

One of the entities that was heavily involved in the process was the McColl Site Group (MSG), which was made up of the Defendants.  (Ex. 11 at 0952.) Throughout the process, there were divergences of views as to which remedy would best protect public health and the environment.  (Ex. 11 at 0907; Ex. 41 at 5843; Ex. 42 at 5848.)

c.   Consideration of Cleanup Alternatives

EPA considered a wide range of cleanup alternatives.  (Ex. 11 at 0906.) EPA is guided in remedy selection by the statutory requirements of CERCLA Section 121, 42 U.S.C. § 9621, and the NCP.  The NCP has nine evaluation criteria, which are:  (a) overall protection of human health and the environment, (b) compliance with applicable or relevant and appropriate requirements, (c) long-term effectiveness and permanence, (d) reduction of toxicity, mobility or volume through treatment, (e) short-term effectiveness, (f) implementability, (g) cost effectiveness, (h) State acceptance, and (i) community acceptance.  (Ex. 13 at 1462; Ex. 43 at 6003; Section 300.430(e)(9)(iii) of the NCP).  The NCP provides for a process by which EPA works with interested parties (stakeholders) who have an interest in the cleanup of the hazardous waste.  40 C.F.R. § 300.430(c) (Mar. 8, 1990).  Appendix D to 40 C.F.R. Pt. 300 (Mar. 8, 1990) describes the types of

11

remedial actions generally appropriate for specific situations commonly found at Superfund sites and lists methods for remedying releases that may be considered by the lead agency (EPA).

Pursuant to the statute, which expresses a preference for treatment and for utilization of permanent solutions and alternative treatment technologies to the maximum extent practicable, see supra n.9, EPA considered several remedies within the gamut of treatment and permanent solutions. (Ex. 11 at 0907 and 40 C.F.R. § 300.430 (Mar. 8, 1990).) EPA, the State, MSG and others worked together extensively throughout the remedy selection processes. MSG opposed the approach that EPA was evaluating in the early part of the 1990s relating to excavation and thermal destruction of the hazardous wastes. Based on treatability studies EPA conducted and public comments received as part of the process, including those from the MSG, EPA decided to update and reevaluate the remedial alternatives identified in the 1989 Proposed Plan. (Ex. 44 at 6181.) The reevaluation effort included reviewing a selective excavation and treatment technology proposed by the MSG. (Ex. 11 at 0911.) EPA scheduled the issuance of a new proposed plan for late 1992, along with its plan to conduct an analysis under the nine criteria at 40 C.F.R. § 300.430(e)(9)(iii) (Mar. 8, 1990) to compare the cleanup alternatives. (Ex. 44 at 6181.)

The McColl Site posed complex issues involving protection of public health and the environment, which EPA took seriously and grappled with on multiple fronts. (Ex. 11 at 0887; Ex. 45 at 6184.) There were numerous and regular technical meetings between EPA, the State, and MSG. (Ex. 46 at 6187.) EPA weighed MSG's opinions. (Ex. 47; Ex. 48; Ex. 49; Ex. 50; Ex. 51.) One of the

cleanup alternatives considered was off-site incineration.  (Ex. 52 at 6740; Ex. 53 at 6744.)  Although some members of the public supported off-site incineration, MSG opposed it and meetings were held to discuss that issue.  The South Coast Air Quality Management District objected to EPA's eliminating off-site incineration from further consideration.  (Ex. 54 at 6749.)  While the Defendants were critical of EPA, they also acknowledged that EPA was trying to comply with the law and involve the public in the process of remedy selection.  (Ex. 55 at 6759.)  The Defendants proposed a selective excavation cleanup alternative and encouraged EPA to evaluate their proposal thoroughly.  (Ex. 55 at 6759.)  In August 1991, EPA eliminated the excavation and off-site incineration remedy from further review (Ex. 56 at 6764), although some stakeholders objected to EPA eliminating that alternative.  The Fullerton City Council always preferred a permanent remedy, such as incineration, so that no hazardous waste would remain at the Site.  (Ex. 57 at 6770.)  While MSG continued to oppose excavation and on-site incineration and urged that it be dropped from consideration, EPA, based upon CERCLA and the NCP, did not eliminate the on-site incineration remedy from consideration.  (Ex. 42 at 5851.)

In the Spring of 1992, EPA informed the MSG that eight cleanup alternatives were being considered.  (Ex. 51 at 6737.)  The remedy selected in the 1993 ROD for the soil contamination at the McColl Site was in-situ solidification of the soft layer of the twelve pits at the Site, followed by RCRA-equivalent closure.  (Ex. 11 at 0915.)  This remedy was similar to one proposed by the MSG. (Ex. 41 at 5843; Ex. 51 at 6737.)  If the in-situ solidification proved to be technically unimplementable, the 1993 ROD provided for a contingent RCRA-

13

equivalent closure for the entire Site.  (Ex. 11 at 0951.)  As EPA noted at the time it issued the 1993 ROD, the soft material solidification remedy, unlike closure alone, utilized permanent solutions and treatment technologies and satisfied the statutory preference for treatment.  (Ex. 11 at 0957.)  The in-situ solidification proved to be technically infeasible, and the contingent remedy, known as "RCRA Equivalent Closure," was selected as the final remedy in 1995 and successfully constructed in 1996 and 1997.  It remains in operation today.  (Ex. 7, Harris-Bishop Decl. ¶¶ 19, 20, 23.)

       3.  <u>Response costs</u>

      The response costs are set forth and detailed in Certified Cost Summaries prepared by EPA and attached as Exs. A, B, and C to Magdalen Mak's Declaration, Ex. 4, and in Cost Summaries prepared by William Kime for DOJ and attached to his Declarations, Ex. 8, as Exs. B and C.  The Fong, Johnson, Ouyang and Mak Declarations (Exs. 1, 2, 3, and 4) describe the process of creating the Certified Cost Summaries, the various cost categories included on the Cost Summaries, and the review and verification process associated with the Summaries.  <u>See</u> <u>generally</u>, Fong, Johnson, Ouyang, and Mak Decls. (Exs. 1, 2, 3, and 4.)  Wiley Wright, an independent Certified Public Accountant with extensive experience in Superfund costs and cost recovery, reviewed and summarized all of the cost documentation compiled by William Kime, Yvonne Fong, Sharon Johnson, Lisa Ouyang, and Magdalen Mak.  (Ex. 10, Wright Decl.)  Wright's declaration documents unreimbursed response costs of $52,183,070.79 for EPA's costs through July 31, 2018 and DOJ's costs through September 30, 2019 (including prejudgment interest accruing through September 30, 2019 for both

14

EPA's and DOJ's costs).[10]  (Ex. 10, Wright Decl. ¶ VI.)  Prejudgment interest is applied on the amount recoverable.  <u>See</u> 42 U.S.C. § 9607(a)(4).  Response actions include related enforcement actions.  42 U.S.C. § 9601(25).  <u>See Chapman</u>, 146 F.3d at 1174.  As of the date ranges given above, the total amount the Defendants owe the United States is $49,861,337.62.[11]

## IV.  ARGUMENT

**A. Response Costs Incurred**

    1.  <u>Response Costs Incurred Are Recoverable</u>

    The costs incurred by the United States and documented in the Cost Summaries are precisely the types of costs recoverable under CERCLA.  Section 107(a) makes responsible parties liable for "<u>all costs</u> of removal or remedial action incurred by the United States Government . . . ."  42 U.S.C. § 9607(a) (emphasis added).  The Government is authorized to recover all costs from the person responsible for the hazardous substances so that the ultimate financial responsibility is placed on the responsible party and so the recovered monies can

---

[10] Due to the significant time and expense required to reconcile the voluminous cost documents, EPA and DOJ established cutoffs of July 31, 2018, and September 30, 2019, respectively, to compile the costs for this Motion.  The United States continues to incur costs at the McColl Site.

[11] This figure is the total amount of EPA's costs from July 1, 1990, through July 31, 2018, DOJ's costs from October 1, 1990, through September 30, 2019, and prejudgment interest through September 30, 2019, on both agencies' costs ($52,183,070.79), less the 6.25% share allocated to the United States by stipulation of the parties in 2003, Docket No. 507 at 2 n.1., plus interest ($939,708.75) that accrued on the costs settled under the 1994 Consent Decree.  The $939,708.75 in prejudgment interest accrued starting July 31, 1993, through the date of Defendants' payment of the United States' response costs under the 1994 Consent Decree (Wright Decl., Ex. 10 ¶ IV.K.; 1994 Consent Decree ¶¶ 3.f., 10).

be used to replenish the Superfund.  Meyer, 889 F. 2d at 1500.  The broad remedial purpose of CERCLA supports a liberal interpretation of the term "all costs."  See Chapman, 146 F.3d at 1175; Meyer, 889 F.2d at 1503.

Courts have found that recoverable response costs include:

1)  direct costs and indirect costs such as overhead costs in administering the Superfund program and litigating Superfund enforcement actions.  See Meyer, 889 F.2d at 1503-1504; United States v. Ottati & Goss, Inc., 900 F.2d 429, 444 (1st Cir. 1990); Neville, 213 F. Supp. 2d at 1124.

2)  prejudgment interest.  See, 42 U.S.C. § 9607(a)(4), Meyer, 889 F.2d at 1505; United States v. Monsanto Co., 858 F.2d 160, 175-76 (4th Cir. 1988).

3)  litigation costs, including reasonable attorney fees, administrative costs and investigative costs related to response action.  See 42 U.S.C. § 9601(25), Chapman, 146 F.3d at 1175; United States v. Gurley, 43 F.3d 1188, 1199-1200 (8th Cir. 1994) (DOJ attorneys fees and litigation expenses); Neville 213 F. Supp. 2d at 1124; United States v. Amtreco, Inc., 846 F. Supp. 1578, 1583 n.7, amended, 858 F. Supp. 1189 (M.D. Ga. 1994) (DOJ costs).

4)  government oversight costs.  See Chromalloy Am. Corp., 158 F.3d at 349; Neville, 213 F. Supp. 2d at 1124.

5)  costs incurred assessing, investigating, monitoring, testing and evaluating the situation.  See 42 U.S.C. §9601(23); State of New York v. Shore Realty Corp., 759 F.2d 1032, 1042-1043 (2d Cir. 1985).

All of the costs for which the United States seeks recovery in this motion fall within the categories of recoverable costs described above.  See Fong, Johnson, Mak, Ouyang, Osborne, Kime Decls. (Exs. 1, 2, 4, 3, 6, 8.)  Specifically, the costs

16

at issue fit within the following categories: 1) EPA payroll expenses and travel expenses incurred in conducting response actions and in seeking to recover costs from the Defendants; 2) EPA indirect/oversight costs; 3) DOJ costs; 4) expenditures for contracts and interagency agreements; and 5) prejudgment interest for EPA and DOJ. See Statement of Uncontroverted Facts and Conclusions of Law; Exhibits A, B, and C attached to Ex. 4, Mak Decl; Ex. 10, Wright Decl. The unreimbursed costs and interest in this action total $52,183,070.79 (not including interest on the 1994 Consent Decree, supra n.11). (Ex. 10, Wright Decl. ¶ III.I.)

There are no genuine issues of material fact with respect to these costs. Each of the categories, as described here and in the declarations, are costs of response actions and are recoverable under the law.

2. Response Costs Are Adequately Documented, Calculated and Presented

The United States has adequately documented all costs it seeks to recover thus far in this action. EPA utilized its Superfund Cost Recovery Package Imaging and On-line System (SCORPIOS) in preparing the McColl Cost Summaries. (Ex. 1, Fong Decl. ¶¶ 11, 13; Ex. 4, Mak Decl. ¶¶ 15, 16.)

The United States presents its response costs in the form of attached Declarations and Cost Summaries from EPA and DOJ.[12] These Cost Summaries are based on underlying cost documentation such as time sheets, vouchers and indirect costs. (Ex. 1, Fong Decl. ¶¶ 15, 16, 18; Ex. 4, Mak Decl. ¶¶ 16, 24.) The underlying cost documentation has been compiled, reviewed and summarized by Ms. Johnson, Ms. Fong, Ms. Mak, Ms. Ouyang, and Mr. Kime and is presented to

---

[12] Pursuant to Federal Rule of Evidence 1006, voluminous writings or recordings can be presented to the Court in the form of a chart or summary.

this Court for purpose of convenience in the form of Cost Summaries.  (See Exs. 1, 2, 3, 4, 8, Fong, Johnson, Ouyang, Mak, and Kime Decls., and attachments thereto.)  Due to the complexity and volume of documents involved, the United States tasked Mr. Wright with reviewing and summarizing the documentation compiled by those declarants.  (See Ex. 10, Wright Decl.)  Courts have held that affidavits and cost summaries submitted by the United States in support of its motions for summary judgment on the issue of cost recovery under CERCLA 42 U.S.C. § 9607(a) are admissible and sufficient to establish the amount of these costs.  See Chapman, 146 F.3d at 1172; Hardage, 982 F.2d at 1442-43; Findett, 220 F.3d at 849; Chromalloy, 158 F.3d at 352; Neville, 213 F. Supp. 2d at 1139-42; United States v. Fed. Res. Corp., 30 F. Supp. 3d 979, 994 (D. Idaho 2014), aff'd in part, 691 F. App'x 441 (9th Cir. 2017).  The United States supplies exactly this type of evidence in support of this motion.

In the regular course of business, EPA compiles cost documentation packages for each site, collecting contract vouchers, invoices, and time sheets, reflecting the costs incurred by EPA and its contractors at Superfund sites. (Fong, Johnson, Ouyang, Mak Decls. generally, Exs. 1, 2, 3, 4.)  A certified cost documentation package contains true and correct copies of cost documentation for EPA costs incurred and paid at a specific site.  (See generally Johnson, Ouyang Decls., Exs. 2 and 3.)  The underlying cost documents, which were also produced to Defendants, are thus authentic under Fed. R. Evid. 901 and fall into the business record exception to the hearsay rule under Fed. R. Evid. 803(6).  (Conclusions of Law ¶ 17.)

18

EPA uses the SCORPIOS system to track and summarize the costs for Superfund sites.  (Statement of Uncontroverted Facts ¶ 90; Ex. 1, Fong Decl. ¶ 15; Ex. 4, Mak Decl. ¶ 15.)  These summaries are used in the regular course of EPA business.  (Statement of Uncontroverted Facts ¶ 90; Ex. 2, Johnson Decl. ¶ 8; Ex. 3, Ouyang Decl. ¶ 15.)   The SCORPIOS report tracks and summarizes the voluminous cost documents.  (Statement of Uncontroverted Facts ¶¶ 90-91.)  The SCORPIOS report reflects the amount of each cost type (payroll costs, travel costs, indirect cost, contractor costs, interagency agreement costs) that EPA incurred at the Site.  (Statement of Uncontroverted Facts ¶ 91; Ex. 1, Fong Decl. ¶¶ 15, 18; Ex. 4, Mak Decl. ¶¶ 15, 34.)

Ms. Fong, who was a Cost Accountant in EPA's Superfund Accounting Program, prepared EPA's cost documentation package and Cost Summary for costs from July 1, 1990 through June 30, 2004.  (Ex. 1, Fong Decl. ¶¶ 9-10.)  Ms. Mak, an Accountant in EPA's Accounting Section of the Finance Branch, prepared EPA's cost documentation packages and Cost Summaries for costs from July 1, 2004 through July 31, 2018.  (Ex. 4, Mak Decl. ¶¶ 12, 14.)  Ms. Mak also updated the Cost Summary Ms. Fong had prepared to update final indirect and annual allocation rates and to deduct payments made by Defendants.  (Ex. 4, Mak Decl. ¶¶ 11, 47-56.)  Ms. Fong and Ms. Mak each describe the types of costs and the accounting documentation that established the amount of each cost type incurred by EPA at the Site.  (Ex. 1, Fong Decl.  ¶¶ 24-61; Ex. 4, Mak Decl. ¶¶ 25-42.)  For costs incurred from approximately July 1, 1990 through June 30, 2004, Ms. Johnson and Ms. Fong personally reviewed the underlying records, produced the SCORPIOS summary, and reconciled the summary against the underlying

19

documents.  (Ex. 1, Fong Decl. ¶ 19; Ex. 2, Johnson Decl. ¶ 11.)  For costs incurred from July 1, 2004 through July 31, 2018, Ms. Mak and Ms. Ouyang personally reviewed the underlying records, produced the SCORPIOS summary, and reconciled the summaries against the underlying documents.  (Ex. 4, Mak Decl. ¶¶ 11-12; Ex. 3, Ouyang Decl. ¶¶ 18-19.)

Ms. Fong and Ms. Mak prepared the intramural portion of the Cost Summaries.  (Ex. 1, Fong Decl. ¶ 20; Ex. 4, Mak Decl. ¶ 20.)   Intramural costs include EPA Region 9 and Headquarters payroll costs and travel expenses.  (Ex. 1, Fong Decl. ¶ 17; Ex. 4, Mak Decl. ¶ 17.)  To prepare the intramural cost sections for the McColl Site, Ms. Fong and Ms. Mak collected documents, including employee time sheets, employee travel vouchers, airline tickets and other related travel receipts.  (Ex. 1, Fong Decl. ¶¶ 21-23; Ex. 4, Mak Decl. ¶ 21-24.)  EPA maintains the documents collected by Ms. Fong and Ms. Mak in the ordinary course of business.  (Ex. 1, Fong Decl. ¶ 20; Ex. 4, Mak Decl. ¶ 21.)

The Regional payroll costs of $1,372,429.33 through July 31, 2018, are an accurate accounting of Region 9's payroll costs.  (Ex. 10, Wright Decl. ¶ IV.E.) The headquarters payroll costs of $13,659.42 are an accurate accounting of the Headquarters costs.  (Id.)  The Regional travel costs of $264,355.95 are an accurate accounting of travel costs.  (Id.)  The Headquarters travel costs of $5,167.25 are an accurate accounting of the Headquarters travel costs.  (Id.)

Ms. Fong and Ms. Mak also prepared the extramural portion of the Cost Summaries.  (Ex. 1, Fong Decl. ¶ 29; Ex. 4, Mak Decl. ¶ 29.)  They collected documents such as vouchers, invoices, and United States Treasury confirmation schedules to calculate the extramural costs.  (Ex. 1, Fong Decl. ¶ 30-36; Ex. 4, Mak

20

Decl. ¶ 30-35).  EPA's extramural costs of $8,423,381.57 are an accurate accounting of the agency's contractor and direct procurement costs.  (Ex. 10, Wright Dec. ¶ IV.F.)

The costs summarized by Ms. Fong, Ms. Mak, and Mr. Wright also include both "indirect" costs incurred by EPA as well as an "annual allocation." (Ex. 1, Fong Decl. ¶ 16; Ex. 4, Mak Decl. ¶ 16; Ex. 10, Wright Decl. ¶¶ IV.E., IV.F). Christopher Osborne, Senior Financial Adviser of EPA's Office of the Controller, Immediate Office, describes the process employed by EPA to calculate EPA's indirect costs and the annual allocation rates.  (Ex. 6, Osborne Decl.)  Mr. Osborne states that the indirect rate and annual allocation process are reasonable and based on generally accepted practices.  (Ex. 6, Osborne Decl. ¶¶ 11, 18, 19, 20, 40, 52.) The indirect rate methodology employed by EPA fairly allocates the indirect costs associated with EPA's Superfund program to specific sites and complies with the relevant accounting standard.  United States v. W.R. Grace & Co.-Conn., 280 F. Supp. 2d 1149, 1185-87 (D. Mont. 2003), aff'd, 429 F.3d 1224 (9th Cir. 2005). The annual allocation methodology apportions to sites contractors' non-site-specifically charged costs that nevertheless support, benefit or relate to site response actions.  (Ex. 6, Osborne Decl. ¶ 45.); see also Findett, 220 F.3d at 849.

Mr. Kime, a C.P.A., describes the calculation for DOJ enforcement costs and indirect costs.  (Statement of Uncontroverted Facts ¶ 95.)  The Cost Summaries attached to Mr. Kime's Declaration summarize the underlying time sheets and other accounting records for direct labor costs and indirect costs incurred by DOJ in prosecuting this case.  (See Exs. B & C to Kime Decl., Ex. 8.)  Mr. Kime describes the process employed to calculate indirect costs incurred by DOJ.

21

(Statement of Uncontroverted Facts ¶ 99; Ex. 8, Kime Decl., ¶¶ 14-15; Ex. C to Ex. 8 ¶ 6.)  Mr. Kime declares that the indirect rate and methodology are reasonable and based on good accounting practices.  (Ex. 8, Kime Decl. ¶ 23; Ex. C to Ex. 8 ¶ 9.)  Additionally, the attorneys' fees incurred in connection with the Site are reasonable and consistent with Ninth Circuit mandates.  (See Ex. 9, Weinischke Decl.)

CERCLA provides that "all costs" include prejudgment interest.  42 U.S.C. § 9607(a)(4).  Interest accrues "from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned."  Id. Mr. Wright explains that prejudgment interest has accrued from the date of EPA's first demand for payment on September 17, 1990, through September 30, 2019, on the United States' costs in the amount of $26,850,574.05.  (Ex. 10, Wright Decl. ¶ IV.J.)

Based on the foregoing, the United States EPA has incurred unreimbursed costs of $52,183,070.79 through July 31, 2018, including DOJ's costs from October 1, 1990 through September 30, 2019, and including prejudgment interest calculated.  (Statement of Uncontroverted Facts ¶ 7; Ex. 10, Wright Decl. ¶ VI.) Since the United States has established a prima facie case for recovery of response costs, it is entitled to recover the costs as set forth in the declarations and cost summaries attached thereto, absent a contrary showing by Defendants that the response actions were not consistent with the NCP.

**B. All Response Costs are Recoverable**

    1.  <u>Legal Standard for Recovery of Response Costs</u>

    CERCLA Section 113(j) provides that (1) judicial review of EPA's response action shall be limited to the administrative record, (2) the standard of judicial review is whether the defendant proves that the decision was arbitrary and capricious, and (3) the remedy is an award of only those response costs that are not inconsistent with the NCP.  42 U.S.C. § 9613(j).

    Case law is well-settled regarding the recovery of response costs incurred by the Government in connection with the release of hazardous substances from a site such as the McColl Site.  Once the United States shows that it has incurred response costs as a result of a release or threat of release of hazardous substances, the burden shifts to the defendant to show, on the administrative record, that: 1) the response action selected by the Government for which the costs were incurred was inconsistent with the NCP; 2) the Government acted arbitrarily and capriciously or not in accordance with law; and 3) the amount of additional costs incurred as a result.  <u>United States v. Burlington N. R.R. Co.</u>, 200 F.3d at 692, 695.

    Because the evidence establishes that the United States incurred response costs in connection with the release of hazardous substances from the McColl Site, the burden now shifts to the Defendants to prove that the response actions selected by the United States were inconsistent with a specific provision of the NCP.  <u>See</u> <u>Chapman</u>, 146 F.3d at 1170.  Consistency with the NCP is presumed once the Government has established its prima facie case.  <u>Id</u>. at 1170.  Thus, the only basis the Defendants have for challenging the costs incurred by the United States in

connection with the Site is to show, on the administrative record, that the selection of a specific response action was inconsistent with the NCP.  Id. at 1169-70.[13]

In determining whether the Government acted arbitrarily and capriciously, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Occidental Eng'g Co. v. I.N.S. 753 F.2d 766, 769 (9th Cir. 1985); see also City and County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997).  The court is thus not required to "resolve any facts," as EPA is the finder of fact here.  Occidental Eng'g, 753 F.2d at 769-70.  Summary judgment is the "appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  Id. at 770.

Finally, even if a response action is shown to be inconsistent with the NCP, the Defendants have the burden of demonstrating that the cleanup, because of some variance from the NCP, resulted in demonstrably excess costs.  United States v. Burlington N. R.R. Co., 200 F.3d at 695 (citations omitted); W.R. Grace & Co.-Conn., 280 F. Supp. 2d at 1179 ("defendant must prove inconsistency exists and the amount of additional costs that were incurred as a result of the inconsistency").

2.  EPA Compiled Administrative Records As Prescribed by the NCP

The NCP provides that the "documents that form the basis for the selection of a response action" should be placed in an administrative record.  40 C.F.R.

_____

[13] Defendants must prove that selection of a response action, not the associated "costs," was inconsistent with the NCP.  As emphasized in Hardage, "[t]he NCP regulates choice of response actions, not costs.  Costs, by themselves, cannot be inconsistent with the NCP."  982 F. 2d. at 1443 (internal citations omitted).

24

§ 300.800(a) (Mar. 8, 1990).  EPA has compiled an administrative record for the RODs it has issued in connection with the McColl Site.  (Ex. 5, Chan Decl. ¶ 6.) The administrative record contains comments from the public, including those from the Defendants, submitted on EPA's response action decisions, all documents that Defendants attached to their comments, and EPA's response to the comments, in accordance with the NCP.  40 C.F.R. § 300.815 (Mar. 8, 1990).  EPA has certified the administrative record, made it available to the Defendants, and filed the applicable portions of the administrative record with the Court electronically. The filed documents (Exs. 11-57) contain true and correct copies of the original administrative record documents pertaining to activities and costs relevant to this Motion.  (Ex. 5, Chan Decl. ¶ 7.)

## V.  CONCLUSION

The United States has met its burden of demonstrating that it is entitled recover its response costs.  For the reasons set forth above, the Court should enter a ruling that the United States is entitled to recover from the Defendants $48,921,628.87 in unrecovered response costs that it incurred in responding to the hazardous substances at the McColl Site from approximately July 1, 1990 through July 31, 2018.  The United States will seek to recover additional costs incurred after July 31, 2018 by stipulation or through further proceedings in this Court.  The United States further seeks $939,708.75 in interest on the amount the Defendants agreed to pay under the 1994 Consent Decree, as well as the interest that continues to accrue on that amount.  See supra n.11.

Dated: July 10, 2020.

1

2                                          Respectfully submitted,

3                                          /s/ William A. Weinischke
                                           WILLIAM A. WEINISCHKE
4                                          Senior Attorney
5                                          Environmental Enforcement Section
                                           Environment & Natural Resources Division
6
    OF COUNSEL:
7   MADELINE GALLO
8   Assistant Regional Counsel
    Environmental Protection Agency
9   75 Hawthorne Street
10  San Francisco, CA 94105

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          26