# In the United States Court of Federal Claims

No. 19-1795C

(Filed: June 29, 2020)

| | | |
|---|---|---|
| _____ | ) | Suit for recovery of "charges" in |
| **SHELL OIL COMPANY**, *et al.*, | ) | the form of environmental |
| | ) | remediation costs incurred as a |
| Plaintiffs, | ) | result of avgas contracts entered in |
| | ) | the 1940s; *res judicata*; partial |
| v. | ) | breach; Restatement (Second) of |
| | ) | Contracts § 243; application of the |
| **UNITED STATES**, | ) | Contract Settlements Act and the |
| | ) | savings clause of Pub. L. No. 111- |
| Defendant. | ) | 350 |
| _____ | ) | |

  Michael W. Kirk, Cooper & Kirk, PLLC, Washington, D.C., for plaintiffs.  Of counsel were Vincent J. Colatriano and J. Joel Alicea, Cooper & Kirk, PLLC, Washington, D.C.

  Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

  LETTOW, Senior Judge.

  Plaintiffs Shell Oil Company, Atlantic Richfield Company, Texaco Inc., and Union Oil Company of California (the "oil companies") have brought suit against the United States (the "government") to obtain indemnification of costs incurred and related interest for environmental remediation stemming from their performance of war production contracts in World War II.  The factual and procedural posture of this case is closely connected to prior litigation in this court and the Federal Circuit.  In 2018, the Federal Circuit affirmed a decision of this court awarding the oil companies nearly $100 million for remediation costs incurred by the oil companies through November 30, 2015.  *See Shell Oil Co. v. United States*, 896 F.3d 1299, 1316 (Fed. Cir. 2018) ("*Fed. Cir. Damages Opinion*").  That award also included simple interest running up to November 30, 2015, even though payment of the judgment was not made until April 1, 2019.  Compl. ¶ 27.  Remediation remains ongoing, *see* Compl. ¶ 23, and plaintiffs now seek damages for additional remediation costs incurred after November 30, 2015 through November 15, 2019, and interest on those amounts through the date of payment, Compl. ¶¶ 24-26.  They also seek interest related to costs incurred before November 2015 for the period between November 30, 2015 and the date of final payment on April 1, 2019.  Compl. ¶ 27.

The court concludes that plaintiffs are entitled to indemnification and associated interest through the date of payment for remediation costs incurred after November 30, 2015 through November 15, 2019, but they are not entitled to any further interest on remediation costs incurred before November 30, 2015.

## BACKGROUND[1]

### A.  *The Avgas Contracts and Associated Waste*

The events underlying this dispute date back nearly eight decades to a world at war. High-octane aviation gasoline ("avgas"), a technological development of the late 1930s, "enabled aircraft to fly faster and higher, with improved rates of climb and higher payload carrying capacity." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Fed. Cir. Liability Opinion*").  When the December 1941 attack on the naval base at Pearl Harbor plunged the United States into World War II, avgas soon became the "most critically needed refinery product" of the American war effort.  *Id.*  But despite its sudden status as an essential military resource, avgas "production was nowhere near sufficient for the massive quantities the United States and its allies would require to" wage war on a global scale.  *Id.*  Recognizing the critical nature of its need within days after Pearl Harbor, the government concluded that "[i]t is essential, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses be increased immediately to the maximum."  *Id.* at 1286 (emphasis and citations omitted).  Accordingly, the government turned to the American petroleum industry, and in 1942 and 1943 the United States entered into contracts to purchase large quantities of avgas from the oil companies.  *See id.*

The agreements required the oil companies to rapidly "expand avgas production facilities," *Fed. Cir. Liability Opinion*, 751 F.3d at 1286 n.3, and "sell vast quantities of avgas" to the government with an artificially low profit margin between six and seven percent, *id.* at 1286-87.  "The [o]il [c]ompanies agreed to the avgas contracts' low profits in return for the [g]overnment's assumption of certain risks outside of the [o]il [c]ompanies' control," *id.* at 1296, producing a "cooperative endeavor in which the [o]il [c]ompanies worked to achieve the [g]overnment's goal of maximizing avgas production and the [g]overnment assumed the risks of such increased production," *id.* at 1287.  Among the concessions made, the government agreed in each of the contracts to pay "*any new or additional* taxes, fees, or *charges*, . . . which [the oil companies] may be *required by any* municipal, state, or *federal law* in the United States or any foreign country to collect or pay *by reason of the production*, manufacture, sale or delivery *of* [*avgas*]."  Pls.' App. at 19 (emphasis added).[2]

---

[1]The following recitations do not constitute findings of fact by the court.  Instead, the recited factual elements are taken from the complaint, the parties' briefs and attached appendices, and previous opinions in related litigation.

[2]Both plaintiffs and defendant attached appendices to their opening briefs.  Plaintiffs' appendix was consecutively paginated and will be cited as "Pls.' App. at [page number]."  Defendant's appendix was filed in seven separate attachments and will be cited as "Def.'s App. at [appendix number]-[page number]."

These cooperative arrangements would prove "crucial to Allied success in the war," generating a twelve-fold increase in avgas production "from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945." *Fed. Cir. Liability Opinion*, 751 F.3d at 1287 (footnote omitted). But sudden production of avgas on such scale created deleterious environmental side effects. Avgas blends a base of ordinary gasoline with petroleum distillates and other hydrocarbons, the most prevalent of which is alkylate. *See id.* at 1288. Alkylate is produced by the process of alkylation, which employs sulfuric acid as a catalyst and results in a waste product called spent alkylation acid—which, even when further processed to generate a waste product called acid sludge, has severely limited uses. *See id.* Predictably, avgas production on the prodigious scale demanded by the war effort generated vast quantities of acid waste, but the government twice denied applications to construct acid processing facilities, and wartime scarcities in railroad tank cars inhibited transporting it elsewhere for reprocessing or other potential uses including especially as raw material for fertilizer production. *See id.* Consistent with its concentration on the military situation, the government prioritized "production over reprocessing," ultimately requiring the oil companies to dump "spent alkylation acid, along with acid sludge, on property in California owned by Eli McColl." *Fed. Cir. Damages Opinion*, 896 F.3d at 1304 (footnote and citation omitted).[3] The oil companies disposed of acid waste on that property ("the McColl site") from 1942 until shortly after the war ended in 1945, when the need for avgas plummeted and the government terminated the contracts. *See Fed. Cir. Liability Opinion*, 751 F.3d at 1288. "The McColl site closed on September 6, 1946." *Fed. Cir. Damages Opinion*, 896 F.3d at 1304 (citation omitted).

### B. Prior Litigation

Forty-five years later, in the early 1990s, the United States and California sued the oil companies under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, seeking to recover costs from cleaning up the McColl site. The district court first found both the oil companies and the United States jointly and severally liable, *see United States v. Shell Oil Co.*, 841 F. Supp. 962, 975-76 (C.D. Cal. 1993), but later allocated all the cleanup costs to the government as an "arranger" of the disposal, *see United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1030 (C.D. Cal. 1998). The Ninth Circuit reversed that allocation, holding that the United States was not an arranger for most of the waste at the site. *See United States v. Shell Oil Co.*, 294 F.3d 1045, 1062 (9th Cir. 2002).[4] Consequently, the oil companies have borne nearly all the clean-up costs incurred since 1994. Compl. ¶ 16.

On remand from the Ninth Circuit, the district court transferred the oil companies' breach of contract counterclaim to this court. *Fed. Cir. Liability Opinion*, 751 F.3d at 1289. The oil

---

[3]As relevant here, the avgas contracts pertained to the oil companies' refineries in the Los Angeles area: Shell's Wilmington and Dominquez refineries, Atlantic Richfield's Watson refinery, Texaco's Wilmington refinery, and Union's Wilmington refinery. *See* Pls.' Mot. for Summary Judgment at 3, ECF No. 25.

[4]The Ninth Circuit affirmed the district court's ruling that the United States was responsible for the "benzol" waste at the McColl site, which was about 5.5 percent of the total waste. *See Shell Oil*, 294 F.3d at 1049.

3

companies voluntarily dismissed the transferred counterclaim without prejudice in order to exhaust their administrative remedies.  *Id.*  Having done so, they filed a new complaint in this court in 2006.  *See Shell Oil Co. v. United States*, 80 Fed. Cl. 411 (2008).  The court found the government liable for all cleanup costs at the McColl site under the avgas contracts and granted summary judgment to the oil companies, *see id.* at 420, but the Federal Circuit vacated that judgment when it came to light that the judge to whom the case had been assigned had an inadvertent conflict of interest stemming from his wife's investments, *see Shell Oil Co. v. United States*, 672 F.3d 1283, 1290-91 (Fed. Cir. 2012).

On remand from the Federal Circuit, the case was reassigned to a different judge, and the court again granted summary judgment in 2013, but this time to the government.  *See Shell Oil Co. v. United States*, 108 Fed. Cl. 422, 448 (2013).  The Federal Circuit reversed, determining that "[t]he plain language of the new or additional charges provision [] requires the [g]overnment to indemnify the [o]il [c]ompanies for CERCLA costs incurred 'by reason of' the avgas contracts," *Fed Cir. Liability Opinion*, 751 F.3d at 1293, and remanded the case back to this court "to determine how much acid waste at the McColl site was 'by reason of' the avgas contracts," *id.* at 1303.  Yet a different judge of this court held a trial on damages in early 2016, finding that "all of the acid waste disposed of at the McColl site was 'by reason of' the avgas contracts," *Shell Oil Co. v. United States*, 130 Fed. Cl. 8, 34 (2017) (heading) (capitalization omitted), and awarding the oil companies $99,509,847.32 in damages, *id.* at 40.  That amount "represented 100 percent of the costs that the [o]il [c]ompanies had incurred at the McColl [s]ite through November 30, 2015, plus the statutory interest on those costs that had accrued up to that point in time." Pls.' Mot. for Summary Judgment ("Pls.' Mot.") at 8, ECF No. 25.[5]  The Federal Circuit unanimously affirmed the judgment on July 18, 2018, *see Fed. Cir. Damages Opinion*, 896 F.3d at 1316, and the United States paid the oil companies accordingly on April 1, 2019, *see* Pls.' App. at 3 (Decl. of Michael W. Kirk).

### C.  Present Litigation

Remediation of the McColl site remains ongoing at the present time.  The instant dispute centers on (1) cleanup costs the oil companies have continued to incur since November 30, 2015; (2) interest related to those costs; and (3) interest in addition to that already paid on costs previously reimbursed by the government pursuant to the prior judgment.

The oil companies submitted a formal demand for these costs and interest to the General Services Administration on July 29, 2019, *see* Pls.' App. at 195-203, but they received no response, *see* Pls.' Mot. at 10.[6]  Accordingly, they filed their complaint in this court pursuant to

---

[5]The Contact Settlement Act allowed recovery of 2.5 percent simple interest that can continue to run until the date of payment.  *See* 41 U.S.C. § 106(f) (2010) (repealed 2011).  This statutory provision for interest is quoted *infra*, at 5.

[6]The General Services Administration is the successor-in-interest to the Defense Supplies Corporation, a subsidiary of the Reconstruction Finance Corporation, a government-owned corporation.  *See Fed. Cir. Liability Opinion*, 751 F.3d at 1286.

the Contract Settlement Act ("CSA"), Pub. L. No. 78-395, 58 Stat. 694 (1944) (repealed 2011), and the Tucker Act, 28 U.S.C. § 1491, on November 22, 2019. *See generally* Compl.

Between November 30, 2015 and November 15, 2019, the oil companies paid an additional $1,543,840.68 to the contractor overseeing remediation at the McColl site and $69,300.00 to the contractor providing security at the site—a total of $1,613,140.68. Pls.' App. at 207 (Decl. of Edmond F. Bourke). Plaintiffs seek reimbursement of those costs. They also seek interest on these amounts, Compl. ¶ 26—accruing though the date of payment pursuant to the CSA, which provided that federal agencies shall "pay interest on the amount due and unpaid from time to time on any termination claim under a prime contract at the rate of 2½ per centum per annum for the period beginning thirty days after the date fixed for termination and ending with the date of final payment," 41 U.S.C. § 106(f) (2010) (repealed 2011).[7]

Finally, the oil companies note that 41 U.S.C. § 106(f) (2010) (repealed 2011) requires that interest accrue until "the date of final payment." Because the government's April 1, 2019 payment of costs incurred through November 30, 2015, plus interest, only included interest accrued until that time—and did not account for interest accrued up to the date of final payment—they accordingly seek interest accrued on those costs during the period between November 30, 2015 and April 1, 2019, an amount totaling $5,709,993.05. *See* Pls.' Mot. at 10. In sum, plaintiffs seek a total of $7,399,297.46 plus interest accrued on the new remediation costs until such date as payment is made. *Id.*

The oil companies filed a motion for summary judgment on November 25, 2019, *see* Pls.' Mot., and the government filed a response and motion to dismiss on February 4, 2020, *see* Def.'s Mot. to Dismiss and Response to Pls.' Mot. ("Def.'s Cross-Mot."), ECF No. 12. Briefing was completed on May 15, 2020, *see* Pls.' Reply and Response to Def.'s Mot. ("Pls.' Resp."), ECF No. 15; Def.'s Reply to Pl.'s Resp. ("Def.'s Reply"), ECF No. 16; Pls.' Notice of Additional Authority ("Pls.' Notice"), ECF No. 17; Def.'s Response to Pls.' Notice ("Def.'s Resp."), ECF No. 19, and a hearing was held on June 3, 2020. The case is ready for disposition.

---

[7]As this court previously noted:

> In 2011, the CSA was repealed and replaced by An Act To Enact Certain Laws Relating To Public Contracts, Pub. L. 111-350, 124 Stat. 3677. The 2011 Act contained a savings clause providing that, "[t]he laws ... are repealed except for *rights and duties that matured,* penalties that were incurred, and proceedings that were begun before the date of enactment of this Act." Pub. L. No. 111-350, § 7(b), 124 Stat. 3677, 3855 (2011) (emphasis added). Consequently, the Oil Companies may still recover for interest on the environmental remediation costs they have incurred, as the Oil Companies' right to be reimbursed for environmental remediation costs under the Avgas Contracts matured prior to 2011.

*Shell Oil Co.*, 130 Fed. Cl. at 39 n.42, *aff'd*, *Fed. Cir. Damages Opinion*, 896 F.3d at 1306, 1316.

# STANDARDS FOR DECISION

### A. Motion to Dismiss

#### 1. Rule 12(b)(1): Lack of Jurisdiction.

Plaintiff must establish jurisdiction by a preponderance of the evidence. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). The court must, when ruling on a motion to dismiss for lack of jurisdiction, "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). "If a court lacks jurisdiction to decide the merits of a case, dismissal is required as a matter of law." *Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985)); *see also* Rule 12(h)(3) of the Rules of the Court of Federal Claims ("RCFC") ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

#### 2. Rule 12(b)(6): Failure to State a Claim.

Under RCFC 12(b)(6), a complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986)) (additional citation omitted). But conclusory statements of law and fact "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557); *accord Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

### B. Summary Judgment.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC Rule 56(a). A fact is material when it "might affect the outcome of the suit." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (interpreting Fed. R. Civ. P. 56).[8] A genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor of either party. *Id.* at 250.

The movant bears the burden of demonstrating the absence of any genuine disputes of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), which requires the movant to "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," RCFC 56(c)(1)(A). The court may consider other materials in the record even if not cited by the parties. RCFC 56(c)(3). "[T]he inferences to be drawn . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). If the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

### A. Res Judicata *and Partial Breach Doctrine*

The legal issues presented by this case require reference to its pedigree in this court and the Federal Circuit. In that respect, the oil companies and the government find common ground, both conceding that "(1) the parties to this litigation and the previous litigation are identical; (2) the [c]ourt's [prior] judgment became final; and (3) this litigation is based on the same set of transactional facts as the first round of litigation." Pls.' Resp. at 2 (quoting Def.'s Mot. at 8). The parties part ways on the implications of that common ground.

The doctrine of *res judicata* establishes that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action," *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citation omitted), and is central to "the conclusive resolution of disputes," *Montana v. United States*, 440 U.S. 147, 153 (1979) (citations omitted). It protects litigants "from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id*. at 153-54 (footnote omitted).

The bar of *res judicata* generally applies if three prerequisites appertain: "(1) there is identity of parties (or their privies); (2) there has been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir. 2000) (citation omitted). "The doctrine of *res judicata* rests at bottom upon the ground that the party to be affected . . . has litigated or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction." *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 797 n.4 (1996). Thus, a judgment is generally *res judicata* "not only as to all matters litigated and decided by it, but as to

---

[8]Because RCFC 56 mirrors Fed. R. Civ. P. 56, the two rules should be interpreted *in pari materia*.

7

all relevant issues which could have been but were not raised and litigated in the suit." *Heiser v. Woodruff*, 327 U.S. 726, 735 (1946) (citations omitted); *see also Brown v. Felsen*, 442 U.S. 127, 131 (1979) ("*Res judicata* prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.").

The oil companies contend that their claims are not barred by *res judicata* because they fall within a partial breach exception to general claim preclusion principles. *See* Pls.' Resp. at 2-7. The court agrees insofar as it relates to the claims for *new* costs and related interest, but it is not persuaded that such an exception applies to the oil companies' claim for additional interest on the costs already recovered on April 1, 2019 pursuant to the prior judgment.

The partial breach doctrine is implicated when the non-breaching party to a contract has performed its duties under the contract, but the breaching party's obligations under the contract remain unsatisfied or ongoing. Under such circumstances, the non-breaching party is not automatically entitled to immediately recover the full value of the bargain as a result of any breach; instead, "a party to a contract who has no longer any obligation of performance on his side, but is in the position of an annuitant or a creditor exacting payment from a debtor, may be compelled to wait for the installments as they severally mature, just as a landlord may not accelerate the rent for the residue of the term because the rent is in default for a month or for a year." *New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 680 (1936); *see also City of Hampton, Va. v. United States*, 218 F.2d 401, 405 (4th Cir. 1955) ("[I]t is clear . . . that for breach of a contract for the payment of money in instalments, where the contract is unilateral or has become unilateral as the result of performance by the complaining party, the right of recovery is limited to the instalments due at the time of institution of suit."). In sum, "[i]f the injured party elects to or is required to await the balance of the other party's performance under the contract, [its] claim is said instead to be one for damages for partial breach." RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. b (1981). Underlying this precept is the premise that "contract law precludes recovery for speculative damages." *San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997). The law permits "a series of recoveries for partial breach, as opposed to a single recovery for total breach, [] to avoid speculation about the quantum of future damages." *Boston Edison Co. v. United States*, 658 F.3d 1361, 1367 (Fed. Cir. 2011) (citation omitted).

The partial breach doctrine, however, is juxtaposed against principles of *res judicata*, which ordinarily would bar successive claims between identical parties over the same set of transactional facts. If both doctrines were applied in a draconian way, they could engender situations where non-breaching parties might be prevented by the partial breach doctrine from seeking all their claimed post-trial damages in the initial round of litigation but then barred from recovering those same damages in the second round by *res judicata*. The Federal Circuit addressed this precise circumstance in *Indiana Michigan Power Co. v. United States*, noting an exception to the doctrine of *res judicata*: "[a] judgment in an action for breach of contract does not normally preclude the plaintiff from thereafter maintaining an action for breaches of the same contract that consist of failure to render performance due after commencement of the first action." 422 F.3d 1369, 1377 (Fed. Cir. 2005) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 26 cmt. g). The court concluded that "[w]hen a party sues for partial breach, it retains its right to sue for damages for its remaining rights to performance," *id.* (citing RESTATEMENT (SECOND)

OF CONTRACTS § 236(2) (1981)), because "prospective damages for anticipated future nonperformance" are not recoverable in a partial breach case, *id.* at 1376 (citation omitted). In short, if the partial breach doctrine prevented a claim or part of a claim from being resolved in the first place—as it would for a claim for prospective, indeterminate damages—then it is not the kind of claim that would be barred by *res judicata* in a later suit. And that understanding is consistent with the principles underlying *res judicata*, which only bars a claim that "*could have been* but w[as] not raised and litigated" in the first suit. *Heiser*, 327 U.S. at 735 (emphasis added).

Again, the general rule is that when one party has performed its duties under a contract and the other party's obligations are ongoing, a breach by the latter party must be considered partial. *See New York Life*, 297 U.S. at 678-80 (noting that damages may not exceed the amount in default when the suit is commenced); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 243(3) ("Where at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by nonperformance as to less than the whole, whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach."). In these respects, the oil companies' initial lawsuit must be classified as a suit for partial, not total, breach insofar as it sought indemnification for past cleanup costs at the McColl site. Insurance or indemnity agreements like the one at hand are a paradigmatic example giving rise to partial breach claims. *See* RESTATEMENT (SECOND) OF CONTRACTS § 243 cmt. c, ill. 5. Plaintiffs note that the Federal Circuit already conclusively determined that they "held up their end of the bargain," Pls.' Resp. at 5 (quoting *Fed. Cir. Liability Opinion*, 751 F.3d at 1287), but the government's duty to indemnify them under the "charges" clause of the contract carried forward indefinitely. As a result, plaintiffs correctly contend that, when "[t]he [g]overnment breached its contract 60 years *after* the [o]il [c]ompanies had finished performing under the [a]vgas [c]ontracts," *id.* (emphasis in original), they stood "in the position of an annuitant or a creditor exacting payment from a debtor" and as such were "compelled to wait for the instalments as they severally mature," *id.* at 6 (quoting *New York Life*, 297 U.S. at 680). The partial breach doctrine thus applies.

The government's objections to this conclusion are unavailing. First, the government insists that "[t]he oil companies cannot cram these facts into a partial breach analysis" because they "sought a single payment in 2005, with the intent of resolving all of their claims related to the McColl site" and "elect[ed] to treat the alleged breach as total in seeking past and future costs" when they brought suit. Def.'s Reply at 8. In the government's view, the oil companies cannot now characterize the prior claims as claims for a partial breach when they originally elected to plead a total breach, thereby merging their demands for future damages into the judgment awarding past damages. *See* Hr'g Tr. at 30:20 to 31:22 (June 3, 2020).[9] That contention is unpersuasive to the extent that the government would apply it to costs incurred after the prior trial. What the government overlooks is that, even if the oil companies in their complaint in the prior action had sought future costs, plaintiffs could not effectively elect to treat their claims for future costs as part of a total breach. *See* RESTATEMENT (SECOND) OF CONTRACTS § 243(3); *New York Life*, 297 U.S. at 680. The mere fact that plaintiffs asserted those claims in their complaint in the first case did not make them viable claims. "[C]ontract law

---

[9]Further citations to the hearing conducted on June 3, 2020 will omit the date.

precludes recovery for speculative damages," *San Carlos Irrigation*, 111 F.3d at 1563, and it would be difficult to describe an attempt by the oil companies at the time of the first suit to project future costs they might (or might not) incur as anything but speculative. And, those claims for speculative future damages did not merge into the judgment rendered but were simply put aside and not reflected in, or addressed by, the judgment.[10]

Second, the government maintains that the oil companies were obligated to claim a total breach because the government had repudiated any obligation under the contracts. *See* Def.'s Reply at 8-10. To support this contention, the government cites a comment in the Restatement (Second) of Judgments, which states that if a breach is followed by repudiation "and the plaintiff thereafter commences an action for damages, he is obliged in order to avoid 'splitting,' to claim all his damages with respect to the contract, prospective as well as past, and judgment in the action precludes any further action by the plaintiff for damages arising from the contract." Def.'s Reply at 9 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 26 cmt. g). That statement is inconsistent with the more specific statement found in the Restatement (Second) of Contracts, which expressly specifies that—under circumstances exactly like these, where "the only remaining duties of performance are those of the party in breach and are for the payment of money in installments"—non-performance by the breaching party, "whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach." RESTATEMENT (SECOND) OF CONTRACTS § 243(3); *see also id.* § 243 cmt. c, ills. 4, 5. The tension between these two provisions can be reconciled by noting the generality of the former and the specificity of the latter, and as the facts at hand are precisely described by the more specific provision, they fit squarely within its purview.

It also is not apparent that the government acted explicitly to repudiate the content in conjunction with the first claim. The government points to a denial in 2006 by the General Services Administration ("GSA") of the oil companies' claims as an "unequivocal repudiation of any obligations under the avgas contracts." Def.'s Reply at 9.[11] But the GSA's denial did not

---

[10]Relatedly, the government contends that to the extent the oil companies did not pursue their claims for future costs to judgment in the prior litigation or on appeal, they waived those claims. *See* Def.'s Cross-Mot. at 13; Def.'s Reply at 11. "Waiver consists of a voluntary and intentional relinquishment of a known right." *Cherokee Nation v. United States*, 355 F.2d 945, 950 (Ct. Cl. 1966). The government's position fails because it incorrectly assumes that the future claims were available to plaintiffs in the first suit. The partial breach doctrine precluded the oil companies from receiving speculative future damages in this context and, accordingly, they could not have waived a right to claims that they could not assert.

[11]The GSA denial read as follows:

> I have reviewed your claim and can find no basis for recovery and no basis for the appointment of a contracting officer. Specifically, your letters assert a termination claim under § 113(a) of the Contract Settlement Act of 1944 (the "Act"), 41 U.S.C. § 113(a) for terminated World War II contracts, yet no evidence has been provided demonstrating that these war contracts were actually terminated for the convenience of or at the option of the former Defense Supplies Corporation, rather than expiring of their own accord. War contracts that were not terminated

constitute a repudiation. "Repudiation occurs when one party refuses to perform and communicates that refusal distinctly and unqualifiedly to the other party." *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1344 (Fed. Cir. 2000) (citations omitted). GSA's denial reveals that it sets forth a conclusion about the GSA's ability to assert jurisdiction over the claims under the CSA. The denial did not constitute a distinct and unqualified refusal to perform, but an insistence that GSA did not possess authority to assert jurisdiction over the claims under the CSA because of its view that the avgas contracts had not been terminated after the war. That interpretation of the denial is also consistent with the government's position throughout the previous litigation, where it never claimed repudiation but consistently maintained that the contract simply did not require it to indemnify the oil companies. *See* Hr'g Tr. at 12:3-9. In short, the government cannot show that it repudiated the contract or, even if it had done so, that the partial breach doctrine was inapplicable.

One further, separate, aspect of *res judicata* deserves attention. The partial breach doctrine does not preserve the oil companies' claim for interest accrued through the date of payment on the charges awarded in the first suit. Unlike plaintiffs' claims for future damages—which were speculative and barred by the doctrine of partial breach—the oil companies could have sought interest on past damages through the date of payment under Section 106(f) of the CSA in the first suit, and the decision to award such interest was within the discretion of the court. *See, e.g.*, *Modeer v. United States*, 68 Fed. Cl. 131, 145 (2005) (awarding "interest running from the date indicated in the parties' notice to the date this judgment is paid"). Accordingly, that claim for interest merged into the prior judgment and is barred from consideration in this subsequent claim.[12]

## B. The Contract Settlement Act

In 2011, a legislative enactment reorganizing federal public contract law included a detailed table of statutory provisions repealed thereby. Pub. L. No. 111-350, 124 Stat. 3677, 3855-62 (Jan. 4, 2011). Among those repealed provisions was the CSA and its interest-mandating section, but preceding the list of repealed provisions Congress included a savings clause stating that "[t]he laws specified in the following schedule are repealed, except for rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act." *Id.* at 3855. The parties dispute whether any of those exceptions in the savings clause apply to preserve the oil companies' claims. The government contends that because "[n]o proceeding had begun with respect to the 2019 claim as of [the date of repeal],"

---

        in the manner prescribed by the Act are not eligible for compensation or consideration under the Act. See 41 U.S.C. §§ 103(d) and 103(h).

Def.'s Reply at 9.

   [12]The government also challenges this court's jurisdiction to award pre-judgment interest on similar CERCLA-related litigation currently pending in the District Court for the Central District of California. *See* Def.'s Cross-Mot. at 21-22; Hr'g Tr. at 6:5 to 9:1. Nonetheless, the court need not address that matter because the oil companies aver that they "have not yet incurred these costs" and thus the "argument is premature." Pls.' Resp. at 1 n.1.

11

Def.'s Reply at 14, and because its duties under the avgas contracts had not matured by the time of repeal in 2011, "the court lacks jurisdiction to entertain this action under the CSA," Def.'s Cross-Mot. at 16 (heading) (capitalizations omitted). The court finds the government's position unpersuasive because the rights and duties of the parties had matured before the repealing statute's enactment.[13]

The parties do not dispute that the oil companies' rights under the contracts had matured by the 1990s at the latest, well before the repeal. *See* Pls.' Response at 17-18; Def.'s Reply at 16; Hr'g Tr. at 35:20 to 36:5.[14] But the government correctly observes that "both 'rights' *and* 'duties' must have 'matured' as of January 4, 2011, for a claim to be cognizable under the CSA." Def.'s Cross-Mot. at 17 (emphasis in original) (citation omitted). It then notes that "no CSA contracting officer claim had been filed as of 2011," and thus "the savings clause of the [repealing statute] cannot apply" because "the [g]overnment lacked any CSA 'duty' at the time that law was repealed." *Id.* The government insists that the court's assertion of CSA jurisdiction over the oil companies' complaint in 2006 does not mean that "any right to payment under the same contracts must have 'matured' before 2011" because "a right to seek reimbursement cannot lead to a 'duty' to reimburse until the contractor actually seeks reimbursement and, thus, there can be no duty to reimburse absent a plaintiff's election to invoke its rights." *Id.* (emphasis and citation omitted). In other words, the government contends that the event triggering its duty was the oil companies' formal request for reimbursement now before the court, which occurred after 2011.

When the government's duty to indemnify the oil companies matured is thus the dispositive question in determining whether this provision in the savings clause applies. The avgas contracts established corresponding rights and duties—a right to reimbursement and a duty to indemnify—and likewise defined when those rights and duties would mature. The contracts did not specify a precise time for performance. Given the unforeseeable nature of the costs obviously contemplated by the indemnification provisions, they could not have done so. But the

---

[13]The government also seeks to undermine the court's jurisdiction over claims made by Atlantic Richfield Company and Texaco by reference to the Anti-Assignment Act, 41 U.S.C. § 6305, which sets out a general bar of unconsented assignments of government contracts. *See* Def.'s Cross-Mot. at 20-21. The merits of that position were subsequently rebutted and conceded as a factual matter after consideration of corporate reorganizations through the decades. *See* Hr'g Tr. at 22:4 to 23:1. The Texas Company, an entity that entered a contract for avgas production, simply changed its name in 1959. *See* Pls.' Reply at 23-24. Atlantic Richfield's predecessor-in-interest, the Richfield Oil Corporation, entered into avgas contracts in 1942. In 1966, Richfield Oil Corporation merged into the Atlantic Refining Company. That latter company was the surviving corporation, and it changed its name to the Atlantic Richfield Company. *Id*. Transfers by operation of law fall outside the Anti-Assignment Act's prohibition. *See Seaboard Airline Ry. v. United States*, 256 U.S. 655, 657 (1921) (The Act does not apply to transfers arising from "the orderly merger or consolidation of corporations.").

[14]The court previously held as much when it concluded that "the [o]il [c]ompanies['] right to be reimbursed for environmental remediation costs under the [a]vgas [c]ontracts matured prior to 2011." *Shell Oil Co.*, 130 Fed. Cl. at 39 n.42.

agreements did indicate when the government's obligation or duty would be triggered, *i.e.*, when the oil companies' corresponding liability arose and charges were incurred.

Under the plain language of the agreements, the government's duty to pay any new or additional charges the oil companies incurred by reason of the production of avgas was not contingent on the oil companies' act of seeking reimbursement, but instead upon their incurrence of new liabilities dictated by federal law. The agreements thus indicate that the government's duty to pay arose at whatever time the oil companies became liable to pay charges required by CERCLA due to their production of avgas—and both parties agree that that happened, at the latest, when the oil companies were found liable for remediation at the McColl site in the 1990s, well before the CSA's repeal. That no breach could occur until the oil companies demanded performance is irrelevant to whether the government previously had an existing duty to eventually perform.

In support of this conclusion, the oil companies rely on *Kratz v. United States*, 300 F.2d 461 (Ct. Cl. 1962). *See* Pls.' Resp. at 19-20. *Kratz* involved an Army Reserve officer who had been selected for promotion from lieutenant colonel to colonel, but without issuing his promotion orders, the Army forced him to retire in 1952 when he was found permanently unfit for duty due to physical disability. *Kratz*, 300 F.2d at 482. Kratz was entitled to a colonel's pension under a 1947 statute, and he sued after receiving a lieutenant colonel's pension, but the government argued that he was not entitled to the larger pension because the 1947 statute was repealed in 1956. *Id.* at 482-83. The repealing statute, however, contained a savings clause like the one at issue here, leading the court to conclude that "[p]laintiff's rights 'matured' under the Act of 1947 by virtue of his retirement as a lieutenant colonel in 1952, and the subsequent repeal of [the relevant statute] . . . in 1956 had no effect on his right to recovery under that [statute]." *Id.* at 484. The oil companies stress that "*Kratz* forecloses the [g]overnment's argument that the [o]il [c]ompanies' right to indemnification—and the [g]overnment's corresponding duty to indemnify them—matured when the [o]il [c]ompanies demanded that the [g]overnment perform its duty." Pls.' Resp. at 20. Rather, they note that in *Kratz*, the "claim matured when he retired, not when he demanded his pension" and "[t]he latter was completely irrelevant to the Court of Claims' decision." Pls.' Resp. at 20 (citations and emphasis omitted).

The government unsuccessfully attempts to distinguish *Kratz* by emphasizing that the plaintiff there was challenging governmental action—namely, the decision to medically retire him as a lieutenant colonel rather than colonel—that happened in 1952 before the statute's repeal in 1956. *See* Def.'s Reply at 16. "Here," the government asserts, "the first action by the [f]ederal [g]overnment with respect to the contracts was the denial of plaintiffs' claims, submitted [in 2019] more than eight years *after* repeal." *Id.* at 17 (emphasis in original). But the government misstates the governmental action at issue. The action relevant here reaches all the way back to the 1940s, when the government agreed to reimburse future charges the oil companies might incur by reason of the avgas contracts. That duty was triggered decades later, but well before the repeal of the CSA, when the oil companies became liable for remediation costs at the McColl site.

The government cites *Ford Motor Co. v. United States*, 378 F.3d 1314, 1317 (Fed. Cir. 2004), for the proposition that plaintiffs must make an administrative demand for written findings as a "necessary predicate" for bringing a claim under the CSA. *See* Def.'s Reply at 15.

13

On that basis, the government contends that administrative exhaustion under the CSA was required before it had any duty to pay. *Id.* But that postulate misinterprets the implications of *Ford Motor*, which says nothing about when a duty matures but simply clarifies that certain administrative procedures are "a necessary predicate to bringing a claim under the CSA." *Ford Motor*, 378 F.3d at 1317. The CSA does not dictate when the rights and duties defined in a contract mature for purposes of the savings clause in the repealing statute; rather, it defines a set of procedural rules that are unrelated to the substantive legal obligations arising under an independent contractual agreement like the one here. In sum, *Ford Motor* has no bearing on whether the savings clause of the repealing statute applies here.

The government's reliance on *Tektel, Inc. v. United States*, 121 Fed. Cl. 680 (2015), is likewise misplaced. The government cites *Tektel* to support the proposition that its duties could not mature until the oil companies had exhausted their administrative remedies. *See* Def.'s Cross-Mot. at 18. But it dismisses a significant difference between *Tektel* and this case. The driving force requiring the exhaustion of administrative remedies before rights matured in *Tektel* was a provision to that effect in the contract itself. *See Tektel*, 121 Fed. Cl. at 686. The avgas contracts at issue here contained no such requirement. The government would graft such requirements onto the plain language of the contracts by incorporating the procedural rules of the CSA, which it asserts are a necessary predicate under *Ford Motor* to bringing any CSA claim. As already noted, however, the CSA establishes required procedures for bringing a claim thereunder; it does not purport to define rights and obligations under the contract itself. And unlike the contract at issue in *Tektel*, the avgas contracts do not specify any set of procedures the oil companies must follow before the government's duty to indemnify can mature. The plain terms of the contract indicate that the duty matured in tandem with the oil companies' corresponding incurrence of liability. *Tektel* is thus not relevant to when the government's duty to indemnify the oil companies matured.

C. *Statute of Limitations*

The government also asserts that the oil companies' claims are time-barred under the CSA and the Tucker Act, both of which have their own applicable statutes of limitations. *See* Def.'s Cross-Mot. at 15-16. Because the court determines that it possesses jurisdiction under the CSA, it need not address whether it would similarly have jurisdiction, at least over non-interest claims, pursuant to the Tucker Act.

The CSA requires plaintiffs to submit a claim to the relevant contracting agency, but "[t]he claim is subsequently time-barred if the contractor fails to initiate civil proceedings within ninety days after delivery of the [agency's] findings or, if no findings are provided, within one year after the demand for findings." *Ford Motor*, 378 F.3d at 1316-17 (referring to 41 U.S.C. § 113(a)-(c)). The government asserts that "the oil companies' 2019 administrative claim and complaint seek a subset of the exact relief that they demanded in their 2005 administrative claim and 2006 complaint," and because "GSA denied that claim in 2006 . . . all of plaintiffs' claims in this case accrued no later than 2006." Def.'s Cross-Mot. at 15 (emphasis omitted). Therefore, the government considers the complaint time-barred under the CSA. *Id.*

The government's position is premised on the same faulty assumptions as its assertion of *res judicata*. Insisting that "[f]iling a second administrative claim cannot restart the clock,"

14

Def.'s Reply at 12, the government assumes that the oil companies cannot now bring these claims because they brought the same claims in 2006. But as already noted, under the partial breach doctrine—regardless of their aspirational but unavailing inclusion of such costs in the 2006 claims—the oil companies could not previously bring these claims and the court could not previously consider them. *See New York Life*, 297 U.S. at 680. Thus, the oil companies correctly observe that "nothing in the CSA forbids [them] from obtaining jurisdiction under the CSA in a second, follow-on lawsuit that is otherwise permitted by principles of preclusion." Pls.' Resp. at 12 (emphasis removed).

### D. The Government's Insurance-Offset Defense

In the aftermath of CERCLA's enactment, thousands of claims made against the oil companies led them in turn "to make claims on hundreds of general liability insurance policies that were in effect over different periods for over half a century," and "the [o]il [c]ompanies entered a series of omnibus settlement agreements with their insurers" in the 1990s. Hr'g Tr. at 23:3-12. The government now seeks "to assert insurance recovery defenses based upon the massive amounts that plaintiffs obtained from their insurers." Def.'s Cross-Mot. at 22. Such defenses, however, are barred in this suit by principles of preclusion. And in any event, recoveries from independent insurance agreements cannot offset the government's obligation to indemnify the oil companies because remote insurance transactions do not appertain to calculating damages.

Principles of *res judicata* generally apply to both claims and defenses. *See Brown*, 442 U.S. at 127. "When a valid and final personal judgment is rendered in favor of the plaintiff . . . the defendant cannot avail himself of defenses he might have interposed, or did interpose, in the first action." RESTATEMENT (SECOND) OF JUDGMENTS § 18 (1982); *see also Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1297 (Fed. Cir. 2001) (holding as precluded "a defense that was or could have been raised in the prior litigation"). Here, as already noted, the oil companies' claims fit within the partial breach exception to *res judicata*, but no such exception applies to the government's insurance-offset defense. The Federal Circuit previously affirmed this court's conclusion that attempting to offset liability by reference to third party payments "is an affirmative defense and hence waivable." *Fed. Cir. Damages Opinion*, 896 F.3d at 1315. It then held that the government waived the defense and concluded that permitting the government to amend its answer to include it would prejudice the oil companies because "nearly a decade had passed since the [o]il [c]ompanies filed their [c]omplaint . . . and more than seven decades had passed since the operative events that gave rise to the insurance policies." *Id.* at 1316 (citation omitted). Accordingly, the government may not now—absent some showing, which it has not made, that it is exempt from preclusion—raise a defense in this suit that it could have timely raised in the prior suit.

Moreover, the government's defense fails on the merits. Because of the "the endlessness and futility of the effort to follow every transaction to its ultimate result," the law does not generally "go beyond the first step" in calculating damages. *Southern Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S 531, 533-34 (1918). Paradigmatic of remote transactions that do go beyond the first step, and are thus irrelevant for calculating damages, are those involving insurance recoveries. *See id.* at 534 (noting that the recovery of insurance is not something with which defendants are concerned). "An injured party's recovery from third parties does not

decrease the amount of the wrongdoer's liability." *Wisconsin Elec. Power Co. v. United States*, 90 Fed. Cl. 714, 794 (2009). And, despite the government's protestations to the contrary, *see* Def.'s Cross-Mot. at 24-25, the rule makes no distinction as to whether the recovery precedes or succeeds the breach. Such an arbitrary classification would further complicate determinations about when and what transactions could or could not be considered, undermining the very rationale for cutting off the inquiry at the first step. That the oil companies later recovered some amount of the remediation costs they incurred due to the production of avgas is thus irrelevant to the government's independent obligation to indemnify them for such costs.

## CONCLUSION

For the reasons stated, plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART. Plaintiffs are entitled to indemnification for remediation costs incurred at the McColl site since November 30, 2015 through September 30, 2019, amounting to $1,613,140.68. Plaintiffs are also entitled to interest on such costs, accruing through the date of final payment, at the rate and terms specified in 41 U.S.C. § 106(f) (2010). All costs and interest shall be allocated between plaintiffs in accord with the percentages specified in plaintiffs' complaint. *See* Compl. ¶ 23.[15] Plaintiffs' claim for interest on remediation costs incurred before November 30, 2015 is DISMISSED. The clerk is directed to enter judgment accordingly.

Plaintiffs are awarded their costs of suit.

It is so **ORDERED**.

                                                          s/ Charles F. Lettow  
                                                          Charles F. Lettow  
                                                          Senior Judge

---

[15]That allocation is as follows: Shell, 58.58%; Union Oil, 18.94%; Atlantic Richfield, 18.94%; Texaco, 3.54%. *See* Pls.' Mot. at 37.