JS-6

FILED
CLERK, U.S. DISTRICT COURT

12/10/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CW___ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA DEPARTMENT OF HEALTH SERVICES HAZARDOUS SUBSTANCES CLEANUP FUND, <br><br> Plaintiffs, <br><br> v. <br><br> SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, TEXACO INC., LOS COYOTES ESTATES LTD., RAMPARTS RESEARCH & FINANCIAL CORPORATION, and MCAULEY LCX CORP., <br><br> Defendants. | Case No.: CV 91-00589-CJC <br><br><br><br><br><br><br> **ORDER GRANTING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT [Dkt. 674]** |

# I.   INTRODUCTION

This 1991 case concerns who must pay to clean up contamination associated with World War II aviation fuel production on a 22-acre site in Fullerton, California called the McColl Superfund Site (the "McColl Site" or the "Site").  Liability between the parties—Plaintiff the United States government and Defendants Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, Texaco Inc., Los Coyotes Estates Ltd., Ramparts Research & Financial Corporation, and Mcauley LCX Corp. (the "Oil Companies")—has already been established.  All that remains is to determine what costs of the cleanup the United States may recover.  Now before the Court is the United States' motion for summary judgment on that issue, in which it seeks $49,861,337.62 from the Oil Companies.  (Dkt. 674 [Motion, hereinafter "Mot."].)  The Court held a hearing on the motion on November 9, 2020.  For the following reasons, the motion is **GRANTED**.

# II.   BACKGROUND

## A.   Contamination

During World War II, the United States government asked oil companies to quickly produce large amounts of aviation fuel (colloquially referred to as "avgas") to support the war effort.  *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002).  The Oil Companies entered into contracts with the United States to do so.  *See id.* The rapid production of such large amounts of fuel, however, meant that hazardous substances including acid sludge were "generated in much greater quantities than ever before."  *Id.* at 1050.  "[T]he Oil Companies dumped most of it."  *Id.*  As relevant to this case, from June 1942 until shortly after the end of the war, the Oil Companies dumped 72,600 cubic yards of petroleum refinery waste (mostly acid sludge) at the McColl Site. *Id.*; (Dkt. 676-7 [Declaration of Rusty Harris-Bishop, hereinafter "Bishop Decl."] ¶ 7.)

Although the area around Site was sparsely populated at the time of the dumping, it is now located in the boundaries of the Los Coyotes Country Club, with a golf course and numerous residences.  (*Id.* ¶¶ 6–7.)  Residents living near the Site noticed bad odors and waste oozing from the surface of the land, and reported "eye irritation, nausea, headaches, and sore throats up to two times more often than did the residents of the more distant comparison neighborhoods." (Dkt. 676-11 [Source Operable Unit Record of Decision for the McColl Superfund Site, June 1993]; Dkt. 676-16 [results from 1990 health study conducted by California Department of Health].)

## B.    Cleanup

Cleaning up the damage from the Oil Companies' dumping was no small task. (*See* Bishop Decl. ¶¶ 14–20.)  Before the cleanup could begin, the government had to investigate and study the nature and extent of the release of hazardous substances, conduct feasibility studies, evaluate proposed cleanup alternatives, conduct health and treatability studies, and perform community relations work.  (Mot. at 9–10.)  Then, it took years of planning from numerous agencies and over a year of construction work from 29 contractors to perform the actual cleanup.  (*See* Bishop Decl. ¶¶ 17–20.)  The cleanup work addressed both soil contamination (to prevent residents from inhaling volatile organic compounds emitted from waste or ingesting contaminated garden vegetables) and groundwater contamination.  (*Id.* ¶¶ 11–12.)  To address soil contamination, the EPA created a "RCRA-equivalent closure system," which meant it constructed a multi-layer cap over the untreated sumps with a gas collection and treatment system to prevent water infiltration and hazardous air emissions, built subsurface walls around the sumps to prevent migration of water-soluble and gaseous contaminants, and stabilized steep slopes with retaining walls.[1]  (*Id.* ¶ 14.)  To address

---

[1] This was the contingency remedy.  The EPA had studied and planned for another remedy called "Soft Material Solidification" before it concluded that remedy was not feasible for the Site.

groundwater contamination, the EPA redirected surface water off the site, graded areas adjacent to the containment system, and lined onsite drainage channels with low permeability materials. (*Id.* ¶ 15.)

### C.  Types of Costs Incurred

Performing all of these tasks was, unsurprisingly, expensive. The enormous amounts of costs come in various forms. The different types of costs are best summarized by the below chart prepared by the EPA[2]:

| Type | Overview |
|---|---|
| Direct costs | Expenses directly traced to a particular activity, such as a cleanup action. These costs can include the following expenses incurred by EPA and the cleanup contractor: time spent on a cleanup-related activity, travel to and from the site, contractor costs at the site, and equipment used at the site, etc. |
| Indirect costs | Indirect costs are EPA's expenses for managing the Agency. These costs are not directly traceable to any particular cleanup activity and may include costs associated with: administrative matters, personnel issues, guidance development, and office, utility, and supply costs, etc. EPA developed a complex methodology for allocating these costs among all of the activities accomplished during a year. |
| Contractors' annual allocation costs | Money spent by government contractors doing site-related work not traceable to a particular site. For example, training in handling hazardous materials. This training is essential to Superfund cleanup site work, but the training received may be used at several sites. On an annual basis, government contractors allocate these costs across the sites that they have worked on during the past year. The contractor provides EPA with a site-specific allocation of the cost and EPA treats them as direct costs. |

---

[2] *Available at* https://www.epa.gov/enforcement/superfund-cost-recovery.

### D.    This Case

In 1991, the United States and California brought this case against the Oil Companies under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, alleging that the Oil Companies were responsible for the release of hazardous substances and should pay the cleanup costs.[3]  In an appeal from Judge Robert J. Kelleher's 1993 summary judgment order regarding liability, *United States v. Shell Oil Co.*, 841 F. Supp. 962, 975 (C.D. Cal. 1993), the Ninth Circuit held that the Oil Companies are liable for all cleanup costs at the Site, except that the Government is liable for cleanup costs relating to the disposal of benzol acid waste.  *Shell*, 294 F.3d at 1060–62.  After the Ninth Circuit's ruling, the parties stipulated that the United States' fair share for benzol waste contamination at the Site is 6.25%.  (Dkt. 507.)  With liability established, the only question remaining before this Court is what amount of costs the United States may recover.  By this motion, the United States seeks all of the costs the EPA and DOJ incurred from 1990 to 2019, plus prejudgment interest, less the United States' stipulated 6.25% share.

## III.   LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial

---

[3] The Oil Companies counterclaimed for breach of contract, arguing that indemnification provisions in their contracts with the United States required the United States to pay for the cleanup.  *See id.*  The counterclaim was transferred to the Court of Federal Claims.  *See Shell Oil Co. v. United States*, 896 F.3d 1299 (Fed. Cir. 2018); *Shell Oil Co. v. United States*, 2020 WL 3618890 (Fed. Cl. June 29, 2020).

burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 325. A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position. Fed. R. Civ. P. 56(c)(1)(A)–(B). The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## IV.   DISCUSSION

The United States presents voluminous evidence regarding the amount of money it spent responding to the McColl Site contamination.  That evidence includes numerous reports describing how the EPA decided what work to perform, what work was actually performed, and the cost of that work, declarations from various individuals at the EPA and the DOJ summarizing the costs incurred, and declarations from experts determining the costs to be reasonable.  (*See generally* Dkts. 676-1–676-37; Dkts. 677-1–677-28.)  In arguing that summary judgment is not appropriate, the Oil Companies contend that (A) the United States may not recover under CERCLA Section 107, (B) the United States fails to show that the costs are consistent with the NCP, and (C) there are genuine disputes of material fact as to the appropriate amount of recovery.

### A.   Whether the United States May Recover Under Section 107

The Oil Companies first argue that the United States may not pursue a cost recovery claim under CERCLA Section 107, and instead is limited to a contribution claim under CERCLA Section 113.  (Dkt. 689 [Opposition, hereinafter "Opp."] at 12–18.)  "CERCLA provides two mechanisms for private parties to recover their environmental cleanup expenses from other parties." *Whittaker Corp. v. United States*, 825 F.3d 1002, 1006 (9th Cir. 2016).  First, Section 107 allows parties to bring "cost recovery" actions against polluters for response costs incurred.  42 U.S.C. § 9607(a);

1    *United States v. Atl. Research Corp.*, 551 U.S. 128, 132 & n.1 (2007).  Second, CERCLA

2    Section 113(f) authorizes one "potentially responsible party" or "PRP" to sue another

3    PRP for contribution if the polluter has been sued in a Section 107 cost recovery action or

4    settled with the government.  42 U.S.C. §§ 9613(f)(1), (f)(3)(B); *Whittaker*, 825 F.3d at

5    1006; *Atl. Research*, 551 U.S. at 132 & n.1.  Although the remedies are distinct, they are

6    "similar and somewhat overlapping."  *Key Tronic Corp. v. United States*, 511 U.S. 809,

7    816 (1994).  A party uses cost recovery to get reimbursed for its own voluntary cleanup

8    costs, and contribution to get reimbursed for being made to pay more than its fair share to

9    someone else.  *Whittaker*, 825 F.3d at 1007.

10

11    For a time, there was a question of whether PRPs had rights under Section 107, or

12    whether PRPs could only bring claims under Section 113.  The Supreme Court in *Atlantic*

13    *Research* determined that PRPs could recover under either Section 107 or 113 depending

14    on the "procedural circumstances."  *Id.* at 139.  The Court explained that Section 107 and

15    113 remedies "complement each other by providing causes of action to persons in

16    different procedural circumstances"—Section 107(a) to a party who has itself incurred

17    cleanup costs, and Section 113(f) to PRPs with common liability stemming from a

18    Section 107(a) action.  *Id.* at 139.  And it concluded that "the plain terms of

19    § 107(a)(4)(B) allow a PRP to recover costs from other PRPs."  *Id.* at 141.

20

21    After *Atlantic Research*, courts concluded that "a private party must use a § 113(f)

22    contribution action to recover expenses paid under a settlement agreement or a

23    judgment."  *Whittaker*, 825 F.3d at 1009; *see id.* at 1007 ("[A] party who *may* bring a

24    contribution action for certain expenses *must* use the contribution action, even if a cost

25    recovery action would otherwise be available.").  On the other hand, a PRP that incurs

26    costs voluntarily, without having been subject to an action under Section 107, may bring

27    a suit for recovery of its own costs under Section 107.  *Id.* at 933.

28

The Oil Companies argue that the United States cannot recover under Section 107 because after the case was filed, (1) the Ninth Circuit allocated 100% of the cleanup costs for benzol waste to the United States, (2) the Court of Federal Claims determined that the United States must reimburse the Oil Companies for remediation costs of expenses paid to the contractors overseeing remediation and providing security at the Site between November 30, 2015 and November 15, 2019, *Shell Oil Co. v. United States*, 148 Fed. Cl. 781, 787 (2020), (3) the United States has entered into partial consent decrees with the State of California for the State's responses costs related to the Site; and (4) the parties have stipulated to an allocation of cleanup costs at the Site under Section 113(f). (Opp. at 15.) They contend that the United States either never had a viable Section 107 claim, or that it lost such a claim once it was adjudicated liable under CERCLA, lost on the contract claims in the Court of Federal Claims and Federal Circuit, and settled with California. (*Id.*)

The Court is not persuaded. First, it is not clear that *Atlantic Research* and its progeny apply here. That case interpreted the rights and obligations of *private parties* under CERCLA. What is at issue here are the rights and obligations of the United States. CERCLA treats the two types of parties differently. *Compare, e.g.*, 42 U.S.C. § 9607(a)(4)(A) *with* 42 U.S.C. § 9607(a)(4)(B); *see, e.g.*, *United States v. Simon Wrecking, Inc.*, 481 F. Supp. 2d 363, 366 (E.D. Pa. 2007) (explaining that case proscribing rights of private party under CERCLA was not binding precedent because it did not address the rights of the federal government); *United States v. Gurley*, 317 F. Supp. 2d 870, 882 (E.D. Ark. 2004), *aff'd,* 434 F.3d 1064 (8th Cir. 2006) (declining to apply cases rejecting recovery under Section 107 and limiting recovery to Section 113 that involved private parties because they were "clearly distinguishable from the cases brought by the United States"). Indeed, when Congress enacted Section 113, it explained:

> This section does not affect the right of the United States to maintain a cause of action for cost recovery under Section 107, or injunctive relief under Section 106, whether or not the United States was an owner or operator of a facility or a generator of waste at the site.

*Id.* (citing H.R. Rep. No. 99-253, pt. 1 at 79–80 (1985)).

Even if *Atlantic Research* and cases interpreting it do apply here, the Court does not believe that they preclude the government from recovering in this Section 107 action. The situation where "a PRP cannot choose remedies, but must proceed under § 113(f)(1) for contribution" is where "the party has paid to satisfy a settlement agreement or a court judgment pursuant to an action instituted under § 106 or § 107." *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 932 (9th Cir. 2008) (internal citations omitted).  That is not what happened here.  In this case, filed in 1991, the United States does not seek to recover some payment it made to satisfy a settlement or court judgment.  Rather, it seeks to recover costs it incurred removing or remediating contamination at the Site.  Section 107 is the proper vehicle to do that.  *Kotrous*, 523 F.3d at 932 ("If, however, the private party has itself incurred response costs, it may seek recovery under § 107.").

**B.    The Applicable Subsection of Section 107**

Having concluded that the United States may pursue a remedy under Section 107, then, the Court must determine which subsection of Section 107 applies.  CERCLA makes PRPs liable for, among other things:

> (A) all costs of removal or remedial action incurred <u>by the United States Government</u> or a State or an Indian tribe not inconsistent with the national contingency plan;

> (B) any other necessary costs of response incurred <u>by any other person</u> consistent with the national contingency plan;

42 U.S.C. § 9607(a)(4) (emphases added).  The Oil Companies argue that the United States should not be treated as the United States under subsection (A) because it is a PRP liable for 6.25% of benzol waste cleanup at the Site, and instead should be treated as "any other person" under subsection (B).  (Opp. at 10–12.)  The difference matters because, among other things, subsection (A) gives the government a presumption that costs incurred were not inconsistent with the NCP, leaving the primary burden on the party opposing recovery.  *United States v. Chapman*, 146 F.3d 1166, 1170 (9th Cir. 1998) ("When the United States is seeking recovery of response costs, consistency with the NCP is presumed."); *Washington State Dept. of Transportation v. Washington Natural Gas Co., ("WSDOT")*, 59 F.3d 793, 799–800 (9th Cir. 1995).  In contrast, subsection (B) requires that the person seeking recovery show that the response costs were consistent with the NCP.  *Waste Mgmt. of Alameda Cty., Inc. v. E. Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001).

In essence, the Oil Companies argue that the United States loses its status as a governmental entity when it becomes a PRP.  (*See* Opp. at 11.)  The Court disagrees.  The phrase "any other person" in Subsection (B) means any person *other than* the three entities identified in Subsection (A), i.e. the United States, a State, or an Indian Tribe.  *Atl. Research*, 551 U.S. at 135.  Accordingly, courts have concluded that the government retains its status as the United States under subsection (A) even when it is adjudged a PRP.  *Nu-W. Min. Inc. v. United States*, 2011 WL 2604740, at *2 (D. Idaho June 30, 2011) (reasoning that "[i]t would have been easy for Congress to draft § 9607(a)(4)(A) so that it only applied when the Government was not a PRP, but no such language appears," among other support for this position).  Contrary to the Oil Companies' assertion, Section 107(a)(4)(A) applies even though the United States is liable for the benzol waste cleanup at the Site.

**C.     Whether the Costs Are Inconsistent with the NCP**

CERCLA allows the United States Government to recover all costs of removal or remedial action that are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). It is the Oil Companies' burden to prove that a particular government action was inconsistent with the NCP. *WSDOT*, 59 F.3d at 800; *see also United States v. Sterling Centrecorp Inc.*, 2020 WL 5885920, at *7 (9th Cir. Oct. 5, 2020) ("Once Plaintiffs established a prima facie case that their response costs were incurred in connection with the release of hazardous substances from the Site, such costs were presumed to be consistent with the NCP, and the burden shifted to Sterling to prove otherwise."). To meet this burden, the Oil Companies must show that the United States' particular action was arbitrary and capricious. *WSDOT*, 59 F.3d at 803; 42 U.S.C. § 9613(j)(2). The Oil Companies do not argue that any particular action the government took in the cleanup process was arbitrary or capricious. Rather, they contend that (1) consistency with the NCP cannot be determined on summary judgment, and (2) there are genuine disputes of material fact regarding the amount of appropriate cost recovery.

**1.     Whether Consistency with the NCP Can Be Determined on Summary Judgment**

The Oil Companies first argue that the issue of whether the United States has complied with the NCP is a question of fact that a jury must decide. (Opp. at 22.) But numerous courts have determined what amount of CERCLA recovery is appropriate on summary judgment. *See, e.g.*, *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1250 (9th Cir. 2004) (affirming summary judgment order including determinations of whether costs were consistent with the NCP); *United States v. Chapman*, 146 F.3d 1166, 1176 (9th Cir. 1998) (similar); *California ex rel. California Dep't of Toxic Servs. v. Neville Chem. Co.*, 213 F. Supp. 2d 1134, 1138 (C.D. Cal. 2002), *aff'd*, 358 F.3d 661 (9th Cir.

2004); *United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir. 1992) (affirming order granting government partial summary judgment for recovery of response costs). Absent genuine disputes of material fact, there is no reason why this case cannot be resolved on summary judgment.

### 2.   Purported Genuine Disputes of Fact

The Oil Companies next argue that there are genuine disputes of material fact as to whether the United States' (a) direct costs, (b) indirect costs, and (c) annual allocations are recoverable.

### a.  Direct Costs

The Oil Companies contend that there is a genuine dispute of material fact over the appropriate amount of recovery for the United States' direct costs. (Opp. at 22.) As explained, direct costs are the costs of the actual cleanup activities at the Site, including travel to and from the Site. (Dkt. 676-4 [Declaration of Magdalen Mak, hereinafter "Mak Decl."] ¶¶ 15, 17; Dkt. 676-6 [Declaration of Christopher Osborne, hereinafter "Osborne Decl."] ¶ 10; Dkt 676-10 [Declaration of Wiley Wright, III, hereinafter "Wright Decl"] at 7–8.) According to the Oil Companies, in or around 2006 the EPA failed to provide "prompt and adequate information," which required the Oil Companies to spend two years pursuing remedies under the Freedom of Information Act. (Opp. at 22.) Based on this history, the Oil Companies state that "[t]he record shows disputes regarding the US' direct costs remain unresolved, thus, summary judgment is premature." (*Id.* at 22–23.)

The Oil Companies' one-paragraph argument falls far short of raising a genuine dispute of material fact. *See Thornhill*, 594 F.2d at 738 (explaining that conclusory and speculative statements in moving papers are insufficient to raise triable issues of fact and

defeat summary judgment).  The Oil Companies do not describe the information the EPA purportedly failed to provide.  Nor do they contend that they never received the information.  Most importantly, they fail to explain how the allegedly delayed information creates any dispute of fact—much less a genuine or material one—over whether the United States' actions were arbitrary or capricious.

### b. Indirect Costs

The Oil Companies next argue that there is a genuine dispute of material fact over the appropriate calculation of the United States' indirect costs.  Indirect costs are EPA's expenses for managing the agency itself.  (Mak Decl. ¶ 16; Osborne Decl. ¶¶ 10, 23.)  EPA allocates these expenses among individual sites in proportion to the sites' direct costs.  (Osborne Decl. ¶ 10; Wright Decl. at 8–9.)  The idea is this: if a personnel office provides services to Office A and Office B, and Office A has 30% of the payroll costs and Office B has 70% of the payroll costs, Office A will receive a 30% allocation of the personnel office costs and Office B will receive a 70% allocation of the personnel office costs.  (Osborne Decl. ¶ 13; *see id*. ¶ 25 [providing a similar example].)  In the same way, EPA computes an indirect cost rate by EPA region (dividing the total pool of indirect costs by total regional site-specific direct costs), and then each region calculates indirect costs associated with site-specific direct costs.  (*Id.* ¶¶ 38–39.)

The Oil Companies contend in one paragraph of their opposition that the United States used an "unsupported multiplier [that] was applied not only to agency staff time but also to contractor payments, which already included the contractors' own overhead charges," meaning that some of the indirect costs "constitute overhead on overhead."  (Opp. at 23.)  The Oil Companies' argument misinterprets EPA's indirect cost methodology, which allocates EPA's own expenses, not contractor charges.  (*See* Osborne Decl. ¶¶ 11–43.)  And the Oil Companies do not cite a single piece of evidence

or challenge any particular cost the United States seeks to recover.  The Oil Companies simply fail to raise a genuine dispute of material fact as to whether the United States' indirect costs are recoverable.

### c.  Annual Allocations

Next, the Oil Companies contend there is a genuine dispute of material fact as to EPA's "annual allocations."  (Opp. at 23.)  EPA's annual allocation procedure recognizes that some of the tasks that must be performed for site response activities—like training contractors on how to handle hazardous materials, developing standard operating procedures, and maintaining equipment—do not relate to any particular site, but rather benefit all sites subject to contract work.  (Osborne Decl. ¶ 45.)  Accordingly, EPA developed a formula to allocate non-site-specific contract dollars among sites on which the contractors worked.  (*Id.* ¶¶ 47–52.)  The annual allocation rate is calculated for each contract by dividing the allocated costs applicable to sites by the total direct site-specific costs incurred.  (*Id.* ¶ 50.)

The Oil Companies argue, without citing any evidence, that the annual allocations "ranged from 16 to 145 percent" of contractor billings, and that the United States failed to provide "an adequate explanation or justification of the disparity."  (Opp. at 23.)  But the United States thoroughly documented and explained how EPA accounts for the annual allocation of non-site-specific costs.  (Osborne Decl. ¶¶ 44–52.)  That documentation and explanation show that the rates vary widely because different contractors perform different work.  The Oil Companies' argument that the rates vary widely, without pointing to any specific rate that is allegedly excessive, is insufficient to raise a genuine dispute of material fact as to whether any of the United States' response actions were arbitrary and capricious.  *See United States v. Findett Corp.*, 220 F.3d 842, 849 (8th Cir. 2000) (affirming summary judgment and rejecting challenge to annual allocations

because the costs were "sufficiently documented (and the documentation itself, except for its sufficiency, is unchallenged)").

### 3.    Amount of Prejudgment Interest

The Oil Companies next argue that the United States miscalculates the prejudgment interest owed.  (Opp. at 24.)  They further contend that "the Court should not allow the US to charge the Companies interest incurred during the 12-year stay" of this case.  (*Id.* at 25.)

Under CERCLA, interest accrues from "the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a)(4).  Contrary to the Oil Companies' contentions, the United States is not seeking interest based on a theory "that its 1991 complaint constituted a written demand for costs, thereby satisfying the demand requirement for all subsequent costs." (Opp. at 24.)  Rather, the United States properly seeks interest from the later of the date the expenditure was incurred or a demand for payment was made.  (*See, e.g.*, Mak Decl. ¶ 43 [explaining that for costs incurred between July 1, 2004 and December 31, 2012, the United State contends that interest began to accrue on the later of July 1, 2004 or the date the cost was incurred].)   Nor is the Court persuaded that awarding interest for the duration of the stay is improper.  CERCLA makes prejudgment interest mandatory.  *See id.* ("The amounts recoverable in an action under this section shall include interest."). There is no exception to the prejudgment interest requirement for lengthy litigation.

### 4.    "Accounting Irregularities"

Finally, the Oil Companies argue that certain "accounting irregularities" create a genuine dispute of material fact over the amount the United States may recover.  (Opp. at

9–10.)  Specifically, the Oil Companies point to audits performed by the Office of the Inspector General ("OIG") that they contend "illustrate systemic issues with respect to the US' cost recovery efforts at Superfund sites in general and the Site in particular." (Dkt. 689-6 [Declaration of Greg A. Christianson, hereinafter "Christianson Decl."] ¶ 43, Ex. R [OIG website containing audit reports].)  None of the reports the Oil Companies reference, however, create a genuine dispute of material fact here.

The first report on which the Oil Companies rely is OIG's report to Congress for the period October 1, 1995 through March 31, 1996.  (Opp. at 9–10.)  That report summarized an audit related to the McColl Site this way:

```
S5BGN3-09-0140-5300027        CA DOH-MCCOLL NPL SITE CA        8/ 1/95

Summary:  INELIGIBLE COST OF $895,268 INCLUDES $29,892 COSTS NOT
SUPPORTED BY DOCUMENTATION; $687,123 OF UNALLOWABLE COSTS; AND
$178,253 OF FUNDS DRAWN IN EXCESS OF THE APPROPRIATE AMOUNTS.
```

(Christianson Decl. ¶ 44, Ex. S.)  The Oil Companies argue that this report creates a genuine dispute of material fact as to the amount the United States may recover because the United States does not explain the ineligible costs described in the report or show how the ineligible costs are not sought in the motion.  (Opp. at 10.)  However, the United States demonstrated in reply that the issues identified in the OIG report were resolved by an April 3, 2003 "Revised Final Determination Letter" from the EPA.  (Reply at 5.)  That letter shows that the costs described in the OIG report were determined in the end to be eligible for reimbursement.  (*Id.* [citing Dkt. 694-1, Ex. A at 36].)  The Court fails to understand how this issue, resolved nearly two decades ago, raises a genuine dispute of material fact that a jury must resolve.

The other reports the Oil Companies maintain raise a genuine dispute do not relate to the McColl Site, but rather to the expenses of certain contractors on other sites that also performed work on the McColl Site.  (Opp. at 10 [citing Christianson Decl. ¶¶ 45–

48, Exs. T–W.)  The Court is at a loss to understand how the Oil Companies believe that reports regarding other Superfund sites raise a genuine dispute as to whether the amount the United States seeks to recover for cleanup of the McColl Site is inconsistent with the NCP.  *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].").[4]  They do not.

## V.    CONCLUSION

The United States has presented evidence documenting the costs it incurred in responding to the release of hazardous substances at the McColl Site.  The Oil Companies have failed to raise any genuine dispute of material fact regarding whether any of the government's actions relating to contamination at the McColl Site were arbitrary or capricious.  The United States' motion for summary judgment is therefore **GRANTED**.

DATED: December 10, 2020

_____

HON. CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[4] In one paragraph of their opposition, the Oil Companies object to and ask the Court to strike the declarations of Christopher S. Osborne, Wiley R. Wright, Rusty Harris-Bishop, Magdalen Mak, and Lisa Ouyang because the United States failed to disclose the witnesses before the United States filed the Motion.  They contend that "Federal Rule of Civil Procedure 37(c)(1) forbids the use at trial or on a motion of any information not properly disclosed under Rule 26(a) unless the failure to disclose is substantially justified or harmless."  (Opp. at 9.)  The United States explains that Rule 26 was enacted after this 1991 case was filed and did not apply retroactively.  (Reply at 2–3.)  Additionally, the United States' failure to disclose the witnesses was harmless.  This motion was originally filed in 2006.  The Court ordered the United States to re-file the motion "to address the passage of time and potential changed facts, law, or other circumstances."  (Dkt. 669 at 4.)  Most of the new declarants are merely successors in position to those in government roles who filed declarations in support of the 2006 motion.  (Reply at 3–4.)