1

2

UNITED STATES DISTRICT COURT

3

CENTRAL DISTRICT OF CALIFORNIA

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA DEPARTMENT OF HEALTH SERVICES HAZARDOUS SUBSTANCES CLEANUP FUND, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CV-91-0589 (CJC) |
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, TEXACO, INC., LOS COYOTES ESTATES LTD., RAMPARTS RESEARCH CORPORATION, and MCAULEY LCX CORP., | ) ) ) ) ) ) ) ) ) | Partial Consent Decree Among Plaintiff United States of America and Defendant Shell Oil Company Regarding Certain Cost Claims and [Proposed] Order |
| Defendants. | ) | |

1

# TABLE OF CONTENTS

I.      BACKGROUND .................................................................................3
II.     JURISDICTION .................................................................................4
III.    PARTIES BOUND ..............................................................................4
IV.     DEFINITIONS ...................................................................................4
V.      PAYMENT OF RESPONSE COSTS ...............................................7
VI.     FAILURE TO COMPLY WITH CONSENT DECREE ...............9
VII.    DISPUTE RESOLUTION ..............................................................10
VIII.   COVENANTS BY PLAINTIFF .....................................................12
IX.     RESERVATIONS OF RIGHTS BY UNITED STATES ............13
X.      COVENANTS BY SETTLING DEFENDANT ..............................13
XI.     RESERVATIONS OF RIGHTS BY SETTLING DEFENDANT ...............14
XII.    EFFECT OF SETTLEMENT/CONTRIBUTION ........................16
XIII.   ACCESS TO INFORMATION ......................................................17
XIV.    RETENTION OF RECORDS ........................................................18
XV.     NOTICES AND SUBMISSIONS ..................................................19
XVI.    RETENTION OF JURISDICTION ..............................................20
XVII.   INTEGRATION/APPENDICES ...................................................20
XVIII.  LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ...............20
XIX.    SIGNATORIES/SERVICE ...........................................................21
XX.     FINAL JUDGMENT .....................................................................21

Partial Consent Decree Among Plaintiff United States of America and Shell Oil Company (CV 91-0589 RJK (Ex))

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the U.S. Environmental Protection Agency (EPA), filed a complaint in this matter pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended, seeking reimbursement of response costs incurred or to be incurred for response actions taken at or in connection with the release or threatened release of hazardous substances at the McColl Superfund Site in Fullerton, Orange County, California ("the Site").

B.    The Central District of California found the defendants liable under CERCLA Section 107(a), including the defendant that has entered into this Consent Decree ("Settling Defendant"). *United States v. Shell Oil Co.*, 841 F. Supp. 962 (C.D. Cal. 1993).

C.    On July 8, 1993, EPA issued a Unilateral Administrative Order ("1993 UAO") for Remedial Design at the McColl Superfund Site to Shell Oil Company ("Settling Defendant") and Union Oil Company of California, Atlantic Richfield Company, Texaco, Inc., and McAuley LCX Corporation. On July 17, 1996, EPA issued a Unilateral Administrative Order ("1996 UAO") for Remedial Design and Remedial Action at the McColl Superfund Site to Shell Oil Company ("Settling Defendant") and Union Oil Company of California, Atlantic Richfield Company, and Texaco, Inc. Copies of the 1993 UAO and the 1996 UAO, with their respective Statements of Work attached to and included as part of the UAOs, are attached to this Consent Decree, for reference only, as Appendix A and Appendix B, respectively.

D.    The purpose of this Consent Decree is to provide for Settling Defendant's payment of a share of Past Response Costs, and for its continued compensation of the United States for Future Response Costs. Except as otherwise settled by this Consent Decree with respect to Settling Defendant's payment of a share of Past Response Costs and continued compensation of the United States for Future Response Costs, this Decree does not address issues with respect to Settling Defendant's obligations or continuing performance under the 1993 UAO and the 1996 UAO.

E.    The United States and Settling Defendant agree, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith, that settlement of this matter without further litigation and without any further admission or adjudication of any issue of fact or law is

appropriate and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

THEREFORE, with the consent of the Parties to this Decree, it is ORDERED, ADJUDGED, AND DECREED:

## II.   JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §§ 9607 and 9613(b) and also has personal jurisdiction over Settling Defendant. Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendant waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. Settling Defendant shall not challenge entry or the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## III.   PARTIES BOUND

2.      This Consent Decree is binding upon the United States, and upon Settling Defendant and its successors and assigns. Any change in ownership or corporate or other legal status, including but not limited to, any transfer of assets or real or personal property, shall in no way alter the status or responsibilities of Settling Defendant under this Consent Decree.

## IV.   DEFINITIONS

3.      Unless otherwise expressly provided in this Consent Decree, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meanings assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Decree or its appendices, the following definitions shall apply:

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, as amended.

"Consent Decree" shall mean this Consent Decree and all appendices attached hereto. In the event of conflict between this Consent Decree and any appendix, the Consent Decree shall control. However, no provision of the 1993 UAO or 1996 UAO attached as appendices shall be deemed incorporated into this Consent Decree based solely on their inclusion as appendices except as expressly stated in this Consent Decree.

4

"Day" or "day" shall mean a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the U.S. Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this Consent Decree is recorded on the Court's docket.

"EPA" shall mean the U.S. Environmental Protection Agency.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs at or in connection with the McColl Superfund Site on or after July 31, 2018, in reviewing or developing deliverables submitted pursuant to the 1993 UAO, the 1996 UAO, or this Consent Decree; reviewing or verifying the Work, as that term is defined in the UAOs, conducted pursuant to the 1993 UAO or the 1996 UAO; conducting response activities pursuant to Section IX.B.4 of the 1993 UAO or Section XIV (EPA Review of Submissions) of the 1996 UAO as it relates to EPA's performance of all or part of the response action; performing periodic remedial action reviews under Section XI (EPA Periodic Review) of the 1996 UAO or Section 121 of CERCLA, 42 U.S.C. § 9621; or otherwise implementing, overseeing, or enforcing this Consent Decree against Settling Defendant, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, community involvement costs (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), and all litigation costs. Future Response Costs shall also include all Interim Response Costs and Agency for Toxic Substances and Disease Registry (ATSDR) costs regarding the Site.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site

between July 31, 2018, and the Effective Date for EPA's costs and between September 30, 2019, and the Effective Date for DOJ's costs, or (b) incurred prior to the Effective Date but paid after that date.

"McColl Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C.§ 9622(b)(3).

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper- or lower-case letter.

"Parties" shall mean the United States and Settling Defendant.

"Past Response Costs" shall mean all costs, including but not limited to direct and indirect costs, that EPA has paid at or in connection with the Site from July 1, 1990, through July 31, 2018, and all costs, including but not limited to direct and indirect costs, that DOJ has paid on behalf of EPA at or in connection with the Site from October 1, 1990, through September 30, 2019, plus accrued Interest on all such costs through February 2, 2021; and Interest that accrued on amounts paid pursuant to the 1994 Consent Decree (Docket No. 270) from July 31, 1993, through September 30, 2019.

"Plaintiff" shall mean the United States.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

"Settling Defendant" shall mean Shell Oil Company.

"Site" shall mean the McColl Superfund Site, encompassing approximately 22 acres, located at the southwest corner of Rosecrans Avenue and Sunny Ridge Drive in Fullerton, Orange County, California, and the areal extent of contamination therefrom generally shown on the map included in Appendix C.

"1993 Unilateral Administrative Order" or "1993 UAO" shall mean EPA's July 8, 1993 Unilateral Administrative Order No. 93-21, including the Statement of Work attached thereto, issued under Section 106 of CERCLA, 42 U.S.C. § 9606,

(and Section 7003 of RCRA, 42 U.S.C. § 6973,) relating to the McColl Superfund Site. The 1993 UAO is attached as Appendix A.

"1996 Unilateral Administrative Order" or "1996 UAO" shall mean EPA's July 17, 1996 Unilateral Administrative Order No. 96-10, including the Statement of Work attached thereto, issued under Section 106 of CERCLA, 42 U.S.C. § 9606, (and Section 7003 of RCRA, 42 U.S.C. § 6973,) relating to the McColl Superfund Site. The 1996 UAO is attached as Appendix B.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

## V.   PAYMENT OF RESPONSE COSTS

4.     **Payment by Settling Defendant for Past Response Costs**. Within 30 days after the Effective Date, Settling Defendant shall pay to EPA $29,501,511.85, which includes Interest in the amount of $14,876,493.38 and post-judgment interest under 28 U.S.C. § 1961 through March 15, 2021, in the amount of $3,050.39, plus post-judgment interest under 28 U.S.C. § 1961 in the amount of $75.83 per day from March 16, 2021, through the date of payment.

5.     Settling Defendant shall make payment at https://www.pay.gov in accordance with instructions provided to Settling Defendant by the Financial Litigation Unit (FLU) of the U.S. Attorney's Office for the Central District of California after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System (CDCS) number, Site/Spill ID Number 0904, and DJ Number 90-11-2-3A, which shall be used to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> **Cisselon Nichols Hurd**
> Senior Legal Counsel
> Shell Oil Company
> 150 N Dairy Ashford Rd, Room F0614F
> Houston, TX 77079
> **Email:** cisselon.nichols@shell.com

on behalf of Settling Defendant. Settling Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to DOJ and EPA in accordance with Section 0 (Notices and Submissions).

6.     **Deposit of Payment**. The total amount to be paid pursuant to Paragraph 0 shall be deposited by EPA in the McColl Special Account to be

7

retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

7.     **Notice of Payment**. At the time of payment, Settling Defendant shall send to EPA and DOJ, in accordance with Section 0 (Notices and Submissions), a notice of this payment including references to the CDCS Number, Site/Spill ID Number 0904, and DJ Number 90-11-2-3A.

8.     **Payments by Settling Defendant for Future Response Costs**. Settling Defendant shall pay to EPA a total of 58 percent of all Future Response Costs not inconsistent with the NCP.

> a. **Periodic Bills**. On a periodic basis not to exceed 3 years, EPA will send Settling Defendant a bill requiring payment that includes a cost summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. Settling Defendant shall make all payments within 30 days after Settling Defendant's receipt of each bill requiring payment, except as otherwise provided in ¶ 9, at https://www.pay.gov using the "EPA Miscellaneous Payments Cincinnati Finance Center" link, and including references to the Site/Spill ID Number 0904, DJ Number 90-11-2-3A, and the purpose of the payment. Settling Defendant shall send to DOJ and EPA, in accordance with Section 0 (Notices and Submissions), a notice of this payment including these references.

> b. **Deposit of Future Response Costs Payments**. The total amount to be paid by Settling Defendant pursuant to ¶ 8.a. (Periodic Bills) shall be deposited by EPA in the McColl Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the McColl Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site.

9.     **Contesting Future Response Costs**. Settling Defendant may submit a Notice of Dispute, initiating the procedures of Section 0 (Dispute Resolution), regarding any Future Response Costs billed under ¶ 8 (Payments by Settling Defendant for Future Response Costs) in accordance with the standards and procedures in Section VII. The dispute resolution procedures set forth in Section 0

8

(Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Defendant's obligation to reimburse the United States for its Future Response Costs.

10.     Except as otherwise settled by this Consent Decree with respect to Settling Defendant's payment of a share of Past Response Costs and continued compensation of the United States for Future Response Costs, the Parties agree that this Consent Decree does not address Settling Defendant's obligations or continued performance under the 1993 UAO or the 1996 UAO, and Settling Defendant otherwise reserves any rights it may have to object to or challenge any EPA action under the 1993 UAO or the 1996 UAO.

## VI.    FAILURE TO COMPLY WITH CONSENT DECREE

11.     **Interest on Late Payments**. If Settling Defendant fails to make any payment under Paragraph 8 (Payments by Settling Defendant for Future Response Costs) by the required due date, Interest shall continue to accrue on the unpaid balance through the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiff by virtue of Settling Defendant's failure to make timely payments under this Section, including, but not limited to, payment of stipulated penalties pursuant to Paragraph 12 (Stipulated Penalties).

12.     **Stipulated Penalty**

a.     If any amounts due to EPA under Paragraph 0 (Payment by Settling Defendant for Past Response Costs) or Paragraph 8 (Payments by Settling Defendant for Future Response Costs) are not paid by the required date, Settling Defendant shall be in violation of this Consent Decree and shall pay to EPA, as a stipulated penalty, in addition to the Interest required by Paragraph 11, the following stipulated penalties per violation per Day that such payment is late:

| Penalty per Violation per Day | Period of Noncompliance |
| --- | --- |
| $1,000………………………………… | 1st through 7th Day |
| $2,000………………………………… | 8th through 15th Day |
| $3,000………………………………… | 16th Day and beyond |

b.     Stipulated penalties are due and payable within 30 days after the date of the demand for payment of the penalties by EPA. Settling Defendant shall make payment at https://www.pay.gov using the link for "EPA Miscellaneous Payments Cincinnati Finance Center," including references to the Site/Spill ID and DJ numbers listed in Paragraph 0, and the purpose of the payment. Settling Defendant shall send a notice of this payment to DOJ and EPA, in accordance with

9

Paragraph 0. The payment of stipulated penalties and Interest, if any, does not alter any obligation by Settling Defendant under the CD.

        c.      Penalties shall accrue as provided in this Paragraph regardless of whether EPA has notified Settling Defendant of the violation or made a demand for payment but need only be paid upon demand. All penalties shall begin to accrue on the day after payment is due and shall continue to accrue through the date of payment. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

13.    If the United States brings an action to enforce this Consent Decree, Settling Defendant shall reimburse the United States for all costs of such action, including but not limited to costs of attorney time.

14.    Payments made under this Section shall be in addition to any other remedies or sanctions available to Plaintiff by virtue of Settling Defendant's failure to comply with the requirements of this Consent Decree.

15.    Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive payment of any portion of the stipulated penalties that have accrued pursuant to this Consent Decree. Payment of stipulated penalties shall not excuse Settling Defendant from payment as required by Section 0 (Payment of Response Costs) or from performance of any other requirements of this Consent Decree.

## VII.   DISPUTE RESOLUTION

16.    **Standard.** Settling Defendant may contest payment of any Future Response Costs billed by the United States if it determines that the United States has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP.

17.    **Procedures.** The dispute resolution procedures set forth in this Section 0 shall be the exclusive mechanism for resolving disputes regarding Settling Defendant's obligation to reimburse the United States for its Future Response Costs. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of Settling Defendant that have not been disputed in accordance with this Section.

18.    **Dispute Resolution.** The dispute resolution mechanism described in this Section 0 is only available if Settling Defendant complies with the following conditions:

a.  Notice. Any objection to the payment of Future Response Costs shall be made in writing within 30 days of receipt of the bill and accompanying accounting of costs and must be sent to the United States in accordance with Section 0 (Notices and Submissions). EPA may, in its sole discretion, extend the time period for payment. Any such objection (hereinafter referred to as the "Notice of Objection" shall specifically identify the contested Future Response Costs and the basis for objection.

b.  Payment of Undisputed Amounts. In the event of an objection to some but not all Future Response Costs, Settling Defendant shall, within the 30-day period, pay all uncontested Future Response Costs to the United States in the manner described in Paragraph 8.

c.  Escrow for Disputed Amounts. Within 30 days of receipt of a bill for Future Response Costs that are disputed, Settling Defendant shall establish an interest-bearing escrow account in a federally-insured bank and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Settling Defendant shall send to the United States, as provided in Section 0 (Notices and Submissions), a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account.

19.  **Informal Dispute Resolution.** Any dispute with respect to Future Response Costs shall in the first instance be the subject of informal negotiations between the United States and Settling Defendant. The period for informal negotiations shall not exceed 45 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

20.  **Formal Dispute Resolution.**

a.  Initiation. If the dispute is not resolved by informal dispute resolution, then the position advanced by EPA shall be considered binding unless, within 60 days after the conclusion of the informal negotiation period, Settling Defendant commences formal dispute resolution by sending a Notice of Formal Dispute Resolution to the United States. The Notice of Formal Dispute Resolution shall be accompanied by a written Statement of Position by Settling Defendant, stating the basis of its position and citing all factual data, analysis, opinion or other information on which Settling Defendant relies to support its position. The United States shall have 30 days in which to serve a Response setting forth the same information supporting its position.

11

b.      Administrative Record and Decision. EPA shall maintain an administrative record of any dispute as to Future Response Costs for which formal dispute resolution has been initiated. The administrative record shall include the disputed bill and all cost documentation sent by EPA to Settling Defendant, the Notice of Objection served by Settling Defendant, the Notice of Formal Dispute Resolution and accompanying Statement of Position, the United States' Response, and any other documents and information sent to EPA by Settling Defendant for inclusion in the record or relied on by EPA in reaching an administrative resolution of the dispute. The Director of the Superfund and Emergency Management Division, EPA Region IX, will issue a final administrative decision determining whether the disputed Future Response Costs, or any part of them, shall be disallowed as inconsistent with the NCP, as the result of a mathematical error, or as costs outside the scope of this Consent Decree.

c.      Judicial Appeal. Settling Defendant may appeal EPA's administrative decision made pursuant to the preceding subparagraph to this Court within 30 days of its receipt of EPA's decision. The Court's review of EPA's decision shall be limited to EPA's administrative record except to the extent that Settling Defendant establishes that supplemental materials may be considered by the Court under CERCLA and applicable principles of administrative law. Judicial review of any dispute under this subparagraph shall be governed by CERCLA and applicable principles of administrative law.

21.    **Payment Following Dispute Resolution.** Payments determined to be owing to the United States following dispute resolution shall be paid from the escrow account (including accrued Interest on the amounts owed) to the United States in the manner described in Paragraph 8, within 10 days after receipt of the Court's decision or, if EPA's final administrative decision is not timely appealed, within 40 days after EPA's decision. To the extent that any amounts are determined not to be owed, Settling Defendant shall be disbursed the remainder of the escrow account.

## VIII.  COVENANTS BY PLAINTIFF

22.    **Covenants for Settling Defendant by United States**. Except as specifically provided in Section 0 (Reservation of Rights by United States), the United States covenants not to sue or to take administrative action against Settling Defendant pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to recover Past Response Costs and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree.

These covenants extend only to Settling Defendant and do not extend to any other person.

## IX.    RESERVATIONS OF RIGHTS BY UNITED STATES

23.    The United States reserves, and this Consent Decree is without prejudice to, all rights against Settling Defendant with respect to all matters not expressly included within Paragraph 0 (Covenants for Settling Defendant by United States). Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against Settling Defendant with respect to:

a.    liability for failure of Settling Defendant to meet a requirement of this Consent Decree;

b.    liability for costs incurred or to be incurred by the United States that are not within the definition of Past Response Costs or Future Response Costs;

c.    liability for injunctive relief or administrative order enforcement under Section 106 of CERCLA, 42 U.S.C. § 9606;

d.    liability for any and all response costs incurred by the United States (that are not within the definitions of Past Response Costs or Future Response Costs) that are related to Settling Defendant's violation of, or failure or refusal to comply with, the 1993 UAO or the 1996 UAO;

e.    criminal liability;

f.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.    defenses to claims alleged by Settling Defendant in the United States Court of Federal Claims; and

h.    counterclaims against Settling Defendant in the United States Court of Federal Claims.

## X.    COVENANTS BY SETTLING DEFENDANT

24.    Except as specifically provided in Section 0 (Reservation of Rights by Settling Defendant), Settling Defendant covenants not to sue and agrees not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to Past Response Costs, Future Response Costs, and this Consent Decree, including but not limited to:

a.    any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund based on Sections 106(b)(2), 107, 111, 112, or 113

13

of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

       b.    any claim arising out of the response actions at the Site for which the Past Response Costs were incurred, including any claim under the United States Constitution, the Constitution of the State of California, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law; or

       c.    any claim pursuant to Section 107 or 113 of CERCLA, 42 U.S.C. § 9607 or 9613, Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), or state law for Past Response Costs or Future Response Costs;

       d.    appeal of the Court's December 10, 2020 Order Granting the United States' Motion for Summary Judgment (WL 2020 7331993), and Judgment entered on February 3, 2021 (Docket No. 704).

## XI.   RESERVATIONS OF RIGHTS BY SETTLING DEFENDANT

    25.    The Settling Defendant reserves, and this Consent Decree is without prejudice to, all rights against the United States with respect to all matters not expressly included within Paragraph 0 (Covenants for Settling Defendant by United States). Notwithstanding any other provision of this Consent Decree, the Settling Defendant reserves all rights against the United States with respect to:

       a.    liability for failure of the United States to indemnify the Settling Defendant for all costs paid by the Settling Defendant in connection with the Site, including but not limited to, all costs paid by the Settling Defendant pursuant to the Consent Decree;

       b.    liability for the claims of Settling Defendant against the United States that were asserted in the matter *Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc. v. United States of America*, Civ. No. 1:06-CV-00141 in the United States Court of Federal Claims;

       c.    liability for the claims of Settling Defendant against the United States that were asserted in the matter *Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc. v. United States of America*, Civ. No. 1:19-CV-1795 in the United States Court of Federal Claims; and

       d.    liability for any claims of Settling Defendant against the United States that may be asserted in an action in the United States of Court of Federal Claims in the future seeking the recovery of any amounts paid by the Settling Defendant in connection with the Site, including but not limited to amounts paid pursuant to this Consent Decree.

14

26.     Nothing in this Consent Decree shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

27.     **Waiver of Claims by Settling Defendant**

a.     Settling Defendant agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that it may have:

(1)     **De Micromis Waiver**. For all matters relating to the Site against any person where the person's liability to Settling Defendant with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

b.     Exceptions to Waiver

(1)     The waiver under this Paragraph 0 shall not apply with respect to any defense, claim, or cause of action that a Settling Defendant may have against any person otherwise covered by such waiver if such person asserts a claim or cause of action relating to the Site against such Settling Defendant.

(2)     The waiver under Paragraph 0 (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the

15

waiver would apply and that conviction has not been vitiated on appeal or otherwise.

## XII.  EFFECT OF SETTLEMENT/CONTRIBUTION

28.     Except as provided in Paragraph 0 (Waiver of Claims by Settling Defendant), nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. Except as provided in Section 0 (Covenants by Settling Defendant), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that it may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

29.     The Parties agree, and by entering this Consent Decree this Court finds, that this Consent Decree constitutes a judicially-approved settlement pursuant to which Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree are Past Response Costs and Future Response Costs.

30.     The Parties further agree, and by entering this Consent Decree this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

31.     Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Consent Decree, notify EPA and DOJ in writing no later than 60 days prior to the initiation of such suit or claim, except that Settling Defendant need not provide such notification with respect to any suit brought against the United States in the United States Court of Federal Claims seeking recovery of costs paid pursuant to this Consent Decree. Settling Defendant also shall, with respect to any suit or claim brought against it for matters related to this

16

Consent Decree, notify EPA and DOJ in writing within 10 days after service of the complaint or claim upon it. In addition, Settling Defendant shall notify EPA and DOJ within 10 days after service or receipt of any Motion for Summary Judgment, and within 10 days after receipt of any order from a court setting a case for trial, for matters related to this Consent Decree, except that Settling Defendant need not provide such notification with respect to any Motion for Summary Judgment or order setting a case for trial in a suit brought against the United States in the United States Court of Federal Claims seeking recovery of costs paid pursuant to this Consent Decree.

32.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other relief relating to the Site, Settling Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the Covenants by Plaintiff set forth in Section 0.

## XIII.  ACCESS TO INFORMATION

33.     Settling Defendant shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within its possession or control or that of its contractors or agents relating to activities at the Site, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Site.

34.     **Privileged and Protected Claims**

a.      Settling Defendant may assert that all or part of a Record is privileged or protected as provided under federal law, provided it complies with Paragraph 0, and except as provided in Paragraph 0.

b.      If Settling Defendant asserts a claim of privilege or protection, it shall provide Plaintiff with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, Settling Defendant shall provide the Record to Plaintiff in redacted form to mask the privileged or protected

17

information only. Settling Defendant shall retain all Records that it claims to be privileged or protected until the United States has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the Settling Defendant's favor.

        c.     Settling Defendant may make no claim of privilege or protection regarding:

        (1)    any data regarding the Site, including but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological, or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or

        (2)    the portion of any Record that Settling Defendant is required to create or generate pursuant to this Consent Decree.

    35.    **Business Confidential Claims**. Settling Defendant may assert that all or part of a Record submitted to Plaintiff under this Section or Section 0 (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. 2.203(b). Settling Defendant shall segregate and clearly identify all Records or parts thereof submitted under this Consent Decree for which Settling Defendant asserts a business confidentiality claim. Records that Settling Defendant claims to be confidential business information will be accorded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified Settling Defendant that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2 Subpart B, the public may be given access to such Records without further notice to Settling Defendant.

    36.    Notwithstanding any provision of this Consent Decree, the United States retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIV.  RETENTION OF RECORDS

    37.    Until 10 years after the Effective Date, Settling Defendant shall preserve and retain all non-identical copies of Records now in its possession or control or that come into its possession or control, that relate in any manner to its liability under CERCLA with respect to the Site. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

18

38.     At the conclusion of the record retention period, Settling Defendant shall notify EPA and DOJ at least 90 days prior to the destruction of any such Records, and, upon request by EPA or DOJ, and except as provided in Paragraph 0 (Privileged and Protected Claims), Settling Defendant shall deliver any such Records to EPA.

39.     Settling Defendant certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XV.   NOTICES AND SUBMISSIONS

40.     Whenever, under the terms of this Consent Decree, notice is required to be given or a document is required to be sent by one party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the Consent Decree regarding such Party.

**As to DOJ by email**:     eescdcopy.enrd@usdoj.gov

Re: DJ# 90-11-2-3A

**As to DOJ by mail**:     EES Case Management Unit
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-11-2-3A

**As to EPA**:     SP Davis
Remedial Project Manager
U.S. Environmental Protection Agency
Superfund and Emergency Management Division

19

75 Hawthorne St.
San Francisco, CA 94105
davis.sp@epa.gov

Re: Site/Spill ID # 0904

**As to Settling Defendant**:          Toni DeMayo
                                       Principle Program Manager
                                       Shell Oil Products US
                                       20945 S. Wilmington Ave.
                                       Carson, CA 90810
                                       toni.demayo@shell.com

                                       Edmond Bourke
                                       Principal
                                       C2 REM
                                       2382 SE Bristol Street Suite B
                                       Newport Beach, CA 92660
                                       ebourke@c2rem.com

## XVI.  RETENTION OF JURISDICTION

41.     This Court shall retain jurisdiction over this matter for the purpose of interpreting and enforcing the terms of this Consent Decree.

## XVII. INTEGRATION/APPENDICES

42.     This Consent Decree and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree. The following appendices are attached to and incorporated into this Consent Decree: "Appendix A" is the 1993 UAO; "Appendix B" is the 1996 UAO; and "Appendix C" is the map of the Site.

## XVIII.      LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

43.     This Consent Decree shall be lodged with the Court for a period of at least 30 days for public notice and comment. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree

20

disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate. Settling Defendant consents to the entry of this Consent Decree without further notice.

44.     If for any reason this Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XIX.  SIGNATORIES/SERVICE

45.     The undersigned representative of Settling Defendant and the Assistant Attorney General, U.S. Department of Justice, Environment and Natural Resources Division, each certifies that he or she is authorized to enter into the terms and conditions of this Consent Decree and to execute and bind legally such Party to this document.

46.     Settling Defendant agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree, unless the United States has notified Settling Defendant in writing that it no longer supports entry of the Consent Decree.

47.     Settling Defendant shall identify, on the attached signature page, the name and address of an agent who is authorized to accept service of process by mail on its behalf with respect to all matters arising under or relating to this Consent Decree. Settling Defendant hereby agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to, service of a summons.

## XX.   FINAL JUDGMENT

48.     Upon entry of this Consent Decree by the Court, this Consent Decree shall constitute the final judgment between and among the United States and the Settling Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS ___ DAY OF _____, 20___.

_____

United States District Judge

Partial Consent Decree Among Plaintiff United States of America and Shell Oil Company (CV 91-0589 RJK (Ex))

1

Signature Page for Consent Decree Regarding McColl Superfund Site

2

3

**FOR THE UNITED STATES OF AMERICA**:

4

Todd Kim

5

Assistant Attorney General
Environment and Natural Resources Division

6

7

8-4-2021
Dated

/s/William A. Weinischke
William A. Weinischke

8

Senior Attorney

9

U.S. Department of Justice
Environment and Natural Resources Division

10

Environmental Enforcement Section

11

P.O. Box 7611
Washington, D.C. 20044-7611

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Partial Consent Decree Among Plaintiff United States of America and Shell Oil Company (CV 91-0589 RJK (Ex))

Signature Page for Consent Decree Regarding McColl Superfund Site

*John J. Lyons*
*Acting Deputy*
*Director for*



Enrique Manzanilla
Superfund and Emergency Management
Division Director, Region 9
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, CA 94106

Madeline Gallo
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 9
75 Hawthorne Street
Mail Code ORC 3-2
San Francisco, CA 94106

Partial Consent Decree Among Plaintiff United States of America and Shell Oil Company (CV 91-0589 RJK

1

2          Signature Page for Consent Decree Regarding McColl Superfund Site

3

4                          **FOR SHELL OIL COMPANY:**

5

6

7   16-Jun-2021                    *Hector Pineda*

8   Dated                          Name: Hector A. Pineda
                                    Title: VP Legal
9                                   Address: 150 N. Dairy Ashford, Houston, TX 77079

10

11

12  Agent Authorized to Accept Service on Behalf of Above-signed Party:

13
                                    Name:       CT Corporation System
14                                  Address:    818 West 7th St, Los Angeles, CA 90017

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Appendix A**
**1993 UAO**

SFUND RECORDS CTR
88104663

SFUND RECORDS CTR
1654-06120

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## Region IX

In The Matter Of:

| | |
|---|---|
| McColl Superfund Site, Fullerton, CA ) | |
| ) | |
| Shell Oil Company, ) | |
| Union Oil Company of California, ) | |
| Atlantic Richfield Company, ) | U.S. EPA |
| Texaco, Inc., and ) | Docket No. 93-21 |
| McAuley LCX Corporation, ) | |
| ) | |
| Respondents. ) | |
| ) | |
| ) | |
| Proceeding Under Section 106(a) of the ) | |
| Comprehensive Environmental Response, ) | |
| Compensation, and Liability Act of 1980,) | |
| as amended (42 U.S.C. § 9606(a)) ) | |

ADMINISTRATIVE ORDER
FOR REMEDIAL DESIGN AND OTHER RESPONSE ACTIONS

# TABLE OF CONTENTS

I.   INTRODUCTION AND JURISDICTION......................... 3

II.  FINDINGS OF FACT.................................... 4

III. CONCLUSIONS OF LAW AND DETERMINATIONS.............. 6

IV.  NOTICE TO THE STATE................................ 7

V.   ORDER............................................. 7

VI.  DEFINITIONS....................................... 8

VII. NOTICE OF INTENT TO COMPLY......................... 10

VIII. PARTIES BOUND.................................... 10

IX.  WORK TO BE PERFORMED.............................. 11

X.   ENDANGERMENT AND EMERGENCY RESPONSE................. 18

XI.  COMPLIANCE WITH APPLICABLE LAWS..................... 19

XII. PROJECT MANAGER................................... 20

XIII. SITE ACCESS AND DATA/DOCUMENT AVAILABILITY........ 20

XIV. RECORD PRESERVATION............................... 24

XV.  DELAY IN PERFORMANCE............................... 25

XVI. ASSURANCE OF ABILITY TO COMPLETE WORK.............. 25

XVII. UNITED STATES NOT LIABLE.......................... 27

XVIII. ENFORCEMENT AND RESERVATIONS..................... 27

XIX. EFFECTIVE DATE AND COMPUTATION OF TIME............. 29

XX.  OPPORTUNITY TO CONFER............................. 29

2

ADMINISTRATIVE ORDER
FOR REMEDIAL DESIGN AND OTHER RESPONSE ACTIONS

## I. INTRODUCTION AND JURISDICTION

This Administrative Order (the "Order") directs Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, Texaco, Inc. (the "Oil Company Respondents"), and McAuley LCX Corporation ("Respondent McAuley")(collectively referred to as "Respondents") to perform the remedial design and other response actions for the remedy selected and described in the Record of Decision ("ROD") for the Source Soils Operable Unit for the McColl Superfund Site ("the Site"), dated June 30, 1993. The ROD is attached to this Order as Appendix 1 and is incorporated herein by reference.  Work required under this Order is further defined in Section IX (Work To Be Performed).  This Order is issued to each Respondent by the United States Environmental Protection Agency ("EPA") under the authority vested in the President of the United States by Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9606(a).  This authority was delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580 (52 Fed. Reg. 2926, January 29, 1987), and was further delegated to EPA Regional Administrators on September 13, 1987 by EPA Delegation No. 14-14-B.

3

1

## II. FINDINGS OF FACT

2      A.   The twenty-two acre McColl Site is located in Fullerton,

3  Orange County, California, approximately 25 miles southeast of

4  Los Angeles.   Housing developments border the Site to the east

5  and south.   Developed but open areas of a golf course and a

6  regional park border the Site to the west.   An oil field occupies

7  an open area to the north.

8      B.   There are no active facility processes at the Site.   The

9  Site contains twelve large unlined pits, called sumps, filled

10  with refinery wastes placed there in the 1940's.   The sumps have

11  been periodically covered since then with drilling muds and fill

12  materials.   There are an estimated 100,000 cubic yards of waste

13  and contaminated materials at the Site.   The ROD contains a more

14  detailed description of the Site.

15      C.   A groundwater aquifer underlies the Site.   The present

16  horizontal groundwater flow is towards the southwest.   The

17  aquifer downgradient of the Site is used as a drinking water

18  source by residents of the City of Fullerton.   Depth to

19  groundwater at the Site is approximately 250 feet.

20      D.   The Site was included on the EPA National Priority List

21  in September 1982, pursuant to Section 105 of CERCLA, 42 U.S.C.

22  Section 9605.

23      E.   EPA has undertaken various response actions at the Site.

24  Following a remedial investigation and feasibility study

25  conducted in part by certain Respondents, EPA selected an

26  excavation and redisposal remedy in 1984.   The State of

27  California was designated the lead agency for the Site but was

28                                   4

1  later enjoined by a state court from implementing the remedy.

2  EPA undertook additional feasibility study work at the Site, and,

3  having assumed the lead in 1989, proposed an incineration remedy.

4  Following public comment and field testing, EPA reevaluated

5  remedial alternatives.  In August 1992, EPA published its updated

6  feasibility study, called the Supplemental Reevaluation of

7  Alternatives II, and issued a proposed plan identifying soft-

8  material solidification as the preferred remedy.

9       F.  EPA's decision selecting soft-material solidification

10  with a contingency of RCRA-closure is embodied in the ROD

11  executed on June 30, 1993, upon which the State of California had

12  a reasonable opportunity to review and comment.  The ROD is

13  supported by an administrative record that contains the documents

14  and information upon which EPA based the selection of the remedy.

15  The administrative record was made available to the public at the

16  time of the issuance of the proposed plan in August 1992.

17       G.  EPA and the State of California have undertaken other

18  response actions at the Site, including ongoing Site maintenance

19  and Site security.  Since 1989 EPA has been conducting routine

20  groundwater monitoring as part of a groundwater remedial

21  investigation.

22       H.  On May 23, 1990, EPA issued to Respondents and Phillips

23  Petroleum, Inc., Unilateral Administrative Order No. 90-12 for

24  Partial Remedial Investigation and Response Actions, which order

25  related in part to groundwater work.  This Order supersedes Order

26  No. 90-12 and renders Order No. 90-12 null and void.

27       I.  The waste at the Site has a pH of less than 2 and thus

28                                5

1  exhibits the RCRA characteristic of corrosivity.  The waste
2  contains various organic compounds including benzene, toluene and
3  xylene, inorganic chemicals including arsenic and chromium, and
4  high levels of sulfur compounds including sulfur dioxide.  The
5  principal threats at the Site include the inhalation of benzene
6  and sulfur dioxide and the ingestion of arsenic.

7      J.  Oil Company Respondents, or their predecessors in
8  interest, each generated refinery waste sludge that was disposed
9  of at the McColl Site.  Oil Company Respondents, or their
10 predecessors in interest, each arranged for the disposal or
11 treatment, or arranged with a transporter for transport for
12 disposal or treatment, of hazardous substances that each owned or
13 possessed and that were disposed of at the McColl Site.

14     K.  Respondent McAuley is now and has been since 1980 the
15 owner of a portion of the McColl Site.

16
17          III. CONCLUSIONS OF LAW AND DETERMINATIONS

18     A.  The McColl Site and any other area where hazardous
19 substances have come to be located is a "facility" as defined in
20 Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

21     B.  Each Respondent is a "person" as defined in Section
22 101(21) of CERCLA, 42 U.S.C. § 9601(21).

23     C.  Respondents are each a "liable party" as defined in
24 Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) and are subject to
25 this Order under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

26     D.  The substances found at the Site are "hazardous
27 substances" as defined in Section 101(14) of CERCLA, 42 U.S.C.

28                          6

1 § 9601(14).

2     E.   The past disposal and migration of hazardous substances
3 from the Site constitute "releases" as defined in Section 101(22)
4 of CERCLA, 42 U.S.C. § 9601(22).

5     F.   The potential for future migration of hazardous
6 substances from the Site poses a threat of a "release" as defined
7 in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

8     G.   The release and threat of release of one or more
9 hazardous substances from the facility may present an imminent
10 and substantial endangerment to the public health or welfare or
11 the environment.

12     H.   The actions required by this Order are necessary to
13 protect the public health, welfare and the environment.

14

15                IV. <u>NOTICE TO THE STATE</u>

16     On July 2, 1993, prior to issuing this Order, EPA notified
17 the State of California, Department of Toxic Substances Control,
18 that EPA would be issuing this Order.

19

20                     V. <u>ORDER</u>

21     Based on the foregoing, the Respondents are hereby ordered
22 to comply with the following provisions, including but not
23 limited to all attachments to this Order, all documents
24 incorporated by reference into this Order, and all schedules and
25 deadlines contained in this Order, attached to this Order, or
26 incorporated by reference into this Order.

27

28                       7

VI. <u>DEFINITIONS</u>

Unless otherwise expressly provided herein, terms used in
this Order that are defined in CERCLA or in regulations
promulgated under CERCLA shall have the meaning assigned to them
in the statute or its implementing regulations.  Whenever terms
listed below are used in this Order or in the documents attached
to this Order or incorporated by reference into this Order, the
following definitions shall apply:

"CERCLA" shall mean the Comprehensive Environmental
Response, Compensation, and Liability Act of 1980, as amended, 42
U.S.C. §§ 9601 <u>et seq</u>.

"Day" shall mean a working day, which shall mean a day other
than a Saturday, Sunday, Federal holiday, or the days November 24
through 26 and December 20 through 31 of each year.  In computing
any period of time under this Order, where the last day would
fall on a day that is not a working day, the period shall run
until the end of the next working day.

"EPA" shall mean the United States Environmental Protection
Agency.

"National Contingency Plan" or "NCP" shall mean the National
Oil and Hazardous Substances Contingency Plan promulgated
pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and codified
at 40 C.F.R. Part 300, including any amendments thereto.

"Record of Decision" or "ROD" shall mean the EPA Record of
Decision relating to the source soils operable unit of the McColl
Site, signed on June 30, 1993, by the Acting Regional
Administrator, EPA Region IX, and all attachments thereto.

8

1      "Remedial Design" or "RD" shall mean those activities to be

2 undertaken to develop the final plans and specifications for the

3 Remedial Action pursuant to the Statement of Work and this Order.

4      "Section" shall mean a portion of this Order identified by a

5 roman numeral, and includes one or more paragraphs identified by

6 capital letter.

7      "Site" or "McColl Superfund Site" shall mean the property

8 located at 2650 Rosecrans Avenue, Fullerton, California,

9 including all areas where hazardous substances were disposed or

10 have come to be located.

11      "SOW(s)" shall mean the Statement(s) of Work for Remedial

12 Design and other response actions at the Site, as set forth in

13 Appendix 2 to this Order (SOW to Oil Company Respondents) and

14 Appendix 3 to this Order (SOW to Respondent McAuley) and any

15 modifications made to the SOWs under this Order.

16      "State" shall mean the State of California.

17      "United States" shall mean the United States of America.

18      "Work" shall mean all activities Respondents are required to

19 perform under this Order and the SOWs attached hereto, including

20 Remedial Design, other response actions and any activities

21 required to be undertaken pursuant to Sections IX (Work To Be

22 Performed) through XVIII (Enforcement and Reservations) of this

23 Order.

24      "Work Plan" shall mean a work plan developed by the

25 Respondents and approved by EPA which details work to be

26 conducted pursuant to the SOW and this Order.

27

28                         9

1                **VII. <u>NOTICE OF INTENT TO COMPLY</u>**

2        Not later than five (5) days after the effective date of

3 this Order, Respondents shall provide written notice to EPA's

4 manager of the McColl project (EPA's "Project Manager") stating

5 whether or not Respondents will comply with the terms of this

6 Order. If Respondents, or any one of them, do not unequivocally

7 commit to perform the requirements of this Order, they, or each

8 so refusing, shall be deemed to have violated this Order and to

9 have failed or refused to comply with this Order. Respondents'

10 written notice shall describe, using facts that exist on or prior

11 to the effective date of this Order, any "sufficient cause"

12 defenses asserted by Respondents under Sections 106(b) and

13 107(c)(3) of CERCLA, 42 U.S.C. §§ 9606(b) and 9607(c)(3). The

14 absence of a response by EPA to the notice required by this

15 paragraph shall not be deemed to be acceptance of Respondents'

16 assertions.

17

18                  **VIII. <u>PARTIES BOUND</u>**

19      A.   This Order shall apply to and be binding upon the

20 Respondents identified in Section I, their directors, officers,

21 employees, agents, successors, and assigns. Respondents are

22 jointly and severally responsible for carrying out all activities

23 required by this Order, except for those activities expressly

24 required only of another Respondent or group of Respondents. No

25 change in the ownership, corporate status, or other control of

26 Respondents shall alter any of the Respondents' responsibilities

27 under this Order.

28                     **10**

B.   Respondents shall provide a copy of this Order to any prospective owners or successors before a controlling interest in Respondents' assets, property rights, or stock are transferred to the prospective owner or successor.  Respondents shall provide a copy of this Order to each contractor, sub-contractor, laboratory, or consultant retained to perform any Work under this Order, within five (5) days after the effective date of this Order or on the date such services are retained, whichever date occurs later.  Respondents shall also provide a copy of this Order to each person representing any Respondent with respect to the Site or the Work and shall condition all contracts and subcontracts entered into hereunder upon performance of the Work in conformity with the terms of this Order.  With regard to the activities undertaken pursuant to this Order, each contractor and subcontractor shall be deemed to be related by contract to the Respondents within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).  Notwithstanding the terms of any contract, Respondents are responsible (and each Respondent is) responsible for compliance with this Order and for ensuring that their (its) contractors, subcontractors and agents comply with this Order, and perform any Work in accordance with this Order.


IX.   WORK TO BE PERFORMED

A.   General Obligations

1.  Respondents shall cooperate with EPA in providing infor-mation regarding the Work to the public.  As requested by EPA, Respondents shall participate in the preparation of such informa-

11

1  tion for distribution to the public and in public meetings which

2  may be held or sponsored by EPA to explain activities at or

3  relating to the Site.

4  2.  Notwithstanding any approvals which may be granted by

5  the United States or other governmental entities, Respondents

6  shall assume any and all liability arising from or relating to

7  their contractors, subcontractors, or any other person acting on

8  their behalf in the performance of the Work or their failure to

9  perform fully or complete the Work.

10  3.  Oil Company Respondents' Project Coordinator

11  a.  Oil Company Respondents shall appoint a

12  representative ("Project Coordinator") designated by them to act

13  on their behalf to coordinate the Work.  Within five (5) days

14  after the effective date of this Order, the Oil Company

15  Respondents shall notify EPA in writing of the name and

16  qualifications of the Project Coordinator, including the support

17  entities and staff, proposed to be used in carrying out Work

18  under this Order.  If at any time Oil Company Respondents propose

19  to use a different Project Coordinator, Oil Company Respondents

20  shall notify EPA and shall obtain approval from EPA before the

21  new Project Coordinator performs any Work under this Order.

22  b.  EPA will review the Oil Company Respondents'

23  selection of a Project Coordinator according to the terms of this

24  paragraph.  If EPA disapproves of the selection of the Project

25  Coordinator, the Oil Company Respondents shall submit to EPA

26  within twenty (20) days after receipt of EPA's disapproval of the

27  Project Coordinator previously selected, a list of Project

28  12

1  Coordinators, including primary support entities and staff, that

2  would be acceptable to the Oil Company Respondents.  EPA will

3  thereafter provide notice to Oil Company Respondents of the names

4  of the Project Coordinators that are acceptable to EPA.  The Oil

5  Company Respondents may then select any approved Project

6  Coordinator from that list and shall notify EPA of the name of

7  the Project Coordinator selected within fifteen (15) days of

8  EPA's designation of the approved Project Coordinator.

9        c.  Within fifteen (15) days after the effective date

10  of this Order, the Oil Company Respondents shall submit to EPA

11  for approval a Communication and Coordination Plan (CCP) that

12  specifies the requirements and procedures by which the Oil

13  Company Respondents will communicate and coordinate with one

14  another in carrying out the requirements of the Order.  The CCP

15  shall include at a minimum the following:

16        i.  <u>Communication Strategy</u> The Oil Company Respondents

17  shall specify how the Project Coordinator and the individual Oil

18  Company Respondents will communicate and disseminate information

19  relative to this Order.  The name, title, address and telephone

20  number of the primary contact person for each Oil Company

21  Respondent shall be included in the communication strategy.

22        ii.  <u>Coordination of Efforts</u> The Oil Company

23  Respondents shall describe with specificity how the technical,

24  financial, and administrative requirements of this Order are to

25  be coordinated and distributed among and performed by the Oil

26  Company Respondents.  The CCP shall describe the obligations of

27  each and every Oil Company Respondent in full.

28

1    d. A duly authorized representative of each Oil

2 Company Respondent shall sign the CCP prior to submission of the

3 CCP to EPA. Failure of any Oil Company Respondent to sign the

4 CCP will constitute a violation of this Order by the individual

5 Respondent.

6    e. The Oil Company Respondents shall submit all

7 proposed changes or amendments to the CCP to EPA for approval.

8    f. The CCP as approved by EPA shall be incorporated

9 into and enforceable under this Order.

10  4. <u>Respondent McAuley's Project Coordinator</u>

11    a. Respondent McAuley shall appoint a representative

12 ("Project Coordinator") designated by it to act on its behalf to

13 coordinate the Work. Within ten (10) days after the effective

14 date of this Order, Respondent McAuley shall notify EPA in

15 writing of the name and qualifications of the Project

16 Coordinator, including the support entities and staff, proposed

17 to be used in carrying out Work under this Order. If at any time

18 Respondent McAuley proposes to use a different Project

19 Coordinator, Respondent McAuley shall notify EPA and shall obtain

20 approval from EPA before the new Project Coordinator performs any

21 Work under this Order.

22    b. EPA will review Respondent McAuley's selection of a

23 Project Coordinator according to the terms of this paragraph. If

24 EPA disapproves of the selection of the Project Coordinator,

25 Respondent McAuley shall submit to EPA within twenty (20) days

26 after receipt of EPA's disapproval of the Project Coordinator

27 previously selected, a list of Project Coordinators, including

28

14

1   primary support entities and staff, that would be acceptable to

2   Respondent McAuley.   EPA will thereafter provide notice to

3   Respondent McAuley of the names of the Project Coordinators that

4   are acceptable to EPA.   Respondent McAuley may then select any

5   approved Project Coordinator from that list and shall notify EPA

6   of the name of the Project Coordinator selected within fifteen

7   (15) days of EPA's designation of the approved Project

8   Coordinator.

9        5.   Respondents shall submit all reports (daily, weekly,

10   monthly, etc.) prepared by their contractors and subcontractors

11   in accordance with the SOWs to EPA's designated Project Manager

12   or other persons EPA may select.

13   B.   Submission of Work Plans and Other Documents

14        1. Documents to be Submitted by Oil Company Respondents:   In

15   accordance with the SOW attached as Appendix 2 to this Order, the

16   Oil Company Respondents shall submit Work Plans and other

17   documents to EPA for the design of the Remedial Action at the

18   Site and for other response actions, including groundwater

19   monitoring, groundwater remedial investigation and feasibility

20   study activities and site maintenance.   Upon approval by EPA, all

21   Work Plans submitted by the Oil Company Respondents pursuant to

22   the SOW shall be incorporated into and become enforceable under

23   this Order.   Upon approval by EPA of the required Work Plans, the

24   Oil Company Respondents shall implement the Work Plans in

25   accordance with the schedule approved by EPA.   The Oil Company

26   Respondents shall submit all plans, submittals and other

27   deliverables required under the approved Work Plans in accordance

28

1  with the approved schedule for review and approval pursuant to
2  the SOW.  Unless otherwise directed by EPA, the Oil Company
3  Respondents shall not commence any Remedial Design Activities or
4  any other response actions at the Site prior to approval of the
5  required Work Plans.

6      2. <u>Documents to be Submitted by Respondent McAuley</u>:  In
7  accordance with the SOW attached as Appendix 3 to this Order,
8  Respondent McAuley shall submit a Work Plan and other documents
9  to EPA for the design of certain response actions at the Site,
10  including site maintenance and site security.  Upon approval by
11  EPA, the Work Plan submitted by Respondent McAuley pursuant to
12  the SOW shall be incorporated into and become enforceable under
13  this Order.  Upon approval by EPA of the required Work Plan,
14  Respondent McAuley shall implement the Work Plan in accordance
15  with the schedule approved by EPA.  Respondent McAuley shall
16  submit all plans, submittals and other deliverables required
17  under the approved Work Plan in accordance with the approved
18  schedule for review and approval pursuant to the SOW.  Unless
19  otherwise directed by EPA, Respondent McAuley shall not commence
20  any response actions at the Site prior to approval of the
21  required Work Plan.

22      3.  Upon three (3) days advance notice by EPA, by telephone
23  or in writing, to one or both Project Coordinators for
24  Respondents, the Project Coordinator(s) shall attend a scoping
25  meeting at a time and place determined by EPA, to discuss issues
26  relating to the contents of any deliverable, plan, report, or
27  other item which is required to be submitted for review and
28

16

approval pursuant to this Order, or relating to Work to be performed by Respondents pursuant to this Order.

4. After review of any deliverable, plan, report, or other item which is required to be submitted for review and approval pursuant to this Order, EPA may: (a) approve the submission; (b) approve the submission with modifications; (c) disapprove the submission and direct Respondents to re-submit the document after incorporating EPA's comments; or (d) disapprove the submission and assume responsibility for performing all or any part of the response action. As used in this Order, the terms "approval by EPA", "EPA approval" or a similar term mean the action described in subparagraphs (a) or (b) of this paragraph.

5. In the event of approval or approval with modifications by EPA, Respondents shall proceed to take any action required by the deliverable, plan, report, or other item, as approved or modified by EPA.

6. Upon receipt of the notice of disapproval or a request for modification, Respondents shall, within the time set forth on the schedules in the SOWs, correct the deficiencies and resubmit the deliverable, plan, report or other item for approval. Notwithstanding the notice of disapproval, Respondents shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission.

7. If any submission is not approved by EPA, Respondents shall be deemed to be in violation of this Order.

8. The Work performed by the Respondents pursuant to this Order shall, at a minimum, comply with the SOWs and be consistent

17

1   with the ROD.

2   C.   <u>No Warranty Regarding Work Plans</u>

3        Neither the Work Plans nor any approvals, permits or other

4   permissions that may be granted by EPA related to this Order

5   constitute a warranty or representation of any kind by the United

6   States that the Work Plans will achieve the standards set forth

7   in the ROD, and in the SOW, and shall not foreclose the United

8   States from seeking performance of all terms and conditions of

9   this Order.   Nothing in this Order shall be construed to relieve

10  Respondents of their obligations to achieve all standards set

11  forth in the ROD and in the SOW.

12

13            X. <u>ENDANGERMENT AND EMERGENCY RESPONSE</u>

14       A.   In the event of any action or occurrence during the

15  performance of the Work which causes or threatens to cause a

16  release of a hazardous substance or which may present an

17  immediate threat to public health or welfare or the environment,

18  Respondents shall immediately take all appropriate action to

19  prevent, abate, or minimize the threat, and shall immediately

20  notify the EPA Project Manager.   If this person is not available,

21  Respondents shall notify the EPA Emergency Response Unit, Region

22  IX.   Respondents shall take such action in consultation with

23  EPA's Project Manager, and in accordance with all applicable

24  provisions of this Order and all applicable deliverables

25  submitted pursuant to the SOWs, including but not limited to the

26  Health and Safety Plans and the Contingency Plans.   In the event

27  that Respondents fail to take appropriate response action as

28

1 required by this Section, and EPA takes that action instead,

2 Respondents shall be liable to the extent permitted under CERCLA.

3     B. Nothing in the preceding paragraph shall be deemed to

4 limit any authority of the United States to take, direct, or

5 order all appropriate action to protect human health and the

6 environment or to prevent, abate, or minimize an actual or

7 threatened release of hazardous substance on, at, or from the

8 Site.

9

10             XI.   COMPLIANCE WITH APPLICABLE LAWS

11     A. All activities conducted by Respondents pursuant to this

12 Order shall be performed in accordance with the requirements of

13 all Federal and state laws and regulations. EPA has determined

14 that the activities contemplated by this Order are consistent

15 with the National Contingency Plan (NCP) if performed in full

16 compliance with the ROD, this Order, and the plans and schedules

17 approved hereunder.

18     B. Except as provided in Section 121(e) of CERCLA and the

19 NCP, no permit shall be required for any activities conducted

20 entirely on-Site; however, Respondents shall comply with all

21 applicable or relevant and appropriate requirements set forth in

22 the ROD. Where any activities require a Federal or state permit

23 or approval, Respondents shall submit timely applications and

24 take all other actions necessary to obtain and to comply with all

25 such permits or approvals.

26     C. This Order is not, and shall not be construed to be, a

27 permit issued pursuant to any Federal or state statute or

28

1 regulation.

2

3 XII. PROJECT MANAGER

4     A. All communications, whether written or oral, from

5 Respondents to EPA shall be directed to EPA's Project Manager.

6 Respondent shall submit to EPA six (6) copies of all

7 deliverables, documents, including plans, reports, and other

8 correspondence, which are developed pursuant to this Order, and

9 shall send these documents by overnight mail to EPA's Project

10 Manager unless directed otherwise.

11     EPA's Project Manager is:

12         John Blevins
          EPA H-6-1
13         75 Hawthorne Street
          San Francisco, California 94105
14         (415) 744-2241

15     B. EPA has the unreviewable right to change its Project

16 Manager. If EPA changes its Project Manager, EPA will inform

17 Respondents in writing of the name, address, and telephone number

18 of the new Project Manager.

19     C.  EPA's Project Manager shall have the authority lawfully

20 vested in Remedial Project Managers and On-Scene Coordinators by

21 the National Contingency Plan, 40 C.F.R. Part 300.  EPA's Project

22 Manager shall have authority, consistent with the National

23 Contingency Plan, to halt any work required by this Order, and to

24 take any necessary response action.

25

26 XIII.  SITE ACCESS AND DATA/DOCUMENT AVAILABILITY

27     A.  Respondent McAuley shall provide access to its property

28

1 | to EPA and EPA's authorized representatives and contractors and
2 | to the Oil Company Respondents for the purpose of carrying out
3 | the requirements of this Order.

4 |    B.   To the extent that the Site or other areas where Work is
5 | to be performed is owned or controlled by parties other than
6 | those bound by this Order, and to the extent that access to or
7 | easements over property is required for the proper and complete
8 | performance of this Order, the Oil Company Respondents shall
9 | obtain access agreements from the present owners or those persons
10 | who have control over the property, including lessees, within
11 | sixty (60) days of the effective date of this Order.  Site access
12 | agreements shall provide access to EPA, its contractors and
13 | representatives, and to Respondents and their Contractor(s) and
14 | authorized representatives, and such agreements shall specify
15 | that Respondents are not EPA's representatives with respect to
16 | liability associated with Site activities.

17 |    C.   Respondents shall save and hold harmless the United
18 | States and its officials, agents, employees, contractors,
19 | subcontractors, or representatives for or from any and all claims
20 | or causes of action or other costs incurred by the United States
21 | including but not limited to attorneys fees and other expenses of
22 | litigation and settlement arising from or on account of acts or
23 | omissions of Respondents, their officers, directors, employees,
24 | agents, contractors, subcontractors, and any persons acting on
25 | their behalf or under their control, in carrying out activities
26 | pursuant to this Order.

27 |    D.  In the event that site access agreements are not ob-
28 |

21

1 | tained within the sixty (60) day period, the Oil Company
2 | Respondents shall notify EPA within sixty five (65) days of the
3 | effective date of this Order regarding both the lack of, and
4 | efforts to obtain, such agreements. If the Oil Company
5 | Respondents fail to gain access within 60 days, they shall
6 | continue to use best efforts to obtain access until access is
7 | granted. For purposes of this paragraph, "best efforts"
8 | includes, but is not limited to, seeking judicial assistance and
9 | the payment of money as consideration for access.

10 |     E. Respondents or any of their agents or representatives
11 | shall allow EPA and its authorized representatives and
12 | contractors to enter and freely move about all property at the
13 | Site and off-Site areas subject to or affected by the Work under
14 | this Order or where documents required to be prepared or
15 | maintained by this Order are located, for the purposes of
16 | inspecting conditions, activities, the results of activities,
17 | records, operating logs, and contracts related to the Site or
18 | Respondents and their representatives or contractors pursuant to
19 | this Order; reviewing the progress of the Respondents in carrying
20 | out the terms of this Order; conducting tests as EPA or its
21 | authorized representatives or contractors deem necessary; using a
22 | camera, sound recording device or other documentary type
23 | equipment; and verifying the data submitted to EPA by
24 | Respondents. Respondents shall allow EPA and its authorized
25 | representatives and contractors to enter the Site, to inspect and
26 | copy all records, files, photographs, documents, sampling and
27 | monitoring data, and other writings related to work undertaken in
28 |

22
47

1  carrying out this Order.  Nothing herein shall be interpreted as
2  limiting or affecting EPA's right of entry or inspection
3  authority under Federal law.

4      F. Respondents may assert a claim of business
5  confidentiality covering part or all of the information submitted
6  to EPA pursuant to the terms of this Order under 40 C.F.R.
7  § 2.203, provided such claim is not inconsistent with Section
8  104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7) or other provisions
9  of law.  This claim shall be asserted in the manner described by
10  40 C.F.R. § 2.203(b) and substantiated by Respondents at the time
11  the claim is made.  Information determined to be confidential by
12  EPA will be given the protection specified in 40 C.F.R. Part 2.
13  If no such claim accompanies the information when it is submitted
14  to EPA, it may be made available to the public by EPA or the
15  State without further notice to the Respondents.  Respondents
16  shall not assert confidentiality claims with respect to any data
17  related to Site conditions, sampling, monitoring or any other
18  information addressed by Section 104(e)(7).

19      G. Respondents shall maintain for the period during which
20  this Order is in effect, an index of documents that Respondents
21  claim contain confidential business information.  The index shall
22  contain, for each document, the date, author, addressee, and
23  subject of the document.  Upon written request from EPA,
24  Respondents shall submit a copy of the index to EPA.

25      H.  Any person obtaining access to the Site pursuant to this
26  provision shall comply with all applicable provisions of the
27  Worker Health and Safety Plans as submitted pursuant to the SOW.

28

23

1    I.   Notwithstanding any provision of this Order, the United

2    States retains all of its access authorities and rights under

3    CERCLA, RCRA and any other applicable federal statute or

4    authority.

5    J. Each Respondent shall provide to EPA upon request, copies

6    of all documents and information within their possession and/or

7    control or that of its contractors or agents relating to

8    activities at the Site or to the implementation of this Order,

9    including but not limited to trucking logs, receipts, reports,

10   correspondence, or other documents or information related to the

11   Work.   Each Respondent shall also make available to EPA for

12   purposes of investigation, information gathering, or testimony,

13   its employees, agents, or representatives with knowledge of

14   relevant facts concerning the performance of the Work.

15

16              XIV.   RECORD PRESERVATION

17   Until ten (10) years after EPA provides notice to

18   Respondents that the Work has been completed, each Respondent

19   shall preserve and retain all records and documents in its

20   possession or control, including the documents in the possession

21   or control of their contractors and agents on and after the

22   effective date of this Order, that relate in any manner to the

23   Site.   At the conclusion of this document retention period, each

24   Respondent shall notify the United States at least sixty (60)

25   days prior to the destruction of any such records or documents,

26   and upon request by the United States, Respondents shall deliver

27   any such records or documents to EPA.

28

                            24

## XV.   DELAY IN PERFORMANCE

A. Any delay in performance of this Order that, in EPA's judgment, is not properly justified by Respondents under the terms of this Section shall be considered a violation of this Order.   Any delay in performance of this Order shall not affect Respondents' obligations to fully perform all obligations under the terms and conditions of this Order.

B. Respondents shall notify EPA of any delay or anticipated delay in performing any requirement of this Order.   Such notification shall be made by telephone to EPA's Project Manager within forty eight (48) hours after any Respondent first knew or should have known that a delay might occur.   Respondents shall adopt all reasonable measures to avoid or minimize any such delay.   Within five (5) days after notifying EPA by telephone, Respondents shall provide written notification fully describing the nature of the delay, any justification for delay, any reason why Respondents should not be held strictly accountable for failing to comply with any relevant requirements of this Order, the measures planned and taken to minimize the delay, and a schedule for implementing the measures that will be taken to mitigate the effect of the delay.   Increased costs or expenses associated with implementation of the activities called for in this Order is not a justification for any delay in performance.

## XVI.   ASSURANCE OF ABILITY TO COMPLETE WORK

A. Each Respondent shall demonstrate its ability to complete

1   the Work required by this Order and to pay all claims that arise

2   from the performance of the Work by obtaining and presenting to

3   EPA within ninety (90) days after the effective date of this

4   Order, one of the following: (1) a performance bond; (2) a letter

5   of credit; (3) a guarantee by a third party; or (4) internal

6   financial information to allow EPA to determine that Respondent

7   has sufficient assets available to perform the Work.   The Oil

8   Company Respondents shall demonstrate financial assurance to

9   complete work costing not less than $10,000,000.   Respondent

10  McAuley shall demonstrate financial assurance to complete work

11  costing not less than $200,000 per year.   If Respondents present

12  internal financial information and EPA determines that such

13  financial information is inadequate, Respondents shall, within

14  thirty (30) days after receipt of EPA's notice of determination,

15  obtain and present to EPA for approval one of the other three

16  forms of financial assurance listed above.

17      B. At least seven (7) days prior to commencing any work at

18  the Site pursuant to this Order, Respondents shall submit to EPA

19  a certification that Respondents or their contractors and

20  subcontractors have adequate insurance coverage or have

21  indemnification for liabilities for injuries or damages to

22  persons or property which may result from the activities to be

23  conducted by or on behalf of Respondents pursuant to this Order.

24  Respondents shall ensure that such insurance or indemnification

25  is maintained for the duration of performance of the Work

26  required by this Order.

27

28

1                  XVII.   UNITED STATES NOT LIABLE

2       The United States, by issuance of this Order, assumes no

3 liability for any injuries or damages to persons or property

4 resulting from acts or omissions by any or all Respondents, or

5 their directors, officers, employees, agents, representatives,

6 successors, assigns, contractors, or consultants in carrying out

7 any action or activity pursuant to this Order.  Neither EPA nor

8 the United States may be deemed to be a party to any contract

9 entered into by any or all Respondents or their directors,

10 officers, employees, agents, successors, assigns, contractors, or

11 consultants in carrying out any action or activity pursuant to

12 this Order.

13

14              XVIII.   ENFORCEMENT AND RESERVATIONS

15       A. EPA reserves the right to pursue a claim in the pending

16 action (United States et al. v. Shell Oil Co., et al., No. Cv-91-

17 0589 RJK(Ex)), or to bring another action against Respondents

18 under Section 107 of CERCLA, 42 U.S.C. § 9607, for recovery of

19 any response costs incurred by the United States related to this

20 Order.  This reservation shall include but not be limited to past

21 costs, direct costs, indirect costs, the costs of oversight, the

22 costs of compiling the cost documentation to support oversight

23 cost demand, as well as accrued interest as provided in Section

24 107(a) of CERCLA.

25       B. Notwithstanding any other provision of this Order, at any

26 time during the response action, EPA may perform its own studies,

27 complete the response action (or any portion of the response

28

action) as provided in CERCLA and the NCP, and seek reimbursement from Respondents for its costs, or seek any other appropriate relief.

C. Nothing in this Order shall preclude EPA from taking any additional enforcement actions, including modification of this Order or issuance of additional Orders, and/or additional remedial or removal actions as EPA may deem necessary, or from requiring Respondents in the future to perform additional activities pursuant to CERCLA, 42 U.S.C. § 9606(a), et seq., or any other applicable law. Respondents shall be liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for the costs of any such additional actions.

D. Notwithstanding any provision of this Order, the United States hereby retains all of its information gathering, inspection and enforcement authorities and rights under CERCLA, RCRA and any other applicable statutes or regulations.

E. Each Respondent shall be subject to civil penalties under Section 106(b) of CERCLA, 42 U.S.C. § 9606(b), of not more than $25,000 for each day in which it willfully violates, or fails or refuses to comply with this Order without sufficient cause. In addition, failure to properly provide response action under this Order, or any portion hereof, without sufficient cause, may result in liability under Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action.

1    F. Nothing in this Order shall constitute or be construed as

2    a release from any claim, cause of action or demand in law or

3    equity against any person for any liability it may have arising

4    out of or relating in any way to the Site.

5    G. If a court issues an order that invalidates any provision

6    of this Order or finds that any Respondent has sufficient cause

7    not to comply with one or more provisions of this Order,

8    Respondents shall remain bound to comply with all provisions of

9    this Order not invalidated by the court's order.

10

11         XIX.   EFFECTIVE DATE AND COMPUTATION OF TIME

12    This Order shall be effective five (5) days after the Order

13    is signed by the Director, Hazardous Waste Management Division.

14    All times for performance of ordered activities shall be

15    calculated from this effective date.

16

17         XX.   OPPORTUNITY TO CONFER

18    A. Respondents may, within five (5) days after the date this

19    Order is signed, request a conference with the EPA Project

20    Manager to discuss this Order.  If requested, the conference

21    shall occur within ten (10) days of the request unless EPA

22    approves a later date.  The conference shall take place at EPA's

23    offices at 75 Hawthorne Street, San Francisco, California.

24    B. The purpose and scope of the conference shall be limited

25    to issues involving the implementation of the response actions

26    required by this Order and the extent to which Respondents intend

27    to comply with this Order.  This conference is not an evidentiary

28

29

1  hearing, and does not constitute a proceeding to challenge this

2  Order.   It does not give Respondents a right to seek review of

3  this Order, or to seek resolution of potential liability, and no

4  official stenographic record of the conference will be made.   At

5  any conference held pursuant to Respondents' request, Respondents

6  may appear in person or by an attorney or other representative.

7  Requests for a conference must be by telephone to John Blevins,

8  (415) 744-2241, followed by written confirmation mailed that day

9  to John Blevins, McColl Project Manager, H-6-1, 75 Hawthorne

10  Street, San Francisco, California 94105.

11

12

13

14  SO ORDERED, this 8th day of July, 1993.

15

16  BY: _____

17  Jeff Zelikson
    Director, Hazardous Waste Management Division
18  U.S. Environmental Protection Agency
    Region IX

19

20

21

22

23

24

25

26

27

28

8/8/93

## APPENDIX 2

**McCOLL SUPERFUND SITE**
**STATEMENT OF WORK FOR REMEDIAL DESIGN AND OTHER RESPONSE ACTIONS**
**APPENDIX 2 TO OIL COMPANY RESPONDENT'S UNILATERAL ADMINISTRATIVE**
**ORDER IN THE SUPPORT OF JUNE 1993 RECORD OF DECISION**

PURPOSE:

The purpose of this Statement of Work (SOW) is to set forth the
requirements for the remedial design (RD) of the selected remedy
as defined in the Record of Decision (ROD) signed on June 30,
1993.  This SOW is designed to provide the framework for
conducting RD activities at the McColl Superfund Site (McColl) in
Fullerton, California.  The RD for this project includes all
activities necessary to translate the ROD into the remedy to be
constructed under the Remedial Action (RA).  This includes all
activities necessary to fully implement Soft Material
Solidification (SMS) with a contingency of RCRA equivalent
closure. This SOW also includes site maintenance activities and
the assumption and completion of the groundwater Remedial
Investigation/Feasibility Studies (RI/FS) which will culminate in
a ROD for Operable Unit Two (2). The takeover of the groundwater
RI/FS also includes routine groundwater sampling and analysis.

FLOW PATH

This SOW includes the following tasks and sub-tasks:

**TASK 1.0: PROJECT MANAGEMENT**

      1.1 PROJECT PLANNING
      1.2 REPORTING

**TASK 2.0: DEFINITION OF SUMPS (SUMP BOUNDARIES, DEPTH OF SOFT**
             **MATERIAL/CHAR INTERFACE, AND SUMP DEPTH)**

      2.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN,
         QUALITY ASSURANCE PROJECT PLAN, HEALTH AND
         SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND
         AMBIENT AIR MONITORING PLAN)
      2.2 FIELD METHODS OPTIONS ANALYSIS REPORT
      2.3 FINAL REPORT

**TASK 3.0: PILOT SCALE TESTING OF SOLIDIFICATION ON SUMP L-4**

      3.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN,
         QUALITY ASSURANCE PROJECT PLAN, HEALTH AND

1

SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND AMBIENT AIR MONITORING PLAN)

3.2 LETTER REPORT CONTAINING ANALYSIS OF AND RECOMMENDATIONS FOR TETRAHYDROTHIOPHENE CONTROL

3.3 SOLIDIFICATION EQUIPMENT IDENTIFICATION LETTER REPORT

3.4 DESIGN OF AIR TREATMENT SYSTEM FOR PILOT SCALE SOLIDIFICATION UNIT

3.5 DESIGN OF CAPTURE AND TREATMENT SYSTEM FOR FUGITIVE AND TRANSIENT EMISSIONS

3.6 DESIGN OF PERIMETER AIR MONITORING SYSTEM

3.7 PROJECT MANAGEMENT PLAN

3.8 RESIDUALS MANAGEMENT PLAN

3.9 PILOT SCALE TREATABILITY STUDY REPORT

## TASK 4.0: FULL SCALE TESTING OF SOLIDIFICATION ON SUMP L-4

4.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND AMBIENT AIR MONITORING PLAN)

4.2 LETTER REPORT CONTAINING ANALYSIS OF AND RECOMMENDATIONS FOR TETRAHYDROTHIOPHENE CONTROL

4.3 SOLIDIFICATION EQUIPMENT IDENTIFICATION LETTER REPORT

4.4 DESIGN OF AIR TREATMENT SYSTEM FOR SOLIDIFICATION UNIT

4.5 DESIGN OF CAPTURE AND TREATMENT SYSTEM FOR FUGITIVE AND TRANSIENT EMISSIONS

4.6 DESIGN OF PERIMETER AIR MONITORING SYSTEM

4.7 PROJECT MANAGEMENT PLAN

4.8 RESIDUALS MANAGEMENT PLAN

4.9 FULL SCALE TREATABILITY STUDY REPORT

4.10 CONCEPTUAL DESIGN (15%) OF SOLIDIFICATION SYSTEM (DELIVERY SYSTEM, AUGER SYSTEM, EMISSION CAPTURE AND TREATMENT SYSTEM [PRIMARY, FUGITIVE, AND TRANSIENT])

## TASK 5.0: RCRA EQUIVALENT CAP ANALYSIS

5.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, AND COMMUNITY CONTINGENCY PLAN)

5.2 REPORT CONTAINING ANALYSIS AND RECOMMENDATIONS RELATING TO CAP OPTIONS CONSISTENT WITH RCRA REGULATIONS

5.3 CONCEPTUAL DESIGN (15%) OF RCRA EQUIVALENT CAP

## TASK 6.0: SLURRY WALL ANALYSIS

6.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND

2

           SAFETY PLAN, AND COMMUNITY CONTINGENCY PLAN)
6.2 REPORT CONTAINING ANALYSIS AND RECOMMENDATIONS
      RELATING TO SLURRY WALL OPTIONS
6.3 CONCEPTUAL DESIGN (15%) OF SLURRY WALLS

## TASK 7.0 SLOPE STABILIZATION ANALYSIS

7.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN,
    QUALITY ASSURANCE PROJECT PLAN, HEALTH AND
    SAFETY PLAN, AND COMMUNITY CONTINGENCY PLAN)
7.2 REPORT CONTAINING ANALYSIS AND RECOMMENDATIONS
    RELATING TO RETAINING WALL OPTIONS
7.3 CONCEPTUAL DESIGN (15%) OF RETAINING WALLS

## TASK 8.0 INTEGRATED DESIGN

8.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN,
    QUALITY ASSURANCE PROJECT PLAN, HEALTH AND
    SAFETY PLAN, AND COMMUNITY CONTINGENCY PLAN) FOR
    COMPLETION OF DESIGN INCLUDING BUT NOT LIMITED
    TO PRELIMINARY DESIGN (30%), INTERMEDIATE DESIGN
    (60%), AND FINAL DESIGN (100%).

## TASK 9.0 SITE MAINTENANCE (EXCLUDING SITE MOWING AND FENCE REPAIR)

9.1 SITE MAINTENANCE ANALYSIS AND RECOMMENDATIONS
9.2 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN,
    QUALITY ASSURANCE PROJECT PLAN, HEALTH AND
    SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND AIR
    MONITORING PLAN)

## TASK 10.0 GROUNDWATER REMEDIAL INVESTIGATION AND FEASIBILITY STUDY (RI/FS)

10.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN,
    QUALITY ASSURANCE PROJECT PLAN, HEALTH AND
    SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND
    AMBIENT AIR MONITORING PLAN)

## TASK 11.0 ROUTINE GROUNDWATER MONITORING

11.1 ROUTINE GROUNDWATER MONITORING ANALYSIS AND
    RECOMMENDATION REPORT
11.2 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN,
    QUALITY ASSURANCE PROJECT PLAN, HEALTH AND
    SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND
    AMBIENT AIR MONITORING PLAN)

3

## TASK BY TASK DESCRIPTION

## TASK 1.O PROJECT MANAGEMENT

## 1.1 PROJECT PLANNING

The respondents shall submit a project management plan to EPA within 15 days of the effective date of this UAO which contains, at a minimum, the following information:

* the lead contacts within each responding PRPs organization with their full mailing address, phone number, and fax number.
* the project team assembled by the responding PRPs with the hierarchy identified
* all contractors and sub-contractors identified by task and sub-task
* critical flow path charts for the following:

    - the overall project covered by the UAO
    - the pilot scale study
    - the full scale study
    - the deliverables identified within the UAO
    - the 15% design for all components of the project (solidification, cap, slurry walls, and retaining walls)

The respondents shall verbally notify EPA within 24 hours of changes to the submitted project management plan, and will provide EPA with hard copy addendum and/or modifications to the project management plan within 5 days of verbal notification.

## 1.2 REPORTING

The respondents shall adhere to the following guidelines during the life of project covered by the UAO:

1) Whenever field work occurs under the UAO, the respondents will submit weekly reports to EPA with the following information:

* work planned
* work completed
* work planned for next week
* observations made
* deviations from original workplan
* reasons for deviations
* recommendations for additional work
* samples collected
* analytical results
* schedule for analysis
* status of community contingency plan monitoring

4

2) Whenever field work occurs under the UAO, the respondents shall contact EPA or a designated EPA contact daily with a status report on the progress of the work and any issues or obstacles encountered. This contact shall be made either through a phone call or daily fax. The EPA project manager will determine the method of contact on an event by event basis.

3) All deliverables to EPA will be submitted with 6 copies attached.

4) All reports will be submitted to EPA both in hard copy and on computer disk. All reports will be submitted to EPA on high density disks formatted on DOS version 3.2 or higher. All reports will be submitted in Wordperfect version 5.1 or higher.

5) All sampling and analysis data will be submitted to EPA both in hard copy and on computer disk. All reports will be submitted to EPA on high density disks formatted on DOS version 3.2 or higher. All reports will be submitted in Lotus 1-2-3 version 2.2 or higher.

6) All analytical data will be submitted to EPA prior and after QA/QC analysis. Included in the post QA/QC data submittal will be an analysis of the data and documentation of any data subject to QA/QC constraints.

7) All schedules and critical path analysis charts will be submitted to EPA in hard copy and on computer disk. All reports will be submitted to EPA on high density disks formatted on DOS version 3.2 or higher. All reports will be submitted in Microsoft Project version 3.0 or higher.

8) All environmental sampling locations will be surveyed and reported to EPA in the State Plane Coordinate System (x,y,z).

9) A courtesy copy of all deliverables will be simultaneously be sent to the Department of Toxics Substance Control (DTSC).

10) Scoping meetings will be held upon EPA's request prior to the initiation of any task or sub-task contain within this UAO. These meetings will be scheduled within 3 days of EPA's request unless a longer period is agreed upon by EPA.

11) Review meetings will be held upon EPA's request to discuss comments on any deliverable contained within this UAO. These meetings will be scheduled within 3

5

days of EPA's request unless a longer period is agreed
upon by EPA.

**TASK 2.0: DEFINITION OF SUMPS (SUMP BOUNDARIES, DEPTH OF SOFT
MATERIAL/CHAR INTERFACE, AND SUMP DEPTH)**

2.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY
ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY
CONTINGENCY PLAN, AND AMBIENT AIR MONITORING PLAN)

The respondents shall submit a workplan that documents the field
approach required to define the sumps sufficiently to implement
SMS.  All of the sumps shall be defined simultaneously. The
workplan will include a detailed schedule, a detailed cost
estimate, a sampling and analysis plan, a quality assurance
project plan, a health and safety plan, a community contingency
plan, and an ambient air monitoring plan.  The workplan shall
incorporate the results and recommendations from EPA's previous
work on sump L-4 using a cone penetrometer correlated with
geotechnical logs and from Task 2.2.

For purposes of sump boundary definition, the respondents shall
consider the site to be divided into three distinct areas (Upper
Ramparts, Lower Ramparts, and Los Coyotes).  The primary
requirement for the definition of sump boundaries is to allow the
placement of three distinct and separate caps and slurry walls
within these areas (See Figure 1).  The secondary requirement for
the definition of sump boundaries is to determine where to change
the depth of treatment between sumps to allow for the proper
implementation of SMS.

2.2 FIELD METHODS OPTIONS ANALYSIS REPORT

The respondents shall evaluate the field method options available
to accomplish Task 2.0.  The respondents shall consider the
results of EPA's field investigations using CPT and ground
penetration radar technologies on sump L-4 when evaluating the
methods available to define the boundaries of the sumps, the
depth to the soft material/char interface, and the depth of the
sumps.  The respondents shall present the field options
available, the strengths and weaknesses of each approach, and
recommendations for field application.  The respondents shall not
limit their analysis to CPT technology only.  In addition the
respondents shall not limit their analysis to the employment of
single technology applications, but shall analyze combined
technology approaches along with single application approaches.
The EPA approved recommendations will be incorporated into the
workplan being developed in Task 2.1.  The EPA approved approach
shall be implemented on all of the sumps simultaneously.

6

## 2.3 FINAL REPORT

Upon completion of the field work required in Task 2.0, the respondents shall submit to EPA a report that will contain, at a minimum, the following information:

* A description of the field methods used
* A map showing the sampling locations
* A discussion of field observations and impediments
* A discussion of deviations from the original workplan
* A table documenting the samples collected
* A table documenting the results of the sampling
* A table documenting the depth to the soft/material interface by sump
* All appropriate cross sections and fence diagrams
* A table documenting the depth of each sump
* A map showing the boundaries of the three defined areas (Upper Ramparts, Lower Ramparts, and Los Coyotes).
* A map showing the boundaries for changing depth of treatment related to the depth of the soft material/char interface
* A detailed discussion of the methods used to interpret the data to reach the above conclusions
* Recommendations for additional work necessary to design a cap, slurry walls, and retaining walls based on results of the field work

## TASK 3.0: PILOT SCALE TESTING OF SOLIDIFICATION ON SUMP L-4

### 3.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND AMBIENT AIR MONITORING PLAN)

The respondents shall submit a workplan that documents the field approach required to implement a pilot scale study of in-situ solidification on sump L-4. The pilot scale work will be limited to sump L-4 and will be based on the results and recommendations resulting from EPA's bench scale solidification treatability studies. The workplan will include a detailed schedule, a detailed cost estimate, a sampling and analysis plan, a quality assurance project plan, a health and safety plan, a community contingency plan, and an ambient air monitoring plan.

The objectives of the pilot scale treatability study are listed below. The workplan must be developed in such detail to ensure that the data collected will allow EPA to make a determination as to the success of pilot scale study in relation to the objectives. The workplan will also need to incorporate Task 3.2 through 3.9.

7

## PILOT SCALE STUDY OBJECTIVES:

* evaluate the overall applicability of the reagent mixes recommended from the bench scale studies
* evaluate the ability to capture, control and treat the primary emissions from in-situ solidification
* evaluate the ability to capture, control and treat the transient emissions from in-situ solidification
* evaluate the ability to capture, control, and treat the fugitive emissions from in-situ solidification
* evaluate the pumpability of the recommended reagent mixes
* evaluate the in-situ heat profiles generated from the recommended reagent mixes
* evaluate the emission potential from the recommended reagent mixes
* evaluate the swell potential from the recommended reagent mixes
* evaluate the in-situ setting potential from the recommended reagent mixes
* evaluate the in-situ mixability potential from the recommended reagent mixes
* evaluate the potential for effectively monitoring for emissions at the fence-line
* evaluate the emission potential from treated material during grading activities
* evaluate the impact of auger penetration rate and speed on all of the above factors

## 3.2 LETTER REPORT CONTAINING ANALYSIS OF AND RECOMMENDATIONS FOR TETRAHYDROTHIOPHENE CONTROL

The respondents shall submit an analysis of the options available for field use during the pilot study to control tetrahydrothiophene emissions.  The analysis shall evaluate the potential for control of primary, transient, and fugitive tetrahydrothiophene emissions.  The report shall evaluate the options, present the pros and cons and make recommendations concerning innovative methods to be used to control tetrahydrothiophene emissions.

## 3.3 SOLIDIFICATION EQUIPMENT IDENTIFICATION LETTER REPORT

The respondents shall submit a description of the in-situ solidification equipment to be used for the pilot study.  The respondents shall submit information on the following:

- the auguring system
- the reagent delivery system
- the primary emission capture system (shroud)
- the fugitive and transient emission capture system

8

If available, the respondents shall submit as-builts for the
above systems.  If not available the respondents shall submit
design drawings for the above systems, with the understanding
that as-builts will be submitted upon completion of the
fabrication of the necessary units.

The respondents shall submit a detailed description of equipment,
the name and location of the vendor supplying the equipment, and
a schedule for the delivery of the equipment.

## 3.4 DESIGN OF AIR TREATMENT SYSTEM FOR PILOT SCALE SOLIDIFICATION UNIT

The respondents shall submit an intermediate (60%) and final
design package for the pilot scale air treatment system.

## 3.5 DESIGN OF CAPTURE AND TREATMENT SYSTEM FOR FUGITIVE AND TRANSIENT EMISSIONS

The respondents shall submit an intermediate (60%) and final
design package for the pilot scale fugitive and transient air
treatment system.

## 3.6 DESIGN OF PERIMETER AIR MONITORING SYSTEM

The respondents shall submit an intermediate (60%) and final
design package for the pilot scale perimeter air monitoring
system.

## 3.7 PROJECT MANAGEMENT PLAN

The respondents shall submit a project management plan for the
pilot scale treatability study.  This project management plan
will follow the format detailed in the project management plan
developed for the McColl Superfund Site Trial Excavation.   The
project management plan will include, but not be limited, to the
following information:

* project overview
* in-situ solidification and associated operations
* air emission mitigation measures
* schedule

## 3.8 RESIDUALS MANAGEMENT PLAN

The respondents shall submit a residuals management plan that
describes in detail the storage and disposal methods planned for
all residuals generated from the pilot scale treatability
including but not limited to:

* swell material
* decontamination water

9

                  * drill cuttings from pre/post sampling
                  * scrubber effluent
                  * spent activated carbon

All waste material except swell material should be disposed off-
site at an approved hazardous waste management facility.  The
residuals management plan should include details regarding the
transportation of the hazardous material to an off-site facility.
If the swell material can not effectively be managed on-site, it
will also need to be disposed off-site at an approved hazardous
waste facility.

## 3.9 PILOT SCALE TREATABILITY STUDY REPORT

Upon the completion of the pilot scale treatability study the
respondents shall submit a report that details the results of the
pilot scale treatability study.  The report shall contain at a
minimum the following information:

    * A description of the field methods used
    * A map showing the drilling and sampling locations
    * A discussion of field observations and impediments
    * A discussion of deviations from the original workplan and
      project management plan
    * A table documenting the reagents tested and conditions
      under which they were tested
    * A table documenting the samples collected
    * A table documenting the analytical results from the
      treated waste
    * A table documenting the analytical results from the air
      treatment system
    * A table documenting the analytical results from the
      perimeter air monitoring system
    * A table documenting the analytical results from the shroud
    * A table documenting the analytical results from the
      fugitive and transient emission capture system
    * A table documenting the swell, heat generation, and
      emission potential for the reagent mixes tested
    * A discussion of the results and applicability to full
      scale testing
    * Recommendations for modifications to full scale testing
      scope of work based on the results

## TASK 4.0: FULL SCALE TESTING OF SOLIDIFICATION ON SUMP L-4

4.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY
     ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY
     CONTINGENCY PLAN, AND AMBIENT AIR MONITORING PLAN)

The respondents shall submit a workplan that documents the field
approach required to implement a full scale study of in-situ
solidification on sump L-4.  The full scale work will be limited

10

to sump L-4 and will be based on the results and recommendations
resulting from the pilot scale solidification treatability
studies.  The workplan will include a detailed schedule, a
detailed cost estimate, a sampling and analysis plan, a quality
assurance project plan, a health and safety plan, a community
contingency plan, and an ambient air monitoring plan.

The objectives of the full scale treatability study are listed
below. The workplan must be developed in such detail to ensure
that the data collected will allow EPA to make a determination as
to the success of the full scale study in relation to the
objectives.  The data collected should also allow EPA to make a
determination as to the technical implementability of SMS based
on the eight (8) criteria listed in the ROD.  The workplan will
also need to incorporate Task 4.2 through 4.10.

<u>FULL SCALE STUDY OBJECTIVES:</u>

* evaluate the technical implementability of in-situ
  solidification and SMS
* evaluate the overall applicability of the reagent mix
  recommended from the pilot scale study
* evaluate the ability to capture, control and treat the
  primary emissions from in-situ solidification
* evaluate the ability to capture, control and treat the
  transient emissions from in-situ solidification
* evaluate the ability to capture, control, and treat the
  fugitive emissions from in-situ solidification
* evaluate the pumpability of the recommended reagent mix
* evaluate the in-situ heat profile generated from the
  recommended reagent mix
* evaluate the emission potential from the recommended
  reagent mix
* evaluate the swell potential from the recommended reagent
  mix
* evaluate the in-situ setting potential from the
  recommended reagent mix
* evaluate the in-situ mixability potential from the
  recommended reagent mix
* evaluate the potential for effectively monitoring for
  emissions at the fence-line
* evaluate the emission potential from treated material
  during grading activities
* evaluate the optimum auger penetration rate and speed
* evaluate the impact of auger penetration rate and speed
  on all of the above factors
* evaluate the time necessary to fully implement SMS on all
  of the sumps at the site
* evaluate the cost of full implementation of SMS

11

## 4.2 LETTER REPORT CONTAINING ANALYSIS OF AND RECOMMENDATIONS FOR TETRAHYDROTHIOPHENE CONTROL

Based on the results of the pilot scale treatability study, the respondents shall submit an analysis of the options available for field use during the full scale study to control tetrahydrothiophene emissions.  The analysis shall evaluate the potential for control of primary, transient, and fugitive tetrahydrothiophene emissions.  The report shall evaluate the options, present the pros and cons, and make recommendations concerning innovative methods to be used to control tetrahydrothiophene emissions.

## 4.3 SOLIDIFICATION EQUIPMENT IDENTIFICATION LETTER REPORT

Based on the results of the pilot scale treatability study, the respondents shall submit a description of the in-situ solidification equipment to be used for the full scale study. The respondents shall submit information on the following equipment:

- the auguring system
- the reagent delivery system
- the primary emission capture system (shroud)
- the fugitive and transient emission capture system

If available, the respondents shall submit as-builts for the above systems.  If not available the respondents shall submit design drawings for the above systems, with the understanding that as-builts will be submitted upon completion of the fabrication of the necessary units.

The respondents shall submit a detailed description of equipment, the name and location of the vendor supplying the equipment and a schedule for the delivery of the equipment.

## 4.4 DESIGN OF AIR TREATMENT SYSTEM FOR SOLIDIFICATION UNIT

Based on the results of the pilot scale study, the respondents shall submit an intermediate (60%) and final design package for the full scale air treatment system.

## 4.5 DESIGN OF CAPTURE AND TREATMENT SYSTEM FOR FUGITIVE AND TRANSIENT EMISSIONS

Based on the results of the pilot scale study, the respondents shall submit an intermediate (60%) and final design package for the full scale fugitive and transient air treatment system.

12

4.6 DESIGN OF PERIMETER AIR MONITORING SYSTEM

Based on the results of the pilot scale study, the respondents shall submit an intermediate (60%) and final design package for the full scale perimeter air monitoring system.

4.7 PROJECT MANAGEMENT PLAN

Based on the results of the pilot scale study, the respondents shall submit a project management plan for the full scale treatability study.  This project management plan will follow the format detailed in the project management plan developed for the pilot scale study and include the same level of detail.

4.8 RESIDUALS MANAGEMENT PLAN

The respondents shall submit a residuals management plan that describes in detail the storage and disposal methods planned for all residuals generated from the pilot scale treatability including but not limited to:

    * swell material
    * decontamination water
    * drill cuttings from pre/post sampling
    * scrubber effluent
    * spent activated carbon

All waste material except swell material should be disposed off-site at an approved hazardous waste management facility.  The residuals management plan should include details regarding the transportation of the hazardous material to an off-site facility. If the swell material can not effectively be managed on-site, it will also need to be disposed off-site at an approved hazardous waste facility.

4.9 FULL SCALE TREATABILITY STUDY REPORT

Upon the completion of the full scale treatability study, the respondents shall submit a report that details the results of the full scale treatability study.  The report shall contain at a minimum the following information:

    * A description of the field methods used
    * A map showing the area treated and methods used
    * A map showing sampling locations
    * A discussion of field observations and impediments
    * A discussion of deviations from the original workplan and
      project management plan
    * A table documenting the reagents tested and conditions
      under which they were tested
    * A table documenting the samples collected

13

* A table documenting the analytical results from the treated waste
* A table documenting the analytical results from the air treatment system
* A table documenting the analytical results from the perimeter air monitoring system
* A table documenting the analytical results from the shroud
* A table documenting the analytical results from the fugitive and transient emission capture system
* A table documenting the swell, heat generation, and emission potential for the treatment regime
* A discussion of the results and applicability to full scale implementation
* An evaluation of the time necessary for full scale implementation based on results of full scale testing
* An evaluation of the cost for full scale implementation based on results of full scale testing
* Recommendations for modifications to established procedures necessary for full scale implementation

4.10 CONCEPTUAL DESIGN (15%) OF SOLIDIFICATION SYSTEM (DELIVERY SYSTEM, AUGER SYSTEM, EMISSION CAPTURE AND TREATMENT SYSTEM [PRIMARY, FUGITIVE, TRANSIENT])

The respondents shall submit a conceptual design based on the results of the full scale study for an integrated system which addresses: 1) the eficient delivery of reagents, 2) the eficient mixing of reagents and contaminated material, 3) the effective capture, control and treatment of emissions, and  4) the effective control and management of swell material.

**TASK 5.0: RCRA EQUIVALENT CAP ANALYSIS**

5.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, AND COMMUNITY CONTINGENCY PLAN)

The respondents shall submit a workplan that documents the approach necessary to conceptually design a cap system for the site. The workplan will include a detailed schedule, a detailed cost estimate, a sampling and analysis plan, a quality assurance project plan, a health and safety plan, a community contingency plan, and an ambient air monitoring plan, if necessary.  All documents submitted through the 15% conceptual design shall be based on the premise that the cap will be placed over the treated soft material layer as defined in the ROD.

EPA has determined that the site will be divided into three parcels (Los Coyotes, Upper Ramparts, Lower Ramparts) for RCRA equivalent cap evaluation and implementation. The respondents shall submit all documents related to cap installation with the premise that three separate caps will be constructed on-site.

14

The caps will need to be designed with consideration of ultimate
land use requirements.  The respondents shall also take into
consideration that the RCRA equivalent caps proposed for each
parcel will need to be integrated with slurry and retaining walls
envisioned for that parcel.  The actual integration of the RCRA
equivalent cap, slurry walls and retaining walls will not occur
until the preliminary (30%) design, but integration should be
considered in the conceptual design.

## 5.2 REPORT CONTAINING ANALYSIS AND RECOMMENDATIONS RELATING TO CAP OPTIONS CONSISTENT WITH RCRA REGULATIONS

The respondents shall submit a report that evaluates the RCRA
equivalent cap options that are available for implementation at
the site.  This evaluation will include the following factors at
a minimum:

* Construction Method Analysis
* Drainage Analysis
* Land Use Analysis
* Seismic Analysis
* Material Compatibility Analysis
* Material Availability Analysis
* Air Treatment System Analysis
* Integration Analysis

The report will evaluate the RCRA closure regulations and will
contain recommendations concerning the appropriate cap
construction methods for each parcel of the site.

## 5.3 CONCEPTUAL DESIGN (15%) OF RCRA EQUIVALENT CAP

The respondents shall submit a conceptual design based on the
results of the Task 5.2.  The design will be based on RCRA
equivalent cap systems for the three identified parcels of land.
The RCRA equivalent cap design will insure: 1) control of
leachate, 2) control of air emissions, 3) sufficient drainage to
minimize ponding, 4) ability to be integrated with slurry walls
and retaining walls, 5) sufficient flexibility to withstand
settlement, and 6) consistency with project ultimate land use.

## TASK 6.0: SLURRY WALL ANALYSIS

### 6.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, AND COMMUNITY CONTINGENCY PLAN)

The respondents shall submit a workplan that documents the
approach necessary to conceptually design a slurry wall system
for the site. The workplan will include a detailed schedule, a
detailed cost estimate, a sampling and analysis plan, a quality
assurance project plan, a health and safety plan, a community

15

contingency plan, and an ambient air monitoring plan, if necessary.

EPA has determined that the site will be divided into three parcels (Los Coyotes, Upper Ramparts, Lower Ramparts) for slurry wall evaluation and implementation. The respondents shall submit all documents related to slurry wall cap installation with the premise that three separate slurry walls will be constructed on-site. The respondents shall also take into consideration that the slurry walls proposed for each parcel will need to be integrated with the RCRA equivalent cap and retaining walls envisioned for that parcel. The actual integration of the RCRA equivalent cap, slurry walls and retaining walls will not occur until the preliminary (30%) design, but integration should be considered in the conceptual design.

## 6.2 REPORT CONTAINING ANALYSIS AND RECOMMENDATIONS RELATING TO SLURRY WALL OPTIONS

The respondents shall submit a report that evaluates the slurry wall options that are available for implementation at the site. This evaluation will include the following factors at a minimum:

* Construction Method Analysis
* Seismic Analysis
* Material Compatibility Analysis
* Material Availability Analysis
* Integration Analysis

The report will evaluate slurry wall placement options, and will contain recommendations concerning the appropriate slurry wall construction method for each parcel of the site.

## 6.3 CONCEPTUAL DESIGN (15%) OF SLURRY WALLS

The respondents shall submit a conceptual design based on the results of the task 6.2. The design will be based on best engineering judgement of slurry wall placement for the three identified parcels of land. The slurry wall design will insure: 1) containment of the treated material and untreated char, 2) elimination of migration potential for perched water into the treated material and untreated char, 3) elimination of lateral migration potential of gases from treated material or untreated char, 4) ability to add strength to existing grades to minimize potential for above ground retaining walls, and 5) consistency with project ultimate land use.

16

**TASK 7.0 SLOPE STABILIZATION ANALYSIS**

7.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY
ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, AND
COMMUNITY CONTINGENCY PLAN)

The respondents shall submit a workplan that documents the
approach necessary to conceptually design a retaining wall system
for the site. The workplan will include a detailed schedule, a
detailed cost estimate, a sampling and analysis plan, a quality
assurance project plan, a health and safety plan, a community
contingency plan, and an ambient air monitoring plan, if
necessary.

EPA has determined that the site will be divided into three
parcels (Los Coyotes, Upper Ramparts, Lower Ramparts) for
retaining wall evaluation and implementation.  The respondents
shall submit all documents related to retaining wall installation
with the premise that three separate parcels will be developed at
the site.  All existing slopes at the site will be evaluated for
the necessity of retaining walls.  The respondents shall also
take into consideration that the retaining walls proposed for
each parcel will need to be integrated with the RCRA equivalent
cap and slurry walls for that parcel.  The actual integration of
the RCRA equivalent cap, slurry walls and retaining walls will
not occur until the preliminary (30%) design, but integration
should be considered in the conceptual design.

7.2 REPORT CONTAINING ANALYSIS AND RECOMMENDATIONS RELATING TO
RETAINING WALL OPTIONS

The respondents shall submit a report that evaluates retaining
wall options that are available for implementation at the site.
This evaluation will include the following factors at a minimum:

> * Construction Method Analysis
> * Seismic Analysis
> * Material Availability Analysis
> * Material Compatibility Analysis
> * Integration Analysis

The report will evaluate retaining wall placement options, and
will contain recommendations concerning the appropriate retaining
wall construction method for each parcel of the site.

7.3 CONCEPTUAL DESIGN (15%) OF RETAINING WALLS

The respondents shall submit a conceptual design based on the
results of the Task 7.2.  The design will be based on best
engineering judgement of retaining wall placement for the three
identified parcels of land. The retaining wall cap design will
insure:  1) ability to add strength to existing grades to ensure

17

structural integrity of the cover system during maximum credible earthquake (MCE), and 2) consistency with project ultimate land use.

## TASK 8.0 INTEGRATED DESIGN

8.1   WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, AND COMMUNITY CONTINGENCY PLAN) FOR COMPLETION OF DESIGN INCLUDING BUT NOT LIMITED TO PRELIMINARY DESIGN (30%), INTERMEDIATE DESIGN (60%), AND FINAL DESIGN (100%).

The respondents shall submit a workplan that documents the approach required to integrate the 15% design submittals for: the solidification system; the RCRA equivalent cap; slurry walls; and retaining walls into an overall design for the SMS project.  The workplan will document the steps and resources necessary to develop a preliminary (30%), intermediate (60%), and final (100%) design for the overall project.  The workplan will include a detailed schedule, a detailed cost estimate, a sampling and analysis plan, a quality assurance project plan, a health and safety plan, a community contingency plan, and an ambient air monitoring plan, if necessary.

## TASK 9.0 SITE MAINTENANCE (EXCLUDING SITE MOWING AND FENCE REPAIR)

9.1 SITE MAINTENANCE ANALYSIS AND RECOMMENDATIONS

The respondents shall submit an evaluation of site maintenance needs at the site while the design phase of the project is being conducted.  The analysis will evaluate, at a minimum, the following site maintenance items, and make recommendations regarding methods and frequency (weekly,monthly, yearly, etc.):

* site grading
* seep removal
* trash removal (hazardous and non-hazardous)
* erosion control
* ponding control
* electrical repair
* lighting repair
* structure repair or removal
* water system repair (potable and non-potable)
* trailer repair and maintenance
* road repair
* access improvement
* water removal (septic and decontamination station)

At no time will hazardous waste generated during the design phase of the project remain on-site for longer than forty five (45) working days.  In addition, within forty five (45) days of the

18

effective date of this UAO, the respondents will dispose of all stockpiled waste on the site at an approvedl hazardous waste facility.  Removal of non-hazardous trash will occur, at a minimum, on a monthly basis.  Septic tank disposal will occur, at a minimum, on a quarterly basis.  Water removal from the decontamination station will occur at a minimum ten (10) working days after any equipment decontamination takes place.  Water generated from the groundwater RI/FS and routine groundwater sampling will not remain on-site for more than forty five (45) after a drilling or sampling event.

9.2 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND AIR MONITORING PLAN)

The respondents shall submit a workplan that documents the approach required to undertake the recommended site maintenance activities identified in task 9.1.  The workplan will include a detailed schedule, a detailed cost estimate, a sampling and analysis plan, a quality assurance project plan, a health and safety plan, a community contingency plan, and an ambient air monitoring plan.

**TASK 10.0 GROUNDWATER REMEDIAL INVESTIGATION AND FEASIBILITY STUDY (RI/FS)**

10.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND AMBIENT AIR MONITORING PLAN)

The respondents shall submit a workplan that documents the approach required to undertake the actions recommended in EPA's Data Evaluation and Recommendation Report dated May 1993.  The workplan will document the resources necessary to undertake fieldwork, produce a remedial investigation ((RI) report and a feasibility study (FS) report.  The workplan will include a detailed schedule, a detailed cost estimate, a sampling and analysis plan, a quality assurance project plan, a health and safety plan, a community contingency plan, and an ambient air monitoring plan.

**TASK 11.0 ROUTINE GROUNDWATER MONITORING**

11.1 ROUTINE GROUNDWATER MONITORING ANALYSIS AND RECOMMENDATION REPORT

The respondents shall review all existing data related to regional groundwater and review the repairs made by ICF to the existing groundwater wells, and make recommendation related to the long term routine monitoring and analysis of the existing groundwater wells at the site.  The recommendations will need to include justification as to: 1) the utility of additional data to

19

be collected, or 2) the rationale for not sampling existing
wells.  The respondents will collect at a minimum four quarters
of continuous data from all existing wells prior to removing or
altering the sampling protocol established by EPA.

11.2 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY
     ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY
     CONTINGENCY PLAN, AND AMBIENT AIR MONITORING PLAN)

The respondents shall submit a workplan that documents the
approach required to undertake the recommendations from task
11.1.  The workplan will include a detailed schedule, a detailed
cost estimate, a sampling and analysis plan, a quality assurance
project plan, a health and safety plan, a community contingency
plan, and an ambient air monitoring plan, if necessary.

SCHEDULE:

Attachment 1 to this SOW is the overall project schedule.  The
duration of each task is given in working days consistent with
the definition in the UAO.  Attachment 2 is the detailed schedule
for tasks 1.0 through 4.0 (Project Planning, Sump Definition,
Pilot Study, Full Scale Study).  Attachment 3 is the detailed
schedule for task 5.0 through 11.0 (15% Cap Design, 15% Slurry
Wall Design, 15% Retaining Wall Design, Comprehensive Design,
Site Maintenance, Groundwater RI/FS, and Routine Groundwater
Monitoring).  While the schedules given contain estimated EPA
review and approval time, EPA is not bound to these review and
approval times.  However the respondents are bound to their
portion of the schedule.  Compliance will be tracked by the
durations given within the schedule.  Therefore if a document has
a ten (10) day duration associated with it, the respondents have
ten working days to submit the document to EPA based on the date
that EPA delivered its' comments or approval.

DELIVERABLES:

Attachment 5 is a listing of deliverables required under the UAO
as it exists today.  The dates associated with the deliverables
are based on estimated EPA review and approval times.  These
dates are subject to change based on the actual EPA review and
approval time.  Additional deliverables may be added to this list
based on the workplans that will be generated under this UAO.
Documents shall be added or deleted from this list only with
EPA's prior approval.  Compliance monitoring associated with the
deliverables under this UAO will be based upon this list of
deliverables and the durations documented in the individual
schedules in Attachment 2 and 3.

20

ATTACHMENT 1

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 1 | UAO EFFECTIVE DATE | 0d | 7/15/93 8:00am | 7/15/93 8:00am | |
| 2 | PROJECT PLANNING | 28d | 7/15/93 8:00am | 8/23/93 5:00pm | |
| 3 | PROJ. MAN. PLAN | 28d | 7/15/93 8:00am | 8/23/93 5:00pm | |
| 4 | SUMP DEFINITION | 72d | 8/2/93 8:00am | 11/12/93 5:00pm | |
| 5 | WORKPLAN | 34d | 8/2/93 8:00am | 9/17/93 5:00pm | |
| 6 | FIELD METHODS | 23d | 8/2/93 8:00am | 9/1/93 5:00pm | |
| 7 | FIELD WORK | 38d | 9/20/93 8:00am | 11/12/93 5:00pm | |
| 8 | PILOT STUDY | 127d | 8/2/93 8:00am | 2/17/94 5:00pm | |
| 9 | WORKPLAN | 50d | 8/2/93 8:00am | 10/12/93 5:00pm | |
| 10 | THT ANALYSIS | 23d | 8/2/93 8:00am | 9/1/93 5:00pm | |
| 11 | EQUIPMENT REPORT | 18d | 8/2/93 8:00am | 8/25/93 5:00pm | |
| 12 | ATS DESIGN | 40d | 8/23/93 8:00am | 10/19/93 5:00pm | |
| 13 | F&T ATS DESIGN | 40d | 8/23/93 8:00am | 10/19/93 5:00pm | |
| 14 | PAMS DESIGN | 33d | 9/28/93 8:00am | 11/15/93 5:00pm | |
| 15 | PMP | 41d | 10/5/93 8:00am | 12/6/93 5:00pm | |
| 16 | FIELD WORK | 21d | 12/7/93 8:00am | 1/19/94 5:00pm | |
| 17 | PILOT REPORT | 30d | 1/20/94 8:00am | 3/3/94 5:00pm | |
| 18 | FULL SCALE STUDY | 211d | 12/7/93 8:00am | 10/19/94 5:00pm | |
| 19 | WORKPLAN | 75d | 12/7/93 8:00am | 4/6/94 5:00pm | |
| 20 | THT ANALYSIS | 23d | 3/3/94 8:00am | 4/4/94 5:00pm | |
| 21 | EQUIPMENT ANALYSIS | 18d | 3/3/94 8:00am | 3/28/94 5:00pm | |
| 22 | ATS DESIGN | 40d | 3/24/94 8:00am | 5/18/94 5:00pm | |
| 23 | F&T ATS DESIGN | 40d | 3/24/94 8:00am | 5/18/94 5:00pm | |
| 24 | PAMS DESIGN | 33d | 4/28/94 8:00am | 6/14/94 5:00pm | |
| 25 | PMP | 41d | 3/24/94 8:00am | 5/19/94 5:00pm | |
| 26 | FIELD WORK | 60d | 5/6/94 8:00am | 8/1/94 5:00pm | |
| 27 | FULL SCALE REPORT | 55d | 8/2/94 8:00am | 10/19/94 5:00pm | |
| 28 | CONTINGENCY DECISION | 32d | 9/13/94 8:00am | 10/27/94 5:00pm | |
| 29 | 15 % SOL. DESIGN | 75d | 10/28/94 8:00am | 2/28/95 5:00pm | |
| 30 | RCRA CAP | 260d | 8/2/93 8:00am | 8/25/94 5:00pm | |
| 31 | WORKPLAN | 65d | 8/2/93 8:00am | 11/2/93 5:00pm | |
| 32 | FIELDWORK | 45d | 9/28/93 8:00am | 12/3/93 5:00pm | |
| 33 | REPORT | 50d | 12/6/93 8:00am | 3/1/94 5:00pm | |
| 34 | 15 % CAP DESIGN | 160d | 1/10/94 8:00am | 8/25/94 5:00pm | |
| 35 | SLURRY WALLS | 225d | 8/2/93 8:00am | 7/7/94 5:00pm | |
| 36 | WORKPLAN | 65d | 8/2/93 8:00am | 11/2/93 5:00pm | |
| 37 | SW WORK | 30d | 9/26/93 8:00am | 11/8/93 5:00pm | |
| 38 | SW REPORT | 50d | 11/10/93 8:00am | 2/7/94 5:00pm | |
| 39 | 15% SW DESIGN | 140d | 12/6/93 8:00am | 7/7/94 5:00pm | |
| 40 | RETAINING WALLS | 225d | 8/2/93 8:00am | 7/7/94 5:00pm | |
| 41 | WORKPLAN | 65d | 8/2/93 8:00am | 11/2/93 5:00pm | |
| 42 | RW WORK | 30d | 9/28/93 8:00am | 11/9/93 5:00pm | |
| 43 | RW REPORT | 50d | 11/10/93 8:00am | 2/7/94 5:00pm | |
| 44 | 15 % RW DESIGN | 140d | 12/6/93 8:00am | 7/7/94 5:00pm | |
| 45 | DESIGN | 70d | 1/23/95 8:00am | 5/1/95 5:00pm | |
| 46 | WORKPLAN | 70d | 1/23/95 8:00am | 5/1/95 5:00pm | |
| 47 | SITE MAINTENANCE | 85d | 8/2/93 8:00am | 12/3/93 5:00pm | |
| 48 | SM REPORT | 40d | 8/2/93 8:00am | 9/27/93 5:00pm | |
| 49 | SM WORPLAN | 55d | 9/14/93 8:00am | 12/3/93 5:00pm | |
| 50 | GW RI/FS | 105d | 8/2/93 8:00am | 1/14/94 5:00pm | |
| 51 | GW WORKPLAN | 105d | 8/2/93 8:00am | 1/14/94 5:00pm | |
| 52 | ROUTINE GW MON. | 105d | 8/2/93 8:00am | 10/19/93 5:00pm | |
| 53 | ROUTINE GW REPORT | 55d | 8/2/93 8:00am | 10/19/93 5:00pm | |
| 54 | ROUTINE GW WP | 70d | 9/21/93 8:00am | 1/14/94 5:00pm | |

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 1 | UAO EFFECTIVE DATE | 0d | | | | | | | | | | | | | | | | | | | | |
| 2 | PROJECT PLANNING | 28d | | | | | | | | | | | | | | | | | | | | |
| 3 | PROJ. MAN. PLAN | 28d | | | | | | | | | | | | | | | | | | | | |
| 4 | SUMP DEFINITION | 72d | | | | | | | | | | | | | | | | | | | | |
| 5 | WORKPLAN | 34d | | | | | | | | | | | | | | | | | | | | |
| 6 | FIELD METHODS | 23d | | | | | | | | | | | | | | | | | | | | |
| 7 | FIELD WORK | 38d | | | | | | | | | | | | | | | | | | | | |
| 8 | PILOT STUDY | 127d | | | | | | | | | | | | | | | | | | | | |
| 9 | WORKPLAN | 50d | | | | | | | | | | | | | | | | | | | | |
| 10 | THT ANALYSIS | 23d | | | | | | | | | | | | | | | | | | | | |
| 11 | EQUIPMENT REPORT | 18d | | | | | | | | | | | | | | | | | | | | |
| 12 | ATS DESIGN | 40d | | | | | | | | | | | | | | | | | | | | |
| 13 | F&T ATS DESIGN | 40d | | | | | | | | | | | | | | | | | | | | |
| 14 | PAMS DESIGN | 33d | | | | | | | | | | | | | | | | | | | | |
| 15 | PMP | 41d | | | | | | | | | | | | | | | | | | | | |
| 16 | FIELD WORK | 21d | | | | | | | | | | | | | | | | | | | | |
| 17 | PILOT REPORT | 30d | | | | | | | | | | | | | | | | | | | | |
| 18 | FULL SCALE STUDY | 211d | | | | | | | | | | | | | | | | | | | | |
| 19 | WORKPLAN | 75d | | | | | | | | | | | | | | | | | | | | |
| 20 | THT ANALYSIS | 23d | | | | | | | | | | | | | | | | | | | | |
| 21 | EQUIPMENT ANALYSIS | 18d | | | | | | | | | | | | | | | | | | | | |
| 22 | ATS DESIGN | 40d | | | | | | | | | | | | | | | | | | | | |
| 23 | F&T ATS DESIGN | 40d | | | | | | | | | | | | | | | | | | | | |
| 24 | PAMS DESIGN | 33d | | | | | | | | | | | | | | | | | | | | |
| 25 | PMP | 41d | | | | | | | | | | | | | | | | | | | | |
| 26 | FIELD WORK | 60d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | | Progress | | Summary | |
|---|---|---|---|---|---|
| Noncritical | | Milestone ◆ | | Rolled Up ◇ | |

Page 1

| ID | Name | Duration | 1994 | | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|----|------|----------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 27 | FULL SCALE REPORT | 55d | | | | | | | | | | | | | | | | | | | | |
| 28 | CONTINGENCY DECISION | 32d | | | | | | | | | | | | | | | | | | | | |
| 29 | 15 %  SOL. DESIGN | 75d | | | | | | | | | | | | | | | | | | | | |
| 30 | RCRA CAP | 260d | | | | | | | | | | | | | | | | | | | | |
| 31 | WORKPLAN | 65d | | | | | | | | | | | | | | | | | | | | |
| 32 | FIELDWORK | 45d | | | | | | | | | | | | | | | | | | | | |
| 33 | REPORT | 50d | | | | | | | | | | | | | | | | | | | | |
| 34 | 15 % CAP DESIGN | 160d | | | | | | | | | | | | | | | | | | | | |
| 35 | SLURRY WALLS | 225d | | | | | | | | | | | | | | | | | | | | |
| 36 | WORKPLAN | 65d | | | | | | | | | | | | | | | | | | | | |
| 37 | SW WORK | 30d | | | | | | | | | | | | | | | | | | | | |
| 38 | SW REPORT | 50d | | | | | | | | | | | | | | | | | | | | |
| 39 | 15% SW DESIGN | 140d | | | | | | | | | | | | | | | | | | | | |
| 40 | RETAINING WALLS | 225d | | | | | | | | | | | | | | | | | | | | |
| 41 | WORKPLAN | 65d | | | | | | | | | | | | | | | | | | | | |
| 42 | RW WORK | 30d | | | | | | | | | | | | | | | | | | | | |
| 43 | RW REPORT | 50d | | | | | | | | | | | | | | | | | | | | |
| 44 | 15 % RW DESIGN | 140d | | | | | | | | | | | | | | | | | | | | |
| 45 | DESIGN | 70d | | | | | | | | | | | | | | | | | | | | |
| 46 | WORKPLAN | 70d | | | | | | | | | | | | | | | | | | | | |
| 47 | SITE MAINTENANCE | 85d | | | | | | | | | | | | | | | | | | | | |
| 48 | SM REPORT | 40d | | | | | | | | | | | | | | | | | | | | |
| 49 | SM WORPLAN | 55d | | | | | | | | | | | | | | | | | | | | |
| 50 | GW RI/FS | 105d | | | | | | | | | | | | | | | | | | | | |
| 51 | GW WORKPLAN | 105d | | | | | | | | | | | | | | | | | | | | |
| 52 | ROUTINE GW MON. | 105d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | Progress | Summary |
|----------|----------|---------|
| Noncritical | Milestone ◆ | Rolled Up ◇ |

Page 2

| ID | Name | Duration | 1994 Qtr 4 | 1994 Qtr 1 | 1994 Qtr 2 | 1994 Qtr 3 | 1994 Qtr 4 | 1995 Qtr 1 | 1995 Qtr 2 | 1995 Qtr 3 | 1995 Qtr 4 | 1996 Qtr 1 | 1996 Qtr 2 | 1996 Qtr 3 | 1996 Qtr 4 | 1997 Qtr 1 | 1997 Qtr 2 | 1997 Qtr 3 | 1997 Qtr 4 | 1998 Qtr 1 | 1998 Qtr 2 | 1998 Qtr 3 |
|----|------|----------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 53 | ROUTINE GW REPORT | 55d | | ▨ | | | | | | | | | | | | | | | | | | |
| 54 | ROUTINE GW WP | 70d | | ▨ | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | ▨ | Progress | ▬▬▬ | Summary | ▬▬▬ |
|----------|---|----------|-----|---------|-----|
| Noncritical | ▬▬▬ | Milestone | ◆ | Rolled Up | ◇ |

Page 3

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 1 | UOA EFFECTIVE DATE | 0d | 7/15/93 8:00am | 7/15/93 8:00am | |
| 2 | TASK 1.0  P. PLANNING | 28d | 7/15/93 8:00am | 8/23/93 5:00pm | 1 |
| 3 | DRAFT PMP | 15d | 7/15/93 8:00am | 8/4/93 5:00pm | 1 |
| 4 | EPA REVIEW | 5d | 8/5/93 8:00am | 8/11/93 5:00pm | 3 |
| 5 | FINAL PMP | 5d | 8/12/93 8:00am | 8/18/93 5:00pm | 4 |
| 6 | EPA APPROVAL | 3d | 8/19/93 8:00am | 8/23/93 5:00pm | 5 |
| 7 | TASK 2.0 SUMP DEFINITION | 72d | 8/2/93 8:00am | 11/12/93 5:00pm | |
| 8 | DRAFT WORKPLAN | 15d | 8/2/93 8:00am | 8/20/93 5:00pm | |
| 9 | EPA  REVIEW | 7d | 8/23/93 8:00am | 8/31/93 5:00pm | 8 |
| 10 | FINAL WORKPLAN | 7d | 9/1/93 8:00am | 9/10/93 5:00pm | 9 |
| 11 | EPA APPROVAL | 5d | 9/13/93 8:00am | 9/17/93 5:00pm | 10 |
| 12 | DRAFT METHOD REPORT | 10d | 8/2/93 8:00am | 8/13/93 5:00pm | |
| 13 | EPA REVIEW | 5d | 8/16/93 8:00am | 8/20/93 5:00pm | 12 |
| 14 | FINAL METHOD REPORT | 5d | 8/23/93 8:00am | 8/27/93 5:00pm | 13 |
| 15 | EPA APPROVAL | 3d | 8/30/93 8:00am | 9/1/93 5:00pm | 14 |
| 16 | FIELD WORK | 20d | 9/20/93 8:00am | 10/18/93 5:00pm | 11 |
| 17 | DRAFT REPORT | 5d | 10/19/93 8:00am | 10/25/93 5:00pm | 16 |
| 18 | EPA REVIEW | 5d | 10/26/93 8:00am | 11/1/93 5:00pm | 17 |
| 19 | FINAL REPORT | 5d | 11/2/93 8:00am | 11/8/93 5:00pm | 18 |
| 20 | EPA  APPROVAL | 3d | 11/9/93 8:00am | 11/12/93 5:00pm | 19 |
| 21 | TASK 3.0 PILOT WORK | 137d | 8/2/93 8:00am | 3/3/94 5:00pm | |
| 22 | DRAFT WORKPLAN | 20d | 8/2/93 8:00am | 8/27/93 5:00pm | |
| 23 | EPA REVIEW | 15d | 8/30/93 8:00am | 9/20/93 5:00pm | 22 |
| 24 | FINAL WORKPLAN | 10d | 9/21/93 8:00am | 10/4/93 5:00pm | 23 |
| 25 | EPA  APPROVAL | 5d | 10/5/93 8:00am | 10/12/93 5:00pm | 24 |
| 26 | DRAFT THT REPORT | 10d | 8/2/93 8:00am | 8/13/93 5:00pm | |
| 27 | EPA  REVIEW | 5d | 8/16/93 8:00am | 8/20/93 5:00pm | 26 |
| 28 | FINAL THT REPORT | 5d | 8/23/93 8:00am | 8/27/93 5:00pm | 27 |
| 29 | EPA  APPROVAL | 3d | 8/30/93 8:00am | 9/1/93 5:00pm | 28 |
| 30 | DRAFT EQUIP. REPORT | 7d | 8/2/93 8:00am | 8/10/93 5:00pm | |
| 31 | EPA REVIEW | 5d | 8/11/93 8:00am | 8/17/93 5:00pm | 30 |
| 32 | FINAL EQUIP. REPORT | 3d | 8/18/93 8:00am | 8/20/93 5:00pm | 31 |
| 33 | EPA APPROVAL | 3d | 8/23/93 8:00am | 8/25/93 5:00pm | 32 |
| 34 | DRAFT ATS DESIGN | 15d | 8/23/93 8:00am | 9/13/93 5:00pm | 27 |
| 35 | EPA REVIEW | 10d | 9/14/93 8:00am | 9/27/93 5:00pm | 34 |
| 36 | FINAL  ATS DESIGN | 10d | 9/28/93 8:00am | 10/12/93 5:00pm | 35 |
| 37 | EPA APPROVAL | 5d | 10/13/93 8:00am | 10/19/93 5:00pm | 36 |
| 38 | DRAFT F&T ATS | 15d | 8/23/93 8:00am | 9/13/93 5:00pm | 27 |
| 39 | EPA  REVIEW | 10d | 9/14/93 8:00am | 9/27/93 5:00pm | 38 |
| 40 | FINAL F&T ATS | 10d | 9/28/93 8:00am | 10/12/93 5:00pm | 39 |
| 41 | EPA APPROVAL | 5d | 10/13/93 8:00am | 10/19/93 5:00pm | 40 |
| 42 | DRAFT PAMS DESIGN | 15d | 9/28/93 8:00am | 10/19/93 5:00pm | 39 |
| 43 | EPA REVIEW | 10d | 10/20/93 8:00am | 11/2/93 5:00pm | 42 |
| 44 | FINAL  PAMS DESIGN | 5d | 11/3/93 8:00am | 11/9/93 5:00pm | 43 |
| 45 | EPA APPROVAL | 3d | 11/10/93 8:00am | 11/15/93 5:00pm | 44 |
| 46 | DRAFT PMP | 21d | 10/5/93 8:00am | 11/3/93 5:00pm | 24 |
| 47 | EPA  REVIEW | 10d | 11/4/93 8:00am | 11/18/93 5:00pm | 46 |
| 48 | FINAL PMP | 5d | 11/19/93 8:00am | 11/29/93 5:00pm | 47 |
| 49 | EPA APPROVAL | 5d | 11/30/93 8:00am | 12/6/93 5:00pm | 48 |
| 50 | FIELD WORK | 21d | 12/7/93 8:00am | 1/19/94 5:00pm | 49 |
| 51 | DRAFT PILOT REPORT | 10d | 1/20/94 8:00am | 2/2/94 5:00pm | 50 |
| 52 | EPA REVIEW | 10d | 2/3/94 8:00am | 2/17/94 5:00pm | 51 |
| 53 | FINAL  PILOT REPORT | 5d | 2/18/94 8:00am | 2/24/94 5:00pm | 52 |
| 54 | EPA APPROVAL | 5d | 2/25/94 8:00am | 3/3/94 5:00pm | 53 |
| 55 | TASK 4.0  FS STUDY | 232d | 11/3/93 8:00am | 10/19/94 5:00pm | 49 |
| 56 | DRAFT WORKPLAN | 30d | 12/7/93 8:00am | 2/1/94 5:00pm | 49 |
| 57 | EPA REVIEW | 20d | 2/2/94 8:00am | 3/2/94 5:00pm | 56 |
| 58 | FINAL WORKPLAN | 15d | 3/3/94 8:00am | 3/23/94 5:00pm | 57 |
| 59 | EP A  APPROVAL | 10d | 3/24/94 8:00am | 4/6/94 5:00pm | 58 |
| 60 | DRAFT THT REPORT | 10d | 3/3/94 8:00am | 3/16/94 5:00pm | 57 |
| 61 | EPA  REVIEW | 5d | 3/17/94 8:00am | 3/23/94 5:00pm | 60 |
| 62 | FINAL THT REPORT | 5d | 3/24/94 8:00am | 3/30/94 5:00pm | 61 |
| 63 | EPA  APPROVAL | 3d | 3/31/94 8:00am | 4/4/94 5:00pm | 62 |
| 64 | DRAFT EQUIP. REPORT | 7d | 3/3/94 8:00am | 3/11/94 5:00pm | 57 |
| 65 | EPA REVIEW | 5d | 3/14/94 8:00am | 3/18/94 5:00pm | 64 |
| 66 | FINAL EQUIP. REPORT | 3d | 3/21/94 8:00am | 3/23/94 5:00pm | 65 |
| 67 | EPA APPROVAL | 3d | 3/24/94 8:00am | 3/28/94 5:00pm | 66 |
| 68 | DRAFT ATS DESIGN | 15d | 3/24/94 8:00am | 4/13/94 5:00pm | 61 |
| 69 | EPA REVIEW | 10d | 4/14/94 8:00am | 4/27/94 5:00pm | 68 |
| 70 | FINAL ATS DESIGN | 10d | 4/28/94 8:00am | 5/11/94 5:00pm | 69 |
| 71 | EPA APPROVAL | 5d | 5/12/94 8:00am | 5/18/94 5:00pm | 70 |
| 72 | DRAFT F&T ATS | 15d | 3/24/94 8:00am | 4/13/94 5:00pm | 61 |
| 73 | EPA  REVIEW | 10d | 4/14/94 8:00am | 4/27/94 5:00pm | 72 |

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 74 | FINAL F&T ATS | 10d | 4/28/94 8:00am | 5/11/94 5:00pm | 73 |
| 75 | EPA APPROVAL | 5d | 5/12/94 8:00am | 5/18/94 5:00pm | 74 |
| 76 | DRAFT PAMS DESIGN | 15d | 4/28/94 8:00am | 5/18/94 5:00pm | 73 |
| 77 | EPA REVIEW | 10d | 5/19/94 8:00am | 6/2/94 5:00pm | 76 |
| 78 | FINAL  PAMS DESIGN | 5d | 6/3/94 8:00am | 6/9/94 5:00pm | 77 |
| 79 | EPA APPROVAL | 3d | 6/10/94 8:00am | 6/14/94 5:00pm | 78 |
| 80 | DRAFT PMP | 21d | 3/24/94 8:00am | 4/21/94 5:00pm | 58 |
| 81 | EPA  REVIEW | 10d | 4/22/94 8:00am | 5/5/94 5:00pm | 80 |
| 82 | FINAL PMP | 5d | 5/6/94 8:00am | 5/12/94 5:00pm | 81 |
| 83 | EPA APPROVAL | 5d | 5/13/94 8:00am | 5/19/94 5:00pm | 82 |
| 84 | FIELD WORK | 60d | 5/6/94 8:00am | 8/1/94 5:00pm | 81 |
| 85 | DRAFT FS REPORT | 15d | 8/2/94 8:00am | 8/22/94 5:00pm | 84 |
| 86 | EPA REVIEW | 15d | 8/23/94 8:00am | 9/13/94 5:00pm | 85 |
| 87 | FINAL FS REPORT | 15d | 9/14/94 8:00am | 10/4/94 5:00pm | 86 |
| 88 | EPA APPROVAL | 10d | 10/5/94 8:00am | 10/19/94 5:00pm | 87 |
| 89 | CONTINGENCY DECISION | 32d | 9/13/94 8:00am | 10/27/94 5:00pm | 86 |
| 90 | DRAFT 15% SOL. DESIGN | 20d | 10/28/94 8:00am | 11/25/94 5:00pm | 89 |
| 91 | EPA REVIEW | 30d | 11/28/94 8:00am | 1/23/95 5:00pm | 90 |
| 92 | FINAL 15% SOL. DESIGN | 15d | 1/24/95 8:00am | 2/13/95 5:00pm | 91 |
| 93 | EPA APPROVAL | 10d | 2/14/95 8:00am | 2/28/95 5:00pm | 92 |

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 1 | UOA EFFECTIVE DATE | 0d | | | | | | | | | | | | | | | | | | | | |
| 2 | TASK 1.0  P. PLANNING | 28d | | | | | | | | | | | | | | | | | | | | |
| 3 | DRAFT PMP | 15d | | | | | | | | | | | | | | | | | | | | |
| 4 | EPA REVIEW | 5d | | | | | | | | | | | | | | | | | | | | |
| 5 | FINAL PMP | 5d | | | | | | | | | | | | | | | | | | | | |
| 6 | EPA APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 7 | TASK 2.0 SUMP DEFINITIO | 72d | | | | | | | | | | | | | | | | | | | | |
| 8 | DRAFT WORKPLAN | 15d | | | | | | | | | | | | | | | | | | | | |
| 9 | EPA  REVIEW | 7d | | | | | | | | | | | | | | | | | | | | |
| 10 | FINAL WORKPLAN | 7d | | | | | | | | | | | | | | | | | | | | |
| 11 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 12 | DRAFT METHOD REPORT | 10d | | | | | | | | | | | | | | | | | | | | |
| 13 | EPA REVIEW | 5d | | | | | | | | | | | | | | | | | | | | |
| 14 | FINAL METHOD REPORT | 5d | | | | | | | | | | | | | | | | | | | | |
| 15 | EPA APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 16 | FIELD WORK | 20d | | | | | | | | | | | | | | | | | | | | |
| 17 | DRAFT REPORT | 5d | | | | | | | | | | | | | | | | | | | | |
| 18 |  EPA REVIEW | 5d | | | | | | | | | | | | | | | | | | | | |
| 19 | FINAL REPORT | 5d | | | | | | | | | | | | | | | | | | | | |
| 20 | EPA  APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 21 | TASK 3.0 PILOT WORK | 137d | | | | | | | | | | | | | | | | | | | | |
| 22 | DRAFT WORKPLAN | 20d | | | | | | | | | | | | | | | | | | | | |
| 23 | EPA REVIEW | 15d | | | | | | | | | | | | | | | | | | | | |
| 24 | FINAL WORKPLAN | 10d | | | | | | | | | | | | | | | | | | | | |
| 25 | EPA  APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 26 | DRAFT THT REPORT | 10d | | | | | | | | | | | | | | | | | | | | |

| Project: | Critical | | Progress | | Summary | |
|---|---|---|---|---|---|---|
| Date: 7/7/93 | Noncritical | | Milestone ◆ | | Rolled Up ◇ | |

Page 1

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 27 | EPA REVIEW | 5d | | | | | | | | | | | | | | | | | | | | |
| 28 | FINAL THT REPORT | 5d | | | | | | | | | | | | | | | | | | | | |
| 29 | EPA APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 30 | DRAFT EQUIP. REPORT | 7d | | | | | | | | | | | | | | | | | | | | |
| 31 | EPA REVIEW | 5d | | | | | | | | | | | | | | | | | | | | |
| 32 | FINAL EQUIP. REPORT | 3d | | | | | | | | | | | | | | | | | | | | |
| 33 | EPA APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 34 | DRAFT ATS DESIGN | 15d | | | | | | | | | | | | | | | | | | | | |
| 35 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 36 | FINAL ATS DESIGN | 10d | | | | | | | | | | | | | | | | | | | | |
| 37 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 38 | DRAFT F&T ATS | 15d | | | | | | | | | | | | | | | | | | | | |
| 39 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 40 | FINAL F&T ATS | 10d | | | | | | | | | | | | | | | | | | | | |
| 41 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 42 | DRAFT PAMS DESIGN | 15d | | | | | | | | | | | | | | | | | | | | |
| 43 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 44 | FINAL PAMS DESIGN | 5d | | | | | | | | | | | | | | | | | | | | |
| 45 | EPA APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 46 | DRAFT PMP | 21d | | | | | | | | | | | | | | | | | | | | |
| 47 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 48 | FINAL PMP | 5d | | | | | | | | | | | | | | | | | | | | |
| 49 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 50 | FIELD WORK | 21d | | | | | | | | | | | | | | | | | | | | |
| 51 | DRAFT PILOT REPORT | 10d | | | | | | | | | | | | | | | | | | | | |
| 52 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | | Progress | | Summary | |
|---|---|---|---|---|---|
| Noncritical | | Milestone | ◆ | Rolled Up | ◇ |

Page 2

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 53 | FINAL  PILOT REPORT | 5d | | | | | | | | | | | | | | | | | | | | |
| 54 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 55 | TASK 4.0  FS STUDY | 232d | | | | | | | | | | | | | | | | | | | | |
| 56 | DRAFT WORKPLAN | 30d | | | | | | | | | | | | | | | | | | | | |
| 57 | EPA REVIEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 58 | FINAL WORKPLAN | 15d | | | | | | | | | | | | | | | | | | | | |
| 59 | EP A  APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |
| 60 | DRAFT THT REPORT | 10d | | | | | | | | | | | | | | | | | | | | |
| 61 | EPA  REVIEW | 5d | | | | | | | | | | | | | | | | | | | | |
| 62 | FINAL THT REPORT | 5d | | | | | | | | | | | | | | | | | | | | |
| 63 | EPA  APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 64 | DRAFT EQUIP. REPORT | 7d | | | | | | | | | | | | | | | | | | | | |
| 65 | EPA REVIEW | 5d | | | | | | | | | | | | | | | | | | | | |
| 66 | FINAL EQUIP. REPORT | 3d | | | | | | | | | | | | | | | | | | | | |
| 67 | EPA APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 68 | DRAFT ATS DESIGN | 15d | | | | | | | | | | | | | | | | | | | | |
| 69 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 70 | FINAL ATS DESIGN | 10d | | | | | | | | | | | | | | | | | | | | |
| 71 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 72 | DRAFT F&T ATS | 15d | | | | | | | | | | | | | | | | | | | | |
| 73 | EPA  REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 74 | FINAL F&T ATS | 10d | | | | | | | | | | | | | | | | | | | | |
| 75 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 76 | DRAFT PAMS DESIGN | 15d | | | | | | | | | | | | | | | | | | | | |
| 77 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 78 | FINAL  PAMS DESIGN | 5d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| | |
|---|---|
| Critical | Progress | Summary |
| Noncritical | Milestone ◆ | Rolled Up ◇ |

Page 3

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|----|------|----------|------|---|---|---|------|---|---|---|------|---|---|---|------|---|---|---|------|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 79 | EPA APPROVAL | 3d | | | | | | | | | | | | | | | | | | | | |
| 80 | DRAFT PMP | 21d | | | | | | | | | | | | | | | | | | | | |
| 81 | EPA  REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 82 | FINAL PMP | 5d | | | | | | | | | | | | | | | | | | | | |
| 83 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 84 | FIELD WORK | 60d | | | | | | | | | | | | | | | | | | | | |
| 85 | DRAFT FS REPORT | 15d | | | | | | | | | | | | | | | | | | | | |
| 86 | EPA REVIEW | 15d | | | | | | | | | | | | | | | | | | | | |
| 87 | FINAL FS REPORT | 15d | | | | | | | | | | | | | | | | | | | | |
| 88 | EPA APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |
| 89 | CONTINGENCY DECISION | 32d | | | | | | | | | | | | | | | | | | | | |
| 90 | DRAFT 15% SOL. DESIGN | 20d | | | | | | | | | | | | | | | | | | | | |
| 91 | EPA REVIEW | 30d | | | | | | | | | | | | | | | | | | | | |
| 92 | FINAL 15% SOL. DESIGN | 15d | | | | | | | | | | | | | | | | | | | | |
| 93 | EPA APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | | Progress | | Summary | |
|----------|--|----------|--|---------|--|
| Noncritical | | Milestone ◆ | | Rolled Up ◇ | |

Page 4

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 1 | CONTINGENCY DECISION | 32d | 9/13/94 8:00am | 10/27/94 5:00pm | |
| 2 | DRAFT 15% SOL. DESIGN | 20d | 10/28/94 8:00am | 11/25/94 5:00pm | 1 |
| 3 | EPA REVIEW | 30d | 11/28/94 8:00am | 1/23/95 5:00pm | 2 |
| 4 | FINAL 15% SOL. DESIGN | 15d | 1/24/95 8:00am | 2/13/95 5:00pm | 3 |
| 5 | EPA APPROVAL | 10d | 2/14/95 8:00am | 2/28/95 5:00pm | 4 |
| 6 | TASK 5.0 CAP ANALYSIS | 260d | 8/2/93 8:00am | 8/25/94 5:00pm | |
| 7 | DRAFT WORKPLAN | 20d | 8/2/93 8:00am | 8/27/93 5:00pm | |
| 8 | EPA REVIEW | 20d | 8/30/93 8:00am | 9/27/93 5:00pm | 7 |
| 9 | FINAL WORKPLAN | 15d | 9/28/93 8:00am | 10/19/93 5:00pm | 8 |
| 10 | EPA APPROVAL | 10d | 10/20/93 8:00am | 11/2/93 5:00pm | 9 |
| 11 | RCRA ANALYSIS WORK | 45d | 9/28/93 8:00am | 12/3/93 5:00pm | 8 |
| 12 | DRAFT RCRA REPORT | 15d | 12/6/93 8:00am | 1/7/94 5:00pm | 11 |
| 13 | EPA REVEW | 20d | 1/10/94 8:00am | 2/7/94 5:00pm | 12 |
| 14 | FINAL RCRA REPORT | 10d | 2/8/94 8:00am | 2/22/94 5:00pm | 13 |
| 15 | EPA APPROVAL | 5d | 2/23/94 8:00am | 3/1/94 5:00pm | 14 |
| 16 | DRAFT 15% CAP DESIGN | 75d | 1/10/94 8:00am | 4/26/94 5:00pm | 12 |
| 17 | EPA REVIEW | 45d | 4/27/94 8:00am | 6/29/94 5:00pm | 16 |
| 18 | FINAL 15% CAP DESIGN | 20d | 6/30/94 8:00am | 7/28/94 5:00pm | 17 |
| 19 | EPA APPROVAL | 20d | 7/29/94 8:00am | 8/25/94 5:00pm | 18 |
| 20 | TASK 6..0 SLURRY WALLS | 225d | 8/2/93 8:00am | 7/7/94 5:00pm | |
| 21 | DRAFT WORKPLAN | 20d | 8/2/93 8:00am | 8/27/93 5:00pm | |
| 22 | EPA REVIEW | 20d | 8/30/93 8:00am | 9/27/93 5:00pm | 21 |
| 23 | FINAL WORKPLAN | 15d | 9/28/93 8:00am | 10/19/93 5:00pm | 22 |
| 24 | EPA APPROVAL | 10d | 10/20/93 8:00am | 11/2/93 5:00pm | 23 |
| 25 | SW WORK | 30d | 9/28/93 8:00am | 11/9/93 5:00pm | 22 |
| 26 | DRAFT ANALYSIS REPORT | 15d | 11/10/93 8:00am | 12/3/93 5:00pm | 25 |
| 27 | EPA REVEW | 20d | 12/6/93 8:00am | 1/14/94 5:00pm | 26 |
| 28 | FINAL SW REPORT | 10d | 1/17/94 8:00am | 1/31/94 5:00pm | 27 |
| 29 | EPA APPROVAL | 5d | 2/1/94 8:00am | 2/7/94 5:00pm | 28 |
| 30 | DRAFT 15% SW DESIGN | 60d | 12/6/93 8:00am | 3/15/94 5:00pm | 26 |
| 31 | EPA REVIEW | 40d | 3/16/94 8:00am | 5/10/94 5:00pm | 30 |
| 32 | FINAL 15% SW DESIGN | 20d | 5/11/94 8:00am | 6/8/94 5:00pm | 31 |
| 33 | EPA APPROVAL | 20d | 6/9/94 8:00am | 7/7/94 5:00pm | 32 |
| 34 | TASK 7.0 RETAINING WALLS | 225d | 8/2/93 8:00am | 7/7/94 5:00pm | |
| 35 | DRAFT WORKPLAN | 20d | 8/2/93 8:00am | 8/27/93 5:00pm | |
| 36 | EPA REVIEW | 20d | 8/30/93 8:00am | 9/27/93 5:00pm | 35 |
| 37 | FINAL WORKPLAN | 15d | 9/28/93 8:00am | 10/19/93 5:00pm | 36 |
| 38 | EPA APPROVAL | 10d | 10/20/93 8:00am | 11/2/93 5:00pm | 37 |
| 39 | RW WORK | 30d | 9/28/93 8:00am | 11/9/93 5:00pm | 36 |
| 40 | DRAFT RW REPORT | 15d | 11/10/93 8:00am | 12/3/93 5:00pm | 39 |
| 41 | EPA REVEW | 20d | 12/6/93 8:00am | 1/14/94 5:00pm | 40 |
| 42 | FINAL RW REPORT | 10d | 1/17/94 8:00am | 1/31/94 5:00pm | 41 |
| 43 | EPA APPROVAL | 5d | 2/1/94 8:00am | 2/7/94 5:00pm | 42 |
| 44 | DRAFT 15% RW DESIGN | 60d | 12/6/93 8:00am | 3/15/94 5:00pm | 40 |
| 45 | EPA REVIEW | 40d | 3/16/94 8:00am | 5/10/94 5:00pm | 44 |
| 46 | FINAL 15% RW DESIGN | 20d | 5/11/94 8:00am | 6/8/94 5:00pm | 45 |
| 47 | EPA APPROVAL | 20d | 6/9/94 8:00am | 7/7/94 5:00pm | 46 |
| 48 | TASK 8.0  DESIGN | 70d | 1/24/95 8:00am | 5/2/95 5:00pm | |
| 49 | DRAFT WORKPLAN | 30d | 1/23/95 8:00am | 3/6/95 5:00pm | 3 |
| 50 | EPA REVIEW | 20d | 3/7/95 8:00am | 4/3/95 5:00pm | 49 |
| 51 | FINAL  WORKPLAN | 10d | 4/4/95 8:00am | 4/17/95 5:00pm | 50 |
| 52 | EPA  APPROVAL | 10d | 4/18/95 8:00am | 5/1/95 5:00pm | 51 |
| 53 | TASK 9.0 SITE MANT. | 85d | 8/2/93 8:00am | 12/3/93 5:00pm | |
| 54 | DRAFT SMA REPORT | 20d | 8/2/93 8:00am | 8/27/93 5:00pm | |
| 55 | EPA REVIEW | 10d | 8/30/93 8:00am | 9/13/93 5:00pm | 54 |
| 56 | FINAL SMA REPORT | 5d | 9/14/93 8:00am | 9/20/93 5:00pm | 55 |
| 57 | EPA APPROVAL | 5d | 9/21/93 8:00am | 9/27/93 5:00pm | 56 |
| 58 | DRAFT SM WP | 20d | 9/14/93 8:00am | 10/12/93 5:00pm | 55 |
| 59 | EPA REVIEW | 15d | 10/13/93 8:00am | 11/2/93 5:00pm | 58 |
| 60 | FINAL SM WP | 10d | 11/3/93 8:00am | 11/17/93 5:00pm | 59 |
| 61 | EPA APPROVAL | 10d | 11/18/93 8:00am | 12/3/93 5:00pm | 60 |
| 62 | TASK 10  GW RI/FS | 105d | 8/2/93 8:00am | 1/14/94 5:00pm | |
| 63 | DRAFT GW WP | 45d | 8/2/93 8:00am | 10/4/93 5:00pm | |
| 64 | EPA REVIEW | 30d | 10/5/93 8:00am | 11/17/93 5:00pm | 63 |
| 65 | FINAL GW WP | 15d | 11/18/93 8:00am | 12/10/93 5:00pm | 64 |
| 66 | EPA APPROVAL | 15d | 12/13/93 8:00am | 1/14/94 5:00pm | 65 |
| 67 | TASK 11  RGWM | 105d | 8/2/93 8:00am | 1/14/94 5:00pm | |
| 68 | DRAFT RGMA REPORT | 20d | 8/2/93 8:00am | 8/27/93 5:00pm | |
| 69 | EPA REVIEW | 15d | 8/30/93 8:00am | 9/20/93 5:00pm | 68 |
| 70 | FINAL RGMA REPORT | 10d | 9/21/93 8:00am | 10/4/93 5:00pm | 69 |
| 71 | EPA APPROVAL | 10d | 10/5/93 8:00am | 10/19/93 5:00pm | 70 |
| 72 | DRAFT RGWM WP | 20d | 9/21/93 8:00am | 10/19/93 5:00pm | 69 |
| 73 | EPA REVIEW | 20d | 10/20/93 8:00am | 11/17/93 5:00pm | 72 |

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 74 | FINAL RGWM WP | 15d | 11/18/93 8:00am | 12/10/93 5:00pm | 73 |
| 75 | EPA APPROVAL | 15d | 12/13/93 8:00am | 1/14/94 5:00pm | 74 |

| ID | Name | Duration | 1994 Qtr 4 | 1994 Qtr 1 | 1994 Qtr 2 | 1994 Qtr 3 | 1994 Qtr 4 | 1995 Qtr 1 | 1995 Qtr 2 | 1995 Qtr 3 | 1995 Qtr 4 | 1996 Qtr 1 | 1996 Qtr 2 | 1996 Qtr 3 | 1996 Qtr 4 | 1997 Qtr 1 | 1997 Qtr 2 | 1997 Qtr 3 | 1997 Qtr 4 | 1998 Qtr 1 | 1998 Qtr 2 | 1998 Qtr 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CONTINGENCY DECISION | 32d | | | | | | ▨ | | | | | | | | | | | | | | |
| 2 | DRAFT  15% SOL. DESIGN | 20d | | | | | | ▨ | | | | | | | | | | | | | | |
| 3 | EPA REVIEW | 30d | | | | | | | ▨ | | | | | | | | | | | | | |
| 4 | FINAL 15% SOL. DESIGN | 15d | | | | | | | ■ | | | | | | | | | | | | | |
| 5 | EPA APPROVAL | 10d | | | | | | | ■ | | | | | | | | | | | | | |
| 6 | TASK 5.0 CAP ANALYSIS | 260d | | ▨▨▨▨▨▨▨▨ | | | | | | | | | | | | | | | | | | |
| 7 | DRAFT WORKPLAN | 20d | ▨ | | | | | | | | | | | | | | | | | | | |
| 8 | EPA REVIEW | 20d | | ■ | | | | | | | | | | | | | | | | | | |
| 9 | FINAL WORKPLAN | 15d | | ■ | | | | | | | | | | | | | | | | | | |
| 10 | EPA APPROVAL | 10d | | ■ | | | | | | | | | | | | | | | | | | |
| 11 | RCRA ANALYSIS WORK | 45d | | ■ | | | | | | | | | | | | | | | | | | |
| 12 | DRAFT RCRA REPORT | 15d | | | ■ | | | | | | | | | | | | | | | | | |
| 13 | EPA REVEW | 20d | | | ■ | | | | | | | | | | | | | | | | | |
| 14 | FINAL RCRA REPORT | 10d | | | ■ | | | | | | | | | | | | | | | | | |
| 15 | EPA APPROVAL | 5d | | | ■ | | | | | | | | | | | | | | | | | |
| 16 | DRAFT 15% CAP DESIGN | 75d | | | | ■ | | | | | | | | | | | | | | | | |
| 17 | EPA REVIEW | 45d | | | | ■ | | | | | | | | | | | | | | | | |
| 18 | FINAL 15% CAP DESIGN | 20d | | | | | ■ | | | | | | | | | | | | | | | |
| 19 | EPA APPROVAL | 20d | | | | | ■ | | | | | | | | | | | | | | | |
| 20 | TASK 6..0 SLURRY WALLS | 225d | | ▨▨▨▨▨▨▨ | | | | | | | | | | | | | | | | | | |
| 21 | DRAFT WORKPLAN | 20d | ▨ | | | | | | | | | | | | | | | | | | | |
| 22 | EPA REVIEW | 20d | | ■ | | | | | | | | | | | | | | | | | | |
| 23 | FINAL WORKPLAN | 15d | | ■ | | | | | | | | | | | | | | | | | | |
| 24 | EPA APPROVAL | 10d | | ■ | | | | | | | | | | | | | | | | | | |
| 25 | SW WORK | 30d | | ■ | | | | | | | | | | | | | | | | | | |
| 26 | DRAFT ANALYSIS REPORT | 15d | | ■ | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/8/93

| Critical | ▨▨▨▨▨ | Progress | ▬▬▬ | Summary | ▼▬▬▼ |
|---|---|---|---|---|---|
| Noncritical | ■■■■ | Milestone | ◆ | Rolled Up | ◇ |

Page 1

| ID | Name | Duration | 1994 Qtr 4 | 1994 Qtr 1 | 1994 Qtr 2 | 1994 Qtr 3 | 1994 Qtr 4 | 1995 Qtr 1 | 1995 Qtr 2 | 1995 Qtr 3 | 1995 Qtr 4 | 1996 Qtr 1 | 1996 Qtr 2 | 1996 Qtr 3 | 1996 Qtr 4 | 1997 Qtr 1 | 1997 Qtr 2 | 1997 Qtr 3 | 1997 Qtr 4 | 1998 Qtr 1 | 1998 Qtr 2 | 1998 Qtr 3 |
|----|------|----------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | EPA REVEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 28 | FINAL SW REPORT | 10d | | | | | | | | | | | | | | | | | | | | |
| 29 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 30 | DRAFT 15% SW DESIGN | 60d | | | | | | | | | | | | | | | | | | | | |
| 31 | EPA REVIEW | 40d | | | | | | | | | | | | | | | | | | | | |
| 32 | FINAL 15% SW DESIGN | 20d | | | | | | | | | | | | | | | | | | | | |
| 33 | EPA APPROVAL | 20d | | | | | | | | | | | | | | | | | | | | |
| 34 | TASK 7.0 RETAINING WALL | 225d | | | | | | | | | | | | | | | | | | | | |
| 35 | DRAFT WORKPLAN | 20d | | | | | | | | | | | | | | | | | | | | |
| 36 | EPA REVIEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 37 | FINAL WORKPLAN | 15d | | | | | | | | | | | | | | | | | | | | |
| 38 | EPA APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |
| 39 | RW WORK | 30d | | | | | | | | | | | | | | | | | | | | |
| 40 | DRAFT RW REPORT | 15d | | | | | | | | | | | | | | | | | | | | |
| 41 | EPA REVEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 42 | FINAL RW REPORT | 10d | | | | | | | | | | | | | | | | | | | | |
| 43 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 44 | DRAFT 15% RW DESIGN | 60d | | | | | | | | | | | | | | | | | | | | |
| 45 | EPA REVIEW | 40d | | | | | | | | | | | | | | | | | | | | |
| 46 | FINAL 15% RW DESIGN | 20d | | | | | | | | | | | | | | | | | | | | |
| 47 | EPA APPROVAL | 20d | | | | | | | | | | | | | | | | | | | | |
| 48 | TASK 8.0  DESIGN | 70d | | | | | | | | | | | | | | | | | | | | |
| 49 | DRAFT WORKPLAN | 30d | | | | | | | | | | | | | | | | | | | | |
| 50 | EPA REVIEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 51 | FINAL  WORKPLAN | 10d | | | | | | | | | | | | | | | | | | | | |
| 52 | EPA  APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/8/93

Critical   Progress   Summary
Noncritical   Milestone ◆   Rolled Up ◇

Page 2

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|----|------|----------|------|--|--|--|------|--|--|--|------|--|--|--|------|--|--|--|------|--|--|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 53 | TASK 9.0 SITE MANT. | 85d | | | | | | | | | | | | | | | | | | | | |
| 54 | DRAFT SMA REPORT | 20d | | | | | | | | | | | | | | | | | | | | |
| 55 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 56 | FINAL SMA REPORT | 5d | | | | | | | | | | | | | | | | | | | | |
| 57 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 58 | DRAFT SM WP | 20d | | | | | | | | | | | | | | | | | | | | |
| 59 | EPA REVIEW | 15d | | | | | | | | | | | | | | | | | | | | |
| 60 | FINAL SM WP | 10d | | | | | | | | | | | | | | | | | | | | |
| 61 | EPA APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |
| 62 | TASK 10  GW RI/FS | 105d | | | | | | | | | | | | | | | | | | | | |
| 63 | DRAFT GW WP | 45d | | | | | | | | | | | | | | | | | | | | |
| 64 | EPA REVIEW | 30d | | | | | | | | | | | | | | | | | | | | |
| 65 | FINAL GW WP | 15d | | | | | | | | | | | | | | | | | | | | |
| 66 | EPA APPROVAL | 15d | | | | | | | | | | | | | | | | | | | | |
| 67 | TASK 11   RGWM | 105d | | | | | | | | | | | | | | | | | | | | |
| 68 | DRAFT RGMA REPORT | 20d | | | | | | | | | | | | | | | | | | | | |
| 69 | EPA REVIEW | 15d | | | | | | | | | | | | | | | | | | | | |
| 70 | FINAL RGMA REPORT | 10d | | | | | | | | | | | | | | | | | | | | |
| 71 | EPA APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |
| 72 | DRAFT RGWM WP | 20d | | | | | | | | | | | | | | | | | | | | |
| 73 | EPA REVIEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 74 | FINAL RGWM WP | 15d | | | | | | | | | | | | | | | | | | | | |
| 75 | EPA APPROVAL | 15d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/8/93

Critical

Noncritical

Progress

Milestone ◆

Summary

Rolled Up ◇

Page 3

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|---|---|---|---|---|---|
| 1 | PRP CP UAO | 0d | 8/12/93 8:00am | 8/12/93 8:00am | |
| 2 | DRAFT PP TASK 1 | 0d | 8/4/93 8:00am | 8/4/93 8:00am | |
| 3 | FINAL PP TASK 1 | 0d | 8/18/93 8:00am | 8/18/93 8:00am | |
| 4 | DRAFT WP TASK 2 | 0d | 8/20/93 8:00am | 8/20/93 8:00am | |
| 5 | FINAL WP TASK 2 | 0d | 9/10/93 8:00am | 9/10/93 8:00am | |
| 6 | DRAFT MTD RPT TASK 2 | 0d | 8/13/93 8:00am | 8/13/93 8:00am | |
| 7 | FINAL MTD RPT TASK 2 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 8 | DRAFT FIELD RPT TASK 2 | 0d | 10/25/93 8:00am | 10/25/93 8:00am | |
| 9 | FINAL FIELD RPT TASK 2 | 0d | 11/8/93 8:00am | 11/8/93 8:00am | |
| 10 | DRAFT WP TASK 3 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 11 | FINAL WP TASK 3 | 0d | 10/4/93 8:00am | 10/4/93 8:00am | |
| 12 | DRAFT THT RPT TASK 3 | 0d | 8/13/93 8:00am | 8/13/93 8:00am | |
| 13 | FINAL THT PRT TASK 3 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 14 | DRAFT EQ RPT TASK 3 | 0d | 8/10/93 8:00am | 8/10/93 8:00am | |
| 15 | FINAL EQ RPT TASK 3 | 0d | 8/20/93 8:00am | 8/20/93 8:00am | |
| 16 | DRAFT ATS DGN TASK 3 | 0d | 9/13/93 8:00am | 9/13/93 8:00am | |
| 17 | FINAL ATS DGN TASK 3 | 0d | 10/12/93 8:00am | 10/12/93 8:00am | |
| 18 | DRAFT F&T DGN TASK 3 | 0d | 9/13/93 8:00am | 9/13/93 8:00am | |
| 19 | FINAL F&T DGN TASK 3 | 0d | 10/12/93 8:00am | 10/12/93 8:00am | |
| 20 | DRAFT PAM DGN TASK 3 | 0d | 10/19/93 8:00am | 10/19/93 8:00am | |
| 21 | FINAL PAM DGN TASK 3 | 0d | 11/9/93 8:00am | 11/9/93 8:00am | |
| 22 | DRAFT PMP TASK 3 | 0d | 11/3/93 8:00am | 11/3/93 8:00am | |
| 23 | FINAL PMP TASK 3 | 0d | 11/29/93 8:00am | 11/29/93 8:00am | |
| 24 | DRAFT PILOT RPT TASK 3 | 0d | 2/2/94 8:00am | 2/2/94 8:00am | |
| 25 | FINAL PILOT RPT TASK 3 | 0d | 2/24/94 8:00am | 2/24/94 8:00am | |
| 26 | DRAFT WP TASK 4 | 0d | 2/1/94 8:00am | 2/1/94 8:00am | |
| 27 | FINAL WP TASK 4 | 0d | 3/23/94 8:00am | 3/23/94 8:00am | |
| 28 | DRAFT THT RPT TASK 4 | 0d | 3/16/94 8:00am | 3/16/94 8:00am | |
| 29 | FINAL THT PRT TASK 4 | 0d | 3/30/94 8:00am | 3/30/94 8:00am | |
| 30 | DRAFT EQ RPT TASK 4 | 0d | 3/11/94 8:00am | 3/11/94 8:00am | |
| 31 | FINAL EQ RPT TASK 4 | 0d | 3/23/94 8:00am | 3/23/94 8:00am | |
| 32 | DRAFT ATS DGN TASK 4 | 0d | 4/13/94 8:00am | 4/13/94 8:00am | |
| 33 | FINAL ATS DGN TASK 4 | 0d | 5/11/94 8:00am | 5/11/94 8:00am | |
| 34 | DRAFT F&T DGN TASK 4 | 0d | 4/13/94 8:00am | 4/13/94 8:00am | |
| 35 | FINAL F&T DGN TASK 4 | 0d | 5/11/94 8:00am | 5/11/94 8:00am | |
| 36 | DRAFT PAM DGN TASK 4 | 0d | 5/18/94 8:00am | 5/18/94 8:00am | |
| 37 | FINAL PAM DGN TASK 4 | 0d | 6/9/94 8:00am | 6/9/94 8:00am | |
| 38 | DRAFT PMP TASK 4 | 0d | 4/21/94 8:00am | 4/21/94 8:00am | |
| 39 | FINAL PMP TASK 4 | 0d | 5/12/94 8:00am | 5/12/94 8:00am | |
| 40 | DRAFT FS RPT TASK 4 | 0d | 8/22/94 8:00am | 8/22/94 8:00am | |
| 41 | FINAL FS RPT TASK 4 | 0d | 10/4/94 8:00am | 10/4/94 8:00am | |
| 42 | DRAFT SOL 15 % TASK 4 | 0d | 11/25/94 8:00am | 11/25/94 8:00am | |
| 43 | FINAL SOL 15% TASK 4 | 0d | 2/13/95 8:00am | 2/13/95 8:00am | |
| 44 | DRAFT WP TASK 5 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 45 | FINAL WP TASK 5 | 0d | 10/19/93 8:00am | 10/19/93 8:00am | |
| 46 | DRAFT RCRA REPORT | 0d | 1/7/94 8:00am | 1/7/94 8:00am | |
| 47 | FINAL RCRA REPORT | 0d | 2/22/94 8:00am | 2/22/94 8:00am | |
| 48 | DRAFT CAP 15% TASK 5 | 0d | 4/26/94 8:00am | 4/26/94 8:00am | |
| 49 | FINAL CAP 15% TASK 5 | 0d | 7/28/94 8:00am | 7/28/94 8:00am | |
| 50 | DRAFT WP TASK 6 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 51 | FINAL WP TASK 6 | 0d | 10/19/93 8:00am | 10/19/93 8:00am | |
| 52 | DRAFT SW REPORT | 0d | 12/3/93 8:00am | 12/3/93 8:00am | |
| 53 | FINAL SW REPORT | 0d | 1/31/94 8:00am | 1/31/94 8:00am | |
| 54 | DRAFT SW 15% TASK 6 | 0d | 3/15/94 8:00am | 3/15/94 8:00am | |
| 55 | FINAL SW 15% TASK 6 | 0d | 6/8/94 8:00am | 6/8/94 8:00am | |
| 56 | DRAFT WP TASK 7 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 57 | FINAL WP TASK 7 | 0d | 10/19/93 8:00am | 10/19/93 8:00am | |
| 58 | DRAFT SS REPORT | 0d | 12/3/93 8:00am | 12/3/93 8:00am | |
| 59 | FINAL SS REPORT | 0d | 1/31/94 8:00am | 1/31/94 8:00am | |
| 60 | DRAFT SS 15% TASK 7 | 0d | 3/15/94 8:00am | 3/15/94 8:00am | |
| 61 | FINAL SS 15% TASK 7 | 0d | 6/8/94 8:00am | 6/8/94 8:00am | |
| 62 | DRAFT WP TASK 8 | 0d | 3/6/95 8:00am | 3/6/95 8:00am | |
| 63 | FINAL WP TASK 8 | 0d | 4/17/95 8:00am | 4/17/95 8:00am | |
| 64 | DRAFT SM ANAL TASK 9 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 65 | FINAL SM ANAL TASK 9 | 0d | 9/20/93 8:00am | 9/20/93 8:00am | |
| 66 | DRAFT SM WP TASK 9 | 0d | 10/12/93 8:00am | 10/12/93 8:00am | |
| 67 | FINAL SM WP TASK 9 | 0d | 11/17/93 8:00am | 11/17/93 8:00am | |
| 68 | DRAFT GW WP TASK 10 | 0d | 10/4/93 8:00am | 10/4/93 8:00am | |
| 69 | FINAL GW WP TASK 10 | 0d | 12/10/93 8:00am | 12/10/93 8:00am | |
| 70 | DRAFT RGW ANAL TASK 11 | 0d | 8/27/93 8:00am | 8/27/93 8:00am | |
| 71 | FINAL RGW ANAL TASK 11 | 0d | 10/4/93 8:00am | 10/4/93 8:00am | |
| 72 | DRAFT RGW WP TASK 11 | 0d | 10/19/93 8:00am | 10/19/93 8:00am | |
| 73 | FINAL RGW WP TASK 11 | 0d | 12/10/93 8:00am | 12/10/93 8:00am | |

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 1 | PRP  CP UAO | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 2 | DRAFT PP TASK 1 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 3 | FINAL  PP TASK 1 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 4 | DRAFT WP TASK 2. | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 5 | FINAL  WP  TASK 2. | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 6 | DRAFT MTD RPT TASK 2. | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 7 | FINAL MTD RPT TASK 2. | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 8 | DRAFT FIELD RPT TASK 2 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 9 | FINAL FIELD RPT TASK 2 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 10 | DRAFT WP TASK 3 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 11 | FINAL WP TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 12 | DRAFT THT RPT TASK 3 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 13 | FINAL THT PRT TASK 3 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 14 | DRAFT EQ RPT TASK 3 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 15 | FINAL EQ RPT TASK 3 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 16 | DRAFT ATS DGN TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 17 | FINAL ATS DGN TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 18 | DRAFT F&T DGN TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 19 | FINAL  F&T DGN TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 20 | DRAFT PAM DGN TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 21 | FINAL PAM DGN TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 22 | DRAFT PMP TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 23 | FINAL PMP TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 24 | DRAFT PILOT RPT TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 25 | FINAL PILOT RPT TASK 3 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 26 | DRAFT WP TASK 4 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | | Progress | | Summary | |
|---|---|---|---|---|---|
| Noncritical | | Milestone | ◆ | Rolled Up | ◇ |

Page 1

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 27 | FINAL WP TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 28 | DRAFT THT RPT TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 29 | FINAL THT PRT TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 30 | DRAFT EQ RPT TASK 4 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 31 | FINAL EQ RPT TASK 4 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 32 | DRAFT ATS DGN TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 33 | FINAL ATS DGN TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 34 | DRAFT F&T DGN TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 35 | FINAL  F&T DGN TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 36 | DRAFT PAM DGN TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 37 | FINAL PAM DGN TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 38 | DRAFT PMP TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 39 | FINAL PMP TASK 4 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 40 | DRAFT FS  RPT TASK 4 | 0d | | | | | ◆ | | | | | | | | | | | | | | | |
| 41 | FINAL FS RPT TASK 4 | 0d | | | | | ◆ | | | | | | | | | | | | | | | |
| 42 | DRAFT SOL 15 % TASK  4 | 0d | | | | | ◆ | | | | | | | | | | | | | | | |
| 43 | FINAL SOL 15% TASK 4 | 0d | | | | | | ◆ | | | | | | | | | | | | | | |
| 44 | DRAFT WP TASK 5 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 45 | FINAL WP TASK 5 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 46 | DRAFT RCRA REPORT | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 47 | FINAL RCRA REPORT | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 48 | DRAFT CAP 15% TASK 5 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 49 | FINAL CAP 15% TASK 5 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 50 | DRAFT WP TASK 6 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 51 | FINAL WP TASK 6 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 52 | DRAFT SW REPORT | 0d | | ◆ | | | | | | | | | | | | | | | | | | |

| Project: | Critical | ▨▨▨▨ | Progress | ▬▬▬ | Summary | ▬▬▬ |
|---|---|---|---|---|---|---|
| Date: 7/7/93 | Noncritical | ▬▬▬ | Milestone | ◆ | Rolled Up | ◇ |

| ID | Name | Duration | 1994 Qtr 4 | 1994 Qtr 1 | 1994 Qtr 2 | 1994 Qtr 3 | 1994 Qtr 4 | 1995 Qtr 1 | 1995 Qtr 2 | 1995 Qtr 3 | 1995 Qtr 4 | 1996 Qtr 1 | 1996 Qtr 2 | 1996 Qtr 3 | 1996 Qtr 4 | 1997 Qtr 1 | 1997 Qtr 2 | 1997 Qtr 3 | 1997 Qtr 4 | 1998 Qtr 1 | 1998 Qtr 2 | 1998 Qtr 3 |
|----|------|----------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 | FINAL  SW REPORT | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 54 | DRAFT SW 15% TASK 6 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 55 | FINAL SW 15% TASK 6 | 0d | | | | | ◆ | | | | | | | | | | | | | | | |
| 56 | DRAFT WP TASK 7 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 57 | FINAL WP TASK 7 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 58 | DRAFT SS REPORT | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 59 | FINAL SS REPORT | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 60 | DRAFT SS 15% TASK 7 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 61 | FINAL SS 15% TASK 7 | 0d | | | | ◆ | | | | | | | | | | | | | | | | |
| 62 | DRAFT WP TASK 8 | 0d | | | | | | | | ◆ | | | | | | | | | | | | |
| 63 | FINAL WP TASK 8 | 0d | | | | | | | | | ◆ | | | | | | | | | | | |
| 64 | DRAFT SM ANAL TASK 9 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 65 | FINAL SM ANAL TASK 9 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 66 | DRAFT SM WP TASK 9 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 67 | FINAL SM WP TASK 9 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 68 | DRAFT GW WP TASK 10 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 69 | FINAL GW WP TASK 10 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 70 | DRAFT RGW ANAL TASK 1 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 71 | FINAL RGW ANAL TASK 11 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 72 | DRAFT RGW WP TASK 11 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 73 | FINAL RGW WP TASK 11 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |

| Project: Date: 7/7/93 | Critical | Progress | Summary |
|---|---|---|---|
| | Noncritical | Milestone ◆ | Rolled Up ◇ |

Page 3

94

8/8/93

# APPENDIX 3

**McCOLL SUPERFUND SITE**
**STATEMENT OF WORK FOR REMEDIAL DESIGN AND OTHER RESPONSE ACTIONS**
**APPENDIX 3 TO RESPONDENT McAULEY UNILATERAL ADMINISTRATIVE ORDER**
**IN THE SUPPORT OF JUNE 1993 RECORD OF DECISION**

PURPOSE:

The purpose of this Statement of Work (SOW) is to set forth the requirements for the remedial design (RD) of the selected remedy as defined in the Record of Decision (ROD) signed on June 30, 1993. The RD for this project includes all activities necessary to translate the ROD into the remedy to be constructed under the Remedial Action (RA). This includes all activities necessary to fully implement Soft Material Solidification (SMS) with a contingency of RCRA equivalent closure. This SOW includes ancillary work to allow the RD to proceed. It includes site security responsibilities at the site, and the performance of limited site maintenance activities (site mowing and fence repair).

FLOW PATH

This SOW includes the following tasks and sub-tasks:

**TASK 1.0: PROJECT MANAGEMENT**

      1.1 PROJECT PLANNING
      1.2 REPORTING

**TASK 2.0: SITE SECURITY**

      2.1 WORKPLAN (INCLUDING HEALTH AND SAFETY PLAN)

**TASK 3.0: SITE MAINTENANCE (EXCLUDING SITE MOWING AND FENCE REPAIR)**

      3.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN, COMMUNITY CONTINGENCY PLAN, AND AIR MONITORING PLAN)

1

TASK BY TASK DESCRIPTION

**TASK 1.0 PROJECT MANAGEMENT**

1.1 PROJECT PLANNING

The respondents shall submit a project management plan to EPA
within 30 days of the effective date of this UAO which contains,
at a minimum, the following information:

* the lead contact within the responding PRP organization
  with their full mailing address, phone number, and fax
  number.
* the project team assembled by the responding PRPs with the
  hierarchy identified
* all contractors and sub-contractors identified by task and
  sub-task
* critical flow path charts for the following:

    - the acquiring of a contractor to conduct site
      security activities
    - the acquiring of a contractor to conduct site
      maintenance activities

The respondent shall verbally notify EPA within 24 hours of
changes to the submitted project management plan, and will
provide EPA with hard copy addendum and/or modifications to the
project management plan within 5 days of verbal notification.

1.2 REPORTING

The respondents shall adhere to the following guidelines during
the life of project covered by the UAO:

1) Whenever field work occurs under the UAO, the respondents
   will submit weekly reports to EPA with the following
   information:

    * work planned
    * work completed
    * work planned for next week
    * observations made
    * deviations from original workplan
    * reasons for deviations
    * recommendations for additional work
    * status of community contingency plan monitoring

2) Whenever field work occurs under the UAO, the respondents
   shall contact EPA daily with a status report on the
   progress of the work and any issues or obstacles
   encountered.  This contact shall be made either through
   a phone call or daily fax. The EPA project manager will

2

determine the method of contact on an event by event basis.

3) All deliverables to EPA will be submitted with 6 copies attached.

4) All reports will be submitted to EPA both in hard copy and on computer disk. All reports will be submitted to EPA on high density disks formatted on DOS version 3.2 or higher. All reports will be submitted in Wordperfect version 5.1 or higher.

5) All schedules and critical path analysis charts will be submitted to EPA in hard copy and on computer disk. All reports will be submitted to EPA on high density disks formatted on DOS version 3.2 or higher. All reports will be submitted in Microsoft Project version 3.0 or higher.

6) A courtesy copy of all deliverables will be simultaneously be sent to the Department of Toxics Substance Control (DTSC).

7) Scoping meetings will be held upon EPA's request prior to the initiation of any task or sub-task contain within this UAO. These meetings will be scheduled within 3 days of EPA's request unless a longer period is agreed upon by EPA.

8) Review meetings will be held upon EPA's request to discuss comments on any deliverable contained within this UAO. These meetings will be scheduled within 3 days of EPA's request unless a longer period is agreed upon by EPA.

## TASK 2.0 SITE SECURITY

2.1 WORKPLAN (INCLUDING HEALTH AND SAFETY PLAN)

The respondent shall submit a workplan that documents the approach required to undertake site security activities at the site. The workplan will include a detailed schedule, a detailed cost estimate, and a health and safety plan.

The workplan submitted by the respondent shall include, at a minimum, the following:

* provisions for 24 hour security
* provisions for reporting monthly to EPA the parties that entered the site and purpose of entry
* provisions for obtaining EPA approval of site visitors prior to entry into the site

3

          * provisions for complete site tour on a 4 hour basis
            by security personnel

**TASK 3.0 SITE MAINTENANCE (SITE MOWING AND FENCE REPAIR)**

**3.1 WORKPLAN (INCLUDING SAMPLING AND ANALYSIS PLAN, QUALITY
    ASSURANCE PROJECT PLAN, HEALTH AND SAFETY PLAN,
    COMMUNITY CONTINGENCY PLAN, AND AIR MONITORING PLAN)**

The respondent shall submit a workplan that documents the
approach required to undertake site mowing and fence repair
activities.  The workplan will include a detailed schedule, a
detailed cost estimate, a sampling and analysis plan, a quality
assurance project plan, a health and safety plan, a community
contingency plan, and an ambient air monitoring plan.

The workplan submitted by the respondent shall include, at a
minimum, the following:

        * mowing of the entire site twice a year, at a minimum.
          Once in the spring and once in the fall.  In
          addition the respondent shall have the necessary
          resources available to respond to EPA request for
          site mowing on an as needed basis.  This will
          include weed removal in the bridal path that borders
          the site on the South.  It also includes weed
          removal from the area between Rosecrans Avenue and
          the site fence. For areas that are unaccessible to
          mowers, the grass/weeds will be cut using hand held
          equipment

        * raking and grass/weed removal concurrent with all
          mowing activities.  Cut material will not be left
          on-site for more than 5 days prior to off-site
          disposal.

        * Fence inspection quarterly.  This includes all chain
          link fencing, all wooden fencing, and all barbed
          wire.

        * Based on the quarterly inspection or an independent
          written request by EPA, the respondent shall be
          available to initiate fence repair within 3 working
          days.

        * Within five days of the completion of any site
          maintenance work performed a written report will be
          submitted to EPA containing, at a minimum, the
          following information:

                * work completed
                * contingency plan monitoring implemented

4

       * results of contingency plan monitoring
       * before and after picture of working area
       * recommendation for future work

## SCHEDULE:

Attachment 1 to this SOW is the overall project schedule.  The
duration of each task is given in working days consistent with
the definition in the UAO.  Attachment 2 is the detailed schedule
for tasks 1.0 through 3.0 (Project Planning, Site Security, and
Site Maintenance).  While the schedules given contain estimated
EPA review and approval time, EPA is not bound to these review
and approval times.  However the respondents are bound to their
portion of the schedule.  Compliance will be tracked by the
durations given within the schedule.  Therefore if a document has
a ten (10) day duration associated with it, the respondents have
ten working days to submit the document to EPA based on the date
that EPA delivered its' comments or approval.

## DELIVERABLES:

Attachment 3 is a listing of deliverables required under the UAO
as it exists today.  The dates associated with the deliverables
are based on estimated EPA review and approval times.  These
dates are subject to change based on the actual EPA review and
approval time.  Additional deliverables may be added to this list
based on the workplans that will be generated under this UAO.
Documents shall be added or deleted from this list only with
EPA's prior approval.  Compliance monitoring associated with the
deliverables under this UAO will be based upon this list of
deliverables and the durations documented in the individual
schedules in Attachment 2.

5

ATTACHMENT 8

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 1 | PROJECT PLANNING | 55d | 7/15/93 8:00am | 9/30/93 5:00pm | |
| 2 | SITE SECURITY | 105d | 8/2/93 8:00am | 1/14/94 5:00pm | |
| 3 | SITE MAINTENANCE | 125d | 8/2/93 8:00am | 2/14/94 5:00pm | |

| ID | Name | Duration | 1994 | | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 1 | PROJECT PLANNING | 55d | | | | | | | | | | | | | | | | | | | | |
| 2 | SITE SECURITY | 105d | | | | | | | | | | | | | | | | | | | | |
| 3 | SITE MAINTENANCE | 125d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| | |
|---|---|
| Critical | |
| Noncritical | |
| Progress | |
| Milestone | ◆ |
| Summary | |
| Rolled Up | ◇ |

Page 1

101

ATTACHMENT 2

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 1 | UAO EFFECTIVE DATE | 0d | 7/15/93 8:00am | 7/15/93 8:00am | |
| 2 | TASK 1.O PROJ. PLAN | 55d | 7/15/93 8:00am | 9/30/93 5:00pm | |
| 3 | DRAFT PROJ. MAN. PLAN | 30d | 7/15/93 8:00am | 8/25/93 5:00pm | |
| 4 | EPA REVIEW | 10d | 8/26/93 8:00am | 9/9/93 5:00pm | 3 |
| 5 | FINAL PROJ MAN PLAN | 10d | 9/10/93 8:00am | 9/23/93 5:00pm | 4 |
| 6 | EPA APPROVAL | 5d | 9/24/93 8:00am | 9/30/93 5:00pm | 5 |
| 7 | TASK 2.O SITE SECURITY | 105d | 8/2/93 8:00am | 1/14/94 5:00pm | |
| 8 | DRAFT WORKPLAN | 60d | 8/2/93 8:00am | 10/26/93 5:00pm | |
| 9 | EPA REVIEW | 20d | 10/27/93 8:00am | 11/24/93 5:00pm | 8 |
| 10 | FINAL WORKPLAN | 15d | 11/29/93 8:00am | 12/17/93 5:00pm | 9 |
| 11 | EPA APPROVAL | 10d | 1/3/94 8:00am | 1/14/94 5:00pm | 10 |
| 12 | TASK 3.0 SITE MAINT. | 125d | 8/2/93 8:00am | 2/14/94 5:00pm | |
| 13 | DRAFT WORKPLAN | 75d | 8/2/93 8:00am | 11/17/93 5:00pm | |
| 14 | EPA REVIEW | 20d | 11/18/93 8:00am | 12/17/93 5:00pm | 13 |
| 15 | FINAL WORKPLAN | 20d | 1/3/94 8:00am | 1/31/94 5:00pm | 14 |
| 16 | EPA APPROVAL | 10d | 2/1/94 8:00am | 2/14/94 5:00pm | 15 |

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 1 | UAO EFFECTIVE DATE | 0d | | | | | | | | | | | | | | | | | | | | |
| 2 | TASK 1.O PROJ. PLAN | 55d | | | | | | | | | | | | | | | | | | | | |
| 3 | DRAFT PROJ. MAN. PLAN | 30d | | | | | | | | | | | | | | | | | | | | |
| 4 | EPA REVIEW | 10d | | | | | | | | | | | | | | | | | | | | |
| 5 | FINAL PROJ MAN PLAN | 10d | | | | | | | | | | | | | | | | | | | | |
| 6 | EPA APPROVAL | 5d | | | | | | | | | | | | | | | | | | | | |
| 7 | TASK 2.O SITE SECURITY | 105d | | | | | | | | | | | | | | | | | | | | |
| 8 | DRAFT WORKPLAN | 60d | | | | | | | | | | | | | | | | | | | | |
| 9 | EPA REVIEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 10 | FINAL WORKPLAN | 15d | | | | | | | | | | | | | | | | | | | | |
| 11 | EPA APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |
| 12 | TASK 3.0 SITE MAINT. | 125d | | | | | | | | | | | | | | | | | | | | |
| 13 | DRAFT WORKPLAN | 75d | | | | | | | | | | | | | | | | | | | | |
| 14 | EPA REVIEW | 20d | | | | | | | | | | | | | | | | | | | | |
| 15 | FINAL WORKPLAN | 20d | | | | | | | | | | | | | | | | | | | | |
| 16 | EPA APPROVAL | 10d | | | | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | | Progress | | Summary | |
|---|---|---|---|---|---|
| Noncritical | | Milestone ◆ | | Rolled Up ◇ | |

Page 1

ATTACHMENT 3

| ID | Name | Duration | Scheduled Start | Scheduled Finish | Predecessors |
|----|------|----------|-----------------|------------------|--------------|
| 1 | DRAFT PP TASK 1 | 0d | 8/25/93 8:00am | 8/25/93 8:00am | |
| 2 | FINAL PP TASK 1 | 0d | 9/23/93 8:00am | 9/23/93 8:00am | |
| 3 | DRAFT WP TASK 2 | 0d | 10/26/93 8:00am | 10/26/93 8:00am | |
| 4 | FINAL WP TASK 2 | 0d | 12/17/93 8:00am | 12/17/93 8:00am | |
| 5 | DRAFT WP TASK 3 | 0d | 11/17/93 8:00am | 11/17/93 8:00am | |
| 6 | FINAL WP TASK 3 | 0d | 1/31/94 8:00am | 1/31/94 8:00am | |

| ID | Name | Duration | 1994 | | | | 1995 | | | | 1996 | | | | 1997 | | | | 1998 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | Qtr 1 | Qtr 2 | Qtr 3 |
| 1 | DRAFT PP TASK 1 | 0d | ◆ | | | | | | | | | | | | | | | | | | | |
| 2 | FINAL PP TASK 1 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 3 | DRAFT WP TASK 2 | 0d | | ◆ | | | | | | | | | | | | | | | | | | |
| 4 | FINAL WP TASK 2 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 5 | DRAFT WP TASK 3 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |
| 6 | FINAL WP TASK 3 | 0d | | | ◆ | | | | | | | | | | | | | | | | | |

Project:
Date: 7/7/93

| Critical | | Progress | | Summary | |
|---|---|---|---|---|---|
| Noncritical | | Milestone | ◆ | Rolled Up | ◇ |

Page 1

1

2
**Appendix B**
**1996 UAO**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Partial Consent Decree Among Plaintiff United States of America and Shell Oil Company (CV 91-0589 RJK (Ex))

SFUND RECORDS CTR
29658

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
Region IX

| | | |
|---|---|---|
| In The Matter Of: | ) | |
| | ) | |
| McColl Superfund Site, Fullerton, California | ) | |
| | ) | |
| Shell Oil Company, | ) | U.S. EPA |
| Union Oil Company of California, | ) | Docket No. 96-10 |
| Atlantic Richfield Company, and | ) | |
| Texaco, Inc., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| Proceeding Under Section 106(a) of the | ) | |
| Comprehensive Environmental Response, | ) | |
| Compensation, and Liability Act of 1980, | ) | |
| as amended (42 U.S.C. § 9606(a)). | ) | |
| | ) | |
| | ) | |

TABLE OF CONTENTS

    I. INTRODUCTION AND JURISDICTION . . . . . . . . . . . .   1

   II. BACKGROUND AND FINDINGS OF FACT . . . . . . . . . . .   2

  III. CONCLUSIONS OF LAW AND DETERMINATIONS . . . . . . . .   7

   IV. NOTICE TO THE STATE . . . . . . . . . . . . . . . . .   8

    V. ORDER . . . . . . . . . . . . . . . . . . . . . . . .   8

   VI. DEFINITIONS . . . . . . . . . . . . . . . . . . . . .   8

  VII. NOTICE OF INTENT TO COMPLY . . . . . . . . . . . . . .  11

 VIII. PARTIES BOUND . . . . . . . . . . . . . . . . . . . .  11

   IX. WORK TO BE PERFORMED . . . . . . . . . . . . . . . . .  13

    X. FAILURE TO ATTAIN PERFORMANCE STANDARDS . . . . . . .  20

   XI. EPA PERIODIC REVIEW . . . . . . . . . . . . . . . . .  20

  XII. ADDITIONAL RESPONSE ACTIONS . . . . . . . . . . . . .  21

 XIII. ENDANGERMENT AND EMERGENCY RESPONSE . . . . . . . . .  21

  XIV. EPA REVIEW OF SUBMISSIONS . . . . . . . . . . . . . .  22

   XV. PROGRESS REPORTS AND MEETINGS . . . . . . . . . . . .  23

  XVI. QUALITY ASSURANCE, SAMPLING AND DATA ANALYSIS . . . .  23

 XVII. COMPLIANCE WITH APPLICABLE LAWS . . . . . . . . . . .  24

XVIII. REMEDIAL PROJECT MANAGER . . . . . . . . . . . . . . .  25

  XIX. ACCESS TO SITE NOT OWNED BY RESPONDENT(S) . . . . . .  25

   XX. DATA/DOCUMENT AVAILABILITY . . . . . . . . . . . . . .  26

  XXI. RECORD PRESERVATION AND DATA MANAGEMENT . . . . . . .  29

 XXII. DELAY IN PERFORMANCE . . . . . . . . . . . . . . . . .  31

XXIII. ASSURANCE OF ABILITY TO COMPLETE WORK . . . . . . . .  31

 XXIV. UNITED STATES NOT LIABLE . . . . . . . . . . . . . . .  32

  XXV. ENFORCEMENT AND RESERVATIONS . . . . . . . . . . . . .  34

i

XXVI.   ADMINISTRATIVE RECORD   . . . . . . . . . . . . . . . . .  34

XXVII.  EFFECTIVE DATE AND COMPUTATION OF TIME . . . . . . . .  34

XXVIII. OPPORTUNITY TO CONFER . . . . . . . . . . . . . . . .  34

ATTACHMENTS

Attachment 1     Groundwater Record of Decision

Attachment 2     Source Record of Decision

Attachment 3     Scope  of  Work  for  McColl  Superfund  Site
Remedial Action Construction and Operation &
Maintenance

Attachment 4     Schedule and List of Deliverables

ii

1    ADMINISTRATIVE ORDER
2    FOR REMEDIAL DESIGN AND REMEDIAL ACTIONS

3    I. INTRODUCTION AND JURISDICTION
4    1.   This Order directs Shell Oil Company, Union Oil Company of
5    California,   Atlantic   Richfield   Company,   and   Texaco,   Inc.
6    (hereinafter "Respondents") to perform a remedial design for the
7    remedy described in the Record of Decision ("ROD") for the
8    Groundwater Operable Unit (dated May 15, 1996) (hereinafter
9    "Groundwater ROD") for the McColl Superfund Site ("the Site").   In
10   addition, this Order directs Respondents to implement the design
11   performed under Unilateral Administrative Order (UAO) 93-21 issued
12   July 8, 1993, as amended, for the Source Soils Operable Unit
13   (hereinafter "Source ROD"), attached to this Order as Attachment 1,
14   and the remedial design for the Groundwater ROD required herein, by
15   performing the remedial actions set forth in both the Groundwater
16   ROD and the Source ROD.   The Source ROD is attached to this Order
17   as Attachment 2 and is incorporated herein by reference.   The
18   Groundwater ROD is also attached to this Order as Attachment 3.
19   This Order is issued to Respondents by the United States
20   Environmental Protection Agency ("EPA") under the authority vested
21   in the President of the United States by section 106(a) of the
22   Comprehensive Environmental Response, Compensation, and Liability
23   Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9606(a).   This
24   authority was delegated to the Administrator of EPA on January 23,
25   1987, by Executive Order 12580 (52 Fed. Reg. 2926, January 29,
26   1987), and was further delegated to EPA Regional Administrators on
27   September 13, 1987 by EPA Delegation No. 14-14-B.   This authority
28   was further delegated to the Director, Hazardous Waste Management
29   Division, EPA Region 9 by Order R1290.43, dated October 26, 1988.

30   2.   All documents submitted to EPA by the Respondents pursuant to
31   this Order, or attachments thereto, and approved by EPA shall be
32   incorporated into this Order as a requirement of this Order and

1

1   shall be an enforceable part of this Order.  The Work performed by
2   the Respondents pursuant to this Order shall, at a minimum, comply
3   with the Statement of Work ("SOW") attached to this Order as
4   Attachment 4, and shall be consistent with the Groundwater and
5   Source RODs.

## II. BACKGROUND AND FINDINGS OF FACT

7   3.   The twenty-two acre McColl Superfund Site ("Site") is located
8   in Fullerton, Orange County, California, approximately 25 miles
9   southeast of Los Angeles.  Housing developments border the Site to
10  the east and south.  Developed but open areas of a golf course and
11  a regional park border the Site to the west.  An oil field occupies
12  an open area to the north.
13  4.   There are no active facility processes at the Site.  The Site
14  contains twelve large unlined pits, called sumps, filled with
15  refinery wastes placed there in the 1940's.  The sumps have been
16  periodically covered since then with drilling muds and fill
17  materials.  There are an estimated 100,000 cubic yards of waste and
18  contaminated materials at the Site.  The Source ROD and the
19  Groundwater ROD contain more detailed descriptions of the Site.
20  5.   A groundwater aquifer underlies the Site.  The present
21  horizontal groundwater flow is towards the southwest.  The aquifer
22  downgradient of the Site is used as a drinking water source by
23  residents of the City of Fullerton.  Depth to groundwater at the
24  Site is approximately 250 feet.
25  6.   The Site was included on the EPA National Priority List in
26  September 1982, pursuant to Section 105 of CERCLA, 42 U.S.C.
27  Section 9605.  See 40 C.F.R., Part 300, App. B.
28  7.   To fully study and undertake response activities, EPA divided
29  the Site into operable units.  The operable units for the Site
30  address the sump areas (i.e., source areas) and groundwater.  This
31  Order addresses both operable units.
32  8.   EPA has undertaken various response actions at the Site.
33  Following a remedial investigation and feasibility study by
34  Respondents, EPA selected an excavation and redisposal remedy to

2

1   address the source areas in 1984. The State of California
2   ("State") was designated the lead agency for the Site but was later
3   enjoined by a state court from implementing the remedy. EPA
4   undertook additional feasibility study work at the Site, and,
5   having assumed the lead in 1989, proposed an incineration remedy.
6   Following public comment and field testing on the proposed
7   incineration remedy, EPA reevaluated remedial alternatives.
8   9.   In August 1992, pursuant to Section 117 of CERCLA, 42 U.S.C
9   9617, EPA published its updated feasibility study, called the
10  Supplemental Reevaluation of Alternatives II, and issued a proposed
11  plan identifying soft-material solidification as the preferred
12  remedy for the source areas. This proposed plan also identified
13  installation of a Resource Conservation and Recovery Act (RCRA)
14  equivalent closure system as a contingency remedy in the event that
15  soft-material solidification was determined not to be feasible.
16  EPA, following extensive performance testing of soft-material
17  solidification, selected the contingency remedy of a RCRA
18  equivalent closure on September 28, 1995.
19  10.  The contingency remedy selected by EPA requires that a RCRA
20  equivalent closure be implemented. Specifically, the contingency
21  remedy for the source areas includes the following:  (1)
22  constructing a multilayer cap over the untreated sumps with a gas
23  collection and treatment system to prevent infiltration of water
24  and release of hazardous air emissions; (2) building subsurface
25  slurry walls around the sumps to prevent migration of water into
26  the waste and outward migration of contaminants; (3) stabilizing
27  steep slopes on the Site with retaining walls; and (4) conducting
28  groundwater monitoring. Operations and maintenance for the source
29  remedy will be necessary at the Site, which will include monitoring
30  and maintenance of the cap and slurry wall, as well as site
31  security and routine site maintenance. These requirements are
32  embodied in the Source ROD executed on June 30, 1993, and the Task
33  4 Full-Scale Demonstration Test Report of July 1995, both of which
34  the State had a reasonable opportunity to review and comment. The
35  Source ROD and the Task 4 Full-Scale Demonstration Test Report are

3

supported by an administrative record that contains the documents and information upon which EPA based the selection of both the preferred and contingency remedy. From September 1993, to April 1996, Respondents, under EPA's oversight, undertook a Remedial Investigation and Feasibility Study ("RI/FS") for the groundwater operable unit, pursuant to CERCLA and the National Contingency Plan, 40 C.F.R. Part 300.

11. Pursuant to section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the Groundwater FS and of the proposed plan for remedial action on February 15, 1996, and provided opportunity for public comment on the proposed remedial action.

12. EPA's decision to select infiltration controls with long-term monitoring for the groundwater remedy is embodied in the Groundwater ROD executed on May 15, 1996, which the State had a reasonable opportunity to review and comment. The Groundwater ROD is supported by an administrative record that contains the documents and information upon which EPA based the selection of the groundwater remedy. The administrative record was made available to the public at the time of the issuance of the proposed plan in March 1996.

13. EPA and the State have undertaken response actions at the Site, including ongoing site maintenance, site security, and oversight of actions taken by Respondents.

14. On May 23, 1990, EPA issued to Respondents and Phillips Petroleum, Inc., Unilateral Administrative Order No. 90-12 for Partial Remedial Investigation and Response Actions, which required, among other things, the Respondents to conduct response actions related to the groundwater. This Order was superseded by Unilateral Administrative Order No. 93-21 ("Order No. 93-21") which rendered Unilateral Administrative Order No. 90-12 null and void.

15. On July 8, 1993, EPA issued to the Respondents Order 93-21 which required that the Respondents perform soft material solidification tests, begin preliminary design of the solidification process and closure of the sumps, and perform the

4

1    groundwater remedial investigation and feasibility study.

2    16.  On September 28, 1995, concurrent with the selection of the
3    contingency remedy of closure without solidification, EPA amended
4    Order No. 93-21 by issuing a revised statement of work. EPA
5    selected the contingency remedy based upon significant community
6    opposition and unanticipated technical complexities which would
7    have likely led to further delays in implementation.   This
8    amendment directed the Respondents to proceed to final design of
9    the RCRA equivalent closure system for the source.   The design of
10   the closure system is ongoing and Order No. 93-21 is still in
11   effect and shall remain in effect until the final source design
12   deliverables are approved.

13   17.  The waste at the Site has a pH of less than 2.  In addition,
14   the waste contains various organic compounds including benzene,
15   toluene and xylene, inorganic chemicals including arsenic and
16   chromium, and high levels of sulfur compounds including sulfur
17   dioxide.  The principal threats at the Site include the inhalation
18   of benzene and sulfur dioxide, and the ingestion of arsenic.

19   18.  The Site, which is located on two parcels, contains twelve
20   unlined sumps.  One parcel is referred to as the "Ramparts" area
21   and the other the "Los Coyotes" area.  Each area contains six of
22   the twelve sumps.  All sumps contain large volumes of the hazardous
23   organic and inorganic compounds.  The waste material contained
24   within the sumps occurs as somewhat distinct types, segregated by
25   depth.  These types are considered distinct based on their physical
26   characteristics (properties).  The largest waste fraction consists
27   of a hard organic waste material (char) that occurs mainly in the
28   bottom layer of all sumps.  In the middle of the sumps is the tar
29   waste (soft material); however, the location and of the tar within
30   the sumps is quite variable.  The upper portion of the sumps is
31   comprised of soil or a combination of soil and drilling mud.
32   Release of the  wastes through the soil cover and onto the ground
33   surface has been regularly observed on the sumps.  In addition,
34   ongoing release of waste found in the sumps to the groundwater has
35   been detected. Organic and inorganic compounds, including benzene,

5

tetrahydrothiopene and arsenic have been detected in the perched and regional aquifers. Additional information regarding groundwater contamination is contained in the attached Groundwater ROD (see Attachment 1).

19. The exposure pathways of concern evaluated for potential health risks are: (1) inhalation of volatile organic compounds (VOCs) emitted from the sumps; (2) inhalation of fugitive dust and inorganic compounds generated by wind erosion; (3) incidental ingestion of contaminated soil and waste; (4) ingestion of contaminated soil; (5) dermal contact with contaminated soil and waste. Benzene and sulfur dioxide are the primary chemical of concern. Total carcinogenic risks due to this multipathway exposure is in the range of $3 \times 10^{-8}$ to $5 \times 10^{-4}$. Further information regarding source risks is contained in the attached Source ROD (see Attachment 2). Groundwater ingestion was evaluated in the Groundwater ROD and found to be an unacceptable risk for local perched water. Further information regarding groundwater risks is contained in the Groundwater ROD (see Attachment 1).

20. The contingency remedy selected for the source requires that a RCRA equivalent closure be implemented. To prevent further contamination, the groundwater remedy requires that infiltration of surface water be reduced. By doing so, the groundwater remedy will reduce or eliminate current and future site risks to within an acceptable range. Specifically, direct contact and inhalation risks discussed above will be reduced by: (1) constructing a multilayer cap over the untreated sumps with a gas collection and treatment system to prevent infiltration of water and release of hazardous air emissions; (2) building subsurface slurry walls around the sumps to prevent migration of water into the waste and outward migration of contaminants; and (3) stabilizing steep slopes on the site with retaining walls to prevent seismic failure. Future ingestion or inhalation of contaminated groundwater will be prevented by reducing the possibility of additional contaminants reaching the aquifer and by conducting groundwater monitoring.

6

1  This remedy will prevent human and environmental exposure of wastes
2  contained in the sumps.  This remedy will greatly reduce the
3  migration of contaminants into the perched and regional aquifers.
4  21.  Respondents, or their predecessors in interest, each generated
5  refinery waste sludge that was disposed of at the McColl Site.
6  Respondents, or their predecessors in interest, each arranged for
7  the disposal or treatment, or arranged with a transporter for
8  transport for disposal or treatment of hazardous substances that
9  each owned or possessed and that were disposed of at the McColl
10  Site.
11  22.  In February 1991, the United States and the State as co-
12  plaintiffs filed an action against the Respondents under Section
13  107(a) of CERCLA, 42 U.S.C. 9607(a) in federal district court
14  seeking past costs and a declaration of future liability.
15  23.  On September 28, 1993, the Court granted the United States and
16  State's motion for partial summary judgement on liability, (United
17  States, et al. v. Shell Oil Company, et al., 841 F. Supp. 962, C.D.
18  Cal.).  The Court found the Respondents liable as generators and
19  arrangers for disposal.
20                III. CONCLUSIONS OF LAW AND DETERMINATIONS
21  23.  The Site and any other area where hazardous substances have
22  come to be located is a "facility" as defined in Section 101(9) of
23  CERCLA, 42 U.S.C. § 9601(9).
24  24.  Each Respondent is a "person" as defined in Section 101(21) of
25  CERCLA, 42 U.S.C. § 9601(21).
26  25.  Respondents are each a "liable party" as defined in Section
27  107(a) of CERCLA, 42 U.S.C. § 9607(a) and are subject to this Order
28  under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).
29  26.  The substances found at the Site are "hazardous substances" as
30  defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).
31  27.  The past disposal and migration of hazardous substances from
32  the Site constitute "releases" as defined in Section 101(22) of
33  CERCLA, 42 U.S.C. § 9601(22).
34  28.  The potential for future migration of hazardous substances
35  from the Site poses a threat of a "release" as defined in Section

7

1  101(22) of CERCLA, 42 U.S.C. § 9601(22).

2  29.  The release and threat of release of one or more hazardous
3  substances from the facility may present an imminent and
4  substantial endangerment to the public health or welfare or the
5  environment.

6  30.  The contamination and endangerment at this Site constitute an
7  indivisible injury.  The actions required by this Order are
8  necessary to protect the public health, welfare and the
9  environment.

10                       IV. NOTICE TO THE STATE
11  31.  On July 10, 1996, prior to issuing this Order, EPA notified
12  the State that EPA would be issuing this Order.

13                            V. ORDER
14  32.  Based on the foregoing, Respondents are hereby ordered,
15  jointly and severally, to comply with the following provisions,
16  including but not limited to all attachments to this Order, all
17  documents incorporated by reference into this Order, and all
18  schedules and deadlines in this Order, attached to this Order, or
19  incorporated by reference into this Order.

20                          VI. DEFINITIONS
21  33.  Unless otherwise expressly provided herein, terms used in this
22  Order which are defined in CERCLA or in regulations promulgated
23  under CERCLA shall have the meaning assigned to them in the statute
24  or its implementing regulations.  Whenever terms listed below are
25  used in this Order or in the documents attached to this Order or
26  incorporated by reference into this Order, the following
27  definitions shall apply:

28        A.  "CERCLA" shall mean the Comprehensive Environmental
29  Response, Compensation, and Liability Act of 1980, as amended, 42
30  U.S.C. §§ 9601 et seq.

31        B.  "Day" shall mean a working day which shall mean a day
32  other than a Saturday, Sunday, or federal holiday, or the days

8

1    November 24 through 26 and December 20 through 31 of each year.  In
2    computing any period of time under this Order, where the last day
3    would fall on a day that is not a working day, the period shall run
4    until the end of the next working day.

5        C.   "EPA" shall mean the United States Environmental
6    Protection Agency.

7        D.   "Groundwater Record of Decision" or "Groundwater ROD"
8    shall mean the EPA Record of Decision relating to the Site, which
9    addresses the Groundwater Operable Unit signed on May 15, 1996, by
10    the Director of the Superfund Division, EPA Region 9, and all
11    attachments thereto (Attachment 1).

12        E.   "National Contingency Plan" or "NCP" shall mean the
13    National Contingency Plan promulgated pursuant to Section 105 of
14    CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, including
15    any amendments thereto.

16        F.   "Operable Unit" shall mean a discrete action that
17    comprises a incremental step toward comprehensively addressing site
18    problems.  This discrete portion of a remedial response manages
19    migration, or elimination or mitigates a release, threat of
20    release, or pathway of exposure.  The clean up of a site can be
21    divided into a number of operable units, depending on the
22    complexity of the problems associated with the site.  Operable
23    units may address geographical portions of the site, specific site
24    problems, or initial phases of an action, or may consist of any
25    actions that are concurrent but located in different parts of the
26    site.

27        G.   "Operation and Maintenance" or "O&M" shall mean all
28    activities required under the Operation and Maintenance Plan
29    developed pursuant to this Order and the Statement of Work approved
30    by EPA.

31        H.   "Paragraph" shall mean a portion of this Order identified
32    by an arabic numeral.

33        I.   "Performance Standards" shall mean those cleanup
34    standards, standards of control, design criteria, including those
35    presented in the Source Final Integrated Conceptual Design Report

9

and other substantive requirements, criteria, or limitations, identified in the Records of Decision and Statement of Work, that the Remedial Action and Work required by this Order must attain and maintain.

J.    "Remedial Action" or "RA" shall mean those activities including construction, operations, and maintenance of the remedy, to be undertaken by Respondents to implement the remedies contained in the source and groundwater RODs.   The Source and Groundwater remedial actions will be conducted in an integrated fashion and the combined effort will be referred to as the "Integrated Remedial Action".

K.    "Remedial Design" or "RD" shall mean those activities to be undertaken by Respondents to develop the final plans and specifications for the Remedial Action pursuant to the Source and Groundwater Remedial Design Work Plans.

L.    "Response Costs" shall mean all costs, including direct costs, indirect costs, and accrued interest incurred by the United States and the State to perform or support response actions at the Site.   Response costs include but are not limited to the costs of overseeing the Work, such as the costs of reviewing or developing plans, reports and other items pursuant to this Order and costs associated with verifying the Work.

M.    "Site" or "McColl Superfund Site" shall mean the property encompassing approximately 22 acres, located at 2650 Rosecrans Avenue, Fullerton, California, including all areas where hazardous substances were disposed or have come to be located, as described in the Source Record of Decision and the Groundwater Record of Decision.

N.    "Source Record of Decision" or "Source ROD" shall mean the EPA Record of Decision relating to the Site, which addresses the Source Operable Unit, and signed on June 30, 1993, by the Regional Administrator, EPA Region 9, and all attachments thereto.

O.    "Statement of Work," "SOW," shall mean the statement of work for implementation of the Final Integrated Remedial Action, and the Source and Groundwater Operations and Maintenance at the

10

1     Site, as set forth in Attachment 4 to this Order.  The Statement of
2     Work is incorporated into this Order and is an enforceable part of
3     this Order.
4         P.   "Section" shall mean a portion of this Order identified
5     by a roman numeral and includes one or more paragraphs.
6         Q.   "State" shall mean the State of California.
7         R.   "United States" shall mean the United States of America.
8         S.   "Work" shall mean all activities Respondents are required
9     to perform under this Order, including Remedial Design, Remedial
10    Action, and Operation and Maintenance for both the Groundwater and
11    the Source Operable Units, and any activities required to be
12    undertaken pursuant to this Order.

13                VII. NOTICE OF INTENT TO COMPLY
14    34. Respondents shall provide, not later than five (5) days after
15    the effective date of this Order, written notice to EPA's Remedial
16    Project Manager (RPM) stating whether they will comply with the
17    terms of this Order (**RA-1**).  If Respondents, or any one of them, do
18    not unequivocally commit to perform the work as provided by this
19    Order, they, or each so refusing, shall be deemed to have violated
20    this Order and to have failed or refused to comply with this Order.
21    Respondents' written notice shall describe, using facts that exist
22    on or prior to the effective date of this Order, any "sufficient
23    cause" defenses asserted by Respondents under sections 106(b) and
24    107(c)(3) of CERCLA.  The absence of a response by EPA to the
25    notice required by this paragraph shall not be deemed to be
26    acceptance of Respondents' assertions.

27                VIII. PARTIES BOUND
28    35.  This Order shall apply to and be binding upon each Respondent,
29    their directors, officers, employees, agents, successors, and
30    assigns.  Respondents are jointly and severally responsible for
31    carrying out all activities required by this Order.  No change in
32    the ownership, corporate status, or other control of any
33    Respondents shall alter any of the Respondents' responsibilities

11

1   under this Order.

2   36.  Respondents shall provide a copy of this Order to any
3   prospective owners or successors before a controlling interest in
4   Respondents' assets, property rights, or stock are transferred to
5   the prospective owner or successor.  Respondents shall provide a
6   copy of this Order to each contractor, sub-contractor, laboratory,
7   or consultant retained to perform any Work under this Order, within
8   five days after the effective date of this Order or on the date
9   such services are retained, whichever date occurs later.
10  Respondents shall also provide a copy of this Order to each person
11  representing any Respondent with respect to the Site or the Work
12  and shall condition all contracts and subcontracts entered into
13  hereunder upon performance of the Work in conformity with the terms
14  of this Order.  With regard to the activities undertaken pursuant
15  to this Order, each contractor and subcontractor shall be deemed to
16  be related by contract to the Respondents within the meaning of
17  section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).
18  Notwithstanding the terms of any contract, Respondents are
19  responsible for compliance with this Order and for ensuring that
20  their contractors, subcontractors and agents comply with this
21  Order, and perform any Work in accordance with this Order.

22  37.  Respondents' project coordinator shall be responsible for
23  overseeing Respondents' implementation of this Order.  All aspects
24  of the Work to be Performed by Respondents pursuant to this Order
25  shall be under the direction and supervision of the qualified
26  project coordinator.

27  38.  Within 5 days after the effective date of this Order,
28  Respondents shall notify EPA in writing of the name and
29  qualifications of the Respondents project coordinator, including
30  primary support entities and staff, proposed to be used in carrying
31  this Order (**RA-2**).  If at any time Respondents proposes to use a
32  different project coordinator, Respondents shall notify EPA and
33  shall obtain approval from EPA before the new project coordinator
34  performs any Work under this Order.

35  39.  EPA will review Respondents' selection of a project

12

1  coordinator according to the terms of this paragraph and Section
2  XIV of this Order.    If EPA disapproves of the selection of the
3  project coordinator, Respondents shall submit to EPA within 30 days
4  after receipt of EPA's disapproval of the project coordinator
5  previously selected, a list of project coordinators, including
6  primary support entities and staff, that would be acceptable to
7  Respondents.    EPA will thereafter provide written notice to
8  Respondents of the names of the project coordinators that are
9  acceptable to EPA.    Respondents may then select any approved
10 project coordinator from that list and shall notify EPA of the name
11 of the project coordinator selected within twenty-one (21) days of
12 EPA's designation of approved project coordinators.

13                          IX. WORK TO BE PERFORMED

14 40.  Respondents shall cooperate with EPA in providing information
15 regarding the Work to the public.    As requested by the RPM,
16 Respondents shall participate in the preparation of such
17 information for distribution to the public and in public meetings
18 which may be held or sponsored by EPA to explain activities at or
19 relating to the Site.
20 41.  As requested by the EPA RPM the Respondents shall submit to
21 EPA for approval a Communication and Coordination Plan ("CCP") that
22 specifies the requirements and procedures by which the Respondents
23 will communicate and coordinate with one another in carrying out
24 the requirements of the Order.    The CCP shall include at a minimum
25 the following:
26      T.   Communication Strategy.    The Respondents shall specify
27 how the project coordinator and the individual Respondents will
28 communicate and disseminate information relative to this Order.
29 The name, title, address and telephone number of the primary
30 contact person for each Respondent shall be included in the
31 communication strategy.
32      U.   Coordination of Efforts.    The Respondents shall describe
33 with specificity how the technical, financial, and administrative

13

122

1  requirements of this Order are to be coordinated and distributed
2  among and performed by the Respondents.  The CCP shall describe the
3  obligations of each and every Respondent in full.
4  42.  A duly authorized representative of each Respondent shall sign
5  the CCP prior to submission of the CCP to EPA.  Failure of any
6  Respondent to sign the CCP will constitute a violation of this
7  Order by the individual Respondent.
8  43.  The Respondents shall submit all proposed changes or
9  amendments to the CCP to EPA for approval.

10                    A. <u>Groundwater Remedial Design</u>
11  44.   EPA and the Respondents have agreed to integrate the source
12  and groundwater remedial actions at the final design stage.
13  Specifically, the remedial design for the Groundwater ROD will be
14  integrated with the ongoing remedial design for the Source ROD by
15  developing a single integrated design for both operable units. To
16  this end, preliminary design documents for the groundwater remedial
17  action have already been submitted.  The design of the source
18  closure containment system is currently being developed by the
19  Respondents pursuant to Order No. 93-21. Respondents shall
20  integrate the design of the groundwater response action with the
21  design of the Source response action in the Final Design required
22  under Order No. 93-21.
23  45.  Respondents shall submit, for EPA approval, this Integrated
24  Remedial Design in accordance with the schedule for the Final
25  Design required under Order No. 93-21.
26  46.  Respondents shall include as part of the Integrated Remedial
27  Design the following elements: (1) groundwater design criteria and
28  design philosophy; (2) results of additional groundwater field
29  sampling; (3) project delivery strategy; (4) groundwater design
30  plans, drawings and sketches; and (5) required groundwater
31  specifications in outline form.

32                B. <u>Integrated Remedial Action/Construction</u>
                            14

47. The Respondents shall prepare and submit for approval planning documents. Following EPA approval of the Integrated Design and construction planning documents the Respondents shall construct the remedial action. Construction of the remedial action shall include implementing temporary voluntary relocation of residents consistent with plans and guidance as approved by EPA.

48. The primary construction planning document shall be the Remedial Action/Construction Work Plan. The Respondents shall submit and implement the Remedial Action/Construction Work Plan consistent with the Final Integrated Remedial Design. Unless otherwise directed by EPA, Respondents shall not commence the construction at the Site prior to approval of the Remedial Action/Construction Work Plan.

48. The Respondents shall submit to EPA for approval, a Draft Remedial Action/Construction Work Plan within (thirty) 30 days after the effective date of this Order (**RA-3**). Respondents shall submit a proposed detailed schedule for completing all of the work required. The schedule shall address at a minimum site preparation and all construction activities up to and including O&M until EPA approval of the Remedial Action Report discussed in Paragraph 60. (RA-2)

49. The Remedial Action/Construction Work Plan shall be developed in accordance with the RODs, any ESDs and any amendments to the RODs, and the attached Statement of Work, and shall be consistent with the Integrated Remedial Design as approved by EPA (hereinafter "Final Integrated Remedial Design"). The Remedial Action/Construction Work Plan shall include methodologies, plans and schedules for completion of at least the following: (1) selection of the remedial action contractor; (2) implementation of the CQAP; (3) identification of and satisfactory compliance with applicable permitting requirements; (4) implementation of the Operation and Maintenance Plan; (5) implementation of the Community Contingency Plan; (6) development and submission of the Performance Standards assessment plan; and (7) development and submission of the Data Management Plan which addresses various forms of data

15

1    (paper, electronic, video, photographic). The Remedial

2    Action/Construction Work Plan shall also include a schedule for

3    implementing all remedial action tasks identified in the Statement

4    of Work and shall identify the initial formulation of Respondents'

5    Remedial Action Project Team (including the Supervising

6    Contractor). Upon approval by EPA, Respondents shall implement the

7    Remedial Action Construction according to the schedules in the

8    approved RA/CWP.

9    50. The Remedial Action/Construction Work Plan shall also include

10    the following major attachments which are intended to function as

11    independent field operational guides and are further described in

12    the SOW: a) a Residual Management Plan; b) Site perimeter and

13    Ambient Air Monitoring Plan; c) Interim Site Security and

14    Maintenance Plan; d) Health and Safety Plan; e) modified Community

15    Contingency Plan; f) Construction Quality Assurance Plan; and g)

16    Community Relations Plan. The Health and Safety Plan for field

17    activities shall conform to applicable Occupational Safety and

18    Health Administration and EPA requirements, including but not

19    limited to the regulations at 54 Fed. Reg. 9294. The Construction

20    Quality Assurance Plan document shall include a Field Sampling

21    Plan for measuring progress toward meeting the design criteria.

22    The Construction Quality Assurance Plan shall describe the approach

23    to quality assurance during construction activities at the Site and

24    shall specify a quality assurance official, independent of the

25    construction contractor, to conduct a quality assurance program

26    during the construction phase of the project.

27    51. The Final Integrated Remedial Design and the Remedial

28    Action/Construction Work Plan shall be planned and implemented in

29    a manner consistent with the attached Statement of Work, and shall

30    conform with EPA's "Superfund Remedial Design and Remedial Action

31    Guidance, OSWER Directive 9355.0-4A".

32    52. If Respondents seek to retain a construction contractor or

33    sub-contractors to assist in the performance of the Integrated

34    Remedial Action, then Respondents shall submit a copy of the

35    contractor or subcontractors solicitation documents to EPA upon

1  request by EPA and not later than five (5) days after publishing
2  the solicitation documents.
3  53.  Within (ten) 10 days after Respondents selection of a
4  construction contractor to be used in carrying out work under this
5  Order Respondents shall notify EPA in writing of the name, title,
6  and qualifications of the selected construction contractor (**RA-4**).
7  If at any time Respondents propose to change the construction
8  contractor, Respondents shall notify EPA. All personnel performing
9  work at the site must be qualified to perform those portions of the
10  work for which they are assigned.  Respondents shall submit
11  evidence that all portions of the work will be performed, not
12  merely reviewed, by personnel qualified to perform those portions
13  of the Work for which they have been assigned.
14  54.  The Work performed by Respondents pursuant to this Order
15  shall, at a minimum, achieve the performance standards specified in
16  the Source and Groundwater Records of Decision.
17  55.  Notwithstanding any action by EPA, Respondents remain fully
18  responsible for achievement of the performance standards specified
19  in the Source and Groundwater Records of Decision.  Nothing in this
20  Order, or in EPA's approval of the Statement of Work, or in the
21  Remedial Action/Construction Action Work Plans, or approval of any
22  other submission, shall be deemed to constitute a warranty or
23  representation of any kind by EPA that full performance of the
24  Remedial Actions achieve the Performance Standards set forth in the
25  Records of Decision. Respondents' compliance with such approved
26  documents does not preclude EPA from seeking additional work to
27  achieve the applicable design criteria.

28                    C. <u>Operations and Maintenance</u>
29  56.  Within ninety (90) days after EPA approves the Draft Remedial
30  Action/Construction Work Plan, (hereinafter "Final Integrated
31  Remedial Action/Construction Work Plan") Respondents shall submit
32  an Operation and Maintenance Plan for EPA review and approval (**RA-**
33  **5**).  Consistent with the integration of groundwater and source
34  response actions/construction, this document shall encompass

17

1  Operations and Maintenance for all Site activities, including
2  Groundwater and Source remedial actions and general site
3  maintenance. The Operations and Maintenance Plan activities shall
4  commence upon the EPA approval of the Remedial Action Report and
5  continue thereafter.  The O&M Plan shall include the following as
6  attachments: a) Long-term Groundwater Monitoring Plan; b) Long-term
7  Site Security Plan; d) Health and Safety Plan; and e) Remedy
8  Effectiveness Plan.
9  57.  Under the Operations and Maintenance Plan, the Respondents
10  shall continue to perform routine maintenance including landscape
11  maintenance.  The Respondents shall maintain the vegetative cover
12  and cut the grass and weeds covering all areas of the Site
13  including all slope and sump areas.
14  58.  As a part of the Operations and Maintenance Plan the
15  Respondents shall submit to EPA for review and approval a Security
16  Plan for the Site.  The Security Plan shall address on-site
17  continuous security.
18  59.  Respondents shall, prior to any off-site shipment of hazardous
19  substances from the Site to an out-of-state waste management
20  facility, provide written notification to the appropriate state
21  environmental official in the receiving state and to RPM of such
22  shipment of hazardous substances.  However, the notification of
23  shipments shall not apply to any off-Site shipments when the total
24  volume of all shipments from the Site to the State will not exceed
25  ten (10) cubic yards.
26      a.  The notification shall be in writing, and shall include
27  the following information, where available: (1) the name and
28  location of the facility to which the hazardous substances are to
29  be shipped; (2) the type and quantity of the hazardous substances
30  to be shipped; (3) the expected schedule for the shipment of the
31  hazardous substances; and (4) the method of transportation.
32  Respondents shall notify the receiving state of major changes in
33  the shipment plan, such as a decision to ship the hazardous
34  substances to another facility within the same state, or to a
35  facility in another state.

18

b.   The identity of the receiving facility and state will be determined by Respondents following the award of the contract for construction.  Respondents shall provide all relevant information, including information under the categories noted in paragraph (a) above, on the off-Site shipments as soon as practicable after the award of the contract and before the hazardous substances are actually shipped.

60.  a. Within thirty (30) days after Respondents conclude that the Integrated Remedial Action/Construction has been fully performed, Respondents shall so notify EPA by letter and shall schedule and conduct a pre-certification inspection to be attended by Respondents and EPA (**RA-6**).  The pre-certification inspection shall be followed by a Remedial Action Report submitted within (90) ninety days after the pre-certification inspection (**RA-7**).  The Remedial Action Report shall contain certification, by a registered professional engineer and the Respondents' project coordinator, that all Remedial Action/Construction activities have been completed in full satisfaction of the requirements of this Order and that all systems are operational and functional.  If, after completion of the pre-certification inspection and receipt and review of the written report, EPA determines that the Integrated Remedial Action or any portion thereof has not been completed in accordance with this Order, EPA shall notify Respondents in writing of the activities that must be undertaken to complete the Integrated Remedial Action/Construction and shall set forth in the notice a schedule for performance of such activities.  Respondents shall perform all activities described in the notice in accordance with the specifications and schedules established therein.  If EPA concludes, following the initial or any subsequent certification of completion by Respondents that the Integrated Remedial Action/Construction has been fully performed in accordance with this Order, EPA may notify Respondents that the Integrated Remedial Action/Construction has been fully performed.  EPA's notification shall be based on present knowledge and Respondents' certification to EPA, and shall not limit EPA's right to perform

19

1    periodic reviews pursuant to section 121(c) of CERCLA, 42 U.S.C.
2    § 9621(c), or to take or require any action that in the judgment of
3    EPA is appropriate at the Site, in accordance with 42 U.S.C.
4    §§ 9604, 9606, or 9607.
5         b. Within (five) 5 years after EPA approves the Remedial
6    Action Report and each (five) 5 years thereafter the Respondents
7    shall prepare a Five Year Review Report of the remedy implemented
8    for the Source and Groundwater for EPA review and approval (**RA-12**).
9    Prior to preparation of the report the Respondents shall submit to
10   EPA for review and approval an outline showing proposed contents of
11   the Five Year Review Report.

12            X. FAILURE TO ATTAIN PERFORMANCE STANDARDS
13   61.  In the event that EPA determines that additional response
14   activities are necessary to meet applicable Performance Standards,
15   EPA may notify Respondents that additional response actions are
16   necessary.
17   62.  Unless otherwise stated by EPA, within thirty (30) days of
18   receipt of notice from EPA that additional response activities are
19   necessary to meet any applicable Performance Standards, Respondents
20   shall submit for approval by EPA a work plan for the additional
21   response activities.  The plan shall conform to the applicable
22   requirements of sections IX, XVI, and XVII of this Order.  Upon
23   EPA's approval of the plan pursuant to Section XIV, Respondents
24   shall implement the plan for additional response activities in
25   accordance with the provisions and schedule contained therein.

26              XI. EPA PERIODIC REVIEW
27   63.  Under section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and any
28   applicable regulations, EPA may review the Site to assure that the
29   Work performed pursuant to this Order adequately protects human
30   health and the environment.  Until such time as EPA certifies
31   completion of the Work, Respondents shall conduct the requisite
32   studies, investigations, or other response actions as determined
33   necessary by EPA in order to permit EPA to conduct the review under

20

1   section 121(c) of CERCLA.  As a result of any review performed
2   under this paragraph, Respondents may be required to perform
3   additional Work or to modify Work previously performed.

4                    XII. ADDITIONAL RESPONSE ACTIONS
5   64.  EPA may determine that in addition to the Work identified in
6   this Order and attachments to this Order, additional response
7   activities may be necessary to protect human health and the
8   environment.  If EPA determines that additional response activities
9   are necessary, EPA may require Respondents to submit a work plan
10  for additional response activities.  EPA may also require
11  Respondents to modify any plan, design, or other deliverable
12  required by this Order, including any approved modifications.
13  65.  Not later than thirty (30) days after receiving EPA's notice
14  that additional response activities are required pursuant to this
15  Section, Respondents shall submit a work plan for the response
16  activities to EPA for review and approval.  Upon approval by EPA,
17  the work plan is incorporated into this Order as a requirement of
18  this Order and shall be an enforceable part of this Order.  Upon
19  approval of the work plan by EPA, Respondents shall implement the
20  work plan according to the standards, specifications, and schedule
21  in the approved work plan.  Respondents shall notify EPA of their
22  intent to perform such additional response activities within seven
23  (7) days after receipt of EPA's request for additional response
24  activities.

25                  XIII. ENDANGERMENT AND EMERGENCY RESPONSE
26  66.  In the event of any action or occurrence during the
27  performance of the Work which causes or threatens to cause a
28  release of a hazardous substance or which may present an immediate
29  threat to public health or welfare or the environment, Respondents
30  shall immediately take all appropriate action to prevent, abate, or
31  minimize the threat, and shall immediately notify the EPA Remedial
32  Project Manager (RPM).  If the RPM is not available, Respondents
33  shall notify the EPA Emergency Response Unit, Region IX (415-744-

21

1   2000.  Respondents shall take such action in consultation with the
2   RPM and in accordance with all applicable provisions of this Order,
3   including but not limited to the Health and Safety Plan and the
4   Contingency Plan.   In the event that Respondents fail to take
5   appropriate response action as required by this Section, and EPA
6   takes that action instead, Respondents shall be liable to EPA for
7   all costs of the response action not inconsistent with the NCP.
8   67.  Nothing in the preceding paragraph shall be deemed to limit
9   any authority of the United States to take, direct, or order all
10  appropriate action to protect human health and the environment or
11  to prevent, abate, or minimize an actual or threatened release of
12  hazardous substances on, at, or from the Site.

13                  XIV. EPA REVIEW OF SUBMISSIONS
14  68.  After review of any deliverable, plan, report or other item
15  which is required to be submitted for review and approval pursuant
16  to this Order, EPA may: (a) approve the submission; (b) approve the
17  submission with modifications; (c) disapprove the submission and
18  direct Respondents to resubmit the document after incorporating
19  EPA's comments; or (d) disapprove the submission and assume
20  responsibility for performing all or any part of the response
21  action.  As used in this Order, the terms "approval by EPA," "EPA
22  approval," or a similar term means the action described in
23  paragraphs (a) or (b) of this paragraph.
24  69.  In the event of an approval by EPA, Respondents shall proceed
25  to take any action required by the plan, report, or other item, as
26  approved or modified by EPA.
27  70.  Upon receipt of a notice of an EPA disapproval, Respondents
28  shall, within twenty-one (21) days or such time as specified by EPA
29  in its notice of disapproval, correct the deficiencies and resubmit
30  the plan, report, or other item for approval.  Notwithstanding the
31  notice of disapproval, or approval with modifications, Respondents
32  shall proceed, at the direction of EPA, to take any action required
33  by any non-deficient portion of the submission.
34  71.  If any submission is disapproved by EPA, Respondents shall be

22

1    deemed to be in violation of this Order.


2                XV. PROGRESS REPORTS AND MEETINGS

3    72.  In addition to the other deliverables set forth in this Order,

4    Respondents shall provide regular progress reports as directed by

5    EPA with respect to actions and activities undertaken pursuant to

6    this Order.  The progress reports shall be submitted on or before

7    the fifteenth day of each month following the effective date of

8    this Order unless otherwise directed by the RPM.   At a minimum

9    these progress reports shall: (1) describe the actions which have

10    been taken to comply with this Order during the prior month; (2)

11    include all results of sampling and tests and all other data

12    received by Respondents and not previously submitted to EPA; (3)

13    describe all work planned for the next 3 months with schedules

14    relating such work to the overall project schedule for RD/RA

15    completion; and (4) describe all problems encountered and any

16    anticipated problems, any actual or anticipated delays, and

17    solutions developed and implemented to address any actual or

18    anticipated problems or delays.

19    73. Upon three days advance notice by EPA, by telephone or in

20    writing, the project coordinator for Respondents shall attend a

21    meeting at a time and place determined by EPA, to discuss issues

22    relating to the contents of any deliverable, plan, report, or other

23    item which is required to be submitted for review and approval

24    pursuant to this Order, or relating to Work to be performed by

25    Respondents pursuant to this Order.


26      XVI. QUALITY ASSURANCE, SAMPLING AND DATA ANALYSIS

27    74.  Respondents shall use the quality assurance, quality control,

28    and chain of custody procedures described in the "EPA NEIC Policies

29    and Procedures Manual," May 1978, revised May 1986, EPA-330/9-78-

30    001-R, EPA's "Guidelines and Specifications for Preparing Quality

31    Assurance Program Documentation," June 1, 1987, EPA's "Data Quality

32    Objective Guidance," (EPA/540/G87/003 and 004), and any amendments

23

1  to these documents, while conducting all sample collection and
2  analysis activities required herein by any plan.   To provide
3  quality assurance and maintain quality control, Respondents shall:

4      a.   Use only laboratories which have a documented Quality
5           Assurance Program that complies with EPA guidance
6           document QAMS-005/80.

7      b.   Ensure that EPA personnel and EPA's authorized
8           representatives are allowed access to the laboratory and
9           personnel utilized by the Respondents for analyses.

10  75.  Respondents shall notify EPA not less than fourteen (14) days
11  in advance of any sample collection activity.  At the request of
12  EPA, Respondents shall allow split or duplicate samples to be taken
13  by EPA or its authorized representatives, of any samples collected
14  by Respondents with regard to the Site or pursuant to the
15  implementation of this Order.  In addition, EPA shall have the
16  right to take any additional samples that EPA deems necessary.

17              XVII. COMPLIANCE WITH APPLICABLE LAWS
18  76.  All activities by Respondents pursuant to this Order shall be
19  performed in accordance with the requirements of all federal and
20  State statutes and regulations.   EPA has determined that the
21  activities contemplated by this Order are consistent with the
22  National Contingency Plan (NCP) if performed in full compliance
23  with the RODs, this Order, and the plans and schedules approved
24  hereunder.
25  77.  Except as provided in section 121(e) of CERCLA and the NCP, no
26  permit shall be required for any portion of the Work conducted
27  entirely on-Site.  Where any portion of the Work requires a federal
28  or State permit or approval, Respondents shall submit timely
29  applications and take all other actions necessary to obtain and to
30  comply with all such permits or approvals.
31  78.  This Order is not, and shall not be construed to be a permit
32  issued pursuant to any federal or State statute or regulation.
33  79.  All materials removed from the Site shall be disposed of or
34  treated at a facility approved by the RPM and in accordance with

24

1  section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3); with the U.S.
2  EPA "Revised Off-Site policy," OSWER Directive 9834.11, November
3  13, 1987; and with all other applicable Federal, state, and local
4  requirements.

XVIII. PROJECT MANAGER

5
6  80.  All communications, whether written or oral, from Respondents
7  to EPA shall be directed to the RPM.  Unless otherwise directed by
8  EPA, Respondents shall submit to EPA three copies of all documents,
9  including plans, reports, and other correspondence, which are
10 developed pursuant to this Order.
11 The RPM is:
12          Patti Collins
13          U.S. EPA Region IX
14          75 Hawthorne Street, H-6-5
15          San Francisco, CA   94105
16          (415) 744-2229

17 81.  EPA has the unreviewable right to change its RPM.  If EPA
18 changes its RPM, EPA will inform Respondents in writing of the
19 name, address, and telephone number of the new RPM.
20 82.  The RPM shall have the authority lawfully vested in a RPM and
21 On-Scene Coordinator (OSC) by the National Contingency Plan, 40
22 C.F.R. Part 300.  EPA's RPM or Alternate RPM shall have authority,
23 consistent with the National Contingency Plan, to halt any work
24 required by this Order, and to take any necessary response action.

XIX. ACCESS TO SITE NOT OWNED BY RESPONDENT(S)

25
26 83.  If the Site, the off-Site area that is to be used for access,
27 property where documents required to be prepared or maintained by
28 this Order are located, or other property subject to or affected by
29 the clean up, is owned in whole or in part by parties other than
30 those bound by this Order, Respondents will obtain, or use their
31 best efforts to obtain, site access agreements from the present
32 owner(s) no less than thirty (30) days before access is necessary

25

134

1　and no later than 60 days after the effective date of this Order
2　(**RA-8**).   Such  agreements  shall  provide  access  for  EPA,  its
3　contractors and oversight officials, the state and its contractors,
4　and  Respondents  or  Respondents'  authorized  representatives  and
5　contractors, and such agreements shall specify that Respondents are
6　not EPA's representative with respect to liability associated with
7　Site  activities.    Respondents  shall  save  and  hold  harmless  the
8　United  States  and  its  officials,  agents,  employees,  contractors,
9　subcontractors,  or  representatives  for  or  from  any  and  all  claims
10　or  causes  of  action  or  other  costs  incurred  by  the  United  States
11　including  but  not  limited  to  attorneys  fees  and  other  expenses  of
12　litigation  and  settlement  arising  from  or  on  account  of  acts  or
13　omissions  of  Respondents,  their  officers,  directors,  employees,
14　agents,  contractors,  subcontractors,  and  any  persons  acting  on
15　their  behalf  or  under  their  control,  in  carrying  out  activities
16　pursuant  to  this  Order,  including  any  claims  arising  from  any
17　designation  of  Respondents  as  EPA's  authorized  representatives
18　under  section  104(e)  of  CERCLA.   Copies  of  such  agreement  shall  be
19　provided   to   EPA   prior   to   Respondents'   initiation   of   field
20　activities.    Respondents'  best  efforts  shall  include  providing
21　reasonable compensation to any off-Site property owner.   If access
22　agreements  are  not  obtained  within  the  time  referenced  above,
23　Respondents shall immediately notify EPA of its failure to obtain
24　access.   Subject  to  the  United  States'  non-reviewable  discretion,
25　EPA  may  use  its  legal  authorities  to  obtain  access  for  the
26　Respondents,  may  perform  those  response  actions  with  EPA
27　contractors at the property in question, or may terminate the Order
28　if Respondents cannot obtain access agreements.   If EPA performs
29　those tasks or activities with contractors and does not terminate
30　the  Order,  Respondents  shall  perform  all  other  activities  not
31　requiring access to that property, and shall be liable to EPA, for
32　all  costs  incurred  in  performing  such  activities.    Respondents
33　shall  integrate  the  results  of  any  such  tasks  undertaken  by  EPA
34　into its reports and deliverables.

26

## XX.   DATA/DOCUMENT AVAILABILITY

84.   Respondents may assert a claim of business confidentiality covering part or all of the information submitted to EPA pursuant to the terms of this Order under 40 C.F.R. § 2.203, provided such claim is not inconsistent with section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7) or other provisions of law.  This claim shall be asserted in the manner described by 40 C.F.R. § 2.203(b) and substantiated by Respondents at the time the claim is made. Information determined to be confidential by EPA will be given the protection specified in 40 C.F.R. Part 2.  If no such claim accompanies the information when it is submitted to EPA, it may be made available to the public by EPA or the state without further notice to the Respondents.  Respondents shall not assert confidentiality claims with respect to any data related to Site conditions, sampling, or monitoring.

85.   <u>Confidential Information.</u>  The information requested herein must be provided even though the Respondents may contend that it includes confidential information or trade secrets.  Respondents may assert a  confidentiality claim covering part or all of the information requested, pursuant to Sections 104(e)(7)(E) and (F) of CERCLA, 42 U.S.C. §§9604(e)(7)(E) and (F), and Section 3007(b) of RCRA, 42 U.S.C. §6927(b), and 40 C.F.R. §2.203(b).

86. If Respondents make a claim of confidentiality for any of the information submitted to EPA, Respondents' must prove that claim. For each document or response Respondents claim confidential, Respondents must separately address the following points:

1. clearly identify the portions of the information alleged to be entitled to confidential treatment;

2. the period of time for which confidential treatment is desired (e.g., until a certain date, until the occurrence of a specific event, or permanently);

27

3. measures taken by Respondents to guard against the undesired
   disclosure of the information to others;

4. the extent to which the information has been disclosed
   to others, and the precautions taken in connection
   therewith;

5. pertinent confidentiality determinations, if any, by EPA
   or other federal agencies, and a copy of any such
   determinations or reference to them, if available; and

6. whether Respondents assert that disclosure of the information
   would likely result in substantial harmful effects on
   Respondents' business competitive position, and if so, what
   those harmful effects would be, why they should be viewed as
   substantial, and an explanation of the causal relationship
   between disclosure and such harmful effects.

87. To make a confidentiality claim, Respondents shall stamp, or type, "confidential" on all confidential responses and any related confidential documents. Confidential portions of otherwise nonconfidential documents should be clearly identified. Respondents shall indicate a date, if any, after which the information need no longer be treated as confidential. Respondents shall submit their response so that all nonconfidential information, including any redacted versions of documents are in one envelope and all materials for which Respondents desire confidential treatment are in another envelope.

88. All confidentiality claims are subject to EPA verification. It is important that Respondents satisfactorily show that they have taken reasonable measures to protect the confidentiality of the information and that Respondents intend to continue to do so, and that it is not and has not been obtainable by legitimate means without your consent. Information covered by such claim will be disclosed by EPA only to the extent permitted by CERCLA Section

28

1   104(e).  If no such claim accompanies the information when it is
2   received by EPA, then it may be made available to the public by EPA
3   without further notice to Respondents.

4   89.  <u>Disclosure to EPA's Authorized Representatives.</u>  Information
5   which Respondents submit in response to this Order may be disclosed
6   by EPA to authorized representatives of the United States, pursuant
7   to 40 C.F.R. 2.310(h), even if Respondents assert that all or part
8   of it is confidential business information.  The authorized
9   representatives of EPA to which EPA may disclose information
10  contained in your response are as follows:

11       1.  Armstrong Data Services
12           EPA Contract Number 68-W5-0024
13       2.  ICF Kaiser
14           EPA Contract Number 68-W9-0059
15       3.  Department of Toxic Substances Control/California
16           Environmental Protection Agency

17  Any subsequent additions or changes in EPA contractors who may have
18  access to Respondents information submitted under this Order will
19  be published in the Federal Register or provided in writing by EPA.
20  This information may be made available to these authorized
21  representatives of EPA for any of the following reasons: to assist
22  with document handling, inventory, and indexing; or to assist the
23  State in pursuing its own cost recovery action.
24  90.  Respondents shall maintain for the period during which this
25  Order is in effect, an index of documents that Respondents claim
26  contain confidential business information.  The index shall
27  contain, for each document, the date, author, addressee, and
28  subject of the document.  Upon written request from EPA,
29  Respondents shall submit a copy of the index to EPA.

29

XXI.  RECORD PRESERVATION AND DATA MANAGEMENT

91.  Respondents shall provide to EPA upon request, copies of all documents and information within their possession and/or control or that of their contractors or agents relating to activities at the Site or to the implementation of this Order, including but not limited to sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, electronic files, videos, photographs, or other documents or information related to the Work.  Respondents shall also make available to EPA for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

92.  Until ten (10) years after EPA provides notice pursuant to paragraph Section IX paragraph 59 each Respondent shall preserve and retain all records and documents in its possession or control, including the documents in the possession or control of their contractors and agents on and after the effective date of this Order that relate in any manner to the Site.  At the conclusion of this document retention period, Respondents shall notify the United States at least ninety (90) calendar days prior to the destruction of any such records or documents, and upon request by the United States, Respondents shall deliver any such records or documents to EPA.

93.  Until ten (10) years after EPA provides notice pursuant to paragraph Section IX paragraph 59 of this Order, Respondents shall preserve, and shall instruct their contractors and agents to preserve, all documents, records, and information of whatever kind, nature or description relating to the performance of the Work.  Upon the conclusion of this document retention period, Respondents shall notify the United States at least ninety (90) days prior to the destruction of any such records, documents or information, and, upon request of the United States, Respondents shall deliver all such documents, records and information to EPA.

94.  Within thirty (30) days after the effective date of this

30

1    Order, Respondents shall submit a written certification to EPA's
2    RPM that they have not altered, mutilated, discarded, destroyed or
3    otherwise disposed of any records, documents or other information
4    relating to their potential liability with regard to the Site since
5    notification of potential liability by the United States or the
6    State or the filing of suit against it regarding the Site (**RA-9**).
7    Respondents shall not dispose of any such documents without prior
8    approval by EPA.  Respondents shall, upon EPA's request and at no
9    cost to EPA, deliver the documents or copies of the documents to
10    EPA.

11                   XXII. DELAY IN PERFORMANCE
12    95.  Any delay in performance of this Order that, in EPA's
13    judgment, is not properly justified by Respondents under the terms
14    of this paragraph shall be considered a violation of this Order.
15    Any delay in performance of this Order shall not affect Respondents
16    obligations to fully perform all obligations under the terms and
17    conditions of this Order.
18    96.  Respondents shall notify EPA of any delay or anticipated delay
19    in performing any requirement of this Order.  Such notification
20    shall be made by telephone to the RPM within forty eight (48) hours
21    after Respondents first knew or should have known that a delay
22    might occur.  Respondents shall adopt all reasonable measures to
23    avoid or minimize any such delay.  Within five (5) business days
24    after notifying EPA by telephone, Respondents shall provide written
25    notification fully describing the nature of the delay, any
26    justification for delay, any reason why Respondents should not be
27    held strictly accountable for failing to comply with any relevant
28    requirements of this Order, the measures planned and taken to
29    minimize the delay, and a schedule for implementing the measures
30    that will be taken to mitigate the effect of the delay.  Increased
31    costs or expenses associated with implementation of the activities
32    called for in this Order is not a justification for any delay in
33    performance.

31

1          XXIII. ASSURANCE OF ABILITY TO COMPLETE WORK
2  97.  Respondents shall demonstrate their ability to complete the
3  Work required by this Order and to pay all claims that arise from
4  the performance of the Work by obtaining and presenting to EPA
5  within thirty (30) days after effective date of this Order, one of
6  the following: (1) a performance bond; (2) a letter of credit; (3)
7  a guarantee by a third party; or (4) internal financial information
8  to allow EPA to determine that Respondents have sufficient assets
9  available to perform the Work (**RA-10**).   Respondents shall
10  demonstrate financial assurance in an amount no less than the
11  estimate of cost for the remedial design and remedial action
12  contained in the Records of Decision for the Site.  If Respondents
13  seek to demonstrate ability to complete the remedial action by
14  means of internal financial information, or by guarantee of a third
15  party, they shall re-submit such information annually, on the
16  anniversary of the effective date of this Order.  If EPA determines
17  that such financial information is inadequate, Respondents shall,
18  within thirty (30) days after receipt of EPA's notice of
19  determination, obtain and present to EPA for approval one of the
20  other three forms of financial assurance listed above.
21  98.  At least seven (7) days prior to commencing any work at the
22  Site pursuant to this Order, Respondents shall submit to EPA a
23  certification that Respondents or their contractors and
24  subcontractors have adequate insurance coverage or have
25  indemnification for liabilities for injuries or damages to persons
26  or property which may result from the activities to be conducted by
27  or on behalf of Respondents pursuant to this Order (**RA-11**).
28  Respondents shall ensure that such insurance or indemnification is
29  maintained for the duration of the Work required by this Order.

30                XXIV. UNITED STATES NOT LIABLE
31  99.  The United States, by issuance of this Order, assumes no
32  liability for any injuries or damages to persons or property
33  resulting from acts or omissions by Respondents, or their
34  directors, officers, employees, agents, representatives,

32

1   successors, assigns, contractors, or consultants in carrying out
2   any action or activity pursuant to this Order.  Neither EPA nor the
3   United States may be deemed to be a party to any contract entered
4   into by Respondents or their directors, officers, employees,
5   agents, successors, assigns, contractors, or consultants in
6   carrying out any action or activity pursuant to this Order.

7                    XXV. ENFORCEMENT AND RESERVATIONS
8   100. EPA reserves the right to bring an action against Respondents
9   under section 107 of CERCLA, 42 U.S.C. § 9607, for recovery of any
10  response costs incurred by the United States related to this Order
11  and not reimbursed by Respondent(s).  This reservation shall
12  include but not be limited to past costs, direct costs, indirect
13  costs, the costs of oversight, the costs of compiling the cost
14  documentation to support oversight cost demand, as well as accrued
15  interest as provided in section 107(a) of CERCLA.
16  101. Notwithstanding any other provision of this Order, at any time
17  during the response action, EPA may perform its own studies,
18  complete the response action (or any portion of the response
19  action) as provided in CERCLA and the NCP, and seek reimbursement
20  from Respondents for its costs, or seek any other appropriate
21  relief.
22  102. Nothing in this Order shall preclude EPA from taking any
23  additional enforcement actions, including modification of this
24  Order or issuance of additional Orders, and/or additional remedial
25  or removal actions as EPA may deem necessary, or from requiring
26  Respondents in the future to perform additional activities pursuant
27  to CERCLA, 42 U.S.C. § 9606(a), et seq., or any other applicable
28  law.  Respondents shall be liable under CERCLA section 107(a), 42
29  U.S.C. § 9607(a), for the costs of any such additional actions.
30  103. Notwithstanding any provision of this Order, the United States
31  hereby retains all of its information gathering, inspection and
32  enforcement authorities and rights under CERCLA, RCRA and any other
33  applicable statutes or regulations.

33

1     104. Respondents shall be subject to civil penalties under section

2     106(b) of CERCLA, 42 U.S.C. § 9606(b), of not more than $25,000 for

3     each day in which Respondent(s) willfully violates, or fails or

4     refuses to comply with this Order without sufficient cause.  In

5     addition, failure to properly provide response action under this

6     Order, or any portion hereof, without sufficient cause, may result

7     in liability under section 107(c)(3) of CERCLA, 42 U.S.C.

8     § 9607(c)(3), for punitive damages in an amount at least equal to,

9     and not more than three times the amount of any costs incurred by

10    the Fund as a result of such failure to take proper action.

11    105. Nothing in this Order shall constitute or be construed as a

12    release from any claim, cause of action or demand in law or equity

13    against any person for any liability it may have arising out of or

14    relating in any way to the Site.

15    106. If a court issues an order that invalidates any provision of

16    this Order or finds that Respondents have sufficient cause not to

17    comply with one or more provisions of this Order, Respondents shall

18    remain bound to comply with all provisions of this Order not

19    invalidated by the court's order.


20                XXVI. ADMINISTRATIVE RECORD

21    107.  Upon request by EPA, Respondents must submit to EPA all

22    documents related to the selection of the response action for

23    possible inclusion in the administrative record file.


24          XXVII. EFFECTIVE DATE AND COMPUTATION OF TIME

25    108. This Order shall be effective fifteen (15) days after the

26    Order is signed.  Unless otherwise stated in the Order, all times

27    for performance of ordered activities shall be calculated from this

28    effective date.


29            XXVIII. OPPORTUNITY TO CONFER

30    109. Respondents may, within ten (10) days after the Order is

31    signed, request a conference with EPA to discuss this Order.

32    110. The purpose and scope of the conference shall be limited to

34

1    issues involving the implementation of the response actions
2    required by this Order and the extent to which Respondents intend
3    to comply with this Order.  This conference is not an evidentiary
4    hearing, and does not constitute a proceeding to challenge this
5    Order.  It does not give Respondents a right to seek review of this
6    Order, or to seek resolution of potential liability, and no
7    official stenographic record of the conference will be made.  At
8    any conference held pursuant to Respondents' request, Respondents
9    may appear in person or by an attorney or other representative.
10    111. Requests for a conference must be by telephone followed by
11    written confirmation mailed that day to the RPM.

12    So Ordered, this 17 day of July, 1996.

13    BY:
14           Keith A. Takata, Director
15           Superfund Program
16           U.S. Environmental Protection Agency

35

**ATTACHMENT 3**

**Statement of Work for Remedial Action/Construction and
Operation & Maintenance
McColl Superfund Site**

The purpose of this statement of work (SOW) is to set forth the
requirements for the remedial action (RA) for the source
contingency remedy (RCRA-Equivalent Closure) and the groundwater
remedy.  These remedial actions are defined in the Records of
Decision (ROD) signed on June 30, 1993, and on May 15, 1996,
respectively.  This SOW is designed to provide the framework for
the conduct of the integrated RA and Operations and Maintenance
(O&M) activities at the McColl Superfund Site.  The SOW provides
the framework for technical deliverables and does not include all
deliverables required by the UAO.

GROUNDWATER DESIGN ACTIVITIES

A.   Background

EPA and the Respondents agree that integrating the source and
groundwater response actions will result in reduced costs and a
accelerated completion of the site-wide required construction and
O&M.  To expedite the groundwater remedial action, the
Respondents have initiated the evaluation of groundwater response
actions under the previously issued Unilateral Administrative
Order No. 93-21, which was initially issued to address both the
source design and the groundwater RI/FS.  The evaluation of
infiltration controls and monitoring requirements are consistent
with the groundwater ROD.  More specifically, the evaluation
includes:

   1. Redirection/management of water running onto the site,
      including;
      -locations of surface water flowing onto the site,
      -expected average volumes and 100 year flood volumes of
      water flowing onto the site, and
      -how water flowing onto the site will be handled.
   2. Lining drainage channels with low permeability materials
      by evaluating;
      -location of primary and secondary channels at the
      site,
      -materials proposed for lining channels.
   3. Grading areas adjacent to the closure containment system;
      -area proposed for grading to minimize standing water,
      -how grading will fit into the golf course design,
      -a map showing final site contours.


The Respondents shall complete the groundwater portion of the
Integrated Remedial Design consistent with EPA guidance and

1

comments provided to Respondents in the Technical Memoranda required under Order No. 93-21.  The Draft Integrated Remedial Design shall include a detailed cost estimate for construction of the groundwater portion of the integrated construction in addition to the following:

> 1. Purpose, overall objectives and design philosophy for the remedy;
> 2. Analysis of baseline infiltration rates and incremental reduction of infiltration due to implementation of the remedy; and
> 3. Detailed figures showing locations of the different components of the remedy.

INTEGRATED REMEDIAL ACTION TASKS AND DELIVERABLES

This SOW requires the Respondents to complete the following tasks and to prepare and develop the following draft and final deliverables for EPA review and approval:

<u>Remedial Action/Construction Work Plan</u> - The Respondents shall submit a Remedial Action/Construction Work Plan (RACWP). The RACWP shall form the basis for the approach to the implementation and construction of the Integrated Remedial Action which includes the RCRA closure, postclosure design and groundwater response actions.  The RACWP shall include, at a minimum, the following:

- identification of the remedial action team, and an organizational chart, including all contractors, key personnel and description of duties, including the Project Coordinator, the Resident Engineer, the Quality Assurance Team (QAT), the Design Engineer; description of the lines of authority in management of construction activities and contractor roles and relationships to the McColl Site Group (MSG), EPA and the State; and an outline of procedures to resolve misunderstandings, problems or disputes which may arise among the Respondents;

- description of the process that will be used to select and procure subcontractors;

- description of the general scope of remedial activities and a detailed description of major tasks and proposed sequence of major tasks;

- a detailed schedule for remedial action/construction and proposed process to continuously update the schedule; the project schedule shall identify major tasks, task duration, interdependencies, critical path, milestone dates, and key issues that may affect the schedule; detailed description of field construction progress reports and proposed frequency of reporting;

2

- description of procedures or methods to implement in the field to;

    - prevent nuisance sources,
    - capture, control and/or treat fugitive emissions/odors, and
    - prevent or minimize waste extrusion and exposure during construction activities.

- description of methods to implement Construction Quality Assurance/Quality Control Plan, including composition and qualifications of the independent QAT; procedures for quality control; procedures to collect data to validate completion of project; and requirements for project closeout.

The plans listed below shall be submitted as part of the RACWP. The documents shall be submitted as appendices to the RACWP plan so that they may serve as stand alone guides for field personnel.

A.   Residual Management Plan:

The Residual Management Plan shall describe procedures to handle, manage, treat, and/or dispose of residuals generated during construction activities.  These residuals may include, but are not limited to, the following:  decontamination liquids; segregated wastes; spent PPE; contaminated soils and clay slurries; and, excavation spoils.

B.   Site Perimeter and Ambient Air Monitoring Plan:

The Site Perimeter and Ambient Air Monitoring Plan shall set forth the plan for monitoring ambient air for worker health and safety and air along the perimeter of the Site to ensure the general safety of residents consistent with the Community Contingency Plan.

C.   Interim Site Security and Maintenance Plan (ISSMP):

The Interim Site Security and Maintenance Plan shall cover all security and maintenance activities from the effective date of the Order until the approval of the Remedial Action Report after which the implementation of the Operations and Maintenance Plan shall be in effect.   Some of the necessary activities that shall be included in the ISSMP include weed abatement, seep removal and treatment, security (24 hour guard), fencing repair and periodic inspection of sewage backflow devices.  The ISSMP shall list all anticipated activities.  The ISSMP may reference previously approved plans however, the plan shall clearly define new activities (e.g., Security or weed abatement).

D.   Health and Safety Plan:

3

The Health and Safety Plan (HSP) shall cover all field construction activities and meet applicable OSHA and EPA requirements (55 Fed. Reg 9294). The EPA may review and recommend modifications to the HSP however, EPA does not approve the HSP. The plan and the quality of implementation is subject to OSHA inspection and review at any time.

E.    Community Contingency Plan:

To address potential emergencies during construction that may impact the local community, the Respondents shall, if necessary, recommend modifications to the existing Community Contingency Plan. Recommendations to modify the plan must take into consideration the scope of construction activities and possible release and emergency scenarios, including spill control and countermeasure procedures, perimeter air monitoring and response times, on-site and off-site emergency procedures, and contingencies for a potential air emissions release.

F.    Construction Quality Assurance and Quality Control (QA/QC) Plan

The purpose of the Construction QA/QC Plan is to ensure, with a reasonable degree of certainty, that the completed project meets or exceeds all design criteria, plans, and specifications. The plan is to be prepared during the final stages of the remedial design and as a result the final plan deliverable may be modified by the RPM. The plan shall include, at a minimum, the following:

- responsibilities and authorities of all organizations and key personnel involved in the design and construction of the remedy, including a copy of a letter signed by construction contractor which describes the responsibilities and delegates the authorities of the quality control manager;

- names, duties, and qualifications of all proposed quality assurance personnel to demonstrate they possess the training and experience necessary to fulfill their identified responsibilities;

- detailed description of design and performance criteria for the subsurface barrier, cap cover components, and gas collection and treatment system;

- detailed description of all planned QC activities, including manufacturing quality assurance and quality control reviews and inspections, field construction quality control inspections and sampling and test procedures, QA/QC for laboratory testing, and frequency of these activities that will be used to monitor and control construction quality of the subsurface barrier, cap cover, and the gas collection and treatment system;

4

- methods of performing the quality control inspections, material acceptance and conformance sampling and testing for cap components and subsurface barriers, proposed dates and frequency of the inspections and field sampling, and description of testing procedures;

- control testing and calibration procedures for each specific test, including information which authenticates that personnel and laboratories performing the test are qualified and the equipment and procedures to be used complies with applicable standards;

- the acceptance and rejection criteria for observations, field or laboratory tests, or field inspections, and procedures and plans for implementing corrective measures;

- procedures for scheduling and managing submittal, including those of subcontractors, material manufacturers, off-site and on-site fabricators, suppliers, purchasing agents, earthwork contractors, and installation contractors;

- description of reporting requirements for quality assurance activities, including daily summary reports, inspection and testing reports, schedule of data submissions, inspection data formats and sheets, problem identification and corrective measure reports, evaluation reports, acceptance reports, final documentation and provisions for documentation storage and records access.

Technical guidance to be used in developing the quality assurance program can be found in the following documents: <u>Technical Guidance Document:  Construction Quality Assurance for Hazardous Waste Land Disposal Activities</u>, U.S. EPA, October 1986, OSWER Directive 9472.003; <u>Technical Guidance Document: Quality Assurance and Quality Control for Waste Containment Facilities</u>, EPA/600/R-3/182, U.S. EPA, Washington D.C.; and <u>Waste Containment Facilities: Guidance for Construction, Quality Assurance and Quality Control of Liner and Cover Systems</u>, 1995, Authors: D. Daniels, R. Koerner, ASCE Publication No. 40003.

G.   Community Relations Plan

This document shall encompass community relations for both the Groundwater and the Source and shall define the division of responsibility regarding responding to community concerns.  The document shall establish clear guidelines and goals for responding to the variety of concerns that may be expressed by residents.

The LTCRP shall provide a basis for responding to community concerns during O&M.  The plan shall include an outline of the information that will be provided to the community to address

5

ongoing concerns regarding site risks, property transactions and site security in addition to other concerns that may be anticipated.  The plain shall clearly establish individuals responsible for communication and identify individuals at local agencies that may require information regarding concerns raised by residents.  The plan shall generally outline roles and responsibilities.  The plan shall outline the method for informing residents of any important O&M activities (e.g. groundwater monitoring).  Advice on the development of the plan shall be solicited from Site property owners such as the Los Coyotes Country Club (LCX Corp.).

## Operation and Maintenance (O&M) Plan

The O&M Plan shall clearly define the O&M activities required for the Site.  The plan should consider historical Site Maintenance tasks. The initial draft of the O&M Plan shall be prepared by the Remedial Design contractor and submitted to EPA for review ninety (90) days after the approval of the RACWP. The O&M plan will include, at a minimum:

- a description of routine operation and maintenance, including a detailed description of all planned normal operation and maintenance activities and the (schedule) for these activities as applicable to: 1) cap cover and subsurface barrier systems; 2) the gas treatment system; 3) groundwater monitoring system; 4) general grounds, vegetation, and facilities maintenance; 5) surface water drainage system; and 6) the site perimeter (e.g., fencing).

- a description of potential operational or functional problems, including an analyses and description of potential operating problems as applicable to 1) the cap cover system; 2) the subsurface barrier; 3) the gas collection and treatment system; and 4) the surface water drainage system. The analyses shall include the sources of information regarding the potential operational or functional problems and common or proposed remedies to be employed to mitigate the problems.

- a description of routine monitoring and laboratory testing, including a description of routine monitoring tasks for the vadose zone, groundwater, and gas treatment efficiency; a description of required laboratory tests and their interpretation; required QA/QC procedures; a schedule of monitoring frequency, and if applicable, when and why these frequencies may be reduced or discontinued.

- a description of alternate O&M procedures, including an analyses of the vulnerability of the cap cover and subsurface barrier systems and additional resources that may

6

be required should a functional or operational failure occur and the alternate O&M procedures that would be implemented to prevent undue hazard.  The plan shall also include procedures to respond to on-site emergencies.

- a description of all major installation equipment for operation and maintenance of the 1) gas collection and gas condensate (and disposal), and the gas treatment systems, and 2) the vadose zone and groundwater monitoring systems. The plan shall include a maintenance and replacement schedule of site equipment and installed components, and monitoring requirements for gas treatment stack emissions, carbon breakthrough, and carbon changeout.

- an estimated annual budget for O&M activities, including all monitoring activities.

- a description of procedures for the maintenance and reporting of site records, including but not limited to: daily operating logs, laboratory records, operating cost records, personnel and maintenance records.  Mechanisms for reporting emergencies and submittal of routine monthly/annual O&M and monitoring reports to regulatory agencies shall also be included in the plan.

The following shall be provided as attachments to the O&M plan:

A.    Long Term Groundwater Monitoring Plan.

The plan shall include description of sample analytical methods, frequency, well locations and shall include modification to the approved Sample Plan or Quality Assurance Project Plan.

B.    Long-Term Site Security, Health and Safety

This document should provide details on how the respondents will ensure Site Security and Safety for workers and potential users of site surface areas.

The plan shall anticipate a range of security measures for the site based on the planned use and access scenarios.  The plan shall document how the Respondents are going to monitor security, back-up measures, redundancy measures, inspections and responses to trespassers or breach in the security system.

The plan shall document Health and Safety procedures for O&M site personnel.  The plan shall describe the O&M tasks, safety precautions, necessary equipment, protective equipment, etc.  The plan should also include contingency tasks in event of a system failure.

EPA guidance to be used for the development of a O&M plan and

7

cost estimates can be found in the following sources:  <u>RCRA Guidance Manual for Subpart G Closure and Post-Closure Care Standards and Subpart H Cost Estimating Requirements</u>, EPA/530-SW-87-010, and in <u>40 CFR Part 300, "National Oil and Hazardous Substances Pollution Contingency Plan" (1990)</u>.

### Remedial Action Report

A Remedial Action Report shall be prepared after final inspection.  This report shall include, at a minimum,

- a synopsis of the work defined in the EPA approved final design documents and RACWP and certification by the design and resident engineers that this work was performed;

- explanations of any modifications to work in the EPA-approved final design documents and remedial action workplan and why these were necessary for the project;

- description of outstanding construction items, if any, from the prefinal inspection and an indication that the items were resolved;

- certification by the design and resident engineers and quality control manager that the remedy is functional;

- documentation (data) substantiating that performance standards have been met;

- "Record Drawings" (changes to original design drawings or "as-built" drawings).

### Five Year Review Report

The Respondents shall submit to EPA a Five Year Review Report. The Five Year Review Report shall be consistent with EPA Directive 9355.7-02 (May 23, 1991).  The Five Year Review shall include, at a minimum, the following sections: Site Summary (description of site history, remedies and O&M requirements); Remedial Objectives; ARAR's Review; Site Inspection; Areas of Noncompliance; Statement of Protectiveness; Next Review; and Implementation Requirements.

8

**ATTACHMENT 4**

**Schedule and List of Deliverables**

The following is a list of deliverables and dates due to EPA, in
accordance with the Order.  This list is for reference.
Additional documents may be required based on field activities
and other contingencies at the Site.  EPA may extend the due date
for a given document without amending the Order.

| Number | Deliverable | Date Due |
|--------|-------------|----------|
| RA-1 | Notice of Intent to Comply | 5 days after effective date of Order |
| RA-2 | PRP Project Coordinator | 5 days after effective date of Order |
| RA-3 | RA/Construction Work Plan | 30 days after effective date of Order |
| RA-4 | Contractor Designation | 10 days after selection |
| RA-5 | O&M Work Plan | 90 days after approval of the RA/Construction Work Plan |
| RA-6 | RA Construction Notice | 30 days after construction completion |
| RA-8 | Site Access Agreements | 60 days after effective date of Order |
| RA-9 | Records Preservation Notice | 30 days after effective date of Order |
| RA-10 | Financial Assurance | 30 days after effective date |
| RA-11 | Contractor Insurance or Indemnification | 7 days prior to initiation of field activities |
| RA-7 | RA Report | within 90 days of the pre-certification inspection |
| RA-12 | 5 Year Review | within 5 years of approval of the RA Report |

153

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Appendix C
Site
Map**



Figure adapted from 2002 OM&M Annual Report (C2 REM, 5/1/03)

LEGEND:

McColl Site Boundary
Vertical Cutoff Wall
Ramparts Sump Parcels
Los Coyotes Sump Parcels
⊕ Groundwater Monitoring Well
⟵ Generalized Groundwater Flow Direction

N

| U.S. ARMY CORPS OF ENGINEERS SEATTLE DISTRICT | | |
|---|---|---|
| **McColl Site Plan** | | |
| Five-Year Review Report | | |
| Fullerton | **Figure 2** | California |

154

Partial Consent Decree Among Plaintiff United States of America and Shell Oil Company (CV 91-0589 RJK (Ex))